# EXHIBIT A

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Tyrone Ross,<br><br>Plaintiff,<br><br>v.<br><br>Maricopa County Community College District, an Arizona public entity; Brent Cooper; Mark Woehl,<br><br>Defendants. | Case No: 2:25-CV-01671-PHX-SMB |

DEPOSITION OF TYRONE ROSS

Mesa, Arizona

June 11, 2026

Prepared by:

Audra Littou, CVR
Certified Reporter
Certification No. 50152

CERTIFIED TRANSCRIPT

**Page 2**

I N D E X


| WITNESS | | PAGE |
|---|---|---|
| TYRONE ROSS | | |
| Examination by Mr. Pierce | | 4 |


EXHIBITS MARKED


| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Certificate of Competency | 26 |
| Exhibit 2 | Congratulations E-mail | 28 |
| Exhibit 3 | Response to Requests for Production | 30 |
| Exhibit 4 | E-mail String | 42 |
| Exhibit 5 | Letter | 60 |
| Exhibit 6 | E-mail Header | 61 |


**Page 3**

DEPOSITION OF TYRONE ROSS

taken on June 11, 2026, commencing at 8:55 a.m. at the law offices of Pierce Coleman, PLLC, 2812 North Norwalk, Mesa, Arizona 85215, before AUDRA LITTOU, a Certified Court Reporter.

* * *

APPEARANCES:

For the Plaintiff:
MILLS + WOODS LAW, PLLC
By: Sean A. Woods, Esq.
5055 North 12th Street
Phoenix, Arizona 85014
480-999-4556
swoods@millsandwoods.com

For the Defendants:
PIERCE COLEMAN, PLLC
By: Justin S. Pierce, Esq.
2812 North Norwalk, Suite 107
Mesa, Arizona 85215
602-772-5506
Justin@PierceColeman.com

Also present:
Alexandra N. Cayton, Pierce Coleman, PLLC
Sandra Garcia, Maricopa County Community Colleges District
Rachel Cox, Clerk
Mitzi Sandoval, Clerk

**Page 4**

TYRONE ROSS

the witness herein, having been first duly sworn in by the court reporter, was examined and testified as follows:

EXAMINATION

BY MR. PIERCE:

Q Would you mind stating your full name and spelling it for the record?

A Tyrone Dawayne Ross, T-y-r-o-n-e, D-a-w-a-y-n-e, R-o-s-s.

Q For purposes -- have you ever had a deposition taken before?

A No.

Q Okay. I'm going to explain a few things, at least, from my perspective. Perhaps your lawyer's already shared some stuff with you. We're not going to talk about that, but I wanted to just give you a rundown of -- of how this -- how this works from -- from my end. And by the way, you can call me Justin during the course of this. My name's Justin Pierce, I represent the Maricopa County Community Colleges District in the case, and do you prefer that me -- that I call you Tyrone, Mr. Ross, what's your preference?

A Tyrone.

Q Tyrone's good? Okay. A -- a deposition, again, from my perspective, you -- you're a plaintiff in a lawsuit, and -- and you filed a lawsuit making claims against the

**Page 5**

district. This is my opportunity, and really my only opportunity, to ever talk with you about it. Prior to today, we've never met; right?

A No.

Q And so, if -- if I'm looking at the case and trying to understand, you know, what all the bases are for what happened or what's -- what you've alleged to happen, it's not like I can pick up the phone and say, hey, Tyrone, can you explain this to me? You have a lawyer, so this is my chance to -- to just hear it directly from you and to get from you what it is that -- that you believe happened here that -- that brings us here today; okay?

A Yes.

Q I would say the most, to me, the most important thing in a deposition like this is, you -- you're obviously, you're under oath to tell the truth. You gotta tell the truth, but if you don't understand a question that I ask, I don't want you to answer it. I only want you to answer questions that you understand. So if I ask a question, which can happen, by the way, Tyrone, that just doesn't make any sense, I'm all over the place with some question, and if you don't understand it, I want you to say something like, hey, Justin, can -- can you rephrase that, or can you ask that again, or Justin, I don't understand that question, we're going to have to start that over; will you do that for

Page 6

me if that happens?
A Yes.
Q All right. You're doing great already, but this other thing, too, which is, we have a court reporter here that's taking down everything that we're -- that we're saying in this deposition. She can only do that if we have audible questions and answers with each other, and so head nods and uh-huhs are kind of hard for the court reporter to take down. So it's important that -- that everything be audible and, so that we have a clear record, that you and I don't talk over each other. And by the way, I'm notoriously bad at that, so if it happens, don't feel bad, I'll just -- I'll try and stop, and try and stop. It's human nature, you see where I'm going with a question, you -- you kind of see the end of my question, and so you jump in to answer it. Similarly, you're not quite done with the end of your answer, but I already can kind of tell where you're going, and I maybe try to jump in. I'm going to do my very best to not do that, and I'll ask you to do the same; okay?
A Yes.
Q All right. Are you taking any sort of medications or under any influence of anything today that you believe might impact your ability to understand my questions and to answer them truthfully?
A No.

Page 7

Q As I mentioned, this is just my opportunity to try to get from you an understanding of the case. This is not an interrogation. If you need a break at any point in time, you just say, hey, I need -- I need a break, or we have water here. The only thing I would say with regard to that is, if I've asked a question, I would ask you to answer it before taking a break. That's about it; okay?
A Okay.
Q All right. Why don't you, if you wouldn't mind giving me just a little bit of background as to your -- well, let's just say, you know, personal background. How old are you?
A I'm 36.
Q Okay. Did you go to high school?
A Yes, I did.
Q Did you graduate from high school?
A Yes, I did.
Q Where was that?
A California.
Q Okay. What year did you graduate from high school?
A A little bit after 2007.
Q Okay. When did you start the -- the program? As I understand it, it was the -- it was the Collision Repair Program at Gateway Community College. Is that -- is that

Page 8

what the program was?
A Yes.
Q When did you start that?
A Well, it took me five years to get in, so I -- I believe it was 2021 and 2022 semester.
Q Okay. So you -- you applied -- you got in in 2021, but it started in 2022?
A I believe I applied in 2021 --
Q Okay.
A -- and then, I think, somewhere in that year that -- it started, like, I believe in April or something like that.
Q Okay. April of 2022?
A Yeah.
Q Okay. What -- what were you doing between the time you graduated from high school until the time you came into the Collision Repair Program in April of 2022?
A Could you repeat that?
Q Yeah, what -- what -- were you just working, going to school, do -- you know, what was -- what were you doing? I think you said you graduated from high school in 2007?
A Yes.
Q From 2007 until 2022, were -- were you just working, were you going to school, were you doing anything else?

Page 9

A No, I wasn't working. I -- I was just going to, like, Scottsdale Community College, and then I went to Arizona State after that.
Q Okay. Did you -- did you graduate with any sort of a degree from either of those institutions?
A Yes.
Q Okay. What did -- what were your degrees?
A At Scottsdale, it was Associates in Arts, and then at Arizona State, it was Public Administration.
Q What -- what year did you graduate with the degree in Public Administration from ASU?
A It was -- it was during the time that Covid happened, so they postponed it. I believe it was in, like, that time that I was actually going to Gateway Community College. So around 2021-2022. I had, like, a late graduation.
Q Okay. When did you start the Public Administration program at ASU?
A I believe before Covid, so around 2018.
Q So the -- pretty big difference between Public Administration and -- and collision repair. What made you decide to make that change?
A Well, when I was going to Arizona State, I had a -- I had, like, accommodations that was OCR, it was -- or D -- DRC, which is Disability Resource Accommodations. So

prior to that time?
A No. I see my psychiatrist all the time.
Q Always, going back to when you were a kid?
A Yeah, because she -- she the one who gives me my medicine.
Q Okay. I want to make sure we're on the same page. It's probably my fault, 'cause I'm using these terms interchangeably. When I say receiving counseling or receiving therapy, that would also include a psychologist, a psychiatrist. And so now, rewinding, it sounds to me like since you were a kid, you've always been seeing a psychiatrist; is that right?
A Yes.
Q Okay. And then at some point along the way, your psychiatrist believed you -- you should maybe get some additional therapy from a -- from another type of counselor or therapist? Is that why you started receiving additional counseling or therapy?
A Yes.
Q Okay. And that was the 2022 time frame; is that right?
A Yes.
Q Okay. You mentioned earlier that you said you don't work because you receive the Social Security benefits; is that right?



A Yes.
Q Have you applied for jobs since you were -- graduated from high school?
A Well, for me to -- they had this program for me to complete my high school credits, so that way I could graduate because I didn't get to walk the stage in high school. So they -- they still allowed me to take a extra class, which was, like, we go work for, I guess, like, the places that they placed us at, and then I get my credits through that. That way I could get my high school diploma. And that's how I got my high school diploma.
Q Okay. So when did you get your high school diploma? When did you earn it?
A In 2007, just a little after high school ended.
Q Okay. So after you received that high school diploma, did you seek out any sort of work, apply for jobs, or anything?
A Well, I think a few of them, but I just, like, I just didn't know how to, like, do the job, so that's when I just, like, I knew that I couldn't work because, like, most of the stuff was -- was hard to fill out, even the paperwork. So I didn't really know what they were talking about on paperwork and things like that, so, you know, I didn't apply for no jobs.
Q Okay. And after you got through the -- the Public



Administration program at Arizona State University, got your diploma, I guess I -- I'm understanding you also did not apply for any jobs after that regarding -- to try to get a job in Public Administration; is that right?
A No, because when I was -- during the school when I was going for Public Administration, it was hard, so I was already working with my uncle and stuff like that with something that was more easier for me, which was, like, learning how to -- to, like, do parts because that's what I fell in love with.
Q Okay.
A Because, like I said, it reminded me, like, of our childhood with them Hot Wheel cars and stuff like that, and that's the type of cars that he would -- he would work on.
Q So you worked with him starting at about what year?
A Probably about, like, 2016.
Q Okay. And 2016, '17, '18, '19, you're applying for the -- the Collision Repair Program at Gateway Community College, but you're not getting in 'cause you're applying too late; is that right?
A Yeah, it started in 2017.
Q Okay. So then you get in the program in April of 2022, you started; is that right?
A I believe that's when I -- I started, yes.



Q Was it your understanding that it was a year-long program?
A I believe so.
Q So when you started the program in April of 2022, did you have an expectation of when you would be finishing the program?
A Yeah, about a year or two.
Q Okay. So you -- you figured, by -- at the time you started in April of 2022, you figured, okay, April of 2022, I'm hopefully gonna get this -- this certificate or whatever, the whatever you get from that program; is that fair?
A Yes.
Q Okay. So then at that point in time, April of 2023 -- and as I understand it, you did get the certificate; is that right?
A No, I didn't get that certificate. They gave it to me during mediation.
Q Well, are -- you're aware that the records of the university are that you have the certificate, it -- when it was issued in February of 2023; is that right?
A No. They never told me. I did not see a -- receive my certificate until I had a OCR in mediation. That's when they told me that I had my -- my paperwork, which was that, that they gave me right then and there.

Page 26

That's the first time that I had ever received it, and they told me that I couldn't even receive that because I didn't finish my -- my -- my clock hours. So to my recollection, I didn't even receive it because I didn't get to finish my clock hours, and that's what she e-mailed me and told me.
Q Right, but aren't there also e-mails in which you are e-mailed and told congratulations, you've earned the certificate?
A No, I don't remember that.
Q Okay. We'll pull those, too. Let's go ahead and mark this as Exhibit 1.
(Exhibit marked for identification.)
Q So we've marked as an exhibit to this deposition what -- what appears to be a Gateway Community College certification. Have you seen this document before?
A Yes.
Q Okay. Tell me when the first time you saw this document?
A At the OCR mediation.
Q When was that?
A Probably about after -- after I -- I did the second part of when we made an agreement for me to come back to class, so I -- I believe that was in, like, 2023, or -- yeah, 2323. The year after, later down the line -- the -- yeah, 2023.

Page 27

Q And we can -- we have documents that we can help with this, too, but tell me if this is your recollection. It -- wasn't it in December of 2022 that you -- that you left class? December 6th of 2022?
A I believe so.
Q And then you returned to class in February of 2023; is that right?
A I believe so.
Q When you returned to class in February of 2023, you were provided a -- a path to be able to finish the -- the course, is that right, within the next couple of months?
A Yes.
Q So then, with that timeline in mind, when -- does that help you remember when you first saw this -- this document?
A Yeah, it was probably, like, December of 2023 or something, during the mediations.
Q I -- I -- I'm confused. When you say the mediations, what mediations are you referring to?
A So after -- after the second course, when I was supposed to come back to class and finish my credits, after everything that happened during that time, right after that, I had a OCR complaint or, I think, during that time because the same things were happening when I first made my complaint after we made an agreement. So then I opened an

Page 28

OCR case, and then right after I left Gateway is when OCR e-mailed us about having a mediation, which is when I first sent this paperwork.
(Exhibit marked for identification.)
Q This is Exhibit 2. What I've placed in front of you is -- we've marked as Exhibit 2 to your deposition. It is an e-mail chain between Amy Diaz and you; do you see that?
A Yes.
Q Do you see that on Wednesday April 5th, 2023, that Amy Diaz wrote to you, "Congratulations on completing your program." Do you see that?
A Yes.
Q And that she would start a new e-mail who could tell you how to receive your certificate. Do you remember receiving that at that time?
A No.
Q Meaning, you don't remember receiving this e-mail?
A No, because once I completed the class, I couldn't even get back into my e-mail. The last thing that I -- the only thing that I remember was when I e-mailed her about what Mark Woehl had said about me.
Q Okay. But do you see that at the top you responded to the e-mail with your personal e-mail; do you see that?

Page 29

A Yes.
Q Do you have any reason to -- to doubt that -- that you responded to this e-mail?
A No, I didn't respond to this e-mail. I don't remember even getting an e-mail like this.
Q So this is an e-mail chain that has your name at the top of it from you --
A Yeah.
Q -- to Amy Diaz; correct?
A Yes.
Q So you sent this e-mail to Amy Diaz; right?
A The --
Q "Thank you, I appreciate that, my personal e-mail is," and then it's been redacted.
A No, I don't remember that.
Q So you don't remember sending that e-mail?
A No, I don't remember sending that e-mail.
Q Do you have -- do you have a reason to dispute that you -- that you did send this e-mail?
A No.
Q By the way, in preparation for your deposition today, what did you do to -- to prepare for today?
A Nothing really.
Q Did you meet with your lawyer? I'm not going to ask you about what your conversations were, 'cause that's

Page 30

a -- that's a privileged thing, but did you meet with your lawyer about it?
A No, I did not meet with my lawyer.
Q Okay. Not over the phone, or have any --
A He called me to tell me the dates --
Q Okay.
A -- of when I -- 'cause we had to reschedule.
Q Okay. Is that the only communication you've had with your lawyer about the deposition today?
A Like, to come to the deposition?
Q Right.
A Yeah.
Q Okay. How long was that conversation?
A Honestly, I can't -- it was yesterday, and he was just reminding me --
Q Well, again, you don't -- I don't need you to tell me about the -- the --
A Yeah, he just remind me about my deposition.
Q Okay. Did you review any documentation or anything in preparation for today?
A No.
Q Okay. Did I ask you about -- let's go ahead and mark that as three.
(Exhibit marked for identification.)
Q What I've placed before you is Exhibit 3. It is a

Page 31

request and a response in this case to discovery documents that we -- that we asked for. Have you seen that document before?
A This document?
Q Yeah.
A Yeah.
Q What -- what did you do to search for -- for documents that would be responsive to these -- these requests that we made?
A I don't understand.
Q So can you -- you can see in the document, we -- we made several requests, for example, for communications between you and any witnesses and such; do you see that?
A Yes.
Q What did you do to search for those things?
A I don't -- I didn't have any conversations with my friends that were my witnesses. We normally call each other or it was at school. We don't have any, like, formal communication, or text messages, or anything of that nature.
Q Okay. So did -- did you search your -- your e-mails or text messages for these sorts of things?
A Yeah.
Q Are you married?
A No.
Q Girlfriend?

Page 32

A No.
Q Any kids?
A No.
Q Other than the -- what sounds to me like mental health disabilities, whether it, you know, the schizophrenia, bipolar, learning disabilities, do you have any physical disabilities?
A No.
Q Have you ever been arrested or charged with a crime?
A When I was a teen, I believe.
Q Oh, just as a juvenile?
A Yeah.
Q So you've -- you've never been charged, convicted, arrested since the time you were an adult?
A No.
Q When was the last time you were at Gateway Community College?
A Like physically?
Q Yes.
A I cannot recollect that.
Q You finished the program in April of 2023; correct?
A Well, to you guys I finished, but in the -- in -- in the class, I didn't finish.

Page 33

Q Okay. So to Gateway Community College, you finished in April, 2023; that's your understanding?
A Yes.
Q Did you ever go back to Gateway Community College after April of 2023?
A I can't remember.
Q Would -- can you think of any reason you would have had to go back?
A Yeah, 'cause I believe I left, like, some of my stuff that I own there.
Q Okay.
A So I think that would be the only time that I went back.
Q So it would have been right after you finished the program?
A Probably, like, I think so. I believe so.
Q Like, in April of 2023?
A I believe so.
Q Okay. From April of 2023 forward, have you made any applications for -- for work in the collision repair industry?
A No.
Q Have you -- or I guess, have you made any applications for work in any industry? Anything at all?
A No. During the time when I was, I believe, during

Page 34

the second time when I was -- went back to Gateway, Mr. Hernandez was trying to help me apply for other places, which I did, but I didn't -- they didn't, like, never hit me back or anything like that.
Q And when you say when you went back the second time, are we talking about in February of 2023?
A Yes.
Q Okay. Did you have a good relationship with Mr. Hernandez?
A Yes.
Q In -- in anything that you believe has happened to you relating to the -- that gave rise to this lawsuit, do you have any -- was there -- was there anything that Mr. Hernandez did or didn't do that you were concerned about?
A Yes.
Q Okay. Tell me what that is.
A Well, when I went back the second time that -- that -- when we made the agreement and everything of that nature, Mr. Hernandez was scared to help me because he -- he said that didn't want to get in trouble and stuff like that. But then we had an argument about that because I told him that he was supposed to be the only person that teach me so that way we wouldn't run into no issues with Mr. Cooper. But then he, like I said, he was scared to help me, and he

Page 35

told me that he knew -- he -- he told me that he already know -- that I already knew that they didn't want him helping me, so that's why he didn't help me.
Q Okay. So this would have been in February, March time frame of 2023?
A Yes.
Q You came back in February of 2023, and it was supposed to be with Mr. Hernandez being your primary point of contact for the class; is that right?
A Yes.
Q Mr. Cooper was still there as part of the class at that time?
A Yes.
Q How often would you see him?
A Every day.
Q Okay. Until when?
A What do you mean?
Q When was the last time you saw Brent Cooper?
A The second time I went to class.
Q Ever?
A No, that's what I'm saying.
Q Yeah.
A The second time I went to class, every day.
Q Oh, okay. So are you aware that he was removed from the classroom in March of 2023?

Page 36

A No, because I was already gone by then. He did not -- that didn't happen until I left the school, which I found out during the mediation with the -- with the OCR.
Q Okay. So but the last time, though, that you saw Brent Cooper, or had any communication with him or any interaction with him, would have been in March of 2023; right?
A If that was the last day I went to class, yes, correct.
Q Well, if -- if the records are that Brent Cooper never went back to class after March of 2023, do you have any reason to dispute that you -- that the last time you saw him or had any interaction with him would have been in March of 2023?
A No, I seen Brent Cooper until the last day I was in class, physically at school. He just was on the other side.
Q Okay. What date was that?
A I -- I don't know the exact dates that I went to -- that was my last day of -- like, of class, but I could refer to my videos and stuff that I took during that time, and then I can tell you the exact dates.
Q Okay. Do you have reason to dispute that Brent Cooper was placed on -- March 9th -- that -- that Brent Cooper was placed on administrative leave and removed on --

Page 37

from Gateway Community College, gone from the campus, on March 9th of 2023?
MR. WOODS: Foundation.
BY MR. PIERCE:
Q You can still answer if you understand. I can rephrase if you need me to.
A Please. Can you rephrase it?
Q The records of the university are that March 9th, 2023, Brent Cooper was placed on administrative leave. My question for you is, do you have any reason to dispute that that's true?
MR. WOODS: Foundation. You can answer.
A I don't know the exact date that whatever Gateway did with Mr. Cooper, but I know for a fact that I seen Mr. Cooper every day of the second time that I went to class until I left the school.
BY MR. PIERCE:
Q What date was that, that you left the school?
A I would have to go back and look at it, because I don't remember the exact dates.
Q What's your best recollection today of when that was?
MR. WOODS: Form. You can answer.
A It would have to be, from what I remember, I seen, like, I seen Mr. Cooper until the day that the president had

came up there and asked me was I finished, and I told her I wasn't finished. But, you know, they wanted me out of the school, so I was basically sneaking around then to ask her for extra time.
BY MR. PIERCE:
Q So this is in early April of 2023?
A I can't say for -- for a fact. But I know, like, I took the -- the videos on my last day of school because that's when Mr. -- Mr. Hernandez wasn't trying to help me at all 'cause he was scared to help me after what they told him.
Q What videos are you referring to?
A Just, like, me recording myself and showing Mr. Hernandez is helping other students that wasn't even in the -- the school, but he was supposed to be helping me, and he didn't help me at all because of what he told me afterwards. So when he told me that the school didn't want him helping me, he didn't help me at all. Like, he tried to stay away from me, and I had to, like, actually go over there and ask him for help, and we had a big argument because of that. And, you know, afterwards, I told him that I was just a little frustrated because he was my only help from the school and me completing the class, and now he's not helping me. He was helping other students that had graduated during my time, and they weren't even supposed to



be at the school.
Q It -- it sounds to me like that timeline would have been in February, March time frame because Amy Diaz is telling you on April 5th that you've completed your program. Do you have reason to believe that it was after April 5th, or before April 5th of 2023?
A No, I believe she was just saying that to -- to cover her tracks because like I told you, when -- the day she came to me, I even told her that I wasn't finished with my -- with my car at all, so right after that, like, it was to a point where, like, I think I was running out of time completely, so I just gave up. I just said -- I just lied to her and told her I was done with the -- with the class and I'm -- I'm okay, I'm just ready to go. So I never completed the class completely because the second time I went, like I said, I really didn't have no help either the second time, so I just quit and told her that I was done. But that's why I said I think that's her just covering her tracks because I did tell her I was done because of after what they want -- after Mr. Hernandez told me they wanted me gone anyways.
Q And so, when you told her that you were done, that wasn't true?
A No, it wasn't true. I was just, I was done fighting. I was done asking, I was done trying to beg



Mr. Hernandez for help, and I even told her myself when she seen me, and I told her you could see my car, it's not completely done. Mark Woehl said that he wanted me out of the school by Friday, and I was just done with the whole program.
Q That -- was that before or after you got this e-mail from Amy Diaz?
A It was before that. She actually came to -- to the school to see me because of the e-mail I sent her about what Mark had told Mr. Hernandez about me. Mark told Mr. Hernandez that he wanted me -- and I don't know if I'm supposed to say the exact what he said, but I don't -- I don't want to get in trouble by saying it, but Mark told Mr. Hernandez that he didn't care if I was done or not, he wanted me the fuck out of that school by Friday. So Mr. Hernandez came and told me that, and I turned around and told Amy Diaz that in that -- in the e-mails. And I told her exactly what was told to me. I said apparently Mark Woehl wanted me out of here by Friday. I'm not done with my car. And then, all of a sudden, that's when I see her come the next day to check on me.
Q So you were told they wanted you out by Friday. That was Friday, what date?
A I can't remember the exact dates, but that date that he told me was -- it was probably a Monday or Tuesday,



because my -- my time was ended on that Friday. Whatever that timeline that they had gave me.
Q Okay.
A And I explained to Mr. Hernandez that I wasn't even close to being done by that time -- by that time frame, and he literally told me Mark said he wanted me the fuck out of the school by Friday. He did not care if I was finished or not. And that's when I told Mr. Hernandez thank you for telling me that, because what I was feeling and how I felt was actually true, and that's why I was uncomfortable to stay there after that. Again, the second time.
Q And so you never did go back then; right?
A After the second time. After the day I seen Amy Diaz and I just told her I'm good, I'm okay how my car looks, I'm just ready to go. And then she sent that e-mail afterwards, because I believe --
Q That e-mail being the one that we marked as Exhibit 1; right?
A No.
Q What you talking about?
A The e-mail that I told her about what Mark Woehl said about he wanted me out of the school by Friday. That e-mail I sent to her. And the -- then Mark called me that same night and said what I -- what I -- what he told Mr. Hernandez, Mr. Hernandez took it out of proportion, that

Page 42

that's not what he said, he -- I don't know how he got my phone. I don't know how he even got in touch with me, but he texted me and called me that night to -- to -- to try to cover up what he said about me.
Q This is Exhibit 4.
(Exhibit marked for identification.)
Q I've placed what we've marked as Exhibit 4 to the deposition in front of you. This is a continuation, or it might be just -- it might be a new chain with you and Amy. You're referring to text or e-mail messages. I'm wondering if this is the e-mail message you're talking about. Do you recall -- do you recognize this e-mail chain with Amy?
A I don't remember this specifically, but I know this is my e-mail because my name is on it.
Q At the very top of the chain is a -- is an e-mail from you to her that said -- it's on Wednesday April 5th, 2023, and you say, "Good morning, for my last day how would I clock out just clock out? Or would I need to head to the front office and do that? I know we don't have like a graduation so I was wondering how do I go about it?" Do you remember asking that question to Amy?
A No.
Q Do you have any reason to dispute that you --
A No.
Q Okay. Does that help you, though, with the

Page 43

timeline of when your last time was there on campus?
A Yeah, like I -- like I told you the first time, the -- I feel like, during these e-mails, when I was talking to Amy, I was already, like, to a point where, like, I already had gave up on believing in her and everything. So I think, like I told you the first time, I -- I just wanted this to be over. So I was just responding, like, to, you know, respectfully and just responding just to learn how to, like, just get out of this class completely. Like I told you, I already know that -- like, for me, I knew that I wasn't going to finish because of what was going on and how it kept playing out, and like I told her, I was -- I was just, in my head, in my mind, I was just, I was completely over it. I didn't have no help, so me responding to her was just me just trying to get out of this whole situation. And that's how, like, before -- before this and before I even asked her to do another review on the investigation because all they kept doing was denying what I was saying and telling me things, like, what you're saying is unbelievable or -- or it's happening in your head, so completely, I was just, like, out of it, and I wasn't really there. So I was just, like, just wanted to get out the class. So I feel like all of these e-mails that -- that kept coming in after they kept denying my -- what I was saying what was happening, was me just responding to them and just trying to

Page 44

get out the class and just get it over with.
Q Okay. But what I'm -- what I'm trying to understand is just -- is just the timeline of when -- when you no longer went to Gateway Community College. Like, when the last time was that you stepped foot there, and -- and this e-mail is Wednesday April 5th, and -- and you're asking about clocking out. Did you go back to the school ever again after April 5th, Wednesday, April 5th?
A I don't really know if I went back. Like -- like I said to -- I might have went back, I think, that same day, or the day afterwards to just get my -- my belongings.
Q But no later than that?
A I don't believe so.
Q When you went back to get your belongings, do you have a specific recollection of seeing Brent Cooper?
A Not that day. I think, when I -- when I specifically went to get my things, I don't think nobody was in the class. I think they had something else to do or whatever.
Q Okay.
A But I think, even after that, I was going back to the school to do, like, the meetings and stuff like that, and then I would -- that -- they would have me come up to the school with the investigator or something of that nature.

Page 45

Q So this is April 5th. Does this help you put a timeline of when the last time was that you saw Brent Cooper?
A Yes.
Q Okay. When was it?
A Because -- well, I think it probably was the day before I left, because the day before that I left the school, I was already arguing with him about my things, again, that he wasn't supposed to be doing as far as the -- the -- the -- the criteria was for the -- for -- for me to come back to class. He was already violating it everyday, so that's why I know and remember exactly how -- and then, the last day that I was there, my friends from the second class, they were the ones telling me, like, like, something about, like, I -- I -- I honestly think that I was there for his last day, to be honest. I don't know if I even seen him that day. But they just said, like, I think, from what I remember was, when I -- when I went to school, they were saying that Mr. Cooper had came in early and got all his things and left.
Q Okay. But you don't remember how far up until April 5th that was?
A Seeing Mr. Cooper? No. I only -- I know I, like, since I was there I seen him, but now, when I really think about it, I don't remember the exact date he got his stuff,

Page 46

but when I made that second complaint, somewhere after that -- alongs the line after that, I believe, but I -- I don't even think that -- that day that I came, I didn't see him physically that day because he had already left with his things and stuff like that. And then somehow, like, they told me, like, something that I don't -- like, I wasn't really paying attention to the students from the second class, but I know they said something like -- like Mr. Cooper came and got his things that day. That's all I can remember from that day, though.
Q So it's sometime before April 5th of 2023?
A I believe so.
Q How long have we been going? I don't want to -- sometimes I lose track of time.
MR. WOODS: About an hour.
BY MR. PIERCE:
Q Let's take a few minutes, and then we can take a break. Tell me about the program itself, the -- the Collision Repair Program. When you started it in, you know, around -- I think it actually started in May of 2022 -- April, May 2022.
A Yeah.
Q What was the general format of the class?
A What do you mean by general format?
Q Of the program. Like, what -- did you take

Page 47

classes? Was it multiple classes? Was it, you know, lab work? How -- how did it go?
A I believe it was -- on the first day was the -- the, I think -- the first day we, like, had to go into the -- the classroom. Then he would tell us all about the classroom and stuff like that. And then after that, we would have -- they told us that we had to complete, like, a online program to -- to, like, basically say this is what we'll be learning, so we had to go into that, answer questions and stuff like that. And then after that, it would be Mr. Cooper first, and then Mr. Hernandez, I guess, from the first beginning of the class, I guess, like, they split the class off. So Mr. Hernandez was, like, the painting side of things of, like, the car, and then Mr. Cooper would be the more, like, in detail things like taking off door panels and stuff like that, and -- and, like, dent work and stuff like that, and then like -- like welding and things, so --
Q When you started the program, were you given, like, syllabus or syllabi for the -- for the different classes?
A We was given basically the paperwork that they -- we're supposed to receive on the first day.
Q Which tells you, you know, here's what the class is, here's what it requires in order to complete the class;

Page 48

is that right?
A Yes.
Q Did you understand that it required a certain amount of clock hours, or something like that?
A Yes, to my understanding.
Q Okay. That in order to receive the certificate, you would have to meet those -- those requirements of those hours; is that right?
A Yes.
Q Okay. Let's take a quick break. We've been going for a bit. Maybe take a five -- five-or-so minute break.
(Break taken.)
Q All right. Tyrone, let's talk about when you started the program in -- again, it's -- I -- I think the records show that it started in May of 2022, that April 2022, May 2022 time frame. You start the program, as I understand it from your complaint, that you felt like Brent Cooper was antagonistic towards you; is that fair?
A Can you ask that again?
Q When you started the program, you felt that Brent Cooper wasn't treating you right?
A When I started the program?
Q Yeah.
A No. The first day when I started the program, I thought Mr. Cooper was a racist.

Page 49

Q Okay. Well, why did you believe that?
A The first day of class, when we went over the paperwork -- I stayed after with a couple more students to get a more thorough understanding of what they told us on the paperwork -- he told us that day versus what they were saying to us before we got in class. So we had a few, like, a -- a -- a few questions about, like, like, stuff that they didn't explain to us thoroughly versus what he's telling us today. So the first day, that's how it went, and then we stayed after. Me, Gonzo, Bryce, and Zane, we stayed after class with him a little bit. All the other students went next door, and we start talking about, basically, the paperwork. And then it went from us talking about the paperwork, to politics, to how the Internet has taken over people lives, and then it went to, like, homophobicness [sic] 'cause he had a problem with the gay people. And then that's when it went to him talking about how he seen a lynching when he was young. So right then and there, I had a problem with the class, and I even told him I didn't understand how this whole conversation went from school to you ended up saying you seen a lynching as a kid. So I thought he was a racist since the first day, for sure, after he said that.
Q Okay. So then this is in -- do -- do you think this is in May of 2022?

Page 50

A This is the first day of class, whatever the first day of class was. The reason why I remember it was the first day because we were not even allowed to go into the -- the bodywork area until we seen Mr. Cooper. He -- he went down the line about the syllabus, and then he released us. So it was the first day of class we actually went inside a classroom.

Q Okay. So after that conversation, you said you -- you believed that Mr. Cooper was a racist at that point; right?

A Absolutely.

Q Okay. When was the next time you had any sort of interaction with him that you felt was -- well, let's just say it, was -- was a racist communication or interaction with him?

A Well, he -- Mr. Cooper wasn't, like, like, I would say, like, blatantly racist. Like, he was covering it up, so to speak, as -- as we were progressing through the class, because after that conversation we had, he would start telling us, like, things that you could tell he don't like, or the type of people, because he would say, like, he would put emphasis on, like, a Mexican with tattoos, or -- or he would put emphasis on Blacks, or -- when he explained a situation. So like I said, after the first day, I was a little uncomfortable with him because I had to talk to him

Page 51

the second day of class about my disability resources, and like I said, I felt like he didn't really -- he wasn't really concerned about that. He -- he -- he was more so, like, he didn't really -- he -- I don't think he, like, cared about me having, like, disability resources because he was just waving it off, saying things like whatever you need, I'm gonna accommodate you with these things, and don't worry about going to the office and -- and getting you accommodations, 'cause we don't have that for this type of -- type of class. So whatever you need, I will -- I will help you and provide that to you.

Q Okay. Was there ever -- ever anything that you didn't get that you needed from Mr. Cooper on that?

A Yes.

Q What was it?

A Basically everything in the class.

Q When you say everything in the class -- I mean, again -- again, Tyrone, I'm looking at the end of the day, you got the certificate. So I'm -- I'm trying to figure out what -- what you didn't get since you were able to -- I mean, I think we got a transcript here, you got straight A's; right? So if you got straight A's in the class, what was it that you weren't able to do?

A I wasn't really doing nothing. Like, when the -- when it came to the classroom things, Mr. H would be the one

Page 52

that actually helped me do the things for me, because I wasn't getting no help from Mr. Cooper in the first beginning. So when it came to, like, welding and all that stuff, I wasn't really getting it, so when all the students, like, go to lunch or anything like that, Mr. -- Mr. H would stay back and help me.

Q Mr. H being Mr. Hernandez?

A Yeah, Mr. Hernandez, correct.

Q Okay. I think you mentioned earlier, it -- well, it sounds to me like -- like you had a good relationship with Mr. Hernandez throughout the -- the time that you were in the program. Is that -- is that a fair characterization, you and Mr. Hernandez had a good relationship?

A Absolutely.

Q Did he ever do anything to you that you felt was inappropriate, wrong, other than what you -- you've shared earlier that where -- where you said that he wasn't helping you at the end because -- because he was afraid to?

A To be honest, yeah, I do think Mr. H at some -- at some capacity was wrong because he knew exactly what Mr. Cooper was doing -- Mr. Cooper was doing. And he wasn't necessarily saying, like, don't do nothing about it, but he was telling me, like, don't worry about what he's saying, I'm gonna help you out and -- and that way you can get through this. Don't -- don't worry about what he's saying

Page 53

to you, don't worry about how he's treating you, just come to me and I'll -- I'll help you out no matter what. And I felt like he should have been the one, too, as well, giving me help by, like, going to the administration and stuff like that to help me out even more, knowing what Mr. Cooper was doing to me.

Q So this would all have been prior to -- to your complaint to the administration; right?

A Like, before -- or you mean before?

Q Right.

A Yeah, absolutely, because Mr. Hernandez even had arguments with Mr. Cooper about driving my vehicle. So he -- he knew it was wrong, and he would actually argue with Mr. Cooper in class about it, but nothing changed.

Q Okay. And again, this is prior -- this is before you make your -- your complaint to the administration on December 5th, 2022; correct?

A Absolutely.

Q And so you're -- you're feeling as it pertains to Mr. Hernandez is that, between the time the class started and when you finally made the complaint to the administration, he should have done more?

A Absolutely.

Q After the complaint was made in December of 2022, and now administration is -- is looking into things, do

you -- did -- did you think that Mr. Hernandez did anything additional to you at that point in time, or treated you differently, or wrong?

A Yeah, absolutely. Especially after I made the complaint, because like I told you, he was -- he would tell me how he didn't want to get in trouble for helping me. But even when I made the complaint, the administration, I felt, was -- was even more wrong because the lady was telling me things like it was in my head, I was making up things of that nature, and then as a student coming to an administration, I already felt some type of way because when I go to them, it goes nowhere. So when I finally felt like somebody was helping me, they was telling me things of that nature, and I'm like --

Q Who -- who is they? You said the lady told you it was in your head?

A It was -- yeah, the -- Ms. Delfi, or whatever, Delfina --

Q Okay.

A -- her name was, or whatever. She was the one that was, like, literally giving me more pushback than anything. She would be the one over the phone telling me, oh, that's impossible. When I'm making a complaint she would say, like, like, things like that couldn't happen, or like, when -- when we had the -- the agreement Mr. Cooper



stayed away from me. For, like, the first week, it worked. Mr. Hernandez was only helping me, and Mr. Cooper, me and him didn't have no form of contact. When Mr. -- when they took Mr. Hernandez from the classroom -- because another teacher had got sick, so he substituted to a whole nother area -- that's what Mr. Cooper resumed all of the things that he done. So I would leave the classroom and basically go sit with Mr. H. During the second time, when he was in the other class, I keep going back and forth to him to try to get help, because I couldn't ask Mr. Cooper because of what he was doing. So that's what I meant by, like, even during the second time, I don't feel like I completed anything because of that reason. Like, I had to keep getting out the classroom and walk down the hall just for help. It was cutting into my time. Then I'm -- I'm by myself the whole time, and then, like, like Mr. Cooper said -- he said that he wanted to put me in the corner and seclude me. He didn't want me to talk to any students, and they damn near did that. And that's when I -- I felt like it was a problem, because that's like taking my freedom of speech. He didn't want me talking to any students. They wanted me -- to put me in the corner like I was some little boy to them and things of that nature. So like I told you in the beginning, I was already -- in my head, I was checked out the whole time. I just wanted to get the class done



because I didn't want to feel like I failed and not have no paperwork because I -- I was going to try to get something after that. So that was the biggest problem with everything, like, I could not complete it, no matter how much I tried, no matter how much they tried to help me or anything. Mr. Cooper was just of control.

Q You've referenced a couple of different times, the time frames -- the two different time frames, like you said, like, when I came back. I want to make sure we're on the same page as to what that is. As I understand it, class again, starts in April, May 2022. December 5th of 2022 is when you bring the complaint, the -- the written complaint to administration, and then you -- you didn't go back to the class. Is that the first time you're talking -- when you say the first time, you're using those words, like, when you mean the first time, you're talking about that time period; right? The -- the time period of starting the class, and -- and then not going back after December 5th or December 6th, of 2022; is that right?

A Correct.

Q So then, after December 5th, 6th of 2022, you don't go back to class. I think you're dropped from the class, and then through administration, they work out a plan for you to come back in February of 2023; is that right?

A No. What really happened was, I was confused



about the whole situation. I never done a complaint of this type of, like, nature, so when -- when I was told I -- since I -- I was scared to come back to class and I was uncomfortable, I did not have to come back to class. It wasn't until I was dropped that I found out that I was dropped and I was supposed to come to class, no matter if I had reported something, and they didn't tell me that. They didn't tell me that up front. They told me that -- the two ladies that I seen, there was the Vice President of Student Affairs, and then somebody else. They told me I didn't have to come back to class. So from my understanding, that's why I never came back to class that -- that -- after that. I came back the next day to get my belongings to which, when I pull up to the school, I seen Mr. Cooper driving my vehicle again, right after they -- I explained to him, like most of the problem, which was that. I pulled up to the school to get my vehicle, he drive it next to a paint booth where it -- my vehicle could get destroyed, and him and Mr. H is arguing about it. And then, so I go straight to the -- to the office and have the lady come escort me back there because I'm -- I don't understand why he's in my car. And I don't -- I don't want to tell him to get out my car and then we start arguing and -- or -- or things of that nature, so I went to the front and asked the lady if she could come because I felt uncomfortable completely when I came to the

Page 58

school and seen that. So then she walked me back there, and that's when I was able to get all my stuff. And Mr. Cooper was trying to harass me and tell -- try to say, like, oh, why are you making complaints, we're friends and -- and things like that when we weren't.

Q What did you think would happen with your status in that program at that point when you -- when you left and didn't -- and didn't come back to class?

A Really, I didn't know. I'd never -- I never been in that situation before. I really didn't know, like, how -- how it was supposed to go. I felt, like, like, how I took it was, they -- they're going to handle this situation, and then I'll be able to complete it through another avenue, which that's why I was more -- more than happy to hear when it was like, okay, they allowed me to try to finish the class even through what I went through. 'Cause I -- like I said, I just wanted to get over -- just to get out of there. I just wanted to just get the class over with, no matter what it took. So during that -- the whole time from the beginning of the class, I was just basically tucking my tail and just taking everything he said, because every single time that he says anything, like call me out in front of the class -- like we had a big ole meeting about the materials. He would say, oh, people like you can't afford these things, and I just felt like that was inappropriate because he can

Page 59

address us as students who can't afford materials or what they gave it to us for. But he was singling me out versus everybody else because I was asking him, why do I have to keep consistently coming to ask you for free materials and then you give me so much pushback on it? So then he had a -- a meeting because I was the one who -- who kept questioning everything. So he wanted to assert dominance by saying, like, this is how it's gonna go, this is how it's gonna happen, and I -- and I referred back to the syllabus and told him, like, you can't do that because the syllabus says that we -- these materials are for people like us. And then he was, like, well, people like you that can't afford things. And right after that, I walked out the class. So I was basically taking all of that stuff. And then Mr. H and -- and Mr. Woehl would be like, just keep it in-house. If you have a problem, just come talk to me, and that way we can figure things out and it stays back here. And that -- that right there was a red flag to me, because before we even came to the classroom, we already heard about, like, like, that -- it was a lot of issues with the classroom. So basically, like, just keep it between them. So that's -- that's how we were never, like, we never -- well, I never really understood how to go above them, because every time I went above them -- I thought Mark -- Mark was the above guy, and what Mark would do is he would -- he would sit there

Page 60

like you're doing right now. He would hear me out, and then he would tell me to go talk to Mr. Cooper. When I go to talk to Mr. Cooper, he would laugh and make jokes about it and -- and things of that nature, so I would just get up and just say, okay, and just leave.

Q And this -- to make sure I understand when this was happening, this was during that first time, before December 5th of 2022; right?

A Absolutely.

Q Tell me -- I just want to make sure I understand everything. You -- you've shared a lot of things and I -- and some of it's in the complaint, so I -- I -- I have some of these things already. I've seen this, but from the time that you started the program until the complaint in December -- December 5th -- in fact, we should probably mark that, the complaint.

(Exhibit marked for identification.)

Q We've marked Exhibit 5 to the deposition. Do you recognize this -- this document?

A I'm assuming this is my complaint.

Q Do you recognize it as that?

A Well, I had -- I had put, like, complaint and stuff on mines.

Q Okay. And take as much time as you need to look at it to see if -- if it looks like the complaint that you

Page 61

submitted to -- to the district?

A Yes.

Q Did you send this to the district attached to an e-mail?

A I believe so.

(Exhibit marked for identification.)

Q We'll mark as Exhibit 6. Does this look like the e-mail that you sent where you attached the complaint that is Exhibit 5?

A I believe so.

Q So that was -- I was a day off. It looks like it was December 6th of 2022; is that right?

A That's what it says right here.

Q The subject line is, "Withdrawal from class if possible." That's what you wrote?

A I believe so.

Q Okay. And what were you hoping to -- when you say withdrawal from class if possible, what were you hoping to accomplish with that?

A Basically, when I made the complaint about Mr. -- Mr. Cooper and the things that was going on in the class, I just wanted to basically drop from where I was at and see if that -- there was any way that I can start the class over without him, or -- or any other -- basically, like I said, avenue to -- to finish my -- to, like, actually do the class

Page 62

the correct way.
Q Prior to this date where you sent this -- this complaint in, who had you spoken with about the issues that you were having in the program?
A So he had a -- he had a clerk in the front --
Q Who is he?
A -- it was Mark Woehl. It was a woman.
Q Okay.
A She would -- she knew. I would talk to her about it, Mr. Hernandez knew, Mark Woehl knew, and Mr. Cooper knew.
Q Okay. So -- and when you say they knew, it's because of communications you had with each one of those people?
A Absolutely. I --
Q So --
A -- would --
Q -- so --
A -- definitely --
Q I'm sorry, go ahead.
A Every time a incident happened, I would tell Mark, and Mark would sit there like you're doing right now, listen to us, and tell us that we -- the only option we had was to go talk to Mr. Cooper.
Q Okay. How many times do you think you had a

Page 63

conversation with Mark about -- about your concerns between the time you started the program and -- and December 6th of 2022?
A Almost more than ten times.
Q Okay. How about, you said he -- he had a clerk, like a --
A A woman, yes. It was in -- in the front office.
Q Like an administrative assistant, sort of?
A Yes. The lady that was in the front. Like, we -- if he wasn't there, we could make an appointment or tell him, you know, we'll come back or whatever.
Q And you said you spoke with her about it as well?
A Absolutely.
Q Do you remember her name?
A No, I don't remember her name.
Q Okay.
A But I remember who she is if I see her.
Q And what -- how many times did you have a communication directly with her about your concerns?
A All -- same amount as Mark Woehl, because she would see every time I come up there and complain.
Q Okay.
A I would say hi to her, 'cause she was our good friend. Even when she came out the office and I told her what was happening and she tell -- exactly told me what to

Page 64

do, too.
Q Okay.
A So she knew, like, she basically was saying, like, you got to go above him and stuff like that. But I didn't really know how to go above him because at -- like I told you, during the whole time when I was going to school and these things was happening, I was a little discouraged on -- on help completely. I didn't believe any -- anyone from the school could help me because every time I would go to Mark so much that it -- nothing happens. I would go to him so much about complaining about what Mr. Cooper behavior is and the way he treated me versus any of the other students in the class, he would literally just tell me to go back to Mr. Cooper. I even told him how uncomfortable I was even talking to Mr. Cooper because when he singled me out in front of the whole class, I was so uncomfortable to talk to him about that, that he laughed even when I told him about, you know, I can't afford these things. You're right, I -- people like us can't because -- especially when I only have Social Security to cover my -- my rent and everything, and I'm just trying to come to school to learn something. You know, I don't think it was right for you to be calling me out just 'cause I can't afford something. He laughed about it. He said I didn't think you was gonna take it serious or feel no type of way about it. So yeah, I -- I definitely

Page 65

gave up on the whole school in total about trying to seek help.
Q And so just to make sure I know, Mark Woehl --
A Yes.
Q -- his administrative assistant, Brent Cooper, Mr. Hernandez, and who -- anybody else?
A All the students in my first class, 'cause even -- even they were complaining -- helping complain for me, and that's what, like, I said in the -- my complaint. That's why he called us a lynch mob, because even my friends started to help and stand up for me, and they was just -- they didn't understand why -- why he was allowed to treat me like that and nothing was happening. So like I said, all of my friends seen it. All of my friends are witnesses, and -- and that's what was a -- a key thing to me, too. Like, on my initial report, I -- I named almost the whole class, and they only interviewed a few people.
Q You say initial report, are you talking about this document right here?
A Yeah, and -- and the --
Q Exhibit 5?
A Yeah. And they had a whole -- they had me write a whole nother paper with my witnesses on it, and I even told them that I just named the people who was listening to him being racist with the -- with the word that he was using.

Page 66

And the people who heard him use the word, not -- not -- not just them seeing what was happening to me, the whole class, 'cause that was the whole class.

Q So you put together people that you thought would have information about it; right?

A No. They -- they put they self. When they seen me go complain, they told me out of their own mouth that they would go complain with me, and they would tell exactly what was happening, 'cause they were tired of seeing me go through that. So I never told anybody to go for me. They told me they self that they would go, and that's exactly what happened. We all went there that same day, and we all made a complaint at the same time.

Q So are you aware, during the course of the investigation into the matter, how many be of those folks were spoken to by the investigators?

A Yes, because they told me.

Q Okay.

A They told me during the time of the class when I made the -- made the complaint, when I went back up there to get all of my things, they told me that they went, but they were -- they were -- they were basically saying that the investigator wasn't asking the questions that I put on the paper, so that was the last time I got to speak to my friends from that course.

Page 67

Q So now, this is the second time you came back; right?

A No. This is the first time.

Q Well, the complaint was made, though, at -- at the end of the first time you were -- the first period we're talking about?

A No. My friends were still in school. When I made the complaint, we were still in school.

Q Right.

A But they still had a second -- we still had a whole second block to go through.

Q Right. But that investigation is happening during that second block of time; right?

A The first class, yes.

Q Yes. Is -- this Exhibit 5 document, was this the first time you -- you put anything to writing to submit to the district?

A Yes, because that day, when Mr. Cooper used inappropriate words towards me, I walked into Mark Woehl office and I told him that I was tired of coming to complain to him about everything. He got on the phone, he called somebody that was, I guess, above him, and he -- he said Tyrone said he's done, he's walking out of class today, and he's not taking any more of this shit, and then that's when I left, because I knew right then and there, like I said, it

Page 68

was just staying in-house. So I walked next door, I asked the -- the -- the hairdresser guy, and he walked me through all this. He was the one who helped me actually put it in paperwork, because when it -- when it came to Mark, he never told us to -- to -- to put anything in paperwork. He would say tell me what was happening, like, if he was our therapist. So he was acting as a therapist versus acting as a -- a -- a person who was supposed to write our complaints down. The only time I ever seen him write a complaint down was the -- the day that I told him, before this was happening, how he used a word that was inappropriate and told me that he had to get head from a black woman when I was supposed to be painting in the paint booth. So when I told him that and he didn't write that down, that's when I knew, like, he was just trying to act as a therapist. He was just trying to keep everything in-house. So that -- that next day, when that happened, when he used the N-word, is when I -- I was done with the whole class, which is the date that I -- I made this -- this -- this paperwork about my incident.

Q So when -- you said when he used the N-word, you're talking about Cooper; right?

A Absolutely.

Q And that happened on the -- on December 5th? The -- the complaint was submitted on the 6th.

Page 69

A So it happened that -- the day that I made the complaint is the day that he said those words.

Q Okay. Was that the first time you'd heard him use those words?

A Nigger? Yeah, absolutely.

Q And that was kind of a trigger point, then? You were like, okay, I'm done. Is that right?

A No. The -- the -- it's -- because that day, when I was -- when I was done with the whole class, is because that -- those words, basically my whole theory about him being racist, it just completely -- basically I was telling myself I knew this whole time. The way he only treated me, the way that he only did that, and now he's too loose with this word nigger, saying that he can say it. Him and his friends say it at a -- at a bar and all that, just -- it just -- I knew I was right at that point, and that's when I was like, I'm done with this class. Because I've been -- have been telling them this whole time that I was under a racist teacher, and they would just have me keep going back to him. And then all -- everything that I thought about, like, no wonder he was careless about everything that I came to him with my concerns was because he's racist.

Q So tell me about -- tell me about the -- the -- the communication, everything that happened. This would have been on the 5th or 6th -- December 5th or 6th, 2020 --

Page 74

that -- that he seen a lynching and -- and I -- you know, in my head I'm just like -- like, since the beginning, I'm like, this -- this just can't be true. Like, you -- I'm just going around it like it's -- it's really not happening because I just -- how bad I want to finish the class and -- and just get out of here. But I knew since the first day that something about him was off, and I felt like he was a racist since the first day. And since the first day, it led up all the way from him mistreating me, telling me things about him getting head in the mountains by a black woman, and I just could never understand why he's been specific with color. Like, he could say -- he could have just got head with any woman, but specifically saying a black woman I felt like he was, like, trying to get under my skin and -- and disrespect me. Every time I complained, he would say this is my class, I can do whatever I want to do in this class. And then I told him, like, you can't be driving my car, though. Like, just because this is your class where they gave you permission to teach us, my personal vehicle has nothing to do with you. He would tell me he -- it's his class, if he feel a need to move it, he gonna move it no matter what I say. So I was taking a lot of stuff before that word -- those words was came out, but then it really made me uncomfortable for a white man to tell me he -- he don't know why he can't use the word nigger. Like, that --

Page 75

that right there just -- it just ended everything for me. And I just, I had no hope in nothing about the school after that, because I had been complaining about this man being racist and it -- the way I'm being treated and singled out the whole time, and like I said, they all looked at me and was saying this is just an incredible story, or this just can't happen or -- or -- or the things in my head was -- I was making up, that's impossible. So I just -- I was done with it. At that last day, when he said that stuff and it -- and I was trying to tell him to let it go, it didn't bother me because somebody personal text got out -- which I don't even understand how it got to the teachers -- and -- and that's what was the problem. Like, he was trying to force me to feel some type of way about the word that they were using in private, and he made it public. And that's what -- that was the problem. I knew right then and there I was done with the class, because I couldn't understand where he was going with that. Why did he force me to feel some type of way about him using the word when he wasn't the one who used the word in -- in the beginning?

Q And so that -- that prompted you to make sure that this information was -- was elevated above Mr. Woehl; is that right?

A No. I was already trying to elevate it before it even got to this level. The problem was, was I didn't --

Page 76

every time I come to Woehl, that's -- that's who they kept referring us to. That's who they said keep going to, and I'm thinking Woehl would be, you know, taking notes down or -- or telling people about it when he wasn't. Like, the whole time he was not, and then I -- like, that last day, I just knew, like, this had to go somewhere else besides me going -- keep consistently going back to him. And then Mr. Hernandez, you know, on the side telling me just forget about the things he's saying, you know. Mr. Hernandez was kind of like -- like -- like basically a real friend to me because he -- he didn't say the things that Mr. Cooper was doing wasn't right or wrong, but basically he was saying, like, I know how bad you want to finish the class, and there's no way around it, so just ignore everything he saying, try to finish, don't give up on yourself, and I'm gonna help you. Any extra thing you need, or anything of that nature, then I will help you. And that's the only thing that I said about Mr. H was he -- the only way he was wrong was because I felt like he knew how to take it above Mr. Woehl head, and I just felt like he was scared to do that because he was scared to get in trouble.

Q So just, again, going back to the -- the -- the question that I'm asking is, this is the point in time in -- on December 6th that it gets elevated above Mr. Woehl for the first time; is that right?

Page 77

A Absolutely.

Q Okay. And then you received several communications with the district management about -- about next steps; is that right?

A Yes.

Q And it was investigated from there; correct?

A Yes.

Q And then sometime between December and -- and February, beginning of February, you have communications with district personnel that set up a plan for you to come back and finish the program starting in February; is that right? February of 2023?

A Yes. Because I didn't know that I had to come back, so --

Q Did you --

A -- the confusion was when I first dropped the class, and I elevated my -- went to the higher up and I told them how uncomfortable I was to even come back, I didn't think I needed to come back at all. So when I found out I was dropped and that I wasn't receiving a certificate, that's when I was concerned because I'm like, like, I didn't just want to quit and not be able to, like, receive my certificate. So then that's when they told me that's how we came up with the second part with the plan, was because I wanted to at least try to get my certificate no matter what

Page 78

I went through.
Q So that -- that -- that helps me understand a little bit better. Did -- did you think, on December 6th when you left the program, did you think that you would be able to get the certificate without ever coming back to class?
A No. I just didn't think that I had to go back to class under somebody who was racist for me to finish.
Q Okay.
A I didn't think that I had to completely finish my -- when I dropped out of that class, I told them that I was uncomfortable, I didn't feel safe around him. So I didn't want to go in no environment where I couldn't feel safe, especially going to a school where I'm supposed to feel safe. So I didn't feel safe at all, that's why I never wanted to complete, so I thought that they were gonna come up with a plan for me to not ever see him again or fix the problem, that way I could come back and complete it, especially since that they didn't even accommodate me on my disability resource -- resources at all. So -- so technically, I was thinking, like, maybe I could get extra time because I was supposed to in -- in the beginning, but I never even received that either.
Q Well, okay. So then, when you left in December, you knew you hadn't completed the program; right?

Page 79

A Correct.
Q You believed that -- that there would be a -- a way for you to complete the program at that point in time that would not involve Mr. Cooper; is that right?
A Correct.
Q And so then, they did come up with a plan where Mr. Hernandez would be your primary point of contact and that you wouldn't have to work directly with Mr. Cooper; right?
A Correct.
Q And I would start in February of 2023?
A I believe so. Correct.
Q And then the idea was, you had a couple of months left to finish the program, and -- and then that's what would happen; right?
A Correct.
Q Okay. I've heard a lot, and -- and -- well, Exhibit 5, is everything that you wrote in that complaint, is it all true to the best of your knowledge?
A A hundred percent accurate.
Q Was there anything that you left out about -- about your complaints, or did you feel like this was a -- a --
A I left -- I left a lot out because I felt like the -- the -- the initial, like, what I wrote was just, you

Page 80

know, good enough to open an investigation, and that way I get to tell them exactly what was going on.
Q Okay.
A But this -- this doesn't fit the every day treatment that I went through that -- the every day him arguing with me over free supplies that the school supplied for us, it doesn't -- doesn't have every day that he made me leave my keys, doesn't have every day that he drove my car, it doesn't have every day where he tried to tell me whatever he say goes, or -- and if -- and if I keep talking back to him that he was gonna get me suspended or kicked out of class, it doesn't have, like, all the threads of how I felt when I was being supervised up under him. It doesn't make me -- this -- this doesn't fit everything that I was going through in class. This just was, like, a summary of everything that I -- that I -- that I was just done with as far as how I was being treated in class, and then on top of him using the word nigger, especially telling my friends that -- the same thing. So this -- this can't fit everything that I went through in just two pages, but I knew that it was starting to be a lot, and I didn't want to be all over the place because I was already getting help from -- from a whole nother section of the school. And I didn't really want to take him from where he was sitting, but he didn't have no problem coming to help me. But I just

Page 81

felt like I couldn't put everything on a paper at that time.
Q When you came back in February of 2023, can you outline for me every incident that you believe happened where Mr. Cooper treated you wrongly?
A Yeah, the first day. The -- the -- the first day I came to the second part, where we were supposed to have a meeting to go over the rules, go over the structure that they made for me to come to class the second time. Fortunately enough for me, I showed up early because, you know, I was already scared, I wanted to talk to Mark by myself and Mr. Hernandez and tell them how uncomfortable I would be having a meeting with them together, especially with Mr. Cooper. I just so happen to walk up to them having a meeting about how they were gonna retaliate against me, how they were gonna have, like, turn the students against me because they -- they didn't believe that I was the type of person that -- to -- to -- to not get along with somebody or -- or start, like, not getting along with the students. So they wanted to basically pin another student against me by -- by, I don't know, like, starting an argument or something like that. But when I walked up, I heard that, I instantly started recording because they started calling me names like I'm a sticker, I'm a runner, and -- and when -- what Mr. Cooper was saying, the things that he was saying before I started recording was, like, he was basically still

**Page 94**

MR. WOODS: Foundation.
A I really don't understand that.
BY MR. PIERCE:
Q So I'll use the word secretly instead of surreptitiously. Are you aware that in Arizona it is a Class 5 felony to secretly record two people's conversation unless you are a party to that conversation?
MR. WOODS: Foundation. You can answer.
BY MR. PIERCE:
Q Whether -- if you -- the question is if you know that or not?
A From -- from what I know is what the investigator told me. The investigator told me, after Ms. Delfina told me that I could not record somebody, he said that if I hear my name and I'm supposed to be at that meeting, that I'm -- that I can record. That --
Q Were -- were you supposed to be at that meeting?
A Yes. I was told to show up at that meeting at a specific time, and I showed up earlier. So yes, I was supposed to be in that meeting.
Q Okay.
A And that's what the investigator allowed me to understand. Because I didn't understand if my name is being brought up and they talking about retaliating on me in the same meeting that we were supposed to come to an agreement

**Page 95**

on, why I couldn't record them. And that's what I told the investigator and Ms. Delfina Wilson. She was the one who was saying that, well, that's -- you can't do that. You can't record people without their knowledge. And then the investigator said that's not true, because, again, you're supposed to be in that meeting, and you heard your name.
Q The investigator for --
A For Gateway Community College.
Q Okay.
A It was -- it was a male. He the one who told me that that wasn't true.
Q Okay. Going back to what -- what happened from the day you came back, I think we've explained -- you've explained this situation where you came upon that -- that meeting between Mr. Woehl and Mr. Cooper, from that point until your last day there, what other incidences of mistreatment do you believe you experienced?
A Well, as I told you, when I first told you about the second time, one, Mr. Cooper was enabling me from using the paint booths to where I could complete the car that he wanted me to complete --
Q Okay.
A -- and get back to what I was supposed to do. So that's one. He knew that, like, basically how to go around, not making it look like he was mistreating me, which was,

**Page 96**

one, the paint booth, because he had -- he had control over that. Because Mr. -- Mr. Hernandez wasn't teaching the first block of that second class, and I fell in -- in -- in the first block of the second class, which was Mr. Cooper's class. So now I'm on the -- the -- the right side of the classroom by myself. And then Mr. H is just basically come -- coming on the fly to -- to help me and stuff like that. Then they moved him, like I said, to -- to the -- to the -- like, where another teacher was sick, so he covered for them, and basically -- so I was just floating around the --
Q Can -- can you pause just a second? When you say there was another teacher that was sick, so Mr. Hernandez went to cover for that teacher --
A Yes. Mark --
Q -- correct?
A -- Mark Woehl had made him substitute for that class.
Q How long -- like, if you started back up in the beginning of February, how -- how long was it before that happened with Mr. H?
A Like, the second day.
Q Okay. And then did that other teacher come back and Mr. H go back to --
A Not until -- not until almost, like, my last week

**Page 97**

of school. So Mr. H was over there the whole time.
Q So for about a month?
A Yeah, absolutely. And that's why I felt like -- like I didn't understand that part either, because Mr. H was supposed to be the only one helping me complete the second part. So if they take Mr. H out the first day, which well -- well, Mark did. Mark moved him to substitute over there. Then I was over there just basically doing nothing by myself, which is, like I said, I heard them say that. I heard them say that before I started recording, that he just wanted me to myself on the right side, secluded away from everybody, not talking to nobody. And I -- like I said, I didn't understand that, because now it -- it enabled me from even getting to my car. So I was literally just walking around there for the first, almost two weeks, almost a month because I could not access the paint booth to finish the car.
Q Okay. So other than Mr. Cooper, was there anybody else that you believe engaged in conduct towards you that was inappropriate based on race?
A Can you repeat that? Like --
Q It -- well, you talked about Mr. Cooper being a racist; right? That -- that was your belief; right?
A Yes.
Q Was there anybody else that you felt treated you

Page 98

improperly because of your race?
A I can't really say that, but I can say that what I was bringing to them, which is the -- the people that's higher than Mr. Mark, I felt like this was a uncomfortable situation, because it was about race. So I felt like they just didn't -- they was trying to cover it up as much as possible because I -- I -- what I'm saying was the truth, to where, like, every time that I would -- like I said, I would go to them, it would be too much pushback as far as me being a student trying to look for help and a safety net, which they -- which they have in they syllabus and all of that and stuff like that, saying that we can come forward and everything. So I feel like that, for me, made me feel like it was about a race thing, because even when I went above the people that I said was treating me wrong, I got the same treatment from them without even having to see them. Like, they were, like I said, telling me things were in my head and it couldn't be true, and stuff like that versus, like I said, actually giving me aid or giving me a safety net, saying like, I -- I -- I -- we -- we're not gonna say we don't believe you, but we're gonna do an investigation, but at the same time, you know, help you out and accommodate you in ways that we -- that they didn't, and they didn't do anything of that nature. They just kept telling me that it was unbelievable and -- and -- and that I couldn't record

Page 99

people and -- and -- and -- that's talking about me and trying to retaliate against me. So -- so in my opinion, yeah, it was -- for me, that's exactly how I felt it was about race, because how come they didn't do nothing about it? How come they was the ones that was supposed to correct the situation, but they gave me more pushback than -- than anybody at the school?
Q So that -- I guess, to understand, though, the difference between, like, Mr. Cooper and the others, it -- is it fair to say that -- that your concern with the way Mr. Cooper treated you was that he treated you the way he treated you because of your race? The others didn't do enough to -- to address the situation with Mr. Cooper, but they didn't, like, say anything to you racist or anything like that; is that fair?
A Yeah, I believe, it was all a -- for me, I believe all of it was about race because --
Q Well, let me pause you then 'cause -- so do you believe that everybody involved in the situation, they're all racist?
A I felt like, during the whole -- that everybody that was involved in the situation was uncomfortable that Mr. Cooper was racist and they didn't want it to get out, because every time -- like I said, every time I asked and -- and -- and -- and I'm not racist, but they were white. The

Page 100

people that I talked to was white, and they were the ones giving me pushback after I told them this racist stuff was going on. So in my opinion, I'm -- I'm just trying to figure out -- it felt a little uncomfortable coming to white people with this racist situation about a racist teacher and they not doing nothing about it, so I feel like they didn't care that it was race. I'm not saying that they're specifically racist, I'm just saying that they didn't care enough about it being a racist situation to where they want to stray away from it is as much as possible and -- and how -- how I grow up, especially in -- in -- in the Kingdom Hall, a -- a person that turns the head of -- of somebody who is racist is just as racist as them. It's -- 'cause it's like, they -- they basically turn their head from something that's going on and basically try to make it seem like it's not going on, it's not happening to me. So they basically was come -- trying to confuse me as if nothing was happening, this can't be a racist situation, so I mean, from -- from, you know, coming to them, like I said, nothing happened, and they didn't really care. I mean, how else am I supposed to take it?
Q Did anybody other than Mr. Cooper ever say anything racist to you?
A Not that I know of.
Q Did anybody other than -- well, strike that.

Page 101

Mr. -- Mr. Hernandez, did he -- how long -- when did you first meet Mr. Hernandez?
A I met Mr. Hernandez, I believe, right before the -- I was signed up for the class, 'cause they were -- they were the -- when I went to the class, they were walking back there and, like, introduced me to the class. And then Mr. Hernandez was there to, like, basically explain the whole class to me, like, what they do and things of that nature, so that's the first time I met Mr. H.
Q Okay. Just like the first day of class, or before? Before?
A That was before they were -- they were -- when I went, they are already having another class, so when I went early to apply this time, she basically let me walk back there, and get to look at what they were doing and stuff like that, and that's when Mr. -- I met Mr. H.
Q When did -- when did you first meet Mr. Woehl?
A It was not until we -- I actually started the class. I didn't meet Mr. Woehl until the first day, like, when I went into this little -- little situation with Mr. Cooper, and I went to his office.
Q So Mr. Cooper and Mr. Hernandez are the -- are the key instructors for the program during the time you were there?
A Yes.

Page 102

Q We've been going for another hour? Okay. Let's take -- let's take five.
(Break taken.)
BY MR. PIERCE:
Q All right. Tyrone, when -- as you look back on -- on your time at Gateway Community College, everything that happened, what -- what do you believe should have been done differently to address your situation?
A Do you want me to be completely honest with you?
Q I would appreciate it.
A I don't think there's no way to address racism. I just think you just, for me, I could have just probably just quit school way earlier than that and not basically believe what they told me. Like, you know, just -- just walk away from it and stuff like -- like that. I just feel like there's -- there's -- there's -- racism is -- is in life, and I don't think there's really no solution, to be honest. I just think you have to be a good person and just want to be a good person and want to treat other peoples how you want to be treated. So I don't really think there was no solution for racism, though.
Q And -- and I understand where you're coming from on that, but maybe I'll ask it this way then. I mean, obviously you brought -- you brought a lawsuit against the district based on it. What -- what could the district have

Page 103

done differently that would have caused you not to bring this lawsuit?
A Honestly, I -- I just -- I feel like there's nothing they could have done, 'cause they would have had done it. If -- if they could have done it, I think, like, for me this is new. I never -- I never, like, I never been in this situation before. I never, like, had a -- a teacher or anybody, like, that I, like, went to school with treat me this -- like, treat me this way or treat me racist or -- or because of my race. But I really don't think there's, like, I don't think there -- there was a solution for -- for -- for racism. I just think probably just not going to that school, probably never attending the school probably would have been, like, my best bet. I don't -- I don't -- like, at the time, I don't -- I think they -- I don't know if they really wanted to -- to, like, help me. I can't really sit here and say that they were a hundred percent on my side, because they -- they weren't. And especially the way I was feeling, and, you know, going through all these -- these -- these hula hoops to -- for me to -- to -- to, like, basically get justice for myself. I don't think that they wanted to, so I don't think there was no solution because of that.
Q But they removed Brent Cooper -- you know Brent Cooper does not work for Maricopa County Community College

Page 104

District; right?
A Well, again, I didn't really know that he did not work there until we had the OCR meeting. So that was the first thing that they wanted to make clear to me when we went into the meeting, and at that point I felt like it didn't really matter that they -- they fixed the problem after I wasn't there. I -- I mean, like, you -- you guys saved the next -- probably next black person that -- that's a person of color coming in, but you didn't save me, or you didn't fix the problem. Y'all didn't stop the retaliation -- retaliation or the things that he brought that was racist or the way he treated me. They never fixed that. They never even had a solution for that. That was after I went to the school and after I was out that Mr. Cooper was, I guess he was let go.
Q Right, but you understand that -- that there was a process to investigate to get to that point; right?
A No. I didn't -- I didn't understand the process thoroughly, I just knew that I had to complain and they were going to open an investigation up about the complaint. I didn't know anything about a process of a teacher being disciplined or -- or any disciplinary ways that the school would take action against a teacher.
Q So your complaint to the district was -- was presented in December of 2022; correct?

Page 105

A Uh-huh.
Q And Brent Cooper was removed as a teacher in March of 2023, a three-month time frame; does that sound right?
A I didn't -- like I said, I didn't know when he got fired or if he got fired until I was in the OCR meeting. That's the first thing that they made clear to me. That -- that he was no longer in the school and that they had corrected the situation, but like I said, I was not attending school at that point.
Q But, so my question is, do -- do you believe that -- that in receiving the complaint in December, investigating it, and him being removed by March is an unreasonable time frame to resolve the issue?
A Yes. Because during the investigation, even when I was in the class he -- nothing stopped that I complained about. The treatment didn't stop, him -- he didn't stop driving my car or anything like that, so I felt like if they wanted to correct it, then he should have never been had access to any of my vehicles, he shouldn't have had access to me or -- or be around me at all, so no.
Q Your -- you believe that's the case while they were investigating it, they should have done that?
A They -- they -- they didn't do that. So even during the investigation, like I said, when I had to come back the second time, the only time I didn't see Mr. Cooper

Page 106

was when I removed myself that last day from the class until when I actually came back to the class.
Q And you said seeing him, and that's one thing, but isn't it true, though, that you weren't required to work directly with him when you came back?
A Say it again?
Q You weren't required to work directly with Mr. Cooper when you came back in February; is that right?
A Right, and that was the problem right there. He was not supposed to be having direct contact with me or anything of that nature, but Mr. Cooper was the one that was trying to force me to do everything and make the timeline for how he seen fit for me to finish class when he wasn't supposed to. And that's where the -- the first -- that issue relied. That -- that's when it started. Because he was not supposed to be a director of how I finished my class or anything of that nature, but he was. And Mr. -- Mr. -- Mark allowed him to.
Q But in terms of interactions --
A Yes.
Q -- when you came back, other than seeing Mr. Cooper, you weren't having direct daily interactions with him and him overseeing your work; right?
A He was not supposed to, but that's exactly what he was doing. He was not supposed to oversee my work, he was

Page 107

not supposed to talk to me, but that's what he would do every day still. And that was the point of me complaining about retaliation because he wasn't supposed to tell me anything about my car, but he would come over and tell me move my car, and I would tell him, like, there's nobody in here right now, and this is the only part that I'm supposed to work in. He would say, well, you can't -- you gotta move your car. If I say you gotta move it, I gotta move it because he run the class, and that's what he was doing, even after that. And I told him, aren't -- isn't Mr. H supposed to come tell me to move my car versus you? And this is why, because we go back and forth, and we arguing now, you want me to get kicked out of class. So yes, the first day, second day, third day of my second time, he would come up to me every day and bother me about my car. He would try to assert authority over me how -- and dictate how I would work in the class when I would -- he wasn't supposed to. So, yes, every single day that I came the second time, he was not supposed to be talking to me, and he -- he felt a need to come talk to me, direct me somewhere. When I'm standing next to students, he would come directly in front of me, sit -- sit in front of me, not say a word, and try to intimidate me from stop -- to stop talking in front of the students.
Q Did you talk to anybody about that?

Page 108

A Yes, I did. I talked to Mark, and then Mark tried to tell me that he was afraid that I was telling the second part of the class about how racist he was because there was another black student in the class.
Q And so you talked to Mark about it?
A Yes, I did.
Q Anybody else?
A Mr. Hernandez.
Q Okay. Anybody else?
A I -- I made a complaint, again, to -- like I -- like I told you, the first day about Mr. -- how they had the video and Mr. Cooper's conduct. I kept complaining about that.
Q And then, again, that was investigated, and he was removed from the --
A I don't know when he was removed. Like -- like I said, when I made the second complaint about everything that they were saying and how they had a plan to retaliate against me, and Ms. -- the lady I spoke to, she just basically wiped it under the rug and said that I had to continue no matter what.
Q Until you finished in the beginning of April of 2023; right?
A Like I said, on paper I finished, but the knowledge and hands-on, no, because Mr. H wasn't even there

Page 109

to help me. I didn't -- I basically -- I got -- like I told you, I had a video of me and Mr. H right after I had an argument, how he was helping other students who didn't even have the classroom, that didn't even attend the school, versus helping me when he was supposed to, when he came back to the classroom, because he was so afraid that he was gonna get in trouble by his superiors because of -- because of helping me.
Q We talked about your first day in class and you got the paperwork, like, the syllabus and such. Did you read all of that prior to starting the class?
A No, I didn't read it prior to starting the class. The first day I actually read it was when Mr. Cooper read it out loud because he -- he could read, like, the words better and explain it, and that's the reason why, after class, I still had to asked him to just, you know, go through it one more time with me, so that way I can get a better understanding because of my learning disability versus the whole class. So that's what made us stay afterwards a little longer to get a better understanding of the syllabus. And then, like I said, it went from that to politicians to homophobicness and to -- him saying he --
Q But -- but in that -- in that -- at that time, you -- you did have the syllabus and -- and were able to read through it together with Mr. Cooper?

Page 110

A Mr. Cooper read it, and he was basically trying to help me understand it.
Q Okay.
A Like, I never physically read it myself.
Q When you -- I think you mentioned earlier that the complaint, the -- the -- the formal complaint, the -- Exhibit 5, that that was triggered by the use of the N-word that had been used the day before, or that day, and that you'd talked to Mr. Woehl about that. Was that the first time you'd mentioned to Mr. Woehl that -- that there was racial conduct that was being -- that was happening?
A No. And that -- that -- that -- that's not what triggered me to -- to go make the initial complaint. Because he already had told my friends that he referred to tires as niggers and stuff -- and things of that nature. So, like I told you before, the things that he was saying and doing towards me behind my back, my -- my friends in the class would actually come and tell me that. And that was the problem, like, he thought that saying it to them, he had, like, a friend in secret saying that when they told me everything that he said. So what happened is, when they said things of that nature, I would just go tell Mark, like man, my friends would say this and I -- I -- I truly believe, like I told him on numerous -- on numerous occasions that I was uncomfortable, I know for a fact that

Page 111

he's -- he's treating me differently. And especially the -- like, the choice of words and the people that he using as examples, like I told you, when he was talking about he needed to go get head in the mountains by a black woman, it's just like -- like, I knew for a fact that he was racist. But I -- I allowed Mr. H and -- and, like, the girl in the front office to, you know, talk me out of -- out of what I initially wanted to do basically 'cause my ultimate goal was just to finish the class because I already had plans after that. I already knew what I wanted to do because I knew what I wanted to do when I was going to Public Administration. Because I knew that was too hard, and then I fell in love with another trade, which was working with my uncle. So that's what -- that's what basically held me back from -- I knew if I was to complain, I would stop my own -- stop from learning everything, and I knew this would be the end of the road for me, and I didn't want that to happen for myself. I -- I just wanted something to believe in that I was actually good at for once. And then, during the time, I would let him get away with a lot of things that I shouldn't have never allowed him to get away from in the beginning as a black man, period. He shouldn't have never in his life said anything with tires and rims are called niggers or anything like that. I shouldn't have -- I should have said something in the

Page 112

beginning, but like I said, allowing myself to -- to -- to -- to just scoop lower than what I would have done and -- and -- and believing that Mr. H was my only friend there to help me, which he did, he did, and -- and I'm not mad at that, but he know from the beginning I wanted to go and tell as much as I could, because I knew that I was the only one getting treated that way. So it was more than just a triggering when he told me that he -- he -- he could use these words and -- and that -- that he didn't see no problem with it, and that -- that -- that -- that I didn't have to be a pussy, and all kind of -- of these things of this nature. And I just, like, for somebody to -- to reiterate to a black man why he can't use the word, and -- and he don't see no problem with using the word and that -- that the only problem with the word from another white student using it was because it was at school, it -- I just knew my time was done at the school right then and there because I know for a fact that I wasn't being protected. I know for a fact that that just -- that just sealed -- that I shouldn't have never let it go this far. Because now he's too comfortable with it, now he's too comfortable with being -- being a racist, and he's too comfortable because now he making something, like I said, that was initially private, that I never knew about, he forced it on me to make it public. And I -- I felt, like, no racism -- if you're gonna

Page 113

be racist, take that somewhere else and just get it away from me and be in your own private space about that. Don't -- don't make it seem like I'm okay with it because that's -- that's when I drew the line on, like, okay, he -- he thinks that I'm okay with it because he's been doing this a lot, and I ain't really said nothing about it. So now he thinks it's okay, that he can keep going on about it 'cause from -- from when I let it go and I told him just -- just let it go and walk away from it, he doubled down and came back over and told me I'm not trying to keep it a secret. I'm not trying to make it seem like I'm scared to tell you this out loud because I just don't understand why my wife get to use the word nigger, and I can't use the word nigger at all. And that's when I was done.
Q Again, we're talking about Mr. Cooper. I'm talking about the first time that you talked to Mr. Woehl, where you explained to him that you felt like racial conduct was going on versus -- versus other -- other things. Was -- wasn't it in that December conversation with him where you -- where -- where you first explained to him that you felt like there was this racial stuff going on?
A No. The -- the -- the first day of class, I told him that I was completely uncomfortable with a white man telling me that he seen a lynching when he was a kid.
Q Okay.

Page 122

didn't really learn nothing due to Mr. Cooper. He was always in my face doing things and -- and harvesting me from learning anything. And -- and -- and the first part was the most important part because you had to learn how to take apart a car and all that. I didn't get to learn that because he was helping more of the white students than me. So I didn't learn anything with Mr. Cooper. The -- the fact of the matter is, I wasn't supposed to even move forward without learning the stuff that Mr. Cooper was supposed to teach me, and he knew that I didn't understand half of the stuff, and he didn't really care. Like I said, he would blow it away, he would spend more time with the white students, he'd get on his hands and knees and help them, physically get hands-on with the car, but then when I asked him, he would walk up to me and say, oh, well, you did that wrong, and then completely walk away. Now I'm looking at his back.

Q You were working with your uncle in this line of work, like, collision repair and stuff?

A Absolutely.

Q Starting in 2016?

A Probably. I think a little bit before that, but see, the difference between the school and my uncle, he understands my disability. Like, he don't just tell me something and not explain it over and over. He -- he

Page 123

actually shows me and explains to me, and then that's why I was -- I was learning a lot more with him. And that's when he told me that he would -- he would rather me go to school and get, like, paperwork and that I learned it on the technical level then versus what he's teaching me, hands-on, under the table.

Q Were you -- did you -- were you working with him consistently from 2016 forward, until today? Are you still doing work with him?

A No.

Q When did you stop doing work with him?

A To be honest, they -- none of my family knew what was going on. I kept it, like, a secret 'cause I was -- I was more so embarrassed, you know, to tell him things of that nature. So when I finally told him, he didn't -- 'cause he kept asking, like, what was going on with school, and I would just, like, walk around the question and stuff like that 'cause I didn't want to let him down. Especially after, you know, he -- he was already helping me a lot, and he -- he actually wanted me to be something. So like, the simple fact that I was already scared to tell him that I quit 'cause I felt like I let myself down, and I let him down. So I didn't really want to tell him that, so he didn't really find out until, like, I actually stopped school. And then this whole stuff was going on, so he

Page 124

thought I was going to school the whole time.

Q So hold -- so hold on. In -- in December is when you, quote, unquote, quit school; right? December of 2022?

A No, I was already quitting before that. Like, I was already missing school because -- because of how I was treated. I was already not coming and everything, and that's how I got behind on, like, my time and everything 'cause I was missing school on purpose because I already knew what was happening at school. So I was already scared to go to school.

Q How much time were you -- had you missed prior to December?

A Well, it was enough time for them to drop me, but Mr. -- Mr. H and I believe, at the time, I was talking to Mark about how everything was happening and how I was falling behind, but he -- he wanted to say it was just because he said my learning disability, but I was telling him everything that was happening, and that was holding me back the most with my time. And that's why I really couldn't complete it, 'cause like I said, I was scared to come to -- to even come to school with Mr. Cooper there. So I was already going a lot -- losing a lot of time 'cause I didn't want to go to school no more.

Q Okay. So then, talking about your uncle, you -- you didn't want to tell him that you were -- that you'd quit

Page 125

school, but then you restarted back up in February. Were you still working with your uncle during that time period?

A No.

Q Okay. So when did you -- when did you stop working with your uncle?

A I never really -- I never really, like, physically got, like, a check or anything from him, so I was just basically helping him with everything.

Q Oh, okay.

A I wasn't technically, like, getting paid for it or anything like that. I was learning -- in the learning process of actually learning how to -- to do everything, and -- and that's how I fell in love with it. That's how I fell in love with the body shop stuff because, like, the things that he was teaching me, it wasn't really that hard. It wasn't really that bad, like, just change the oil and stuff like that. I was -- I was more so learning about, like, the engine -- the engine work and stuff like that. And then I didn't know that he even knew how to paint on it and stuff like that, and then he showed me. And then that's when I was more excited because I liked the way my car was looking when he was helping me paint it. It was, like, a beautiful color, and that's when I fell in love with, like, painting the cars and how it would come out -- from seeing where it start from, to seeing where it ends. So I wasn't

**Page 130**

everything. I didn't have to go -- go through those excruciating, like, like, painful interviews, or me not understanding certain stuff. I already knew that I was okay to -- to work right afterwards 'cause I knew that my uncle had set something up for me, which is -- that's the reason why he -- he wanted me to go get the technical side. But to -- to go back to him and tell him that I know how to take off a door and -- and he actually put me to a customer car and then everything goes bad, I didn't want to be the one to do that. So during this investigation, I told him the truth. Then he said he wished I would have told him earlier, that way he could have helped me, maybe come up to the school and stuff like that to talk for me and things like that, but he was more -- he said that he didn't -- he didn't really care if I had quit. He didn't -- he just kind of discouraged that I didn't come tell him the truth because he -- he felt like no matter -- no matter how bad I wanted to make him proud or whatever, he did -- me going through racism wasn't enough to hide it from him.

Q So then, now what is -- what are you planning -- are you planning to try to seek out work, or?

A No, I don't think -- like, just based on the simple fact that I know, like, I don't know, like, what I was supposed to learn. I don't -- I -- I just, like, going through all this stuff, it just -- it just -- it just, like,

**Page 131**

I can't remember most of the things, like, when it come to, like, the -- the -- the technical side of actually putting, like, the cars and all that together, and -- and I just wish that -- that I didn't -- I wish that I never had went to this -- I wish -- because I was, like I said, I couldn't see anything else, I -- I really wanted to help my uncle, especially that he getting older and everything. I just -- I just -- this is -- I knew this is what I wanted to do, and, like, right after this, I just couldn't really look at him the same because he depended on me for so much -- so much stuff to learn, and I -- I couldn't really look at him and say I don't really know it. So I just -- I basically just -- I stayed with my mom, and then every time, like, he would ask me to, like, come help him and stuff, I just make up something like I don't feel good or something like that. So that way he won't -- he won't try to -- like, he basically won't be disappointed in me and stuff.

Q Do you have any plans to -- to try to do any sort of work in the future, whether in collision repair or anything else?

A If I'm being honest, no, because, like, this experience, like, I -- I -- it's just really hard for me to -- especially, like, when -- when I go into something that I don't really know, I don't know, like, how people gonna look at me, especially after this. Like, I don't want

**Page 132**

to go up in there and then I'm the only one that -- that -- that's slower than people, or like, I don't get it as fast as them. And I don't want to feel like I'm -- I'm dragging people work and all that, 'cause then I'm gonna get fired. Then I'm -- then at that point, then I won't be able to work at all, so like, I didn't -- I just, I'm -- I'm just at the house. I just play games and stuff like that.

Q And you -- do you live at home with your mom, or?

A No, not now. I got Section 8, so I got Section 8 housing and stuff, so I'm by myself with my -- with my -- like, my animals and stuff.

Q Okay. All right. Okay. I think we're done.

MR. WOODS: Okay. No follow-ups. We'll read and sign.

(Thereupon, the deposition concluded at 12:21 PM)

______________________________
TYRONE ROSS

**Page 133**

STATE OF ARIZONA )
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn in by me to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction.

I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

[X] Review and signature was requested.
[ ] Review and signature was waived.
[ ] Review and signature was not requested.

I CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 (J)(1)(g)(1) and (2). Dated at Tempe, Arizona, this 17th of June, 2026.

Audra Littou
------------------------------------
AUDRA LITTOU, CVR
Certified Reporter
Arizona CR No. 51052

**Page 134**

I CERTIFY that Coash Court Reporting & Video, LLC, has complied with the ethical obligations set forth in ACJA 7-206 (J) (1)(g)(1) through (6).

------------------------------------------------

COASH COURT REPORTING & VIDEO,LLC
Registered Reporting Firm
Arizona RRF No. R1228

# GateWay Community College

This certifies that:

## Tyrone Dawayne Ross

Has completed the course of study prescribed by the

Maricopa Community College District Governing Board

Awarded this seventh day of February, two thousand twenty-three

## Certificate of Competency

### Collision Repair Technician

President of the College | Chancellor | President of the Governing Board

EXHIBIT
6/11/24
Ross 1

**From:** Tyrone Ross <tyr2142738@maricopa.edu>
**Sent:** Wed, 05 Apr 2023 12:12:24 -0700
**To:** "amy.diaz@gatewaycc.edu" <amy.diaz@gatewaycc.edu>
**Subject:** Re: Request for Administrative Review of Investigation

---

Thank you, I appreciate that, my personal email is [redacted]

On Wednesday, April 5, 2023, Amy Diaz <amy.diaz@gatewaycc.edu> wrote:

Hi Tyrone,

Congratulations on completing your program! I will start a new email with our Registrar who can tell you about receiving your certificate.

I would say please check out with Mr. Hernandez and Mr. Woehl to see if there is anything else you need to do.

You'll hear from me on the complaint process in the coming days. By the way, do I have a personal email address for you given that your college-issued email may not be one you check as regularly?

Thank you,

Amy

**Amy Diaz, Ed.D.**

GateWay Community College

MARICOPA COMMUNITY COLLEGES

Interim President

108 N. 40th Street, Phoenix, AZ 85034

amy.diaz@gatewaycc.edu

https://www.gatewaycc.edu/

O: 602-286-8008

Pronouns: she/her/hers

LinkedIn | Twitter | Facebook

**Would you support our students with your tax-deductible gift?**

**PLEASE GIVE NOW**

EXHIBIT
6/11/24
Ross 2
A. Litton
PENGAD 800-631-6989

Robert T. Mills (Arizona Bar #018853)
Sean A. Woods (Arizona Bar #028930)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com
swoods@millsandwoods.com
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

TYRONE ROSS,

Plaintiff,

vs.

MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT, an Arizona Public Entity; BRENT COOPER; MARK WOEHL,

Defendants.

Case No.: 2:24-CV-00312-SRB

**PLAINTIFF'S RESPONSE TO DEFENDANT MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT'S FIRST SET OF REQUESTS FOR PRODUCTION**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

Through counsel undersigned and pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiff Tyrone Ross ("Plaintiff") hereby responds to the First Set of Requests for Production served upon him by Defendant Maricopa County Community College District ("MCCCD"), as set forth below.

**REQUESTS FOR PRODUCTION ("RFPs")**

**RFP 1: All communications between you and any witness or potential witness regarding any of your claims asserted in this action.**

EXHIBIT
6/11/26
Ross 3
A. Litton
PENGAD 800-631-6989

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**RESPONSE:** Plaintiff objects to RFP 1 on the grounds that it is overbroad, unduly burdensome, vague, and violative of privacy.

Subject to and without waiving the above objections, *see* ROSS000001-36, 54, 56-64.

**RFP 2: Any audio or video recording(s) or transcript(s) of recording(s) that relate to any of the claims asserted in this action.**

**RESPONSE:** Plaintiff objects to RFP 2 on the grounds that it is overbroad, unduly burdensome, and violative of privacy.

Subject to and without waiving the above objections, *see* ROSS000053, 56.

**RFA 3: Any statement, however recorded, whether signed or unsigned, given by any person, entity, or agency that relates to any of your claims asserted in this action.**

**RESPONSE:** Plaintiff objects to RFP 3 on the grounds that it is overbroad, unduly burdensome, vague, and violative of privacy.

Subject to and without waiving the above objections, *see* ROSS000001-54, 56-64.

**RFP 4: All documents or communications submitted by you or on your behalf to any federal, state, county, or local governmental agency that relate to any of your claims asserted in this action.**

**RESPONSE:** Plaintiff objects to RFP 4 on the grounds that it is overbroad, unduly burdensome, vague, and violative of privacy.

Subject to and without waiving the above objections, *see* ROSS000022-52.

**<u>RFP 5:</u> All profiles, postings, messages, photographs, videos, or other communications (including status updates and wall comments) by you on any social media site, including but not limited to Facebook, LinkedIn, Twitter ("X"), Google+, Tumblr, Instagram, Snapchat, TikTok, etc., that relate to any of your claims asserted in this action.**

**<u>RESPONSE:</u>** Plaintiff objects to RFP 5 on the grounds that it is overbroad, unduly burdensome, vague, and violative of privacy.

Subject to and without waiving the above objections, Plaintiff has no responsive documents.

**<u>RFP 6:</u> All non-privileged e-mail communications sent or received by Plaintiff, including those from any personal email account, that relate to any claim asserted in this action.**

**<u>RESPONSE:</u>** Plaintiff objects to RFP 6 on the grounds that it is overbroad, unduly burdensome, and violative of privacy.

Subject to and without waiving the above objections, Plaintiff has no responsive documents, as Plaintiff used his MCCCD school email account, which he continues to be denied access to, to send and receive any email communications relating to this action. Accordingly, on information and belief any documents responsive to RFP 6 are currently in the possession and control of MCCCD.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**RFP 7: Any and all communications between you and any employee or agent of the Maricopa County Community College District relating to your enrollment, attendance, or participation in Gateway Community College's Autobody and Collision Certificate Program.**

**RESPONSE:** Plaintiff objects to RFP 7 on the grounds that it is overbroad, unduly burdensome, vague, violative of privacy, and seeks documents that are not relevant to this action.

Subject to and without waiving the above objections, Plaintiff used his MCCCD school email account, which he continues to be denied access to, to send and receive any email communications relating to this action. In addition to email communications, *see* ROSS000001-17, 54, 56-64.

**RFP 8: Any and all communications between you and any employee or agent of the Maricopa County Community College District relating to any of your claims asserted in this action.**

**RESPONSE:** Plaintiff objects to RFP 8 on the grounds that it is overbroad, unduly burdensome, vague, and violative of privacy.

Subject to and without waiving the above objections, Plaintiff used his MCCCD school email account, which he continues to be denied access to, to send and receive any email communications relating to this action. In addition to email communications, *see* ROSS000001-17, 54, 56-64.

**RFP 9: All documents and communications not otherwise covered above that you contend support, relate to, or in any way pertain to any of your claims asserted in this action.**

**RESPONSE:** Plaintiff objects to RFP 9 on the grounds that it is overbroad, unduly burdensome, vague, and violative of privacy.

Subject to and without waiving the above objections, *see* ROSS000055.

**RESPECTFULLY SUBMITTED** this 21st day of May 2026.

**MILLS + WOODS LAW, PLLC**

By *_/s/ Sean A. Woods_*
Sean A. Woods
Robert T. Mills
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
*Attorneys for Plaintiff*

**ORIGINAL** served this 21st day of May 2026
via email to:

Justin S. Pierce
Justin@PierceColeman.com
Alexandra N. Cayton
Alex@PierceColeman.com
**PIERCE COLEMAN PLLC**
17851 N 85th St., Ste. 175
Scottsdale, AZ 85255
(602) 772-5506
*Attorneys for Defendants*

*_/s/ Ben Dangerfield_*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

On Wed, Apr 5, 2023 at 10:11 AM Tyrone Ross <tyr2142738@maricopa.edu> wrote:

Good morning, for my last day how would I clock out just clock out? Or would I need to head to the front office and do that? I know we don't have like a graduation so I was wondering how do I go about it?

On Friday, March 31, 2023, Tyrone Ross <tyr2142738@maricopa.edu> wrote:

Thank you so much mam, I appreciate you to

The upmost, have a blessed weekend.

On Friday, March 31, 2023, Amy Diaz <amy.diaz@gatewaycc.edu> wrote:

Dear Tyrone,

This email is sent to inform you that I have received your request for an Administrative Review of the investigation mentioned below. I will look into this matter and get back to you within the allotted 10 business days that I have according to the policy (by April 13th).

I understand that you and Mr. Woehl have connected (perhaps through Mr. Hernandez) and that you will be given one more day to complete your project.

Congratulations on completing your program! I wish you well as you look for a job (and remember to contact George Spelius if you're interested in considering a career at Safelite).

Fondly,
Amy

EXHIBIT
6/11/26
Ross 4
A. Litton

PENGAD 800-631-6989

Good morning, my name is Tyrone ross, I'm currently a student at gateway community college, I attend the collision car repair class, in which I have not been treated fair. I don't feel welcome in the class and my instructor has made it the worst experience a student can ever encounter. I have to write this letter because I feel like I've been racially singled out, I've been a victim of racial bias, I absolutely feel like I cannot speak my mind freely in class due to my teacher Mr. Cooper. Mr. Cooper has been the most negative teacher I ever ran across, he has not inspired not one person in this class to be here or to do collision repair work. Every time I do a project he always has something negative to say about it vs helping me. For example, when I finished painting my slingshot pieces and showed Mr. Hernandez he replied that "oh Mr. Hernandez did a good job trying to put me down as if I can't do good work myself". When I bought me new spray guns he told me I didn't need them for the level I'm on as if I wasted my time purchasing new paint guns. He has been completely negative towards me since I started this class. He has not given me any donated materials that's for students who can't afford materials, in turn he always asked me if I have money and why can't I afford things which doesn't Make any sense if it supposes to be for us, but yet he won't hesitate to give the materials to [redacted]which is another student that he has been showing favoritism to since the first day of class. I felt completely uncomfortable with my instructor since the day he singled me out in class calling me out just because I couldn't afford materials that comes with this class, and it has gotten more worst from when we first supposedly resolved this issue. He's always talking about how he likes it when he has girl students so when they have their breast out it makes him hornier then when he was a young adult, he always talking about his out of school life which I have been completely uncomfortable with as well because he not only sounds like a prowler but also a pervert. Her told us that's exactly why he shows favoritism and not to us. He has been showing favoritism to one student, [redacted]who has made this class a hazardous working environment, there was an incident last week when the instructor came to help me with a dent in my car, she immediately started cursing them out screaming why is he helping me as if I'm not a student, then Mr. Cooper did nothing about it. He allowed her to scream, curse them out all because her project didn't come out correctly. Now whenever I need help I can't get help because of the situation with her, and the teachers feel more obligated to help her than any other students. There was also an incident where a student used the word (nigger) and Mr. Cooper came up to me and asked me verbatim, "did anybody use this word towards you, I replied no, then he asked me was I ok I replied yes and I wanted to let it go because it was not directed towards me, so if you want to address it based on just the word being used then yes its inappropriate, but then Mr. Cooper proceeded to tell me that using the word isn't the issue because him and his friends use it all the time and he actually said (nigger) then said he just knows when he get to school that word is not allowed to use. So, in turn I felt completely disrespected, I felt completely uncomfortable, because he basically said being a racist or using the word isn't a problem but only when you use it at school. Last week he came up to me and asked me why certain people get to use the word (nigger) and certain people can't, then I asked him what does he mean by that, so he explained that his wife called him a (nigger) which he actually says the word comfortably every single time, that she called him one and then apologized. To be honest I just stayed quite because I was honestly lost why he had come up to me which I am the only black student in class to feel that comfortable with telling me this. Mr. cooper has been very disrespectful on that level and doesn't blink an eye when it comes to telling me racist stuff like this. Every time I speak my mind like today because has allowing [redacted]o do whatever she likes in class, takes the painting booth whenever she wants to and then he set rules forth for us but is allowing her to break each rule, so when I speak my mind about it and tell Mr. Cooper he is not being fair he tells me I'm looking at an illusion, or we don't know what has going through putting up

EXHIBIT
PENGAD 800-631-6989
6/11/24
Ross 5
A. Litton

with her making it ok for him to show favoritism to her and treat me differently. Today he tried kicking me out of class because I'm fed up with the way has treating not only me but the rest of the class. We all pulled him to the side today and told him he's been treating us unfair in this class and all he does is walk around it with excuses. I do not feel that I have gotten what I paid for. I've complained to Mark, the program manager and told him about the two incidents where me Cooper singled me out and took my freshly painted pieces off my bench just to put other students there. I have multiple witnesses who can attest to this as well. Then he started moving my car without permission while I'm there and when I politely asked him to come get me to move my car since I'm here he replied that this is his body shop he can do whatever he wanted then we got into a heated argument there. Just like today when I spoke my mind and called him out on his lies he wanted to try and kick me out the class, so now I want to leave. I don't feel welcome in this class I haven't since day one of this class especially when he referred to my race as "people like you", even when my white friend/student name [redacted] was helping me he would pull him to the side and say, you know your white jokingly, then says it don't look right that you working for a black person. I told mark about it and Mr. Cooper has not changed since. So now I want to find a solution for me to leave the class because I just can't continue with this class knowing I've been a targeted student, racially targeted by all he Has said to me and all he has done to me. he's in my eyes a racist, bias teacher, he doesn't like me because of who I am and how I speak up to defend myself every time. After I write this letter I will try and follow up with taking this the legal route because I have been completely treated unfair, I've been targeted and my freedom of speaking my mind has gotten me targeted. He called us a lynch mob because today we all got fed up and spoke our mind while he still making excuses for his behavior as a teacher, then told me if I don't let it go then I would have to leave for the day so I went to his boss mark because I think it not right him trying to tell me to leave just because I'm bringing up a revolving issue. I'm tired of him saying racist things to me and I'm tired of being a target for him. I don't not want to continue this class, I don't feel safe, I don't feel welcome what so ever. As I sated previously I have more than 10 students who can attest to his racist, pervert, disrespectful, favoritism, negative behavior, ways which I will get for this letter.

To recap I've had multiple conversations to resolve this matter with Mr. Cooper with no success therefore I am writing this account to the best of my knowledge to be accurate and true.

**From:** Tyrone Ross <TYR2142738@maricopa.edu>
**Sent:** Tue, 06 Dec 2022 12:07:41 -0700
**To:** "Urbanski,Craig K" <craig.urbanski@gatewaycc.edu>
**Subject:** Withdrawal from class if possible
**Attachments:**
· Tyrone Complaint.docx *(21 kb)*

---

EXHIBIT
6/11/26
Ross 6
A. Litton
PENGAD 800-631-6989

# EXHIBIT B

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Tyrone Ross,<br>Plaintiff,<br>vs.<br>Maricopa County Community College District, an Arizona public entity; Brent Cooper and Mark Wohl,<br>Defendants. | Case No. CV-25-01671-PHX-SMB |

DEPOSITION OF ROGER MARK WOEHL

Peoria, Arizona

March 25, 2026

Prepared by:

Gerard T. Coash, RPR, RMR
Certified Reporter
Certification No. 50503

CERTIFIED TRANSCRIPT

INDEX


| WITNESS | | PAGE |
|---|---|---|
| ROGER MARK WOEHL | | |
| Examination by Mr. Woods | | 5 |

EXHIBITS MARKED

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Letter from Tyrone Ross MCCCD-Ross 000428 - 000429 | 17 |
| Exhibit 2 | Email caption from Tyrone Ross to Mark Woehl date4d 12-6-22 MCCCD-Ross 000431 | 34 |
| Exhibit 3 | Emails MCCCD-Ross 000443 - 000444 | 35 |
| Exhibit 4 | Emails MCCCD-Ross 000462 - 000470 | 40 |
| Exhibit 5 | Email string ending from Lora Timmons to Stephanie Polliard dated 12-12-22 MCCCD-Ross 000488 - 000492 | 48 |
| Exhibit 6 | Emails MCCCD-Ross 000466 | 50 |
| Exhibit 7 | Defendant's Responses to Plaintiff's First Set of Interrogatories Case No: 25-CV-01671-PHX-SMB | 58 |
| Exhibit 8 | Plaintiff's First Supplemental Disclosure Statement Case No: CV-25-01671-PHX-SMB | 62 |
| Exhibit 9 | Letter from Amy Diaz to Tyrone Ross dated 3-10-23 ROSS_000003 - 000007 | 66 |
| Exhibit 10 | Recording Ross_000053 - IMG_4450.MOV | 99 |





| | | |
|---|---|---|
| Exhibit 11 | Recording Ross_000053 - IMG_4450.mp4 | 99 |
| Exhibit 12 | Non-Discrimination Policy MCCCD-Ross 001058 - 001101 | 100 |




DEPOSITION OF ROGER MARK WOEHL

was taken on March 25, 2026, commencing at 9:00 a.m., with the witness appearing from 12428 West Montgomery Road, Peoria, Arizona; with all other participants appearing via videoconference from their respective locations, before Gerard T. Coash, a Certified Reporter in the State of Arizona.

* * *

APPEARANCES:

For the Plaintiff:
MILLS + WOODS LAW, PLLC
By: Sean A. Woods, Esq.
5055 North 12st Street
Suite 101
Phoenix, Arizona 85014
480-999-4556
swoods@millsandwoods.com

For the Defendants:
PIERCE COLEMAN, PLLC
By: Alexandra N. Cayton, Esq.
17851 North 85th Street
Suite 175
Scottsdale, Arizona 85255
602-772-5506
alex@piercecoleman.com

Also present: Tyrone Ross, Sandra Garcia



ROGER MARK WOEHL,

the witness herein, having been first duly sworn by the Certified Reporter, was examined and testified as follows:

EXAMINATION

BY MR. WOODS:
Q. Good morning, Mr. Woehl. Would you state your full name for the record?
A. Excuse me, I couldn't hear you.
Q. Okay. Can you hear me right now?
A. You're very very faint.
(An off-the-record discussion ensued.)
BY MR. WOODS:
Q. Okay. Would you state your full name for the record?
A. My full name is Roger Mark Woehl, W-o-e-h-l.
Q. I think we might have had your name misspelled, so I'll make sure we correct that. My apologies on that.
Have you ever had your deposition taken before?
A. No.
Q. Okay. I'll be very brief on the ground rules. We can't speak over each other because the court reporter has to be able to take down all the words that we speak. Okay?

A. Okay.
Q. We have to -- you have to give verbal answers. Sometimes people will nod or make an uh-huh or something like that. If you hear me say, "Was that a yes," I'm not trying to be mean. It's just we're trying to get a clear record. Okay?
A. Understood.
Q. If you ever need to take a break, let me know. If there's a question pending, go ahead and answer that, then we'll go to break. Sound good?
A. Sounds good.
Q. Okay. Where are you from?
A. Originally?
Q. Yeah.
A. Salina, Kansas.
Q. Okay. When did you move to Arizona?
A. I believe 1980.
Q. Okay. I assume you were young?
A. I was a junior in high school.
Q. Okay. You have some college?
A. I do.
Q. What degrees do you have?
A. I stopped at my AA.
Q. Okay. What is your current job?
A. I teach construction at Mesa Community College, a



faculty member.
Q. Okay. When did you start working at Mesa?
A. Three years ago.
Q. Do you have an approximate month and day?
A. I believe the first day was -- the first day of accountability was like August, I think the 13th or something like that, first or second week of August. It was three years ago. It was 2023, right? Right before the semester begins.
Q. Okay. All right. So well over two and a half years ago?
A. Yes.
Q. And did you leave GateWay to join Mesa?
A. I did.
Q. Why did you leave GateWay?
A. I wanted to teach, so I applied for the job, a teaching position. I applied actually several times, and then finally got an interview and got selected.
Q. Okay. Prior to leaving GateWay, what was your position before you left?
A. I was the program manager for the Clock Hour programs.
Q. What's a Clock Hour program?
A. So it works on time -- seat time. So clock hour basically means that a student would pay for X amount of



hours to get the training necessary to complete competencies. And he has to make 100 percent attendance in order to graduate from that program. Versus the credit world where you just do your three credit loads and then move on to your class. This is actually a combination of all classes bundled into a Clock Hour model.
Are you familiar with RSI refrigeration school? They do similar projects.
Q. Okay.
A. So these are technical training schools.
Q. Okay. And you oversaw all the Clock Hour programs?
A. I did. I think there was -- one, two, three, four, five, six -- seven of them.
Q. When did you get hired -- let me ask you this. I'm sorry.
What was the first date you were hired by the Maricopa Community College District?
A. I believe it was 2010, April, maybe. 2010.
Q. You've been employed by them ever since?
A. That's correct.
Q. Okay.
A. I started with Rio, and then I moved to GateWay.
Q. It looks like, based on what I've seen, you were a vocational trainer at Rio?



A. I was.
Q. What did that entail?
A. Teaching. Actually, it was cabinetry at Lewis prison through their incarcerated programs.
Q. And then you were an instructor at the Maricopa Skill Center?
A. For I think about three or four years, I taught construction.
Q. Okay. And then you became an assistant program manager?
A. I think it was just program manager. I don't think there was an assistant label at the time.
Q. When did that happen?
A. I think in my third, fourth year at GateWay.
Q. Okay. As the program manager at GateWay, what were your day-to-day responsibilities?
A. I oversaw program and staff. It morphed many times in the nine years that I was there to different roles and responsibilities. But primarily, my job was to make sure that the instructors had the material and the budget that they needed to operate the class properly, meet deadlines that are required by the -- are you familiar with HLC, Higher Learning Commission for accreditation?
Q. Just high level, why don't you explain that?

Page 10

A. So just program review. I just made sure that the programs were operating smoothly so the instructors had what they need to teach the students.
Q. Okay. Did you oversee any of the students?
A. How so?
Q. Were you responsible for handling student complaints?
A. No -- student complaints, yes.
Q. Okay. That was a broad question. You answered student complaints, yes.
What kind of complaints were you responsible for?
A. We had two types of complaints. One was noninstructional grievance, and one was an instructional grievance.
Q. Were you responsible for evaluating instructors?
A. Yes.
Q. What did that entail?
A. Walking into the classroom, meeting with the instructors, looking over what they were going to teach that day, and then monitoring how they taught that topic or subject. I looked for how they actually presented the curriculum and the training, and then how they interacted with the students. Most of them were done in lab, so we watched how the students were actually participating in

Page 11

the labs that were taking place. I measured them on their communication and their ability to deliver curriculum.
Q. You said "we," who else would be involved in that?
A. I don't remember "we."
Q. When I asked about evaluating and supervising instructors, you said that we would go into the classroom.
A. It was just me. I misspoke.
Q. Yeah, I just wanted to make sure.
A. Yeah.
Q. You worked with Brent Cooper, correct?
A. I did.
Q. How long did you work with Brent Cooper?
A. I believe it was six years, five to six.
Q. In that six years, was he in the same role the entire time?
A. He was.
Q. And what role was that?
A. He was the lead instructor for the automotive collision repair program.
Q. Did he report to you?
A. He did.
Q. Was there ever a time in that six years where he reported to somebody else?
A. No.

Page 12

Q. You were his supervisor when Mr. Ross filed his complaint in December 2022, correct?
A. Yes.
Q. In those six years, did you conduct performance evaluations of Mr. Cooper?
A. Yes.
Q. In those six years, did you ever receive any complaints about Mr. Cooper's conduct toward students?
A. No.
Q. Except for Mr. Ross's, correct?
A. That is correct, until Mr. Ross's, yes.
Q. Okay. Did you ever -- did you ever see Mr. Cooper make any racially insensitive remarks?
A. I did not see him do that.
Q. Did you ever see him make any sexually inappropriate comments?
A. No.
Q. Who was your supervisor?
A. At the time of the complaint or prior?
Q. At the time.
A. It was Craig Urbanski.
Q. Was he the dean?
A. He was the division chair for applied science, I believe. The dean was on I believe what they call a reassignment at the district. So Craig took the position

Page 13

while he was actually doing work at the district level.
Q. Okay.
A. CJ Wurster, I believe.
Q. CJ -- what was that last name again?
A. Wurster, W-u-s-t-e-r [sic]. But he wasn't present at the time. He was working on bachelor's programs.
Q. Okay. So during that time, was it your understanding that Craig Urbanski was like an interim dean?
A. Correct.
Q. Describe -- we talked about the automotive repair program. What is that program?
A. Collision repair. It's basically tearing down an automobile, fixing it, removing the dents, sanding it, and then putting everything back together and painting it. So it was the actual repair part and then the finish part.
Q. Okay. So they would actually do -- in that program, students would do auto body work --
A. At the beginning.
Q. -- painting?
A. And then learning the steps to paint, correct.
Q. In December of 2022, were there other instructors besides Brent Cooper that ran that program?
A. Yes. There was an instructor, Mike Hernandez.

Page 14

Q. Were Brent Cooper and Mike Hernandez at the same level?
A. Mike was an instructor. Brent was the lead instructor.
Q. Okay. Did they have -- so I'm guessing -- correct me if I'm wrong -- did they have separate classes where Mike taught one and Brent taught the other?
A. They worked together in tandem to help the students because of the number of students and the actual design of the classroom. Both of them had individual strength, like Brent was better at the collision repair side, and Mike was better on the painting/refinishing side. However, with the volume of students, and for safety concerns, they intermingled between each other's strengths and weaknesses.
Q. Okay. At the time, were there -- regardless of who was instructing, were there multiple different -- I guess take it back.
In a college, there's an English course. And there are going to be multiple teachers and multiple times and dates that the English course is taught with different classroom makeups. At the time of -- in December of 2022, were there multiple classrooms for this automotive program?
A. No. There was just the lab and one classroom for

Page 15

theory.
Q. Okay. So when students signed up under that Clock Hour program for that, it would always be -- the students would have to show up at the same time, same dates. Is that accurate?
A. Yes. The program ran from 7:00 to 2:00. It was six hours a day, Monday through Thursday. 25 hours, I believe, weekly.
Q. Were there any other days that if a student missed a Monday through Thursday, were there makeup days or some sort of situation to allow for makeup hours?
A. There were built-in makeup days. We left our Fridays open for that to be a possibility.
Also within the schedule, we actually had a few days built in like between a section. So if a student completed a body section and was moving from fenders, let's say, to hoods, we would throw an extra day in there for a student to either complete a project or come back and make up time.
Q. In the program that was running in December of 2022, did you know -- or can you recall what the demographic makeup of the student class was at that time?
MS. CAYTON: I'm going to object to FERPA on this question.
MR. WOODS: Okay. I guess you just do a

Page 16

form, foundation. But if you're going to object to FERPA, all I'm asking about is the demographic. I'm not asking about individual students.
MS. CAYTON: The demographic makeup of those students are going to require Mark to give away individual demographics of the class makeup.
MR. WOODS: I'm not asking, again, about individuals. I'm asking just about the overall. I'm sure that Maricopa County Community Colleges has a demographic statistic that is public facing.
BY MR. WOODS:
Q. So let me ask more specifically, was Mr. Ross the only African-American student at that time?
A. I do not recall.
Q. When I say "at that time," I mean in that actual class.
A. I don't recall.
Q. Mr. Ross came to you with complaints about Mr. Cooper before he filed his formal complaint, correct?
A. Yes.
Q. How many times did Mr. Ross come to you before he filed a formal complaint?
A. I think maybe twice. I know one for sure, but it might have been twice.
Q. Okay. Do you remember Mr. Ross's complaint being

Page 17

sent to you?
A. What do you mean, sent to me?
Q. Via an email?
A. No. I don't recall it being sent to me. Are you talking about the formal complaint?
Q. I'm talking about -- I'll show you here. Let me just show you. I don't think we're going to mark anything yet. Let me know when you can see this.
A. Yeah, I don't remember that document.
Q. Okay. So you don't remember this document that starts on screen, "Good morning, my name is Tyrone Ross"?
A. I don't remember this document. I don't recall it.
Q. Okay. Just for reference, this document is Bates stamped MCCCD-Ross 000428 and 429. I'm going to mark -- I am going to mark those two pages as Exhibit 1.
(Deposition Exhibit 1 was marked for identification.)
BY MR. WOODS:
Q. When Mr. Ross came to you with his complaints those two times prior to a formal complaint, do you recall what he told you?
A. Excuse me, I didn't hear that last part.
Q. Do you recall what Mr. Ross told you?
A. I do not recall.

Page 18

Q. Do you recall him telling you that Mr. Cooper had told a student -- a white student that that white student working with Mr. Ross didn't look right, and it is reverse slavery?
A. No.
Q. You don't recall the term reverse slavery?
A. I do not.
Q. What specifically did Mr. Ross tell you about Mr. Cooper?
A. He came into my office to discuss a lot of things all at one time, but felt like he was struggling in the class and needed additional help is what I remember. He told me that they had a personality difference and a clash with how they communicated. And I took down some notes about what he was talking about. I actually talked to him about our policy and how our policy works, that what we were doing was an informal version of mediation to try to come to some kind of solution to whatever was going on.
I -- from what I can recall, it was that he needed more time on task to get caught up. And that's pretty much a standard in these programs where students are learning a new technical skill, hands-on skill. Some students accelerate faster than others, and he wanted additional time or additional help.
Q. Anything else?

Page 19

A. That's all I can remember. Oh, I did tell him that -- you know, I gave him the policy on how noninstructional complaints work by the college, and I told him that he needed to follow that process.
Q. You told him he needed to follow what kind of process?
A. Our noninstructional grievance process. And I don't remember all the details. It's been three years -- three years, maybe four years since I've looked at that.
But the first part I do recall was basically where a student had a conflict of interest. He was asked to speak to the instructor directly to come to some kind of resolution within a certain time frame. And then if it escalated, then it became a formal complaint.
Q. Are there two grievance processes? You mentioned noninstructional --
A. Noninstructional and instructional.
Q. Okay. What would an instructional grievance consist of?
A. You're not happy with a grade or you want to argue about a grade or a test or a quiz.
Q. And anything else on that, or is it just grade related?
A. That's the only part I can recall.
Q. In your current role with Maricopa County

Page 20

Community Colleges, do those grievance processes still reply?
A. They do.
Q. Okay. What would noninstructional grievance process entail?
A. I don't remember all the details of it.
From what I can recall, it was first you reach out to instructor, you try to figure it out. You guys have a conversation. You come up with a solution, right? You agree to a solution. And then if that doesn't work, then the next step is to have a written formal complaint submitted to upper leadership to see if they can get in the middle and mediate some kind of resolution.
Q. Were there next steps if all that failed?
A. So, yeah, that all went to upper leadership. So once that process starts, I usually was sidelined.
Q. You mentioned that when Mr. Ross came to you that you took notes. Were those handwritten? Were those written into a Word document? How were those -- how were those written down?
A. I wrote them down in a Google form.
Q. In a Google form?
A. In a Google form, yes.
Q. Is that something that you created or something that --

Page 21

A. It's something I created.
Q. Okay. Is that something you still have?
A. I do not.
Q. Was that created on your personal Google account or your Maricopa County --
A. Maricopa account.
Q. And when did that -- when did you lose access to that Google form?
A. I didn't look at it after I left GateWay. So I don't know when it was removed from my box. I think, if I recall, Google sends me these notices every now and then that says these unopened files will be deleted after X amount of days. For some reason, 100 days sounds familiar to me. And I get occasional emails about purging or archiving. So I don't really pay attention to it, as far as the exact dates.
Q. And you believe you got a notice on this Google form?
A. Excuse me?
Q. You believe you received a purge notice related to this Google form?
A. I could not say that it was specific to that.
Q. Was this a Google form that you had created as a generic form that you could fill out any time there was a grievance?

Page 22

A. That is correct. It wasn't just for grievances. It was for any time a student wanted to come in and have a conversation and ask about, you know, how to handle something. So I took notes this way so that it was easily and quickly documented.
Q. Okay. And why would you want it documented?
A. So I had something to recall. Because when you're managing nine programs, you have a lot of students interacting with a lot of different staff members and faculty and instructors, and I couldn't keep it all together. There was times it was, you know, hundreds of students in the actual programs. So in order for me to keep track of this, I created a Google form, basically a checklist to make sure that I wrote down what the student was saying, the date, the time, so that we had an ongoing record of what was going on. A majority of these were solved between a student and the instructor or the staff member without any further interactions. Occasionally, on rare occasions, it showed up again so that it actually gave me a way to monitor how progress was actually being held, because I couldn't be in every classroom every second of the day.
Q. When you filled out that Google form, would it create a document once you submitted it, or how did that work?

Page 23

A. Yeah, it creates a spreadsheet. You have to download it as a spreadsheet.
Q. Would it save it in your Google drive as a spreadsheet?
A. That's correct.
Q. Okay. And then you could download it to Microsoft or something like that, right?
A. Yeah, you can download it.
Q. Has your Google account changed since you were at GateWay?
A. I don't really know what that means. My email address changed to Mesa. But as far as the account, I don't believe so. I think it's just been updated with my new designation within the company.
Q. Okay. So when you moved from GateWay to Mesa and your email changed, did you still have access to the same Google drive or did that change as well?
A. No, I still had access to the same Google drive.
Q. When the formal complaint came in from Mr. Ross, were you asked to provide any documentation that you had related to him?
MS. CAYTON: Form.
THE WITNESS: Go ahead.
BY MR. WOODS:
Q. You can answer if you can.

Page 24

A. I didn't hear that.
Q. Your attorney objected with the word "form." You're going to hear those objections periodically. She's just preserving her objection on the record. But you can answer the question.
A. So that was shared with my boss.
Q. Okay. So you would share your documentation with your boss?
A. Yes.
Q. And again, that was Craig?
A. Correct, uh-huh.
Q. Did you share the Google form, the spreadsheet that resulted from it with your boss?
A. I did.
Q. Do you remember Mr. Ross telling you that Mr. Cooper told his class that he had attended a lynching with his grandfather when he was a kid?
A. I do not.
Q. Do you remember Mr. Ross telling you that Mr. Cooper used the N-word in conversation during class time?
A. I do remember him telling me that.
Q. Do you remember Mr. Ross telling you that Mr. Cooper made sexually explicit comments in class?
A. I do not.

Page 25

Q. Do you remember Mr. Ross complaining about being denied donated shop supplies?
A. I do not.
Q. Do you remember him telling you that other students received donated shop supplies?
A. No.
Q. Do you remember Mr. Ross complaining about being denied equal access to the paint booth?
A. No.
Q. Do you remember Mr. Ross complaining about Mr. Cooper actually driving Mr. Ross's personal vehicle without permission?
A. No.
Q. Do you remember Mr. Ross complaining about being singled out for his dress code?
A. No.
Q. I'm sorry, I didn't hear that.
A. No. Sorry, no.
Q. With the two different grievances that you mentioned, the instructional and the noninstructional, were there -- at the time, were there forms maintained that you knew of that were the official forms to use for those complaints?
A. There was link in the syllabus for the students to actually go -- under grievances in the syllabus for a

Page 26

student to go to. It was the district's site that actually spelled out the process. I also, in our original meeting with Tyrone -- I did this with all students -- I gave them a printed copy of the grievance process to follow so they would have had a printed one. They would have had one in their syllabus, in their course syllabus, and then they would have full access to the student policy manual that also included that.

Q. Okay. Did those processes exist in some sort of overarching document with policies?

A. It was in the policy manual, yeah.

Q. Okay. Did they have specific form names?

A. I'm not really sure what -- what you mean by forms. It was this is the process. They didn't really have a form you filled out. It was this is the process you followed. So if the student had a handwritten complaint that he wanted to make a formal complaint, that's what he did.

I believe it also talked about who in the chain of command would get this formal complaint. So for example, if it came to me, I would submit it to the dean. The dean would review it, and then I believe would actually submit it to the VP so that they were aware, and then it would go through the process of being investigated. I was not in line of investigating my own

Page 27

staff.

Q. When Mr. Ross came to you before his formal complaint, did you tell Mr. Ross to speak directly with Mr. Cooper about his concerns?

A. I did.

Q. I went through a couple of questions about, you know, did Mr. Ross tell you this. And one of them was did Mr. Ross ever tell you that Mr. Cooper used the N-word. Do you remember answering yes to that?

A. Mr. Ross did tell me that, yes.

Q. Was Mr. Cooper -- I'm sorry -- what race is Mr. Cooper?

A. I think white, Caucasian.

Q. Okay. Again, you directed Mr. Ross to bring his concerns directly to Mr. Cooper?

A. I gave him both options, to file a formal complaint or to address it with Mr. Cooper.

Q. Did you tell Mr. Ross that nothing could be done about his complaints?

A. No.

Q. At any point did you offer to intervene between Mr. Ross and Mr. Cooper?

A. Did you say ask to intervene?

Q. Yeah, did you offer to intervene?

A. So I did meet with Mr. Ross and with Brent

Page 28

Cooper.

Q. Separately?

A. On the onset of the complaint. Like I said, what I recall, it deal more with instructional time, that they made an agreement, from what I can remember. It was called a student instructional communication form. It talked about how a student who was behind on competencies could make them up, a timeline for making them up, how the student and the instructor were going to hold each other accountable to this agreement, and then they both signed it. I remember them -- that being Brent Cooper and Tyrone doing that with my presence. They made the agreement. I just signed the document stating that I was there, present, but it was an agreement in classroom management between the instructor and a student.

Q. Besides that agreement, did you take any other steps to separate Mr. Ross from Mr. Cooper?

A. No. I was never asked to.

Q. And I may have already asked this, but before Mr. Ross brought you those concerns, had you ever received complaints from any other student about Mr. Cooper?

A. Not that I can recall.

Q. Do you recall Craig ever saying that there were multiple issues in Mr. Cooper's classroom regarding Mr. Ross?

Page 29

A. No.

Q. Did Mike Hernandez ever mention any issues or raise any concerns about Mr. Cooper's conduct?

A. No.

Q. Were you aware of any complaint about Mr. Cooper's favoritism towards a female student, first name Missy?

A. I don't recall.

Q. Were you aware that Mr. Cooper made or referred to certain car aesthetics, for example, as having black rims with a racial slur?

A. No.

Q. And I'm not going to say the word, but it starts with the N-word and then ends in -a-t-e-d, so N-word-ated. You never heard that before?

A. No.

Q. Were you aware that Mr. Cooper talked about his personal sex life with the students?

A. No.

Q. Do you know a Jessica Brosilo?

A. I do.

Q. Who is that?

A. I believe she runs the apprenticeship program at GateWay Community College.

Q. To your knowledge, is she still there?

Page 50

A. You do.
Q. Do you remember working with Lora Timmons at that time on issues in Brent Cooper's class?
A. I don't remember working with Lora.
Q. Okay. We've already looked at those emails, so we're done with that.
(Deposition Exhibit 6 was marked for identification.)
BY MR. WOODS:
Q. Let me know when you can see the screen.
A. I can.
Q. We'll mark this one as Exhibit 6. This is one page, and it's 466 at the bottom. Do you see that?
A. I do see that.
Q. In the middle of the page, there is an email from Lora Timmons on December 12, 2022 at 2:24 p.m. Is that correct?
A. That is correct.
Q. It says, "This is a related issue to the Tyrone Ross complaint, but the issue was submitted to BIT and there has been no follow-up on . . . perhaps some of why the other escalated." Do I have that right?
A. You do.
Q. Do you recall an issue escalating at that time other than Mr. Ross's?

Page 51

A. I do not.
Q. Right below that email is an email from you to Lora Timmons. We've already seen this email, but I just want to be clear. That email is from you on December 12, 2022 at 8:20 a.m., correct?
A. That is correct.
Q. And it was just sent to Lora Timmons, correct?
A. Yes.
Q. And in that email, you just wrote "FYI," correct?
A. Yes.
Q. And there's subject of FWD: Redacted issues. Do I have that right?
A. That is correct.
Q. And you don't recall sending this email?
A. I don't remember.
Q. And you don't recall there being any other issues other than Mr. Ross?
A. I do not.
Q. But you do recall Mr. Ross's issues, correct?
A. I do remember Mr. Ross coming into my office and talking about needing additional help with his program.
Q. And you remember that clearly?
A. Yes, I remember that clearly. He was in my office, and we were discussing options so that he could complete the program.

Page 52

Q. Okay. But you don't remember him reporting racial concerns or sexual concerns. Is that correct?
A. Well, once he brought it up, part of my responsibility was to inform leadership, that was the practice, that a student has this complaint, and then share with them our process for dealing with these kinds of complaints. So that's what I did. Basically I think what you're reading here is the outcome of upper leadership working through that process of investigating.
Q. In that December time frame and even prior, how many times did Mr. Ross come to you?
A. I can recall two times only.
Q. Only two times.
Do you recall when those two times were?
A. I do not.
Q. And you only recall him asking you about issues with his -- I'm sorry. Let me just ask that again.
Just repeat again what he told you.
MS. CAYTON: Asked and answered.
But you can respond.
BY MR. WOODS:
Q. Yeah, I just want to get a recollection here for my next question.
A. He wanted to know what we could do to get him the kind of help that he needed to make up some time in his

Page 53

classroom and finish his project. That's what I recall. That was the main theme of our interaction, was how we could get him additional time to complete the tasks, to finish the competencies, and complete the program.
Q. And again, you remembered him saying that Mr. Cooper used the N-word, correct?
A. I do remember him saying that, yes.
Q. Is that when you told him to go through the formal complaint process?
A. The formal complaint process was always on the table. It's actually -- it actually was part of our conversations every time. I followed that same practice with every student, right? I followed the steps. I think there was like three steps, you know. He introduces the issue and the concern. We talk about a resolution with the faculty member. We work through that, agreed upon by both of the staff and the student -- I mean the instructor and the student. Then once it escalates, it moves to upper leadership. So when Tyrone escalated it, then it went to upper leadership, out of my privy.
Q. But as we saw, you actually forwarded certain emails to your upper leadership --
A. Well, I let them know, yeah, things were happening. That's correct. That's part of the practice. As soon as -- you know, I don't know if the student is

Page 54

going to file a formal complaint. So on behalf of working with the college, I let my leadership know this is what's going on.
Q. We talked about earlier that Mr. Cooper was removed from the classroom, right?
A. The thing we talked about earlier stated that they were considering removing Mr. Cooper. And then yes, when I realized he was being removed -- when I was informed, it was at the same time he was being removed.
Q. So he was actually removed?
A. He was.
Q. For how long?
A. I don't remember the timeline.
Q. Did he come back to the classroom?
A. He did.
Q. That same semester?
A. We don't work in semesters. It's yearlong. So I don't remember how long he was out and when he returned. I just don't -- I don't remember the timeline.
Q. So this -- sorry -- this Clock Hour program went for a year?
A. It goes for 600 -- I believe 680 hours, so I believe it covers an eight-month -- eight to nine months of contact time with the students.
Q. So during that time -- at some point during that

Page 55

eight-month period, after Mr. Cooper was removed, he came back to the classroom, correct?
A. You know, I don't -- I don't remember that outcome. So I think maybe my memory is a little foggy on this. I think -- I don't think he did once he was removed. I think he -- he and upper administration met, had a meeting, and then things were discussed. And I think he -- either they let him go or he resigned. I didn't get the details of the outcome, so I don't -- I don't recall. I think -- I think Tyrone left the class and then came back. Brent was still there. But I can't remember the other way. It was a while ago.
Q. Do you recall a formal investigation being performed regarding Mr. Ross's complaints?
A. I do recall that there was a formal investigation being done.
Q. Do you recall when that was done?
A. No.
Q. Do you recall being interviewed during that process?
A. I do not remember being interviewed.
Q. You don't remember being interviewed or you know that you weren't interviewed?
A. I don't know if I was interviewed. I don't remember. I think -- I think they had everything that I

Page 56

had available already documented and sent to them. So I don't remember them ever coming and having a conversation with me about the investigation at all.
Q. Do you recall ever being sent anything or any requests regarding a formal investigation?
A. No.
Q. So just to be clear, do you recall anything about the formal investigation?
A. No. I do not recall anything about the investigation.
Q. Do you recall -- Okay. So you don't recall anything about it. Do you recall being interviewed by district employees informally about Mr. Ross's complaints?
A. No, not even informally.
Q. Now, Ms. Cayton is here. She's your attorney, correct?
A. Yes. She's the attorney for the district.
Q. And you, correct?
A. Yes.
Q. And Brent Cooper, correct?
A. Yes.
MS. CAYTON: Sean, I just want to jump in here. I'm the attorney for the district, both Mark and Brent have only been named in their official capacities. So to the extent that they're district employees, I

Page 57

represent them, but I don't represent them in their personal capacity.
MR. WOODS: Thank you.
BY MR. WOODS:
Q. What did you do to prepare for this deposition?
A. Read the complaint.
Q. Any other documents?
A. The documents, yeah. Is that what this is? I read this.
Q. I didn't see it. What does it say?
A. It says Tyrone Ross, plaintiff, amended complaint and jury demand. That's what I read.
Q. Do you have any notes on that document?
A. I do not.
Q. Do you have anything else in front of you?
A. My Monster.
Q. Any other documents?
A. No.
Q. So you read the first amended complaint, that's it?
A. That's it. I also spoke to Alex.
Q. You spoke to Ms. Cayton?
A. Ms. Cayton, yes.
Q. How many times?
MS. CAYTON: You can tell him that we spoke,

Earlier we talked about the supportive measures and --
A. I don't -- I don't remember this.
Q. Your answer was "I don't know what supportive measures are."
A. Yeah, I don't know what they are. I don't know what they are. I'm reading this because you're sharing it with me.
Q. Okay. But you just told me also that the district told you what to do, correct?
A. That's how I'm reading it. The district -- if you read the last sentence, MCC will implement measures in a way that does not unreasonably burden the other party. So they're telling me. That's how I'm reading it. I'm reading this statement as they're telling me this is what's going to happen.
Q. Right.
A. I don't remember any of this happening, but this is what I'm reading.
Q. But just a second ago you said the district told you what to do?
A. That's what they would do. They would tell me, right? That's what I'm reading. They would --
Q. Did they tell you what to do in this case?
A. I don't recall that.



Q. Okay. But you recall -- you recall this policy, though, 5.1, Non-Discrimination policy, correct?
A. I know that there's a policy about non-discrimination. I don't remember every single detail of the policy.
Q. Right. But you've seen it before, correct?
A. I have seen it before. I've seen all policies from the district.
Q. Yeah, I mean, it's 44 pages. You can't be expected to remember it all from memory, right?
A. Right. I remember in our training that once certain things happened that were outside of my authority, I handed them to upper leadership to get not only guidance but support and some kind of resolution, and that's what I did.
Q. Okay. Do you remember ever talking with Mr. Hernandez and saying that you wanted Tyrone Ross out by Friday and you didn't give an F if he was finished or not?
A. No.
MR. WOODS: Okay. I have nothing further.
MS. CAYTON: I don't have any questions. We're just going to read and sign.
(An off-the-record discussion ensued.)
MR. WOODS: We'll just take a PDF.



MS. CAYTON: Same with us.
(The deposition was concluded at 12:24 p.m.)

____________________________
ROGER MARK WOEHL



STATE OF ARIZONA )
COUNTY OF MARICOPA )

BE IT KNOWN the foregoing deposition was taken by me pursuant to stipulation of counsel; that I was then and there a Certified Reporter of the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; notice was provided that the transcript was available for signature by the deponent; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed into typewriting under my direction; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony had and adduced upon the taking of said deposition, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto nor am I in any way interested in the outcome hereof.

DATED at Phoenix, Arizona, this 31st day of March, 2026.

Gerard T. Coash, RMR
Certified Reporter #50503

# EXHIBIT C

**Declaration of Dr. Delfina Acosta Wilson**

---

I, Dr. Delfina Acosta Wilson, do hereby declare as follows:

1. I currently hold the position of Vice President of Student Affairs ("VPSA") at GateWay Community College ("GWCC"), one of ten community colleges within the Maricopa County Community College District (the "District").

2. I was the VPSA for GWCC when Plaintiff Tyrone Ross ("Plaintiff") was enrolled in GWCC's Autobody/Collision Repair Program (the "Program").

3. In my position as VPSA, I am responsible for leading GWCC's Division of Student Affairs, including directing non-instructional student services, enrollment management, student life, early college programs, and athletics. I also serve as the student affairs liaison for GWCC compliance requirements, including, but not limited to, student issues involving Title IX of the Education Amendments of 1972, Title VI of the Civil Rights Act of 1964, and the Americans with Disabilities Act of 1990.

4. As a result of my employment with GWCC, I have become knowledgeable about GWCC's and the District's Administrative Regulations, rules, policies, procedures, and practices.

5. The District/GWCC has multiple anti-discrimination and/or harassment policies, including Administrative Regulation Section 5, Non-Discrimination, and ND-2 Discrimination Complaint Procedures for Students (the "ND-2 Policy"). ND-2 is an appendix to Administrative Regulation Section 5, Non-Discrimination. True and correct copies of Administrative Regulation Section 5, Non-Discrimination and the ND-2 Policy are attached as **Exhibits 1** and **2** to this Declaration.

6. ND-2 is the District/GWCC's primary policy governing student discrimination and/or harassment complaints. Among other things, ND-2 outlines the procedures for informally resolving complaints, filing formal complaints, investigating formal complaints, and determining and implementing appropriate corrective action.

7. Responsibility for oversight of student complaints under the ND-2 Policy transitioned from the District's individual colleges to the District upon the District's hiring of Regional Directors. The Regional Director positions were filled in 2023. On June 12, 2023, ND-2 was amended to designate the Regional

Directors as the officials responsible for investigating and resolving student complaints of harassment and/or discrimination, not otherwise addressed by the District/GWCC's Title IX Sexual Misconduct Policy.

8. Before the June 12, 2023 amendment to ND-2, Vice Presidents of Student Affairs (or designee) at the respective District colleges were responsible for and had authority to investigate student complaints under the ND-2 Policy. Additionally, under the prior version of ND-2, Vice Presidents of Student Affairs were responsible for ensuring that appropriate corrective action was taken in response to complaints of student discrimination and/or harassment.

9. When Plaintiff was a student at GWCC, I (or my designee) was responsible for investigating and resolving GWCC student complaints falling under the ND-2 Policy.

10. While Plaintiff was a student at GWCC, I had the authority to investigate alleged discrimination and/or harassment by GWCC employees or students; I was designated under District/GWCC policy as an individual responsible for receiving or responding to discrimination and/or harassment complaints; and I was authorized to make decisions regarding discrimination and/or harassment complaints on GWCC's behalf.

11. On December 6, 2022, Plaintiff emailed Craig Urbanski ("Urbanski"), GWCC's Industrial Technology/Division Chair at the time, with the Subject Line stating "withdrawal if possible" and attached an internal complaint regarding Program Instructor Brent Cooper ("Cooper") (hereinafter, "Complaint 1").

12. Urbanski does not have any authority to investigate alleged discrimination and/or harassment by District employees or students; I did not designate him as an individual responsible for investigating and/or resolving student discrimination complaints; he is not designated under District/GWCC policy as an individual responsible for receiving or responding to discrimination and/or harassment complaints; and he is not authorized to make decisions regarding discrimination and/or harassment complaints on the District's or GWCC's behalf.

13. On December 6, 2022, Plaintiff also emailed Program Manager Mark Woehl ("Woehl") a copy of Complaint 1.

14. Woehl and his front desk clerk at the time did not have any authority to investigate alleged discrimination and/or harassment by District employees or students; I did not designate Woehl or his front desk clerk as an individual responsible for investigating and/or resolving student discrimination complaints; Woehl and his front desk clerk are not designated under District/GWCC policy as individuals responsible for receiving or responding to discrimination and/or harassment complaints; and Woehl and his front desk clerk are not authorized to make decisions regarding discrimination and/or harassment complaints on the District's or GWCC's behalf.

15. On December 8, 2022, I received a copy of Complaint 1. A true and correct copy of Complaint 1 is attached as **Exhibit 3** to this Declaration.

16. Before Complaint 1, I had no record of GWCC's Student Affairs Office receiving any complaints alleging that Cooper engaged in conduct that could violate the District/GWCC's anti-discrimination and harassment policies.

17. On December 9, 2022, I emailed Plaintiff to confirm that GWCC had received Complaint 1. I informed Plaintiff that the allegations raised in his complaint were of significant concern to GWCC and would be investigated and addressed accordingly. I also provided Plaintiff with my contact information and offered to meet with him the following week.

18. On December 13, 2022, I informed Cooper that GWCC received a discrimination complaint from Plaintiff alleging that he had engaged in conduct that may violate the District/GWCC's anti-discrimination and harassment policy. I also informed Cooper that GWCC is investigating his alleged conduct.

19. I assigned GWCC Human Resources professionals Mika Davis ("Davis") and Zachary Romo ("Romo") to investigate Plaintiff's Complaint 1 against Cooper.

20. On December 14, 2022, I emailed Plaintiff to inform him that investigators had been assigned to investigate Complaint 1 and would be contacting him shortly to schedule a meeting.

21. GWCC President Dr. Amy Diaz ("Diaz") instructed me to determine whether Plaintiff had been withdrawn from the Program. I confirmed that Plaintiff stopped

attending the Program on December 6, 2022, and was withdrawn for excessive absences in accordance with GWCC's 2022-2023 attendance policy on December 13, 2022.

22. The District closed for winter break between December 20, 2022 and January 2, 2023.

23. On or about January 3, 2023, Diaz informed me that Plaintiff wished to continue participating in the Program. I began determining the number of Program hours Plaintiff was required to make up and evaluating potential reenrollment options.

24. GWCC's then-Dean of Student Affairs, Terese Brown, and I scheduled a meeting with Plaintiff on January 13, 2023 at 11:00 a.m. to discuss how he could make up his missed hours in the Program. However, Plaintiff did not attend the meeting.

25. On January 23, 2023, I emailed Plaintiff regarding the hours he had missed from the Program, which resulted in his removal from the Program pursuant to GWCC's attendance policy. I also explained that GWCC's investigation into Complaint 1 remained ongoing and that the investigative process takes time. Additionally, I informed Plaintiff that GWCC was exploring options for him to make up the hours he missed and return to the Program. I further explained that while those options were being evaluated, GWCC did not want to place Plaintiff in an environment where he felt uncomfortable.

26. On January 26, 2023 at 4:20 p.m., Plaintiff emailed me expressing concern regarding being dropped from the Program.

27. On January 26, 2023 at 4:48 p.m., I emailed Plaintiff again, explaining that he was enrolled in a clock-hours program that required him to complete a specified number of hours. I explained that, after he stopped attending the Program on December 6, 2022, he was withdrawn in accordance with GWCC's attendance policy. I also informed Plaintiff that I had developed a proposed timeline for him to make up the missed hours and return to the Program under the supervision of Associate Program Instructor Michael Hernandez ("Hernandez"), and that I wanted to discuss it with him.

28. Plaintiff and I were scheduled to meet on January 31, 2023 at 3:30 p.m. Plaintiff confirmed that he was available for the meeting. However, he did not attend.

29. On February 1, 2023, I emailed Plaintiff to advise him that he had missed our scheduled meeting. In that email, I explained that the purpose of the meeting was to discuss options for completing the remaining hours required to earn his Program certificate. I also outlined options for his consideration, including returning to the Program on February 8, 2023, under Hernandez's supervision.

30. Plaintiff responded to my February 1, 2023 email, explaining that he broke his phone. I subsequently met with Plaintiff on February 3, 2023. During that meeting, Plaintiff agreed to return to the Program effective February 8, 2023 under Hernandez's supervision. Additionally, I informed Plaintiff that Cooper had been instructed not to speak to him.

31. GWCC readmitted Plaintiff to the Program on or about February 8, 2023. GWCC provided Plaintiff with additional time to complete the Program.

32. Plaintiff remained under Hernandez's supervision until his completion of the Program. Cooper was never again assigned to supervise Plaintiff.

33. On or about February 27, 2023, GWCC completed the investigation into Complaint 1 and generally substantiated Plaintiff's claims.

34. On March 7, 2023, I met with Plaintiff. He expressed new concerns regarding alleged retaliation from Cooper after he returned to the Program.

35. In April 2023, GWCC opened a separate investigation into Plaintiff's allegations of retaliation against Cooper (hereinafter "Complaint 2"). I assigned Davis and Romo to investigate Complaint 2.

36. On or about May 10, 2023, GWCC completed the investigation into Complaint 2 and substantiated Plaintiff's claim.

37. Both of Plaintiff's internal complaints were investigated in accordance with District policy.

38. The documents attached as Exhibits D and E to Defendants' Motion for Summary Judgment in *Tyrone Ross v. Maricopa County Community College District et al.* (Case No. 2:25-CV-01671-PHX-SMB) are true and correct copies of the Program Syllabi (Exhibit D) and GWCC's 2022-2023 Attendance Policies (Exhibit E).

39. This declaration is based upon my own personal knowledge. I would so testify if called to do so.

I declare under penalty of perjury that the foregoing is true and correct.

8/27/26
Date

Dr. Delfina Acosta Wilson

EXHIBIT 1
to Declaration of Dr. Delfina Wilson

# 5.1 Non-Discrimination

## 5.1.1
## Maricopa County Community College District (Maricopa EEO Policy)

It is the policy of the Maricopa County Community College District (MCCCD), (consisting of Chandler-Gilbert Community College, the District Office, Estrella Mountain Community College, GateWay Community College, GateWay Community College - Central City, Glendale Community College, Mesa Community College, Paradise Valley Community College, Phoenix College, Rio Salado Community College, Scottsdale Community College, South Mountain Community College, and all affiliated locations) to:

1. Recruit, hire, and promote in all job groups, and to ensure that all Human Resources (HR) employment selection and decision practices do not discriminate, nor tolerate discrimination in employment against any applicant or employee, on the basis of race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information.
2. Administer all HR employment selection and decision practices pertaining to advertising, benefits, compensation, discipline (including probation, suspension, and/or involuntary termination for cause or layoff), employee facilities, performance evaluation, recruitment, social/recreational programs, and training will be administered without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information.
3. Hold each level of management responsible for ensuring that all employment policies, procedures, and activities are in full compliance with all applicable federal, state, and local EEO statutes, rules, and regulations.
4. Maintain an educational environment that does not discriminate or tolerate discrimination on the basis of race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, or veteran status in federally funded programs, activities and MCCCD sponsored events.
5. Hold each level of academic and student life management responsible for ensuring that all academic environments and activities are in full compliance with all applicable federal, state, and local non-discrimination laws.

**AMENDED by Direct Approval from the Chancellor, April 8, 2020**
**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

## 5.1.2
## Maricopa EEO Policy

The Maricopa County Community College District (MCCCD) Equal Employment Opportunity (EEO) Policy Statement or EEO Clause appears in all major publications distributed to employees, students, and applicants. Copies of these documents are available at each of the colleges, at the District Office, and at the EEO/Affirmative Action (AA) Office.

In accordance with all applicable federal, state, and local regulations, MCCCD will maintain and update its Affirmative Action Plans (AAPs) on an annual basis. Copies of the AAP will be distributed to the Governing Board and CEC members by December 31st of each year. They include the AAP for Minorities and Females, the AAP for Individuals with Disabilities, and the AAP for Special Disabled Veterans, Vietnam Era Veterans, and Other Eligible Veterans.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED-by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

# 5.1.3
# EEO Policy Statement

It is the policy of the Maricopa County Community College District (MCCCD) to promote equal employment opportunities through a positive continuing program. This means that Maricopa will not discriminate, nor tolerate discrimination in employment or education, against any applicant, employee, or student because of race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information. Additionally, it is the policy of Maricopa to provide an environment for each Maricopa job applicant and employee that is free from sexual harassment, as well as harassment and intimidation on account of an individual's race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information.

In addition, lack of English language skills is not a barrier to admission into Career and Technical Education (CTE) programs or skill centers.

**AMENDED by Direct Approval from the Chancellor, April 8, 2020**
**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by Direct Approval from the Chancellor, May 20, 2014**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

# 5.1.4
# EEO Clause

The Maricopa County Community College District (MCCCD) is an EEO/AA Institution and does not discriminate on the basis of race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information.

**AMENDED by Direct Approval from the Chancellor, April 8, 2020**
**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by Direct Approval from the Chancellor, March 19, 2018**
**AMENDED by Direct Approval from the Chancellor, January 3, 2018**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

# 5.1.5
# Use of the EEO Policy Statement or EEO Clause

As required by federal regulations, the EEO Policy Statement or EEO Clause MUST appear in all major publications distributed to employees, students, and applicants throughout MCCCD. These publications include, but are not limited to, catalogs, handbooks, schedules, policy manuals, recruitment publications, advertisements (internal and external), and application forms (employee and student).

Additionally, the EEO Policy Statement or EEO Clause MUST be included in all purchase orders and contracts.

The approved statements and clauses for use in publications are posted as Appendix ND-3.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by Direct Approval from the Chancellor, January 3, 2018**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

# 5.1.6

# Policy Statements Declaration

The Policy Statements Declaration, which is an exhibit to this regulation, is a one-page document of the Maricopa County Community College District (MCCCD) policies that are to be posted on bulletin boards throughout the District. It defines MCCCD's firm commitment to EEO/AA and to a workplace that is free from harassment.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

# 5.1.7
# Notice of Americans with Disabilities Act (ADA)/ Section 504 of the Rehabilitation Act/Title IX Coordinator

Under the ADA and Section 504, the Maricopa County Community College District (MCCCD) recognizes the obligation to provide overall program accessibility throughout its locations for qualified disabled individuals. Students and employees can raise concerns or make complaints, without retaliation, about matters made unlawful under the ADA.

EMPLOYEES
The District Office and each College must post the address and telephone number for the individual responsible for coordinating services and/or activities relating to the Americans with Disabilities Act (42 U.S.C. Chapter 126), Section 504 of the Rehabilitation Act (29 U.S.C. §794(d)), and all other applicable law. The Notice will specify how employees can request reasonable accommodations.

College ADA Coordinators (Credentials are needed to enter secure site.)

STUDENTS
The District Office and each MCCCD location must post the address and telephone number for the individual responsible for coordinating services and/or activities relating to the Americans with Disabilities Act (42 U.S.C. Chapter 126), Section 504 of the Rehabilitation Act (29 U.S.C. §794(d)), and Title IX of the Education Amendments of 1972 (20 U.S.C. §1681), using the format below:

- ADA/504/Title IX Coordinator
- Address
- Phone #
- Email address

Additionally, each college/center must publish electronically or in print the above information in student handbooks and catalogs.

The designated ADA/504/Title IX Coordinator at each college/center will provide information as to the existence and location of services, activities, and facilities that are accessible to and usable by individuals with disabilities.

Likewise, under Title IX, there is an obligation to provide services and program accessibility in a gender-neutral manner.

Title IX Coordinators

ADA/504 Managers

## MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT
**Policy Statements Declaration**

### EEO Clause

The Maricopa County Community College District (MCCCD) is an EEO/AA institution.

### EEO Policy Statement

It is the policy of Maricopa County Community College District (MCCCD) (consisting of the District Office, Chandler-Gilbert Community College, Estrella Mountain Community College, Glendale Community College, GateWay Community College, GateWay Community College - Central City, Mesa Community College, Paradise Valley Community College, Phoenix College, Rio Salado Community College, Scottsdale Community College, South Mountain Community College, and all affiliated locations) to promote equal employment opportunities. This means that MCCCD will not discriminate, nor tolerate discrimination in employment or education, against any applicant, employee, or student because of race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, veteran status or genetic information. Additionally, it is the policy of MCCCD to provide an environment for each MCCCD job applicant, employee, and student that is free from sexual harassment, as well as harassment and intimidation on account of an individual's race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, veteran status or genetic information.

### Affirmative Action Policy Statement for Individuals with Disabilities

In conformance with the provisions of Section 503 of the Rehabilitation Act of 1973, as amended, and the implementing regulations, 41 CFR 60-741.5 (a), as amended, Maricopa County Community College District (MCCCD) will not discriminate, nor tolerate discrimination in employment or education, against any applicant, employee, or student because of physical or mental disability in regard to any position for which the known applicant or employee is qualified. MCCCD agrees to take affirmative action to employ, advance in employment, and otherwise treat known qualified individuals with disabilities without regard to their physical or mental disability in all human resources selection and decision practices, such as the following: advertising, benefits, compensation, discipline (including probation, suspension, and/or termination for cause or layoff), employee facilities, performance evaluation, recruitment, social/recreational programs, and training. MCCCD will also continue to administer these practices without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, veteran status or genetic information. Additionally, all applicants and employees are protected from coercion, intimidation, interference, or discrimination for filing a complaint or assisting in an investigation under the Act.

### Affirmative Action Policy Statement for Other Eligible Veterans, Special Disabled Veterans, and Vietnam Era Veterans

In conformance with the Vietnam Era Veterans Readjustment Assistance Act of 1974, the Veterans Employment Opportunities Act of 1998, and the implementing regulations, 41 CFR 60-250 (k), Maricopa County Community College District (MCCCD) will not discriminate, nor tolerate discrimination in employment or education, against any applicant, employee, or student because they are a special disabled veteran or Vietnam era veteran in

regard to any position for which the known applicant or employee is qualified. MCCCD agrees to take affirmative action to employ, advance in employment, and otherwise treat known qualified special disabled veterans and Vietnam era veterans without discrimination based upon their disabled or veteran status in all human resources selection and decision practices, such as the following: advertising, benefits, compensation, discipline (including probation, suspension, and/or termination for cause or layoff), employee facilities, performance evaluation, recruitment, social/recreational programs, and training. MCCCD will continue to administer these practices without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, veteran status or genetic information. Additionally, MCCCD agrees to post all suitable job openings at the local office of the State employment service where the job opening occurs. This includes full-time, temporary greater than 3 days' duration, and part-time employment. Finally, all applicants and employees are protected from coercion, intimidation, interference, or discrimination for filing a complaint or assisting in an investigation under the Act.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

# 5.1.8
# Policy Prohibiting Harassment

**A. Policy**

The policy of the Maricopa County Community College District (MCCCD) is to provide an educational, employment, and business environment free of harassment that is based on race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information. Such prohibited harassment includes but is not limited to sexual violence, unwelcome sexual advances, requests for sexual favors, and other verbal and/or physical conduct or communications constituting harassment with regards to race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information as defined and otherwise prohibited by state and federal law.

Employee complaints of harassment must be reported to the District Office of Equal Employment and Opportunity.

Harassment based on race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information violates MCCCD Policy when the conduct is unwelcome, verbal, or physical conduct that is sufficiently severe, or pervasive that it alters working conditions and creates a hostile environment for employees. The unwelcome behavior may be based on power differentials, the creation of a hostile environment, or retaliation for harassment complaints. Harassment by and between any student or employee (paid, unpaid, or contract), is prohibited by this policy.

Due process is afforded any employee accused of harassment. Upon receipt of a complaint, an immediate preliminary review will be conducted to determine if there is reasonable cause to believe the nondiscrimination policy may have been violated. If so, then a prompt, thorough, impartial investigation will be conducted by the

authorized administrator, or designee. If the final decision is that harassment occurred, the college will take immediate action to eliminate the hostile environment, prevent its recurrence, and address its effects. Remedies for the complainant will also be sought. Violations of this policy may result in disciplinary action up to and including termination for employees, sanctions up to and including suspension or expulsion for students, and appropriate sanctions against campus visitors. This policy applies to prohibited conduct that occurs both on and off campus and covers employees, and visitors.

MCCCD affirms its commitment to supporting the academic and personal freedom of all members of the community. In particular, the policy against harassment shall not be applied in a manner that contradicts the principle of academic freedom: Faculty and other members of the community are entitled to freedom in research, and faculty members are entitled to freedom in the classroom to pursue controversial matters related to their disciplines. However, this right to teach controversial material entails the responsibility that it be carried out in a way that would be judged by peers as not violating the District's non-discrimination policy.

Questions about this policy may be directed to the MCCCD EEO/Affirmative Action Office.

**B. Examples of Policy Violations**

It shall be a violation of MCCCD's Harassment Policy for any employee (paid, unpaid, or contract), student or campus visitor to engage in any unwelcome conduct that is based on race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information. Such as to:

1. Engage in offensive conduct that is sufficiently severe or pervasive to create a work or academic environment that a reasonable person would consider intimidating, hostile, or abusive. Such conduct must be based on race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information.
2. Engage in unwelcome verbal or physical conduct, including intimidation, ridicule, insult, or comments, when the behavior can reasonably be considered to adversely affect the work or academic environment, or an employment decision based upon the employee's acceptance or rejection of such conduct. Such verbal or physical conduct must be based on race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information or on their protected activities under applicable non-discrimination laws and policies.
3. Engage in Sexual Harassment, which includes, but is not limited to:
    - A. Make unwelcome sexual advances to another employee (paid, unpaid, or contract), student or campus visitor;
    - B. Make unwelcome requests for sexual favors, whether or not accompanied by promises or threats with regard to the employment or academic relationship;
    - C. Engage in verbal or physical conduct of a sexual nature with another employee, student or campus visitor, that may threaten or insinuate, either explicitly or implicitly, that the individual's submission to, or rejection of, the sexual advances will in any way:
        1. Influence any personnel decision regarding that person's employment, evaluation, wages, advancement, assigned duties, shifts or any other condition of employment or career development; or
        2. Influence his or her grades, participation in or access to academic programs, class standing or other educational opportunities;
    - D. Engage in verbal or physical conduct of a sexual nature that:
        1. Has the purpose or effect of substantially interfering with an employee's ability to do his or her job; or with a student's ability to learn or participate in a class; or
        2. Which creates an intimidating, hostile or offensive work or academic environment;
    - E. Commit any act of sexual assault or public sexual indecency against any employee or student whether on MCCCD property or in connection with any MCCCD-sponsored activity;
    - F. Continue to express sexual interest in another employee, student or campus visitor after being informed or on notice that the interest is unwelcome (reciprocal attraction is not considered sexual harassment).

4. Engage in other harassing conduct in the workplace or academic environment, whether physical or verbal, including, but not limited to, commentary about an individual's body (or body parts), degrading words to describe an individual, offensive comments, suggestive language or jokes, innuendoes, and suggestive objects, print or digital media. Misconduct may include exploitation, stalking, bullying. Such conduct must be based on an individual's race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information.
5. Treat a complainant or witness of harassment in a manner that could dissuade a reasonable person from pursuing or participating in the complaint and investigation. Such treatment must be based on an individual's race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information.
6. Engage in sexual misconduct, including but not limited to:
    A. The use or display in the classroom, including electronic, of pornographic or sexually harassing materials such as posters, photos, cartoons or graffiti without pedagogical justification.
    B. Explicit sexual comments by one or more employees about another employee or student, or circulating drawings or other images depicting an employee or student in a sexual manner.
    C. Unwelcome sexual advances, repeated propositions or requests for a sexual relationship to an individual who has previously indicated that such conduct is unwelcome, or sexual gestures, noises, remarks, jokes, questions, or comments by a student about another person's sexuality or sexual experience.
    D. Harassment based on sex, pregnancy, gender identity, gender expression, or sexual orientation that creates a hostile environment. A hostile environment exists when the conduct is sufficiently severe, or pervasive that it unreasonably interferes with, limits, or deprives an individual from participating in or benefitting from the District's education programs and/or activities, including employment. The existence of a hostile environment is to be judged both objectively (meaning a reasonable person would find the environment hostile) and subjectively (meaning the impacted individual felt the environment was hostile).
    E. Sexual Exploitation, which means taking non-consensual or abusive sexual advantage of another for anyone's advantage or benefit other than the person being exploited. Examples of behavior that could rise to the level of Sexual Exploitation include:
        1. Recruiting, harboring, transporting, providing, or obtaining another person for the purpose of sexual exploitation;
        2. Non-consensual visual (e.g., video, photograph) or audio-recording of sexual activity;
        3. Non-consensual distribution of photos, other images, or information of an individual's sexual activity, intimate body parts, or nakedness, with the intent to or having the effect of embarrassing an individual who is the subject of such images or information;
        4. Going beyond the bounds of consent (such as attempting to kiss an employee or student without their consent)
        5. Engaging in non-consensual voyeurism;
        6. Knowingly transmitting an STI (sexually transmitted infection), such as HIV, to another without disclosing one's STI status;
        7. Exposing one's genitals in non-consensual circumstances, or inducing another to expose their genitals;
        8. Possessing, distributing, viewing or forcing others to view obscenity.
7. All complaints of sexual harassment or sexual misconduct shall be referred promptly to the college Title IX Coordinator (or the District Title IX Coordinator, if the allegations concern a District Office employee), for initial review in determining the appropriate investigation channel.
8. Matters pertaining to sexual harassment/misconduct that do not meet the definition of sexual harassment as outlined in Administrative Regulation 5.1.16 or otherwise do not meet the definition of an educational program or activity and do not occur against a person within the United States will be referred by the Title IX Coordinator to the College or District's respective Human Resources Department for investigation and adjudication under this conduct policy.

**AMENDED by Direct Approval from the Chancellor, August 18, 2020**
**AMENDED by Direct Approval from the Chancellor, April 8, 2020**
**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by Direct Approval from the Chancellor, August 4, 2016**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

## 5.1.9
## Additional Policy Violations

Mandatory Reporters Reporters (as defined in Administrative Regulation 5.1.16) must report allegations of sexual harassment/assault (whether reported by the person who is the subject of the sexual harassment or a witness) to an Official with Authority or the Title IX Coordinator (as defined in Administrative Regulation 5.1.16). Failure to report to an Official with Authority or the Title IX Coordinator is a policy violation subject to discipline up to and including dismissal.

Campus Security Authority (CSAs) are mandatory reporters under the Cleary Act. Failure to report is a policy violation subject to discipline up to and including dismissal.

Mandatory Reporters are expected to report harassment/discrimination (whether reported by the person who is the subject of the sexual harassment or a witness) based on an individual's race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, veteran status or genetic information. Failure to report may be a policy violation subject to discipline up to and including dismissal.

**AMENDED by the Administrative Regulations approval process, November 16, 2020**
**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

## 5.1.10
## Responsibility for Policy Enforcement

Employees and students must avoid offensive or inappropriate harassing behavior based on an individual's race, color, religion, sex, sexual orientation, gender identity,national origin, citizenship status (including document

abuse), age, disability, veteran status or genetic information at work or in the academic environment (in and out of the classroom).

Employees and students are encouraged (but not required) to inform perceived offenders of this policy and that the commentary/conduct is offensive and unwelcome.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

## 5.1.11
## Complaints

1. **Employees**
   Employees who experience harassment at work (by a supervisor, co- employee, student or visitor) are urged to report such conduct to the direct attention of their supervisor, their college president or to the Maricopa County Community College District (MCCCD) Equal Employment Opportunity/Affirmative Action Office. If the complaint involves the employee's supervisor or someone in the direct line of supervision, or if the employee for any reason is uncomfortable in dealing with their immediate supervisor, the employee may go directly to the MCCCD EEO/AA Office.
2. **Students**
   Students who experience sexual harassment or sexual assault in a school's education program and activities (by a faculty member, administrator, staff, campus visitor or other student) are urged to report such conduct to the designated Title IX Coordinator, of which there is one for each MCCCD college. A student may also contact the MCCCD EEO/AA Office to obtain the name and phone number of the college official designated to respond to harassment complaints based on an individual's race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, veteran status or genetic information.
3. **General**
   A. Complaints by employees will be investigated according to procedures established by the MCCCD EEO/AA Office. Copies of these procedures may be obtained on the District website and the MCCCD EEO/AA Office.
   B. Complaints by students will be investigated according to the procedures established in the College Environment section of the Administrative Regulations (AR 2.4). Copies of these procedures are posted on the District website.
   C. All complaints will be investigated in a prompt, through, and impartial manner.
   D. Where investigation confirms the allegations, appropriate, response action will be taken by the college/center/MCCCD.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**

**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

# 5.1.12
# Confidentiality

Records will be maintained in a confidential manner to the extent permitted by law and insofar as they do not interfere with the Maricopa County Community College District's (MCCCD) legal obligation to investigate and resolve issues of discrimination and harassment based on one's protected class status as outlined in law and in MCCCD policy. The MCCCD cannot promise complete confidentiality.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

# 5.1.13
# Violations of Law

An employee or student may be accountable for discrimination, retaliation, and/or harassment under applicable local, state, and/or federal law, as well as under Maricopa County Community College District (MCCCD) policy. Disciplinary action by MCCCD may proceed while criminal proceedings are pending and will not be subject to challenge on the grounds that criminal charges involving the same incident have been dismissed or reduced.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

# 5.1.14
# False Statements Prohibited

Any individual who knowingly provides false information pursuant to filing a discrimination charge or during the investigation of a discrimination charge, will be subject to appropriate disciplinary action, up to and

including, employment termination or academic dismissal.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

## 5.1.15
## Retaliation Prohibited

Retaliation against an employee or student for engaging in protected activity is strictly prohibited. The Maricopa County Community College District (MCCCD) strictly prohibits taking an adverse action that might deter a reasonable person from participating in activity protected by antidiscrimination laws. Protected activity consists of:

(a) opposing conduct reasonably believed to constitute discrimination, including harassment which violates a nondiscrimination statute or which MCCCD policy prohibits;

(b) filing a complaint about such practice; or

(c) testifying, assisting, or participating in any manner in an investigation or other proceeding related to a discrimination complaint.

Retaliatory actions are not limited to formal personnel actions such as termination, demotion, non-promotion, or non-selection. Retaliatory actions are broadly defined as harassing behavior, significant changes to job duties or working conditions, and even threats to take personnel actions based on engaging in protected activity. MCCCD will take appropriate disciplinary action, up to and including employment termination or academic dismissal if retaliation occurs.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

## 5.1.16
## Title IX Sexual Harassment Policy

## Table of Contents


I. DEFINITIONS
II. RATIONALE FOR POLICY
III. TITLE IX COORDINATOR
IV. OFFICIALS WITH AUTHORITY AND MANDATORY REPORTERS
V. CONFIDENTIAL RESOURCES AND FEDERAL RESOURCES
VI. NOTICE/COMPLAINTS OF DISCRIMINATION, HARASSMENT, AND/OR RETALIATION
VII. SUPPORTIVE MEASURES
VIII. EMERGENCY REMOVAL
IX. PRIVACY
X. JURISDICTION
XI. TIME LIMITS ON REPORTING
XII. ONLINE HARASSMENT AND MISCONDUCT
XIII. TITLE IX SEXUAL HARASSMENT
XIV. RETALIATION
XV. WHEN A COMPLAINANT DOES NOT WISH TO PROCEED
XVI. FEDERAL TIMELY WARNING OBLIGATIONS
XVII. FALSE ALLEGATIONS AND EVIDENCE
XVIII. AMNESTY FOR COMPLAINANTS AND WITNESSES
XIX. FEDERAL STATISTICAL REPORTING OBLIGATIONS
XX. ALLEGED VIOLATIONS OF THE TITLE IX POLICY


I. **DEFINITIONS** - Back to Top

1. **Actual Knowledge** means that an employee, student, or third-party informs the Title IX Coordinator or other Official with Authority of the alleged occurrence of alleged harassing, discriminatory, and/or retaliatory conduct. Actual knowledge compels the Maricopa County Community College District (MCCCD) to initiate action.
2. **Advisor** means a person chosen by a party or appointed by the institution to accompany the party to meetings related to the resolution process, to advise the party on that process, and to conduct cross-examination for the party at the hearing, if a hearing is held. This individual may be an MCCCD employee, a member of the community, or attorney (hired and paid for by a party).
3. **Complainant** means an individual who is alleged to be the victim of conduct that could constitute sexual harassment or retaliation for engaging in a protected activity.
4. **Formal Complaint** means a document filed with the Title IX Coordinator/signed by a Complainant or signed by the Title IX Coordinator alleging against sexual harassment or retaliation for engaging in a protected activity against a Respondent and requesting that the MCCCD investigate the allegation.
5. **Confidential Resource** means an employee who is not a Mandatory Reporter or an Official with Authority (irrespective of Clery Act Campus Security Authority status). At MCCCD, there is only one confidential resource. This confidential resource is the Ombudsman, who is located in the MCCCD Office of Public Stewardship.
6. **Day(s)** means a business day when the MCCCD is in normal operation.

7. **Education program** or **activity** means locations, events, or circumstances where MCCCD exercises substantial control over both the Respondent and the context in which the sexual harassment or discrimination occurs and also includes any building owned or controlled by a student organization that is officially recognized by the MCCCD.
8. **Final Determination of Responsibility** means a conclusion by preponderance of the evidence that the alleged conduct occurred, or did not occur, and whether it did, or did not violate policy.
9. **Formal Grievance Process** means a method of formal resolution designated by MCCCD to address conduct that falls within the policies included below, and which complies with the requirements of 34 CFR Part 106.45.
10. **Grievance Process Pool** means any investigators, appeal officers, hearing administrators, and Advisors who may perform any or all of these roles (though not at the same time or with respect to the same case).
11. **Hearing Decision-maker** means a person who has decision-making and sanctioning authority within the MCCCD's Formal Title IX Grievance process.
12. **Investigator** means the person or persons charged by MCCCD with gathering facts about an alleged violation of this policy, assessing relevance and credibility, synthesizing the evidence, and compiling this information into an investigation report and file of directly related evidence.
13. **Mandatory Reporter** means an employee of MCCCD who is obligated by policy to share knowledge, notice, and/or reports of harassment, discrimination, and/or retaliation with the Title IX Coordinator. Mandatory reporters do not convey actual knowledge to the MCCCD. Mandatory Reporter under this policy does not diminish the requirement under Arizona state law to report alleged or suspected child abuse, elder abuse, and/or abuse of individuals with disabilities to appropriate officials, though these responsibilities may overlap with those who have mandatory\ reporter responsibility in this policy.
14. **Official with Authority (OWA)** means an employee of the MCCCD explicitly vested with the responsibility to implement corrective measures for harassment and/or retaliation on behalf of the MCCCD. Notice to an OWA of an allegation of sexual harassment as defined in this policy conveys actual knowledge to the MCCCD and triggers a responsibility to act.
15. **Parties** include the Complainant(s) and Respondent(s), collectively.
16. **Promptness** means the time period in which allegations are acted upon once MCCCD has received notice or a formal complaint. Typically, complaints can take 60-90 business days to resolve. There are always exceptions and extenuating circumstances that can cause a resolution to take longer, but MCCCD will avoid all undue delays within its control.
17. **Remedies** means post-finding actions directed to the Complainant and/or the community as mechanisms to address safety, prevent recurrence, and restore access to MCCCD's educational program.
18. **Respondent** means an individual who has been reported to be the perpetrator of conduct that could constitute harassment or discrimination based on a protected class; or retaliation for engaging in a protected activity. When the Respondent is a member of the MCCCD community, a grievance process may be available regardless of the status of the Complainant, who may or may not be a member of the MCCCD community.
19. **Resolution** means the result of an informal or formal grievance process.
20. **Sanction** means a consequence imposed by MCCCD on a Respondent who is found to have violated this policy.
21. **Sexual Harassment** means the umbrella category including the offenses of sexual harassment, sexual assault, stalking, and dating violence and domestic violence.
22. **Title IX Coordinator** is at least one official designated by MCCCD to ensure compliance with Title IX and the MCCCD's Title IX program. References to the coordinator throughout this policy may also encompass a designee of the coordinator for specific tasks.
23. **Student** means any individual who is registered or enrolled for credit or non-credit bearing coursework, camps and other District-sponsored programs or activities, and who maintains an ongoing relationship with the MCCCD, which means the student is on leave (medical, administrative, or other documented leave of absence), but is not registered or taking classes at the time of the complaint being filed.

24. **Title IX Team** refers to the Title IX Coordinator, any deputy coordinators, and any member(s) of the Grievance Process Pool.

## II. RATIONALE FOR POLICY - Back to Top

MCCCD is committed to providing a workplace and educational environment, as well as other benefits, programs, and activities, that are free from sexual harassment, discrimination on the basis of sex, and retaliation. To ensure compliance with federal and state civil rights laws and regulations, and to affirm its commitment to promoting the goals of fairness and equity in all aspects of the educational program or activity, MCCCD has developed internal policies and procedures that provide a prompt, fair, and impartial process for those involved in an allegation of sexual harassment, and for allegations of retaliation. MCCCD values and upholds the equal dignity of all members of its community and strives to balance the rights of the parties in the grievance process during what is often a difficult time for all those involved.

## III. TITLE IX COORDINATOR - Back to Top

Each MCCCD college has a designated Title IX Coordinator who oversees implementation of this policy. The Title IX Coordinator has the primary responsibility for coordinating MCCCD's efforts related to the intake, investigation, resolution, and implementation of supportive measures to stop, remediate, and prevent discrimination, harassment, and retaliation prohibited under this policy.

The names and contact information for each college Title IX Coordinator can be found on the following page: https://district.maricopa.edu/consumer-information/title-ix/title-ix-coordinators. It is the responsibility of each of the MCCCD colleges' Vice Presidents of Student Affairs to ensure this list is up-to-date with correct information. The college Title IX Coordinators must act with independence and authority free from bias and conflicts of interest.

To raise any concern involving bias or conflict of interest by the college Title IX Coordinator, contact the Compliance Office in the Office of General Counsel by emailing compliance@domail.maricopa.edu. Concerns of bias or a potential conflict of interest by any other Title IX team member should be raised with the respective college Title IX Coordinator.

Reports of misconduct or discrimination committed by the college Title IX Coordinator should be reported to the college Human Resources Department. Reports of misconduct or discrimination committed by any other Title IX Team member should be reported to the respective college Title IX Coordinator.

## IV. OFFICIALS WITH AUTHORITY AND MANDATORY REPORTERS - Back to Top

### OFFICIALS WITH AUTHORITY

MCCCD has determined that the following administrators are Officials with Authority to address and correct sexual harassment and/or retaliation. In addition to the Title IX team members listed in Section 1. Definitions, these Officials with Authority listed below may also accept notice or complaints on behalf of the MCCCD. Knowledge on the part of an Official with Authority conveys actual knowledge to the MCCCD.

1. College/District Title IX Coordinator

2. Chancellor
3. Provost
4. General Counsel and Associate General Counsels
5. Chief Human Resources Officer
6. Chief Executive Officer
7. College Vice Presidents (at all levels)
8. Associate Vice Chancellors
9. Law enforcement
10. Athletic Directors
11. Directors (in any administrative area of a college or the District)

**MANDATORY REPORTERS**

The following classification of employees are mandatory reporters and are required to report actual or suspected discrimination or harassment to the respective college Title IX Coordinator or to the District Compliance Office for District employees. A Complainant who expects formal action in response to their allegations, but does not wish to contact the Title IX Coordinator should report their allegations to any mandatory reporter who can connect them with resources to report crimes and/or policy violations. Mandatory reporters will, within twenty-four (24) hours, refer reports to the Title IX Coordinator (and/or police, if desired by the Complainant), who will take action. Mandatory reporters must promptly (within twenty-four (24) hours) share with the Title IX Coordinator all known details of a report made to them in the course of their employment. The persons occupying the following positions are mandatory reporters. Knowledge to a mandatory reporter does not convey actual knowledge to the MCCCD.

1. Chancellor
2. Provost
3. General Counsel
4. Chief Human Resources Officer
5. Chief Workforce and Economic Development Officer
6. Chief Executive Officer
7. College Presidents
8. Associate Vice Chancellors
9. Director of Communications
10. Associate General Counsels
11. Supervisors/Managers/Directors (but not including division or department chairs)
12. College Vice Presidents, at all levels
13. Deans, at all levels
14. Athletic Directors/Coaches/Trainers
15. Law enforcement

**Anonymous Notice to Mandated Reporters**

A Complainant may request that the mandatory reporter provide notice to the Title IX Coordinator anonymously, without identification of the Complainant. A mandatory reporter cannot remain anonymous themselves. The MCCCD will investigate matters in which anonymous notice has been given to the extent

possible, both to assess the underlying allegation(s) and to determine if supportive measures or remedies can be provided. However, anonymous notice typically limits the MCCCD's ability to investigate, respond, and provide remedies, depending on what information is shared. When a Complainant has made a request for anonymity, the Complainant's personally identifiable information may be withheld by a mandatory reporter, but all other details of the alleged incident(s) must be shared with the Title IX Coordinator. Supportive measures may be offered to the Complainant as the result of such disclosures without formal MCCCD action.

Failure of a mandatory reporter to report an incident of harassment or discrimination of which they become aware is a violation of MCCCD policy and the mandatory reporter may be subject to disciplinary action, up to and including termination, for failure to comply.

## V. CONFIDENTIAL RESOURCES AND FEDERAL RESOURCES - Back to Top

- On-campus (Maricopa Community Colleges District Office) Office of Public Stewardship
- Off-campus (non-employees):
  - Licensed professional counselors and other medical providers
  - Local rape crisis counselors
  - Domestic violence resources
  - Local or state assistance agencies
  - Clergy/Chaplains
  - Attorneys

The Office of Public Stewardship will timely submit anonymous statistical information for Clery Act purposes unless they believe it would be harmful to their client.

External Inquiries may also be made to:

Office for Civil Rights,
***Denver Office***
U.S. Department of Education
Cesar E. Chavez Memorial Building
1244 Speer Boulevard, Suite 310
Denver, CO 80204-3582
Telephone: (303) 844-5695
Facsimile: (303) 844-4303
Email: OCR.Denver@ed.gov

## VI. NOTICE/COMPLAINTS OF DISCRIMINATION, HARASSMENT, AND/OR RETALIATION - Back to Top

Notice or complaints of discrimination, harassment, and/or retaliation in violation of this policy may be made using any of the following options:

1. File a complaint with, or give verbal notice to, a college Title IX Coordinator or an Official with Authority. Such a report may be made at any time (including during non-business hours) by using the telephone number or email address, or by mail to the office address, listed for the Title IX Coordinator or any other official listed. Title IX Coordinators can be found on the following page: https://district.maricopa.edu/consumer-information/title-ix/title-ix-coordinators. It is the responsibility of each of the MCCCD college's Vice President of Student Affairs to ensure this list is up to date with correct information.
2. Report online, using the reporting form posted at https://district.maricopa.edu/consumer-information/reporting. Anonymous reports are accepted, but can give rise to a need to investigate. The MCCCD tries to provide supportive measures to all Complainants, which is impossible with an anonymous report when the name of the Complainant is not shared in the report. Since anonymous reporting carries no obligation to initiate a formal response and since the MCCCD respects a Complainant's requests to dismiss complaints, unless there is a compelling threat to health and/or safety, the matter will be dismissed.

A formal complaint is a document filed and signed by the Complainant or signed by the Title IX Coordinator alleging a policy violation by a Respondent and requesting that the MCCCD investigate the allegation(s). A complaint may be filed with the Title IX Coordinator in person, by mail, or by electronic mail, by using the contact information in the section immediately above, or as described in this section. As used in this paragraph, the phrase "document filed by a Complainant" means a document or electronic submission (such as by electronic mail or through an online portal provided for this purpose by the MCCCD) that contains the Complainant's physical or digital signature, which can include the Complainant's name on the email, or otherwise indicates that the Complainant is the person filing the complaint.

The Title IX Coordinator will contact the Complainant regarding any notice that is submitted in a form that does not comply with these requirements to ensure that it is filed correctly.

## VII. SUPPORTIVE MEASURES - Back to Top

MCCCD will offer and implement appropriate and reasonable supportive measures to the parties upon notice of alleged harassment, discrimination, and/or retaliation.

Supportive measures are non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the parties to restore or preserve access to the MCCCD's education program or activity, including measures designed to protect the safety of all parties, the MCCCD's educational environment, and/or deter sexual harassment, discrimination on the basis of sex, and/or retaliation.

The Title IX Coordinator shall make supportive measures available to the parties upon receiving notice of allegations or a formal complaint. There is no statute of limitations for filing a Title IX Complaint. The Title IX Coordinator works with the Complainant to ensure their wishes are considered with respect to the planned and implemented supportive measures.

The MCCCD will maintain the privacy of the supportive measures, provided that maintaining privacy does not impair the MCCCD's ability to provide the supportive measures. MCCCD will act to ensure as minimal an academic impact on the parties as possible. The MCCCD will implement measures in a way that does not unreasonably burden the other party.

These actions may include, but are not limited to:

1. Referral to counseling, medical, and/or other healthcare services

2. Referral to the Employee Assistance Program
3. Referral to community-based service providers
4. In-house visa and immigration assistance
5. Student financial aid counseling
6. Education to the community or community subgroup(s)
7. Altering work arrangements for employees or student-employees
8. Safety planning
9. Providing campus safety escorts
10. Implementing contact limitations (no contact orders) between the parties
11. Academic support, extensions of deadlines, or other course/program-related adjustments
12. Trespass orders, when applicable
13. Timely warnings under the Clery Act
14. Class schedule modifications, withdrawals, or leaves of absence
15. Increased security and monitoring of certain areas of the campus
16. Any other actions deemed appropriate by the Title IX Coordinator

Violations of no contact orders will be referred to appropriate student or employee conduct processes for enforcement and further discipline, as is necessary.

## VIII. EMERGENCY REMOVAL - Back to Top

MCCCD can act to remove a Respondent entirely or partially from its education program/activities or MCCCD employment on an emergency basis when an individualized safety and risk analysis has determined that an immediate threat to the physical health or safety of any student or other individual justifies removal. This risk analysis is performed by the Title IX Coordinator in conjunction with the college or District Behavioral Intervention Team (also known as BIT/BAT/TAT/CARE, etc.) using its standard objective violence risk assessment procedures.

The Title IX Coordinator has sole discretion under this policy to implement or stay an emergency removal and to determine the conditions and duration. Violation of an emergency removal under this policy will be grounds for discipline, which may include expulsion from the MCCCD or termination from employment.

In all cases where an emergency removal is imposed:

1. The Respondent will be given written notice of the action. In the written notice will be the option to request to meet with the Title IX Coordinator as soon as reasonably possible, to show cause as to why the action/removal should not be implemented or should be modified. This meeting is not a hearing on the merits of the underlying Title IX allegations, but rather an administrative process intended to determine solely whether the emergency removal is appropriate.
2. The Respondent has three (3) days after the receipt of the emergency removal to request a meeting with the Title IX Coordinator. If the Respondent does not make such a request within the three (3) day time period, objection to the emergency removal is deemed waived.
3. The Respondent may be accompanied by an Advisor of their choosing in the Show Cause administrative meeting with the Title IX Coordinator.
4. The Respondent will be given access to a written summary of the basis for the emergency removal prior to the meeting to allow for adequate preparation. Such summary will be included in the notification letter regarding the emergency removal.
5. The Title IX Coordinator will issue a Show Cause Meeting Determination letter to the Respondent within two (2) days of the meeting taking place.
6. There is no appeal process for emergency removal decisions.
7. A Complainant and their Advisor may be permitted to participate in this meeting, as it is equitable to do so.
8. MCCCD will implement the least restrictive emergency actions possible in light of the circumstances and safety concerns.

**For additional information regarding emergency removals, please see Emergency Removals.**

## IX. PRIVACY - Back to Top

Every effort is made by the MCCCD to preserve the privacy of a report under this policy.

**For additional information regarding privacy and confidentiality under this policy, please see Privacy and Confidentiality.**

## X. JURISDICTION - Back to Top

This policy applies to all MCCCD educational programs and activities, and to conduct that takes place on the campus or on property owned or controlled by the MCCCD, at MCCCD-sponsored events, or in buildings owned or controlled by MCCCD's recognized student organizations. The Respondent must be a member of MCCCD's community in order for its policies to apply. Nevertheless, even when the Respondent is not a member of the MCCCD's community, supportive measures, remedies, and resources may be accessible to the Complainant by contacting the Title IX Coordinator.

This policy applies to the effects of off-campus misconduct that effectively deprive someone of access to MCCCD's educational programs. The MCCCD may also extend jurisdiction to off-campus and/or to online conduct when the Title IX Coordinator determines that the conduct affects a substantial MCCCD interest.

Regardless of where the conduct occurred, the MCCCD will address notice/complaints to determine whether the conduct occurred in the context of its employment or educational program or activity and/or has continuing effects on campus or in an off-campus sponsored program or activity.

A Title IX Coordinator may be able to provide guidance for a student or employee Complainant who experiences sexual harassment/discrimination in an externship, study abroad program, or other environment external to the MCCCD under the MCCCD's Student Conduct Code or employee conduct or nondiscrimination policies.

**For additional information regarding the MCCCD jurisdiction over Title IX matters, please see Jurisdiction.**

## XI. TIME LIMITS ON REPORTING - Back to Top

There is no time limitation on providing notice/complaints to the Title IX Coordinator. However, if the Respondent is no longer subject to the MCCCD's jurisdiction and/or significant time has passed, the ability to investigate, respond, and provide remedies may be more limited or impossible.

Acting on notice/complaints significantly impacted by the passage of time (including, but not limited to, the rescission or revision of policy) is at the discretion of the Title IX Coordinator (except in cases where mandatory dismissal is required), who may document allegations for future reference, offer supportive measures and/or remedies, and/or engage in informal or formal action, as appropriate.

The MCCCD will apply the policy in place at the time of the alleged misconduct and the procedures in place at the time of the notice of alleged misconduct or complaint of sexual harassment.

## XII. ONLINE HARASSMENT AND MISCONDUCT - Back to Top

This policy is written and should be interpreted broadly to include online and cyber manifestations of any of the behaviors prohibited below, when those behaviors occur in or have an effect on the MCCCD's education programs and activities or use MCCCD networks, technology, or equipment.

When harassing communications made on websites, social media, and other venues not controlled by the MCCCD are reported to the MCCCD pursuant to this policy the MCCCD will attempt to address and mitigate the effects of such communications. Any online postings or other electronic communication by students and employees, including cyber-bullying, cyber-stalking, cyber-harassment, etc., occurring completely outside of the MCCCD's control (e.g., not on MCCCD networks, websites, or between MCCCD email accounts) will only be subject to this policy when such online conduct can be shown to cause a substantial in-program disruption to the student's educational pursuit of MCCCD's educational programs and/or activities.

Off-campus harassing speech by employees, whether online or in person, may be regulated by the MCCCD only when such speech is made in an employee's official or work-related capacity, including where the speaker holds themselves out as employees of an MCCCD college or District office. Otherwise, such communications are considered speech protected by the First Amendment. Supportive measures for Complainants will be provided, but protected speech will not be subjected to discipline.

## XIII. TITLE IX SEXUAL HARASSMENT - Back to Top

MCCCD has adopted the following definition of Title IX Sexual Harassment in order to address the unique environment of an academic community, which consists not only of employer and employees, but of students as well.

Acts of sexual harassment may be committed by any person upon any other person, regardless of the sex, sexual orientation, and/or gender identity of those involved.

Sexual Harassment, as an umbrella category, includes the offenses of sexual harassment/discrimination, sexual assault, domestic violence, dating violence, and stalking, and is defined as:

Conduct on the basis of sex that satisfies one or more of the following:

1. Quid Pro Quo:
   a. an employee of the MCCCD,
   b. conditions the provision of an aid, benefit, or service of the MCCCD,
   c. on an individual's participation in unwelcome sexual conduct; and/or

2. Sexual Harassment:
   a. unwelcome conduct,
   b. determined by a reasonable person,
   c. to be so severe, and
   d. pervasive, and,
   e. objectively offensive,
   f. that it effectively denies a person equal access to the MCCCD's education program or activity. Severity, pervasiveness, and objective offensiveness are evaluated based on the totality of the circumstances from the perspective of a reasonable person in the same or similar

circumstances ("in the shoes of the Complainant"), including the context in which the alleged incident occurred and any similar, previous patterns that may be evidenced.

3. Sexual assault, defined as:
    a. Sex Offenses, Forcible:
        i. Any sexual act directed against another person,
        ii. without the consent of the Complainant,
        iii. including instances in which the Complainant is incapable of giving consent.
    b. Forcible Rape:
        i. Penetration,
        ii. no matter how slight,
        iii. of the vagina or anus with any body part or object, or
        iv. oral penetration by a sex organ of another person,
        v. without the consent of the Complainant.
    c. Forcible Sodomy:
        i. Oral or anal sexual intercourse with another person,
        ii. forcibly,
        iii. and/or against that person's will (non-consensually), or
        iv. not forcibly or against the person's will in instances in which the Complainant is incapable of giving consent because of age (under the age of 18) or because of temporary or permanent mental or physical incapacity.
    d. Sexual Assault with an Object:
        i. The use of an object or instrument to penetrate,
        ii. however slightly,
        iii. the genital or anal opening of the body of another person,
        iv. forcibly,
        v. and/or against that person's will (non-consensually),
        vi. or not forcibly or against the person's will in instances in which the Complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.
    e. Forcible Fondling:
        i. The touching of the private body parts of another person (buttocks, groin, breasts),
        ii. for the purpose of sexual gratification,
        iii. forcibly,
        iv. and/or against that person's will (non-consensually),
        v. or not forcibly or against the person's will in instances in which the Complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.
    f. Sex Offenses, Non-forcible:
        i. Incest:
            1. Non-forcible sexual intercourse,
            2. between persons who are related to each other,
            3. within the degrees wherein marriage is prohibited by Arizona law.
        ii. Statutory Rape:
            1. Non-forcible sexual intercourse,
            2. with a person who is under the Arizona statutory age of consent, which is the age of 18 years old.

4. Dating Violence, defined as:
    a. violence,
    b. on the basis of sex,
    c. committed by a person,
    d. who is in or has been in a social relationship of a romantic or intimate nature with the Complainant.

i. The existence of such a relationship shall be determined based on the Complainant's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship. For the purposes of this definition
ii. Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse
iii. Dating violence does not include acts covered under the definition of domestic violence.

5. Domestic Violence, defined as:
   a. violence,
   b. on the basis of sex,
   c. committed by a current or former spouse or intimate partner of the Complainant
   d. by a person with whom the Complainant shares a child in common, or
   e. by a person who is cohabitating with, or has cohabitated with, the Complainant as a spouse or intimate partner, or
   f. by a person similarly situated to a spouse of the Complainant under the domestic or family violence laws of the state of Arizona or
   g. by any other person against an adult or youth Complainant who is protected from that person's acts under the domestic or family violence laws of the state of Arizona.

To categorize an incident as Domestic Violence, the relationship between the Respondent and the Complainant must be more than just two people living together as roommates. The people cohabitating must be current or former spouses or have an intimate relationship.

6. Stalking, defined as:
   a. engaging in a course of conduct,
   b. on the basis of sex,
   c. directed at a specific person, that

would cause a reasonable person to fear for the person's safety, or the safety of others; or
suffer substantial emotional distress.

For the purposes of this definition—

i. Course of conduct means two or more acts, including, but not limited to, acts in which the Respondent directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.
ii. Reasonable person means a reasonable person under similar circumstances and with similar identities to the Complainant.
iii. Substantial emotional distress means significant mental suffering or anguish that may but does not necessarily require medical or other professional treatment or counseling.

MCCCD reserves the right to impose any level of sanction, ranging from a reprimand up to and including suspension or expulsion/termination, for any offense under this policy.

**Force, Coercion, Consent, and Incapacitation:**
As used in the offenses above, the following definitions apply:

**Force:** Force is the use of physical violence and/or physical imposition to gain sexual access. Force also includes threats, intimidation (implied threats), and coercion that is intended to overcome resistance or produce consent.

Sexual activity that is forced is, by definition, non-consensual, but non-consensual sexual activity is not necessarily forced. Silence or the absence of resistance alone is not consent. Consent is not demonstrated by the absence of resistance. While resistance is not required or necessary, it is a clear demonstration of non-consent.

**Coercion:** Coercion is unreasonable pressure for sexual activity. Coercive conduct differs from seductive conduct based on factors such as the type and/or extent of the pressure used to obtain consent. When someone makes clear that they do not want to engage in certain sexual activity, that they want to stop, or that they do not want to go past a certain point of sexual interaction, continued pressure beyond that point may be coercive.

**Consent is:**

- knowing, and
- voluntary, and
- clear permission
- by word or action
- to engage in sexual activity.

Since individuals may experience the same interaction in different ways, it is the responsibility of each party to determine that the other has consented before engaging in the activity. No one under the age of consent in Arizona, specifically, 18 years old, can consent to sexual activity.

If consent is not clearly provided prior to engaging in the activity, consent may be ratified by word or action at some point during the interaction or thereafter, but clear communication from the outset is strongly encouraged.

For consent to be valid, there must be a clear expression in words or actions that the other individual consented to that specific sexual conduct. Reasonable reciprocation can be implied. For example, if someone kisses you, you can kiss them back (if you want to) without the need to explicitly obtain their consent to being kissed back.

Consent can also be withdrawn once given, as long as the withdrawal is reasonably and clearly communicated. If consent is withdrawn, that sexual activity should cease within a reasonable time.

Consent to some sexual contact (such as kissing or fondling) cannot be presumed to be consent for other sexual activity (such as intercourse). A current or previous intimate relationship is not sufficient to constitute consent.

Proof of consent or non-consent is not a burden placed on either party involved in an incident. Instead, the burden remains on the MCCCD to determine whether its policy has been violated. The existence of consent is based on the totality of the circumstances evaluated from the perspective of a reasonable person in the same or similar circumstances, including the context in which the alleged incident occurred and any similar, previous patterns that may be evidenced.

**Incapacitation:** Incapacitation occurs when someone cannot make rational, reasonable decisions because they lack the capacity to give knowing/informed consent (e.g., to understand the "who, what, when, where, why, or how" of their sexual interaction).

Incapacitation is determined through consideration of all relevant indicators of an individual's state and is not synonymous with intoxication, impairment, blackout, and/or being drunk.

A person cannot consent if they are unable to understand what is happening or are disoriented, helpless, asleep, or unconscious, for any reason, including by alcohol or other drugs. As stated above, a Respondent violates this policy if they engage in sexual activity with someone who is incapable of giving consent.

It is a defense to a sexual assault policy violation that the Respondent neither knew nor should have known the Complainant to be physically or mentally incapacitated. "Should have known" is an objective, reasonable person standard which assumes that a reasonable person is both sober and exercising sound judgment.

This policy also covers a person whose incapacity results from a temporary or permanent physical or mental health condition, involuntary physical restraint, and/or the consumption of incapacitating drugs.

## XIV. RETALIATION - Back to Top

Protected activity under this policy includes reporting an incident that may implicate this policy, participating in the grievance process, supporting a Complainant or Respondent, assisting in providing information relevant to an investigation, and/or acting in good faith to oppose conduct that constitutes a violation of this policy.

Acts of alleged retaliation should be reported immediately to the Title IX Coordinator and will be promptly investigated. The MCCCD is prepared to take appropriate steps to protect individuals who fear that they may be subjected to retaliation.

It is prohibited for the MCCCD or any member of MCCCD's community to take materially adverse action by intimidating, threatening, coercing, harassing, or discriminating against any individual for the purpose of interfering with any right or privilege secured by law or policy, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this policy and procedure.

Charges against an individual for Student Conduct Code violations that do not involve sex discrimination or sexual harassment but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by Title IX, constitutes retaliation.

The following do not constitute retaliation under this policy:

1. The exercise of rights protected under the First Amendment.
2. Charging an individual with a code of conduct violation for making a materially false statement in bad faith in the course of a grievance proceeding under this policy and procedure. A determination regarding responsibility, alone, is not sufficient to conclude that any party has made a materially false statement in bad faith.

**For additional information on prohibited retaliation, please see Retaliation.**

## XV. WHEN A COMPLAINANT DOES NOT WISH TO PROCEED - Back to Top

If a complainant does not wish for their name to be shared, does not wish for an investigation to take place, or does not want a formal complaint to be pursued, they may make such a request to the Title IX Coordinator, who will evaluate that request in light of the duty to ensure the safety of the campus and to comply with state or federal law.

The Title IX Coordinator has ultimate discretion over whether the MCCCD proceeds when the complainant does not wish to do so. The Title IX Coordinator may sign a formal complaint to initiate a grievance process upon completion of an appropriate violence risk assessment. The Title IX Coordinator's decision to sign a formal complaint should be based on results of the violence risk assessment that show a compelling risk to health and/or safety that requires the MCCCD to pursue formal action to protect the community.

When the Title IX Coordinator executes the written complaint, they do not become the Complainant. The Complainant is the individual who is alleged to be the victim of conduct that could constitute a violation of this policy. The Complainant (or their Advisor) may have as much or as little involvement in the process as they wish. The Complainant retains all rights of a Complainant under this Policy irrespective of their level of participation. Typically, when the Complainant chooses not to participate, the Advisor may be appointed as proxy for the Complainant throughout the process, acting to ensure and protect the rights of the Complainant.

In cases in which the Complainant requests confidentiality/no formal action and the circumstances allow the MCCCD to honor that request, the MCCCD will offer supportive measures, and remedies to the Complainant and the community, but will not otherwise pursue formal action.

If the Complainant elects to take no action, they can change that decision if they decide to pursue a formal complaint at a later date. Upon making a formal complaint, a Complainant has the right, and can expect, to have allegations taken seriously by the MCCCD, and to have the incidents investigated and properly resolved through these procedures.

## XVI. FEDERAL TIMELY WARNING OBLIGATIONS - Back to Top

Parties reporting sexual assault, domestic violence, dating violence, and/or stalking should be aware that under the Clery Act, MCCCD must issue timely warnings for incidents reported to them that pose a serious or continuing threat of bodily harm or danger to members of the campus community.

MCCCD will ensure that a Complainant's name and other identifying information is not disclosed, while still providing enough information for community members to make safety decisions in light of the potential danger.

## XVII. FALSE ALLEGATIONS AND EVIDENCE - Back to Top

Deliberately false and/or malicious accusations under this policy, as opposed to allegations which, even if erroneous, are made in good faith, are a serious offense and will be referred to either the Student Conduct Code or employee conduct policies for appropriate disciplinary action.

Additionally, witnesses and parties knowingly providing false evidence, tampering with or destroying evidence after being directed to preserve such evidence, or deliberately misleading an investigator or hearing Decision-maker will be subject to discipline under the appropriate student or employee policy as well as under this policy for providing false testimony.

## XVIII. AMNESTY FOR COMPLAINANTS AND WITNESSES - Back to Top

The MCCCD community encourages the reporting of misconduct and crimes by Complainants and witnesses. Sometimes, Complainants or witnesses are hesitant to report to MCCCD officials or participate in grievance processes because they fear that they themselves may be in violation of certain policies, such

as underage drinking or use of illicit drugs at the time of the incident. Respondents may hesitate to be forthcoming during the process for the same reasons.

It is in the best interests of the MCCCD community that Complainants choose to report misconduct to MCCCD officials, that witnesses come forward to share what they know, and that all parties be forthcoming during the process. To encourage reporting and participation in the process, MCCCD maintains a policy of offering parties and witnesses amnesty from minor policy violations, such as underage consumption of alcohol or the use of illicit drugs related to the incident being reported.

Amnesty does not apply to more serious allegations such as physical abuse of another or illicit drug distribution. A decision not to offer amnesty to a Respondent should not be based on sex nor gender, but should take into account the rationale for amnesty. The incentive to report serious misconduct is rarely applicable to Respondents with respect to a Complainant.

MCCCD maintains a policy of amnesty for students who offer help to others in need via bystander intervention. While policy violations cannot be overlooked, MCCCD may provide purely educational options with no official disciplinary finding, rather than punitive sanctions, to those who offer their assistance to others in need.

## XIX. FEDERAL STATISTICAL REPORTING OBLIGATIONS - Back to Top

Certain campus officials – those deemed Campus Security Authorities – have a duty to report the following for federal statistical reporting purposes (Clery Act):

a. All "primary crimes," which include homicide, sexual assault, robbery, aggravated assault, burglary, motor vehicle theft, and arson;
b. Hate crimes, which include any bias motivated primary crime as well as any bias motivated larceny or theft, simple assault, intimidation, or destruction/damage/vandalism of property;
c. VAWA based crimes, which include sexual assault, domestic violence, dating violence, and stalking (VAWA is the Violence Against Women Act, enacted in 1994 codified in part at 42 U.S.C. sections 13701 through 14040); and
d. Arrests and referrals for disciplinary action for weapons-related law violations, liquor-related law violations, and drug abuse-related law violations.

All personally identifiable information is kept private, but statistical information must be passed along to campus law enforcement regarding the type of incident and its general location (on or off-campus or in the surrounding area, but no addresses are given) for publication in the Annual Security Report and daily campus crime log.

Campus Security Authorities include: presidents, vice-presidents, student affairs/student conduct staff, campus law enforcement/public safety, local police, coaches, athletic directors, student activities staff, human resources staff, Advisors to student organizations, and any other official with significant responsibility for student and campus activities.

## XX. ALLEGED VIOLATIONS OF THE TITLE IX POLICY - Back to Top

1. **Overview**

MCCCD will act on any formal or informal notice/complaint of violation of the Title IX Sexual Harassment policy ("the Policy") that is received by the Title IX Coordinator or any other Official with Authority by applying these procedures.

The procedures below apply **only** to qualifying allegations of sexual harassment (including sexual assault, dating violence, domestic violence, and stalking, as defined in Section XIII) involving MCCCD students, staff, administrator, or faculty members.

Unionized/other categorized employees are subject to the terms of their agreements/employees' rights to the extent those agreements do not conflict with this policy.

2. **Notice/Complaint**

Upon receipt of a complaint or notice to the Title IX Coordinator of an alleged violation of this Policy, MCCCD will initiate a prompt initial assessment to determine the next steps. The Title IX Coordinator will initiate at least one of three responses:

1. Offering supportive measures because the Complainant does not want to proceed formally;
2. Offering supportive measures and initiating an informal resolution; or
3. Offering supportive measures and initiating a Formal Grievance Process including an investigation and a hearing to determine whether or not the Policy has been violated.

3. **Initial Assessment**

Following receipt of notice or a complaint of an alleged violation of this Policy, the Title IX Coordinator (or designee) will engage in an initial assessment, which is typically one (1) to five (5) business days in duration.

**For more information related to the Initial Assessment, please see The Investigative Process.**

4. **Emergency Removal**

In the event an emergency removal is considered, the Title IX Coordinator will follow the procedures outlined in Section VIII of this policy.

5. **Dismissal (Mandatory and Discretionary)**

Mandatory Dismissal: The Title IX Coordinator must dismiss a formal complaint or any allegations therein if, at any time during the investigation or hearing, it is determined that:

1. The conduct alleged in the formal complaint would not constitute sexual harassment as defined in the Policy hereinabove, even if proved; and/or
2. The conduct did not occur in an educational program or activity controlled by MCCCD (including buildings or property controlled by recognized student organizations), and/or MCCCD does not have control of the Respondent; and/or

3. The conduct did not occur against a person in the United States.

Any conduct alleged in the formal complaint that is dismissed under the first (1st) provision above will be referred by the Title IX Coordinator to the Student Code of Conduct administrator (for student Respondents) or the college or district Human Resources administrator (for employee/third party Respondents). Referrals shall take place within three (3) days of the date of the Dismissal Letter being mailed to the parties.

Discretionary Dismissal: The Title IX Coordinator may choose to dismiss a formal complaint or any allegations therein if, at any time during the investigation or hearing:

1. A Complainant notifies the Title IX Coordinator in writing that the Complainant would like to withdraw the formal complaint or any allegations therein. A Complainant who decides to withdraw a complaint may later request to reinstate it or refile it; or

2. The Respondent is no longer enrolled in or employed by the MCCCD; or

3. Specific circumstances prevent MCCCD from gathering evidence sufficient to reach a determination as to the formal complaint or allegations therein.

4.

Upon any dismissal, MCCCD will promptly send written notice of the dismissal and the rationale for doing so simultaneously to the parties.

Both mandatory and discretionary dismissal decisions are appealable by any party under the procedures for appeal below.

6. **Counterclaims**

MCCCD is obligated to ensure that the grievance process is not abused for retaliatory purposes. MCCCD permits the filing of counterclaims but uses an initial assessment, described above, to assess whether the allegations in the counterclaim are made in good faith. Counterclaims made with retaliatory intent will not be permitted and may constitute a violation of this policy.

Counterclaims determined to have been reported in good faith will be processed using the grievance procedures below. Investigation of such claims may take place after resolution of the underlying initial allegation, in which case a delay may occur.

Counterclaims may also be resolved through the same investigation as the underlying allegation, at the discretion of the Title IX Coordinator.

7. **Right to an Advisor**

The parties may each have an Advisor of their choice. The Advisor may be a friend, mentor, family member, attorney, or any other individual a party chooses to advise, support, and/or consult with them throughout the resolution process. The parties may choose Advisors from inside or outside of the MCCCD community. The Advisor may be present with the Complainant or Respondent for all of their meetings and interviews within the resolution process, if they so choose.

The parties may select whoever they wish to serve as their Advisor as long as the Advisor is eligible and available. "Available" means the party agrees to act as Advisor and has no conflict of interest in doing so. Also, the Advisor cannot have institutionally conflicting roles, such as being a Title IX administrator who has an active role in the matter, or a supervisor who must monitor and implement sanctions.

Choosing an Advisor who is also a witness in the process creates potential for bias and conflict-of-interest. A party who chooses an Advisor who is also a witness can anticipate that issues of potential bias will be explored by the hearing Decision-maker.

If the parties choose an Advisor from the pool available from the MCCCD, the Advisor will be trained by the MCCCD and be familiar with the MCCCD's resolution process. If the parties choose an Advisor from outside the pool of those identified by the MCCCD, the Advisor may not have been trained by the MCCCD and may not be familiar with MCCCD policies and procedures.

Parties also have the right to choose not to have an Advisor in the initial stages of the resolution process, prior to a hearing. If either party chooses not to have an Advisor present in the initial stages of the resolution process, this choice will be documented in the record of the case.

**For more information regarding the training received by an Advisor, please see Advisors FAQ.**

a. **Advisors in Hearings/MCCCD-Appointed Advisor**

Under U.S. Department of Education regulations applicable to Title IX, cross-examination is required during the hearing, but must be conducted by the parties' Advisors. The parties are not permitted to directly cross-examine each other or any witnesses. If a party does not have an Advisor for a hearing, MCCCD will appoint a trained Advisor for the limited purpose of conducting cross-examination.

A party may reject this appointment and choose their own Advisor, but they may not proceed with the hearing without an Advisor. If the party's Advisor will not conduct cross-examination, MCCCD will appoint an Advisor who will do so thoroughly, regardless of the participation or non-participation of the advised party in the hearing itself. Extensive questioning of the parties and witnesses may also be conducted by the Decision-maker during the hearing.

b. **Pre-Interview Meetings**

Advisors may request to meet with the administrative officials conducting interviews/meetings in advance of these interviews or meetings. In order for a pre-interview meeting to be held it must be requested by the Advisor. This pre-meeting allows Advisors to clarify and understand their role and MCCCD's policies and procedures. A pre-interview meeting is not mandatory.

c. **Advisor Violations of MCCCD Policy**

All Advisors are subject to the same MCCCD policies and procedures, whether they are attorneys or not. Advisors are expected to advise without disrupting proceedings. Advisors may not address MCCCD officials in a meeting or interview unless invited to do so (e.g., asking procedural questions). The Advisor may not speak on behalf of their advisee during any meeting or proceeding and may not speak on behalf of the advisee to the investigator(s) or other Decision-maker except during a hearing proceeding, during cross-examination.

The parties are expected to respond to questions on their own behalf throughout the investigation phase of the resolution process. Although the Advisor generally may not speak on behalf of their advisee, the Advisor may consult with their advisee, either privately as needed, or by conferring or passing notes during any resolution process meeting or interview. For longer or more involved discussions, the parties and their Advisors should ask for breaks to allow for private consultation.

Any Advisor who oversteps their role as defined by this policy will be warned only once. If an Advisor continues to disrupt or otherwise fails to respect the limits of the Advisor role, the meeting will be ended, or other appropriate measures implemented. Subsequently, the Title IX Coordinator will determine how to address the Advisor's non-compliance and future role.

d. **Sharing Information with the Advisor**

Parties may share documentation and evidentiary information directly with their Advisor or other individuals if they wish. Doing so may help the parties participate more meaningfully in the resolution process.

MCCCD also provides a consent form (FERPA authorization to release) that authorizes the MCCCD to share such information directly with a party's Advisor. The parties must either complete and submit this form to the Title IX Coordinator or provide similar documentation demonstrating consent to a release of information to the Advisor before MCCCD is able to share records with an Advisor.

The MCCCD will not comply with any party's request that all communications be made through their attorney Advisor.

e. **Privacy of Records Shared with Advisor**

Advisors are expected to maintain the privacy of the records shared with them. These records may not be shared with third parties, disclosed publicly, or used for purposes not explicitly authorized by MCCCD. MCCCD may seek to restrict the role of any Advisor who does not respect the sensitive nature of the process or who fails to abide by the MCCCD's privacy expectations.

f. **Expectations of an Advisor**

The MCCCD expects an Advisor to adjust their schedule to allow them to attend MCCCD meetings when planned. At the sole discretion of the Title IX Coordinator, scheduled meetings may be changed to accommodate an Advisor's inability to attend, if doing so does not cause an unreasonable delay. A Title IX Coordinator's decision as to whether to change meeting dates and times is final.

MCCCD may also make reasonable provisions to allow an Advisor who cannot attend in person to attend a meeting by telephone, video conferencing, or other similar technologies as may be convenient and available.

g. **Expectations of the Parties with Respect to Advisors**

A party may elect to change Advisors during the process and is not obligated to use the same Advisor throughout. The parties are expected to inform the Investigator(s) of the identity of their Advisor at least two (2) business days before the date of their first meeting with Investigators (or as soon as possible if a more expeditious meeting is necessary or desired).

The parties are expected to provide timely notice to the Title IX Coordinator if they change Advisors at any time. It is assumed that if a party changes Advisors, consent to share information with the previous Advisor is terminated, and a release for the new Advisor must be secured. Parties are expected to inform the Title IX Coordinator of the identity of their hearing Advisor at least two (2) business days before the hearing.

8. **Resolution Processes**

Resolution proceedings are private. All persons present at any time during the resolution process are expected to maintain the privacy of the proceedings in accordance with MCCCD policy. While there is an expectation of privacy around what Investigators share with parties during interviews, the parties have discretion to share their own knowledge and evidence with others if they so choose. MCCCD encourages parties to discuss this topic with their Advisors before doing so.

9. **Formal Grievance Process**

The Formal Grievance Process relies on a pool of administrators ("the Pool") to carry out the process. Members of the Pool are announced in an annual distribution of this policy to all students, parents/guardians of students, employees, prospective students, and prospective employees. They are also listed in the Annual Title IX Report published by the Title IX Office.

**For more information regarding the Formal Grievance Pool—including selection, training, and responsibilities—please see Formal Grievance Pool.**

10. **Formal Grievance Process: Notice of Investigation and Allegations**

The Title IX Coordinator will provide written notice of allegations (the "NOA") to the Respondent upon commencement of the Formal Grievance Process. This facilitates the Respondent's ability to prepare for the interview and to identify and choose an Advisor to accompany them. The NOA is also copied to the Complainant, who is to be given advance notice of when the NOA will be delivered to the Respondent.

The NOA will include:

- A meaningful summary of all of allegations,
- The identity of the involved parties (if known),
- The precise misconduct being alleged,
- The date and location of the alleged incident(s) (if known),
- The specific policies implicated,
- A statement of the potential sanctions/responsive actions that could result
- A statement that the MCCCD presumes the Respondent is not responsible for the reported misconduct unless and until the evidence supports a different determination,
- A statement that determinations of responsibility are made at the conclusion of the process and that the parties will be given an opportunity to inspect and review all directly related and/or relevant evidence obtained during the review and comment period,
- A statement about the MCCCD's policy on retaliation,
- Information on the need for each party to have an Advisor of their choosing and suggestions for ways to identify an Advisor,
- A statement informing the parties that the MCCCD's policy prohibits knowingly making false statements, including knowingly submitting false information during the resolution process,
- Detail on how the party may request disability accommodations during the interview process,
- A suggested date and time for an initial meeting (proper time will be given to allow for the selection of an Advisor)
- The name(s) of the Investigator(s), along with a process to identify, in advance of the interview process, to the Title IX Coordinator any conflict of interest that the Investigator(s)

may have, and
- An instruction to preserve any evidence that is directly related to the allegations.

Amendments and updates to the NOA may be made as the investigation progresses and more information becomes available regarding the addition or dismissal of various charges.

Notice will be made in writing and will be sent via electronic mail to the MCCCD-issued email account and mailed via regular mail to the local or permanent address as indicated in official MCCCD records. Notice is presumed to have been given upon emailing the NOA to the Respondent's MCCCD-owned email address. The NOA will also be placed in regular mail, postage pre-paid.

11. **Resolution Timeline**

The MCCCD will make a good faith effort to complete the resolution process within a sixty-to-ninety (60-90) business day time period, including appeal, which can be extended as necessary for appropriate cause by the Title IX Coordinator, who will provide notice and rationale for any extensions or delays to the parties as appropriate, as well as an estimate of how much additional time will be needed to complete the process.

12. **Appointment of Investigators**

Once the decision to commence a formal investigation is made, the Title IX Coordinator shall appoint a team of two (2) investigators to investigate the allegations. Appointment of investigators typically occurs within two (2) business days of determining that an investigation should proceed.

13. **Ensuring Impartiality**

Any individual materially involved in the administration of the resolution process may neither have nor demonstrate a conflict of interest or bias for a party generally, or for a specific Complainant or Respondent. The Title IX Coordinator will vet the assigned Investigator(s) to ensure impartiality by ensuring there are no actual or apparent conflicts of interest or disqualifying biases. The parties may, at any time during the resolution process, raise a concern regarding bias or conflict of interest, and the Title IX Coordinator will determine whether the concern is reasonable and supportable. The Title IX Coordinator's decision allegations of bias or conflict of interest is final.

The Formal Grievance Process involves an objective evaluation of all relevant inculpatory and exculpatory evidence obtained. Credibility determinations may not be based solely on an individual's status or participation as a Complainant, Respondent, or witness.

A Respondent is presumed not to be responsible for the reported misconduct unless and until the Respondent is determined to be responsible for a policy violation by the applicable preponderance of the evidence standard.

14. **Delays in the Investigation Process and Interactions with Law Enforcement**

The MCCCD may undertake a short delay in its investigation (several days) if the following circumstances require: a request from law enforcement to temporarily delay the investigation, the need for language assistance, the absence of parties and/or witnesses, and/or accommodations for disabilities or health conditions, or such circumstances as determined by the Title IX Coordinator in their sole discretion.

The MCCCD will communicate in writing the anticipated duration of the delay and reason to the parties and provide the parties with status updates if necessary. The MCCCD will promptly resume

its investigation and resolution process as soon as feasible. During such a delay, MCCCD will implement supportive measures, as deemed appropriate.

The MCCCD's action(s) are not typically altered or precluded on the grounds that civil or criminal charges involving the underlying incident(s) have been filed or that criminal charges have been dismissed or reduced.

15. **The Investigation Process**

All investigations should be thorough, reliable, impartial, prompt, and fair. Investigations involve interviews with all relevant parties and witnesses; obtaining available, relevant evidence; and identifying sources of expert information, as necessary. Either party may submit a written statement to the Title IX Coordinator outlining their position on the allegations.

All parties have a full and fair opportunity, through the investigation process, to suggest witnesses and questions, to provide evidence and expert witnesses (at their own expense), and to fully review and respond to all evidence on the record.

**For additional information regarding steps in the investigative process, please see Investigative Process.**

16. **Role and Participation of Witnesses in the Investigation**

Witnesses (as distinguished from the parties) who are employees or students of the MCCCD are expected to cooperate with and participate in the MCCCD's investigation and resolution process. Failure of such witnesses to cooperate with and/or participate in the investigation or resolution process constitutes a violation of this policy and may warrant discipline.

While in-person interviews for parties and all potential witnesses are ideal, circumstances (e.g., study abroad, summer break) may require individuals to be interviewed remotely. Skype, Zoom, FaceTime, WebEx, or similar technologies may be used for interviews if the Investigator(s) determine that timeliness or efficiency dictate a need for remote interviewing. MCCCD will take appropriate steps to reasonably ensure the security/privacy of remote interviews.

Witnesses may also provide written statements in addition to being interviewed.

17. **Recording of Interviews**

No audio or video recording of any kind is permitted during investigation meetings.

18. **Evidentiary Considerations in the Investigation**

The investigation does not consider:

1. incidents not directly related to the possible violation, unless they evidence a pattern;
2. the character of the parties; or
3. questions and evidence about the Complainant's sexual predisposition or prior sexual behavior, unless such questions and evidence about the Complainant's prior sexual behavior are offered to prove that someone other than the Respondent committed the conduct alleged by the Complainant, or if the questions and evidence concern specific incidents of the Complainant's prior sexual behavior with respect to the Respondent and are offered to prove consent.

19. **Referral for Hearing**

The Title IX Coordinator will refer the matter for a hearing, once the final investigative report is shared with the parties.

The hearing cannot be less than ten (10) business days from the conclusion of the investigation, when the final investigation report is made available to the Parties and the Decision-maker for review and comment, unless all parties, and the Decision-maker agrees to an expedited timeline. This agreement must be in writing.

The Title IX Coordinator will select a Decision-maker that is hired from a list of approved attorneys for any hearing held under the Title IX policy.

20. **Hearing Decision-maker Composition**

The MCCCD will designate a single decision-maker. The single Decision-maker will also be the Chair of the hearing. The Decision-maker will not have had any previous involvement with the investigation. The Decision-maker is an out-sourced position. The Decision-maker will not be an MCCCD employee. The Decision-maker will have had no previous involvement in the matter at hand.

21. **Evidentiary Considerations in the Hearing**

Any evidence that the Decision-maker determines is relevant and credible may be considered. The hearing does not consider:

1. incidents not directly related to the possible violation, unless they evidence a pattern;
2. the character of the parties; or
3. questions and evidence about the Complainant's sexual predisposition or prior sexual behavior, unless such questions and evidence about the Complainant's prior sexual behavior are offered to prove that someone other than the Respondent committed the conduct alleged by the Complainant, or if the questions and evidence concern specific incidents of the Complainant's prior sexual behavior with respect to the Respondent and are offered to prove consent.

Previous disciplinary action of any kind involving the Respondent may be considered in determining an appropriate sanction upon a determination of responsibility. This information is only considered at the sanction stage of the process.

The parties, if they so choose, may submit a written impact statement prior to the hearing for the consideration of the Decision-maker at the sanction stage of the process when a determination of responsibility is reached.

After post-hearing deliberation, the Decision-maker renders a determination based on the preponderance of the evidence--whether it is more likely than not that the Respondent violated the policy as alleged.

22. **Notice of Hearing**

No less than ten (10) business days prior to the hearing, the Title IX Coordinator will send notice of the hearing to the parties via email to the individual MCCCD-issued email address. Once emailed, notice will be presumptively delivered.

The notice will contain:

1. A description of the alleged violation(s), a list of all policies allegedly violated, a description of the applicable procedures, and a statement of the potential sanctions/responsive actions that could result.
2. The time, date, and location of the hearing and a reminder that attendance is mandatory, superseding all other campus activities. Thoroughness and fairness are the primary FOCI of any Title IX hearing process. Hearings are generally scheduled for two (2) hours, but can be extended, as needed at the discretion of the Decision-maker, to ensure that both parties are able to present the information relevant to their position. (e.g., complicated fact pattern, numerous witnesses, etc.).
3. Any technology that will be used to facilitate the hearing.
4. A list of all those who will attend the hearing, along with an invitation to object to the Decision-maker on the basis of demonstrated bias. This must be raised with the Title IX Coordinator at least two (2) business days prior to the hearing.
5. Information on how the hearing will be recorded and on access to the recording for the parties after the hearing.
6. A statement that if any party or witness does not appear at the scheduled hearing, the hearing may be held in their absence. For compelling reasons, the Decision-maker may reschedule the hearing.
7. Notification that the parties may have the assistance of an Advisor of their choosing at the hearing and will be required to have one present for any questions they may desire to ask. The party must notify the Title IX Coordinator if they do not have an Advisor, and the MCCCD will appoint one. Each party must have an Advisor present. There are no exceptions.
8. An invitation to each party to submit to the Decision-maker an impact statement. Pre-hearing that the Decision-maker will review during any sanction determination.
9. An invitation to contact the Title IX Coordinator to arrange any disability accommodations, language assistance, and/or interpretation services that may be needed at the hearing, at least seven (7) business days prior to the hearing.
10. Direction that the parties may not bring mobile phones/devices into the hearing.

Hearings for possible violations that occur near or after the end of an academic term (assuming the Respondent is still subject to this policy) and are unable to be resolved prior to the end of term will typically be held immediately after the end of the term or during the summer, as needed, to meet the resolution timeline followed by the MCCCD and remain within the 60-90 business day goal for resolution.

In these cases, if the Respondent is a graduating student, a hold may be placed on graduation and/or official transcripts until the matter is fully resolved (including any appeal). A student facing charges under this policy is not in good standing to graduate.

23. **Virtual Hearings**

All hearings will occur virtually by use of technology, specifically WebEx or Zoom technology. Each party will be located in a separate room from the Decision-maker, but will be able to see and hear each other. Witnesses will testify in the same room as the Decision-maker, but not the room where the parties and their Advisors sit. The Title IX Coordinator will arrange to use technology to allow remote testimony without compromising the fairness of the hearing.

24. **Pre-Hearing Preparation**

The Decision-maker, or designee, after any necessary consultation with the parties, Investigator(s) and/or Title IX Coordinator, will provide the names of persons who will be participating in the hearing, all pertinent documentary evidence, and the final investigation report to the parties at least ten (10) business days prior to the hearing. During the ten (10) business day period prior to the

hearing, the parties have the opportunity to review and comment on the final investigation report and available evidence.

The Decision-maker, or designee will also provide the parties a copy of the pre-hearing preparation checklist/document. A copy of the pre-hearing preparation checklist/document may be found on the MCCCD's Title IX webpage: https://district.maricopa.edu/consumer-information/title-ix/ .

## 25. Hearing Procedures

At the hearing, the Decision-maker has the authority to hear and make determinations on all allegations of sexual harassment and/or retaliation and may also hear and make determinations on any additional alleged policy violations that have occurred in concert with the discrimination, harassment, and/or retaliation, even though those collateral allegations may not specifically fall within the Title IX policy.

Participants at the hearing will include the Decision-maker, the hearing facilitator, the Investigator(s) who conducted the investigation, the parties, Advisors to the parties, any called witnesses, the Title IX Coordinator and anyone providing authorized accommodations or assistive services.

The Decision-maker will answer all questions of procedure. Anyone appearing at the hearing to provide information will respond to questions on their own behalf.

The Decision-maker will allow witnesses who have relevant information to appear at a portion of the hearing in order to respond to specific questions from the Decision-maker and the parties and will then be excused from attendance.

## 26. Joint Hearings

In hearings involving more than one Respondent or in which two (2) or more Complainants have accused the same individual of substantially similar conduct, the parties may agree to hear the allegations jointly. All parties must agree to a joint hearing. If one party does not agree, the default will be to hold the hearings separately.

In joint hearings, separate determinations of responsibility will be made for each Respondent with respect to each alleged policy violation.

## 27. Refusal to Submit to Cross-Examination and Inferences

The Decision-maker may not draw any inference solely from a party's or witness's absence from the hearing or refusal to answer cross-examination or other questions.

If charges of policy violations other than sexual harassment are considered at the same hearing, the Decision-maker may consider all evidence it deems relevant.

If a party's Advisor of choice refuses to comply with MCCCD's established rules of decorum for the hearing, MCCCD may require the party to use a different Advisor. If a MCCCD-provided Advisor refuses to comply with the rules of decorum, the Title IX Coordinator may provide that party with a different Advisor to conduct cross-examination on behalf of that party.

## 28. Recording Hearings

Hearings (but not deliberations) are recorded by MCCCD for purposes of review in the event of an appeal. The parties may not record the proceedings and no other unauthorized recordings are permitted.

The Decision-maker, the parties, their Advisors, and appropriate administrators of the MCCCD will be permitted to listen to the recording in a controlled environment determined by the Title IX Coordinator. No person will be given a copy or be allowed to make a copy of the recording.

29. **Deliberation, Decision-making, and Standard of Proof**

The Decision-maker will deliberate alone to determine, by a preponderance of the evidence, whether the Respondent is responsible or not responsible for the policy violation(s) in question. The deliberation period is not to exceed five (5) days. The Decision-maker may consider the previously submitted party impact statements in determining appropriate sanction(s), when there is a finding of responsibility as to one or more of the allegations.

The Decision-maker will ensure that each of the parties has an opportunity to review any impact statement submitted by the other party(ies). The Decision-maker may--at their discretion--consider the statements, but they are not binding.

The Decision-maker will then prepare a written deliberation statement and deliver it to the Title IX Coordinator, detailing the determination, rationale, the evidence used in support of its determination, the evidence disregarded, credibility assessments, and any sanctions. This report typically should not exceed three (3) to five (5) pages in length and must be submitted electronically to the Title IX Coordinator within two (2) business days of the end of deliberations, unless the Title IX Coordinator grants an extension. If an extension is granted, the Title IX Coordinator will notify the parties in writing of the extension.

30. **Notice of Outcome**

Using the deliberation statement, the Title IX Coordinator will prepare a Notice of Outcome, which shall include the final determination, rationale, and any applicable sanction(s). The Title IX Coordinator will then provide the Notice of Outcome to the parties and their Advisors within five (5) business days of receiving the Decision-maker's deliberation statement. The Notice of Outcome must be shared with the parties simultaneously.

Notification will be made in writing and will be mailed to the local or permanent address of the parties as indicated in official MCCCD records, or emailed to the parties' MCCCD-issued email or otherwise approved account. Once mailed, emailed, and/or received in-person, notice will be presumptively delivered.

**For more information about the Notice of Outcome Letter, please see Notice of Outcome.**

31. **Sanctions**

Factors considered when determining a sanction/responsive action may include, but are not limited to:

1. The nature, severity of, and circumstances surrounding the violation(s)
2. The Respondent's disciplinary history
3. Previous allegations or allegations involving similar conduct
4. The need for sanctions/responsive actions to bring an end to the discrimination, harassment, and/or retaliation
5. The need for sanctions/responsive actions to prevent the future recurrence of discrimination, harassment, and/or retaliation
6. The need to remedy the effects of the discrimination, harassment, and/or retaliation on the Complainant and the community
7. Any other information deemed relevant by the Decision-maker

The sanctions will be implemented as soon as is feasible, either upon the outcome of any appeal or the expiration of the window to appeal without an appeal being requested.

The sanctions described in this policy are not exclusive of, and may be in addition to, other actions taken or sanctions imposed by external authorities.

a. **Student Sanctions**

The following are the usual sanctions that may be imposed upon students or organizations singly or in combination:

1. *Warning:* A formal statement that the conduct was unacceptable and a warning that further violation of any MCCCD policy, procedure, or directive will result in more severe sanctions/responsive actions.
2. *Required Counseling:* A mandate to meet with and engage in external counseling to better comprehend the misconduct and its effects.
3. *Probation:* A written reprimand for violation of institutional policy, providing for more severe disciplinary sanctions in the event that the student is found in violation of any institutional policy, procedure, or directive within a specified period of time. Terms of the probation will be articulated and may include denial of specified social privileges, exclusion from co-curricular activities, exclusion from designated areas of campus, no-contact orders, and/or other measures deemed appropriate.
4. *Suspension:* Termination of student status for a definite period of time not to exceed two years and/or until specific criteria are met. Students who return from suspension are automatically placed on probation through the remainder of their tenure as a student at MCCCD.
5. *Expulsion:* Permanent termination of student status and revocation of rights to be on any MCCCD campus for any reason or to attend MCCCD-sponsored events.
6. *Withholding Diploma:* MCCCD may withhold a student's diploma for a specified period of time and/or deny a student participation in commencement activities if the student has an allegation pending or as a sanction if the student is found responsible for an alleged violation.
7. *Revocation of Degree:* MCCCD reserves the right to revoke a degree previously awarded from MCCCD for fraud, misrepresentation, and/or other violation of MCCCD policies, procedures, or directives in obtaining the degree, or for other serious violations committed by a student prior to graduation.
8. *Organizational Sanctions:* Deactivation, loss of recognition, loss of some or all privileges (including MCCCD registration) for a specified period of time.
9. *Other Actions:* In addition to or in place of the above sanctions, MCCCD may assign any other sanctions as deemed appropriate.

b. **Employee Sanctions**

Responsive actions for an employee who has engaged in harassment, discrimination, and/or retaliation include:

1. Warning – Verbal or Written
2. Performance Improvement/Management Process
3. Required Counseling
4. Required Training or Education
5. Probation
6. Loss of Annual Pay Increase

7. Loss of Oversight or Supervisory Responsibility
8. Demotion
9. Suspension with pay
10. Suspension without pay
11. Termination
12. Other Actions: In addition to or in place of the above sanctions, the MCCCD may assign any other sanctions as deemed appropriate.

32. **Withdrawal or Resignation While Charges Pending**

Students: If a student is a Respondent in a pending matter alleging a violation of the Title IX policy, the MCCCD may place a hold on a student's ability to graduate and/or to receive an official transcript/diploma.

Should a student decide to not participate in the resolution process, the process proceeds absent their participation to a reasonable resolution. Should a student Respondent permanently withdraw from the MCCCD, the resolution process ends, as the MCCCD no longer has disciplinary jurisdiction over the withdrawn student. A student who withdraws or leaves while the process is pending may not return to any MCCCD college. Such exclusion applies to all campuses of MCCCD. A hold will be placed on their ability to be readmitted. They may also be barred from MCCCD property and/or events.

However, MCCCD will continue to address and remedy any systemic issues, variables that may have contributed to the alleged violation(s), and any ongoing effects of the alleged harassment, discrimination, and/or retaliation.

During the resolution process, MCCCD may put a hold on a responding student's educational record that a disciplinary matter is pending.

Employees: Should an employee Respondent resign with unresolved allegations pending, the resolution process ends, as MCCCD no longer has disciplinary jurisdiction over the resigned employee. The employee who resigns with unresolved allegations pending is not eligible for rehire with any MCCCD or any campus of the MCCCD, and the records retained by the Title IX Coordinator will reflect that status. Human Resources should also be notified and make the appropriate notation on its list of people who are not permitted to be rehired.

However, MCCCD will continue to address and remedy any systemic issues, variables that contributed to the alleged violation(s), and any ongoing effects of the alleged harassment or discrimination.

All MCCCD responses to future inquiries regarding employment references for that individual will include that the former employee resigned during a pending disciplinary matter.

33. **Appeals**

Any party may file a Request for Appeal by submitting such a request in writing to the Title IX Coordinator within five (5) days of the delivery of the Notice of Outcome Letter. Once the five (5) days have passed, the matter will be deemed closed.

The request for appeal will be forwarded to the Provost or Chief Academic Officer for the MCCCD, acting as the Appeal Chair, for consideration to determine if the request meets the grounds for appeal.

a. **Grounds for Appeal**

Appeals are limited to the following grounds:

A. Procedural irregularity that affected the outcome of the matter;
B. New evidence that was not reasonably available at the time the determination regarding responsibility or dismissal was made, that could affect the outcome of the matter; and
C. An allegation that the Title IX Coordinator, Investigators, or Decision-maker had a conflict of interest or bias for or against Complainants or Respondents generally or the specific Complainant or Respondent that affected the outcome of the matter.

The Appeal Chair will deny any request for appeal that does not meet the grounds in this policy and will notify the parties and their Advisors in writing of the denial and the rationale. Denials based on lack of grounds shall be communicated to the requesting party within five (5) days of the request for appeal being received by the Appeal Chair.

If any of the grounds in the Request for Appeal meet the grounds in this policy, then the appeal chair will:

1. Notify the other party(ies) and their Advisors, the Title IX Coordinator, and, when appropriate, the investigators and/or the original Decision-maker.
2. Provide the other party(ies) and their Advisors, the Title IX Coordinator, and, when appropriate, the Investigators and/or the original Decision-maker a copy of the appeal request with the approved grounds outlined.
3. Provide the other party(ies) and their Advisors, the Title IX Coordinator, and when appropriate, the investigators and/or the original Decision-maker five (5) days to submit a response to the portion of the appeal that was approved and involves them.
4. Collect any additional information needed and all documentation regarding the approved grounds and the subsequent responses and render a decision in no more than fifteen (15) days from the date the Request for Appeal was filed, barring exigent circumstances. All decisions apply the preponderance of the evidence.
5. Prepare a Notice of Appeal Outcome letter and send it to all parties simultaneously, which includes the decision on each approved ground and rationale for each decision. The Notice of Appeal Outcome letter will also outline specific instructions for remand or reconsideration of any sanction imposed by the Decision-maker, which MCCCD is permitted to share according to state or federal law.

The Notice of Appeal Outcome letter will be mailed to the local or permanent address of the parties as indicated in official institutional records and emailed to the parties' MCCCD-issued email or otherwise approved account. Notice is presumed to have been made once the letter is emailed.

b. **Sanctions Status During the Appeal**

Any sanctions imposed as a result of the hearing are stayed during the appeal process. Supportive measures may be continued or reinstated, subject to the supportive measures procedure in Section VII of this policy.

MCCCD may still place holds on official transcripts, diplomas, graduations, and course registration pending the outcome of an appeal when the original sanctions included separation.

34. **Long-Term Remedies/Other Actions**

Following the conclusion of the resolution process, and in addition to any sanctions implemented, the Title IX Coordinator may implement additional long-term remedies or actions with respect to the parties and/or the campus community that are intended to stop the harassment, and/or retaliation, remedy the effects, and prevent reoccurrence.

These remedies/actions may include, but are not limited to:

1. Referral to community services including counseling and health services
2. Referral to the Employee Assistance Program
3. Education to the individual and/or the community
4. Permanent alteration of work arrangements for employees
5. Provision of campus safety escorts
6. Climate surveys
7. Policy modification and/or training
8. Implementation of long-term contact limitations between the parties
9. Implementation of adjustments to academic deadlines, course schedules, etc.

At the discretion of the Title IX Coordinator, certain long-term support or measures may also be provided to the parties even if no policy violation is found.

When no policy violation is found, the Title IX Coordinator will address any remedies owed by the MCCCD to the Respondent to ensure that the Respondent did not experience effective denial of educational access.

The MCCCD will maintain the privacy of any Party subject to any long-term remedies/actions/measures, provided doing so does not impair the MCCCD's ability to provide these services.

35. **Failure to Comply with Sanctions and/or Interim and Long-term Remedies and/or Responsive Actions**

All parties are expected to comply with the assigned sanctions, responsive actions, and/or corrective actions within the timeframe specified by the final Decision-maker (including the Appeal Chair).

Failure to abide by the sanction(s)/action(s) imposed by the date specified, whether by refusal, neglect, or any other reason, may result in additional sanction(s)/action(s), including suspension, expulsion, and/or termination from the MCCCD.

A suspension will only be lifted when compliance is achieved to the satisfaction of the Title IX Coordinator.

36. **Recordkeeping**

MCCCD will maintain for a period of seven (7) years records of:

1. Each sexual harassment investigation including any determination regarding responsibility and any audio or audiovisual recording or transcript required under federal regulation;
2. Any disciplinary sanctions imposed on the Respondent;

3. Any remedies provided to the Complainant designed to restore or preserve equal access to the MCCCD's education program or activity;
4. Any appeal and the result therefrom;
5. Any Informal Resolution and the result therefrom;
6. All materials used to train Title IX Coordinators, investigators, Decision-makers, and any person who facilitates an Informal Resolution process. MCCCD will make these training materials publicly available on MCCCD's website. (Note: If the MCCCD does not maintain a website, MCCCD must make these materials available upon request for inspection by members of the public.); and
7. Any actions, including any supportive measures, taken in response to a report or formal complaint of sexual harassment, including:
   a. The basis for all conclusions that the response was not deliberately indifferent;
   b. Any measures designed to restore or preserve equal access to the MCCCD's education program or activity; and
   c. If no supportive measures were provided to the Complainant, document the reasons why such a response was not clearly unreasonable in light of the known circumstances.

The MCCCD will also maintain any and all records in accordance with state and federal laws. The MCCCD will follow the destruction of records policy as outlined by the state of Arizona.

37. **Disabilities Accommodations in the Resolution Process**

MCCCD is committed to providing reasonable accommodations and support to qualified students, employees, or others with disabilities to ensure equal access to the MCCCD's resolution process. Anyone needing such accommodation should contact the Title IX Coordinator and request the accommodation. The Title IX Coordinator shall seek consultation from the college Disability Resource Services Manager (for students) or Human Resources (for employees).

38. **Mandatory Training**

This policy requires that annual training for the Title IX Coordinators, investigators, decision-makers, and any person who facilitates an informal resolution process will include:

1. the definition of sexual harassment under this policy,
2. the scope of the MCCCDs education program or activity,
3. how to conduct an investigation and grievance process including hearings, appeals, and informal resolution processes, as applicable, and
4. how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias.

Decision-makers will receive annual training on any technology to be used at a live hearing and on issues of relevance of questions and evidence, including when questions and evidence about the complainant's sexual predisposition or prior sexual behavior are not relevant.

Investigators will receive annual training on issues of relevance to create an investigative report that fairly summarizes relevant evidence.

Any materials used to train Title IX Coordinators, investigators, decision-makers, and any person who facilitates an informal resolution process, must not rely on sex stereotypes and must promote impartial investigations and adjudications of formal complaints of sexual harassment.

39. **Revision of this Policy and Procedures**

This policy and procedures supersede any previous policy(ies) addressing Title IX sexual harassment and discrimination. The policy (administrative regulation) will be reviewed and updated as needed by the Title IX Coordinator, in consultation with any other stakeholders deemed necessary by the Title IX Coordinator and upon approval by the Chancellor. MCCCD reserves the right to make changes to this document as necessary, and once those changes are posted online, they are in effect.

During the resolution process, the Title IX Coordinator may make minor modifications to procedures that do not materially jeopardize the fairness owed to any party, such as to accommodate summer schedules. District legal may also vary procedures materially with notice (on the institutional website, with the appropriate effective date identified) upon determining that changes to law or regulation require policy or procedural alterations not reflected in this policy and procedures.

If government laws or regulations change – or court decisions alter – the requirements in a way that impacts this document, this document will be construed to comply with the most recent government regulations or holdings.

This document does not create legally enforceable protections beyond the protection of the background state and federal laws which frame such policies and codes, generally.

This policy and procedures are effective August 14, 2020.

ATIXA 2020 ONE POLICY, TWO PROCEDURES MODEL.

USE AND ADAPTATION OF THIS MODEL WITH CITATION TO ATIXA IS PERMITTED THROUGH A LIMITED LICENSE

TO MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT ALL OTHER RIGHTS.

Back to Top of Policy

**AMENDED by Direct Approval from the Chancellor, September 20, 2021**
**AMENDED by Direct Approval from the Chancellor, September 16, 2020**
**ADOPTED by Direct Approval from the Chancellor, August 3, 2020**

EXHIBIT 2
to Declaration of Dr. Delfina Wilson

# ND-2 Discrimination Complaint Procedures for Students

I. This procedure provides for the prompt and equitable resolution of discrimination and harassment complaints brought by students against a member of the college community that is based on membership in a "protected class/category" (not otherwise addressed in the Title IX Sexual Misconduct Policy).

1. Complaints may be brought under this procedure for discrimination based on membership in a protected group: race, color, religion, national origin, citizenship status (including document abuse), sex (including pregnancy and sexual harassment), (not including those cases under the Title IX Policy Jurisdiction), sexual orientation, gender identity, age, veteran status, physical or mental disability, or genetic information.
2. All members of the college community should act promptly upon receipt of an allegation of conduct that might constitute harassment and/or discrimination. Any member of the college community should refer a person who might be a victim of such conduct to the college's equal opportunity & Title IX Regional Director [Regional Director] (or designee) or to the district's Title IX, ADA/504 Coordinator who are both responsible for resolving complaints of unlawful harassment/discrimination.
3. Students who believe they are experiencing sexual harassment in violation of Title IX should submit a written complaint under Administrative Regulation 5.1.16, Title IX Sexual Harassment Policy.
4. Students who wish to file a complaint related to disability accommodations should first exhaust the remedies outlined under A.R. 2.8 Students with Disabilities.
5. Students who feel they have been treated unfairly or unjustly by a faculty member regarding instruction or a grade **not involving discrimination based on membership in a protected group (as outlined above)** should utilize the S-6 Instructional Grievance Process.

II. College officials should take all necessary steps to ensure the prompt and equitable resolution of any complaint of harassment/discrimination. The typical time period to resolve allegations under this policy is sixty (60) business days. MCCCD will make a good faith effort to complete the resolution process within this period. Any extenuating circumstances that extend this time period will be communicated to the complainant and respondent and noted in the investigative file.

1. The term 'Complainant" refers to an individual who has experienced the alleged prohibited conduct. Only the person who has experienced the alleged prohibited conduct may file a complaint under this policy. The term "Respondent" refers to an individual who has been accused of engaging in prohibited conduct.
2. The written complaint must identify the action, decision, conduct, or basis that the student believes constitutes prohibited discrimination or harassment. If the complaint does not contain the above-

referenced information, the Regional Title IX Director or district Title IX, ADA/504 Coordinator will request clarification.

3. Every effort will be made to address the complaint consistent with the complainant's desires. However, under certain circumstances, the MCCCD may have a legal obligation to identify and remedy discrimination or harassment, irrespective of whether a formal complaint is actually filed and even if the complainant would prefer no action be taken.

### III. Optional Informal Resolution of Discrimination Complaints

1. Before filing a formal complaint under this procedure, the student may attempt to resolve the problem through informal discussions with the respondent. Students are not required to use the informal resolution process before filing a formal complaint.
2. The student should work with the Regional Director to schedule and facilitate the informal resolution meeting.
3. The informal resolution process consists of: **a)** the discussion between parties regarding the allegations, **b)** the response to the allegations, and **c)** a written resolution agreement between the parties as to the disposition of the allegations. The Regional Director shall be involved with the drafting of the written resolution agreement.
4. Both parties must sign the written resolution agreement in order to deem the matter closed.
5. There is no appeal to the informal resolution process. The Regional Director is charged with ensuring the disposition (and any actions stated therein) is completed.
6. At any time before the signing of the resolution agreement, the student can end the informal process and initiate the formal process.
7. If the complaint cannot be informally resolved to the satisfaction of the student, the student has the right to file a formal complaint and to proceed under the formal resolution procedures.

### IV. Formal Resolution of Discrimination Complaints

1. A student who contends that unlawful or MCCCD-prohibited discrimination has occurred may file a formal complaint by contacting the Regional Director at each respective college or center or the district's Title IX, ADA/504 Coordinator if the respondent is a district office employee.
2. A formal complaint is a signed and dated document submitted by the complainant (an email from the student will suffice) alleging a policy violation by a respondent, a summary of allegations, and requesting that the MCCCD investigate the allegation(s).
3. The formal process consists of a signed complaint, preliminary assessment, an investigation, a determination regarding the allegation, appropriate corrective action or sanctions when the complaint is substantiated, and an offered appeal process.
4. Upon receipt of a formal complaint of discrimination or harassment, the Regional Director shall conduct a preliminary assessment to determine whether, if substantiated, the behavior or conduct reported would constitute a violation of MCCCD policy. The Regional Director has sole discretion to determine whether

further investigation is necessary in any particular case. In circumstances where a complaint will not be investigated, the complaint will be notified.

5. Following the determination that an investigation should take place, the Regional Director shall appoint two (2) trained investigators to investigate the allegations. The complainant, respondent and/or investigators shall disclose any potential conflicts of interest or bias regarding the complaint to the Regional Director.
6. Regional Director will provide written notice of allegations (the "NOA") to the respondent upon commencement of the formal resolution process. The NOA will include: **a)** a summary of all allegations, **b)** specific policies implicated, **c)** a statement of the potential sanctions/corrective actions that could result, **d)** a statement that the applicable evidentiary standard is a preponderance of the evidence, **e)** a statement that the MCCCD presumes the respondent is not responsible for the reported misconduct unless and until the evidence supports a determination of a policy violation, **f)** the name(s) of the assigned investigator(s), **g)** detail on how the party may request disability accommodations during the interview process, **h)** a statement about MCCCD's policy on retaliation, and **i)** an instruction to preserve any evidence that is directly related to the allegations.
7. Amendments and updates to the NOA may be made as the investigation progresses and more information becomes available. Notice is presumed to have been given upon emailing the NOA to the respondent's MCCCD-owned email address.
8. The investigators shall review all information provided to the Regional Director and will interview individuals who potentially possess relevant evidence as identified by the parties and determined by the investigators. The investigators shall focus on the allegation(s) of policy violation, assess the relevance of witnesses and evidence, and work efficiently to conclude the investigation promptly (within 60 business days), as outlined in this procedure. The investigators shall deliver to the Regional Director the investigation report, which shall include: **a)** a summary of the allegations, **b)** a written determination (including rationale) regarding the allegation and whether a policy violation is substantiated or unsubstantiated, and, **c)** any recommendation(s) addressing substantiated findings.
9. Within ten (10) business days following receipt of the results of the investigation the Regional Director will accept or recommend further investigation. The Regional Director will provide a written notification of the investigation outcome simultaneously to the complainant and respondent. This outcome notification will include a summary of the investigator's written findings.

## V. Sanctions and Corrective Action

1. The Vice President of Student Affairs will implement student sanctions as appropriate under A.R. 2.5 Student Rights and Responsibilities Policy. If the respondent is an employee, the Vice President of Student Affairs will report the findings of fact and policy conclusions to the college or District Human Resources who will issue appropriate disciplinary sanctions or corrective action.
2. MCCCD has clear policy goals to prevent and correct discrimination or harassment, therefore, possible sanctions include, but are not limited to: written warning, counseling, suspension, transfer, mandatory

training, or dismissal of the respondent. As appropriate to remedy the effects of policy violations, action on behalf of complainants, such as employee assistance, professional counseling, voluntary transfer, etc., may also be offered. The institution will take appropriate steps to prevent further occurrences.

## VI. Supportive Measures

For any allegation of unlawful discrimination, the MCCCD may provide supportive measures to assist or protect the parties during the pendency of the investigation. Such measures may include academic adjustments, arranging for changes in class schedules, or other appropriate temporary measures.

## VII. Appeal Right

1. A complainant or respondent who is not satisfied with the outcome has five (5) business days to submit an appeal of the decision, in writing, to the College President. If a conflict of interest prevents the College President from serving as the appeal officer, then the district Provost shall serve as the appeal officer. For respondents who are district office employees, the Provost shall serve as the appeal officer. If the Provost has a conflict of interest, a College President may serve as the appeal officer. Conflicts of interest requiring a change of appeal officer shall be communicated to the requesting party.

   **Grounds for Appeal.** Appeals are limited under the following grounds: **a)** Procedural irregularity that affected the outcome of the matter; ***OR***, **b)** New evidence that was not reasonably available at the time the determination regarding responsibility or dismissal was made that could affect the outcome of the matter.
2. The appeal request must state the grounds for appeal and why the complainant or respondent believes the outcome was improper.
3. Denials based on lack of grounds shall be communicated to the requesting party within five (5) business days of the request for appeal being received by the appeal officer.
4. If any grounds for appeal are met, the appeal officer will review the results of the investigation and written findings and respond to the request within ten (10) business days from receipt of the request. The ten-day review and response period may be extended for extenuating circumstances, with notice to all parties. The appeal officer may accept, reject, or modify the investigatory outcome. If the appeal officer determines that it is necessary to remedy a substantial deficiency caused by one of the appeal grounds above, the case file will be reopened and assigned for further investigation. If necessary, other investigator(s) may be assigned. If the appeal officer determines that the investigation was thorough and complete and that the decision is supported by the evidence, the appeal officer will affirm the investigation outcome. At this point, the student has exhausted the Discrimination Complaint Procedure for Students.

## VIII. Maintenance of Documentation

Documentation resulting from each level in the Formal Resolution Process (including witness statements, investigative notes, etc.) will be maintained in accordance with state and MCCCD document retention guidelines, A.R. 4.15 Retrieval, Disclosure and Retention of Records.

**IX. Confidentiality of Proceedings**

Every effort will be made by the college and MCCCD to protect the confidentiality of the parties during the processing of complaints under this procedure. Records will be maintained in a confidential manner to the extent permitted by law and insofar as they do not interfere with MCCCD's legal obligation to investigate and resolve issues of discrimination.

**X. Retaliation Prohibited**

Retaliation against a person who has filed a complaint or against any witness questioned during an investigation is strictly prohibited. Any retaliatory action by instructors, supervisors, managers, academic professionals, administrators, or other employees who have the authority to take adverse action against a complainant or witness is prohibited and may be grounds for disciplinary action. As per A.R. 5.1.15 Retaliation Prohibited, "MCCCD strictly prohibits an adverse action that might deter a reasonable person from participating in activity protected by antidiscrimination laws."

**XI. False Statements Prohibited**

Any individual who knowingly provides false information pursuant to filing a discrimination charge or during the investigation of a discrimination charge will be subject to appropriate discipline under the Student Conduct Code or appropriate employee Administrative Regulation.

**External Filing of Discrimination Complaint**

MCCCD encourages students to use the MCCCD Discrimination Complaint Procedure for Students to resolve discrimination concerns. Students also have the right to file civil rights complaints with appropriate external agencies. No retaliation will be taken against a person for filing a complaint with an external agency. The following agency accepts discrimination charges filed by, or on behalf of, students:

Office for Civil Rights, Region VIII (OCR) Denver Office
U.S. Department of Education Federal Building
1244 Speer Boulevard, Suite 310
Denver, Colorado 80204-3582
Phone: 303-844-5695
Fax: 303-844-4303
TDD: 303-844-3417
E-mail: OCR_Denver@ed.gov

**AMENDED through the Administrative Regulation Approval Process, June 12, 2023**
**AMENDED by Direct Chancellor Approval, April 1, 2015**
**AMENDED through the Administrative Regulation Approval Process, March 13, 2012**

EXHIBIT 3
to Declaration of Dr. Delfina Wilson

Good morning, my name is Tyrone ross, I'm currently a student at gateway community college, I attend the collision car repair class, in which I have not been treated fair. I don't feel welcome in the class and my instructor has made it the worst experience a student can ever encounter. I have to write this letter because I feel like I've been racially singled out, I've been a victim of racial bias, I absolutely feel like I cannot speak my mind freely in class due to my teacher Mr. Cooper. Mr. Cooper has been the most negative teacher I ever ran across, he has not inspired not one person in this class to be here or to do collision repair work. Every time I do a project he always has something negative to say about it vs helping me. For example, when I finished painting my slingshot pieces and showed Mr. Hernandez he replied that "oh Mr. Hernandez did a good job trying to put me down as if I can't do good work myself". When I bought me new spray guns he told me I didn't need them for the level I'm on as if I wasted my time purchasing new paint guns. He has been completely negative towards me since I started this class. He has not given me any donated materials that's for students who can't afford materials, in turn he always asked me if I have money and why can't I afford things which doesn't Make any sense if it supposes to be for us, but yet he won't hesitate to give the materials to [redacted] which is another student that he has been showing favoritism to since the first day of class. I felt completely uncomfortable with my instructor since the day he singled me out in class calling me out just because I couldn't afford materials that comes with this class, and it has gotten more worst from when we first supposedly resolved this issue. He's always talking about how he likes it when he has girl students so when they have their breast out it makes him hornier then when he was a young adult, he always talking about his out of school life which I have been completely uncomfortable with as well because he not only sounds like a prowler but also a pervert. Her told us that's exactly why he shows favoritism and not to us. He has been showing favoritism to one student, [redacted] who has made this class a hazardous working environment, there was an incident last week when the instructor came to help me with a dent in my car, she immediately started cursing them out screaming why is he helping me as if I'm not a student, then Mr. Cooper did nothing about it. He allowed her to scream, curse them out all because her project didn't come out correctly. Now whenever I need help I can't get help because of the situation with her, and the teachers feel more obligated to help her than any other students. There was also an incident where a student used the word (nigger) and Mr. Cooper came up to me and asked me verbatim, "did anybody use this word towards you, I replied no, then he asked me was I ok I replied yes and I wanted to let it go because it was not directed towards me, so if you want to address it based on just the word being used then yes its inappropriate, but then Mr. Cooper proceeded to tell me that using the word isn't the issue because him and his friends use it all the time and he actually said (nigger) then said he just knows when he get to school that word is not allowed to use. So, in turn I felt completely disrespected, I felt completely uncomfortable, because he basically said being a racist or using the word isn't a problem but only when you use it at school. Last week he came up to me and asked me why certain people get to use the word (nigger) and certain people can't, then I asked him what does he mean by that, so he explained that his wife called him a (nigger) which he actually says the word comfortably every single time, that she called him one and then apologized. To be honest I just stayed quite because I was honestly lost why he had come up to me which I am the only black student in class to feel that comfortable with telling me this. Mr. cooper has been very disrespectful on that level and doesn't blink an eye when it comes to telling me racist stuff like this. Every time I speak my mind like today because has allowing [redacted] to do whatever she likes in class, takes the painting booth whenever she wants to and then he set rules forth for us but is allowing her to break each rule, so when I speak my mind about it and tell Mr. Cooper he is not being fair he tells me I'm looking at an illusion, or we don't know what has going through putting up

with her making it ok for him to show favoritism to her and treat me differently. Today he tried kicking me out of class because I'm fed up with the way has treating not only me but the rest of the class. We all pulled him to the side today and told him he's been treating us unfair in this class and all he does is walk around it with excuses. I do not feel that I have gotten what I paid for. I've complained to Mark, the program manager and told him about the two incidents where me Cooper singled me out and took my freshly painted pieces off my bench just to put other students there. I have multiple witnesses who can attest to this as well. Then he started moving my car without permission while I'm there and when I politely asked him to come get me to move my car since I'm here he replied that this is his body shop he can do whatever he wanted then we got into a heated argument there. Just like today when I spoke my mind and called him out on his lies he wanted to try and kick me out the class, so now I want to leave. I don't feel welcome in this class I haven't since day one of this class especially when he referred to my race as "people like you", even when my white friend/student name [redacted] was helping me he would pull him to the side and say, you know your white jokingly, then says it don't look right that you working for a black person. I told mark about it and Mr. Cooper has not changed since. So now I want to find a solution for me to leave the class because I just can't continue with this class knowing I've been a targeted student, racially targeted by all he Has said to me and all he has done to me. he's in my eyes a racist, bias teacher, he doesn't like me because of who I am and how I speak up to defend myself every time. After I write this letter I will try and follow up with taking this the legal route because I have been completely treated unfair, I've been targeted and my freedom of speaking my mind has gotten me targeted. He called us a lynch mob because today we all got fed up and spoke our mind while he still making excuses for his behavior as a teacher, then told me if I don't let it go then I would have to leave for the day so I went to his boss mark because I think it not right him trying to tell me to leave just because I'm bringing up a revolving issue. I'm tired of him saying racist things to me and I'm tired of being a target for him. I don't not want to continue this class, I don't feel safe, I don't feel welcome what so ever. As I sated previously I have more than 10 students who can attest to his racist, pervert, disrespectful, favoritism, negative behavior, ways which I will get for this letter.

To recap I've had multiple conversations to resolve this matter with Mr. Cooper with no success therefore I am writing this account to the best of my knowledge to be accurate and true.

# EXHIBIT D




**Collision Repair Program Syllabus**

| | |
|---|---|
| **Course** | ABO103 |
| **Section Number** | 10469 |
| **Year** | Fall 2022 |
| **College - Campus** | Gateway Central City Campus |
| **Course Start Date** | May 23, 2022 |
| **Course End Date** | July 20, 2022 |
| **Class Schedule** | Mon-Thurs, 7AM-2:00PM, Break 8:50-9:10, Lunch 11:00 |
| **Room** | A335 Lab, Classroom TBD |
| **Course Description** | The Certificate of Competency (CCT) in Collision Repair Technician gives students the knowledge and hands-on experience to start a career in the automotive collision repair industry. Learn about metal and plastic repair, metal inert gas (MIG) welding, vehicle disassembly, refinishing, reassembly, estimate reading, coolant removal/replacement, and air conditioning (A/C) discharge/recharge and industry terminology. |
| **Instructors** | Brent Cooper brent.cooper@gatewaycc.edu (602) 238-4388<br>Mike Hernandez hernandezm@gatewaycc.edu (602) 238-0070 |

**Course Purpose:**

The "Collision Repair Technician" program is broken into four distinct training courses: ABO103, 104, 203, & 204. **ABO103** or "Introduction to Auto Body Repair", is the first course offered in the program. The students learn a mixture of work ethic, work safety, automotive collision metal and plastic repair, welding and cutting, vehicle assembly/disassembly along with proper and safe tool use before moving on to the next three courses. Without the introduction to and knowledge of these topics a worker will have difficulty in all aspects of auto collision repair.

**Course Objectives:**

Practice personal and workplace safety standards.

Use, maintain, and store tools, equipment and workspace according to professional standards for the automotive industry.

Create a repair plan that includes the analysis of the damage, needed tools, chemicals, additives, time, cost, and parts to complete a collision and refinish repair job.

Produce a damage repair independently.

Produce refinishing work independently.

Recognize efficient and quality work according to industry standards.

Demonstrate industry professionalism and a commitment to professional development such as I-CAR.

Communicate effectively by collaborating with diverse audiences orally, visually, and in writing.

Demonstrate professionalism with conduct, ethics, and workplace practices.

| **Grading** | | | | | | | **Weight** | |
|---|---|---|---|---|---|---|---|---|
| A | 90 – 100% | Pass | | C | 70 – 79% | Pass | Competencies = 25% | Attendance = 25% |
| B | 80 – 89% | Pass | | D | 0 – 69% | Fail | I-CAR course = 25% | Participation = 25% |

**Mission Statement**

*Gateway Central City Collision Repair Program uses a career and competency-based learning format for students planning their future as a collision repair technician. Students will receive hands-on training with up-to-date tools and technology to learn the fundamental skills needed for entering into collision repair as a highly qualified apprentice. We will provide accessible, affordable, and quality training by qualified instructors. Gateway will strive to maintain an updated curriculum, training methods, and equipment to stay abreast of the rapid technological advancements and trends in today's collision repair field. We will provide an atmosphere that is conducive to lifelong learning that accentuates diversity, equity, and inclusion.*

**Required to Pass:**

Pass all competencies

Pass I-CAR quizzes and final exams

Maintain 100% attendance in each course

**Required Texts, Materials, Third Party Tools, and Technologies**

In this course you will have the following requirements:

- **Prior to start of class** Purchase the Skills Workbook: https://catalog.collisioncareerinstitute.com/browse/catalogs-workbooks/courses/tech- basic-skills-tracker-workbook
- It is highly recommended that you have access to a computer and internet for homework assignments.
- **One Textbook is required for this course.**
- This course will utilize Canvas LMS as a main source for accessing and submitting assignments.
- A link to Canvas can be found on the my.maricopa.edu webpage.
- Theory will be delivered via Canvas, lectures, Lab Demonstrations Worksheets, Videos, and various media applications including PowerPoints. Assignments and assessments are always being updated for content delivery and maximum competency effectiveness.
- Pen/pencil – student supplied
- Notebook and Paper – student supplied
- Headphones or earbuds for the computer audio are required

**Course Prerequisites: None**

**Attendance**

The attendance requirement for this course is 100% of the required 624 hours. It is the student's responsibility to be accountable for 100% of their attendance hours. There are 2 makeup days allocated for this course and will be scheduled by the instructor. Additional makeup time is based on a case-by-case basis and scheduled by the instructor based on availability. Students who fail to maintain attendance the 100% standard may be withdrawn and /or experience a loss of eligibility for funding to include, but are not limited to, Federal Student Aid, Veterans benefits, and third-party agency funding. Refer to Attendance Standard 2.3.2 in the Student Handbook for additional information.

**Attendance Standards:**

- Arrive on time at the beginning of class, from break(s) and lunch.
- Tardiness or absenteeism must be communicated to the instructor via email or the "Remind" app

**Dress Code**

- Safety glasses are to be always worn in the lab space – no exceptions
- School uniforms are required to be always worn.

- School ID badges are to be always worn
- No open-toed shoes or sandals are allowed – non-slip shoes are preferred
- No profane clothing is allowed
- Long hair must be secured in a safe manner
- Pants or Work shorts with belt loop and kept at waist high

**Cell Phone Usage**

- All personal calls are to take place outside of the classroom and lab space
- Absolutely no texting and web surfacing allowed in the classroom or lab space
- All phones are to be on silent or vibrate mode while in the classroom and lab space
- Cell phones are allowed to be used for classroom and lab informational purposes only
- Personal earbuds and headphones worn only in one ear – no exceptions.

**Communication Protocols**

Student are required to check their student emails and the Remind app at least once per day. Students are also required to check Canvas for updates and announcements daily. Students are required to communicate by email or the Remind app for any tardiness and absenteeism immediately.

**Food and Drinks**

Eating in the lab and classroom is prohibited. Drinks are allowed in the classroom and lab space in closed top container, e.g., water and soda bottles and coffee cups.

**GateWay Institutional Learning Outcomes**

At GWCC, learning will be assessed in three areas, across the institution, called Institutional Learning Outcomes: Effective Communication, Critical Thinking, and Problem Solving, and Civic Engagement and Personal Responsibility. Your instructor in this course will explain how one or more of these outcomes will be taught and assessed during the course. Your participation in assessment activities is vital to the College's efforts to improve teaching and student learning.

**Student Responsibilities**

Students are responsible for the information in the syllabus and college policies included in GWCC's college catalog and student handbook.

- While reading this syllabus for the first time, be sure to click all the links.
- Treat your instructors and fellow classmates with respect, as well as their property and the property of the school.
- Resolve conflict in a professional manner.
- Be considerate of your neighbors.
- You are responsible for keeping your workspace or locker clean. Cleaning supplies are available from your instructor.
- Daily all students must participate in cleaning the lab even if the mess is not entirely theirs.

**Last Day of Attendance Policy**

Last Date of Attendance Policy for Online and Hybrid (more than 50% online) Classes

At Maricopa Community Colleges, students must be engaged in some type of academic activity each week of their online course. Should a student discontinue their active involvement in an online course, faculty are required to withdraw the student from the course. This requires faculty to report a student's last date of attendance and withdraw the student within fourteen (14) days of identifying the last date of academic attendance. Simply logging into an online class will not count as academic attendance. The following is a list of activities that constitute online class academic attendance:

- Completing all I-CAR course work and exams

- Submitting an academic assignment (assignment required in the course, regardless of whether it is graded or not), paper, or project.
- Taking an exam, quiz, computer-assisted instruction, or an interactive tutorial required by the course.
- Attending an online or in-person study group (where there is assigned attendance/participation as part of the course).
- Initiating contact with a faculty member to ask a question about the academic subject studied in the course.
- Do not leave anything (books, headsets, USB drives, eyeglasses, personal safety equipment, etc.) unsecured overnight. Unauthorized items may be thrown away by the cleaning crew.

**Instructional Grievance Process**

A student who feels that he/she has been treated unfairly or unjustly by a faculty member (full-time or part-time) regarding an academic process such as grading, testing or assignments may resolve their grievance using the approved procedures referenced here: Instructional Grievance Process

**Non-Instructional Complaint Resolution**

A student who feels that he or she has been treated unfairly or unjustly by any employee regarding a non-instructional process such as a student or administrative services has the right to file a formal and written complaint according to the approved procedures referenced here: Non-Instructional Complaint Resolution

**Classroom Accommodations for Students with Disabilities**

In accordance with the Americans with Disabilities Act, the Maricopa County Community College District (MCCCD) and its associated colleges are committed to providing equitable access to learning opportunities to students with documented disabilities (e.g., mental health, attentional, learning, chronic health, sensory, or physical). Each class/term/semester that a student is in need of academic adjustments/accommodations, the qualified student is required to work with the Disability Resources & Services Office (DRS) at their individual college(s). Contact with the DRS should be made as soon as possible to ensure academic needs are met in a reasonable time. New and returning students must request accommodations each semester through DRS Connect online services. To learn more about this easy process, please contact your local DRS office.

If you have not yet established services through DRS, but have a temporary health condition or permanent disability that requires accommodations, you are welcome to contact DRS by calling (602) 286-8171 or by clicking the link here. The DRS offers resources and coordinates reasonable accommodations for students with disabilities and/or temporary health conditions qualifying for accommodations/academic adjustments.

**Addressing Incidents of Sexual Harassment/Assault, Dating/Domestic Violence, and Stalking**

In accordance with Title IX of the Education Amendments of 1972, MCCCD prohibits unlawful sex discrimination against any participant in its education programs or activities. The District also prohibits sexual harassment—including sexual violence—committed by or against students, District employees, and visitors to campus. As outlined in District policy, sexual harassment, dating violence, domestic violence, sexual assault, and stalking are considered forms of "Sexual Misconduct" prohibited by District policy.

**Minimum Progress**

Progress is measured by the student's ability to accomplish competencies within stated time frames. Instructor observations and formal skills assessments will determine whether these competencies are met. To maintain satisfactory academic progress, you must successfully complete all assigned work with a C or better.

Students and the instructor will discuss progress at regular intervals throughout each course. Upon failure of competency, the instructor will develop an action plan, with a timeline to assist you in meeting the competency prior to the end of the course. Failure to meet all required competencies in a course will result in withdrawal from the program at the end of the course. Additionally, you may lose financial aid eligibility, Veterans benefits, and/or agency support.

If a student does not make satisfactory academic progress in a current class, the student will be withdrawn from that course and cannot advance to the next course in the sequence. The student will also be terminated from the Program of Study and withdrawn from remaining courses due to failure to meet program completion requirements by not maintaining satisfactory academic progress.

**Catalog & Student Handbook**

The Catalog & Student Handbook can be located online at GWCC Student Handbook (https://www.gatewaycc.edu/catalog). Please refer to this handbook for current policies and procedures.

Before entry into the program, or any materials issued, all students must read and acknowledge in Canvas or by signing the Statement of Responsibility and Acknowledgement their commitment to following the policies, procedures, and standards contained in this Syllabus as well as those in the GWCC Student Handbook. Violation of any of these procedures will result in appropriate disciplinary action to be taken, up to and including dismissal from the program.

**Veterans Services Office**

If you are active military or a student veteran, thank you for your service. There are resources on the Washington campus to keep you informed of your rights and privileges. If you have any questions regarding the certification of educational benefits for active duty military, dependents and veterans please contact the Veterans' Services Department (https://www.gatewaycc.edu/veterans-services); veterans@gatewaycc.edu; (602) 286-8076

**Disability Resources**

The Disability Resources Department (https://www.gatewaycc.edu/disability-resources) provides information and resources to students with disabilities on a case-by-case basis. For more information contact disability.services@gatewaycc.edu or call (602) 238-0040.

Information for Students with Academic Adjustment Needs: If a student has a documented disability (as protected by the Americans with Disability Act Amendment Act) or is pregnant or parenting (as protected under Title IX) and would like to discuss possible academic adjustments, please contact the Disability Resources and Services Office.

Access to Course Materials: If a student is having trouble accessing course materials because of a disability, please contact your instructor. All students should have equal access to course materials and technology.

**Counseling**

The Counseling Department (https://www.gatewaycc.edu/counseling) provides a unique and confidential relationship between a professional and a person in need of help. For more information contact counseling.centralcity@gatewaycc.edu or call (602) 286-8900.

**The Learning Center**

The Washington Campus Learning Center (https://www.gatewaycc.edu/learning-center) is located in IE 2108 and is a great place to get some help understanding your reading or writing homework. Tutors and multi-media materials are available at no cost to you. For more information call (602) 286-8800.

**Your Responsibilities and Rights as a Student**

The GWCC Student Handbook has information on your rights and responsibilities.

**Academic Honesty/ Integrity**

Besides academic performance, students should exhibit the qualities of honesty and integrity. Every student is expected to produce his/her original, independent work. Any student whose work indicates a violation of the MCCCD Academic Misconduct Policy including cheating, plagiarism, and dishonesty will be subject to disciplinary action. Refer to the GWCC Student Handbook for information regarding Academic Misconduct and due process procedures.

**Statement of Responsibility and Acknowledgement**

This syllabus is intended to contain complete and accurate information; however, I reserve the right to adjust this syllabus during the course. Students will be notified by the instructor of any changes in course requirements or policies.

By signing this document, I acknowledge having read and understood the contents of this syllabus. In addition, I agree with the following statements:

- I understand and agree to the policies, rules, and standards set forth in this syllabus.
- I understand and agree to the policies, rules, and standards set forth in the GateWay Community College catalog.
- I understand and agree to the policies, rules, and standards set forth in the GateWay Community College Student Handbook.
- I fully understand that the information in this syllabus is subject to change at any time.

Print Name ______________________________________

Signature ________________________________________

Date ___________________________

The Maricopa County Community College District (MCCCD) is an EEO/AA institution and an equal opportunity employer of protected veterans and individuals with disabilities. All qualified applicants will receive consideration for employment without regard to race, color, religion, sex, sexual orientation, gender identity, age, or national origin. A lack of English language skills will not be a barrier to admission and participation in the career and technical education programs of the District.

The Maricopa County Community College District does not discriminate on the basis of race, color, national origin, sex, disability or age in its programs or activities. For Title IX/504 concerns, call the following number to reach the appointed coordinator: (480) 731-8499. For additional information, as well as a listing of all coordinators within the Maricopa College system, visit https://www.maricopa.edu/non-discriminationLinks to an external site

Learn More, Live Better!
GATEWAY COMMUNITY COLLEGE
A MARICOPA COMMUNITY COLLEGE

**Collision Repair Program Syllabus**

| | |
|---|---|
| **Course** | ABO104 |
| **Section Number** | 10468 |
| **Year** | Fall 2022 |
| **College - Campus** | Gateway Central City Campus |
| **Course Start & End Date** | May 23, 2022 – July 20, 2022 |
| | |
| **Class Schedule** | Mon-Thurs, 7AM-2:00PM, Break 8:50-9:10, Lunch 11a |
| **Room** | A335 Lab, Classroom TBD |
| **Course Description** | The Certificate of Competency (CCT) in Collision Repair Technician gives students the knowledge and hands-on experience to start a career in the automotive collision repair industry. Learn about metal and plastic repair, metal inert gas (MIG) welding, vehicle disassembly, refinishing, reassembly, estimate reading, coolant removal/replacement, and air conditioning (A/C) discharge/recharge and industry terminology. |
| **Instructors** | Brent Cooper brent.cooper@gatewaycc.edu (602) 238-4388<br>Mike Hernandez hernandezm@gatewaycc.edu (602) 238-0070 |

**Course Purpose:**

The collision Repair Technician program is broken into four distinct training courses ABO103, 104, 203, 204. ABO104 or **Introduction to Automotive Refinishing** is the second course in our line-up for collision repair technician. This course will allow a student the opportunity to learn prime and refinish techniques. These skills are a necessity for all technicians even if they do not plan to be a painter. The student will leave with an understanding of what is required to obtain an industry approved automotive finish.

**Course Objectives:**

Practice personal and workplace safety standards.
Use, maintain, and store tools, equipment and workspace according to professional standards for the automotive industry.
Create a repair plan that includes the analysis of the damage, needed tools, chemicals, additives, time, cost, and parts to complete a collision and refinish repair job.
Produce a damage repair independently.
Produce refinishing work independently.
Recognize efficient and quality work according to industry standards.
Demonstrate industry professionalism and a commitment to professional development such as I-CAR, NATEF, or ASE certifications.
Communicate effectively by collaborating with diverse audiences orally, visually, and in writing.
Demonstrate professionalism with conduct, ethics, and workplace practices.

| **Grading** | | | | | | | **Weight** | |
|---|---|---|---|---|---|---|---|---|
| A | 90 – 100% | Pass | | C | 70 – 79% | Pass | Competencies = 25% | Attendance = 25% |
| B | 80 – 89% | Pass | | D | 0 – 69% | Fail | I-CAR course = 25% | Participation = 25% |

**Mission Statement**

*Gateway Central City Collision Repair Program uses a career and competency-based learning format for students planning their future as a collision repair technician. Students will receive hands-on training with up-to-date tools and technology to learn the fundamental skills needed for entering into collision repair as a highly qualified apprentice. We will provide accessible, affordable, and quality training by qualified instructors. Gateway will strive to maintain an updated curriculum, training methods, and equipment to stay abreast of the rapid technological advancements and trends in today's collision repair field. We will provide an atmosphere that is conducive to lifelong learning that accentuates diversity, equity, and inclusion.*

**Required to Pass:**

Pass all competencies

Pass I-CAR quizzes and final exams

Maintain 100% attendance in each course

**Required Texts, Materials, Third Party Tools, and Technologies**

In this course you will have the following requirements:

- **Prior to start of class** Purchase the Skills Workbook: https://catalog.collisioncareerinstitute.com/browse/catalogs-workbooks/courses/tech- basic-skills-tracker-workbook
- It is highly recommended that you have access to a computer and internet for homework assignments.
- **One Textbook is required for this course.**
- This course will utilize Canvas LMS as a main source for accessing and submitting assignments.
- A link to Canvas can be found on the my.maricopa.edu webpage.
- Theory will be delivered via Canvas, lectures, Lab Demonstrations Worksheets, Videos, and various media applications including PowerPoints. Assignments and assessments are always being updated for content delivery and maximum competency effectiveness.
- Pen/pencil – student supplied
- Notebook and Paper – student supplied
- Headphones or earbuds for the computer audio are required

**Course Prerequisites: None**

**Attendance**

The attendance requirement for this course is 100% of the required 624 hours. It is the student's responsibility to be accountable for 100% of their attendance hours. There are 2 makeup days allocated for this course and will be scheduled by the instructor. Additional makeup time is based on a case-by-case basis and scheduled by the instructor based on availability. Students who fail to maintain attendance the 100% standard may be withdrawn and /or experience a loss of eligibility for funding to include, but are not limited to, Federal Student Aid, Veterans benefits, and third-party agency funding. Refer to Attendance Standard 2.3.2 in the Student Handbook for additional information.

**Attendance Standards:**

- Arrive on time at the beginning of class, from break(s) and lunch.
- Tardiness or absenteeism must be communicated to the instructor via email or the "Remind" app

**Dress Code**

- Safety glasses are to be always worn in the lab space – no exceptions
- School uniforms are required to be always worn.

- School ID badges are to be always worn
- No open-toed shoes or sandals are allowed – non-slip shoes are preferred
- No profane clothing is allowed
- Long hair must be secured in a safe manner
- Pants or Work shorts with belt loop and kept at waist high

**Cell Phone Usage**

- All personal calls are to take place outside of the classroom and lab space
- Absolutely no texting and web surfacing allowed in the classroom or lab space
- All phones are to be on silent or vibrate mode while in the classroom and lab space
- Cell phones are allowed to be used for classroom and lab informational purposes only
- Personal earbuds and headphones worn only in one ear – no exceptions.

**Communication Protocols**

Student are required to check their student emails and the Remind app at least once per day. Students are also required to check Canvas for updates and announcements daily. Students are required to communicate by email or the Remind app for any tardiness and absenteeism immediately.

**Food and Drinks**

Eating in the lab and classroom is prohibited. Drinks are allowed in the classroom and lab space in closed top container, e.g., water and soda bottles and coffee cups.

**GateWay Institutional Learning Outcomes**

At GWCC, learning will be assessed in three areas, across the institution, called Institutional Learning Outcomes: Effective Communication, Critical Thinking, and Problem Solving, and Civic Engagement and Personal Responsibility. Your instructor in this course will explain how one or more of these outcomes will be taught and assessed during the course. Your participation in assessment activities is vital to the College's efforts to improve teaching and student learning.

**Student Responsibilities**

Students are responsible for the information in the syllabus and college policies included in GWCC's college catalog and student handbook.

- While reading this syllabus for the first time, be sure to click all the links.
- Treat your instructors and fellow classmates with respect, as well as their property and the property of the school.
- Resolve conflict in a professional manner.
- Be considerate of your neighbors.
- You are responsible for keeping your workspace or locker clean. Cleaning supplies are available from your instructor.
- Daily all students must participate in cleaning the lab even if the mess is not entirely theirs.

**Last Day of Attendance Policy**

Last Date of Attendance Policy for Online and Hybrid (more than 50% online) Classes

At Maricopa Community Colleges, students must be engaged in some type of academic activity each week of their online course. Should a student discontinue their active involvement in an online course, faculty are required to withdraw the student from the course. This requires faculty to report a student's last date of attendance and withdraw the student within fourteen (14) days of identifying the last date of academic attendance. Simply logging into an online class will not count as academic attendance. The following is a list of activities that constitute online class academic attendance:

- Completing all I-CAR course work and exams

- Submitting an academic assignment (assignment required in the course, regardless of whether it is graded or not), paper, or project.
- Taking an exam, quiz, computer-assisted instruction, or an interactive tutorial required by the course.
- Attending an online or in-person study group (where there is assigned attendance/participation as part of the course).
- Initiating contact with a faculty member to ask a question about the academic subject studied in the course.
- Do not leave anything (books, headsets, USB drives, eyeglasses, personal safety equipment, etc.) unsecured overnight. Unauthorized items may be thrown away by the cleaning crew.

**Instructional Grievance Process**

A student who feels that he/she has been treated unfairly or unjustly by a faculty member (full-time or part-time) regarding an academic process such as grading, testing or assignments may resolve their grievance using the approved procedures referenced here: Instructional Grievance Process

**Non-Instructional Complaint Resolution**

A student who feels that he or she has been treated unfairly or unjustly by any employee regarding a non-instructional process such as a student or administrative services has the right to file a formal and written complaint according to the approved procedures referenced here: Non-Instructional Complaint Resolution

**Classroom Accommodations for Students with Disabilities**

In accordance with the Americans with Disabilities Act, the Maricopa County Community College District (MCCCD) and its associated colleges are committed to providing equitable access to learning opportunities to students with documented disabilities (e.g., mental health, attentional, learning, chronic health, sensory, or physical). Each class/term/semester that a student is in need of academic adjustments/accommodations, the qualified student is required to work with the Disability Resources & Services Office (DRS) at their individual college(s). Contact with the DRS should be made as soon as possible to ensure academic needs are met in a reasonable time. New and returning students must request accommodations each semester through DRS Connect online services. To learn more about this easy process, please contact your local DRS office.

If you have not yet established services through DRS, but have a temporary health condition or permanent disability that requires accommodations, you are welcome to contact DRS by calling (602) 286-8171 or by clicking the link here. The DRS offers resources and coordinates reasonable accommodations for students with disabilities and/or temporary health conditions qualifying for accommodations/academic adjustments.

**Addressing Incidents of Sexual Harassment/Assault, Dating/Domestic Violence, and Stalking**

In accordance with Title IX of the Education Amendments of 1972, MCCCD prohibits unlawful sex discrimination against any participant in its education programs or activities. The District also prohibits sexual harassment—including sexual violence—committed by or against students, District employees, and visitors to campus. As outlined in District policy, sexual harassment, dating violence, domestic violence, sexual assault, and stalking are considered forms of "Sexual Misconduct" prohibited by District policy.

**Minimum Progress**

Progress is measured by the student's ability to accomplish competencies within stated time frames. Instructor observations and formal skills assessments will determine whether these competencies are met. To maintain satisfactory academic progress, you must successfully complete all assigned work with a C or better.

Students and the instructor will discuss progress at regular intervals throughout each course. Upon failure of competency, the instructor will develop an action plan, with a timeline to assist you in meeting the competency prior to the end of the course. Failure to meet all required competencies in a course will result in withdrawal from the program at the end of the course. Additionally, you may lose financial aid eligibility, Veterans benefits, and/or agency support.

If a student does not make satisfactory academic progress in a current class, the student will be withdrawn from that course and cannot advance to the next course in the sequence. The student will also be terminated from the Program of Study and withdrawn from remaining courses due to failure to meet program completion requirements by not maintaining satisfactory academic progress.

**Catalog & Student Handbook**
The Catalog & Student Handbook can be located online at GWCC Student Handbook (https://www.gatewaycc.edu/catalog). Please refer to this handbook for current policies and procedures.

Before entry into the program, or any materials issued, all students must read and acknowledge in Canvas or by signing the Statement of Responsibility and Acknowledgement their commitment to following the policies, procedures, and standards contained in this Syllabus as well as those in the GWCC Student Handbook. Violation of any of these procedures will result in appropriate disciplinary action to be taken, up to and including dismissal from the program.

**Veterans Services Office**
If you are active military or a student veteran, thank you for your service. There are resources on the Washington campus to keep you informed of your rights and privileges. If you have any questions regarding the certification of educational benefits for active duty military, dependents and veterans please contact the Veterans' Services Department (https://www.gatewaycc.edu/veterans-services); veterans@gatewaycc.edu; (602) 286-8076

**Disability Resources**
The Disability Resources Department (https://www.gatewaycc.edu/disability-resources) provides information and resources to students with disabilities on a case-by-case basis. For more information contact disability.services@gatewaycc.edu or call (602) 238-0040.

Information for Students with Academic Adjustment Needs: If a student has a documented disability (as protected by the Americans with Disability Act Amendment Act) or is pregnant or parenting (as protected under Title IX) and would like to discuss possible academic adjustments, please contact the Disability Resources and Services Office.
Access to Course Materials: If a student is having trouble accessing course materials because of a disability, please contact your instructor. All students should have equal access to course materials and technology.

**Counseling**
The Counseling Department (https://www.gatewaycc.edu/counseling) provides a unique and confidential relationship between a professional and a person in need of help. For more information contact counseling.centralcity@gatewaycc.edu or call (602) 286-8900.

**The Learning Center**
The Washington Campus Learning Center (https://www.gatewaycc.edu/learning-center) is located in IE 2108 and is a great place to get some help understanding your reading or writing homework. Tutors and multi-media materials are available at no cost to you. For more information call (602) 286-8800.

**Your Responsibilities and Rights as a Student**
The GWCC Student Handbook has information on your rights and responsibilities.

**Academic Honesty/ Integrity**
Besides academic performance, students should exhibit the qualities of honesty and integrity. Every student is expected to produce his/her original, independent work. Any student whose work indicates a violation of the MCCCD Academic Misconduct Policy including cheating, plagiarism, and dishonesty will be subject to disciplinary action. Refer to the GWCC Student Handbook for information regarding Academic Misconduct and due process procedures.

**Statement of Responsibility and Acknowledgement**

This syllabus is intended to contain complete and accurate information; however, I reserve the right to adjust this syllabus during the course. Students will be notified by the instructor of any changes in course requirements or policies.

By signing this document, I acknowledge having read and understood the contents of this syllabus. In addition, I agree with the following statements:

- I understand and agree to the policies, rules, and standards set forth in this syllabus.
- I understand and agree to the policies, rules, and standards set forth in the GateWay Community College catalog.
- I understand and agree to the policies, rules, and standards set forth in the GateWay Community College Student Handbook.
- I fully understand that the information in this syllabus is subject to change at any time.

Print Name ________________________________________

Signature __________________________________________

Date ___________________________

The Maricopa County Community College District (MCCCD) is an EEO/AA institution and an equal opportunity employer of protected veterans and individuals with disabilities. All qualified applicants will receive consideration for employment without regard to race, color, religion, sex, sexual orientation, gender identity, age, or national origin. A lack of English language skills will not be a barrier to admission and participation in the career and technical education programs of the District.

The Maricopa County Community College District does not discriminate on the basis of race, color, national origin, sex, disability or age in its programs or activities. For Title IX/504 concerns, call the following number to reach the appointed coordinator: (480) 731-8499. For additional information, as well as a listing of all coordinators within the Maricopa College system, visit https://www.maricopa.edu/non-discriminationLinks to an external site

Learn More, Live Better!

GATEWAY COMMUNITY COLLEGE
A MARICOPA COMMUNITY COLLEGE

**Collision Repair Program Syllabus**

| | |
|---|---|
| **Course** | ABO203 |
| **Section Number** | 10346 |
| **Year** | Fall 2022 |
| **College - Campus** | Gateway Central City Campus |
| **Course Start Date** | May 23, 2022 |
| **Course End Date** | July 20, 2022 |
| **Class Schedule** | Mon-Thurs, 7AM-2:00PM, Break 8:50-9:10, Lunch 11:00 |
| **Room** | A335 Lab, Classroom TBD |
| **Course Description** | The Certificate of Competency (CCT) in Collision Repair Technician gives students the knowledge and hands-on experience to start a career in the automotive collision repair industry. Learn about metal and plastic repair, metal inert gas (MIG) welding, vehicle disassembly, refinishing, reassembly, estimate reading, coolant removal/replacement, and air conditioning (A/C) discharge/recharge and industry terminology. |
| **Instructors** | Brent Cooper brent.cooper@gatewaycc.edu (602) 238-4388<br>Mike Hernandez hernandezm@gatewaycc.edu (602) 238-0070 |

**Course Purpose:**
**ABO203** Is the advanced portion of the collision repair program. Students will put into practice the skills taught to them in ABO103&4. This practice may come in the form of an actual automobile or a project that requires similar steps to complete. Note: Working on a personal vehicle will require you to pay for supplies.

**Course Objectives:**
Practice personal and workplace safety standards.
Use, maintain, and store tools, equipment and workspace according to professional standards for the automotive industry.
Create a repair plan that includes the analysis of the damage, needed tools, chemicals, additives, time, cost, and parts to complete a collision and refinish repair job.
Produce a damage repair independently.
Produce refinishing work independently.
Recognize efficient and quality work according to industry standards.
Demonstrate industry professionalism and a commitment to professional development such as I-CAR, NATEF, or ASE certifications.
Communicate effectively by collaborating with diverse audiences orally, visually, and in writing.
Demonstrate professionalism with conduct, ethics, and workplace practices.

| **Grading** | | | | | | | **Weight** | |
|---|---|---|---|---|---|---|---|---|
| A | 90 – 100% | Pass | | C | 70 – 79% | Pass | Competencies = 25% | Attendance = 25% |
| B | 80 – 89% | Pass | | D | 0 – 69% | Fail | I-CAR course = 25% | Participation = 25% |

**Mission Statement**

*Gateway Central City Collision Repair Program uses a career and competency-based learning format for students planning their future as a collision repair technician. Students will receive hands-on training with up-to-date tools and technology to learn the fundamental skills needed for entering into collision repair as a highly qualified apprentice. We will provide accessible, affordable, and quality training by qualified instructors. Gateway will strive to maintain an updated curriculum, training methods, and equipment to stay abreast of the rapid technological advancements and trends in today's collision repair field. We will provide an atmosphere that is conducive to lifelong learning that accentuates diversity, equity, and inclusion.*

**Required to Pass:**

Pass all competencies

Pass I-CAR quizzes and final exams

Maintain 100% attendance in each course

**Required Texts, Materials, Third Party Tools, and Technologies**

In this course you will have the following requirements:

- **Prior to start of class** Purchase the Skills Workbook: https://catalog.collisioncareerinstitute.com/browse/catalogs-workbooks/courses/tech- basic-skills-tracker-workbook
- It is highly recommended that you have access to a computer and internet for homework assignments.
- **One Textbook is required for this course.**
- This course will utilize Canvas LMS as a main source for accessing and submitting assignments.
- A link to Canvas can be found on the my.maricopa.edu webpage.
- Theory will be delivered via Canvas, lectures, Lab Demonstrations Worksheets, Videos, and various media applications including PowerPoints. Assignments and assessments are always being updated for content delivery and maximum competency effectiveness.
- Pen/pencil – student supplied
- Notebook and Paper – student supplied
- Headphones or earbuds for the computer audio are required

**Course Prerequisites: None**

**Attendance**

The attendance requirement for this course is 100% of the required 624 hours. It is the student's responsibility to be accountable for 100% of their attendance hours. There are 2 makeup days allocated for this course and will be scheduled by the instructor. Additional makeup time is based on a case-by-case basis and scheduled by the instructor based on availability. Students who fail to maintain attendance the 100% standard may be withdrawn and /or experience a loss of eligibility for funding to include, but are not limited to, Federal Student Aid, Veterans benefits, and third-party agency funding. Refer to Attendance Standard 2.3.2 in the Student Handbook for additional information.

**Attendance Standards:**

- Arrive on time at the beginning of class, from break(s) and lunch.
- Tardiness or absenteeism must be communicated to the instructor via email or the "Remind" app

**Dress Code**

- Safety glasses are to be always worn in the lab space – no exceptions
- School uniforms are required to be always worn.

- School ID badges are to be always worn
- No open-toed shoes or sandals are allowed – non-slip shoes are preferred
- No profane clothing is allowed
- Long hair must be secured in a safe manner
- Pants or Work shorts with belt loop and kept at waist high

**Cell Phone Usage**

- All personal calls are to take place outside of the classroom and lab space
- Absolutely no texting and web surfacing allowed in the classroom or lab space
- All phones are to be on silent or vibrate mode while in the classroom and lab space
- Cell phones are allowed to be used for classroom and lab informational purposes only
- Personal earbuds and headphones worn only in one ear – no exceptions.

**Communication Protocols**

Student are required to check their student emails and the Remind app at least once per day. Students are also required to check Canvas for updates and announcements daily. Students are required to communicate by email or the Remind app for any tardiness and absenteeism immediately.

**Food and Drinks**

Eating in the lab and classroom is prohibited. Drinks are allowed in the classroom and lab space in closed top container, e.g., water and soda bottles and coffee cups.

**GateWay Institutional Learning Outcomes**

At GWCC, learning will be assessed in three areas, across the institution, called Institutional Learning Outcomes: Effective Communication, Critical Thinking, and Problem Solving, and Civic Engagement and Personal Responsibility. Your instructor in this course will explain how one or more of these outcomes will be taught and assessed during the course. Your participation in assessment activities is vital to the College's efforts to improve teaching and student learning.

**Student Responsibilities**

Students are responsible for the information in the syllabus and college policies included in GWCC's college catalog and student handbook.

- While reading this syllabus for the first time, be sure to click all the links.
- Treat your instructors and fellow classmates with respect, as well as their property and the property of the school.
- Resolve conflict in a professional manner.
- Be considerate of your neighbors.
- You are responsible for keeping your workspace or locker clean. Cleaning supplies are available from your instructor.
- Daily all students must participate in cleaning the lab even if the mess is not entirely theirs.

**Last Day of Attendance Policy**

Last Date of Attendance Policy for Online and Hybrid (more than 50% online) Classes

At Maricopa Community Colleges, students must be engaged in some type of academic activity each week of their online course. Should a student discontinue their active involvement in an online course, faculty are required to withdraw the student from the course. This requires faculty to report a student's last date of attendance and withdraw the student within fourteen (14) days of identifying the last date of academic attendance. Simply logging into an online class will not count as academic attendance. The following is a list of

activities that constitute online class academic attendance:

- Completing all I-CAR course work and exams
- Submitting an academic assignment (assignment required in the course, regardless of whether it is graded or not), paper, or project.
- Taking an exam, quiz, computer-assisted instruction, or an interactive tutorial required by the course.
- Attending an online or in-person study group (where there is assigned attendance/participation as part of the course).
- Initiating contact with a faculty member to ask a question about the academic subject studied in the course.
- Do not leave anything (books, headsets, USB drives, eyeglasses, personal safety equipment, etc.) unsecured overnight. Unauthorized items may be thrown away by the cleaning crew.

**Instructional Grievance Process**

A student who feels that he/she has been treated unfairly or unjustly by a faculty member (full-time or part-time) regarding an academic process such as grading, testing or assignments may resolve their grievance using the approved procedures referenced here: Instructional Grievance Process

**Non-Instructional Complaint Resolution**

A student who feels that he or she has been treated unfairly or unjustly by any employee regarding a non-instructional process such as a student or administrative services has the right to file a formal and written complaint according to the approved procedures referenced here: Non-Instructional Complaint Resolution

**Classroom Accommodations for Students with Disabilities**

In accordance with the Americans with Disabilities Act, the Maricopa County Community College District (MCCCD) and its associated colleges are committed to providing equitable access to learning opportunities to students with documented disabilities (e.g., mental health, attentional, learning, chronic health, sensory, or physical). Each class/term/semester that a student is in need of academic adjustments/accommodations, the qualified student is required to work with the Disability Resources & Services Office (DRS) at their individual college(s). Contact with the DRS should be made as soon as possible to ensure academic needs are met in a reasonable time. New and returning students must request accommodations each semester through DRS Connect online services. To learn more about this easy process, please contact your local DRS office.

If you have not yet established services through DRS, but have a temporary health condition or permanent disability that requires accommodations, you are welcome to contact DRS by calling (602) 286-8171 or by clicking the link here. The DRS offers resources and coordinates reasonable accommodations for students with disabilities and/or temporary health conditions qualifying for accommodations/academic adjustments.

**Addressing Incidents of Sexual Harassment/Assault, Dating/Domestic Violence, and Stalking**

In accordance with Title IX of the Education Amendments of 1972, MCCCD prohibits unlawful sex discrimination against any participant in its education programs or activities. The District also prohibits sexual harassment—including sexual violence—committed by or against students, District employees, and visitors to campus. As outlined in District policy, sexual harassment, dating violence, domestic violence, sexual assault, and stalking are considered forms of "Sexual Misconduct" prohibited by District policy.

**Minimum Progress**

Progress is measured by the student's ability to accomplish competencies within stated time frames. Instructor observations and formal skills assessments will determine whether these competencies are met. To maintain satisfactory academic progress, you must successfully complete all assigned work with a C or better.

Students and the instructor will discuss progress at regular intervals throughout each course. Upon failure of competency, the instructor will develop an action plan, with a timeline to assist you in meeting the competency prior to the end of the course. Failure to meet all required competencies in a course will result in withdrawal from the program at the end of the course. Additionally, you may lose financial aid eligibility, Veterans benefits, and/or agency support.

If a student does not make satisfactory academic progress in a current class, the student will be withdrawn from that course and cannot advance to the next course in the sequence. The student will also be terminated from the Program of Study and withdrawn from remaining courses due to failure to meet program completion requirements by not maintaining satisfactory academic progress.

**Catalog & Student Handbook**

The Catalog & Student Handbook can be located online at GWCC Student Handbook (https://www.gatewaycc.edu/catalog). Please refer to this handbook for current policies and procedures.

Before entry into the program, or any materials issued, all students must read and acknowledge in Canvas or by signing the Statement of Responsibility and Acknowledgement their commitment to following the policies, procedures, and standards contained in this Syllabus as well as those in the GWCC Student Handbook. Violation of any of these procedures will result in appropriate disciplinary action to be taken, up to and including dismissal from the program.

**Veterans Services Office**

If you are active military or a student veteran, thank you for your service. There are resources on the Washington campus to keep you informed of your rights and privileges. If you have any questions regarding the certification of educational benefits for active duty military, dependents and veterans please contact the Veterans' Services Department (https://www.gatewaycc.edu/veterans-services); veterans@gatewaycc.edu; (602) 286-8076

**Disability Resources**

The Disability Resources Department (https://www.gatewaycc.edu/disability-resources) provides information and resources to students with disabilities on a case-by-case basis. For more information contact disability.services@gatewaycc.edu or call (602) 238-0040.

Information for Students with Academic Adjustment Needs: If a student has a documented disability (as protected by the Americans with Disability Act Amendment Act) or is pregnant or parenting (as protected under Title IX) and would like to discuss possible academic adjustments, please contact the Disability Resources and Services Office.

Access to Course Materials: If a student is having trouble accessing course materials because of a disability, please contact your instructor. All students should have equal access to course materials and technology.

**Counseling**

The Counseling Department (https://www.gatewaycc.edu/counseling) provides a unique and confidential relationship between a professional and a person in need of help. For more information contact counseling.centralcity@gatewaycc.edu or call (602) 286-8900.

**The Learning Center**

The Washington Campus Learning Center (https://www.gatewaycc.edu/learning-center) is located in IE 2108 and is a great place to get some help understanding your reading or writing homework. Tutors and multi-media materials are available at no cost to you. For more information call (602) 286-8800.

**Your Responsibilities and Rights as a Student**

The GWCC Student Handbook has information on your rights and responsibilities.

**Academic Honesty/ Integrity**

Besides academic performance, students should exhibit the qualities of honesty and integrity. Every student is expected to produce his/her original, independent work. Any student whose work indicates a violation of the MCCCD Academic Misconduct Policy including cheating, plagiarism, and dishonesty will be subject to disciplinary action. Refer to the GWCC Student Handbook for information regarding Academic Misconduct and due process procedures.

**Statement of Responsibility and Acknowledgement**

This syllabus is intended to contain complete and accurate information; however, I reserve the right to adjust this syllabus during the course. Students will be notified by the instructor of any changes in course requirements or policies.

By signing this document, I acknowledge having read and understood the contents of this syllabus. In addition, I agree with the following statements:

- I understand and agree to the policies, rules, and standards set forth in this syllabus.
- I understand and agree to the policies, rules, and standards set forth in the GateWay Community College catalog.
- I understand and agree to the policies, rules, and standards set forth in the GateWay Community College Student Handbook.
- I fully understand that the information in this syllabus is subject to change at any time.

Print Name ______________________________

Signature ______________________________

Date ____________________

The Maricopa County Community College District (MCCCD) is an EEO/AA institution and an equal opportunity employer of protected veterans and individuals with disabilities. All qualified applicants will receive consideration for employment without regard to race, color, religion, sex, sexual orientation, gender identity, age, or national origin. A lack of English language skills will not be a barrier to admission and participation in the career and technical education programs of the District.

The Maricopa County Community College District does not discriminate on the basis of race, color, national origin, sex, disability or age in its programs or activities. For Title IX/504 concerns, call the following number to

reach the appointed coordinator: (480) 731-8499. For additional information, as well as a listing of all coordinators within the Maricopa College system, visit https://www.maricopa.edu/non-discriminationLinks to an external site

Learn More, Live Better!

GATEWAY COMMUNITY COLLEGE
A MARICOPA COMMUNITY COLLEGE

**Collision Repair Program Syllabus**

| | |
|---|---|
| **Course** | ABO204 |
| **Section Number** | 10347 |
| **Year** | Fall 2022 |
| **College - Campus** | Gateway Central City Campus |
| **Course Start Date** | May 23, 2022 |
| **Course End Date** | July 20, 2022 |
| **Class Schedule** | Mon-Thurs, 7AM-2:00PM, Break 8:50-9:10, Lunch 11:00 |
| **Room** | A335 Lab, Classroom TBD |
| **Course Description** | The Certificate of Competency (CCT) in Collision Repair Technician gives students the knowledge and hands-on experience to start a career in the automotive collision repair industry. Learn about metal and plastic repair, metal inert gas (MIG) welding, vehicle disassembly, refinishing, reassembly, estimate reading, coolant removal/replacement, and air conditioning (A/C) discharge/recharge and industry terminology. |
| **Instructors** | Brent Cooper brent.cooper@gatewaycc.edu (602) 238-4388<br>Mike Hernandez hernandezm@gatewaycc.edu (602) 238-0070 |

**Course Purpose:**
**ABO204** Is the advanced portion of the collision repair program. Students will continue to put into practice the skills taught to them in ABO103, 104, & 203. This practice may come in the form of an actual automobile or a project that requires similar steps to complete.

**Course Objectives:**
Practice personal and workplace safety standards.
Use, maintain, and store tools, equipment and workspace according to professional standards for the automotive industry.
Create a repair plan that includes the analysis of the damage, needed tools, chemicals, additives, time, cost, and parts to complete a collision and refinish repair job.
Produce a damage repair independently.
Produce refinishing work independently.
Recognize efficient and quality work according to industry standards.
Demonstrate industry professionalism and a commitment to professional development such as I-CAR.
Communicate effectively by collaborating with diverse audiences orally, visually, and in writing.
Demonstrate professionalism with conduct, ethics, and workplace practices.

| **Grading** | | | | | | | **Weight** | | |
|---|---|---|---|---|---|---|---|---|---|
| A | 90 – 100% | Pass | | C | 70 – 79% | Pass | Competencies = 25% | Attendance = 25% | |
| B | 80 – 89% | Pass | | D | 0 – 69% | Fail | I-CAR course = 25% | Participation = 25% | |

**Mission Statement**

*Gateway Central City Collision Repair Program uses a career and competency-based learning format for students planning their future as a collision repair technician. Students will receive hands-on training with up-to-date tools and technology to learn the fundamental skills needed for entering into collision repair as a highly qualified apprentice. We will provide accessible, affordable, and quality training by qualified instructors. Gateway will strive to maintain an updated curriculum, training methods, and equipment to stay abreast of the rapid technological advancements and trends in today's collision repair field. We will provide an atmosphere that is conducive to lifelong learning that accentuates diversity, equity, and inclusion.*

**Required to Pass:**

Pass all competencies

Pass I-CAR quizzes and final exams

Maintain 100% attendance in each course

**Required Texts, Materials, Third Party Tools, and Technologies**

In this course you will have the following requirements:

- **Prior to start of class** Purchase the Skills Workbook: https://catalog.collisioncareerinstitute.com/browse/catalogs-workbooks/courses/tech- basic-skills-tracker-workbook
- It is highly recommended that you have access to a computer and internet for homework assignments.
- **One Textbook is required for this course.**
- This course will utilize Canvas LMS as a main source for accessing and submitting assignments.
- A link to Canvas can be found on the my.maricopa.edu webpage.
- Theory will be delivered via Canvas, lectures, Lab Demonstrations Worksheets, Videos, and various media applications including PowerPoints. Assignments and assessments are always being updated for content delivery and maximum competency effectiveness.
- Pen/pencil – student supplied
- Notebook and Paper – student supplied
- Headphones or earbuds for the computer audio are required
- **Note: If repairing a personal vehicle all supplies must be purchased by the student.**

**Course Prerequisites: None**

**Attendance**

The attendance requirement for this course is 100% of the required 624 hours. It is the student's responsibility to be accountable for 100% of their attendance hours. There are 2 makeup days allocated for this course and will be scheduled by the instructor. Additional makeup time is based on a case-by-case basis and scheduled by the instructor based on availability. Students who fail to maintain attendance the 100% standard may be withdrawn and /or experience a loss of eligibility for funding to include, but are not limited to, Federal Student Aid, Veterans benefits, and third-party agency funding. Refer to Attendance Standard 2.3.2 in the Student Handbook for additional information.

**Attendance Standards:**

- Arrive on time at the beginning of class, from break(s) and lunch.
- Tardiness or absenteeism must be communicated to the instructor via email or the "Remind" app

**Dress Code**

- Safety glasses are to be always worn in the lab space – no exceptions

- School uniforms are required to be always worn.
- School ID badges are to be always worn
- No open-toed shoes or sandals are allowed – non-slip shoes are preferred
- No profane clothing is allowed
- Long hair must be secured in a safe manner
- Pants or Work shorts with belt loop and kept at waist high

**Cell Phone Usage**

- All personal calls are to take place outside of the classroom and lab space
- Absolutely no texting and web surfacing allowed in the classroom or lab space
- All phones are to be on silent or vibrate mode while in the classroom and lab space
- Cell phones are allowed to be used for classroom and lab informational purposes only
- Personal earbuds and headphones worn only in one ear – no exceptions.

**Communication Protocols**

Student are required to check their student emails and the Remind app at least once per day. Students are also required to check Canvas for updates and announcements daily. Students are required to communicate by email or the Remind app for any tardiness and absenteeism immediately.

**Food and Drinks**

Eating in the lab and classroom is prohibited. Drinks are allowed in the classroom and lab space in closed top container, e.g., water and soda bottles and coffee cups.

**GateWay Institutional Learning Outcomes**

At GWCC, learning will be assessed in three areas, across the institution, called Institutional Learning Outcomes: Effective Communication, Critical Thinking, and Problem Solving, and Civic Engagement and Personal Responsibility. Your instructor in this course will explain how one or more of these outcomes will be taught and assessed during the course. Your participation in assessment activities is vital to the College's efforts to improve teaching and student learning.

**Student Responsibilities**

Students are responsible for the information in the syllabus and college policies included in GWCC's college catalog and student handbook.

- While reading this syllabus for the first time, be sure to click all the links.
- Treat your instructors and fellow classmates with respect, as well as their property and the property of the school.
- Resolve conflict in a professional manner.
- Be considerate of your neighbors.
- You are responsible for keeping your workspace or locker clean. Cleaning supplies are available from your instructor.
- Daily all students must participate in cleaning the lab even if the mess is not entirely theirs.

**Last Day of Attendance Policy**

Last Date of Attendance Policy for Online and Hybrid (more than 50% online) Classes

At Maricopa Community Colleges, students must be engaged in some type of academic activity each week of their online course. Should a student discontinue their active involvement in an online course, faculty are required to withdraw the student from the course. This requires faculty to report a student's last date of attendance and withdraw the student within fourteen (14) days of identifying the last date of academic

attendance. Simply logging into an online class will not count as academic attendance. The following is a list of activities that constitute online class academic attendance:

- Completing all I-CAR course work and exams
- Submitting an academic assignment (assignment required in the course, regardless of whether it is graded or not), paper, or project.
- Taking an exam, quiz, computer-assisted instruction, or an interactive tutorial required by the course.
- Attending an online or in-person study group (where there is assigned attendance/participation as part of the course).
- Initiating contact with a faculty member to ask a question about the academic subject studied in the course.
- Do not leave anything (books, headsets, USB drives, eyeglasses, personal safety equipment, etc.) unsecured overnight. Unauthorized items may be thrown away by the cleaning crew.

**Instructional Grievance Process**

A student who feels that he/she has been treated unfairly or unjustly by a faculty member (full-time or part-time) regarding an academic process such as grading, testing or assignments may resolve their grievance using the approved procedures referenced here: Instructional Grievance Process

**Non-Instructional Complaint Resolution**

A student who feels that he or she has been treated unfairly or unjustly by any employee regarding a non-instructional process such as a student or administrative services has the right to file a formal and written complaint according to the approved procedures referenced here: Non-Instructional Complaint Resolution

**Classroom Accommodations for Students with Disabilities**

In accordance with the Americans with Disabilities Act, the Maricopa County Community College District (MCCCD) and its associated colleges are committed to providing equitable access to learning opportunities to students with documented disabilities (e.g., mental health, attentional, learning, chronic health, sensory, or physical). Each class/term/semester that a student is in need of academic adjustments/accommodations, the qualified student is required to work with the Disability Resources & Services Office (DRS) at their individual college(s). Contact with the DRS should be made as soon as possible to ensure academic needs are met in a reasonable time. New and returning students must request accommodations each semester through DRS Connect online services. To learn more about this easy process, please contact your local DRS office.

If you have not yet established services through DRS, but have a temporary health condition or permanent disability that requires accommodations, you are welcome to contact DRS by calling (602) 286-8171 or by clicking the link here. The DRS offers resources and coordinates reasonable accommodations for students with disabilities and/or temporary health conditions qualifying for accommodations/academic adjustments.

**Addressing Incidents of Sexual Harassment/Assault, Dating/Domestic Violence, and Stalking**

In accordance with Title IX of the Education Amendments of 1972, MCCCD prohibits unlawful sex discrimination against any participant in its education programs or activities. The District also prohibits sexual harassment—including sexual violence—committed by or against students, District employees, and visitors to campus. As outlined in District policy, sexual harassment, dating violence, domestic violence, sexual assault, and stalking are considered forms of "Sexual Misconduct" prohibited by District policy.

**Minimum Progress**

Progress is measured by the student's ability to accomplish competencies within stated time frames. Instructor observations and formal skills assessments will determine whether these competencies are met. To maintain

satisfactory academic progress, you must successfully complete all assigned work with a C or better.

Students and the instructor will discuss progress at regular intervals throughout each course. Upon failure of competency, the instructor will develop an action plan, with a timeline to assist you in meeting the competency prior to the end of the course. Failure to meet all required competencies in a course will result in withdrawal from the program at the end of the course. Additionally, you may lose financial aid eligibility, Veterans benefits, and/or agency support.

If a student does not make satisfactory academic progress in a current class, the student will be withdrawn from that course and cannot advance to the next course in the sequence. The student will also be terminated from the Program of Study and withdrawn from remaining courses due to failure to meet program completion requirements by not maintaining satisfactory academic progress.

**Catalog & Student Handbook**
The Catalog & Student Handbook can be located online at GWCC Student Handbook (https://www.gatewaycc.edu/catalog). Please refer to this handbook for current policies and procedures.

Before entry into the program, or any materials issued, all students must read and acknowledge in Canvas or by signing the Statement of Responsibility and Acknowledgement their commitment to following the policies, procedures, and standards contained in this Syllabus as well as those in the GWCC Student Handbook. Violation of any of these procedures will result in appropriate disciplinary action to be taken, up to and including dismissal from the program.

**Veterans Services Office**
If you are active military or a student veteran, thank you for your service. There are resources on the Washington campus to keep you informed of your rights and privileges. If you have any questions regarding the certification of educational benefits for active duty military, dependents and veterans please contact the Veterans' Services Department (https://www.gatewaycc.edu/veterans-services); veterans@gatewaycc.edu; (602) 286-8076

**Disability Resources**
The Disability Resources Department (https://www.gatewaycc.edu/disability-resources) provides information and resources to students with disabilities on a case-by-case basis. For more information contact disability.services@gatewaycc.edu or call (602) 238-0040.

Information for Students with Academic Adjustment Needs: If a student has a documented disability (as protected by the Americans with Disability Act Amendment Act) or is pregnant or parenting (as protected under Title IX) and would like to discuss possible academic adjustments, please contact the Disability Resources and Services Office.
Access to Course Materials: If a student is having trouble accessing course materials because of a disability, please contact your instructor. All students should have equal access to course materials and technology.

**Counseling**
The Counseling Department (https://www.gatewaycc.edu/counseling) provides a unique and confidential relationship between a professional and a person in need of help. For more information contact counseling.centralcity@gatewaycc.edu or call (602) 286-8900.

**The Learning Center**
The Washington Campus Learning Center (https://www.gatewaycc.edu/learning-center) is located in IE 2108 and is a great place to get some help understanding your reading or writing homework. Tutors and multi-media materials are available at no cost to you. For more information call (602) 286-8800.

**Your Responsibilities and Rights as a Student**
The GWCC Student Handbook has information on your rights and responsibilities.

**Academic Honesty/ Integrity**
Besides academic performance, students should exhibit the qualities of honesty and integrity. Every student is expected to produce his/her original, independent work. Any student whose work indicates a violation of the MCCCD Academic Misconduct Policy including cheating, plagiarism, and dishonesty will be subject to disciplinary action. Refer to the GWCC Student Handbook for information regarding Academic Misconduct and due process procedures.

**Statement of Responsibility and Acknowledgement**

This syllabus is intended to contain complete and accurate information; however, I reserve the right to adjust this syllabus during the course. Students will be notified by the instructor of any changes in course requirements or policies.

By signing this document, I acknowledge having read and understood the contents of this syllabus.
In addition, I agree with the following statements:

- I understand and agree to the policies, rules, and standards set forth in this syllabus.
- I understand and agree to the policies, rules, and standards set forth in the GateWay Community College catalog.
- I understand and agree to the policies, rules, and standards set forth in the GateWay Community College Student Handbook.
- I fully understand that the information in this syllabus is subject to change at any time.

Print Name ______________________________

Signature ______________________________

Date ____________________

The Maricopa County Community College District (MCCCD) is an EEO/AA institution and an equal opportunity employer of protected veterans and individuals with disabilities. All qualified applicants will receive consideration for employment without regard to race, color, religion, sex, sexual orientation, gender identity, age, or national origin. A lack of English language skills will not be a barrier to admission and participation in the career and technical education programs of the District.

The Maricopa County Community College District does not discriminate on the basis of race, color, national origin, sex, disability or age in its programs or activities. For Title IX/504 concerns, call the following number to reach the appointed coordinator: (480) 731-8499. For additional information, as well as a listing of all coordinators within the Maricopa College system, visit https://www.maricopa.edu/non-discriminationLinks to an external site

# EXHIBIT E

# GateWay Community College 2022-2023 Attendance Policies

**Absences**

Absences begin to accumulate with the first scheduled class meeting. Students may be withdrawn from a class or program for unsatisfactory attendance. Students should refer to their course syllabus for specific attendance requirements.

**Attendance Policy**

Students enrolled in clock-hour programs must complete 100% of the required hours for each course within their program. Completing over 110% of program hours may have financial implications.

**Attendance Standards**

Students enrolled in GateWay Community College clock-hour programs are encouraged and expected to attend regularly in order to derive maximum benefit from the instructional program, and develop habits of punctuality, self-discipline, and responsibility. Each program has the responsibility to prepare students with the necessary occupational and work-related skills to enter the workforce. Effective work habits are paramount to students' success.

Students who fail to maintain attendance standards may be withdrawn from the course, which may result in a loss of eligibility of funding to include, but not limited to, Federal Student Aid, VA Education Benefits, and third-party agency funding. Refer to the catalog section on Satisfactory Academic Progress regarding continuation of federal student aid. Students should refer to their course syllabus for specific attendance requirements. Students are responsible for verifying that their attendance is accurately recorded in the attendance system. If students identify an attendance error, they must notify their instructor as soon as possible, and no later than the third business day following the date of the error. Failure to maintain attendance standards may jeopardize a student's ability to remain in their program of study.

Students are required to clock in when arriving to class and clock out when leaving class. Students must use their MEID when clocking in and out. Students must clock in and out on the designated attendance system. Students must be physically present in person or on line to be marked in attendance.

Disciplinary action per the Student Code of Conduct Policy will take place if a student clocks in or out for another student. Admissions and Records will be the final authority to document the number of hours and absences for each student. There are NO excused absences. Students are considered present or absent. Time missed due to arriving late or leaving early counts toward time missed (absence).

**Makeup Time**

- Instructors will determine the schedule for makeup hours.
- Makeup hours will not exceed 10% of the total clock hours required per course.
- Students are required to make up all hours to meet the 100% attendance requirement per course.
- Students who fall below 90% attendance hours **may** be withdrawn from the course and remainder of the program regardless of hours made up.
- All makeup hours are required to be completed before the 100% refund deadline date of the next sequential course.
- Students are required to clock in and out following regular attendance procedure and to officially document makeup time.

Laboratory class periods and clinical externship hours are not always possible to make up. When an absence results in the inability of the student to develop and demonstrate clinical practice objectives and meet the required hours of the course necessary for credit, the student cannot receive a passing grade and will be withdrawn from the program.

**Minimum Progress**

Clock-hour student progress is measured by the student's ability to accomplish competencies within stated timeframes. Failure to meet all required competencies in a course may result in withdrawal from the program at the end of the course. To maintain satisfactory academic progress, a student must successfully complete all courses with a P (or a grade of C or better). A student who declares a clock-hour program of study (certificate seeking) must successfully complete courses that constitute the desired program in the order in which they are scheduled. If a student does not make satisfactory academic progress in a current course, the student may be withdrawn from that course and cannot advance to the next course in the sequence. The student will also be terminated from the program of study and withdrawn from remaining courses due to failure to meet program completion requirements by not maintaining satisfactory academic progress.

**Re-Enrollment from Withdrawal for Clock Hours**

Students who wish to return to school must initiate the re-enrollment process through Enrollment Services. Prior to re-enrollment, student academic records will be evaluated to determine appropriate class schedule, based on current catalog requirements. Depending on the program, students may be required to start the program in the beginning and any coursework completed/started would need to be repeated.

**Withdrawal Due to Unsatisfactory Attendance**

Students who do not maintain the attendance standard at a rate of 100% or higher for an individual course will fail the current course and/or be withdrawn from the program. Students who fall below 90% attendance hours may be withdrawn for excessive absences regardless of

hours made up. Students who discontinue studies in a course or program may refer to Enrollment Services for specific information regarding withdrawal procedures and appeals.

# EXHIBIT F

## Declaration of Dr. Amy Diaz

I, Dr. Amy Diaz, do hereby declare as follows:

1. I currently hold the position of President of GateWay Community College ("GWCC"), one of ten community colleges within the Maricopa County Community College District (the "District").

2. I was the Interim President of GWCC when Plaintiff Tyrone Ross ("Plaintiff") was enrolled in GWCC's Autobody/Collision Repair Program.

3. On April 15, 2023, I was named permanent President of GWCC.

4. As President, I am responsible for providing overall leadership and strategic direction for GWCC. I directly supervise three Vice Presidents, including GWCC's Vice President of Student Affairs ("VPSA"), as well as two Senior Associate Vice Presidents. My responsibilities also include, but are not limited to, leading District and college-level committees, fostering effective communication and collaboration across GWCC and the District, and representing GWCC with members, partners, and the broader community.

5. As a result of my employment with GWCC, I have become knowledgeable about GWCC's and the District's Administrative Regulations, rules, policies, procedures, and practices.

6. On or about December 7, 2022, I received a request from Plaintiff to meet with me on January 3, 2023.

7. On or about December 13, 2022, I received a copy of Plaintiff's December 6, 2022 internal complaint regarding former Program Instructor Brent Cooper ("Cooper") (hereinafter "Complaint 1"). A true and correct copy of the complaint I received is attached as **Exhibit 1** to this Declaration.

8. At the time Plaintiff requested a meeting with me on or about December 7, 2022, I had not received a copy of Complaint 1.

9. On December 13, 2022, I considered placing Cooper on administrative leave. However, I was made aware that Plaintiff stopped attending the Program. Thus, GWCC did not place Cooper on leave given that Plaintiff was no longer in the classroom.

10. On December 18, 2022, I emailed Plaintiff, "I believe I have been brought up to speed regarding your situation. With an investigation in process, would you still like to meet with me?" Soon after, Plaintiff emailed me to say he was hoping to find a solution to his class situation because his teacher had dropped him from the Program, but that he had not been back because he does not feel safe or welcome under Cooper's supervision.

11. On December 19, 2022, I emailed Plaintiff stating that "I am very concerned about you and this situation but also recognize there is a process that we need to follow. However, the fact that you've shared that you were dropped from the program by your instructor (not that you dropped yourself) is very problematic for me, which is why I have included Dr. Wilson and Maribel on this thread."

12. After Plaintiff suggested that his instructor dropped him without his consent, I instructed GWCC VPSA Dr. Delfina Wilson ("Wilson") to verify whether that had occurred. Wilson informed me that Plaintiff was withdrawn from the Program on December 13, 2022, for excessive absences in accordance with GWCC policy.

13. On January 3, 2023, Plaintiff emailed me expressing concern that he would not receive his certificate of completion because he had been removed from the Program. Because Plaintiff indicated that he wished to continue participating in the Program, I informed Wilson that GWCC would need to determine the number of Program hours Plaintiff was required to make up and evaluate potential reenrollment options.

14. Under GWCC/District policy in effect at the time of Plaintiff's enrollment in the Program, a student or respondent who was dissatisfied with the outcome of an investigation could request administrative review of the decision by the President. Because I was designated as the official responsible for hearing appeals of investigative findings, I did not participate in discussions regarding Plaintiff's re-enrollment in the Program or the investigation process while Complaint 1 remained pending.

15. In response to Plaintiff's concerns regarding potential retaliation by Cooper and the pending disciplinary action against Cooper arising from the investigation into Complaint 1, GWCC placed Cooper on administrative leave on March 9, 2023. Following this action, Cooper did not return to active employment with GWCC and/or the District.

16. After Cooper was placed on administrative leave, GWCC did not allow him to return to GWCC's campus at any time before Plaintiff completed the Program.

17. On March 10, 2023, I informed both Plaintiff and Cooper of the outcome of GWCC's investigation into Complaint 1. The investigation concluded that Cooper more likely than not directly contributed to the creation of a hostile learning environment for Plaintiff and potentially other students. Furthermore, the investigation found that it was more likely than not that Cooper managed course conduct and resources in a manner that unfairly favored the only woman in the course over the men.

18. On April 5, 2023, Plaintiff emailed me "[F]or my last day how would I clock out just clock out? Or would I need to head to the front office to do that?" I then emailed Plaintiff to congratulate him on completing the Program. I asked Plaintiff for his personal email address because GWCC would be investigating his second complaint regarding alleged retaliation by Cooper (hereinafter, "Complaint 2"). Plaintiff responded, "Thank you, I appreciate that[,]" and provided his personal email address.

19. Plaintiff completed all of his Program hours on April 13, 2023.

20. Plaintiff received his Certificate of Competency. A Certificate of Competency is essentially a diploma certifying that Plaintiff had completed the Program and is qualified to work in the autobody collision and repair industry. His Certificate of Competency was conferred on February 7, 2023, the Program's scheduled end date, even though he had not yet completed all Program requirements. Plaintiff was granted additional time to complete the remaining requirements and therefore finished the Program shortly thereafter.

21. Plaintiff received all "A"s in the Program.

22. On April 18, 2023, I informed Cooper that a new complaint alleging retaliation had been filed against him and that GWCC would be conducting an investigation.

23. On May 17, 2023, I informed both Plaintiff and Cooper of the outcome of GWCC's investigation into Complaint 2. The investigation concluded that it was more likely than not that Cooper did not fully implement the supportive measures agreed upon for Plaintiff.

24. Cooper resigned his employment in lieu of termination. Since his resignation, he has not been employed by the District and/or GWCC.

25. Cooper, Mark Woehl ("Woehl"), and Woehl's administrative assistant at the time did not have any authority to investigate alleged discrimination and/or harassment by GWCC employees or students; they are not designated under GWCC/District policy as individuals responsible for receiving or responding to discrimination

and/or harassment complaints; and they are not authorized to make decisions regarding discrimination and/or harassment complaints on the District's or GWCC's behalf.

26. The document attached as Exhibit G to Defendants' Motion for Summary Judgment in *Tyrone Ross v. Maricopa County Community College District et al.* (Case No. 2:25-CV-01671-PHX-SMB) is a true and correct copy of the letter sent to Cooper notifying him of his placement on administrative leave.

27. The documents attached as Exhibits H and I to Defendants' Motion for Summary Judgment in *Tyrone Ross v. Maricopa County Community College District et al.* (Case No. 2:25-CV-01671-PHX-SMB) are true and correct copies of Plaintiff's Certificate of Competency (Exhibit H) and Program Transcript (Exhibit I).

28. This declaration is based upon my own personal knowledge. I would so testify if called to do so.

I declare under penalty of perjury that the foregoing is true and correct.

August 26, 2026
Date

Amy S. Diaz
Dr. Amy Diaz

EXHIBIT 1
to Declaration of Dr. Amy Diaz

Good morning, my name is Tyrone ross, I'm currently a student at gateway community college, I attend the collision car repair class, in which I have not been treated fair. I don't feel welcome in the class and my instructor has made it the worst experience a student can ever encounter. I have to write this letter because I feel like I've been racially singled out, I've been a victim of racial bias, I absolutely feel like I cannot speak my mind freely in class due to my teacher Mr. Cooper. Mr. Cooper has been the most negative teacher I ever ran across, he has not inspired not one person in this class to be here or to do collision repair work. Every time I do a project he always has something negative to say about it vs helping me. For example, when I finished painting my slingshot pieces and showed Mr. Hernandez he replied that "oh Mr. Hernandez did a good job trying to put me down as if I can't do good work myself". When I bought me new spray guns he told me I didn't need them for the level I'm on as if I wasted my time purchasing new paint guns. He has been completely negative towards me since I started this class. He has not given me any donated materials that's for students who can't afford materials, in turn he always asked me if I have money and why can't I afford things which doesn't Make any sense if it supposes to be for us, but yet he won't hesitate to give the materials to [redacted] which is another student that he has been showing favoritism to since the first day of class. I felt completely uncomfortable with my instructor since the day he singled me out in class calling me out just because I couldn't afford materials that comes with this class, and it has gotten more worst from when we first supposedly resolved this issue. He's always talking about how he likes it when he has girl students so when they have their breast out it makes him hornier then when he was a young adult, he always talking about his out of school life which I have been completely uncomfortable with as well because he not only sounds like a prowler but also a pervert. Her told us that's exactly why he shows favoritism and not to us. He has been showing favoritism to one student, [redacted] who has made this class a hazardous working environment, there was an incident last week when the instructor came to help me with a dent in my car, she immediately started cursing them out screaming why is he helping me as if I'm not a student, then Mr. Cooper did nothing about it. He allowed her to scream, curse them out all because her project didn't come out correctly. Now whenever I need help I can't get help because of the situation with her, and the teachers feel more obligated to help her than any other students. There was also an incident where a student used the word (nigger) and Mr. Cooper came up to me and asked me verbatim, "did anybody use this word towards you, I replied no, then he asked me was I ok I replied yes and I wanted to let it go because it was not directed towards me, so if you want to address it based on just the word being used then yes its inappropriate, but then Mr. Cooper proceeded to tell me that using the word isn't the issue because him and his friends use it all the time and he actually said (nigger) then said he just knows when he get to school that word is not allowed to use. So, in turn I felt completely disrespected, I felt completely uncomfortable, because he basically said being a racist or using the word isn't a problem but only when you use it at school. Last week he came up to me and asked me why certain people get to use the word (nigger) and certain people can't, then I asked him what does he mean by that, so he explained that his wife called him a (nigger) which he actually says the word comfortably every single time, that she called him one and then apologized. To be honest I just stayed quite because I was honestly lost why he had come up to me which I am the only black student in class to feel that comfortable with telling me this. Mr. cooper has been very disrespectful on that level and doesn't blink an eye when it comes to telling me racist stuff like this. Every time I speak my mind like today because has allowing [redacted] to do whatever she likes in class, takes the painting booth whenever she wants to and then he set rules forth for us but is allowing her to break each rule, so when I speak my mind about it and tell Mr. Cooper he is not being fair he tells me I'm looking at an illusion, or we don't know what has going through putting up

with her making it ok for him to show favoritism to her and treat me differently. Today he tried kicking me out of class because I'm fed up with the way has treating not only me but the rest of the class. We all pulled him to the side today and told him he's been treating us unfair in this class and all he does is walk around it with excuses. I do not feel that I have gotten what I paid for. I've complained to Mark, the program manager and told him about the two incidents where me Cooper singled me out and took my freshly painted pieces off my bench just to put other students there. I have multiple witnesses who can attest to this as well. Then he started moving my car without permission while I'm there and when I politely asked him to come get me to move my car since I'm here he replied that this is his body shop he can do whatever he wanted then we got into a heated argument there. Just like today when I spoke my mind and called him out on his lies he wanted to try and kick me out the class, so now I want to leave. I don't feel welcome in this class I haven't since day one of this class especially when he referred to my race as "people like you", even when my white friend/student name [redacted] was helping me he would pull him to the side and say, you know your white jokingly, then says it don't look right that you working for a black person. I told mark about it and Mr. Cooper has not changed since. So now I want to find a solution for me to leave the class because I just can't continue with this class knowing I've been a targeted student, racially targeted by all he Has said to me and all he has done to me. he's in my eyes a racist, bias teacher, he doesn't like me because of who I am and how I speak up to defend myself every time. After I write this letter I will try and follow up with taking this the legal route because I have been completely treated unfair, I've been targeted and my freedom of speaking my mind has gotten me targeted. He called us a lynch mob because today we all got fed up and spoke our mind while he still making excuses for his behavior as a teacher, then told me if I don't let it go then I would have to leave for the day so I went to his boss mark because I think it not right him trying to tell me to leave just because I'm bringing up a revolving issue. I'm tired of him saying racist things to me and I'm tired of being a target for him. I don't not want to continue this class, I don't feel safe, I don't feel welcome what so ever. As I sated previously I have more than 10 students who can attest to his racist, pervert, disrespectful, favoritism, negative behavior, ways which I will get for this letter.

To recap I've had multiple conversations to resolve this matter with Mr. Cooper with no success therefore I am writing this account to the best of my knowledge to be accurate and true.

# EXHIBIT G

MARICOPA COMMUNITY COLLEGES | HUMAN RESOURCES

Chandler-Gilbert | Estrella Mountain | GateWay | Glendale | Mesa
Paradise Valley | Phoenix | Rio Salado | Scottsdale | South Mountain

March 9, 2023

Brent Cooper
[redacted]

Dear Mr. Cooper:

**Re: Paid Administrative Leave**

Upon the recommendation of Amy Diaz, Interim College President for Gateway College, you are being placed on Paid Administrative Leave, effective March 9, 2023, pending the outcome of the investigation into the student discrimination complaint.

Pursuant to Section 6.1 of the MCCCD Administrative Regulations,

> An employee may be placed on paid administrative leave of absence pursuant to this policy only under either of the following circumstances:
>
> A. an investigation into conduct that would be grounds for discipline, up to and including termination from employment, is pending and the Vice Chancellor for Human Resources has determined that such paid administrative leave of absence is in the best interests of the employee or in the best interests of other employees or students of Maricopa;

You will remain an employee of MCCCD while on paid administrative leave of absence and shall continue on such status until further notice. You must continue to observe all policies and regulations regarding the conduct of Maricopa employees, and will continue to accrue all rights and benefits as an employee.

For the duration of this paid administrative leave, you should not report to work and must send an email to Mark Woehl, Instructional Services Manager, at mark.woehl@gatewaycc.edu each workday to advise him of all locations and telephone numbers where you may be reached. If you will be leaving the local area, or need to request any type of leave, you will need to request this leave from Mr. Woehl. You

MARICOPA COMMUNITY COLLEGES | HUMAN RESOURCES

Chandler-Gilbert | Estrella Mountain | GateWay | Glendale | Mesa
Paradise Valley | Phoenix | Rio Salado | Scottsdale | South Mountain

should not contact any other campus staff or students while you are on this paid administrative leave.

During this paid administrative leave, you are prohibited from claiming to represent the Maricopa Community College District, or any of its individual colleges.

You will be notified of the findings and outcome of the investigation.

Sincerely,

/s/

Georgetta Kelly,

Chief Human Resources Officer

cc: Mika Davis, Gateway College Human Resources Director
Employee Personnel File

# EXHIBIT H

# GateWay Community College

This certifies that:

Tyrone Dawayne Ross

Has completed the course of study prescribed by the

Maricopa Community College District Governing Board

Awarded this seventh day of February, two thousand twenty-three

## Certificate of Competency

Collision Repair Technician

Amy S. Diaz
President of the College

Steven R. Gonzales
Chancellor

Marie A. Sullivan
President of the Governing Board

# EXHIBIT I

# Gateway Community College Clock Hours Transcript



**Student Name:** **Tyrone Dawayne Ross**
**Student ID:** [redacted]

Birthdate: [redacted]
Print Date: 09/11/2023

**Awards**

Degree: Certificate of Competency
Confer Date: 02/07/2023
Institution:
Plan: Collision Repair Technician (Day)

**Beginning of Clock Hours Record**

**Academic Year 2021-2022**

| Course | Title | Comp Hrs | Grade | Req Hrs |
|---|---|---|---|---|
| ABO 103 | Intro to Auto Body Repair | 164.00 | A | 164.00 |

**Academic Year 2022-2023**

| Course | Title | Comp Hrs | Grade | Req Hrs |
|---|---|---|---|---|
| ABO 104 | Intro to Automotive Refinishin | 164.00 | A | 156.00 |
| ABO 203 | Adv. Automotive Body Repair | 204.00 | A | 156.00 |
| ABO 204 | Adv. Refinishing Fundamentals | 260.77 | A | 156.00 |

**End of Gateway Community College Clock Hours Transcript**

**Ross,Tyrone Dawayne**
[redacted]

This transcript must bear signature and seal to be official.