# Exhibit 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Tyrone Ross,

Plaintiff,

v. Case No: 2:25-CV-01671-PHX-SMB

Maricopa County Community College District, an Arizona public entity; Brent Cooper; Mark Woehl,

Defendants.

DEPOSITION OF TYRONE ROSS

Mesa, Arizona

June 11, 2026

Prepared by:

Audra Littou, CVR
Certified Reporter
Certification No. 50152

CERTIFIED TRANSCRIPT

# I N D E X


| WITNESS | PAGE |
|---|---|
| TYRONE ROSS | |
| Examination by Mr. Pierce | 4 |


## EXHIBITS MARKED


| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Certificate of Competency | 26 |
| Exhibit 2 | Congratulations E-mail | 28 |
| Exhibit 3 | Response to Requests for Production | 30 |
| Exhibit 4 | E-mail String | 42 |
| Exhibit 5 | Letter | 60 |
| Exhibit 6 | E-mail Header | 61 |

DEPOSITION OF TYRONE ROSS

taken on June 11, 2026, commencing at 8:55 a.m. at the law offices of Pierce Coleman, PLLC, 2812 North Norwalk, Mesa, Arizona 85215, before AUDRA LITTOU, a Certified Court Reporter.

* * *

APPEARANCES:

For the Plaintiff:
MILLS + WOODS LAW, PLLC
By: Sean A. Woods, Esq.
5055 North 12th Street
Phoenix, Arizona 85014
480-999-4556
swoods@millsandwoods.com

For the Defendants:
PIERCE COLEMAN, PLLC
By: Justin S. Pierce, Esq.
2812 North Norwalk, Suite 107
Mesa, Arizona 85215
602-772-5506
Justin@PierceColeman.com

Also present:

Alexandra N. Cayton, Pierce Coleman, PLLC
Sandra Garcia, Maricopa County Community Colleges District
Rachel Cox, Clerk
Mitzi Sandoval, Clerk

TYRONE ROSS

the witness herein, having been first duly sworn in by the court reporter, was examined and testified as follows:

EXAMINATION

08:55:48 BY MR. PIERCE:

Q Would you mind stating your full name and spelling it for the record?
A Tyrone Dawayne Ross, T-y-r-o-n-e, D-a-w-a-y-n-e, R-o-s-s.
08:56:08 Q For purposes -- have you ever had a deposition taken before?
A No.
Q Okay. I'm going to explain a few things, at least, from my perspective. Perhaps your lawyer's already 08:56:18 shared some stuff with you. We're not going to talk about that, but I wanted to just give you a rundown of -- of how this -- how this works from -- from my end. And by the way, you can call me Justin during the course of this. My name's Justin Pierce, I represent the Maricopa County Community 08:56:38 Colleges District in the case, and do you prefer that me -- that I call you Tyrone, Mr. Ross, what's your preference?
A Tyrone.
Q Tyrone's good? Okay. A -- a deposition, again, from my perspective, you -- you're a plaintiff in a lawsuit, 08:56:58 and -- and you filed a lawsuit making claims against the

08:57:03 district. This is my opportunity, and really my only opportunity, to ever talk with you about it. Prior to today, we've never met; right?

A No.

08:57:17 Q And so, if -- if I'm looking at the case and trying to understand, you know, what all the bases are for what happened or what's -- what you've alleged to happen, it's not like I can pick up the phone and say, hey, Tyrone, can you explain this to me? You have a lawyer, so this is 08:57:32 my chance to -- to just hear it directly from you and to get from you what it is that -- that you believe happened here that -- that brings us here today; okay?

A Yes.

Q I would say the most, to me, the most important 08:57:46 thing in a deposition like this is, you -- you're obviously, you're under oath to tell the truth. You gotta tell the truth, but if you don't understand a question that I ask, I don't want you to answer it. I only want you to answer questions that you understand. So if I ask a question, 08:58:02 which can happen, by the way, Tyrone, that just doesn't make any sense, I'm all over the place with some question, and if you don't understand it, I want you to say something like, hey, Justin, can -- can you rephrase that, or can you ask that again, or Justin, I don't understand that question, 08:58:19 we're going to have to start that over; will you do that for

08:58:22 me if that happens?

A Yes.

Q All right. You're doing great already, but this other thing, too, which is, we have a court reporter here

08:58:30 that's taking down everything that we're -- that we're saying in this deposition. She can only do that if we have audible questions and answers with each other, and so head nods and uh-huhs are kind of hard for the court reporter to take down. So it's important that -- that everything be

08:58:49 audible and, so that we have a clear record, that you and I don't talk over each other. And by the way, I'm notoriously bad at that, so if it happens, don't feel bad, I'll just -- I'll try and stop, and try and stop. It's human nature, you see where I'm going with a question, you -- you kind of see

08:59:07 the end of my question, and so you jump in to answer it. Similarly, you're not quite done with the end of your answer, but I already can kind of tell where you're going, and I maybe try to jump in. I'm going to do my very best to not do that, and I'll ask you to do the same; okay?

08:59:21 A Yes.

Q All right. Are you taking any sort of medications or under any influence of anything today that you believe might impact your ability to understand my questions and to answer them truthfully?

08:59:39 A No.

08:59:39 Q As I mentioned, this is just my opportunity to try to get from you an understanding of the case. This is not an interrogation. If you need a break at any point in time, you just say, hey, I need -- I need a break, or we have
09:00:00 water here. The only thing I would say with regard to that is, if I've asked a question, I would ask you to answer it before taking a break. That's about it; okay?
A Okay.
Q All right. Why don't you, if you wouldn't mind
09:00:17 giving me just a little bit of background as to your -- well, let's just say, you know, personal background. How old are you?
A I'm 36.
Q Okay. Did you go to high school?
09:00:29 A Yes, I did.
Q Did you graduate from high school?
A Yes, I did.
Q Where was that?
A California.
09:00:37 Q Okay. What year did you graduate from high school?
A A little bit after 2007.
Q Okay. When did you start the -- the program? As I understand it, it was the -- it was the Collision Repair
09:00:52 Program at Gateway Community College. Is that -- is that

09:00:55 what the program was?
A Yes.
Q When did you start that?
A Well, it took me five years to get in, so I -- I
09:01:01 believe it was 2021 and 2022 semester.
Q Okay. So you -- you applied -- you got in in 2021, but it started in 2022?
A I believe I applied in 2021 --
Q Okay.
09:01:15 A -- and then, I think, somewhere in that year that -- it started, like, I believe in April or something like that.
Q Okay. April of 2022?
A Yeah.
09:01:26 Q Okay. What -- what were you doing between the time you graduated from high school until the time you came into the Collision Repair Program in April of 2022?
A Could you repeat that?
Q Yeah, what -- what -- were you just working, going
09:01:41 to school, do -- you know, what was -- what were you doing? I think you said you graduated from high school in 2007?
A Yes.
Q From 2007 until 2022, were -- were you just working, were you going to school, were you doing anything
09:01:55 else?

09:01:56 A No, I wasn't working. I -- I was just going to, like, Scottsdale Community College, and then I went to Arizona State after that.

Q Okay. Did you -- did you graduate with any sort 09:02:08 of a degree from either of those institutions?

A Yes.

Q Okay. What did -- what were your degrees?

A At Scottsdale, it was Associates in Arts, and then at Arizona State, it was Public Administration.

09:02:32 Q What -- what year did you graduate with the degree in Public Administration from ASU?

A It was -- it was during the time that Covid happened, so they postponed it. I believe it was in, like, that time that I was actually going to Gateway Community 09:02:51 College. So around 2021-2022. I had, like, a late graduation.

Q Okay. When did you start the Public Administration program at ASU?

A I believe before Covid, so around 2018.

09:03:22 Q So the -- pretty big difference between Public Administration and -- and collision repair. What made you decide to make that change?

A Well, when I was going to Arizona State, I had a -- I had, like, accommodations that was OCR, it was -- or 09:03:41 D -- DRC, which is Disability Resource Accommodations. So

when I was going for Public Administration, it was -- it was pretty hard, so right after that, I already knew, like, I didn't -- I didn't really want to do that. So I just got that just to graduate, you know, 'cause I didn't want to give up at the time when I was going to Arizona State. And then after that, my uncle, he does -- he has his own business, which was bodywork and stuff like that. And after I graduated, I started to hang around with him a lot more, and I started going to, like, Jehovah Witness Kingdom Hall with him and everything, so that's when, like, I started working with him, and then I started having more love for what he was doing at that time. So that's what, like, initially started me to even, like, learn body and repair collision and stuff like that.

Q And that was, you said, in what year?

A It was before Covid, right, because I -- when I -- when I finished school, I couldn't graduate because of Covid because the school and everything had shut down, and we were at, like, the house and stuff like that. So during those times, before I had graduated from Arizona State, is when I was working with my uncle.

Q Okay. And to understand this timeline a little bit better, as I understand it, you -- you started at ASU around 2018; is that right?

A It was, like, 2017-2018, yeah.

09:04:59 Q Okay. And how long did you spend in the program, the Public Administration program at ASU?

A I think it was probably about, like, a year, I believe.

09:05:17 Q Okay. So when you -- you started in, or about the 2017-28 time frame, and you spent about a year in the program; is that what you're saying?

A No. I think it was 2017-2018 'cause it was right before Covid. But while I was going to Arizona State, like 09:05:55 I said, it was -- it was pretty hard, so that's when I was already hanging with my uncle and doing, like, a lot of car work. And even a little bit before that, because I had bought a -- I bought a car that I really liked. Well, my -- they got it for me for my graduation, so I -- I started 09:06:08 working on that a lot and I started learning how to rebuild the whole car myself with my uncle. So it was even a little bit before that that I actually started working on, like, cars myself because it reminded me of when I was a kid, like a Hot Wheel car, which is this car, Polaris Slingshot.

09:06:24 Q Okay. So then, did you earn your degree at ASU in that approximate year that you were working at -- at ASU in the program?

A I wasn't working at ASU.

Q I'm sorry, what I mean by that is that you were a 09:06:41 student in the program; is that right?

09:06:44 A Yes. I was a student at Arizona State around 2017-2018 because it was right before Covid, and I didn't get to graduate till about 2021.

Q Okay. And is that -- but did you continue to

09:06:59 study in the program through 2021? Were you taking classes?

A No. I was at Gateway.

Q Okay. So did you receive a degree from Arizona State University?

A Yes.

09:07:14 Q And that degree is -- was it a bachelor's, or a -- what was the degree?

A Bachelor's.

Q Okay. Bachelor's in Public Administration?

A Yes.

09:07:25 Q So I guess I'm trying to understand, when were you taking the classes to achieve that degree?

A I believe 2017 to 2018. Right before Covid.

Q So in 2018, you had completed all of the requirements for the -- the bachelor's of Public

09:07:45 Administration?

A Yes.

Q But you didn't receive your diploma until 2021, you said?

A Yes. Well, they gave us -- they sent us the, I

09:07:57 guess, the paper, but I didn't get to actually walk the

09:08:00 stage and graduate, have a full graduation until 2021.
Q Okay.
A Or 2022, because that was after Covid. But I received my paperwork for my bachelor's when I graduated and
09:08:10 completed the class.
Q Okay. That's what I'm -- I guess I'm trying to understand. So you -- your -- you received your bachelor's in Public Administration from ASU in -- on what date?
A I can't remember the exact date that they sent me
09:08:27 the actual paper because it was after that we graduated -- or we finished our courses and stuff. So I don't remember the exact date they mailed me the paperwork.
Q But if you -- if you go to apply for a job, for example, you'll -- they'll ask you in the application, do
09:08:44 you have a -- a degree from a, you know, college, and you would say yes. And they would say, what's that degree? You would say bachelor's of Public Administration. And they would maybe ask you, you know, when you earned that, you know, what -- what's the date of your degree? What do you
09:09:01 typically say?
A In 2018.
Q Okay. So -- so in 2018, you've got a degree from ASU in Public Administration. Did you do anything over the next few years to try to get a job in Public Administration?
09:09:20 A No because the reason why I went to Public

09:09:23 Administration is because at Gateway, every time I applied, it was already full.

Q Meaning the Collision Repair Program?

A Yes.

09:09:33 Q Okay. When did you start applying to the collision repair program?

A If I can remember, it was, like, 2017.

Q Okay.

A 'Cause it took me, like I said, about five years 09:09:42 to -- to get in the course, and when I finally got in the course, I was happy to get in the course 'cause it took five years. Because every time that I went, the -- 'cause I didn't know when to go apply. The class would always be full.

09:09:53 Q Okay. So you were applying too late each time, is that what your understanding was?

A Yes.

Q Okay. So then in 2021, you applied early enough to be able to get in in 2022; is it your understanding?

09:10:07 A Yes, because I had -- I had talked to a lady in the front office, and she gave me, like, basically every -- every detail and when to come to apply. So I was pretty much the first one to apply for the class at that time.

Q Okay. From your high school graduation in 2007 09:10:36 through, well, through today, let's say, what -- what jobs

09:10:42 have you had?
A Well, I don't work. I receive Social Security.
Q Okay. You've been receiving Social Security since 2007, since you graduated from high school?
09:10:59 A No. Since I was a kid.
Q Oh, okay. What's the reason for that?
A For my Social Security?
Q Yeah. Why -- why do you receive Social Security benefits?
09:11:15 A Do to have to answer that?
MR. WOODS: Answer the question.
A It's because of my disabilities.
BY MR. PIERCE:
Q Okay. And what are the disabilities that you
09:11:25 have?
A Well, I have a learning disability, bipolar disorder, I'm schizophrenic, and things of that nature.
Q Was that diagnosed when you were a kid?
A Yes.
09:11:39 Q Okay. How old were you?
A I can't even remember how old I was when they diagnose me.
Q Can you give me a ballpark? I won't -- just ballpark year?
09:11:49 A Seven years old, six years old.

09:11:51 Q Okay. So did you start receiving disability benefits at that time in your life, or was it something that came later after you were an adult?
A According to my mom, that's when -- I don't -- I
09:12:06 don't know. I wasn't of age to know that.
Q Okay. When you became an adult then, did the benefits start coming to you directly?
A Yes, when I turned 18.
Q Okay. Do you -- do you now, or did you previously
09:12:38 receive, like, counseling of any type related to these disabilities?
A Yes.
Q When did you start receiving counseling for them?
A For my disabilities?
09:12:53 Q Yeah.
A It was only when I was a kid.
Q Okay. So before you were 18?
A Yeah, way before I was 18. I was probably about eight or nine years old.
09:13:04 Q Okay.
A It's the only time I ever had counseling.
Q Oh, okay. So then, through today, for -- accept for when you were eight or nine years old, have you ever seen a -- a counselor of any type, psychologist,
09:13:15 psychiatrist?

09:13:17
A Yes.
Q Okay. When was the last time you saw a psychiatrist -- or, tell me what type of counselor we're talking about?
09:13:25
A Well, I seen my therapist last week.
Q Okay. What kind of therapist?
A I don't understand.
Q What kind -- do you know if you see a counselor that -- and I'm going to use the word counselor, but that could be a psychologist, for example. A psychiatrist, for example, can prescribe medication, or -- or maybe it's another type of doctor or whatnot. What kind of counselor are you seeing?
A A therapist.
09:13:56
Q Okay. What is the therapist's name?
A I don't remember his name. I think it's Enrique if I'm not mistaken.
Q Okay. How long have you been seeing this therapist?
09:14:24
A For about a year now.
Q How about prior to this therapist? Were you seeing other therapists?
A Yes. I had another therapist before this one because I was -- I was basically missing my appointments sometimes, and then, like, if you miss your appointments,
09:14:44

then you have to -- to, like, get another therapist. So sometimes, like, when I had got sick, I didn't check in, so I had to get a new therapist.

Q Oh, okay. So, like, you missed appointments, and so they would drop you as a -- as a client?

A Exactly.

Q Okay. Have you had consistent therapist counseling for the last several years? How far does this go back?

A Yes. Probably about -- I was seeing a therapist during the school. When -- when things were happening, I had got a therapist through my psychiatrist.

Q When you say when the things were happening, what things are you talking about?

A At Gateway.

Q Okay. What about prior to that? You said you -- you got a referral from a psychiatrist?

A Yes, I did.

Q Okay. So you've been seeing a psychiatrist prior to that?

A I have been seeing my psychiatrist to prescribe my medicine.

Q Okay. Let's -- let's back up then, and I just want to make sure I understand the timeline right. So I think you said that when you were a kid, you had some

09:15:57 counseling, therapy, whatever, when you were eight, nine years old; is that right?
A Yeah, for different issues.
Q For different issues? When -- when did you start
09:16:07 seeing a counselor, therapist, psychologist, psychiatrist after that, after you were eight, nine years old?
A It wasn't until Gateway.
Q Okay. So you were eight, nine years old seeing a therapist or a counselor. You did not see a counselor or
09:16:32 therapist or -- or anybody again until what year?
A Probably about -- I want to say 2022.
Q You mentioned that you've been -- you've been receiving Social Security, though, since you were 18 years old for disability; right?
09:17:08 A Correct.
Q And that dis -- those -- that or those disabilities relate to learning disabilities, schizophrenia, and bipolar disorder; is that right?
A Correct.
09:17:21 Q Are you required as part of the Social Security benefits to -- to see a psychologist or psychiatrist along the way to continue to receive those benefits?
A No.
Q Okay. So from the time you graduated from high
09:17:46 school until the time you were at Gateway, how come you

09:17:51 didn't go see counselors, or psychologists, or
psychiatrists?
A I don't understand.
Q If you had been diagnosed with these disabilities
09:18:04 early in life, why didn't -- why didn't you go seek
additional counseling relating to those disabilities?
A I don't really understand that.
Q From the time you were 18 until the time you were
at Gateway Community College, did you ever feel like you had
09:18:45 any issues with these learning disabilities, schizophrenia,
or bipolar disorder?
A Yes, my learning disability.
Q Okay. And that was when you were at ASU, and
at -- at --
09:18:57 A Every school that I went to, I was able to get my
accommodations, except for at Gateway. Every school that I
attended, they would allow me to go up in there, fill out my
paperwork, bring all my paperwork that says -- that has
history of my learning disability, and they would
09:19:12 accommodate me with extra time during tests, I would have my
own cubicle where I could be quiet and not be distracted,
except for Gateway. That's the only place that said that
they didn't accommodate the disability resources because it
was a hands-on, I guess, class.
09:19:29 Q Okay. Who told you that?

09:19:32 A Mr. Cooper.
Q Okay.
A He told me that on the second day of class.
Q So I think you said that 2022 is the first time you'd gone back to see a counselor, therapist of any type, I guess, since you were a kid; is that right?
09:20:06
A Yeah, it was -- it was a little after we started -- we started at Gateway.
Q Okay. What -- what led you to seek out a counselor?
09:20:28
A Because I was scared to go to school.
Q When -- when was your first visit with the counselor in 2022? Therapist counselor, sorry.
A I think, when I finally -- when I finally opened up to my psychiatrist and told her that -- what -- what was the reason why I was scared to go to school because she kept -- she -- she noticed something was wrong, but I just -- I just kept it in. So I ended up telling her the reason why I -- I -- I wanted to seek counseling, 'cause I was scared because Mr. Cooper had the -- the security officers and stuff like that following me around school.
09:21:15
09:21:31
Q Okay. I think we might be using the two terms -- I -- I'm using the word counselor or therapist, and you're also referring to a psychiatrist, and I -- I'm gathering from that that -- that maybe you were seeing a psychiatrist
09:21:47

09:21:50 prior to that time?

A No. I see my psychiatrist all the time.

Q Always, going back to when you were a kid?

A Yeah, because she -- she the one who gives me my
09:22:00 medicine.

Q Okay. I want to make sure we're on the same page. It's probably my fault, 'cause I'm using these terms interchangeably. When I say receiving counseling or receiving therapy, that would also include a psychologist, a
09:22:18 psychiatrist. And so now, rewinding, it sounds to me like since you were a kid, you've always been seeing a psychiatrist; is that right?

A Yes.

Q Okay. And then at some point along the way, your
09:22:43 psychiatrist believed you -- you should maybe get some additional therapy from a -- from another type of counselor or therapist? Is that why you started receiving additional counseling or therapy?

A Yes.

09:23:00 Q Okay. And that was the 2022 time frame; is that right?

A Yes.

Q Okay. You mentioned earlier that you said you don't work because you receive the Social Security benefits;
09:23:25 is that right?

09:23:26 A Yes.

Q Have you applied for jobs since you were -- graduated from high school?

A Well, for me to -- they had this program for me to complete my high school credits, so that way I could graduate because I didn't get to walk the stage in high school. So they -- they still allowed me to take a extra class, which was, like, we go work for, I guess, like, the places that they placed us at, and then I get my credits through that. That way I could get my high school diploma. And that's how I got my high school diploma.

09:23:40

09:23:57

Q Okay. So when did you get your high school diploma? When did you earn it?

A In 2007, just a little after high school ended.

09:24:11 Q Okay. So after you received that high school diploma, did you seek out any sort of work, apply for jobs, or anything?

A Well, I think a few of them, but I just, like, I just didn't know how to, like, do the job, so that's when I just, like, I knew that I couldn't work because, like, most of the stuff was -- was hard to fill out, even the paperwork. So I didn't really know what they were talking about on paperwork and things like that, so, you know, I didn't apply for no jobs.

09:24:29

09:24:43 Q Okay. And after you got through the -- the Public

09:24:50 Administration program at Arizona State University, got your diploma, I guess I -- I'm understanding you also did not apply for any jobs after that regarding -- to try to get a job in Public Administration; is that right?

09:25:08 A No, because when I was -- during the school when I was going for Public Administration, it was hard, so I was already working with my uncle and stuff like that with something that was more easier for me, which was, like, learning how to -- to, like, do parts because that's what I 09:25:22 fell in love with.

Q Okay.

A Because, like I said, it reminded me, like, of our childhood with them Hot Wheel cars and stuff like that, and that's the type of cars that he would -- he would work on.

09:25:33 Q So you worked with him starting at about what year?

A Probably about, like, 2016.

Q Okay. And 2016, '17, '18, '19, you're applying for the -- the Collision Repair Program at Gateway Community 09:25:52 College, but you're not getting in 'cause you're applying too late; is that right?

A Yeah, it started in 2017.

Q Okay. So then you get in the program in April of 2022, you started; is that right?

09:26:06 A I believe that's when I -- I started, yes.

09:26:10 Q Was it your understanding that it was a year-long program?

A I believe so.

Q So when you started the program in April of 2022,
09:26:18 did you have an expectation of when you would be finishing the program?

A Yeah, about a year or two.

Q Okay. So you -- you figured, by -- at the time you started in April of 2022, you figured, okay, April
09:26:34 of 2022, I'm hopefully gonna get this -- this certificate or whatever, the whatever you get from that program; is that fair?

A Yes.

Q Okay. So then at that point in time, April
09:26:47 of 2023 -- and as I understand it, you did get the certificate; is that right?

A No, I didn't get that certificate. They gave it to me during mediation.

Q Well, are -- you're aware that the records of the
09:27:00 university are that you have the certificate, it -- when it was issued in February of 2023; is that right?

A No. They never told me. I did not see a -- receive my certificate until I had a OCR in mediation. That's when they told me that I had my -- my paperwork,
09:27:16 which was that, that they gave me right then and there.

That's the first time that I had ever received it, and they told me that I couldn't even receive that because I didn't finish my -- my -- my clock hours. So to my recollection, I didn't even receive it because I didn't get to finish my clock hours, and that's what she e-mailed me and told me.
Q Right, but aren't there also e-mails in which you are e-mailed and told congratulations, you've earned the certificate?
A No, I don't remember that.
Q Okay. We'll pull those, too. Let's go ahead and mark this as Exhibit 1.
(Exhibit marked for identification.)
Q So we've marked as an exhibit to this deposition what -- what appears to be a Gateway Community College certification. Have you seen this document before?
A Yes.
Q Okay. Tell me when the first time you saw this document?
A At the OCR mediation.
Q When was that?
A Probably about after -- after I -- I did the second part of when we made an agreement for me to come back to class, so I -- I believe that was in, like, 2023, or -- yeah, 2323. The year after, later down the line -- the -- yeah, 2023.

09:29:16 Q And we can -- we have documents that we can help with this, too, but tell me if this is your recollection. It -- wasn't it in December of 2022 that you -- that you left class? December 6th of 2022?

09:29:30 A I believe so.

Q And then you returned to class in February of 2023; is that right?

A I believe so.

Q When you returned to class in February of 2023, 09:29:41 you were provided a -- a path to be able to finish the -- the course, is that right, within the next couple of months?

A Yes.

Q So then, with that timeline in mind, when -- does that help you remember when you first saw this -- this 09:30:04 document?

A Yeah, it was probably, like, December of 2023 or something, during the mediations.

Q I -- I -- I'm confused. When you say the mediations, what mediations are you referring to?

09:30:20 A So after -- after the second course, when I was supposed to come back to class and finish my credits, after everything that happened during that time, right after that, I had a OCR complaint or, I think, during that time because the same things were happening when I first made my 09:30:37 complaint after we made an agreement. So then I opened an

09:30:42 OCR case, and then right after I left Gateway is when OCR e-mailed us about having a mediation, which is when I first sent this paperwork.

(Exhibit marked for identification.)

09:31:35 Q This is Exhibit 2. What I've placed in front of you is -- we've marked as Exhibit 2 to your deposition. It is an e-mail chain between Amy Diaz and you; do you see that?

A Yes.

09:32:06 Q Do you see that on Wednesday April 5th, 2023, that Amy Diaz wrote to you, "Congratulations on completing your program." Do you see that?

A Yes.

Q And that she would start a new e-mail who could

09:32:26 tell you how to receive your certificate. Do you remember receiving that at that time?

A No.

Q Meaning, you don't remember receiving this e-mail?

A No, because once I completed the class, I couldn't

09:32:38 even get back into my e-mail. The last thing that I -- the only thing that I remember was when I e-mailed her about what Mark Woehl had said about me.

Q Okay. But do you see that at the top you responded to the e-mail with your personal e-mail; do you

09:32:51 see that?

09:32:51
A Yes.
Q Do you have any reason to -- to doubt that -- that you responded to this e-mail?
A No, I didn't respond to this e-mail. I don't remember even getting an e-mail like this.
09:32:59
Q So this is an e-mail chain that has your name at the top of it from you --
A Yeah.
Q -- to Amy Diaz; correct?
09:33:11
A Yes.
Q So you sent this e-mail to Amy Diaz; right?
A The --
Q "Thank you, I appreciate that, my personal e-mail is," and then it's been redacted.
09:33:22
A No, I don't remember that.
Q So you don't remember sending that e-mail?
A No, I don't remember sending that e-mail.
Q Do you have -- do you have a reason to dispute that you -- that you did send this e-mail?
09:33:33
A No.
Q By the way, in preparation for your deposition today, what did you do to -- to prepare for today?
A Nothing really.
Q Did you meet with your lawyer? I'm not going to ask you about what your conversations were, 'cause that's
09:34:14

09:34:17 a -- that's a privileged thing, but did you meet with your lawyer about it?
A No, I did not meet with my lawyer.
Q Okay. Not over the phone, or have any --
09:34:25 A He called me to tell me the dates --
Q Okay.
A -- of when I -- 'cause we had to reschedule.
Q Okay. Is that the only communication you've had with your lawyer about the deposition today?
09:34:34 A Like, to come to the deposition?
Q Right.
A Yeah.
Q Okay. How long was that conversation?
A Honestly, I can't -- it was yesterday, and he was
09:34:46 just reminding me --
Q Well, again, you don't -- I don't need you to tell me about the -- the --
A Yeah, he just remind me about my deposition.
Q Okay. Did you review any documentation or
09:34:58 anything in preparation for today?
A No.
Q Okay. Did I ask you about -- let's go ahead and mark that as three.
(Exhibit marked for identification.)
09:35:29 Q What I've placed before you is Exhibit 3. It is a

09:35:34 request and a response in this case to discovery documents that we -- that we asked for. Have you seen that document before?
A This document?
09:35:45 Q Yeah.
A Yeah.
Q What -- what did you do to search for -- for documents that would be responsive to these -- these requests that we made?
09:36:02 A I don't understand.
Q So can you -- you can see in the document, we -- we made several requests, for example, for communications between you and any witnesses and such; do you see that?
A Yes.
09:36:12 Q What did you do to search for those things?
A I don't -- I didn't have any conversations with my friends that were my witnesses. We normally call each other or it was at school. We don't have any, like, formal communication, or text messages, or anything of that nature.
09:36:28 Q Okay. So did -- did you search your -- your e-mails or text messages for these sorts of things?
A Yeah.
Q Are you married?
A No.
09:36:43 Q Girlfriend?

09:36:46 A No.
Q Any kids?
A No.
Q Other than the -- what sounds to me like mental
09:37:01 health disabilities, whether it, you know, the schizophrenia, bipolar, learning disabilities, do you have any physical disabilities?
A No.
Q Have you ever been arrested or charged with a
09:37:23 crime?
A When I was a teen, I believe.
Q Oh, just as a juvenile?
A Yeah.
Q So you've -- you've never been charged, convicted,
09:37:31 arrested since the time you were an adult?
A No.
Q When was the last time you were at Gateway Community College?
A Like physically?
09:37:56 Q Yes.
A I cannot recollect that.
Q You finished the program in April of 2023; correct?
A Well, to you guys I finished, but in the -- in --
09:38:08 in the class, I didn't finish.

09:38:12 Q Okay. So to Gateway Community College, you finished in April, 2023; that's your understanding?
A Yes.
Q Did you ever go back to Gateway Community College
09:38:25 after April of 2023?
A I can't remember.
Q Would -- can you think of any reason you would have had to go back?
A Yeah, 'cause I believe I left, like, some of my
09:38:36 stuff that I own there.
Q Okay.
A So I think that would be the only time that I went back.
Q So it would have been right after you finished the
09:38:45 program?
A Probably, like, I think so. I believe so.
Q Like, in April of 2023?
A I believe so.
Q Okay. From April of 2023 forward, have you made
09:39:04 any applications for -- for work in the collision repair industry?
A No.
Q Have you -- or I guess, have you made any applications for work in any industry? Anything at all?
09:39:17 A No. During the time when I was, I believe, during

09:39:21 the second time when I was -- went back to Gateway, Mr. Hernandez was trying to help me apply for other places, which I did, but I didn't -- they didn't, like, never hit me back or anything like that.

09:39:33 Q And when you say when you went back the second time, are we talking about in February of 2023?

A Yes.

Q Okay. Did you have a good relationship with Mr. Hernandez?

09:39:45 A Yes.

Q In -- in anything that you believe has happened to you relating to the -- that gave rise to this lawsuit, do you have any -- was there -- was there anything that Mr. Hernandez did or didn't do that you were concerned 09:40:02 about?

A Yes.

Q Okay. Tell me what that is.

A Well, when I went back the second time that -- that -- when we made the agreement and everything of that 09:40:12 nature, Mr. Hernandez was scared to help me because he -- he said that didn't want to get in trouble and stuff like that. But then we had an argument about that because I told him that he was supposed to be the only person that teach me so that way we wouldn't run into no issues with Mr. Cooper. 09:40:26 But then he, like I said, he was scared to help me, and he

09:40:29 told me that he knew -- he -- he told me that he already know -- that I already knew that they didn't want him helping me, so that's why he didn't help me.

Q Okay. So this would have been in February, March
09:40:40 time frame of 2023?

A Yes.

Q You came back in February of 2023, and it was supposed to be with Mr. Hernandez being your primary point of contact for the class; is that right?

09:40:59 A Yes.

Q Mr. Cooper was still there as part of the class at that time?

A Yes.

Q How often would you see him?

09:41:08 A Every day.

Q Okay. Until when?

A What do you mean?

Q When was the last time you saw Brent Cooper?

A The second time I went to class.

09:41:24 Q Ever?

A No, that's what I'm saying.

Q Yeah.

A The second time I went to class, every day.

Q Oh, okay. So are you aware that he was removed
09:41:33 from the classroom in March of 2023?

09:41:36 A No, because I was already gone by then. He did not -- that didn't happen until I left the school, which I found out during the mediation with the -- with the OCR.

Q Okay. So but the last time, though, that you saw

09:41:52 Brent Cooper, or had any communication with him or any interaction with him, would have been in March of 2023; right?

A If that was the last day I went to class, yes, correct.

09:42:03 Q Well, if -- if the records are that Brent Cooper never went back to class after March of 2023, do you have any reason to dispute that you -- that the last time you saw him or had any interaction with him would have been in March of 2023?

09:42:25 A No, I seen Brent Cooper until the last day I was in class, physically at school. He just was on the other side.

Q Okay. What date was that?

A I -- I don't know the exact dates that I went

09:42:38 to -- that was my last day of -- like, of class, but I could refer to my videos and stuff that I took during that time, and then I can tell you the exact dates.

Q Okay. Do you have reason to dispute that Brent Cooper was placed on -- March 9th -- that -- that Brent

09:43:17 Cooper was placed on administrative leave and removed on --

09:43:20 from Gateway Community College, gone from the campus, on March 9th of 2023?

MR. WOODS: Foundation.

BY MR. PIERCE:

09:43:35 Q You can still answer if you understand. I can rephrase if you need me to.

A Please. Can you rephrase it?

Q The records of the university are that March 9th, 2023, Brent Cooper was placed on administrative leave. My 09:43:55 question for you is, do you have any reason to dispute that that's true?

MR. WOODS: Foundation. You can answer.

A I don't know the exact date that whatever Gateway did with Mr. Cooper, but I know for a fact that I seen 09:44:12 Mr. Cooper every day of the second time that I went to class until I left the school.

BY MR. PIERCE:

Q What date was that, that you left the school?

A I would have to go back and look at it, because I 09:44:28 don't remember the exact dates.

Q What's your best recollection today of when that was?

MR. WOODS: Form. You can answer.

A It would have to be, from what I remember, I seen, 09:45:00 like, I seen Mr. Cooper until the day that the president had

came up there and asked me was I finished, and I told her I wasn't finished. But, you know, they wanted me out of the school, so I was basically sneaking around then to ask her for extra time.

BY MR. PIERCE:

Q So this is in early April of 2023?

A I can't say for -- for a fact. But I know, like, I took the -- the videos on my last day of school because that's when Mr. -- Mr. Hernandez wasn't trying to help me at all 'cause he was scared to help me after what they told him.

Q What videos are you referring to?

A Just, like, me recording myself and showing Mr. Hernandez is helping other students that wasn't even in the -- the school, but he was supposed to be helping me, and he didn't help me at all because of what he told me afterwards. So when he told me that the school didn't want him helping me, he didn't help me at all. Like, he tried to stay away from me, and I had to, like, actually go over there and ask him for help, and we had a big argument because of that. And, you know, afterwards, I told him that I was just a little frustrated because he was my only help from the school and me completing the class, and now he's not helping me. He was helping other students that had graduated during my time, and they weren't even supposed to

09:46:13 be at the school.

Q It -- it sounds to me like that timeline would have been in February, March time frame because Amy Diaz is telling you on April 5th that you've completed your program. 09:46:35 Do you have reason to believe that it was after April 5th, or before April 5th of 2023?

A No, I believe she was just saying that to -- to cover her tracks because like I told you, when -- the day she came to me, I even told her that I wasn't finished with 09:46:50 my -- with my car at all, so right after that, like, it was to a point where, like, I think I was running out of time completely, so I just gave up. I just said -- I just lied to her and told her I was done with the -- with the class and I'm -- I'm okay, I'm just ready to go. So I never 09:47:02 completed the class completely because the second time I went, like I said, I really didn't have no help either the second time, so I just quit and told her that I was done. But that's why I said I think that's her just covering her tracks because I did tell her I was done because of after 09:47:16 what they want -- after Mr. Hernandez told me they wanted me gone anyways.

Q And so, when you told her that you were done, that wasn't true?

A No, it wasn't true. I was just, I was done 09:47:29 fighting. I was done asking, I was done trying to beg

09:47:32 Mr. Hernandez for help, and I even told her myself when she seen me, and I told her you could see my car, it's not completely done. Mark Woehl said that he wanted me out of the school by Friday, and I was just done with the whole
09:47:42 program.

Q That -- was that before or after you got this e-mail from Amy Diaz?

A It was before that. She actually came to -- to the school to see me because of the e-mail I sent her about
09:47:54 what Mark had told Mr. Hernandez about me. Mark told Mr. Hernandez that he wanted me -- and I don't know if I'm supposed to say the exact what he said, but I don't -- I don't want to get in trouble by saying it, but Mark told Mr. Hernandez that he didn't care if I was done or not, he
09:48:08 wanted me the fuck out of that school by Friday. So Mr. Hernandez came and told me that, and I turned around and told Amy Diaz that in that -- in the e-mails. And I told her exactly what was told to me. I said apparently Mark Woehl wanted me out of here by Friday. I'm not done with my
09:48:21 car. And then, all of a sudden, that's when I see her come the next day to check on me.

Q So you were told they wanted you out by Friday. That was Friday, what date?

A I can't remember the exact dates, but that date
09:48:36 that he told me was -- it was probably a Monday or Tuesday,

09:48:38 because my -- my time was ended on that Friday. Whatever that timeline that they had gave me.

Q Okay.

A And I explained to Mr. Hernandez that I wasn't

09:48:46 even close to being done by that time -- by that time frame, and he literally told me Mark said he wanted me the fuck out of the school by Friday. He did not care if I was finished or not. And that's when I told Mr. Hernandez thank you for telling me that, because what I was feeling and how I felt

09:49:00 was actually true, and that's why I was uncomfortable to stay there after that. Again, the second time.

Q And so you never did go back then; right?

A After the second time. After the day I seen Amy Diaz and I just told her I'm good, I'm okay how my car

09:49:12 looks, I'm just ready to go. And then she sent that e-mail afterwards, because I believe --

Q That e-mail being the one that we marked as Exhibit 1; right?

A No.

09:49:19 Q What you talking about?

A The e-mail that I told her about what Mark Woehl said about he wanted me out of the school by Friday. That e-mail I sent to her. And the -- then Mark called me that same night and said what I -- what I -- what he told

09:49:34 Mr. Hernandez, Mr. Hernandez took it out of proportion, that

09:49:38 that's not what he said, he -- I don't know how he got my phone. I don't know how he even got in touch with me, but he texted me and called me that night to -- to -- to try to cover up what he said about me.

09:50:45 Q This is Exhibit 4.

(Exhibit marked for identification.)

Q I've placed what we've marked as Exhibit 4 to the deposition in front of you. This is a continuation, or it might be just -- it might be a new chain with you and Amy.
09:51:27 You're referring to text or e-mail messages. I'm wondering if this is the e-mail message you're talking about. Do you recall -- do you recognize this e-mail chain with Amy?

A I don't remember this specifically, but I know this is my e-mail because my name is on it.

09:52:03 Q At the very top of the chain is a -- is an e-mail from you to her that said -- it's on Wednesday April 5th, 2023, and you say, "Good morning, for my last day how would I clock out just clock out? Or would I need to head to the front office and do that? I know we don't have like a
09:52:23 graduation so I was wondering how do I go about it?" Do you remember asking that question to Amy?

A No.

Q Do you have any reason to dispute that you --

A No.

09:52:35 Q Okay. Does that help you, though, with the

09:52:39 timeline of when your last time was there on campus?

A Yeah, like I -- like I told you the first time, the -- I feel like, during these e-mails, when I was talking to Amy, I was already, like, to a point where, like, I 09:52:50 already had gave up on believing in her and everything. So I think, like I told you the first time, I -- I just wanted this to be over. So I was just responding, like, to, you know, respectfully and just responding just to learn how to, like, just get out of this class completely. Like I told 09:53:04 you, I already know that -- like, for me, I knew that I wasn't going to finish because of what was going on and how it kept playing out, and like I told her, I was -- I was just, in my head, in my mind, I was just, I was completely over it. I didn't have no help, so me responding to her was 09:53:21 just me just trying to get out of this whole situation. And that's how, like, before -- before this and before I even asked her to do another review on the investigation because all they kept doing was denying what I was saying and telling me things, like, what you're saying is unbelievable 09:53:35 or -- or it's happening in your head, so completely, I was just, like, out of it, and I wasn't really there. So I was just, like, just wanted to get out the class. So I feel like all of these e-mails that -- that kept coming in after they kept denying my -- what I was saying what was 09:53:49 happening, was me just responding to them and just trying to

get out the class and just get it over with.

Q Okay. But what I'm -- what I'm trying to understand is just -- is just the timeline of when -- when you no longer went to Gateway Community College. Like, when the last time was that you stepped foot there, and -- and this e-mail is Wednesday April 5th, and -- and you're asking about clocking out. Did you go back to the school ever again after April 5th, Wednesday, April 5th?

A I don't really know if I went back. Like -- like I said to -- I might have went back, I think, that same day, or the day afterwards to just get my -- my belongings.

Q But no later than that?

A I don't believe so.

Q When you went back to get your belongings, do you have a specific recollection of seeing Brent Cooper?

A Not that day. I think, when I -- when I specifically went to get my things, I don't think nobody was in the class. I think they had something else to do or whatever.

Q Okay.

A But I think, even after that, I was going back to the school to do, like, the meetings and stuff like that, and then I would -- that -- they would have me come up to the school with the investigator or something of that nature.

09:55:21 Q So this is April 5th. Does this help you put a timeline of when the last time was that you saw Brent Cooper?
A Yes.
09:55:27 Q Okay. When was it?
A Because -- well, I think it probably was the day before I left, because the day before that I left the school, I was already arguing with him about my things, again, that he wasn't supposed to be doing as far as the --
09:55:49 the -- the -- the criteria was for the -- for -- for me to come back to class. He was already violating it everyday, so that's why I know and remember exactly how -- and then, the last day that I was there, my friends from the second class, they were the ones telling me, like, like, something
09:56:11 about, like, I -- I -- I honestly think that I was there for his last day, to be honest. I don't know if I even seen him that day. But they just said, like, I think, from what I remember was, when I -- when I went to school, they were saying that Mr. Cooper had came in early and got all his
09:56:26 things and left.
Q Okay. But you don't remember how far up until April 5th that was?
A Seeing Mr. Cooper? No. I only -- I know I, like, since I was there I seen him, but now, when I really think
09:56:41 about it, I don't remember the exact date he got his stuff,

09:56:44 but when I made that second complaint, somewhere after that -- alongs the line after that, I believe, but I -- I don't even think that -- that day that I came, I didn't see him physically that day because he had already left with his things and stuff like that. And then somehow, like, they told me, like, something that I don't -- like, I wasn't really paying attention to the students from the second class, but I know they said something like -- like Mr. Cooper came and got his things that day. That's all I can remember from that day, though.

Q So it's sometime before April 5th of 2023?

A I believe so.

Q How long have we been going? I don't want to -- sometimes I lose track of time.

MR. WOODS: About an hour.

BY MR. PIERCE:

Q Let's take a few minutes, and then we can take a break. Tell me about the program itself, the -- the Collision Repair Program. When you started it in, you know, around -- I think it actually started in May of 2022 -- April, May 2022.

A Yeah.

Q What was the general format of the class?

A What do you mean by general format?

Q Of the program. Like, what -- did you take

09:58:15 classes? Was it multiple classes? Was it, you know, lab work? How -- how did it go?

A I believe it was -- on the first day was the -- the, I think -- the first day we, like, had to go into

09:58:32 the -- the classroom. Then he would tell us all about the classroom and stuff like that. And then after that, we would have -- they told us that we had to complete, like, a online program to -- to, like, basically say this is what we'll be learning, so we had to go into that, answer

09:58:51 questions and stuff like that. And then after that, it would be Mr. Cooper first, and then Mr. Hernandez, I guess, from the first beginning of the class, I guess, like, they split the class off. So Mr. Hernandez was, like, the painting side of things of, like, the car, and then

09:59:10 Mr. Cooper would be the more, like, in detail things like taking off door panels and stuff like that, and -- and, like, dent work and stuff like that, and then like -- like welding and things, so --

Q When you started the program, were you given,

09:59:28 like, syllabus or syllabi for the -- for the different classes?

A We was given basically the paperwork that they -- we're supposed to receive on the first day.

Q Which tells you, you know, here's what the class

09:59:42 is, here's what it requires in order to complete the class;

09:59:44 is that right?

A Yes.

Q Did you understand that it required a certain amount of clock hours, or something like that?

09:59:53 A Yes, to my understanding.

Q Okay. That in order to receive the certificate, you would have to meet those -- those requirements of those hours; is that right?

A Yes.

10:00:03 Q Okay. Let's take a quick break. We've been going for a bit. Maybe take a five -- five-or-so minute break.

(Break taken.)

Q All right. Tyrone, let's talk about when you started the program in -- again, it's -- I -- I think the

10:14:45 records show that it started in May of 2022, that April 2022, May 2022 time frame. You start the program, as I understand it from your complaint, that you felt like Brent Cooper was antagonistic towards you; is that fair?

A Can you ask that again?

10:15:13 Q When you started the program, you felt that Brent Cooper wasn't treating you right?

A When I started the program?

Q Yeah.

A No. The first day when I started the program, I

10:15:25 thought Mr. Cooper was a racist.

10:15:28 Q Okay. Well, why did you believe that?
A The first day of class, when we went over the paperwork -- I stayed after with a couple more students to get a more thorough understanding of what they told us on
10:15:42 the paperwork -- he told us that day versus what they were saying to us before we got in class. So we had a few, like, a -- a -- a few questions about, like, like, stuff that they didn't explain to us thoroughly versus what he's telling us today. So the first day, that's how it went, and then we
10:15:59 stayed after. Me, Gonzo, Bryce, and Zane, we stayed after class with him a little bit. All the other students went next door, and we start talking about, basically, the paperwork. And then it went from us talking about the paperwork, to politics, to how the Internet has taken over
10:16:15 people lives, and then it went to, like, homophobicness [sic] 'cause he had a problem with the gay people. And then that's when it went to him talking about how he seen a lynching when he was young. So right then and there, I had a problem with the class, and I even told him I didn't
10:16:29 understand how this whole conversation went from school to you ended up saying you seen a lynching as a kid. So I thought he was a racist since the first day, for sure, after he said that.
Q Okay. So then this is in -- do -- do you think
10:16:41 this is in May of 2022?

10:16:43 A This is the first day of class, whatever the first day of class was. The reason why I remember it was the first day because we were not even allowed to go into the -- the bodywork area until we seen Mr. Cooper. He -- he went
10:16:54 down the line about the syllabus, and then he released us. So it was the first day of class we actually went inside a classroom.
Q Okay. So after that conversation, you said you -- you believed that Mr. Cooper was a racist at that point;
10:17:10 right?
A Absolutely.
Q Okay. When was the next time you had any sort of interaction with him that you felt was -- well, let's just say it, was -- was a racist communication or interaction
10:17:24 with him?
A Well, he -- Mr. Cooper wasn't, like, like, I would say, like, blatantly racist. Like, he was covering it up, so to speak, as -- as we were progressing through the class, because after that conversation we had, he would start
10:17:44 telling us, like, things that you could tell he don't like, or the type of people, because he would say, like, he would put emphasis on, like, a Mexican with tattoos, or -- or he would put emphasis on Blacks, or -- when he explained a situation. So like I said, after the first day, I was a
10:17:58 little uncomfortable with him because I had to talk to him

10:18:01 the second day of class about my disability resources, and like I said, I felt like he didn't really -- he wasn't really concerned about that. He -- he -- he was more so, like, he didn't really -- he -- I don't think he, like,
10:18:11 cared about me having, like, disability resources because he was just waving it off, saying things like whatever you need, I'm gonna accommodate you with these things, and don't worry about going to the office and -- and getting you accommodations, 'cause we don't have that for this type
10:18:26 of -- type of class. So whatever you need, I will -- I will help you and provide that to you.

Q Okay. Was there ever -- ever anything that you didn't get that you needed from Mr. Cooper on that?

A Yes.

10:18:38 Q What was it?

A Basically everything in the class.

Q When you say everything in the class -- I mean, again -- again, Tyrone, I'm looking at the end of the day, you got the certificate. So I'm -- I'm trying to figure out
10:18:51 what -- what you didn't get since you were able to -- I mean, I think we got a transcript here, you got straight A's; right? So if you got straight A's in the class, what was it that you weren't able to do?

A I wasn't really doing nothing. Like, when the --
10:19:06 when it came to the classroom things, Mr. H would be the one

10:19:09 that actually helped me do the things for me, because I wasn't getting no help from Mr. Cooper in the first beginning. So when it came to, like, welding and all that stuff, I wasn't really getting it, so when all the students,
10:19:20 like, go to lunch or anything like that, Mr. -- Mr. H would stay back and help me.

Q Mr. H being Mr. Hernandez?

A Yeah, Mr. Hernandez, correct.

Q Okay. I think you mentioned earlier, it -- well,
10:19:29 it sounds to me like -- like you had a good relationship with Mr. Hernandez throughout the -- the time that you were in the program. Is that -- is that a fair characterization, you and Mr. Hernandez had a good relationship?

A Absolutely.

10:19:42 Q Did he ever do anything to you that you felt was inappropriate, wrong, other than what you -- you've shared earlier that where -- where you said that he wasn't helping you at the end because -- because he was afraid to?

A To be honest, yeah, I do think Mr. H at some -- at
10:20:01 some capacity was wrong because he knew exactly what Mr. Cooper was doing -- Mr. Cooper was doing. And he wasn't necessarily saying, like, don't do nothing about it, but he was telling me, like, don't worry about what he's saying, I'm gonna help you out and -- and that way you can get
10:20:16 through this. Don't -- don't worry about what he's saying

10:20:17 to you, don't worry about how he's treating you, just come to me and I'll -- I'll help you out no matter what. And I felt like he should have been the one, too, as well, giving me help by, like, going to the administration and stuff like 10:20:28 that to help me out even more, knowing what Mr. Cooper was doing to me.

Q So this would all have been prior to -- to your complaint to the administration; right?

A Like, before -- or you mean before?

10:20:38 Q Right.

A Yeah, absolutely, because Mr. Hernandez even had arguments with Mr. Cooper about driving my vehicle. So he -- he knew it was wrong, and he would actually argue with Mr. Cooper in class about it, but nothing changed.

10:20:50 Q Okay. And again, this is prior -- this is before you make your -- your complaint to the administration on December 5th, 2022; correct?

A Absolutely.

Q And so you're -- you're feeling as it pertains to 10:21:02 Mr. Hernandez is that, between the time the class started and when you finally made the complaint to the administration, he should have done more?

A Absolutely.

Q After the complaint was made in December of 2022, 10:21:14 and now administration is -- is looking into things, do

10:21:18 you -- did -- did you think that Mr. Hernandez did anything additional to you at that point in time, or treated you differently, or wrong?

A Yeah, absolutely. Especially after I made the
10:21:28 complaint, because like I told you, he was -- he would tell me how he didn't want to get in trouble for helping me. But even when I made the complaint, the administration, I felt, was -- was even more wrong because the lady was telling me things like it was in my head, I was making up things of
10:21:46 that nature, and then as a student coming to an administration, I already felt some type of way because when I go to them, it goes nowhere. So when I finally felt like somebody was helping me, they was telling me things of that nature, and I'm like --

10:21:58 Q Who -- who is they? You said the lady told you it was in your head?

A It was -- yeah, the -- Ms. Delfi, or whatever, Delfina --

Q Okay.

10:22:05 A -- her name was, or whatever. She was the one that was, like, literally giving me more pushback than anything. She would be the one over the phone telling me, oh, that's impossible. When I'm making a complaint she would say, like, like, things like that couldn't happen, or
10:22:20 like, when -- when we had the -- the agreement Mr. Cooper

10:22:24 stayed away from me. For, like, the first week, it worked. Mr. Hernandez was only helping me, and Mr. Cooper, me and him didn't have no form of contact. When Mr. -- when they took Mr. Hernandez from the classroom -- because another
10:22:37 teacher had got sick, so he substituted to a whole nother area -- that's what Mr. Cooper resumed all of the things that he done. So I would leave the classroom and basically go sit with Mr. H. During the second time, when he was in the other class, I keep going back and forth to him to try
10:22:55 to get help, because I couldn't ask Mr. Cooper because of what he was doing. So that's what I meant by, like, even during the second time, I don't feel like I completed anything because of that reason. Like, I had to keep getting out the classroom and walk down the hall just for
10:23:07 help. It was cutting into my time. Then I'm -- I'm by myself the whole time, and then, like, like Mr. Cooper said -- he said that he wanted to put me in the corner and seclude me. He didn't want me to talk to any students, and they damn near did that. And that's when I -- I felt like
10:23:20 it was a problem, because that's like taking my freedom of speech. He didn't want me talking to any students. They wanted me -- to put me in the corner like I was some little boy to them and things of that nature. So like I told you in the beginning, I was already -- in my head, I was checked
10:23:32 out the whole time. I just wanted to get the class done

because I didn't want to feel like I failed and not have no paperwork because I -- I was going to try to get something after that. So that was the biggest problem with everything, like, I could not complete it, no matter how much I tried, no matter how much they tried to help me or anything. Mr. Cooper was just of control.

Q You've referenced a couple of different times, the time frames -- the two different time frames, like you said, like, when I came back. I want to make sure we're on the same page as to what that is. As I understand it, class again, starts in April, May 2022. December 5th of 2022 is when you bring the complaint, the -- the written complaint to administration, and then you -- you didn't go back to the class. Is that the first time you're talking -- when you say the first time, you're using those words, like, when you mean the first time, you're talking about that time period; right? The -- the time period of starting the class, and -- and then not going back after December 5th or December 6th, of 2022; is that right?

A Correct.

Q So then, after December 5th, 6th of 2022, you don't go back to class. I think you're dropped from the class, and then through administration, they work out a plan for you to come back in February of 2023; is that right?

A No. What really happened was, I was confused

10:25:05 about the whole situation. I never done a complaint of this type of, like, nature, so when -- when I was told I -- since I -- I was scared to come back to class and I was uncomfortable, I did not have to come back to class. It 10:25:19 wasn't until I was dropped that I found out that I was dropped and I was supposed to come to class, no matter if I had reported something, and they didn't tell me that. They didn't tell me that up front. They told me that -- the two ladies that I seen, there was the Vice President of Student 10:25:34 Affairs, and then somebody else. They told me I didn't have to come back to class. So from my understanding, that's why I never came back to class that -- that -- after that. I came back the next day to get my belongings to which, when I pull up to the school, I seen Mr. Cooper driving my vehicle 10:25:47 again, right after they -- I explained to him, like most of the problem, which was that. I pulled up to the school to get my vehicle, he drive it next to a paint booth where it -- my vehicle could get destroyed, and him and Mr. H is arguing about it. And then, so I go straight to the -- to 10:26:00 the office and have the lady come escort me back there because I'm -- I don't understand why he's in my car. And I don't -- I don't want to tell him to get out my car and then we start arguing and -- or -- or things of that nature, so I went to the front and asked the lady if she could come 10:26:13 because I felt uncomfortable completely when I came to the

school and seen that. So then she walked me back there, and that's when I was able to get all my stuff. And Mr. Cooper was trying to harass me and tell -- try to say, like, oh, why are you making complaints, we're friends and -- and things like that when we weren't.

Q What did you think would happen with your status in that program at that point when you -- when you left and didn't -- and didn't come back to class?

A Really, I didn't know. I'd never -- I never been in that situation before. I really didn't know, like, how -- how it was supposed to go. I felt, like, like, how I took it was, they -- they're going to handle this situation, and then I'll be able to complete it through another avenue, which that's why I was more -- more than happy to hear when it was like, okay, they allowed me to try to finish the class even through what I went through. 'Cause I -- like I said, I just wanted to get over -- just to get out of there. I just wanted to just get the class over with, no matter what it took. So during that -- the whole time from the beginning of the class, I was just basically tucking my tail and just taking everything he said, because every single time that he says anything, like call me out in front of the class -- like we had a big ole meeting about the materials. He would say, oh, people like you can't afford these things, and I just felt like that was inappropriate because he can

10:27:27 address us as students who can't afford materials or what they gave it to us for. But he was singling me out versus everybody else because I was asking him, why do I have to keep consistently coming to ask you for free materials and 10:27:38 then you give me so much pushback on it? So then he had a -- a meeting because I was the one who -- who kept questioning everything. So he wanted to assert dominance by saying, like, this is how it's gonna go, this is how it's gonna happen, and I -- and I referred back to the syllabus 10:27:50 and told him, like, you can't do that because the syllabus says that we -- these materials are for people like us. And then he was, like, well, people like you that can't afford things. And right after that, I walked out the class. So I was basically taking all of that stuff. And then Mr. H 10:28:03 and -- and Mr. Woehl would be like, just keep it in-house. If you have a problem, just come talk to me, and that way we can figure things out and it stays back here. And that -- that right there was a red flag to me, because before we even came to the classroom, we already heard about, like, 10:28:17 like, that -- it was a lot of issues with the classroom. So basically, like, just keep it between them. So that's -- that's how we were never, like, we never -- well, I never really understood how to go above them, because every time I went above them -- I thought Mark -- Mark was the above guy, 10:28:33 and what Mark would do is he would -- he would sit there

10:28:36 like you're doing right now. He would hear me out, and then he would tell me to go talk to Mr. Cooper. When I go to talk to Mr. Cooper, he would laugh and make jokes about it and -- and things of that nature, so I would just get up and
10:28:47 just say, okay, and just leave.

Q And this -- to make sure I understand when this was happening, this was during that first time, before December 5th of 2022; right?

A Absolutely.

10:28:55 Q Tell me -- I just want to make sure I understand everything. You -- you've shared a lot of things and I -- and some of it's in the complaint, so I -- I -- I have some of these things already. I've seen this, but from the time that you started the program until the complaint in
10:29:17 December -- December 5th -- in fact, we should probably mark that, the complaint.

(Exhibit marked for identification.)

Q We've marked Exhibit 5 to the deposition. Do you recognize this -- this document?

10:30:10 A I'm assuming this is my complaint.

Q Do you recognize it as that?

A Well, I had -- I had put, like, complaint and stuff on mines.

Q Okay. And take as much time as you need to look
10:30:25 at it to see if -- if it looks like the complaint that you

10:30:28 submitted to -- to the district?
A Yes.
Q Did you send this to the district attached to an e-mail?
10:30:45 A I believe so.
(Exhibit marked for identification.)
Q We'll mark as Exhibit 6. Does this look like the e-mail that you sent where you attached the complaint that is Exhibit 5?
10:31:29 A I believe so.
Q So that was -- I was a day off. It looks like it was December 6th of 2022; is that right?
A That's what it says right here.
Q The subject line is, "Withdrawal from class if
10:31:44 possible." That's what you wrote?
A I believe so.
Q Okay. And what were you hoping to -- when you say withdrawal from class if possible, what were you hoping to accomplish with that?
10:31:59 A Basically, when I made the complaint about Mr. -- Mr. Cooper and the things that was going on in the class, I just wanted to basically drop from where I was at and see if that -- there was any way that I can start the class over without him, or -- or any other -- basically, like I said,
10:32:18 avenue to -- to finish my -- to, like, actually do the class

10:32:21 the correct way.
Q Prior to this date where you sent this -- this complaint in, who had you spoken with about the issues that you were having in the program?
10:32:40 A So he had a -- he had a clerk in the front --
Q Who is he?
A -- it was Mark Woehl. It was a woman.
Q Okay.
A She would -- she knew. I would talk to her about
10:32:49 it, Mr. Hernandez knew, Mark Woehl knew, and Mr. Cooper knew.
Q Okay. So -- and when you say they knew, it's because of communications you had with each one of those people?
10:33:00 A Absolutely. I --
Q So --
A -- would --
Q -- so --
A -- definitely --
10:33:02 Q I'm sorry, go ahead.
A Every time a incident happened, I would tell Mark, and Mark would sit there like you're doing right now, listen to us, and tell us that we -- the only option we had was to go talk to Mr. Cooper.
10:33:15 Q Okay. How many times do you think you had a

conversation with Mark about -- about your concerns between the time you started the program and -- and December 6th of 2022?

A Almost more than ten times.

Q Okay. How about, you said he -- he had a clerk, like a --

A A woman, yes. It was in -- in the front office.

Q Like an administrative assistant, sort of?

A Yes. The lady that was in the front. Like, we -- if he wasn't there, we could make an appointment or tell him, you know, we'll come back or whatever.

Q And you said you spoke with her about it as well?

A Absolutely.

Q Do you remember her name?

A No, I don't remember her name.

Q Okay.

A But I remember who she is if I see her.

Q And what -- how many times did you have a communication directly with her about your concerns?

A All -- same amount as Mark Woehl, because she would see every time I come up there and complain.

Q Okay.

A I would say hi to her, 'cause she was our good friend. Even when she came out the office and I told her what was happening and she tell -- exactly told me what to

10:34:13 do, too.

Q Okay.

A So she knew, like, she basically was saying, like, you got to go above him and stuff like that. But I didn't 10:34:19 really know how to go above him because at -- like I told you, during the whole time when I was going to school and these things was happening, I was a little discouraged on -- on help completely. I didn't believe any -- anyone from the school could help me because every time I would go to Mark 10:34:32 so much that it -- nothing happens. I would go to him so much about complaining about what Mr. Cooper behavior is and the way he treated me versus any of the other students in the class, he would literally just tell me to go back to Mr. Cooper. I even told him how uncomfortable I was even 10:34:47 talking to Mr. Cooper because when he singled me out in front of the whole class, I was so uncomfortable to talk to him about that, that he laughed even when I told him about, you know, I can't afford these things. You're right, I -- people like us can't because -- especially when I only have 10:34:59 Social Security to cover my -- my rent and everything, and I'm just trying to come to school to learn something. You know, I don't think it was right for you to be calling me out just 'cause I can't afford something. He laughed about it. He said I didn't think you was gonna take it serious or 10:35:10 feel no type of way about it. So yeah, I -- I definitely

10:35:12 gave up on the whole school in total about trying to seek help.
Q And so just to make sure I know, Mark Woehl --
A Yes.
10:35:20 Q -- his administrative assistant, Brent Cooper, Mr. Hernandez, and who -- anybody else?
A All the students in my first class, 'cause even -- even they were complaining -- helping complain for me, and that's what, like, I said in the -- my complaint. That's 10:35:40 why he called us a lynch mob, because even my friends started to help and stand up for me, and they was just -- they didn't understand why -- why he was allowed to treat me like that and nothing was happening. So like I said, all of my friends seen it. All of my friends are witnesses, and -- 10:35:54 and that's what was a -- a key thing to me, too. Like, on my initial report, I -- I named almost the whole class, and they only interviewed a few people.
Q You say initial report, are you talking about this document right here?
10:36:05 A Yeah, and -- and the --
Q Exhibit 5?
A Yeah. And they had a whole -- they had me write a whole nother paper with my witnesses on it, and I even told them that I just named the people who was listening to him 10:36:14 being racist with the -- with the word that he was using.

10:36:16 And the people who heard him use the word, not -- not -- not just them seeing what was happening to me, the whole class, 'cause that was the whole class.

Q So you put together people that you thought would
10:36:31 have information about it; right?

A No. They -- they put they self. When they seen me go complain, they told me out of their own mouth that they would go complain with me, and they would tell exactly what was happening, 'cause they were tired of seeing me go
10:36:43 through that. So I never told anybody to go for me. They told me they self that they would go, and that's exactly what happened. We all went there that same day, and we all made a complaint at the same time.

Q So are you aware, during the course of the
10:36:54 investigation into the matter, how many be of those folks were spoken to by the investigators?

A Yes, because they told me.

Q Okay.

A They told me during the time of the class when I
10:37:05 made the -- made the complaint, when I went back up there to get all of my things, they told me that they went, but they were -- they were -- they were basically saying that the investigator wasn't asking the questions that I put on the paper, so that was the last time I got to speak to my
10:37:18 friends from that course.

10:37:21 Q So now, this is the second time you came back; right?
A No. This is the first time.
Q Well, the complaint was made, though, at -- at the
10:37:30 end of the first time you were -- the first period we're talking about?
A No. My friends were still in school. When I made the complaint, we were still in school.
Q Right.
10:37:41 A But they still had a second -- we still had a whole second block to go through.
Q Right. But that investigation is happening during that second block of time; right?
A The first class, yes.
10:37:58 Q Yes. Is -- this Exhibit 5 document, was this the first time you -- you put anything to writing to submit to the district?
A Yes, because that day, when Mr. Cooper used inappropriate words towards me, I walked into Mark Woehl
10:38:27 office and I told him that I was tired of coming to complain to him about everything. He got on the phone, he called somebody that was, I guess, above him, and he -- he said Tyrone said he's done, he's walking out of class today, and he's not taking any more of this shit, and then that's when
10:38:40 I left, because I knew right then and there, like I said, it

10:38:43 was just staying in-house. So I walked next door, I asked the -- the -- the hairdresser guy, and he walked me through all this. He was the one who helped me actually put it in paperwork, because when it -- when it came to Mark, he never 10:38:54 told us to -- to -- to put anything in paperwork. He would say tell me what was happening, like, if he was our therapist. So he was acting as a therapist versus acting as a -- a -- a person who was supposed to write our complaints down. The only time I ever seen him write a complaint down 10:39:08 was the -- the day that I told him, before this was happening, how he used a word that was inappropriate and told me that he had to get head from a black woman when I was supposed to be painting in the paint booth. So when I told him that and he didn't write that down, that's when I 10:39:21 knew, like, he was just trying to act as a therapist. He was just trying to keep everything in-house. So that -- that next day, when that happened, when he used the N-word, is when I -- I was done with the whole class, which is the date that I -- I made this -- this -- this paperwork about 10:39:34 my incident.

Q So when -- you said when he used the N-word, you're talking about Cooper; right?

A Absolutely.

Q And that happened on the -- on December 5th? 10:39:44 The -- the complaint was submitted on the 6th.

A So it happened that -- the day that I made the complaint is the day that he said those words.
Q Okay. Was that the first time you'd heard him use those words?
A Nigger? Yeah, absolutely.
Q And that was kind of a trigger point, then? You were like, okay, I'm done. Is that right?
A No. The -- the -- it's -- because that day, when I was -- when I was done with the whole class, is because that -- those words, basically my whole theory about him being racist, it just completely -- basically I was telling myself I knew this whole time. The way he only treated me, the way that he only did that, and now he's too loose with this word nigger, saying that he can say it. Him and his friends say it at a -- at a bar and all that, just -- it just -- I knew I was right at that point, and that's when I was like, I'm done with this class. Because I've been -- have been telling them this whole time that I was under a racist teacher, and they would just have me keep going back to him. And then all -- everything that I thought about, like, no wonder he was careless about everything that I came to him with my concerns was because he's racist.
Q So tell me about -- tell me about the -- the -- the communication, everything that happened. This would have been on the 5th or 6th -- December 5th or 6th, 2020 --

10:40:55 A That's what it says, yes.
Q -- two? Who was there when this conversation happened with Mr. Cooper that you're talking about?
A Basically the whole class knew about it.
10:41:04 Q Well, I'm asking who was there for this conversation?
A For him saying nigger to me?
Q Yeah.
A A couple of my friends. But it started through
10:41:13 Mr. H. It started through Mr. Hernandez. That's how the word even got brought up. Because a text message from the group chat that the other students had, which I wasn't even in the group chat, it was just the -- the white kids and the Mexican kids and everybody else who was in the group chat.
10:41:28 The word nigger was used in the group chat. One of the students who didn't like that they were using the -- the word nigger told Mr. Hernandez. Mr. Hernandez told Mr. Cooper. Mr. Cooper then came to me after he told a student that I was gonna beat him up for using the words in
10:41:45 text messages that -- he came to me and asked me was I uncomfortable, and I -- I didn't know what he was talking about.
Q And so who -- so Mr. Cooper comes to you --
A Yes.
10:41:54 Q -- to ask you if you were comfortable?

10:41:55 A Yes.
Q And you -- where is this conversation?
A Well, it was -- I was cleaning out the paint booth.
10:42:01 Q Okay. So you're in the paint booth?
A I was by myself. Me and Mr. Hernandez. All the other students were doing what they do, and he just came out of nowhere with it.
Q He?
10:42:09 A Mr. Cooper.
Q Mr. Cooper. So Mr. Cooper comes to the paint booth --
A Yes.
Q -- where you are?
10:42:14 A Absolutely.
Q Mr. Hernandez is there?
A No. Mr. Hernandez is cleaning this booth and I'm cleaning this booth.
Q Okay. So when this conversation with Mr. Cooper
10:42:23 happened, who was present? Like, who was there as part of the conversation? Was it just you and him?
A When he asked me was I uncomfortable?
Q Yeah.
A Yeah, with -- at the time, it was me and him.
10:42:32 Q So when you said a minute -- a few minutes ago

that there was a couple friends that were there, where were they?

A Because when Mr. Cooper asked me if I was uncomfortable, we were walking out from the paint booth. Because when he came up in there, we are already coming out, and Mr. Hernandez stayed right there. So now me and him are walking towards the students as he's asking me this. 'Cause I couldn't understand what he's asking me about and things of that nature. So now me and Mr. Cooper are proceeded to walk towards the -- where all the students are at. And -- and when he -- when he -- when we were walking towards where the students were at, he's like, basically doubling down on everything he's saying. So he -- he asked me am I uncomfortable, I told him I don't know what you're talking about, and he's like, oh, the student used that word. I'm like, what word? And he said, oh, a student used the word nigger. I said whoa, wait a minute. Like, what you mean a student used that word, and why are you even telling me as a teacher? Why are you coming to say the exact word? Why -- why aren't you covering the word up by saying he's using inappropriate words? And that's when all my friends started to come around because it was -- he seen that we're starting to get heated. And then I'm like, Mr. Cooper, just let it go, you know what I mean? I'm not uncomfortable, it wasn't said to me directly, and you're basically telling me

something personal about people text messages that got out personally. That has nothing to do with me. So I proceeded to walk away, and he stopped me and said, Tyrone, you do not have to be a pussy about it or wimp up about it because using the word nigger isn't a problem. Using the word nigger at school is the problem. And that's when I turned around, like, Mr. Cooper, where you going with this? Like, what -- what are you talking about? Like, why do you keep using the word like it's -- like you're comfortable with it? And then he was saying, like, oh, I just don't understand how people can use the word, but I can't use the word. And then I just walked off. Me and my friends walked off. As we sitting over there, he literally comes back and tell me, he said, Tyrone, I wasn't trying to, like, keep it under wraps like -- like I'm scared to use the word nigger. I'm just saying, how come my wife get to use the word nigger and I don't? And I -- I lost it after that. I -- I -- I -- I snatched all of my products up, I snatched everything that I could snatch up right there, and that's when I went to Mr. Woehl and I told him, like, I'm done with this class completely. He -- he just -- he too comfortable being racist. He too comfortable telling me why he can't use the word nigger, and he was already telling my friends that -- that we use to refer to -- to tires as niggers back in the day. He already told me in the beginning of class that --

that -- that he seen a lynching and -- and I -- you know, in my head I'm just like -- like, since the beginning, I'm like, this -- this just can't be true. Like, you -- I'm just going around it like it's -- it's really not happening because I just -- how bad I want to finish the class and -- and just get out of here. But I knew since the first day that something about him was off, and I felt like he was a racist since the first day. And since the first day, it led up all the way from him mistreating me, telling me things about him getting head in the mountains by a black woman, and I just could never understand why he's been specific with color. Like, he could say -- he could have just got head with any woman, but specifically saying a black woman I felt like he was, like, trying to get under my skin and -- and disrespect me. Every time I complained, he would say this is my class, I can do whatever I want to do in this class. And then I told him, like, you can't be driving my car, though. Like, just because this is your class where they gave you permission to teach us, my personal vehicle has nothing to do with you. He would tell me he -- it's his class, if he feel a need to move it, he gonna move it no matter what I say. So I was taking a lot of stuff before that word -- those words was came out, but then it really made me uncomfortable for a white man to tell me he -- he don't know why he can't use the word nigger. Like, that --

10:45:43 that right there just -- it just ended everything for me. And I just, I had no hope in nothing about the school after that, because I had been complaining about this man being racist and it -- the way I'm being treated and singled out
10:45:55 the whole time, and like I said, they all looked at me and was saying this is just an incredible story, or this just can't happen or -- or -- or the things in my head was -- I was making up, that's impossible. So I just -- I was done with it. At that last day, when he said that stuff and
10:46:08 it -- and I was trying to tell him to let it go, it didn't bother me because somebody personal text got out -- which I don't even understand how it got to the teachers -- and -- and that's what was the problem. Like, he was trying to force me to feel some type of way about the word that they
10:46:22 were using in private, and he made it public. And that's what -- that was the problem. I knew right then and there I was done with the class, because I couldn't understand where he was going with that. Why did he force me to feel some type of way about him using the word when he wasn't the one
10:46:33 who used the word in -- in the beginning?

Q And so that -- that prompted you to make sure that this information was -- was elevated above Mr. Woehl; is that right?

A No. I was already trying to elevate it before it
10:46:56 even got to this level. The problem was, was I didn't --

10:46:58 every time I come to Woehl, that's -- that's who they kept referring us to. That's who they said keep going to, and I'm thinking Woehl would be, you know, taking notes down or -- or telling people about it when he wasn't. Like, the 10:47:10 whole time he was not, and then I -- like, that last day, I just knew, like, this had to go somewhere else besides me going -- keep consistently going back to him. And then Mr. Hernandez, you know, on the side telling me just forget about the things he's saying, you know. Mr. Hernandez was 10:47:27 kind of like -- like -- like basically a real friend to me because he -- he didn't say the things that Mr. Cooper was doing wasn't right or wrong, but basically he was saying, like, I know how bad you want to finish the class, and there's no way around it, so just ignore everything he 10:47:41 saying, try to finish, don't give up on yourself, and I'm gonna help you. Any extra thing you need, or anything of that nature, then I will help you. And that's the only thing that I said about Mr. H was he -- the only way he was wrong was because I felt like he knew how to take it above 10:47:54 Mr. Woehl head, and I just felt like he was scared to do that because he was scared to get in trouble.

Q So just, again, going back to the -- the -- the question that I'm asking is, this is the point in time in -- on December 6th that it gets elevated above Mr. Woehl for 10:48:13 the first time; is that right?

10:48:14
A Absolutely.
Q Okay. And then you received several communications with the district management about -- about next steps; is that right?
10:48:25
A Yes.
Q And it was investigated from there; correct?
A Yes.
Q And then sometime between December and -- and February, beginning of February, you have communications
10:48:42
with district personnel that set up a plan for you to come back and finish the program starting in February; is that right? February of 2023?
A Yes. Because I didn't know that I had to come back, so --
10:48:59
Q Did you --
A -- the confusion was when I first dropped the class, and I elevated my -- went to the higher up and I told them how uncomfortable I was to even come back, I didn't think I needed to come back at all. So when I found out I
10:49:13
was dropped and that I wasn't receiving a certificate, that's when I was concerned because I'm like, like, I didn't just want to quit and not be able to, like, receive my certificate. So then that's when they told me that's how we came up with the second part with the plan, was because I
10:49:29
wanted to at least try to get my certificate no matter what

10:49:32 I went through.

Q So that -- that -- that helps me understand a little bit better. Did -- did you think, on December 6th when you left the program, did you think that you would
10:49:43 be able to get the certificate without ever coming back to class?

A No. I just didn't think that I had to go back to class under somebody who was racist for me to finish.

Q Okay.

10:49:51 A I didn't think that I had to completely finish my -- when I dropped out of that class, I told them that I was uncomfortable, I didn't feel safe around him. So I didn't want to go in no environment where I couldn't feel safe, especially going to a school where I'm supposed to
10:50:04 feel safe. So I didn't feel safe at all, that's why I never wanted to complete, so I thought that they were gonna come up with a plan for me to not ever see him again or fix the problem, that way I could come back and complete it, especially since that they didn't even accommodate me on my
10:50:19 disability resource -- resources at all. So -- so technically, I was thinking, like, maybe I could get extra time because I was supposed to in -- in the beginning, but I never even received that either.

Q Well, okay. So then, when you left in December,
10:50:33 you knew you hadn't completed the program; right?

10:50:37 A Correct.
Q You believed that -- that there would be a -- a way for you to complete the program at that point in time that would not involve Mr. Cooper; is that right?
10:50:48 A Correct.
Q And so then, they did come up with a plan where Mr. Hernandez would be your primary point of contact and that you wouldn't have to work directly with Mr. Cooper; right?
10:50:58 A Correct.
Q And I would start in February of 2023?
A I believe so. Correct.
Q And then the idea was, you had a couple of months left to finish the program, and -- and then that's what
10:51:12 would happen; right?
A Correct.
Q Okay. I've heard a lot, and -- and -- well, Exhibit 5, is everything that you wrote in that complaint, is it all true to the best of your knowledge?
10:51:30 A A hundred percent accurate.
Q Was there anything that you left out about -- about your complaints, or did you feel like this was a -- a --
A I left -- I left a lot out because I felt like
10:51:43 the -- the -- the initial, like, what I wrote was just, you

10:51:46 know, good enough to open an investigation, and that way I get to tell them exactly what was going on.

Q Okay.

A But this -- this doesn't fit the every day

10:51:58 treatment that I went through that -- the every day him arguing with me over free supplies that the school supplied for us, it doesn't -- doesn't have every day that he made me leave my keys, doesn't have every day that he drove my car, it doesn't have every day where he tried to tell me whatever

10:52:13 he say goes, or -- and if -- and if I keep talking back to him that he was gonna get me suspended or kicked out of class, it doesn't have, like, all the threads of how I felt when I was being supervised up under him. It doesn't make me -- this -- this doesn't fit everything that I was going

10:52:28 through in class. This just was, like, a summary of everything that I -- that I -- that I was just done with as far as how I was being treated in class, and then on top of him using the word nigger, especially telling my friends that -- the same thing. So this -- this can't fit

10:52:41 everything that I went through in just two pages, but I knew that it was starting to be a lot, and I didn't want to be all over the place because I was already getting help from -- from a whole nother section of the school. And I didn't really want to take him from where he was sitting,

10:52:54 but he didn't have no problem coming to help me. But I just

10:52:56 felt like I couldn't put everything on a paper at that time.

Q When you came back in February of 2023, can you outline for me every incident that you believe happened where Mr. Cooper treated you wrongly?

10:53:29 A Yeah, the first day. The -- the -- the first day I came to the second part, where we were supposed to have a meeting to go over the rules, go over the structure that they made for me to come to class the second time. Fortunately enough for me, I showed up early because, you 10:53:45 know, I was already scared, I wanted to talk to Mark by myself and Mr. Hernandez and tell them how uncomfortable I would be having a meeting with them together, especially with Mr. Cooper. I just so happen to walk up to them having a meeting about how they were gonna retaliate against me, 10:53:59 how they were gonna have, like, turn the students against me because they -- they didn't believe that I was the type of person that -- to -- to -- to not get along with somebody or -- or start, like, not getting along with the students. So they wanted to basically pin another student against me 10:54:14 by -- by, I don't know, like, starting an argument or something like that. But when I walked up, I heard that, I instantly started recording because they started calling me names like I'm a sticker, I'm a runner, and -- and when -- what Mr. Cooper was saying, the things that he was saying 10:54:28 before I started recording was, like, he was basically still

10:54:30 saying, like, this is my class. Tyrone -- just 'cause Tyrone made a complaint does not mean he gonna run everything, and then Mr. -- that's when I started recording everything. And then Mr. Woehl was like, that's why you're
10:54:40 here in the first place. That's why Tyrone keeps making a complaint for you, because you can't come out here and directly saying this is my class, this is what's gonna happen and things of that nature. You have to go -- do it -- basically, like, telling him another way to do it
10:54:52 without him getting in trouble and making it look like he's the one that's doing that. So, you know, walking in on the first time, the first day, I already knew they whole plan or -- or what they were going to do to me, and I -- I -- I still couldn't believe it. In my head I'm -- I'm just,
10:55:06 like, I honestly was, like, appalled because I -- I just couldn't understand. What did I -- what did I do for them to -- to be doing all this to me? I didn't understand where I went wrong at and -- and -- and things like that. Like, why -- why are y'all trying to, you know, make other
10:55:21 students befool me or other students dislike me, or y'all want me to get kicked out of class? And it's just, like, like, I don't understand. I -- I never understood it. That's why I was just trying to process everything, 'cause I'm like, I just went through all of this, and the -- the --
10:55:35 the first thing the school kept telling me was, like, oh,

10:55:37 we're not gonna have him retaliate against you. They gonna protect you and all this, and the first day I come back to class, it's nothing but retaliatory talk. I can't even -- I did even feel comfortable. The only reason why I stayed 10:55:48 that first day was because of Mr. Hernandez, and I told Mr. Hernandez that I heard them talking about me and everything. I pulled him right out of there, and I'm like, like, like, what's going on Mr. Hernandez? You just allowing them to, like, make a plan for them to get me 10:55:59 kicked out of class and everything? And Mr. Hernandez didn't say nothing but walk away, so I already knew when I first came up there, they tried to force me to do things that I already knew that I -- that they knew that I didn't want to do, which was Mr. Cooper's friend car. So I'm like, 10:56:10 I'm not gonna do anything for Mr. Cooper when he's the reason why I'm in this situation. So Mr. Cooper wanted me to do his friend car, or -- or else that -- they said I wasn't -- wasn't gonna be able to come in to -- to class. So my whole issue with the -- with me arguing with him is, 10:56:24 I'm arguing for nothing, because the deal we made was I come to class and finish my car, I finish the things that I need to do for -- for my sake. And then, when I come into class, they -- they give me an ultimatum saying it's either you do this car or you ain't gonna be able to come to class. And I 10:56:41 never -- I never agreed to that. I never agreed to that --

10:56:43 that -- that deal that they made for me to go back to class. That wasn't nowhere on the deal. So when he tried to come the first day and force me to do things, we had a big ole argument, and I had to wait like almost two hours just to go
10:56:54 in class because I was -- I was saying -- I was denying all of it, but they wouldn't allow me to go back to class without saying I was gonna do the car. And that's when I was feeling like I was forced to do that car, and that's why Mr. H helped me. So I wasn't even gonna be able to get back
10:57:06 in class the first day because they kept trying to make me do something that I wasn't supposed to do, and they knew I was gonna push back on it because I had heard them say that before. So I automatically -- I automatically knew in my heart that I was not gonna be able to go to class anymore
10:57:17 because I knew I wasn't gonna do that car, and I didn't care what they had to say. I didn't -- I told them specifically, like, you know that that's not part of my deal. My deal was to come finish mines and whatever I need to finish, and Mr. H would help me. But Mark Woehl and Mr. Cooper forced
10:57:34 me to do the -- do the -- do the car 'cause I knew I did not want to do that car, and I -- it didn't have nothing to do with my deal, so right after that, I made the complaint about it. Like, they're -- they're forcing me to do a car that I do not want to do, and Ms. Delfine [sic] that I spoke
10:57:44 to tried to, like, give me pushback about it, like, well,

10:57:47 you still did it, so technically you -- you -- you -- you -- like, basically saying, like, since I did it, I -- I can't say I didn't have a choice. But I'm like, that's not right, because I didn't have a choice. They would not let me back
10:57:59 in class if I did not do the car Mr. Cooper wanted me to do, and that's how it went. And then, since the first day, it was incident after incident because I had -- I -- I was like, I didn't understand why I'm forced to do this car when I only have a certain amount of time to finish my car, and
10:58:12 in the second part of the class, they didn't give me a long time. So if I was to do this car, that's already two -- almost two and a half weeks out of my time from doing what I was supposed to complete. So halfway already, I was already cut out halfway of my -- my things that I needed to learn
10:58:26 because they forced me to do that first car. And every day Mr. Cooper would say that I couldn't use the paint booth because they said that -- that -- that something was happening with the paint booth, so I was basically being held back because I could not start the class without doing
10:58:39 this car. So the longer that they was holding the paint booth, I -- I -- it took me, like, two weeks to do the car with Mr. H because every single day there was some -- a reason why I couldn't use the paint booth that day. So basically the first two weeks of even that, from they little
10:58:51 plan that they had, I couldn't even touch no car because the

10:58:53 paint booths enabled me to, 'cause Mr. Cooper said I basically couldn't use the paint booths.

Q And -- and this is in the beginning of February of 2023; right?

10:59:00 A The -- the first day of the second class.

Q Okay.

A When I -- when I --

Q When you came back?

A -- went back. From that day forward, it was a 10:59:07 problem, 'cause I told you, I was only supposed to come back for a certain amount of time to finish, to get this paperwork. My car was the -- what I was supposed to complete, but since they wanted me -- forced -- they tried to force me to do that to get back in class, it almost took 10:59:21 me a month to do this car just to get back to my car to complete, 'cause I could not touch my car until they wanted me to do that car. So it already took almost half of my time at -- from the second block to complete my class.

Q And you said that it -- the -- the treatment 10:59:39 that -- that you felt was wrong started on the day that you came back because you came up on a -- on a meeting -- like, explain to me how you -- how that happened, how -- how you -- how you came up on that with -- and how do you know that it was Mr. Woehl and Mr. Cooper, they were having the 10:59:56 conversation?

10:59:57
A Can you rephrase that? I -- I really don't understand that.
Q You said the day that you came back --
A Yes.
11:00:02
Q -- you -- you were -- you came up on a conversation that they were having?
A Yes.
Q Okay. Where were they having that conversation?
A Well, I was supposed to be, I think, at school -- 11:00:12 I want to say about, like, 7 o'clock, right before the -- the class starts, but I showed up, like, 30 to 40 minutes earlier than that. So I was -- my -- my mission was to just -- to go see if I could talk to Mr. H and Mr. Mark Woehl early so that way I could tell them how I felt, and I 11:00:32 didn't really feel comfortable with having a conversation with Mr. Cooper. As I'm going into the office -- there's two sections of the office, there's the first part, and then there's a second part that Mr. -- Mr. Cooper is in the second spot, Mr. Hernandez is in the first spot. Mark Woehl 11:00:49 is sitting there. When I -- right when I was about to walk into their office, and they -- they didn't even see me right there, they got to talking about me and everything, and that's when I started recording. I backed right out the office at the front door, and I started recording. So I 11:01:01 physically seen exactly where they were sitting, exactly who

was in there, and -- and at exactly the time that I was supposed to go. I wasn't even supposed to go that early. They was expecting me to go when class, like, ten minutes before class started. So I showed up early, and I was gonna go up in there and talk to them.

Q So -- so you actually saw them in there?

A Physically, yes.

Q Okay. Do you know if they saw you?

A No, they did not see me at all.

Q Okay. How do you know that?

A Because when I walked into the office, they were facing forward, and then I heard them talking. Once I heard my name, I backed right out. Like, I was literally about to walk in until I heard my name, and then I backed out. I'm like, why are they talking about me, you know what I mean? Like, what's going on? And then, that's what I started recording, because that's when they started talking about me on how they wanted to retaliate against me and everything.

Q And then you -- were you in the hallway at the point?

A Yes, I was.

Q Okay.

A I was literally standing like this with my phone out, almost, not even to the door. I was literally on the side of the door. The camera was right there, and they --

11:01:51 I'm pretty sure they seen me right there.
Q You said they saw you. Who?
A The cameras.
Q Oh, okay.
11:01:58 A 'Cause I was standing -- it's a camera standing directly in front of Mr. Cooper's door.
Q Okay.
A I mean, Mr. Mark Woehl's door.
Q And then -- and I think that I'm -- I'm pretty
11:02:06 sure -- is that the recording that is in Mr. Woehl -- his -- there was a deposition for Mr. Woehl in this case. Do you remember -- I think you were present at that; is that right?
A The -- the one on the computer?
Q Yeah.
11:02:22 A Yes.
Q And he -- he was presented with that recording during that deposition; right?
A Yes.
Q Okay. Why did you -- why did you decide that you
11:02:39 wanted to record that conversation?
A Because I heard them calling me on my name. I heard them calling me names.
Q Why didn't you just go in and talk to them about it at that point?
11:02:52 A Because I already knew that the teachers and

11:02:54 nobody believed me. None of the -- the higher-ups believed me. They kept -- like I told you, they kept saying things that I made up -- that -- that I was talking about was made up. So this was my piece of -- my peace of mind, knowing 11:03:05 that I wasn't lying and that I needed to record it so somebody would believe me or somebody knew -- know exactly what I was talking about it and I wasn't lying about this. So that's why I started recording for my safety, and I knew from my own -- my own -- my own well-being that I wasn't -- 11:03:18 I wasn't just hearing or seeing these things. So that was my peace of mind that my safety, like, I knew exactly that -- that -- what they wanted to do. And when I told them -- when -- after I recorded it, I called and made another complaint, and they did not believe me. They did 11:03:33 not believe that -- that I had a recording. They didn't believe that that's what they were saying. What -- what that lady said to me on the phone was well -- well, when it come to law, you can't record nobody without they permission versus saying okay, let me -- let me hear the video. Let me 11:03:46 see what you're going through, because you have been making complaints. That's how I seen it. Like, I felt like they should have helped me versus always pushing me -- giving me pushback about -- that I was lying about things that was going on. So that recording was for me to know and for 11:03:59 everybody else to hear that I was not telling no lies about

11:04:02 the situation.
Q So you said you talked to somebody about it who told you that it -- that you weren't allowed to make that recording?
11:04:09 A Yes, I did.
Q Who -- who said that to you?
A The lady that I actually referring to? What's her name? I think it was Delfine Wilson.
Q Okay.
11:04:18 A Delfina Wilson, or however you pronounce it.
Q So the -- the recording, and I've heard it before, the recording kind of abruptly ends. It looks like you're, like, either turning away to walk away and turn it off. How -- how come it ended that way?
11:04:42 A Because I was honestly tired of hearing them talk about me. I was -- I -- I just had enough, and that's when I interrupted them, and I just told Mr. H -- I pulled him to the side, like, I'm not doing this. I'm not coming to school. I heard you guys talking about me and everything. 11:04:52 I just -- I literally just got tired of them talking about me because Mr. -- Mr. Mark Woehl was -- was calling me out my names and stuff like that. He was calling me stickers and stuff like that, like I'm a thorn and things of that nature. So right after that, I just, I -- I was still in 11:05:07 disbelief, and I just -- I just cut it off. I'm like,

11:05:09 I'm -- I'm sick of this. Like, I'm done with this whole recording. I'm done with the school, because now, when I thought that I was gonna be okay the second time, I know I'm not because of this recording. I know their mission, I know
11:05:19 their intentions and all of that, so I know they were going to retaliate against me, and that's supposedly -- that I was protected under retaliation. Like, I -- they told me if I make a complaint, that I'll be protected away from all of this, and that was absolutely a lie.

11:05:33 Q So you didn't want them to know that you were recording them because if -- if they knew you were recording, they might not have said what they said?

A Exactly. So what I did was, right after that recording, right after I told Mr. -- Mr. H and everybody, I
11:05:45 told Mr. H that I heard them recorded, I called -- I -- during that day, I called the -- to make another complaint, and that's when I spoke to Delfina Wilson. I told her exactly what I heard, and she told me that you can't record people or stuff like that. Like, basically just giving me
11:06:00 pushback and saying it won't basically stand up in court. That's what she was telling me.

Q Did -- did she tell you that it was illegal?

A Yes, she did.

Q Did you know that it was illegal to --

11:06:11 A No, because --

11:06:12
Q -- to -- to -- to surreptitiously record --
A No, because --
Q -- people?
A -- the investigate -- I don't mean to cut you off. The investigator told me that that's not true. He told me that if I basically heard my name being brought up or spoken about, then I'm allowed to record. He told me that on the phone.

11:06:18

Q Okay. Are you -- so you haven't looked into the -- the legality or not?

11:06:32

A No. I believe them.
Q You're not -- you're not aware that in Arizona, it's a Class 5 felony to surreptitiously record people's conversation unless you're a party to it?

11:06:48

MR. WOODS: Foundation. Don't answer.

BY MR. PIERCE:

Q Well, I think if he understands the question, he can answer it. I can rephrase it?

MR. WOODS: Foundation.

11:06:56

BY MR. PIERCE:

Q Do you know whether it's a Class 5 felony or not in Arizona to surreptitiously record people's conversations if you are not a party to it?
A I don't know what surreptitious means.

11:07:14

Q Secretly.

11:07:19 MR. WOODS: Foundation.
A I really don't understand that.
BY MR. PIERCE:
Q So I'll use the word secretly instead of
11:07:31 surreptitiously. Are you aware that in Arizona it is a
Class 5 felony to secretly record two people's conversation
unless you are a party to that conversation?
MR. WOODS: Foundation. You can answer.
BY MR. PIERCE:
11:07:50 Q Whether -- if you -- the question is if you know
that or not?
A From -- from what I know is what the investigator
told me. The investigator told me, after Ms. Delfina told
me that I could not record somebody, he said that if I hear
11:08:03 my name and I'm supposed to be at that meeting, that I'm --
that I can record. That --
Q Were -- were you supposed to be at that meeting?
A Yes. I was told to show up at that meeting at a
specific time, and I showed up earlier. So yes, I was
11:08:15 supposed to be in that meeting.
Q Okay.
A And that's what the investigator allowed me to
understand. Because I didn't understand if my name is being
brought up and they talking about retaliating on me in the
11:08:26 same meeting that we were supposed to come to an agreement

11:08:28 on, why I couldn't record them. And that's what I told the investigator and Ms. Delfina Wilson. She was the one who was saying that, well, that's -- you can't do that. You can't record people without their knowledge. And then the 11:08:40 investigator said that's not true, because, again, you're supposed to be in that meeting, and you heard your name.

Q The investigator for --

A For Gateway Community College.

Q Okay.

11:08:47 A It was -- it was a male. He the one who told me that that wasn't true.

Q Okay. Going back to what -- what happened from the day you came back, I think we've explained -- you've explained this situation where you came upon that -- that 11:09:08 meeting between Mr. Woehl and Mr. Cooper, from that point until your last day there, what other incidences of mistreatment do you believe you experienced?

A Well, as I told you, when I first told you about the second time, one, Mr. Cooper was enabling me from using 11:09:41 the paint booths to where I could complete the car that he wanted me to complete --

Q Okay.

A -- and get back to what I was supposed to do. So that's one. He knew that, like, basically how to go around, 11:09:49 not making it look like he was mistreating me, which was,

one, the paint booth, because he had -- he had control over that. Because Mr. -- Mr. Hernandez wasn't teaching the first block of that second class, and I fell in -- in -- in the first block of the second class, which was Mr. Cooper's class. So now I'm on the -- the -- the right side of the classroom by myself. And then Mr. H is just basically come -- coming on the fly to -- to help me and stuff like that. Then they moved him, like I said, to -- to the -- to the -- like, where another teacher was sick, so he covered for them, and basically -- so I was just floating around the --

Q Can -- can you pause just a second? When you say there was another teacher that was sick, so Mr. Hernandez went to cover for that teacher --

A Yes. Mark --

Q -- correct?

A -- Mark Woehl had made him substitute for that class.

Q How long -- like, if you started back up in the beginning of February, how -- how long was it before that happened with Mr. H?

A Like, the second day.

Q Okay. And then did that other teacher come back and Mr. H go back to --

A Not until -- not until almost, like, my last week

11:10:54 of school. So Mr. H was over there the whole time.

Q So for about a month?

A Yeah, absolutely. And that's why I felt like -- like I didn't understand that part either, because Mr. H was supposed to be the only one helping me complete the second part. So if they take Mr. H out the first day, which well -- well, Mark did. Mark moved him to substitute over there. Then I was over there just basically doing nothing by myself, which is, like I said, I heard them say that. I heard them say that before I started recording, that he just wanted me to myself on the right side, secluded away from everybody, not talking to nobody. And I -- like I said, I didn't understand that, because now it -- it enabled me from even getting to my car. So I was literally just walking around there for the first, almost two weeks, almost a month because I could not access the paint booth to finish the car.

Q Okay. So other than Mr. Cooper, was there anybody else that you believe engaged in conduct towards you that was inappropriate based on race?

A Can you repeat that? Like --

Q It -- well, you talked about Mr. Cooper being a racist; right? That -- that was your belief; right?

A Yes.

Q Was there anybody else that you felt treated you

11:12:09 improperly because of your race?

A I can't really say that, but I can say that what I was bringing to them, which is the -- the people that's higher than Mr. Mark, I felt like this was a uncomfortable situation, because it was about race. So I felt like they just didn't -- they was trying to cover it up as much as possible because I -- I -- what I'm saying was the truth, to where, like, every time that I would -- like I said, I would go to them, it would be too much pushback as far as me being a student trying to look for help and a safety net, which they -- which they have in they syllabus and all of that and stuff like that, saying that we can come forward and everything. So I feel like that, for me, made me feel like it was about a race thing, because even when I went above the people that I said was treating me wrong, I got the same treatment from them without even having to see them. Like, they were, like I said, telling me things were in my head and it couldn't be true, and stuff like that versus, like I said, actually giving me aid or giving me a safety net, saying like, I -- I -- I -- we -- we're not gonna say we don't believe you, but we're gonna do an investigation, but at the same time, you know, help you out and accommodate you in ways that we -- that they didn't, and they didn't do anything of that nature. They just kept telling me that it was unbelievable and -- and -- and that I couldn't record

11:13:21 people and -- and -- and -- that's talking about me and trying to retaliate against me. So -- so in my opinion, yeah, it was -- for me, that's exactly how I felt it was about race, because how come they didn't do nothing about
11:13:31 it? How come they was the ones that was supposed to correct the situation, but they gave me more pushback than -- than anybody at the school?

Q So that -- I guess, to understand, though, the difference between, like, Mr. Cooper and the others, it --
11:13:45 is it fair to say that -- that your concern with the way Mr. Cooper treated you was that he treated you the way he treated you because of your race? The others didn't do enough to -- to address the situation with Mr. Cooper, but they didn't, like, say anything to you racist or anything
11:14:03 like that; is that fair?

A Yeah, I believe, it was all a -- for me, I believe all of it was about race because --

Q Well, let me pause you then 'cause -- so do you believe that everybody involved in the situation, they're
11:14:15 all racist?

A I felt like, during the whole -- that everybody that was involved in the situation was uncomfortable that Mr. Cooper was racist and they didn't want it to get out, because every time -- like I said, every time I asked and --
11:14:25 and -- and -- and I'm not racist, but they were white. The

11:14:29 people that I talked to was white, and they were the ones giving me pushback after I told them this racist stuff was going on. So in my opinion, I'm -- I'm just trying to figure out -- it felt a little uncomfortable coming to white

11:14:38 people with this racist situation about a racist teacher and they not doing nothing about it, so I feel like they didn't care that it was race. I'm not saying that they're specifically racist, I'm just saying that they didn't care enough about it being a racist situation to where they want

11:14:51 to stray away from it is as much as possible and -- and how -- how I grow up, especially in -- in -- in the Kingdom Hall, a -- a person that turns the head of -- of somebody who is racist is just as racist as them. It's -- 'cause it's like, they -- they basically turn their head from

11:15:06 something that's going on and basically try to make it seem like it's not going on, it's not happening to me. So they basically was come -- trying to confuse me as if nothing was happening, this can't be a racist situation, so I mean, from -- from, you know, coming to them, like I said, nothing

11:15:21 happened, and they didn't really care. I mean, how else am I supposed to take it?

Q Did anybody other than Mr. Cooper ever say anything racist to you?

A Not that I know of.

11:15:35 Q Did anybody other than -- well, strike that.

11:15:45 Mr. -- Mr. Hernandez, did he -- how long -- when did you first meet Mr. Hernandez?

A I met Mr. Hernandez, I believe, right before the -- I was signed up for the class, 'cause they were -- 11:16:04 they were the -- when I went to the class, they were walking back there and, like, introduced me to the class. And then Mr. Hernandez was there to, like, basically explain the whole class to me, like, what they do and things of that nature, so that's the first time I met Mr. H.

11:16:18 Q Okay. Just like the first day of class, or before? Before?

A That was before they were -- they were -- when I went, they are already having another class, so when I went early to apply this time, she basically let me walk back 11:16:29 there, and get to look at what they were doing and stuff like that, and that's when Mr. -- I met Mr. H.

Q When did -- when did you first meet Mr. Woehl?

A It was not until we -- I actually started the class. I didn't meet Mr. Woehl until the first day, like, 11:16:43 when I went into this little -- little situation with Mr. Cooper, and I went to his office.

Q So Mr. Cooper and Mr. Hernandez are the -- are the key instructors for the program during the time you were there?

11:16:57 A Yes.

11:17:25
Q We've been going for another hour? Okay. Let's take -- let's take five.

(Break taken.)

BY MR. PIERCE:

11:42:07
Q All right. Tyrone, when -- as you look back on -- on your time at Gateway Community College, everything that happened, what -- what do you believe should have been done differently to address your situation?

A Do you want me to be completely honest with you?

11:42:36
Q I would appreciate it.

A I don't think there's no way to address racism. I just think you just, for me, I could have just probably just quit school way earlier than that and not basically believe what they told me. Like, you know, just -- just walk away from it and stuff like -- like that. 11:42:54 I just feel like there's -- there's -- there's -- racism is -- is in life, and I don't think there's really no solution, to be honest. I just think you have to be a good person and just want to be a good person and want to treat other peoples how you want to be treated. 11:43:10 So I don't really think there was no solution for racism, though.

Q And -- and I understand where you're coming from on that, but maybe I'll ask it this way then. I mean, obviously you brought -- you brought a lawsuit against the district based on it. 11:43:26 What -- what could the district have

11:43:28 done differently that would have caused you not to bring this lawsuit?

A Honestly, I -- I just -- I feel like there's nothing they could have done, 'cause they would have had done it. If -- if they could have done it, I think, like, for me this is new. I never -- I never, like, I never been in this situation before. I never, like, had a -- a teacher or anybody, like, that I, like, went to school with treat me this -- like, treat me this way or treat me racist or -- or because of my race. But I really don't think there's, like, I don't think there -- there was a solution for -- for -- for racism. I just think probably just not going to that school, probably never attending the school probably would have been, like, my best bet. I don't -- I don't -- like, at the time, I don't -- I think they -- I don't know if they really wanted to -- to, like, help me. I can't really sit here and say that they were a hundred percent on my side, because they -- they weren't. And especially the way I was feeling, and, you know, going through all these -- these -- these hula hoops to -- for me to -- to -- to, like, basically get justice for myself. I don't think that they wanted to, so I don't think there was no solution because of that.

Q But they removed Brent Cooper -- you know Brent Cooper does not work for Maricopa County Community College

11:45:03 District; right?
A Well, again, I didn't really know that he did not work there until we had the OCR meeting. So that was the first thing that they wanted to make clear to me when we
11:45:15 went into the meeting, and at that point I felt like it didn't really matter that they -- they fixed the problem after I wasn't there. I -- I mean, like, you -- you guys saved the next -- probably next black person that -- that's a person of color coming in, but you didn't save me, or you
11:45:30 didn't fix the problem. Y'all didn't stop the retaliation -- retaliation or the things that he brought that was racist or the way he treated me. They never fixed that. They never even had a solution for that. That was after I went to the school and after I was out that
11:45:44 Mr. Cooper was, I guess he was let go.
Q Right, but you understand that -- that there was a process to investigate to get to that point; right?
A No. I didn't -- I didn't understand the process thoroughly, I just knew that I had to complain and they were
11:46:00 going to open an investigation up about the complaint. I didn't know anything about a process of a teacher being disciplined or -- or any disciplinary ways that the school would take action against a teacher.
Q So your complaint to the district was -- was
11:46:17 presented in December of 2022; correct?

11:46:23
A Uh-huh.
Q And Brent Cooper was removed as a teacher in March of 2023, a three-month time frame; does that sound right?
A I didn't -- like I said, I didn't know when he got
11:46:38
fired or if he got fired until I was in the OCR meeting. That's the first thing that they made clear to me. That -- that he was no longer in the school and that they had corrected the situation, but like I said, I was not attending school at that point.
11:46:53
Q But, so my question is, do -- do you believe that -- that in receiving the complaint in December, investigating it, and him being removed by March is an unreasonable time frame to resolve the issue?
A Yes. Because during the investigation, even when
11:47:18
I was in the class he -- nothing stopped that I complained about. The treatment didn't stop, him -- he didn't stop driving my car or anything like that, so I felt like if they wanted to correct it, then he should have never been had access to any of my vehicles, he shouldn't have had access
11:47:34
to me or -- or be around me at all, so no.
Q Your -- you believe that's the case while they were investigating it, they should have done that?
A They -- they -- they didn't do that. So even during the investigation, like I said, when I had to come
11:47:47
back the second time, the only time I didn't see Mr. Cooper

11:47:50 was when I removed myself that last day from the class until when I actually came back to the class.

Q And you said seeing him, and that's one thing, but isn't it true, though, that you weren't required to work directly with him when you came back? 11:48:04

A Say it again?

Q You weren't required to work directly with Mr. Cooper when you came back in February; is that right?

A Right, and that was the problem right there. He was not supposed to be having direct contact with me or anything of that nature, but Mr. Cooper was the one that was trying to force me to do everything and make the timeline for how he seen fit for me to finish class when he wasn't supposed to. And that's where the -- the first -- that issue relied. That -- that's when it started. Because he was not supposed to be a director of how I finished my class or anything of that nature, but he was. And Mr. -- Mr. -- Mark allowed him to. 11:48:15 11:48:28

Q But in terms of interactions --

A Yes. 11:48:41

Q -- when you came back, other than seeing Mr. Cooper, you weren't having direct daily interactions with him and him overseeing your work; right?

A He was not supposed to, but that's exactly what he was doing. He was not supposed to oversee my work, he was 11:48:54

11:48:57 not supposed to talk to me, but that's what he would do every day still. And that was the point of me complaining about retaliation because he wasn't supposed to tell me anything about my car, but he would come over and tell me 11:49:07 move my car, and I would tell him, like, there's nobody in here right now, and this is the only part that I'm supposed to work in. He would say, well, you can't -- you gotta move your car. If I say you gotta move it, I gotta move it because he run the class, and that's what he was doing, even 11:49:18 after that. And I told him, aren't -- isn't Mr. H supposed to come tell me to move my car versus you? And this is why, because we go back and forth, and we arguing now, you want me to get kicked out of class. So yes, the first day, second day, third day of my second time, he would come up to 11:49:32 me every day and bother me about my car. He would try to assert authority over me how -- and dictate how I would work in the class when I would -- he wasn't supposed to. So, yes, every single day that I came the second time, he was not supposed to be talking to me, and he -- he felt a need 11:49:46 to come talk to me, direct me somewhere. When I'm standing next to students, he would come directly in front of me, sit -- sit in front of me, not say a word, and try to intimidate me from stop -- to stop talking in front of the students.

11:49:58 Q Did you talk to anybody about that?

11:50:00 A Yes, I did. I talked to Mark, and then Mark tried to tell me that he was afraid that I was telling the second part of the class about how racist he was because there was another black student in the class.
11:50:11 Q And so you talked to Mark about it?
A Yes, I did.
Q Anybody else?
A Mr. Hernandez.
Q Okay. Anybody else?
11:50:19 A I -- I made a complaint, again, to -- like I -- like I told you, the first day about Mr. -- how they had the video and Mr. Cooper's conduct. I kept complaining about that.
Q And then, again, that was investigated, and he was
11:50:31 removed from the --
A I don't know when he was removed. Like -- like I said, when I made the second complaint about everything that they were saying and how they had a plan to retaliate against me, and Ms. -- the lady I spoke to, she just
11:50:43 basically wiped it under the rug and said that I had to continue no matter what.
Q Until you finished in the beginning of April of 2023; right?
A Like I said, on paper I finished, but the
11:50:56 knowledge and hands-on, no, because Mr. H wasn't even there

11:51:00 to help me. I didn't -- I basically -- I got -- like I told you, I had a video of me and Mr. H right after I had an argument, how he was helping other students who didn't even have the classroom, that didn't even attend the school,
11:51:10 versus helping me when he was supposed to, when he came back to the classroom, because he was so afraid that he was gonna get in trouble by his superiors because of -- because of helping me.

Q We talked about your first day in class and you
11:51:23 got the paperwork, like, the syllabus and such. Did you read all of that prior to starting the class?

A No, I didn't read it prior to starting the class. The first day I actually read it was when Mr. Cooper read it out loud because he -- he could read, like, the words better
11:51:39 and explain it, and that's the reason why, after class, I still had to asked him to just, you know, go through it one more time with me, so that way I can get a better understanding because of my learning disability versus the whole class. So that's what made us stay afterwards a
11:51:52 little longer to get a better understanding of the syllabus. And then, like I said, it went from that to politicians to homophobicness and to -- him saying he --

Q But -- but in that -- in that -- at that time, you -- you did have the syllabus and -- and were able to
11:52:06 read through it together with Mr. Cooper?

11:52:10
A Mr. Cooper read it, and he was basically trying to help me understand it.
Q Okay.
A Like, I never physically read it myself.
11:53:17
Q When you -- I think you mentioned earlier that the complaint, the -- the -- the formal complaint, the -- Exhibit 5, that that was triggered by the use of the N-word that had been used the day before, or that day, and that you'd talked to Mr. Woehl about that. Was that the first
11:53:42
time you'd mentioned to Mr. Woehl that -- that there was racial conduct that was being -- that was happening?
A No. And that -- that -- that -- that's not what triggered me to -- to go make the initial complaint. Because he already had told my friends that he referred to
11:54:01
tires as niggers and stuff -- and things of that nature. So, like I told you before, the things that he was saying and doing towards me behind my back, my -- my friends in the class would actually come and tell me that. And that was the problem, like, he thought that saying it to them, he
11:54:16
had, like, a friend in secret saying that when they told me everything that he said. So what happened is, when they said things of that nature, I would just go tell Mark, like man, my friends would say this and I -- I -- I truly believe, like I told him on numerous -- on numerous
11:54:30
occasions that I was uncomfortable, I know for a fact that

11:54:33 he's -- he's treating me differently. And especially the -- like, the choice of words and the people that he using as examples, like I told you, when he was talking about he needed to go get head in the mountains by a black woman, 11:54:41 it's just like -- like, I knew for a fact that he was racist. But I -- I allowed Mr. H and -- and, like, the girl in the front office to, you know, talk me out of -- out of what I initially wanted to do basically 'cause my ultimate goal was just to finish the class because I already had 11:54:58 plans after that. I already knew what I wanted to do because I knew what I wanted to do when I was going to Public Administration. Because I knew that was too hard, and then I fell in love with another trade, which was working with my uncle. So that's what -- that's what 11:55:11 basically held me back from -- I knew if I was to complain, I would stop my own -- stop from learning everything, and I knew this would be the end of the road for me, and I didn't want that to happen for myself. I -- I just wanted something to believe in that I was actually good at for 11:55:25 once. And then, during the time, I would let him get away with a lot of things that I shouldn't have never allowed him to get away from in the beginning as a black man, period. He shouldn't have never in his life said anything with tires and rims are called niggers or anything like that. I 11:55:40 shouldn't have -- I should have said something in the

11:55:41 beginning, but like I said, allowing myself to -- to -- to -- to just scoop lower than what I would have done and -- and -- and believing that Mr. H was my only friend there to help me, which he did, he did, and -- and I'm not mad at

11:55:55 that, but he know from the beginning I wanted to go and tell as much as I could, because I knew that I was the only one getting treated that way. So it was more than just a triggering when he told me that he -- he -- he could use these words and -- and that -- that he didn't see no problem

11:56:10 with it, and that -- that -- that -- that I didn't have to be a pussy, and all kind of -- of these things of this nature. And I just, like, for somebody to -- to reiterate to a black man why he can't use the word, and -- and he don't see no problem with using the word and that -- that

11:56:26 the only problem with the word from another white student using it was because it was at school, it -- I just knew my time was done at the school right then and there because I know for a fact that I wasn't being protected. I know for a fact that that just -- that just sealed -- that I shouldn't

11:56:42 have never let it go this far. Because now he's too comfortable with it, now he's too comfortable with being -- being a racist, and he's too comfortable because now he making something, like I said, that was initially private, that I never knew about, he forced it on me to make it

11:56:55 public. And I -- I felt, like, no racism -- if you're gonna

11:56:59 be racist, take that somewhere else and just get it away from me and be in your own private space about that. Don't -- don't make it seem like I'm okay with it because that's -- that's when I drew the line on, like, okay, he --
11:57:10 he thinks that I'm okay with it because he's been doing this a lot, and I ain't really said nothing about it. So now he thinks it's okay, that he can keep going on about it 'cause from -- from when I let it go and I told him just -- just let it go and walk away from it, he doubled down and came
11:57:22 back over and told me I'm not trying to keep it a secret. I'm not trying to make it seem like I'm scared to tell you this out loud because I just don't understand why my wife get to use the word nigger, and I can't use the word nigger at all. And that's when I was done.

11:57:34 Q Again, we're talking about Mr. Cooper. I'm talking about the first time that you talked to Mr. Woehl, where you explained to him that you felt like racial conduct was going on versus -- versus other -- other things. Was -- wasn't it in that December conversation with him where
11:57:55 you -- where -- where you first explained to him that you felt like there was this racial stuff going on?

A No. The -- the -- the first day of class, I told him that I was completely uncomfortable with a white man telling me that he seen a lynching when he was a kid.

11:58:11 Q Okay.

11:58:11 A So I -- the first day of class, I was completely uncomfortable with him being an authority figure over me completely because he was just too comfortable with telling me that he seen a lynching.

11:58:20 Q Meaning -- meaning Cooper?

A Yeah, he -- he -- he -- he said it too smoothly. He said it like he was happy and everything, like -- it like -- it didn't bother him at all. And that comment, that really bothered me like never before 'cause I'm like, okay, 11:58:32 if Mr. Cooper, if I could guess his age, he about 60 or something. If we take it back 60 -- probably 55 years, there was no white people getting lynched like that. I hate to, like, you know, be blunt about it, but, like, only black people was getting lynched. Lynching came from racism, from 11:58:46 slavery. So I'm like, you're telling me, and -- and you're white, that you've seen a lynching? I -- I can only assume that you've seen a black person get hung.

Q So my question, though, was about, again, Mr. Woehl.

11:58:57 A Yes, the first day.

Q So you talked to Mr. Woehl about this communication with Mr. Cooper?

A Absolutely, and he -- what they were -- what they were directing us to do was keep it in-house. He would say 11:59:08 no matter -- no matter what complaint you have, you come to

11:59:12 Mark Woehl. Don't go to the front office and everything. Go to Mark Woehl and he will handle it, so I believe that.

Q Who told you that?

A Mr. Hernandez, Mr. Cooper, and Mark Woehl himself.

11:59:21 Q Okay.

A So every time that I felt uncomfortable, every time that I -- I got called out from my -- from me not being able to afford things, every time I called him out for, you know, making me feel like he's racist, I went to Mark Woehl. 11:59:32 And Mark Woehl, like I said, he would be like a therapist and just try to say, like, oh, I don't think Mr. Cooper's racist. You should go talk to him, and -- and that way you can get things put behind you. So he was just basically covering they tracks the whole time. And -- and I even told 11:59:46 him, like, how come every time I come complain to you, nothing happens? And that's why that last day, when I told him I'm done coming to you, he knew that I was done coming to him about all the situations that I came to him before about Mr. Cooper. He knew that I was finally gonna go above 11:59:59 his head, because he called Mr. Obaseki and said that. He said Tyrone said he's had enough, he's about to go over our head, and he's not taking this, whatever Mr. Cooper did. And I listened to him say that, and then I left. So he knew since the beginning. He knew every single time that I came 12:00:15 up in there. He knew that -- that -- that every single time

12:00:17 I come, he would like -- he would, like, act like he typing some notes in, but I never seen no complaint that I told him about this. Before this racism, before the first day, I never seen any -- any notes of him saying that I came up in
12:00:30 there, and that's when I knew it was a problem. That's when I started to wake up and not go to him for anything else. That's why I went to the front lady, and she know exactly how many times I came up in there, because she told me not to keep it a secret and stop going to Mark.
12:02:13 Q Last thing I think I wanted to talk about was just, as I understood from your complaint or something along the way, that you -- did you feel like he was -- Mr. Cooper was also -- that he mistreated others in the class?
A Not -- not in a sense of how he treated me. He
12:02:33 would -- he would -- he would give my friends a slap on the wrist, but then, like, if -- if I was to, like, talk back to him or anything like that, he would try to get me kicked out the class. So he was letting a lot of stuff go with the students versus what he would let me get away with. Like,
12:02:47 for -- for example, my clothes. Like, you know, in the class, like, you gonna get dirty. Like, we all know if you gonna -- it's hands-on, it's dirty, and we gonna get dirty. So I came in with my -- with my -- with my button-up off one time with just my -- my -- my undershirt, which is like a --
12:03:02 a white shirt like this. He would call me out for that, but

12:03:05 then, like, when the white girl come in the class, she got her -- her breasts out, she got her -- her little skirts on, like, inappropriate stuff, or my friends would come -- looking like they came from a bar or a club, they would be 12:03:16 drinking, they -- he would never say nothing about their clothes. He would just allow them to look how they want to look, but he made it his duty to come tell me to make sure I dress appropriate.

Q Okay. So that -- I appreciate that example. 12:03:28 What -- did -- did you feel like the -- the woman in the class was treated more favorably than -- than the -- the other guys?

A No. I feel like they all was getting better treatment than me.

12:03:38 Q Okay.

A But when it came to the girl, he was -- he was -- he was more like a -- a -- a -- and excuse me, I don't -- I don't want to offend anybody, but he was also, like, a sex predator in the class. Because he would tell us things 12:03:49 like, oh, I love when girls come to the class, because I get to see them with they breasts out and stuff like that. So of course he gonna treat her differently than he treated all the other guys, because he like her. So he was -- technically he was inappropriate by the way he was flirting 12:04:02 with her and everything and stuff like that in front of us.

12:04:04 So of course he gonna treat her better than all of us, but he treated the whole class separately from how he treated me, especially the white students. He didn't really care -- he didn't really care about anything they done. He
12:04:15 didn't -- when -- when it came to my friend Bryce, Bryce would sit there and talk to me the whole time. He had never told him to get to work. The moment that I say something to Bryce, he said, oh, you gotta get back to work or things of that nature, or he would go behind my back and tell my white
12:04:29 friends, like, you can't help him work on his car because it looks like reverse slavery, and then my friends stopped working with me. So I had to, like, find out by myself the things that he was saying behind my back because my friends -- my white friends was scared to even, like, help
12:04:40 me or hang around with me because then -- that -- that -- he would start to, like, like, talk stuff about them and -- and in a cultural -- a cultural type of manner, not a school manner. He would tell them, like, we're white and stuff like that, and that don't look right helping a black person.
12:04:54 So like, no, he -- he treated me differently than any other person, but he also gave favoritism to her because he was flirting with her and letting her do what she want to do because he wanted to see her like that.

Q Can you explain to me a little bit more on the --
12:05:06 that you said the car issue, like, when you came back. What

was your understanding or expectation when it came to what car you were gonna be able to work on?

A So when I -- when I asked to come back to the school, there's a -- there's a certain amount of, like, I guess it like, basically, like, if you -- if you -- if they don't have nothing for you to do basically, then -- then you get to work on your own car.

Q Okay.

A During that -- during the time where I was working on my car, Mr. H and them knew that I was falling so far behind that he didn't -- they didn't really -- he didn't really care if I worked on my car or -- or the -- the competencies because he knew what was happening. He knew, like, my learning disability, so he was just, like, the class is moving too fast for you, and we don't want -- we don't want you to be the reason why they aren't able to move on. So he was just basically, like, just go ahead and work on my car. But I wasn't supposed to, because I didn't pass the first part of the block. So they still allowed me to work on my car even though -- that -- I didn't really under -- fully understand the stuff, but Mr. H knew, like, okay, he -- he -- Mr. Cooper's being a total dickhead to him, so I'm -- I'm gonna just try my best to help catch him up and also do the car. So the whole situation when I quit, I already knew I didn't -- I already knew everything was just

12:06:24 a blur to me, so I just was, like, the only thing that I can get out of it is just doing my car. So that's why I asked him -- I didn't want to come up there and do anything else but my car because I already tried that and nothing -- and
12:06:34 nothing happened. I didn't really learn anything, and on top of that, that's Mr. Cooper's friend car that they wanted completed. So I didn't feel like I should come back and have to work on somebody else stuff, and when I didn't even know what I was doing in the first place, I'd rather work on
12:06:47 my own stuff. So what I believe, and what I got out from it that I just had to do the -- the rest of my car and I'd be done, but it was different when I came back.

Q So when you came back, you were required to do something else other than your car?

12:07:02 A No.

Q Okay.

A They forced me to do something that was not required for me to do, which was Mr. Cooper's friend car. The only requirements that I had was to come finish my hours
12:07:12 and my personal vehicle only. When I got there, they forced me to do somebody whole -- a whole nother person's vehicle, which was Mr. Cooper's friend. I was not supposed to do that, but I was forced to because I wasn't able to get back in the class without me doing that car because that's what
12:07:25 they told me. Mr. Cooper told me that I cannot come back to

12:07:28 the class the second time if I didn't complete the car, and that's where the whole issue of after the recording of me and him getting into a heated -- a heated conversation of me walking out again 'cause I wasn't supposed to complete that.
12:07:40 Nobody that made the deal with me from the higher-ups told me that I had to do anything with the school as far as a customer car or even another student car.

Q I guess I'm confused because you mentioned something about you were falling behind because of the
12:07:54 disability?

A No. I was falling behind because I didn't understand the stuff that they -- that they were trying to explain to me, and I didn't get any of my disability accommodations. I mean, it was moving so fast that I
12:08:06 couldn't learn it that fast. I wanted just a little extra time, which they never gave me.

Q So again, because of the disability? Is that what you're saying?

A Of -- of -- of what?

12:08:16 Q That -- that was causing you to fall behind?

A Of -- of learning?

Q Yeah.

A I -- I guess.

Q Okay.

12:08:21 A I can't really -- I can't really say because I

12:08:23 didn't really learn nothing due to Mr. Cooper. He was always in my face doing things and -- and harvesting me from learning anything. And -- and -- and the first part was the most important part because you had to learn how to take 12:08:34 apart a car and all that. I didn't get to learn that because he was helping more of the white students than me. So I didn't learn anything with Mr. Cooper. The -- the fact of the matter is, I wasn't supposed to even move forward without learning the stuff that Mr. Cooper was supposed to 12:08:45 teach me, and he knew that I didn't understand half of the stuff, and he didn't really care. Like I said, he would blow it away, he would spend more time with the white students, he'd get on his hands and knees and help them, physically get hands-on with the car, but then when I asked 12:08:58 him, he would walk up to me and say, oh, well, you did that wrong, and then completely walk away. Now I'm looking at his back.

Q You were working with your uncle in this line of work, like, collision repair and stuff?

12:09:18 A Absolutely.

Q Starting in 2016?

A Probably. I think a little bit before that, but see, the difference between the school and my uncle, he understands my disability. Like, he don't just tell me 12:09:29 something and not explain it over and over. He -- he

12:09:32 actually shows me and explains to me, and then that's why I was -- I was learning a lot more with him. And that's when he told me that he would -- he would rather me go to school and get, like, paperwork and that I learned it on the
12:09:45 technical level then versus what he's teaching me, hands-on, under the table.

Q Were you -- did you -- were you working with him consistently from 2016 forward, until today? Are you still doing work with him?

12:09:56 A No.

Q When did you stop doing work with him?

A To be honest, they -- none of my family knew what was going on. I kept it, like, a secret 'cause I was -- I was more so embarrassed, you know, to tell him things of
12:10:08 that nature. So when I finally told him, he didn't -- 'cause he kept asking, like, what was going on with school, and I would just, like, walk around the question and stuff like that 'cause I didn't want to let him down. Especially after, you know, he -- he was already helping me a lot, and
12:10:20 he -- he actually wanted me to be something. So like, the simple fact that I was already scared to tell him that I quit 'cause I felt like I let myself down, and I let him down. So I didn't really want to tell him that, so he didn't really find out until, like, I actually stopped
12:10:34 school. And then this whole stuff was going on, so he

12:10:37 thought I was going to school the whole time.

Q So hold -- so hold on. In -- in December is when you, quote, unquote, quit school; right? December of 2022?

A No, I was already quitting before that. Like, I was already missing school because -- because of how I was treated. I was already not coming and everything, and that's how I got behind on, like, my time and everything 'cause I was missing school on purpose because I already knew what was happening at school. So I was already scared to go to school.

Q How much time were you -- had you missed prior to December?

A Well, it was enough time for them to drop me, but Mr. -- Mr. H and I believe, at the time, I was talking to Mark about how everything was happening and how I was falling behind, but he -- he wanted to say it was just because he said my learning disability, but I was telling him everything that was happening, and that was holding me back the most with my time. And that's why I really couldn't complete it, 'cause like I said, I was scared to come to -- to even come to school with Mr. Cooper there. So I was already going a lot -- losing a lot of time 'cause I didn't want to go to school no more.

Q Okay. So then, talking about your uncle, you -- you didn't want to tell him that you were -- that you'd quit

12:11:53 school, but then you restarted back up in February. Were you still working with your uncle during that time period?

A No.

Q Okay. So when did you -- when did you stop

12:12:04 working with your uncle?

A I never really -- I never really, like, physically got, like, a check or anything from him, so I was just basically helping him with everything.

Q Oh, okay.

12:12:15 A I wasn't technically, like, getting paid for it or anything like that. I was learning -- in the learning process of actually learning how to -- to do everything, and -- and that's how I fell in love with it. That's how I fell in love with the body shop stuff because, like, the

12:12:29 things that he was teaching me, it wasn't really that hard. It wasn't really that bad, like, just change the oil and stuff like that. I was -- I was more so learning about, like, the engine -- the engine work and stuff like that. And then I didn't know that he even knew how to paint on it

12:12:40 and stuff like that, and then he showed me. And then that's when I was more excited because I liked the way my car was looking when he was helping me paint it. It was, like, a beautiful color, and that's when I fell in love with, like, painting the cars and how it would come out -- from seeing

12:12:53 where it start from, to seeing where it ends. So I wasn't

12:12:57 really getting no paycheck or anything like that, I was basically just helping him with everything he needed help with and learning. And then after that, I was supposed to go to -- he wanted me to go to school, so that way, once I 12:13:06 learned everything on the technical side, then I could start working and taking over. And that way, he ain't really have to do nothing after that.

Q Okay. So that just never -- it just never progressed beyond that?

12:13:18 A Well, I stopped -- when I -- when I finally got into -- to Gateway, he knew that that's when I, like, I basically, like, stopped helping him -- I stopped, like, working with him. So it was -- it was about, like, 2021 I stopped helping 'cause I wanted to focus on the things that 12:13:32 he wanted me to focus on to be able to have all of -- all of the overall knowledge of what he does. So that's when I -- I stopped helping him a lot, and then I went to the school and I started going to the school. And then I would tell him everything, like, you know, what happened at school and 12:13:47 stuff like that, and like, most of the time I'd be lying to him because I didn't -- I didn't really want him to, like, feel sad and stuff like that, like, the stuff that I was going to -- going through and stuff like that. And I didn't want him to think that -- that I gave up easily and stuff 12:13:58 like that, so.

12:14:03 Q So then, did -- have you ever been paid for anything that your uncle -- any work that you did with your uncle?
A I mean, of course, but I wasn't, like, an actual -- like, an actual employee. Like, I didn't receive, like, no checks, but he would -- he would actually give me money and stuff like that from helping him, you know, just put some money in my pockets and stuff like that. But I never received, like, a -- a real check, like, as a real employee. I would just -- like I said, I would just help him out and learn all these things and I'm watching him for years and stuff like that, and then I felt confident enough to be like, okay, this is what I want to do while I was going to Arizona State because that was completely hard. That was, like, that was extremely hard for me, you know, having to read a lot of -- lot of books, especially I couldn't read that good. So I just wanted to just, you know what I mean, I finally found something that I was -- I felt like that I could focus on more, that -- that I can actually go into this field, and boom, I know exactly what I want to do 'cause I -- I love doing it. So during the time, like I said, I was going to Arizona State, I was going over there every day after -- after school and stuff. I would help him with anything he needed help with and stuff like that, so.
Q So when's the last time you ever did any work with

12:15:17 your uncle?
A The last time I ever did any work with my uncle was literally probably like the first or second week of school.
12:15:25 Q Okay. So 2022?
A Probably 2020 -- I believe so, 2022, 2021.
Q Is he still in that line of work?
A Yes.
Q Have you ever gone back to him and said, hey, I've
12:15:37 got my certificate, I'd like to start doing this?
A No, because that wasn't the truth if I was to tell him that.
Q How was that not the truth?
A Because like -- like I told you, on paper I -- I
12:15:49 received the -- the certificate, but I didn't really even learn nothing. I felt like, if I would have told him that I completed school, which was a lie, I didn't really complete school. They just -- I just completed the hours, but me personally, I didn't want to tell him that I completed
12:16:03 school and then he -- he -- he holding me to an expectation that I learned from -- from school that I didn't.
Q Okay. So then, what did you -- I mean, he knew you were in school; right? So does he think you just dropped out?
12:16:18 A No, he didn't -- he -- he for sure asked me --

12:16:20 so -- about -- 'cause my mom told him that, you know, I guess about the -- but -- about the court thing, but he -- he was -- he for sure thought I completed school and everything.

12:16:33 Q Okay.

A But I didn't tell him that. My mom did.

Q Okay. But then, why not go back to work with him?

A 'Cause I honestly -- I just, I lost all the love for it. I -- I completely, like, I felt like, like, during 12:16:49 the time, like, I was so happy because it -- it almost took me, like, damn near six years to get in this class. I was -- I was more than excited. I was more -- I just couldn't believe at the time, like, when I was -- when I was struggling for the school that I -- I actually found 12:17:04 something that I was good at. So -- so when I -- when I -- when I went to school, I was really, really excited. You can ask the lady, like, I could not believe it took me that long to get in class, but once I finally got in there, that's when I was like, okay, things is -- is -- is going in 12:17:17 the up-and-up for me. I finally get to do something that I -- that I actually want to do. So when I went to school, I -- I was happy. I was literally -- I was learning the things that my uncle taught me, which was making me happy, and I knew at the end of my school that I was already going 12:17:31 to be okay with -- with -- with -- with a job and

12:17:34 everything. I didn't have to go -- go through those excruciating, like, like, painful interviews, or me not understanding certain stuff. I already knew that I was okay to -- to work right afterwards 'cause I knew that my uncle
12:17:45 had set something up for me, which is -- that's the reason why he -- he wanted me to go get the technical side. But to -- to go back to him and tell him that I know how to take off a door and -- and he actually put me to a customer car and then everything goes bad, I didn't want to be the one to
12:18:01 do that. So during this investigation, I told him the truth. Then he said he wished I would have told him earlier, that way he could have helped me, maybe come up to the school and stuff like that to talk for me and things like that, but he was more -- he said that he didn't -- he
12:18:15 didn't really care if I had quit. He didn't -- he just kind of discouraged that I didn't come tell him the truth because he -- he felt like no matter -- no matter how bad I wanted to make him proud or whatever, he did -- me going through racism wasn't enough to hide it from him.

12:18:32 Q So then, now what is -- what are you planning -- are you planning to try to seek out work, or?

A No, I don't think -- like, just based on the simple fact that I know, like, I don't know, like, what I was supposed to learn. I don't -- I -- I just, like, going
12:18:48 through all this stuff, it just -- it just -- it just, like,

12:18:51 I can't remember most of the things, like, when it come to, like, the -- the -- the technical side of actually putting, like, the cars and all that together, and -- and I just wish that -- that I didn't -- I wish that I never had went to 12:19:06 this -- I wish -- because I was, like I said, I couldn't see anything else, I -- I really wanted to help my uncle, especially that he getting older and everything. I just -- I just -- this is -- I knew this is what I wanted to do, and, like, right after this, I just couldn't really look at 12:19:21 him the same because he depended on me for so much -- so much stuff to learn, and I -- I couldn't really look at him and say I don't really know it. So I just -- I basically just -- I stayed with my mom, and then every time, like, he would ask me to, like, come help him and stuff, I just make 12:19:34 up something like I don't feel good or something like that. So that way he won't -- he won't try to -- like, he basically won't be disappointed in me and stuff.

Q Do you have any plans to -- to try to do any sort of work in the future, whether in collision repair or 12:19:49 anything else?

A If I'm being honest, no, because, like, this experience, like, I -- I -- it's just really hard for me to -- especially, like, when -- when I go into something that I don't really know, I don't know, like, how people 12:20:04 gonna look at me, especially after this. Like, I don't want

12:20:07 to go up in there and then I'm the only one that -- that -- that's slower than people, or like, I don't get it as fast as them. And I don't want to feel like I'm -- I'm dragging people work and all that, 'cause then I'm gonna get fired.
12:20:17 Then I'm -- then at that point, then I won't be able to work at all, so like, I didn't -- I just, I'm -- I'm just at the house. I just play games and stuff like that.

Q And you -- do you live at home with your mom, or?

A No, not now. I got Section 8, so I got Section 8
12:20:37 housing and stuff, so I'm by myself with my -- with my -- like, my animals and stuff.

Q Okay. All right. Okay. I think we're done.

MR. WOODS: Okay. No follow-ups. We'll read and sign.

12:21:01 (Thereupon, the deposition concluded at 12:21 PM)

______________________________

TYRONE ROSS

STATE OF ARIZONA )
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn in by me to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction.

I CERTIFY that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

[X] Review and signature was requested.

[ ] Review and signature was waived.

[ ] Review and signature was not requested.

I CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 (J)(1)(g)(1) and (2). Dated at Tempe, Arizona, this 17th of June, 2026.

Audra Littou

------------------------------------

AUDRA LITTOU, CVR

Certified Reporter

Arizona CR No. 51052

I CERTIFY that Coash Court Reporting & Video, LLC, has complied with the ethical obligations set forth in ACJA 7-206 (J) (1)(g)(1) through (6).

--------------------------------------

COASH COURT REPORTING & VIDEO,LLC

Registered Reporting Firm

Arizona RRF No. R1228

### Exhibits

**Ross Exhibit 001** 2:8 26:11 41:18

**Ross Exhibit 002** 2:9 28:5,6

**Ross Exhibit 003** 2:10 30:25

**Ross Exhibit 004** 2:11 42:5,7

**Ross Exhibit 005** 2:12 60:18 61:9 65:21 67:15 79:18 110:7

**Ross Exhibit 006** 2:13 61:7

### 1

**1** 26:11 41:18

**12:21** 132:15

**17** 24:18

**18** 16:8,17,18 19:13 20:8 24:18

**19** 24:18

### 2

**2** 28:5,6

**2007** 7:22 8:21,23 14:24 15:4 23:14

**2016** 24:17,18 122:21 123:8

**2017** 12:17 14:7 24:22

**2017-2018** 10:25 11:8 12:2

**2017-28** 11:6

**2018** 9:19 10:24 12:17,18 13:21,22

**2020** 69:25 128:6

**2021** 8:5,7,8 12:3,5,22 13:1 14:18 126:13 128:6

**2021-2022** 9:15

**2022** 8:5,7,13,17,23 13:3 14:19 19:11 21:4,13 22:20 24:24 25:4,9,10 27:3,4 46:20,21 48:15,16 49:25 53:17,24 56:11,19,21 60:8 61:12 63:3 104:25 124:3 128:5,6

**2023** 25:15,21 26:23,25 27:7,9,16 28:10 32:22 33:2,5,17,19 34:6 35:5,7,25 36:6,11,14 37:2,9 38:6 39:6 42:17 46:11 56:24 77:12 79:11 81:2 86:4 105:3 108:23

**2323** 26:24

### 3

**3** 30:25

**30** 87:11

**36** 7:13

### 4

**4** 42:5,7

**40** 87:11

### 5

**5** 60:18 61:9 65:21 67:15 79:18 93:13,21 94:6 110:7

**55** 114:11

**5th** 28:10 39:4,5,6 42:16 44:6,8 45:1,22 46:11 53:17 56:11,18,21 60:8,15 68:24 69:25

### 6

**6** 61:7

**60** 114:10,11

**6th** 27:4 56:18,21 61:12 63:2 68:25 69:25 76:24 78:4

### 7

**7** 87:10

### 8

**8** 132:9

### 9

**9th** 36:24 37:2,8

### A

**A's** 51:22

**ability** 6:23

**abruptly** 91:12

**absolutely** 50:11 52:14 53:11,18,23 54:4 60:9 62:15 63:13 68:23 69:5 71:15 77:1 92:9 97:3 114:23 122:20

**accept** 16:22

**access** 97:16 105:19

**accommodate** 20:20,23 51:7 78:19 98:22

**accommodations** 9:24,25 20:16 51:9 121:14

**accomplish** 61:19

**accurate** 79:20

**achieve** 12:16

**act** 68:15 116:1

**acting** 68:7

**action** 104:23

**actual** 13:10 127:5

**additional** 20:6 22:16,17 54:2

**address** 59:1 99:13 102:8,11

**administration** 9:9,11,18,21 10:1 11:2 12:13,20 13:8,17,23,24 14:1 24:1,4,6 53:4,8,16,22,25 54:7,11 56:13,23 111:12

**administrative** 36:25 37:9 63:8 65:5

**adult** 16:3,6 32:15

**Affairs** 57:10

**afford** 58:24 59:1,12 64:18,23 115:8

**afraid** 52:18 108:2 109:6

**age** 16:5 114:10

**agreed** 83:25

**agreement** 26:22 27:25 34:19 54:25 94:25

**ahead** 26:10 30:22 62:20 119:17

**aid** 98:19

**alleged** 5:7

**allowed** 23:7 50:3 58:15 65:12 91:3 93:7 94:22 106:18 111:6,21 119:19

**allowing** 83:9 112:1

**alongs** 46:2

**amount** 48:4 63:20 85:9 86:11 119:4

**Amy** 28:7,11 29:9,11 39:3 40:7,17 41:13 42:9,12,21 43:4

**animals** 132:11

**answers** 6:7

**antagonistic** 48:18

**anymore** 84:14

**appalled** 82:15

**apparently** 40:18

**appears** 26:14

**application** 13:14

**applications** 33:20,24

**applied** 8:6,8 14:1,18 23:2

**apply** 13:13 14:13,22,23 23:16,24 24:3 34:2 101:14

**applying** 14:5,15 24:18,20

**appointment** 63:10

**appointments** 17:24,25 18:4

**approximate** 11:21

**April** 8:11,13,17 24:23 25:4,9,14 28:10 32:22 33:2,5,17,19 38:6 39:4,5,6 42:16 44:6,8 45:1,22 46:11,21 48:15 56:11 108:22

**area** 50:4 55:6

**argue** 53:13

**arguing** 45:8 57:19,23 80:6 83:19,20 107:12

**argument** 34:22 38:20 81:20 84:4 109:3

**arguments** 53:12

**Arizona** 9:3,9,23 10:5,20 11:9 12:1,7 24:1 93:12,22 94:5 127:14,22

**arrested** 32:9,15

**Arts** 9:8

**assert** 59:7 107:16

**assistant** 63:8 65:5

**Associates** 9:8

**assume** 114:16

**assuming** 60:20

**ASU** 9:11,18 10:23 11:2, 20,21,23 13:8,23 20:13

**attached** 61:3,8

**attend** 109:4

**attended** 20:17

**attending** 103:13 105:9

**attention** 46:7

**audible** 6:7,10

**authority** 107:16 114:2

**automatically** 84:13

**avenue** 58:13 61:25

**aware** 25:19 35:24 66:14 93:12 94:5

**B**

**bachelor's** 12:10,12,13, 19 13:4,7,17

**back** 18:9,23 21:5 22:3 26:22 27:21 28:20 33:4,8, 13 34:1,4,5,18 35:7 36:11 37:19 41:12 44:7,9,10,14, 21 45:11 52:6 55:9 56:9, 13,18,22,24 57:3,4,11,12, 13,20 58:1,8 59:9,17 63:11 64:13 66:20 67:1 69:19 73:13,24 76:7,22 77:11,14,18,19 78:5,7,18 80:10 81:2 83:2 84:1,6,9, 12 85:4,19 86:8,9,10,14, 15,21 87:3 95:12,13,23 96:19,23,24 101:6,14 102:5 105:25 106:2,5,8,21 107:12 109:5 110:17 111:15 113:10 114:11 116:16 118:8,9,13,25 119:3 120:7,12,13,23,25 122:17 124:19 125:1 128:9 129:7 130:7

**backed** 87:23 88:13,14

**background** 7:10,11

**bad** 6:12 74:5 76:13 125:16 130:9,17

**ballpark** 15:23,24

**bar** 69:15 117:4

**based** 97:20 102:25 130:22

**bases** 5:6

**basically** 14:21 17:24 38:3 47:8,22 49:12 51:16 55:7 58:20 59:14,21 61:20,22,24 64:3 66:22 69:10,11 70:4 72:12,25 76:10,12 81:19,25 82:9 85:2,18,24 86:2 92:19,20 93:6 95:24 96:6,10 97:8 100:14,15,17 101:7,14 102:13 103:21 108:20 109:1 110:1 111:8,15 115:13 119:5,6,17 125:8 126:2,12 131:12,17

**beat** 70:19

**beautiful** 125:23

**befool** 82:20

**beg** 39:25

**beginning** 47:12 52:3 55:24 58:20 73:25 74:2 75:20 77:9 78:22 86:3 96:20 108:22 111:22 112:1,5 115:24

**behavior** 64:11

**belief** 97:23

**believed** 22:15 50:9 79:2 90:1

**believing** 43:5 112:3

**belongings** 44:11,14 57:13

**benefits** 15:9 16:2,7 19:21,22 22:24

**bet** 103:14

**big** 9:20 38:20 58:23 84:3

**biggest** 56:3

**bipolar** 15:16 19:18 20:11 32:6

**bit** 7:10,22 10:23 11:12,17 48:11 49:11 78:3 118:24 122:22

**black** 68:12 74:10,13 104:8 108:4 111:4,22 112:13 114:13,17 118:19

**Blacks** 50:23

**blatantly** 50:17

**block** 67:11,13 86:18 96:3,4 119:19

**blow** 122:12

**blunt** 114:13

**blur** 120:1

**body** 10:13 125:14

**bodywork** 10:7 50:4

**books** 127:16

**boom** 127:20

**booth** 57:17 68:13 71:4,5, 12,17,18 72:4 85:16,18, 21,23 96:1 97:16

**booths** 86:1,2 95:20

**bother** 75:11 107:15 114:8

**bothered** 114:9

**bought** 11:13

**boy** 55:23

**break** 7:3,4,7 46:18 48:10,11,12 102:3

**breasts** 117:2,21

**Brent** 35:18 36:5,10,15, 23,24 37:9 44:15 45:2 48:17,20 65:5 103:24 105:2

**bring** 20:18 56:12 103:1

**bringing** 98:3

**brings** 5:12

**brought** 70:11 93:6 94:24 102:24 104:11

**Bryce** 49:10 118:5,8

**business** 10:7

**button-up** 116:23

**C**

**California** 7:19

**call** 4:18,21 31:17 58:22 116:25

**called** 30:5 41:23 42:3 65:10 67:21 90:13 92:15, 16 111:24 115:7,8,20

**calling** 64:22 81:22 89:21,22 91:21,22

**camera** 88:25 89:5

**cameras** 89:3

**campus** 37:1 43:1

**capacity** 52:20

**car** 11:11,13,16,19 39:10 40:2,20 41:14 47:14 57:21,22 74:18 80:8 83:14,17,21,24 84:7,8,15, 20,21,23 85:5,8,9,11,15, 20,21,25 86:12,15,16,17 95:20 97:14,17 105:17 107:4,5,8,11,15 118:10,25 119:2,7,10,12,18,20,24 120:2,4,6,11,14,18,24 121:1,7 122:5,14 125:21 130:8

**care** 40:14 41:7 84:15 100:7,8,20 118:3,4 119:12 122:11 130:15

**cared** 51:5

**careless** 69:21

**cars** 11:18 24:13,14 125:24 131:3

**case** 4:20 5:5 7:2 28:1 31:1 89:11 105:21

**catch** 119:23

**caused** 103:1

**causing** 121:20

**certificate** 25:10,16,17, 20,23 26:8 28:15 48:6 51:19 77:20,23,25 78:5 128:10,15

**certification** 26:15

**chain** 28:7 29:6 42:9,12, 15

**chance** 5:10

**change** 9:22 125:16

**changed** 53:14

**characterization** 52:12

**charged** 32:9,14

**chat** 70:12,13,14,15

**check** 18:2 40:21 125:7 127:9

**checked** 55:24

**checks** 127:6

**childhood** 24:13

**choice** 85:3,4 111:2

**claims** 4:25

**class** 13:5 14:13,23 20:24 21:3 23:8 26:23 27:4,6,9, 21 28:19 32:25 35:9,11, 19,23 36:8,11,16,20 37:15 38:23 39:13,15 43:9,22 44:1,18 45:11,14 46:8,23 47:12,13,24,25 49:2,6,11, 19 50:1,2,6,18 51:1,10,16, 17,22 53:14,20 55:9,25 56:10,14,17,22,23 57:3,4, 6,11,12 58:8,16,18,20,23 59:13 61:14,18,21,23,25 64:13,16 65:7,16 66:2,3, 19 67:14,23 68:18 69:9,17 70:4 73:20,25 74:5,16,17, 18,21 75:17 76:13 77:17 78:6,8,11 80:12,15,17 81:8 82:1,7,21 83:3,10,18, 21,22,24 84:1,5,6,10,14 85:5,10,19 86:5,14,18 87:11 88:3,4 93:13,21 94:6 96:3,4,5,18 101:4,5, 6,8,10,13,19 105:15 106:1,2,13,16 107:9,13,17 108:3,4 109:9,11,12,15,19 110:18 111:9 113:22 114:1 116:13,18,21 117:1, 11,19,20 118:2 119:15 120:24 121:1 129:11,18

**classes** 12:5,16 47:1,21

**classroom** 35:25 47:5,6 50:7 51:25 55:4,7,14 59:19,20 96:6 109:4,6

**cleaning** 71:3,17,18

**clear** 6:10 104:4 105:6

**clerk** 62:5 63:5

**client** 18:5

**clock** 26:3,5 42:18 48:4

**clocking** 44:7

**close** 41:5

**clothes** 116:20 117:6

**club** 117:4

**college** 7:25 9:2,15 13:15 20:9 24:20 26:14 32:18 33:1,4 37:1 44:4 95:8 102:6 103:25

**Colleges** 4:20

**collision** 7:24 8:17 9:21 10:14 14:3,6 24:19 33:20 46:19 122:19 131:19

**color** 74:12 104:9 125:23

**comfortable** 70:25 73:9, 21,22 83:4 87:15 112:21, 22 114:3

**comment** 114:8

**communication** 30:8 31:19 36:5 50:14 63:19 69:24 114:22

**communications** 31:12 62:13 77:3,9

**Community** 4:19 7:25 9:2,14 20:9 24:19 26:14 32:18 33:1,4 37:1 44:4 95:8 102:6 103:25

**competencies** 119:13

**complain** 63:21 65:8 66:7,8 67:20 104:19 111:15 115:15

**complained** 74:15 105:15

**complaining** 64:11 65:8 75:3 107:2 108:12

**complaint** 27:23,25 46:1 48:17 53:8,16,21,24 54:5, 7,23 56:12 57:1 60:12,14, 16,20,22,25 61:8,20 62:3 65:9 66:13,20 67:4,8 68:9, 25 69:2 79:18 82:2,6 84:22 90:14 92:8,16 104:20,24 105:11 108:10, 17 110:6,13 114:25 116:2, 11

**complaints** 58:4 68:8 79:22 90:21

**complete** 23:5 47:7,25 56:4 58:13 78:16,18 79:3 85:13 86:13,16,18 95:20, 21 97:5 121:1,4 124:20 128:17

**completed** 12:18 13:5 28:19 39:4,15 55:12 78:25 120:7 128:17,18,19 129:3

**completely** 39:12,15 40:3 43:9,13,20 57:25 64:8 69:11 73:21 78:10 102:9 113:23 114:1,3 122:16 127:14 129:9

**completing** 28:11 38:23

**computer** 89:13

**concern** 99:10

**concerned** 34:14 51:3 77:21

**concerns** 63:1,19 69:22

**concluded** 132:15

**conduct** 97:19 108:12 110:11 113:17

**confident** 127:12

**confuse** 100:17

**confused** 27:18 56:25 121:8

**confusion** 77:16

**congratulations** 26:7 28:11

**consistent** 18:7

**consistently** 59:4 76:7 123:8

**contact** 35:9 55:3 79:7 106:10

**continuation** 42:8

**continue** 12:4 19:22 108:21

**control** 56:6 96:1

**conversation** 30:13 49:20 50:8,19 63:1 70:2,6 71:2,19,21 86:25 87:6,8, 15 89:20 93:14 94:6,7 113:19 121:3

**conversations** 29:25 31:16 93:22

**convicted** 32:14

**Cooper** 21:1,20 34:24 35:11,18 36:5,10,15,24,25 37:9,14,15,25 44:15 45:3, 19,23 46:9 47:11,15 48:18,21,25 50:4,9,16 51:13 52:2,21 53:5,12,14 54:25 55:2,6,10,16 56:6 57:14 58:2 60:2,3 61:21 62:10,24 64:11,14,15 65:5 67:18 68:22 70:3,18,23 71:10,11,19 72:3,9,23 73:7 76:11 79:4,8 81:4,13, 24 83:15,16 84:19 85:5,16 86:1,24 87:16,18 95:15,19 97:18,22 99:9,11,13,23 100:22 101:21,22 103:24, 25 104:15 105:2,25 106:8, 11,22 109:13,25 110:1 113:15 114:5,10,22 115:4, 19,22 116:12 120:25

122:1,7,9 124:21

**Cooper's** 83:14 89:6 96:4 108:12 115:11 119:22 120:6,18,22

**corner** 55:17,22

**correct** 19:15,19 29:9 32:23 36:9 52:8 53:17 56:20 62:1 77:6 79:1,5,10, 12,16 96:16 99:5 104:25 105:18

**corrected** 105:8

**counseling** 16:10,13,21 18:8 19:1 20:6 21:19 22:8, 18

**counselor** 16:24 17:3,8, 9,12 19:5,9 21:5,10,13,23 22:16

**counselors** 20:1

**County** 4:19 103:25

**couple** 27:11 49:3 56:7 70:9 72:1 79:13

**courses** 13:11

**court** 4:3 6:4,8 92:20 129:2

**cover** 39:8 42:4 64:20 96:14 98:6

**covered** 96:9

**covering** 39:18 50:17 72:20 115:14

**Covid** 9:12,19 10:16,17 11:9 12:2,17 13:3

**credits** 23:5,9 27:21

**crime** 32:10

**criteria** 45:10

**cubicle** 20:21

**cultural** 118:17

**customer** 121:7 130:8

**cut** 85:14 91:25 93:4

**cutting** 55:15

D

**D-A-W-A-Y-N-E** 4:8

**daily** 106:22

**damn** 55:19 129:11

**date** 13:8,9,12,19 36:18 37:13,18 40:23,24 45:25 62:2 68:19

**dates** 30:5 36:19,22 37:20 40:24

**Dawayne** 4:8

**day** 21:3 35:15,23 36:8, 15,20 37:15,25 38:8 39:8 40:21 41:13 42:17 44:10, 11,16 45:6,7,13,16,17 46:3,4,9,10 47:3,4,23 48:24 49:2,5,9,22 50:1,2, 3,6,24 51:1,18 57:13 61:11 66:12 67:18 68:10, 17 69:1,2,8 73:25 74:6,8 75:9 76:5 80:4,5,7,8,9 81:5 82:12 83:2,5 84:3,10 85:6,15,22,23 86:5,9,20 87:3 92:16 95:13,16 96:22 97:6 101:10,19 106:1 107:2,13,14,15,18 108:11 109:9,13 110:8 113:22 114:1,20 115:16 116:3 127:23

**deal** 83:20 84:1,2,17,22 121:5

**December** 27:3,4,16 53:17,24 56:11,18,21 60:8,15 61:12 63:2 68:24 69:25 76:24 77:8 78:3,24 104:25 105:11 113:19 124:2,3,12

**decide** 9:22 89:19

**degree** 9:5,10 11:20 12:7, 10,11,16 13:15,16,19,22

**degrees** 9:7

**Delfi** 54:17

**Delfina** 54:18 91:10 92:17 94:13 95:2

**Delfine** 84:24 91:8

**dent** 47:17

**denying** 43:18,24 84:5

**depended** 131:10

**deposition** 4:10,23 5:15 6:6 26:13 28:6 29:21 30:9, 10,18 42:8 60:18 89:11,17 132:15

**destroyed** 57:18

**detail** 14:22 47:15

**diagnose** 15:22

**diagnosed** 15:18 20:4

**Diaz** 28:7,11 29:9,11 39:3 40:7,17 41:14

**dickhead** 119:22

**dictate** 107:16

**difference** 9:20 99:9 122:23

**differently** 54:3 102:8 103:1 111:1 117:22 118:20

**diploma** 12:22 23:10,11, 13,16 24:2

**direct** 106:10,22 107:20

**directing** 114:24

**directly** 5:10 16:7 63:19 72:25 79:8 82:7 89:6 106:5,7 107:21

**director** 106:16

**dirty** 116:21,22

**dis** 19:16

**disabilities** 15:12,14 16:11,14 19:17 20:4,6,10 32:5,6,7

**disability** 9:25 15:16 16:1 19:14 20:12,19,23 51:1,5 78:20 109:18 119:14 121:10,13,17 122:24 124:17

**disappointed** 131:17

**disbelief** 91:25

**disciplinary** 104:22

**disciplined** 104:22

**discouraged** 64:7 130:16

**discovery** 31:1

**dislike** 82:20

**disorder** 15:17 19:18 20:11

**dispute** 29:18 36:12,23 37:10 42:23

**disrespect** 74:15

**distracted** 20:21

**district** 4:20 5:1 61:1,3 67:17 77:3,10 102:25 104:1,24

**doctor** 17:12

**document** 26:15,18 27:15 31:2,4,11 60:19 65:19 67:15

**documentation** 30:19

**documents** 27:1 31:1,8

**dominance** 59:7

**door** 47:16 49:12 68:1 87:24 88:24,25 89:6,8 130:8

**doubled** 113:9

**doubling** 72:12

**doubt** 29:2

**dragging** 132:3

**DRC** 9:25

**dress** 117:8

**drew** 113:4

**drinking** 117:5

**drive** 57:17

**driving** 53:12 57:14 74:17 105:17

**drop** 18:5 61:22 124:13

**dropped** 56:22 57:5,6 77:16,20 78:11 128:24

**drove** 80:8

**due** 122:1

**duly** 4:2

**duty** 117:7

E

**e-mail** 28:7,14,18,20,24 29:3,4,5,6,11,13,16,17,19

40:7,9 41:15,17,21,23 42:10,11,12,14,15 44:6 61:4,8

**e-mailed** 26:5,7 28:2,21

**e-mails** 26:6 31:21 40:17 43:3,23

**earlier** 22:23 52:9,17 87:12 94:19 102:13 110:5 130:12

**early** 14:18 20:5 38:6 45:19 81:9 87:14 88:2,4 101:14

**earn** 11:20 23:13

**earned** 13:18 26:7

**easier** 24:8

**easily** 126:24

**elevate** 75:24

**elevated** 75:22 76:24 77:17

**embarrassed** 123:14

**emphasis** 50:22,23

**employee** 127:5,10

**enabled** 86:1 97:13

**enabling** 95:19

**end** 4:17 6:15,16 51:18 52:18 67:5 111:17 129:24

**ended** 21:18 23:14 41:1 49:21 75:1 91:14

**ends** 91:12 125:25

**engaged** 97:19

**engine** 125:18

**Enrique** 17:16

**environment** 78:13

**escort** 57:20

**everyday** 45:11

**exact** 13:9,12 36:19,22 37:13,20 40:12,24 45:25 72:19

**EXAMINATION** 4:4

**examined** 4:3

**examples** 111:3

**excited** 125:21 129:12,16

**excruciating** 130:2

**excuse** 117:17

**exhibit** 26:11,12,13 28:4, 5,6 30:24,25 41:18 42:5,6, 7 60:17,18 61:6,7,9 65:21 67:15 79:18 110:7

**expectation** 25:5 119:1 128:20

**expecting** 88:3

**experience** 131:22

**experienced** 95:17

**explain** 4:13 5:9 49:8 86:22 101:7 109:15 118:24 121:13 122:25

**explained** 41:4 50:23 57:15 95:13,14 113:17,20

**explains** 123:1

**extra** 20:20 23:7 38:4 76:16 78:21 121:15

**extremely** 127:15

### F

**face** 122:2

**facing** 88:12

**fact** 37:14 38:7 60:15 110:25 111:5 112:18,19 122:7 123:21 130:23

**failed** 56:1

**fair** 25:12 48:18 52:12 99:10,15

**fall** 121:20

**falling** 119:10 121:9,11 124:16

**family** 123:12

**fast** 119:15 121:14,15 132:2

**fault** 22:7

**favorably** 117:11

**favoritism** 118:21

**February** 25:21 27:6,9 34:6 35:4,7 39:3 56:24 77:9,11,12 79:11 81:2 86:3 96:20 106:8 125:1

**feel** 6:12 20:9 43:3,22 55:12 56:1 64:25 74:21 75:14,18 78:12,13,15 79:22 83:4 87:15 98:13 100:6 102:15 103:3 115:9 116:12 117:10,13 120:7 126:22 131:15 132:3

**feeling** 41:9 53:19 84:8 103:19

**fell** 24:10 96:3 111:13 125:13,14,23

**felony** 93:13,21 94:6

**felt** 41:9 48:17,20 50:13 51:2 52:15 53:3 54:7,11, 12 55:19 57:25 58:11,25 74:7,14 76:19,20 79:24 80:12 81:1 86:20 87:14 90:21 97:3,25 98:4,5 99:3, 21 100:4 104:5 105:17 107:19 112:25 113:17,21 115:6 123:22 127:12,18 128:16 129:9 130:17

**field** 127:20

**fighting** 39:25

**figure** 51:19 59:17 100:4 114:2

**figured** 25:8,9

**filed** 4:25

**fill** 20:17 23:21

**finally** 14:10 21:14 53:21 54:12 115:19 123:15 126:10 127:18 129:18,20

**find** 118:12 123:24

**finish** 26:3,4 27:10,21 32:25 43:11 58:15 61:25 74:5 76:13,15 77:11 78:8, 10 79:14 83:21 84:18 85:9 86:11 97:16 106:13 111:9 120:19

**finished** 10:17 13:11 32:22,24 33:2,14 38:1,2 39:9 41:7 106:16 108:22, 24

**finishing** 25:5

**fired** 105:5 132:4

**fit** 80:4,14,19 106:13

**five-or-so** 48:11

**fix** 78:17 104:10

**fixed** 104:6,12

**flag** 59:18

**flirting** 117:24 118:22

**floating** 96:10

**fly** 96:7

**focus** 126:14,15 127:19

**folks** 66:15

**follow-ups** 132:13

**foot** 44:5

**force** 75:14,18 83:12 84:3 86:14 106:12

**forced** 84:8,19 85:8,15 86:13 112:24 120:17,20, 23

**forcing** 84:23

**forget** 76:8

**form** 37:23 55:3

**formal** 31:18 110:6

**format** 46:23,24

**Fortunately** 81:9

**forward** 33:19 86:9 88:12 98:12 122:8 123:8

**found** 36:3 57:5 77:19 127:18 129:14

**Foundation** 37:3,12 93:15,19 94:1,8

**frame** 11:6 22:20 35:5 39:3 41:5 48:16 105:3,13

**frames** 56:8

**free** 59:4 80:6

**freedom** 55:20

**Friday** 40:4,15,19,22,23 41:1,7,22

**friend** 63:24 76:10 83:14, 17 110:20 112:3 118:5

120:6,18,22

**friends** 31:17 45:13 58:4 65:10,14 66:25 67:7 69:15 70:9 72:1,21 73:12,23 80:18 110:14,17,23 116:15 117:3 118:10,11, 14

**front** 14:21 28:5 42:8,19 57:8,24 58:22 62:5 63:7,9 64:16 87:24 89:6 107:21, 22,23 111:7 115:1 116:7 117:25

**frustrated** 38:22

**fuck** 40:15 41:6

**full** 4:6 13:1 14:2,14

**fully** 119:21

**future** 131:19

G

**games** 132:7

**Gateway** 7:25 9:14 12:6 14:1 18:15 19:7,25 20:9, 16,22 21:8 24:19 26:14 28:1 32:17 33:1,4 34:1 37:1,13 44:4 95:8 102:6 126:11

**gathering** 21:24

**gave** 12:24 14:21 25:17, 25 34:12 39:12 41:2 43:5 59:2 65:1 74:19 99:6 118:21 121:16 126:24

**gay** 49:16

**general** 46:23,24

**get all** 58:2 66:21

**get along** 81:17

**girl** 111:6 117:1,16

**Girlfriend** 31:25

**girls** 117:20

**give** 4:16 10:5 15:23 59:5 76:15 83:23 84:25 85:10 116:15 127:6

**giving** 7:10 53:3 54:21 90:22 92:19 98:19 100:2

**goal** 111:9

**Gonzo** 49:10

**good** 4:23 34:8 41:14 42:17 52:10,13 63:23 80:1 102:18,19 111:19 127:17 129:15 131:15

**gotta** 5:16 107:7,8 118:8

**graduate** 7:16,20 9:4,10 10:4,17 12:3 13:1 23:6

**graduated** 8:16,21 10:8, 20 13:4,10 15:4 19:24 23:3 38:25

**graduation** 9:16 11:14 13:1 14:24 42:20

**great** 6:3

**group** 70:12,13,14,15

**grow** 100:11

**guess** 12:15,25 13:6 20:24 21:6 23:8 24:2 33:23 47:11,12 67:22 99:8 104:15 114:10 119:5 121:8,23 129:2

**guy** 59:24 68:2

**guys** 32:24 91:19 104:7 117:12,23

H

**hairdresser** 68:2

**half** 85:12 86:17 122:10

**halfway** 85:13,14

**hall** 10:9 55:14 100:12

**hallway** 88:19

**handle** 58:12 115:2

**hands** 122:13

**hands-on** 20:24 108:25 116:22 122:14 123:5

**hang** 10:8 118:15

**hanging** 11:11

**happen** 5:7,20 36:2 54:24 58:6 59:9 75:7 79:15 81:13 82:8 111:18

**happened** 5:7,11 9:13 27:22 34:11 56:25 62:21 66:12 68:17,24 69:1,24 70:3 71:20 81:3 86:22 95:12 96:21 100:20 102:7 110:21 120:5 126:19

**happening** 18:11,13 27:24 43:20,25 60:7 63:25 64:7 65:13 66:2,9 67:12 68:6,11 74:4 85:18 100:16,18 110:11 119:13 124:9,15,18

**happy** 14:11 58:14 114:7 129:10,22,23

**harass** 58:3

**hard** 6:8 10:2 11:10 23:21 24:6 111:12 125:15 127:14,15 131:22

**harvesting** 122:2

**hate** 114:12

**head** 6:7 42:18 43:13,20 54:9,16 55:24 68:12 74:2, 10,13 75:7 76:20 82:14 98:17 100:12,14 111:4 115:20,22

**health** 32:5

**hear** 5:10 58:14 60:1 90:19,25 94:14

**heard** 59:19 66:1 69:3 79:17 81:21 83:6 84:12 88:12,14 89:21,22 91:11, 19 92:15,18 93:6 95:6 97:9,10

**hearing** 90:10 91:15

**heart** 84:14

**heated** 72:23 121:3

**held** 85:19 111:15

**helped** 52:1 68:3 84:9 90:22 130:12

**helping** 35:3 38:14,15,18, 24 52:17 54:6,13 55:2 65:8 97:5 109:3,5,8 118:19 122:6 123:19 125:8,22 126:2,12,14,17 127:7

**helps** 78:2

**Hernandez** 34:2,9,14,20 35:8 38:9,14 39:20 40:1, 10,11,14,16 41:4,8,25 47:11,13 52:7,8,11,13 53:11,20 54:1 55:2,4 62:10 65:6 70:10,17 71:6, 16,17 72:6 76:8,9 79:7 81:11 83:5,6,8,10 87:19 96:2,13 101:1,2,3,7,22 108:8 115:4

**hey** 5:8,23 7:4 128:9

**hide** 130:19

**high** 7:14,16,20 8:16,21 14:24 15:4 19:24 23:3,5,6, 10,11,12,14,15

**higher** 77:17 98:4

**higher-ups** 90:1 121:5

**history** 20:19

**hit** 34:3

**hold** 124:2

**holding** 85:20 124:18 128:20

**home** 132:8

**homophobicness** 49:15 109:22

**honest** 45:16 52:19 102:9,17 123:12 131:21

**honestly** 30:14 45:15 82:15 91:15 103:3 129:8

**hoops** 103:20

**hope** 75:2

**hoping** 61:17,18

**Hot** 11:19 24:13

**hour** 46:15 102:1

**hours** 26:3,5 48:4,8 84:4 120:19 128:18

**house** 10:19 132:7

**housing** 132:10

**hula** 103:20

**human** 6:13

**hundred** 79:20 103:17

**hung** 114:17

**I**

**idea** 79:13

**identification** 26:12 28:4 30:24 42:6 60:17 61:6

**ignore** 76:14

**illegal** 92:22,24

**impact** 6:23

**important** 5:14 6:9 122:4

**impossible** 54:23 75:8

**improperly** 98:1

**in-house** 59:15 68:1,16 114:24

**inappropriate** 52:16 58:25 67:19 68:11 72:21 97:20 117:3,24

**incidences** 95:16

**incident** 62:21 68:20 81:3 85:7

**include** 22:9

**incredible** 75:6

**industry** 33:21,24

**influence** 6:22

**information** 66:5 75:22

**initial** 65:16,18 79:25 110:13

**initially** 10:13 111:8 112:23

**inside** 50:6

**instantly** 81:22

**institutions** 9:5

**instructors** 101:23

**intentions** 92:5

**interaction** 36:6,13 50:13,14

**interactions** 106:19,22

**interchangeably** 22:8

**Internet** 49:14

**interrogation** 7:3

**interrupted** 91:17

**interviewed** 65:17

**interviews** 130:2

**intimidate** 107:23

**introduced** 101:6

**investigate** 93:4 104:17

**investigated** 77:6 108:14

**investigating** 105:12,22

**investigation** 43:17 66:15 67:12 80:1 98:21 104:20 105:14,24 130:10

**investigator** 44:24 66:23 93:5 94:12,13,22 95:2,5,7

**investigators** 66:16

**involve** 79:4

**involved** 99:19,22

**issue** 83:19 105:13 106:15 118:25 121:2

**issued** 25:21

**issues** 19:3,4 20:10 34:24 59:20 62:3

**J**

**Jehovah** 10:9

**job** 13:13,24 23:19 24:4 129:25

**jobs** 14:25 23:2,16,24 24:3

**jokes** 60:3

**jump** 6:15,18

**justice** 103:21

**Justin** 4:18,19 5:23,24

**juvenile** 32:12

**K**

**key** 65:15 101:23

**keys** 80:8

**kicked** 80:11 82:21 83:10 107:13 116:17

**kid** 11:18 15:5,18 16:16 18:25 21:6 22:3,11 49:21 113:24

**kids** 32:2 70:13,14

**kind** 6:8,14,17 17:6,8,12 69:6 76:10 91:12 112:11 130:15

**Kingdom** 10:9 100:11

**knees** 122:13

**knew** 10:2 23:20 35:1,2 43:10 52:20 53:13 62:9, 10,11,12 64:3 67:25 68:15 69:12,16 70:4 74:6 75:16 76:6,19 78:25 80:20 82:12 83:11,13 84:11,13,15,20 89:25 90:6,8,11 92:11 95:24 104:19 111:5,10,11, 12,15,17 112:6,16,24 115:17,19,23,24,25 116:5 119:10,13,21,25 122:10 123:12 124:9 125:19 126:11 128:22 129:24 130:3,4 131:8

**knowing** 53:5 90:4

**knowledge** 79:19 95:4 108:25 126:16

**L**

**lab** 47:1

**ladies** 57:9

**lady** 14:20 54:8,15 57:20, 24 63:9 90:17 91:7 108:19 116:7 129:17

**late** 9:15 14:15 24:21

**laugh** 60:3

**laughed** 64:17,23

**law** 90:18

**lawsuit** 4:24,25 34:12 102:24 103:2

**lawyer** 5:9 29:24 30:2,3,9

**lawyer's** 4:14

**learn** 10:13 43:8 64:21 85:14 120:5 121:15 122:1, 4,5,7 127:11 128:16 130:24 131:11

**learned** 123:4 126:5 128:21

**learning** 11:15 15:16 19:17 20:10,12,19 24:9 32:6 47:9 109:18 111:16 119:14 121:21 122:3,9 123:2 124:17 125:11,12, 17 126:3 129:22

**leave** 36:25 37:9 55:7 60:5 80:8

**led** 21:9 74:8

**left** 27:4 28:1 33:9 36:2 37:16,18 45:7,20 46:4 58:7 67:25 78:4,24 79:14, 21,24 115:23

**legality** 93:10

**letting** 116:18 118:22

**level** 75:25 123:5

**lie** 92:9 128:17

**lied** 39:12

**lies** 90:25

**life** 16:2 20:5 102:16 111:23

**listen** 62:22

**listened** 115:23

**listening** 65:24

**literally** 41:6 54:21 64:13 73:13 88:13,23,24 91:20 97:14 128:3 129:22

**live** 132:8

**lives** 49:15

**long** 11:1 17:18 30:13 46:13 85:10 96:19,20 101:1 129:18

**longer** 44:4 85:20 105:7 109:20

**looked** 75:5 93:9

**loose** 69:13

**lose** 46:14

**losing** 124:22

**lost** 73:17 129:8

**lot** 10:8 11:11,15 59:20

60:11 74:22 79:17,24 80:21 111:21 113:6 116:18 123:2,19 124:22 126:17 127:16

**loud** 109:14 113:12

**love** 10:11 24:10 111:13 117:20 125:13,14,23 127:21 129:8

**lower** 112:2

**lunch** 52:5

**lying** 90:5,7,23 126:20

**lynch** 65:10

**lynched** 114:12,14

**lynching** 49:18,21 74:1 113:24 114:4,14,16

M

**mad** 112:4

**made** 9:21 26:22 27:24,25 31:9,12 33:19,23 34:19 46:1 53:21,24 54:4,7 61:20 66:13,20 67:4,7 68:19 69:1 74:24 75:15 80:7 81:8 82:2 83:20 84:1, 22 90:3,13 96:17 98:13 105:6 108:10,17 109:19 117:7 121:5

**mailed** 13:12

**make** 5:20 9:22 18:24 22:6 53:16 56:9 60:3,6,10 63:10 65:3 75:21 80:13 82:19 83:9 84:10 91:3 92:8,16 100:15 104:4 106:12 110:13 112:24 113:3,11 117:7 130:18 131:14

**making** 4:25 54:9,23 58:4 75:8 82:5,10 90:20 95:25 112:23 115:9 129:23

**male** 95:10

**man** 74:24 75:3 110:23 111:22 112:13 113:23

**management** 77:3

**manner** 118:17,18

**March** 35:4,25 36:6,11, 13,24 37:2,8 39:3 105:2, 12

**Maricopa** 4:19 103:25

**mark** 26:11 28:22 30:23 40:3,10,13,18 41:6,21,23 59:24,25 60:15 61:7 62:7, 10,21,22 63:1,20 64:9 65:3 67:19 68:4 81:10 84:19 87:13,19 89:8 91:21 96:15,17 97:7 98:4 106:18 108:1,5 110:22 115:1,2,4, 9,10 116:9 124:15

**marked** 26:12,13 28:4,6 30:24 41:17 42:6,7 60:17, 18 61:6

**married** 31:23

**materials** 58:23 59:1,4, 11

**matter** 53:2 56:4,5 57:6 58:18 66:15 74:22 77:25 104:6 108:21 114:25 122:8 130:17

**meaning** 14:3 28:18 114:5

**means** 93:24

**meant** 55:11

**mediation** 25:18,23 26:19 28:2 36:3

**mediations** 27:17,19

**medication** 17:11

**medications** 6:21

**medicine** 18:22 22:5

**meet** 29:24 30:1,3 48:7 101:2,17,19

**meeting** 58:23 59:6 81:7, 12,14 86:21 94:15,17,18, 20,25 95:6,15 104:3,5 105:5

**meetings** 44:22

**mental** 32:4

**mentioned** 7:1 19:12 22:23 52:9 110:5,10 121:8

**message** 42:11 70:11

**messages** 31:19,21 42:10 70:20 73:1

**met** 5:3 101:3,9,16

**Mexican** 50:22 70:14

**mind** 4:6 7:9 27:13 43:13 90:4,11

**mines** 60:23 84:18

**minute** 48:11 71:25 72:17

**minutes** 46:17 71:25 87:11 88:3

**missed** 18:4 124:11

**missing** 17:24 124:5,8

**mission** 87:12 92:4

**mistaken** 17:17

**mistreated** 116:13

**mistreating** 74:9 95:25

**mistreatment** 95:17

**mob** 65:10

**mom** 16:4 129:1,6 131:13 132:8

**moment** 118:7

**Monday** 40:25

**money** 127:7,8

**month** 86:15 97:2,15

**months** 27:11 79:13

**morning** 42:17

**mountains** 74:10 111:4

**mouth** 66:7

**move** 74:21 107:5,7,8,11 119:16 122:8

**moved** 96:8 97:7

**moving** 119:15 121:14

**multiple** 47:1

N

**N-WORD** 68:17,21 110:7

**name's** 4:18

**named** 65:16,24

**names** 81:23 89:22 91:22

**nature** 6:13 15:17 31:19 34:20 44:25 54:10,14 55:23 57:2,23 60:4 72:9 76:17 82:8 91:24 98:24 101:9 106:11,17 110:15, 22 112:12 118:9 123:15

**necessarily** 52:22

**needed** 51:13 77:19 85:14 90:5 111:4 126:2 127:24

**net** 98:10,19

**nigger** 69:5,14 70:7,15,17 72:17 73:5,6,15,16,23 74:25 80:18 113:13

**niggers** 73:24 110:15 111:24

**night** 41:24 42:3

**nods** 6:8

**notes** 76:3 116:2,4

**nother** 55:5 65:23 80:23 120:21

**noticed** 21:17

**notoriously** 6:11

**numerous** 110:24

O

**oath** 5:16

**Obaseki** 115:20

**occasions** 110:25

**OCR** 9:24 25:23 26:19 27:23 28:1 36:3 104:3 105:5

**offend** 117:18

**office** 14:21 42:19 51:8 57:20 63:7,24 67:20 87:16,17,21,24 88:11 101:21 111:7 115:1

**officers** 21:21

**oil** 125:16

**older** 131:7

**ole** 58:23 84:3

**online** 47:8

**open** 80:1 104:20

**opened** 21:14 27:25

**opinion** 99:2 100:3

**opportunity** 5:1,2 7:1

**option** 62:23

**order** 47:25 48:6

**outline** 81:3

**oversee** 106:25

**overseeing** 106:23

P

**pages** 80:20

**paid** 125:10 127:1

**painful** 130:2

**paint** 57:17 68:13 71:3,5, 11 72:4 85:16,18,20,23 86:1,2 95:20 96:1 97:16 125:19,22

**painting** 47:14 68:13 125:24

**panels** 47:16

**paper** 12:25 13:10 65:23 66:24 81:1 108:24 128:14

**paperwork** 13:4,12 20:18 23:22,23 25:24 28:3 47:22 49:3,5,13,14 56:2 68:4,5, 19 86:12 109:10 123:4

**part** 19:20 26:22 35:11 71:20 77:24 81:6 84:17 85:10 87:17,18 97:4,6 107:6 108:3 119:19 122:3, 4

**parts** 24:9

**party** 93:14,23 94:7

**pass** 119:18

**path** 27:10

**pause** 96:12 99:18

**paycheck** 126:1

**paying** 46:7

**peace** 90:4,11

**people** 49:15,16 50:21 58:24 59:11,12 62:14 64:19 65:17,24 66:1,4 73:1,11 76:4 92:19 93:3 95:4 98:3,15 99:1 100:1,5 111:2 114:12,14 131:24 132:2,4

**people's** 93:13,22 94:6

**peoples** 102:19

**percent** 79:20 103:17

**period** 56:16,17 67:5 111:22 125:2

**permission** 74:19 90:18

**person** 34:23 68:8 81:17 100:12 102:18,19 104:8,9 114:17 118:19,21

**person's** 120:21

**personal** 7:11 28:24 29:13 73:1 74:19 75:11 120:20

**personally** 73:2 128:19

**personnel** 77:10

**perspective** 4:14,24

**pertains** 53:19

**phone** 5:8 30:4 42:2 54:22 67:21 88:23 90:17 93:8

**physical** 32:7

**physically** 32:19 36:16 46:4 87:25 88:7 110:4 122:14 125:6

**pick** 5:8

**piece** 90:4

**Pierce** 4:5,19 15:13 37:4, 17 38:5 46:16 93:16,20 94:3,9 102:4

**pin** 81:19

**place** 5:21 20:22 80:22 82:5 120:9

**places** 23:9 34:2

**plaintiff** 4:24

**plan** 56:23 77:10,24 78:17 79:6 82:12 83:9 85:25 108:18

**planning** 130:20,21

**plans** 111:10 131:18

**play** 132:7

**playing** 43:12

**PM** 132:15

**pockets** 127:8

**point** 7:3 22:14 25:14 35:8 39:11 43:4 50:9 54:2 58:7 69:6,16 76:23 79:3,7 88:20 89:24 95:15 104:5, 17 105:9 107:2 132:5

**Polaris** 11:19

**politicians** 109:21

**politics** 49:14

**postponed** 9:13

**predator** 117:19

**prefer** 4:20

**preference** 4:21

**preparation** 29:21 30:20

**prepare** 29:22

**prescribe** 17:11 18:21

**present** 71:20 89:12

**presented** 89:16 104:25

**president** 37:25 57:9

**pretty** 9:20 10:2 11:10 14:22 89:1,9

**previously** 16:9

**primary** 35:8 79:7

**prior** 5:2 17:21 18:16,19 22:1 53:7,15 62:2 109:11, 12 124:11

**private** 75:15 112:23 113:2

**privileged** 30:1

**problem** 49:16,19 55:20 56:3 57:16 59:16 73:5,6 75:13,16,25 78:18 80:25 86:10 104:6,10 106:9 110:19 112:9,14,15 116:5

**proceeded** 72:9 73:2

**process** 82:23 104:17,18, 21 125:12

**products** 73:18

**program** 7:23,25 8:1,17 9:18 11:1,2,7,22,25 12:5 14:3,6 23:4 24:1,19,23 25:2,4,6,11 28:12 32:22 33:15 39:4 40:5 46:18,19, 25 47:8,19 48:14,16,20, 22,24 52:12 58:7 60:14 62:4 63:2 77:11 78:4,25 79:3,14 101:23

**progressed** 126:9

**progressing** 50:18

**prompted** 75:21

**pronounce** 91:10

**proportion** 41:25

**protect** 83:2

**protected** 92:7,8 112:18

**proud** 130:18

**provide** 51:11

**provided** 27:10

**psychiatrist** 16:25 17:3, 10 18:12,17,19,21 19:5,21 21:15,24,25 22:2,10,12,15

**psychiatrists** 20:2

**psychologist** 16:24 17:10 19:5,21 22:9

**psychologists** 20:1

**public** 9:9,11,17,20 10:1 11:2 12:13,19 13:8,17,23, 24,25 23:25 24:4,6 75:15 111:12 112:25

**pull** 26:10 57:14

**pulled** 57:16 83:7 91:17

**purpose** 124:8

**purposes** 4:10

**push** 84:12

**pushback** 54:21 59:5 84:25 90:23 92:20 98:9 99:6 100:2

**pushing** 90:22

**pussy** 73:4 112:11

**put** 45:1 50:22,23 55:17, 22 60:22 66:4,6,23 67:16 68:3,5 81:1 115:13 127:8 130:8

**putting** 131:2

Q

**question** 5:17,19,21,24 6:14,15 7:6 15:11 37:10 42:21 76:23 93:17 94:10 105:10 114:18 123:17

**questioning** 59:7

**questions** 5:19 6:7,23 47:10 49:7 66:23

**quick** 48:10

**quiet** 20:21

**quit** 39:17 77:22 102:13 119:24 123:22 124:3,25 130:15

**quitting** 124:4

**quote** 124:3

R

**R-O-S-S** 4:9

**race** 97:20 98:1,5,14 99:4, 12,17 100:7 103:10

**racial** 110:11 113:17,21

**racism** 102:11,16,21 103:12 112:25 114:14 116:3 130:19

**racist** 48:25 49:22 50:9, 14,17 65:25 69:11,19,22 73:22 74:8 75:4 78:8 97:23 99:14,20,23,25 100:2,5,8,9,13,18,23 103:9 104:12 108:3 111:6 112:22 113:1 115:9,12

**read** 109:11,12,13,14,25 110:1,4 127:16,17 132:13

**ready** 39:14 41:15

**real** 76:10 127:9

**reason** 13:25 15:6 21:16, 19 29:2,18 33:7 36:12,23 37:10 39:5 42:23 50:2 55:13 83:4,16 85:23 109:15 119:16 130:5

**rebuild** 11:15

**recall** 42:12

**receive** 12:7,22 15:2,8 16:10 19:22 22:24 25:23 26:2,4 28:15 47:23 48:6 77:22 127:5

**received** 13:4,7 23:15 26:1 77:2 78:23 127:9 128:15

**receiving** 15:3 16:1,13 19:13 22:8,9,17 28:16,18 77:20 105:11

**recognize** 42:12 60:19, 21

**recollect** 32:21

**recollection** 26:3 27:2 37:21 44:15

**record** 4:7 6:10 89:20 90:5,18 92:18 93:1,7,13, 22 94:6,14,16 95:1,4 98:25

**recorded** 90:13 92:15

**recording** 38:13 81:22,25 82:3 87:23,24 88:17 89:10,16 90:8,15,24 91:4, 11,12 92:2,4,11,12,14 97:10 121:2

**records** 25:19 36:10 37:8 48:15

**red** 59:18

**redacted** 29:14

**refer** 36:21 73:24

**referenced** 56:7

**referral** 18:17

**referred** 59:9 110:14

**referring** 21:24 27:19 38:12 42:10 76:2 91:7

**regard** 7:5

**reiterate** 112:12

**relate** 19:17

**related** 16:10

**relating** 20:6 34:12

**relationship** 34:8 52:10, 13

**released** 50:5

**relied** 106:15

**remember** 13:9,11 14:7 15:21 17:16 26:9 27:14 28:15,18,21 29:5,15,16,17 33:6 37:20,24 40:24 42:13,21 45:12,18,21,25 46:10 50:2 63:14,15,17 89:12 131:1

**remind** 30:18

**reminded** 11:18 24:12

**reminding** 30:15

**removed** 35:24 36:25 103:24 105:2,12 106:1 108:15,16

**rent** 64:20

**repair** 7:24 8:17 9:21 10:13 14:3,6 24:19 33:20 46:19 122:19 131:19

**repeat** 8:18 97:21

**rephrase** 5:23 37:6,7 87:1 93:18

**report** 65:16,18

**reported** 57:7

**reporter** 4:3 6:4,8

**represent** 4:19

**request** 31:1

**requests** 31:9,12

**required** 19:20 48:3 106:4,7 120:13,18

**requirements** 12:19 48:7 120:19

**requires** 47:25

**reschedule** 30:7

**resolve** 105:13

**resource** 9:25 78:20

**resources** 20:23 51:1,5 78:20

**respectfully** 43:8

**respond** 29:4

**responded** 28:24 29:3

**responding** 43:7,8,14,25

**response** 31:1

**responsive** 31:8

**rest** 120:11

**restarted** 125:1

**resumed** 55:6

**retaliate** 81:14 83:1 88:18 92:6 99:2 108:18

**retaliating** 94:24

**retaliation** 92:7 104:11 107:3

**retaliatory** 83:3

**returned** 27:6,9

**reverse** 118:11

**review** 30:19 43:17

**rewinding** 22:10

**rims** 111:24

**rise** 34:12

**road** 111:17

**Ross** 4:1,8,21 132:20

**rug** 108:20

**rules** 81:7

**run** 34:24 82:2 107:9

**rundown** 4:16

**runner** 81:23

**running** 39:11

S

**sad** 126:22

**safe** 78:12,14,15

**safety** 90:8,11 98:10,19

**sake** 83:22

**save** 104:9

**saved** 104:8

**scared** 21:11,16,20 34:20,25 38:10 57:3 73:15 76:20,21 81:10 113:11 118:14 123:21 124:9,20

**schizophrenia** 19:17 20:10 32:6

**schizophrenic** 15:17

**school** 7:14,16,21 8:16, 20,21,24 10:17,18 14:24 15:4 18:11 19:25 20:15,16 21:11,16,21 23:3,5,7,10, 11,12,14,15 24:5 31:18 36:2,16 37:16,18 38:3,8, 15,17,23 39:1 40:4,9,15 41:7,22 44:7,22,24 45:8, 18 49:20 57:14,16 58:1 64:6,9,21 65:1 67:7,8 73:6 75:2 78:14 80:6,23 82:25 87:9 91:19 92:2 97:1 99:7 102:13 103:8,13 104:14, 22 105:7,9 109:4 112:16, 17 118:17 119:4 121:6 122:23 123:3,16,25 124:1, 3,5,8,9,10,21,23 125:1 126:4,17,18,19 127:23 128:4,17,18,20,21,23 129:3,14,16,21,24 130:13

**scoop** 112:2

**Scottsdale** 9:2,8

**sealed** 112:19

**search** 31:7,15,20

**seclude** 55:18

**secluded** 97:11

**secret** 110:20 113:10 116:9 123:13

**secretly** 93:25 94:4,6

**section** 80:23 132:9

**sections** 87:17

**security** 15:2,3,7,8 19:13, 20 21:20 22:24 64:20

**seek** 20:5 21:9,19 23:16 65:1 130:21

**semester** 8:5

**send** 29:19 61:3

**sending** 29:16,17

**sense** 5:21 116:14

**separately** 118:2

**set** 77:10 130:5

**sex** 117:18

**shared** 4:15 52:16 60:11

**shirt** 116:25

**shit** 67:24

**shop** 125:14

**show** 48:15 94:18

**showed** 81:9 87:11 88:4 94:19 125:20

**showing** 38:13

**shows** 123:1

**shut** 10:18

**sic** 49:16 84:24

**sick** 18:2 55:5 92:1 96:9, 13

**side** 36:17 47:14 76:8 88:25 91:18 96:5 97:11 103:17 126:5 130:6 131:2

**sign** 132:14

**signed** 101:4

**Similarly** 6:16

**simple** 123:21 130:23

**single** 58:21 85:22 107:18 115:24,25

**singled** 64:15 75:4

**singling** 59:2

**sit** 55:8 59:25 62:22 103:16 107:22 118:6

**sitting** 73:13 80:24 87:20, 25

**situation** 43:15 50:24 57:1 58:10,12 83:16 91:1 95:14 98:5 99:6,13,19,22 100:5,9,18 101:20 102:8 103:7 105:8 119:24

**situations** 115:18

**skin** 74:14

**skirts** 117:2

**slap** 116:15

**slavery** 114:15 118:11

**Slingshot** 11:19

**slower** 132:2

**smoothly** 114:6

**snatch** 73:19

**snatched** 73:18

**sneaking** 38:3

**Social** 15:2,3,7,8 19:13, 20 22:24 64:20

**solution** 102:17,21 103:11,22 104:13

**sort** 6:21 9:4 23:16 50:12 63:8 131:18

**sorts** 31:21

**sound** 105:3

**sounds** 22:10 32:4 39:2 52:10

**space** 113:2

**speak** 50:18 66:24

**specific** 44:15 74:11 94:19

**specifically** 42:13 44:17 74:13 84:16 100:8

**speech** 55:21

**spelling** 4:6

**spend** 11:1 122:12

**spent** 11:6

**split** 47:13

**spoke** 63:12 84:24 92:17 108:19

**spoken** 62:3 66:16 93:6

**spot** 87:19

**stage** 13:1 23:6

**stand** 65:11 92:20

**standing** 88:23 89:5 107:20

**start** 5:25 7:23 8:3 9:17 14:5 16:1,7,13 19:4 28:14 48:16 49:12 50:19 57:23 61:23 79:11 81:18 85:19 118:16 125:25 126:5 128:10

**started** 8:7,11 10:8,9,10, 11,13,23 11:5,14,15,17 21:8 22:17 24:22,24,25 25:4,9 46:19,20 47:19 48:14,15,20,22,24 53:20 60:14 63:2 65:11 70:9,10 72:21 81:22,25 82:3 86:20 87:23,24 88:4,16,17 90:8 96:19 97:10 101:18 106:15 116:6 126:18

**starting** 24:15 56:17 72:22 77:11 80:21 81:20 109:11,12 122:21

**starts** 56:11 87:11

**State** 9:3,9,23 10:5,20 11:9 12:1,8 24:1 127:14, 22

**stating** 4:6

**status** 58:6

**stay** 38:19 41:11 52:6 109:19

**stayed** 49:3,10 55:1 72:6 83:4 131:13

**staying** 68:1

**stays** 59:17

**stepped** 44:5

**steps** 77:4

**sticker** 81:23

**stickers** 91:22

**stop** 6:13 104:10 105:16 107:23 111:16 116:9 123:11 125:4

**stopped** 73:3 105:15 118:11 123:24 126:10,12, 14,17

**story** 75:6

**straight** 51:21,22 57:19

**stray** 100:10

**strike** 100:25

**structure** 81:7

**struggling** 129:14

**student** 11:25 12:1 54:10 57:9 70:19 72:15,16,18 81:19 98:10 108:4 112:15 121:7

**students** 38:14,24 46:7 49:3,11 52:4 55:18,21 59:1 64:12 65:7 70:12,16 71:7 72:7,10,12 81:15,18 82:20 107:21,24 109:3 116:19 118:3 122:6,13

**study** 12:5

**stuff** 4:15 10:7,14,19 13:11 21:21 23:21 24:7,13 33:10 34:21 36:21 44:22 45:25 46:5 47:6,10,16,17 49:7 52:4 53:4 58:2 59:14 60:23 64:4 74:22 75:9 91:22,23 92:19 96:7 98:12,18 100:2 101:15 102:15 110:15 113:21 116:18 117:3,21,25 118:16,18 119:21 120:8, 10 121:12 122:9,11,19 123:17,25 125:14,17,18, 20 126:20,22,23,24 127:7, 8,12,23,24 130:3,13,25 131:11,14,17 132:7,10,11

**subject** 61:14

**submit** 67:16

**submitted** 61:1 68:25

**substitute** 96:17 97:7

**substituted** 55:5

**sudden** 40:20

**summary** 80:15

**superiors** 109:7

**supervised** 80:13

**supplied** 80:6

**supplies** 80:6

**supposed** 27:21 34:23 35:8 38:15,25 40:12 45:9 47:23 57:6 58:11 68:8,13 78:14,22 81:6 84:11 85:13 86:10,12 87:9 88:2 94:15, 17,20,25 95:6,23 97:5 99:5 100:21 106:10,14,16, 24,25 107:1,3,6,10,17,19 109:5 119:18 120:22 121:4 122:8,9 126:3 130:24

**supposedly** 92:6

**surreptitious** 93:24

**surreptitiously** 93:1,13, 22 94:5

**suspended** 80:11

**sworn** 4:2

**syllabi** 47:20

**syllabus** 47:20 50:5 59:9, 10 98:11 109:10,20,24

**T**

**T-Y-R-O-N-E** 4:8

**table** 123:6

**tail** 58:20

**taking** 6:5,21 7:7 12:5,16 47:16 55:20 58:21 59:14 67:24 74:22 76:3 115:22 126:6

**talk** 4:15 5:2 6:11 48:13 50:25 55:18 59:16 60:2,3 62:9,24 64:16 81:10 83:3 87:13 88:5 89:23 91:15 107:1,20,25 111:7 115:12 116:10,16 118:6,16 130:13

**talked** 14:20 91:2 97:22 100:1 108:1,5 109:9 110:9 113:16 114:21

**talking** 17:4 18:14 23:22 34:6 41:20 42:11 43:3 49:12,13,17 55:21 56:14, 16 64:15 65:18 67:6 68:22 70:3,21 72:14 73:8 80:10 83:6 87:22 88:12,15,17 90:3,7 91:19,20 94:24 97:12 99:1 107:19,23 111:3 113:15,16 124:14, 24

**tattoos** 50:22

**taught** 129:23

**teach** 34:23 74:19 122:10

**teacher** 55:5 69:19 72:19 96:9,13,14,23 100:5 103:7 104:21,23 105:2

**teachers** 75:12 89:25

**teaching** 96:2 123:5 125:15

**technical** 123:5 126:5 130:6 131:2

**technically** 78:21 85:1 117:24 125:10

**teen** 32:11

**telling** 21:18 39:4 41:9 43:19 45:14 49:8 50:20 52:23 54:8,13,22 69:11,18 72:18,25 73:22,23 74:9 76:4,8 80:18 82:9,25 90:25 92:21 98:17,24 108:2 113:24 114:3,15 124:17

**tells** 47:24

**ten** 63:4 88:3

**terms** 21:22 22:7 106:19

**testified** 4:3

**tests** 20:20

**text** 31:19,21 42:10 70:11, 20 73:1 75:11

**texted** 42:3

**theory** 69:10

**therapist** 17:5,6,14,19, 21,23 18:1,3,7,10,12 19:5, 9,10 21:5,13,23 22:17 68:7,15 115:10

**therapist's** 17:15

**therapists** 17:22

**therapy** 19:1 22:9,16,18

**thing** 5:15 6:4 7:5 28:20, 21 30:1 65:15 76:16,18 80:19 82:25 98:14 104:4 105:6 106:3 116:10 120:1 129:2

**things** 4:13 15:17 18:11, 13,14 23:23 27:24 31:15, 21 43:19 44:17 45:8,20 46:5,9 47:14,15,18 50:20 51:6,7,25 52:1 53:25 54:9, 13,24 55:6,23 57:23 58:5, 24 59:13,17 60:4,11,13 61:21 64:7,18 66:21 72:8 74:9 75:7 76:9,11 81:24 82:8,18 83:12,21 84:3 85:14 90:2,10,23 91:23 98:17 101:8 104:11 110:15,16,22 111:21 112:11 113:18 115:8,13 117:19 118:8,13 122:2 123:14 125:15 126:14 127:11 129:19,23 130:13 131:1

**thinking** 76:3 78:21

**thinks** 113:5,7

**thorn** 91:23

**thought** 48:25 49:22 59:24 66:4 69:20 78:16 92:3 110:19 124:1 129:3

**threads** 80:12

**three-month** 105:3

**till** 12:3

**time** 7:3 8:16 9:12,14 10:5,12 11:6 14:1,12,15, 23 16:2,21 17:2 19:24,25 20:8,20 21:4 22:1,2,20 25:8,14 26:1,17 27:22,23 28:16 32:15,17 33:12,25 34:1,6,18 35:5,12,18,19, 23 36:4,12,21 37:15 38:4, 25 39:3,11,15,17 41:1,5, 11,13 43:1,2,6 44:5 45:2 46:14 48:16 50:12 52:11 53:20 54:2 55:8,12,15,16, 25 56:8,14,15,16,17 58:19,22 59:23 60:7,13,24 62:21 63:2,21 64:6,9 66:13,19,24 67:1,3,5,13, 16 68:9 69:3,12,18 71:24 74:15 75:5 76:1,5,23,25 78:22 79:3 81:1,8 82:12 85:9,11,12 86:11,18 88:1 92:3 94:19 95:19 97:1 98:8,22 99:24 101:9,14,23 102:6 103:15 105:3,13,25 107:14,18 109:17,23 110:10 111:20 112:17 113:16 115:6,7,8,14,15, 24,25 116:24 118:6 119:9 121:1,16 122:12 124:1,7, 11,13,14,19,22 125:2 126:20 127:21,25 128:2

129:10,13 131:13

**timeline** 10:22 18:24 27:13 39:2 41:2 43:1 44:3 45:2 106:12

**times** 10:20 56:7 62:25 63:4,18 116:8

**tired** 66:9 67:20 91:15,20

**tires** 73:24 110:15 111:23

**today** 5:3,12 6:22 14:25 16:22 29:22 30:9,20 37:21 49:9 67:23 123:8

**told** 20:25 21:3,15 25:22, 24 26:2,5,7 34:22 35:1 38:1,10,16,17,21 39:8,9, 13,17,20,22 40:1,2,10,13, 16,17,18,22,25 41:6,8,14, 21,24 43:2,6,9,12 46:6 47:7 49:4,5,19 54:5,15 55:23 57:2,8,10 59:10 63:24,25 64:5,14,17 65:23 66:7,10,11,17,19,21 67:20 68:5,10,12,14 70:17,18 72:14 73:20,25 74:17 77:17,23 78:11 83:5 84:16 86:10 90:2,12 91:3,17 92:7,14,15,17,18 93:5,7 94:13,18 95:1,10,18 100:2 102:14 107:10 108:11 109:1 110:14,16,20,24 111:3 112:8 113:8,10,22 115:3,14,16 116:2,8 118:7 120:25 121:5 123:3,15 128:14,16 129:1 130:10, 11

**top** 28:23 29:7 42:15 80:17 120:6

**total** 65:1 119:22

**touch** 42:2 85:25 86:16

**track** 46:14

**tracks** 39:8,19 115:14

**trade** 111:13

**transcript** 51:21

**treat** 65:12 102:19 103:8, 9 117:22 118:1

**treated** 54:2 64:12 69:12 75:4 80:17 81:4 97:25 99:11,12 102:20 104:12 112:7 116:14 117:11,22

118:2,20 124:6

**treating** 48:21 53:1 98:15 111:1

**treatment** 80:5 86:19 98:16 105:16 117:14

**trigger** 69:6

**triggered** 110:7,13

**triggering** 112:8

**trouble** 34:21 40:13 54:6 76:21 82:10 109:7

**true** 37:11 39:23,24 41:10 74:3 79:19 93:5 95:5,11 98:18 106:4

**truth** 5:16,17 98:7 128:11, 13 130:11,16

**truthfully** 6:24

**tucking** 58:20

**Tuesday** 40:25

**turn** 81:15 91:13 100:14

**turned** 16:8 40:16 73:6

**turning** 91:13

**turns** 100:12

**type** 16:10,24 17:3,12 21:5 22:16 24:14 50:21 51:9,10 54:11 57:2 64:25 75:14,19 81:16 118:17

**typically** 13:20

**typing** 116:1

**Tyrone** 4:1,8,21,22 5:8,20 48:13 51:18 67:23 73:3,14 82:1,2,5 102:5 115:21 132:20

**Tyrone's** 4:23

U

**Uh-huh** 105:1

**uh-huhs** 6:8

**ultimate** 111:8

**ultimatum** 83:23

**unbelievable** 43:19 98:25

**uncle** 10:6,21 11:11,16 24:7 111:14 122:18,23 124:24 125:2,5 127:2,3 128:1,2 129:23 130:4 131:6

**uncomfortable** 41:10 50:25 57:4,25 64:14,16 70:21 71:22 72:4,14,24 74:24 77:18 78:12 81:11 98:4 99:22 100:4 110:25 113:23 114:2 115:6

**undershirt** 116:24

**understand** 5:6,17,19, 22,24 6:23 7:24 10:22,23 12:15 13:7 17:7 18:24 20:3,7 25:15 31:10 37:5 44:3 48:3,17 49:20 56:10 57:21 60:6,10 65:12 72:8 73:10 74:11 75:12,17 78:2 82:16,17,22 85:8 87:2 94:2,23 97:4,13 99:8 102:22 104:16,18 110:2 113:12 119:21 121:12 122:10

**understanding** 7:2 14:16,19 24:2 25:1 33:2 48:5 49:4 57:11 109:18,20 119:1 130:3

**understands** 93:17 122:24

**understood** 59:23 82:22 116:11

**university** 12:8 24:1 25:20 37:8

**unquote** 124:3

**unreasonable** 105:13

**up-and-up** 129:20

V

**vehicle** 53:12 57:14,17, 18 74:19 120:20,21

**vehicles** 105:19

**versus** 49:5,8 59:2 64:12 68:7 90:19,22 98:18 107:11 109:5,18 113:18 116:19 123:5

**Vice** 57:9

**video** 90:19 108:12 109:2

**videos** 36:21 38:8,12

**violating** 45:11

**visit** 21:12

W

**wait** 72:17 84:4

**wake** 116:6

**walk** 12:25 23:6 55:14 72:10 73:3 81:13 83:11 87:20 88:14 91:13 101:14 102:14 113:9 122:15,16 123:17

**walked** 58:1 59:13 67:19 68:1,2 73:12 81:21 88:11

**walking** 67:23 72:4,7,11 82:11 97:14 101:5 121:4

**wanted** 4:16 21:19 38:2 39:20 40:3,11,15,19,22 41:6,22 43:6,22 55:17,22, 25 58:17,18 59:7 61:22 77:25 78:16 81:10,19 83:16 85:5 86:13,16 88:18 89:20 90:12 95:21 97:11 103:16,22 104:4 105:18 111:8,10,11,18 112:5 116:10 118:23 120:6 121:15 123:20 124:16 126:4,14,15 127:17 130:6, 17 131:6,8

**watching** 127:11

**water** 7:5

**waving** 51:6

**ways** 98:23 104:22

**Wednesday** 28:10 42:16 44:6,8

**week** 17:5 55:1 96:25 128:3

**weeks** 85:12,21,24 97:15

**welding** 47:18 52:3

**well-being** 90:9

**whatnot** 17:12

**Wheel** 11:19 24:13

**when's** 127:25

**white** 70:13 74:24 99:25 100:1,4 112:15 113:23 114:12,16 116:25 117:1 118:3,9,14,18 122:6,12

**whoa** 72:17

**wife** 73:16 113:12

**Wilson** 91:8,10 92:17 95:2

**wimp** 73:4

**wiped** 108:20

**wished** 130:11

**withdrawal** 61:14,18

**witnesses** 31:13,17 65:14,23

**Woehl** 28:22 40:3,19 41:21 59:15 62:7,10 63:20 65:3 67:19 73:20 75:22 76:1,3,20,24 82:4 84:19 86:24 87:14,19 89:10,11 91:21 95:15 96:17 101:17, 19 110:9,10 113:16 114:19,21 115:1,2,4,9,10

**Woehl's** 89:8

**woman** 62:7 63:7 68:12 74:10,13 111:4 117:10

**wondering** 42:10,20

**WOODS** 15:11 37:3,12, 23 46:15 93:15,19 94:1,8 132:13

**word** 17:9 21:23 65:25 66:1 68:11 69:14 70:11, 15,17 72:15,16,18,19,20 73:5,9,11,15,16,23 74:23, 25 75:14,19,20 80:18 94:4 107:22 112:13,14,15 113:13

**words** 56:15 67:19 69:2, 4,10 70:19 72:21 74:23 109:14 111:2 112:9

**work** 11:12 15:2 22:24 23:8,16,20 24:14 33:20,24 47:2,17 56:23 79:8 103:25 104:3 106:4,7,23,25 107:7,16 118:7,8,10 119:2,7,17,20 120:8,9 122:19 123:9,11 125:18 127:2,25 128:2,7 129:7 130:4,21 131:19 132:4,5

**worked** 24:15 55:1 119:12

**working** 8:19,24 9:1 10:11,21 11:15,17,21,23 24:7 111:14 118:12 119:9 122:18 123:7 125:2,5 126:6,13

**works** 4:17

**worry** 51:8 52:23,25 53:1

**wraps** 73:15

**wrist** 116:16

**write** 65:22 68:8,9,14

**writing** 67:16

**written** 56:12

**wrong** 21:17 52:16,20 53:13 54:3,8 76:12,19 82:18 86:20 98:15 122:16

**wrongly** 81:4

**wrote** 28:11 61:15 79:18, 25

Y

**y'all** 82:19,20 104:10

**year** 7:20 8:10 9:10 10:15 11:3,6,21 15:24 17:20 19:10 24:16 25:7 26:24

**year-long** 25:1

**years** 8:4 13:24 14:9,12 15:25 16:19,23 18:8 19:2, 6,8,13 114:11 127:12 129:11

**yesterday** 30:14

**young** 49:18

Z

**Zane** 49:10

# Exhibit 2

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Tyrone Ross,<br>Plaintiff,<br>vs.<br>Maricopa County Community College District, an Arizona public entity; Brent Cooper and Mark Wohl,<br>Defendants. | Case No. CV-25-01671-PHX-SMB |

DEPOSITION OF ROGER MARK WOEHL

Peoria, Arizona

March 25, 2026

Prepared by:

Gerard T. Coash, RPR, RMR
Certified Reporter
Certification No. 50503

CERTIFIED TRANSCRIPT

# I N D E X


| WITNESS | PAGE |
|---|---|
| ROGER MARK WOEHL | |
| Examination by Mr. Woods | 5 |


## EXHIBITS MARKED


| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Letter from Tyrone Ross<br>MCCCD-Ross 000428 - 000429 | 17 |
| Exhibit 2 | Email caption from Tyrone Ross to Mark Woehl date4d 12-6-22<br>MCCCD-Ross 000431 | 34 |
| Exhibit 3 | Emails<br>MCCCD-Ross 000443 - 000444 | 35 |
| Exhibit 4 | Emails<br>MCCCD-Ross 000462 - 000470 | 40 |
| Exhibit 5 | Email string ending from Lora Timmons to Stephanie Polliard dated 12-12-22<br>MCCCD-Ross 000488 - 000492 | 48 |
| Exhibit 6 | Emails<br>MCCCD-Ross 000466 | 50 |
| Exhibit 7 | Defendant's Responses to Plaintiff's First Set of Interrogatories<br>Case No: 25-CV-01671-PHX-SMB | 58 |
| Exhibit 8 | Plaintiff's First Supplemental Disclosure Statement<br>Case No: CV-25-01671-PHX-SMB | 62 |
| Exhibit 9 | Letter from Amy Diaz to Tyrone Ross dated 3-10-23<br>ROSS_000003 - 000007 | 66 |
| Exhibit 10 | Recording<br>Ross_000053 - IMG_4450.MOV | 99 |

| | | |
|---|---|---|
| Exhibit 11 | Recording<br>Ross_000053 - IMG_4450.mp4 | 99 |
| Exhibit 12 | Non-Discrimination Policy<br>MCCCD-Ross 001058 - 001101 | 100 |

DEPOSITION OF ROGER MARK WOEHL was taken on March 25, 2026, commencing at 9:00 a.m., with the witness appearing from 12428 West Montgomery Road, Peoria, Arizona; with all other participants appearing via videoconference from their respective locations, before Gerard T. Coash, a Certified Reporter in the State of Arizona.

* * *

APPEARANCES:

For the Plaintiff:
MILLS + WOODS LAW, PLLC
By: Sean A. Woods, Esq.
5055 North 12st Street
Suite 101
Phoenix, Arizona 85014
480-999-4556
swoods@millsandwoods.com

For the Defendants:
PIERCE COLEMAN, PLLC
By: Alexandra N. Cayton, Esq.
17851 North 85th Street
Suite 175
Scottsdale, Arizona 85255
602-772-5506
alex@piercecoleman.com

Also present: Tyrone Ross, Sandra Garcia

ROGER MARK WOEHL,

the witness herein, having been first duly sworn by the Certified Reporter, was examined and testified as follows:

09:00:55 EXAMINATION

BY MR. WOODS:

Q. Good morning, Mr. Woehl. Would you state your full name for the record?

A. Excuse me, I couldn't hear you.

09:01:03 Q. Okay. Can you hear me right now?

A. You're very very faint.

(An off-the-record discussion ensued.)

BY MR. WOODS:

Q. Okay. Would you state your full name for the

09:01:19 record?

A. My full name is Roger Mark Woehl, W-o-e-h-l.

Q. I think we might have had your name misspelled, so I'll make sure we correct that. My apologies on that.

Have you ever had your deposition taken

09:01:42 before?

A. No.

Q. Okay. I'll be very brief on the ground rules. We can't speak over each other because the court reporter has to be able to take down all the words that we speak.

09:01:52 Okay?

A. Okay.
Q. We have to -- you have to give verbal answers. Sometimes people will nod or make an uh-huh or something like that. If you hear me say, "Was that a yes," I'm not trying to be mean. It's just we're trying to get a clear record. Okay?
A. Understood.
Q. If you ever need to take a break, let me know. If there's a question pending, go ahead and answer that, then we'll go to break. Sound good?
A. Sounds good.
Q. Okay. Where are you from?
A. Originally?
Q. Yeah.
A. Salina, Kansas.
Q. Okay. When did you move to Arizona?
A. I believe 1980.
Q. Okay. I assume you were young?
A. I was a junior in high school.
Q. Okay. You have some college?
A. I do.
Q. What degrees do you have?
A. I stopped at my AA.
Q. Okay. What is your current job?
A. I teach construction at Mesa Community College, a

faculty member.
Q. Okay. When did you start working at Mesa?
A. Three years ago.
Q. Do you have an approximate month and day?
09:03:17 A. I believe the first day was -- the first day of accountability was like August, I think the 13th or something like that, first or second week of August. It was three years ago. It was 2023, right? Right before the semester begins.
09:03:34 Q. Okay. All right. So well over two and a half years ago?
A. Yes.
Q. And did you leave GateWay to join Mesa?
A. I did.
09:03:47 Q. Why did you leave GateWay?
A. I wanted to teach, so I applied for the job, a teaching position. I applied actually several times, and then finally got an interview and got selected.
Q. Okay. Prior to leaving GateWay, what was your
09:04:09 position before you left?
A. I was the program manager for the Clock Hour programs.
Q. What's a Clock Hour program?
A. So it works on time -- seat time. So clock hour
09:04:24 basically means that a student would pay for X amount of

hours to get the training necessary to complete competencies. And he has to make 100 percent attendance in order to graduate from that program. Versus the credit world where you just do your three credit loads and then move on to your class. This is actually a combination of all classes bundled into a Clock Hour model.

Are you familiar with RSI refrigeration school? They do similar projects.

Q. Okay.

A. So these are technical training schools.

Q. Okay. And you oversaw all the Clock Hour programs?

A. I did. I think there was -- one, two, three, four, five, six -- seven of them.

Q. When did you get hired -- let me ask you this. I'm sorry.

What was the first date you were hired by the Maricopa Community College District?

A. I believe it was 2010, April, maybe. 2010.

Q. You've been employed by them ever since?

A. That's correct.

Q. Okay.

A. I started with Rio, and then I moved to GateWay.

Q. It looks like, based on what I've seen, you were a vocational trainer at Rio?

A. I was.
Q. What did that entail?
A. Teaching. Actually, it was cabinetry at Lewis prison through their incarcerated programs.
09:06:15 Q. And then you were an instructor at the Maricopa Skill Center?
A. For I think about three or four years, I taught construction.
Q. Okay. And then you became an assistant program
09:06:28 manager?
A. I think it was just program manager. I don't think there was an assistant label at the time.
Q. When did that happen?
A. I think in my third, fourth year at GateWay.
09:06:42 Q. Okay. As the program manager at GateWay, what were your day-to-day responsibilities?
A. I oversaw program and staff. It morphed many times in the nine years that I was there to different roles and responsibilities. But primarily, my job was to
09:07:04 make sure that the instructors had the material and the budget that they needed to operate the class properly, meet deadlines that are required by the -- are you familiar with HLC, Higher Learning Commission for accreditation?
09:07:26 Q. Just high level, why don't you explain that?

A. So just program review. I just made sure that the programs were operating smoothly so the instructors had what they need to teach the students.

Q. Okay. Did you oversee any of the students?

09:07:42 A. How so?

Q. Were you responsible for handling student complaints?

A. No -- student complaints, yes.

Q. Okay. That was a broad question. You answered 09:08:01 student complaints, yes.

What kind of complaints were you responsible for?

A. We had two types of complaints. One was noninstructional grievance, and one was an instructional 09:08:12 grievance.

Q. Were you responsible for evaluating instructors?

A. Yes.

Q. What did that entail?

A. Walking into the classroom, meeting with the 09:08:39 instructors, looking over what they were going to teach that day, and then monitoring how they taught that topic or subject. I looked for how they actually presented the curriculum and the training, and then how they interacted with the students. Most of them were done in lab, so we 09:08:56 watched how the students were actually participating in

the labs that were taking place. I measured them on their communication and their ability to deliver curriculum.

Q. You said "we," who else would be involved in that?

09:09:29 A. I don't remember "we."

Q. When I asked about evaluating and supervising instructors, you said that we would go into the classroom.

A. It was just me. I misspoke.

Q. Yeah, I just wanted to make sure.

09:09:48 A. Yeah.

Q. You worked with Brent Cooper, correct?

A. I did.

Q. How long did you work with Brent Cooper?

A. I believe it was six years, five to six.

09:10:04 Q. In that six years, was he in the same role the entire time?

A. He was.

Q. And what role was that?

A. He was the lead instructor for the automotive collision repair program. 09:10:16

Q. Did he report to you?

A. He did.

Q. Was there ever a time in that six years where he reported to somebody else?

09:10:38 A. No.

Q. You were his supervisor when Mr. Ross filed his complaint in December 2022, correct?
A. Yes.
Q. In those six years, did you conduct performance evaluations of Mr. Cooper?
A. Yes.
Q. In those six years, did you ever receive any complaints about Mr. Cooper's conduct toward students?
A. No.
Q. Except for Mr. Ross's, correct?
A. That is correct, until Mr. Ross's, yes.
Q. Okay. Did you ever -- did you ever see Mr. Cooper make any racially insensitive remarks?
A. I did not see him do that.
Q. Did you ever see him make any sexually inappropriate comments?
A. No.
Q. Who was your supervisor?
A. At the time of the complaint or prior?
Q. At the time.
A. It was Craig Urbanski.
Q. Was he the dean?
A. He was the division chair for applied science, I believe. The dean was on I believe what they call a reassignment at the district. So Craig took the position

while he was actually doing work at the district level.
Q. Okay.
A. CJ Wurster, I believe.
Q. CJ -- what was that last name again?
09:12:18 A. Wurster, W-u-s-t-e-r [sic]. But he wasn't present at the time. He was working on bachelor's programs.
Q. Okay. So during that time, was it your understanding that Craig Urbanski was like an interim
09:12:35 dean?
A. Correct.
Q. Describe -- we talked about the automotive repair program. What is that program?
A. Collision repair. It's basically tearing down an
09:12:56 automobile, fixing it, removing the dents, sanding it, and then putting everything back together and painting it. So it was the actual repair part and then the finish part.
Q. Okay. So they would actually do -- in that program, students would do auto body work --
09:13:15 A. At the beginning.
Q. -- painting?
A. And then learning the steps to paint, correct.
Q. In December of 2022, were there other instructors besides Brent Cooper that ran that program?
09:13:32 A. Yes. There was an instructor, Mike Hernandez.

Q. Were Brent Cooper and Mike Hernandez at the same level?

A. Mike was an instructor. Brent was the lead instructor.

09:13:56 Q. Okay. Did they have -- so I'm guessing -- correct me if I'm wrong -- did they have separate classes where Mike taught one and Brent taught the other?

A. They worked together in tandem to help the students because of the number of students and the actual 09:14:19 design of the classroom. Both of them had individual strength, like Brent was better at the collision repair side, and Mike was better on the painting/refinishing side. However, with the volume of students, and for safety concerns, they intermingled between each other's 09:14:41 strengths and weaknesses.

Q. Okay. At the time, were there -- regardless of who was instructing, were there multiple different -- I guess take it back.

In a college, there's an English course. 09:15:03 And there are going to be multiple teachers and multiple times and dates that the English course is taught with different classroom makeups. At the time of -- in December of 2022, were there multiple classrooms for this automotive program?

09:15:21 A. No. There was just the lab and one classroom for

theory.
Q. Okay. So when students signed up under that Clock Hour program for that, it would always be -- the students would have to show up at the same time, same dates. Is that accurate?
09:15:36
A. Yes. The program ran from 7:00 to 2:00. It was six hours a day, Monday through Thursday. 25 hours, I believe, weekly.
Q. Were there any other days that if a student missed a Monday through Thursday, were there makeup days or some sort of situation to allow for makeup hours?
09:16:03
A. There were built-in makeup days. We left our Fridays open for that to be a possibility.
Also within the schedule, we actually had a few days built in like between a section. So if a student completed a body section and was moving from fenders, let's say, to hoods, we would throw an extra day in there for a student to either complete a project or come back and make up time.
09:16:21
Q. In the program that was running in December of 2022, did you know -- or can you recall what the demographic makeup of the student class was at that time?
09:16:49
MS. CAYTON: I'm going to object to FERPA on this question.
MR. WOODS: Okay. I guess you just do a
09:17:13

form, foundation. But if you're going to object to FERPA, all I'm asking about is the demographic. I'm not asking about individual students.

MS. CAYTON: The demographic makeup of those students are going to require Mark to give away individual demographics of the class makeup.

MR. WOODS: I'm not asking, again, about individuals. I'm asking just about the overall. I'm sure that Maricopa County Community Colleges has a demographic statistic that is public facing.

BY MR. WOODS:

Q. So let me ask more specifically, was Mr. Ross the only African-American student at that time?

A. I do not recall.

Q. When I say "at that time," I mean in that actual class.

A. I don't recall.

Q. Mr. Ross came to you with complaints about Mr. Cooper before he filed his formal complaint, correct?

A. Yes.

Q. How many times did Mr. Ross come to you before he filed a formal complaint?

A. I think maybe twice. I know one for sure, but it might have been twice.

Q. Okay. Do you remember Mr. Ross's complaint being

sent to you?
A. What do you mean, sent to me?
Q. Via an email?
A. No. I don't recall it being sent to me. Are you talking about the formal complaint?
Q. I'm talking about -- I'll show you here. Let me just show you. I don't think we're going to mark anything yet. Let me know when you can see this.
A. Yeah, I don't remember that document.
Q. Okay. So you don't remember this document that starts on screen, "Good morning, my name is Tyrone Ross"?
A. I don't remember this document. I don't recall it.
Q. Okay. Just for reference, this document is Bates stamped MCCCD-Ross 000428 and 429. I'm going to mark -- I am going to mark those two pages as Exhibit 1.
(Deposition Exhibit 1 was marked for identification.)
BY MR. WOODS:
Q. When Mr. Ross came to you with his complaints those two times prior to a formal complaint, do you recall what he told you?
A. Excuse me, I didn't hear that last part.
Q. Do you recall what Mr. Ross told you?
A. I do not recall.

Q. Do you recall him telling you that Mr. Cooper had told a student -- a white student that that white student working with Mr. Ross didn't look right, and it is reverse slavery?

09:21:54 A. No.

Q. You don't recall the term reverse slavery?

A. I do not.

Q. What specifically did Mr. Ross tell you about Mr. Cooper?

09:22:12 A. He came into my office to discuss a lot of things all at one time, but felt like he was struggling in the class and needed additional help is what I remember. He told me that they had a personality difference and a clash with how they communicated. And I took down some notes 09:22:35 about what he was talking about. I actually talked to him about our policy and how our policy works, that what we were doing was an informal version of mediation to try to come to some kind of solution to whatever was going on.

I -- from what I can recall, it was that he 09:22:57 needed more time on task to get caught up. And that's pretty much a standard in these programs where students are learning a new technical skill, hands-on skill. Some students accelerate faster than others, and he wanted additional time or additional help.

09:23:20 Q. Anything else?

A. That's all I can remember. Oh, I did tell him that -- you know, I gave him the policy on how noninstructional complaints work by the college, and I told him that he needed to follow that process.
09:23:45 Q. You told him he needed to follow what kind of process?
A. Our noninstructional grievance process. And I don't remember all the details. It's been three years -- three years, maybe four years since I've looked at that.
09:24:02 But the first part I do recall was basically where a student had a conflict of interest. He was asked to speak to the instructor directly to come to some kind of resolution within a certain time frame. And then if it escalated, then it became a formal complaint.
09:24:29 Q. Are there two grievance processes? You mentioned noninstructional --
A. Noninstructional and instructional.
Q. Okay. What would an instructional grievance consist of?
09:24:41 A. You're not happy with a grade or you want to argue about a grade or a test or a quiz.
Q. And anything else on that, or is it just grade related?
A. That's the only part I can recall.
09:25:01 Q. In your current role with Maricopa County

Community Colleges, do those grievance processes still reply?

A. They do.

Q. Okay. What would noninstructional grievance process entail?

A. I don't remember all the details of it.

From what I can recall, it was first you reach out to instructor, you try to figure it out. You guys have a conversation. You come up with a solution, right? You agree to a solution. And then if that doesn't work, then the next step is to have a written formal complaint submitted to upper leadership to see if they can get in the middle and mediate some kind of resolution.

Q. Were there next steps if all that failed?

A. So, yeah, that all went to upper leadership. So once that process starts, I usually was sidelined.

Q. You mentioned that when Mr. Ross came to you that you took notes. Were those handwritten? Were those written into a Word document? How were those -- how were those written down?

A. I wrote them down in a Google form.

Q. In a Google form?

A. In a Google form, yes.

Q. Is that something that you created or something that --

A. It's something I created.
Q. Okay. Is that something you still have?
A. I do not.
Q. Was that created on your personal Google account
09:26:57 or your Maricopa County --
A. Maricopa account.
Q. And when did that -- when did you lose access to that Google form?
A. I didn't look at it after I left GateWay. So I
09:27:19 don't know when it was removed from my box. I think, if I recall, Google sends me these notices every now and then that says these unopened files will be deleted after X amount of days. For some reason, 100 days sounds familiar to me. And I get occasional emails about purging or
09:27:41 archiving. So I don't really pay attention to it, as far as the exact dates.
Q. And you believe you got a notice on this Google form?
A. Excuse me?
09:28:03 Q. You believe you received a purge notice related to this Google form?
A. I could not say that it was specific to that.
Q. Was this a Google form that you had created as a generic form that you could fill out any time there was a
09:28:21 grievance?

A. That is correct. It wasn't just for grievances. It was for any time a student wanted to come in and have a conversation and ask about, you know, how to handle something. So I took notes this way so that it was easily and quickly documented.

Q. Okay. And why would you want it documented?

A. So I had something to recall. Because when you're managing nine programs, you have a lot of students interacting with a lot of different staff members and faculty and instructors, and I couldn't keep it all together. There was times it was, you know, hundreds of students in the actual programs. So in order for me to keep track of this, I created a Google form, basically a checklist to make sure that I wrote down what the student was saying, the date, the time, so that we had an ongoing record of what was going on. A majority of these were solved between a student and the instructor or the staff member without any further interactions. Occasionally, on rare occasions, it showed up again so that it actually gave me a way to monitor how progress was actually being held, because I couldn't be in every classroom every second of the day.

Q. When you filled out that Google form, would it create a document once you submitted it, or how did that work?

A. Yeah, it creates a spreadsheet. You have to download it as a spreadsheet.
Q. Would it save it in your Google drive as a spreadsheet?
09:30:27 A. That's correct.
Q. Okay. And then you could download it to Microsoft or something like that, right?
A. Yeah, you can download it.
Q. Has your Google account changed since you were at
09:30:43 GateWay?
A. I don't really know what that means. My email address changed to Mesa. But as far as the account, I don't believe so. I think it's just been updated with my new designation within the company.
09:31:07 Q. Okay. So when you moved from GateWay to Mesa and your email changed, did you still have access to the same Google drive or did that change as well?
A. No, I still had access to the same Google drive.
Q. When the formal complaint came in from Mr. Ross,
09:31:30 were you asked to provide any documentation that you had related to him?
MS. CAYTON: Form.
THE WITNESS: Go ahead.
BY MR. WOODS:
09:31:44 Q. You can answer if you can.

A. I didn't hear that.
Q. Your attorney objected with the word "form." You're going to hear those objections periodically. She's just preserving her objection on the record. But you can answer the question.
A. So that was shared with my boss.
Q. Okay. So you would share your documentation with your boss?
A. Yes.
Q. And again, that was Craig?
A. Correct, uh-huh.
Q. Did you share the Google form, the spreadsheet that resulted from it with your boss?
A. I did.
Q. Do you remember Mr. Ross telling you that Mr. Cooper told his class that he had attended a lynching with his grandfather when he was a kid?
A. I do not.
Q. Do you remember Mr. Ross telling you that Mr. Cooper used the N-word in conversation during class time?
A. I do remember him telling me that.
Q. Do you remember Mr. Ross telling you that Mr. Cooper made sexually explicit comments in class?
A. I do not.

Q. Do you remember Mr. Ross complaining about being denied donated shop supplies?
A. I do not.
Q. Do you remember him telling you that other students received donated shop supplies?
A. No.
Q. Do you remember Mr. Ross complaining about being denied equal access to the paint booth?
A. No.
Q. Do you remember Mr. Ross complaining about Mr. Cooper actually driving Mr. Ross's personal vehicle without permission?
A. No.
Q. Do you remember Mr. Ross complaining about being singled out for his dress code?
A. No.
Q. I'm sorry, I didn't hear that.
A. No. Sorry, no.
Q. With the two different grievances that you mentioned, the instructional and the noninstructional, were there -- at the time, were there forms maintained that you knew of that were the official forms to use for those complaints?
A. There was link in the syllabus for the students to actually go -- under grievances in the syllabus for a

student to go to. It was the district's site that actually spelled out the process. I also, in our original meeting with Tyrone -- I did this with all students -- I gave them a printed copy of the grievance process to follow so they would have had a printed one. They would have had one in their syllabus, in their course syllabus, and then they would have full access to the student policy manual that also included that.

Q. Okay. Did those processes exist in some sort of overarching document with policies?

A. It was in the policy manual, yeah.

Q. Okay. Did they have specific form names?

A. I'm not really sure what -- what you mean by forms. It was this is the process. They didn't really have a form you filled out. It was this is the process you followed. So if the student had a handwritten complaint that he wanted to make a formal complaint, that's what he did.

I believe it also talked about who in the chain of command would get this formal complaint. So for example, if it came to me, I would submit it to the dean. The dean would review it, and then I believe would actually submit it to the VP so that they were aware, and then it would go through the process of being investigated. I was not in line of investigating my own

staff.

Q. When Mr. Ross came to you before his formal complaint, did you tell Mr. Ross to speak directly with Mr. Cooper about his concerns?

09:36:51 A. I did.

Q. I went through a couple of questions about, you know, did Mr. Ross tell you this. And one of them was did Mr. Ross ever tell you that Mr. Cooper used the N-word. Do you remember answering yes to that?

09:37:12 A. Mr. Ross did tell me that, yes.

Q. Was Mr. Cooper -- I'm sorry -- what race is Mr. Cooper?

A. I think white, Caucasian.

Q. Okay. Again, you directed Mr. Ross to bring his
09:37:32 concerns directly to Mr. Cooper?

A. I gave him both options, to file a formal complaint or to address it with Mr. Cooper.

Q. Did you tell Mr. Ross that nothing could be done about his complaints?

09:37:56 A. No.

Q. At any point did you offer to intervene between Mr. Ross and Mr. Cooper?

A. Did you say ask to intervene?

Q. Yeah, did you offer to intervene?

09:38:14 A. So I did meet with Mr. Ross and with Brent

Cooper.
Q. Separately?
A. On the onset of the complaint. Like I said, what I recall, it deal more with instructional time, that they made an agreement, from what I can remember. It was called a student instructional communication form. It talked about how a student who was behind on competencies could make them up, a timeline for making them up, how the student and the instructor were going to hold each other accountable to this agreement, and then they both signed it. I remember them -- that being Brent Cooper and Tyrone doing that with my presence. They made the agreement. I just signed the document stating that I was there, present, but it was an agreement in classroom management between the instructor and a student.
Q. Besides that agreement, did you take any other steps to separate Mr. Ross from Mr. Cooper?
A. No. I was never asked to.
Q. And I may have already asked this, but before Mr. Ross brought you those concerns, had you ever received complaints from any other student about Mr. Cooper?
A. Not that I can recall.
Q. Do you recall Craig ever saying that there were multiple issues in Mr. Cooper's classroom regarding Mr. Ross?

A. No.
Q. Did Mike Hernandez ever mention any issues or raise any concerns about Mr. Cooper's conduct?
A. No.
09:41:55 Q. Were you aware of any complaint about Mr. Cooper's favoritism towards a female student, first name Missy?
A. I don't recall.
Q. Were you aware that Mr. Cooper made or referred
09:42:15 to certain car aesthetics, for example, as having black rims with a racial slur?
A. No.
Q. And I'm not going to say the word, but it starts with the N-word and then ends in -a-t-e-d, so N-word-ated.
09:42:42 You never heard that before?
A. No.
Q. Were you aware that Mr. Cooper talked about his personal sex life with the students?
A. No.
09:43:21 Q. Do you know a Jessica Brosilo?
A. I do.
Q. Who is that?
A. I believe she runs the apprenticeship program at GateWay Community College.
09:43:40 Q. To your knowledge, is she still there?

A. I'm not sure. I think so.
Q. Do you know a Lora Timmons?
A. Yes.
Q. Who is that?
09:43:54 A. I think she was the dean. I can't remember what department though. I think it was health care.
Q. Do you know a Terese M. Brown?
A. I do know the name. I just don't remember what she did.
09:44:52 Q. Do you know a Melissa Flores?
A. I don't recall the name.
Q. How about Delfina Wilson?
A. Yes.
Q. Who was that?
09:45:07 A. I think she was the VP at the time, of academic affairs.
Q. What about a Jennifer Urrea?
A. No.
Q. How about Tamra Gagnon?
09:45:28 A. No.
Q. How about Stephanie Polliard?
A. Yes.
Q. Who was that?
A. She was a VP. I believe she might have even been -- I don't remember. She was a VP when I was there. 09:45:45

I think she was -- I can't recall. But I thought maybe she was an interim president. I can't remember now. There was a lot of changes, a lot of transitions during my time there.

09:45:59 Q. How about a Mika Davis?
A. Mika, yes.
Q. Who was Mika Davis?
A. She was director of HR.
Q. How about David Bowman?
09:46:18 A. What was the last name?
Q. Bowman, B-o-w-m-a-n.
A. No. I don't know him.
Q. Did you ever have any interactions with Delfina Wilson?
09:46:35 A. Yes.
Q. What -- when would you have interactions with her?
A. During meetings, mostly, talking. She was just mainly talking and just letting us know what the
09:46:55 institution was doing on the academic affairs side.
Q. When would you have interactions with Stephanie Polliard?
A. She -- she was my second-in-command -- second-in-command or two levels up. So same thing,
09:47:27 meetings, requests for information, standard, like,

program manager stuff. She also was responsible for helping me align my funding with my programs and helping me get funding by submitting funding requests through her.
Q. When would you have interactions with Jennifer Urrea?
A. I don't know who that is.
Q. Okay. Just a little bit ago I think you testified that you remember who -- the name Jennifer Urrea. Is that true or no?
A. No. Jennifer Urrea?
Q. Yeah.
A. No, I don't remember that name.
Jessica, is that who you're talking about? Brosilo?
Q. Yeah, you did mention Jessica Brosilo.
A. I don't remember the name.
Q. You remember Brosilo?
A. I do.
Q. And when would you have interactions with her?
A. When we were trying to align up apprenticeship noncredit classes so that they could actually schedule time to use some of our facilities for that kind of training, also helping our students who were looking for apprenticeship-based programs to get into after they graduated, connecting her and her team with them, so

students had someplace to go.
Q. Do you know a Judy Castellanos?
A. The name is familiar, yes.
Q. Familiar enough to remember interacting with her, or just that you remember the name?
A. I did interact with her. She was the HR personnel from the district.
Q. When would you interact with her?
A. Usually during staff-to-staff complaints or interactions. She would be one that would actually investigate what was going on. That was basically it.
Q. Did you know that Mr. Ross had some disabilities?
A. I did not.
Q. Did you know that Mr. Ross asked for accommodations because of disabilities?
A. I do not.
Q. You don't recall Mr. Ross explaining to you that he needed extra time on things because of his disabilities?
A. Not because of his disability.
Q. What do you mean by that?
A. He asked for extra time, but I can't recall because of disabilities. From what I recall, it was because he was struggling to understand the concepts or get the concepts.

Q. I am putting Exhibit 1 back on the screen. Do you see it?
A. I do.
Q. Okay. And I think you mentioned earlier that you don't remember seeing this document. Is that right?
A. I don't remember this document.
Q. If you read some of this, would that help you?
A. Help me remember?
Q. Yeah.
A. I'm looking through it. I don't remember this document. I don't remember the specifics of any of this, to be honest with you. No, I do not recall this document.
Q. Okay. And on this last page, do you recall any of this?
A. I do not.
(Deposition Exhibit 2 was marked for identification.)
BY MR. WOODS:
Q. Let me share another document here. I'm sharing a document which we'll mark as Exhibit 2. At the bottom, it's Bates stamped MCCCD-Ross 000431. Do you see that down at the bottom?
A. I do.
Q. At the top of the email, there's a "From" Tyrone Ross and a "To" to Mark Woehl. Was that your email

address at the time?
A. Yes.
Q. And this is dated Tuesday, December 6, 2022, correct?
09:53:57 A. It is.
Q. And there's an attachment that says "Tyrone complaint.docx." Do you see that?
A. I do.
Q. Do you recall ever receiving this email?
09:54:06 A. I don't remember.
(Deposition Exhibit 3 was marked for identification.)
BY MR. WOODS:
Q. I'll share my screen again. Can you tell me when
09:55:07 you see it?
A. I can see it.
Q. Okay. This document is Bates stamped MCCCD-Ross 000443 and it runs to 444. Do you see that Bates stamp at the bottom with the 443?
09:55:26 A. I do.
Q. Okay. At the top of this it says "On Thursday, December 8, 2022, at 1:03 p.m., Delfi Wilson wrote." Do you see that?
A. I do see that.
09:55:39 Q. And then in there Delfi writes, "Jessica, good

afternoon. Craig shared your email below. I received Tyrone Ross's letter via email this morning from Lora and Craig." Do I have that right?

A. Do you what?

09:55:59 Q. Do I have that right?

A. That's what it says, yes.

Q. Okay. Thank you.

There's another email right below it, on Thursday, December 8, 2022, at 12:22 [sic] p.m., and it

09:56:12 says that Craig Urbanski wrote. Do you see that?

A. I do see that.

Q. Okay. And it says, "Please see the attached from Jessica," correct?

A. That's correct.

09:56:24 Q. Okay. And then down below that, there's another email from Craig Urbanski on Thursday, December 8, 2022, at 12:09 p.m. Do you see that?

A. I do see that.

Q. Okay. And it's to brosilo@gatewaycc.edu, and

09:56:36 it's cc'd to Stephanie Polliard and Mark Woehl, correct?

A. It is.

Q. And that's your email address following your name, correct?

A. That is my email address.

09:56:52 Q. Okay. And in that email address -- or in that

email it says, "Jessica, there are multiple issues going on in this class. Thus, I have already referred this student's letter to Mika, Lora, Tresse, Delfi. They are aware and will be following up." Do I have that right?
09:57:10 A. That is correct.
Q. Okay. So on that day, Craig sent you and Stephanie and Jessica an email, correct?
A. Yes.
Q. Do you recall at that point Craig Urbanski saying
09:57:28 that there were multiple issues going on in this class?
A. I do not recall. I think it was Jessica saying it, not Craig.
Q. The way I read it is, "Jessica, there are multiple issues going on in this class. Thus, I have
09:57:47 already referred this" --
A. Oh, I see what you're saying, from Craig. I got you, yes.
Q. Okay.
A. You're correct. Thank you for correcting me.
09:57:54 Q. Yeah. No, I just want to make the record clear.
Below that is another email from Jessica Brosilo. It doesn't have the cc's on it. And it was sent on December 8, 2022 at 11:57 a.m., correct?
A. That is correct, December 8, 2022.
09:58:15 Q. Okay. And in that email it says, "Hi Craig,

Mark, and Stephanie. This morning I spoke with a student in our auto body and collision repair program, Tyrone Ross," correct?

A. She does, yes. Correct.

Q. She said that "He was in the front lobby and Patty directed him to me because he claimed he did not feel comfortable going back to class," correct?

A. Yes.

Q. "He has alleged that Brent Cooper has unfairly targeted him based on race." Did I read that right?

A. You did.

Q. "Tyrone told me that [he] has already spoken to Brent, Mike Hernandez, and Mark Woehl about the allegations." Do I have that right?

A. Yes.

Q. At that time, do you remember him -- Mr. Ross having made certain allegations regarding Mr. Cooper?

A. At this time, this date, do I remember him making allegations?

Q. Yeah, on December 8.

A. After he filed the formal complaint, he did -- I do know he made allegations.

Q. When you say "the formal complaint," what do you mean by that?

A. So he said -- what I mean is that he felt that he

was being discriminated. And I said under those context -- under that context, he -- I recommended strongly that he write a formal complaint outlining everything. His interactions with me were about getting closure or getting support in the classroom. That's what I recall. It wasn't about being separated from the class. It was just about seeing if he could get some help, either working with Mike Hernandez to finish his project or getting additional support in the class as far as time. I believe he was missing -- his attendance wasn't at 100 percent and he needed to make up time. That's what I was there for.

Once it became, as you can tell, a formal complaint, it went to Mika, Lora, Terese, and Delfi, above my purview as a program manager, and went to them to further investigate these allegations.

Q. So that document that we looked at earlier, Exhibit 1 that had that single-spaced wall of text, you recall that document, right?

A. I don't know which one you're talking about.

I know he files a formal complaint. I just don't ever remember seeing it.

Q. Right. And you see the --

A. I don't ever remember seeing this. I don't recall seeing this. I know he filed one, but I don't

remember seeing it.
Q. Do you recall a different complaint being filed than this one?
A. No, I don't remember if he filed multiple complaints, if that's what you're asking.
Q. Do you remember seeing an actual complaint in any form written by Mr. Ross?
A. Not that I can recall.
MR. WOODS: All right. We've been going for almost an hour. Why don't we take a five-minute break.
(A recess ensued.)
(Deposition Exhibit 4 was marked for identification.)
BY MR. WOODS:
Q. Let me know when you see that on your screen.
A. I see it.
Q. All right. So this is a document I'm showing you. It's Bates stamped at the bottom. I'll skip the preamble. It's 462 and it runs to 470. Do you see that?
A. I do see that.
Q. Okay. Now, at the top, there's an email from Judy Castellanos on Monday, December 12, 2022, correct?
A. Yes.
Q. In that email, Judy writes, "Based on this additional information that has been shared, we would need

to remove this employee while the investigation is concluded." Do I have that correct?
A. You do.
Q. Do you remember any of your higher-ups at the time telling you that Mr. Cooper had to be removed from the classroom?
A. Being told? Yes, being told. He was removed. I actually -- it was at the same time. I was told and he was being removed at the same time, from my recollection.
Q. Who told you?
A. I do not recall.
Q. As we scroll through this, there's a big black box, which means that that portion has been redacted and there's a privilege log which we'll explain why. But I assume it's because Melissa Flores was an attorney working on this. Do you remember Melissa Flores?
A. I do not recall that name.
Q. If you scroll down, there's another email from Delfi Wilson on December 9, 2022. The subject line says "Confidential Complaint Letter Received Tyrone Ross." Do I have that right?
A. You have that right.
Q. Another black box on the next page that goes to page 464. And there's an email there on December 9 at 9:22 a.m. from Delfi to an email tyr2142738@maricopa.edu,

and also copied to Sydney Craig. Do you see that?
A. I do see that.
Q. We were asking about names earlier, but I didn't ask about Sydney Craig. Do you know who that is?
10:14:25 A. She was the administrative assistant to Delfi.
Q. Okay. In that email, Delfi says, "Mr. Tyrone Ross, good morning. I am the" VP -- or, sorry -- "Vice President of Student Affairs at GateWay Community College. I would like to acknowledge that I received a copy of your
10:14:45 complaint letter on December 8, 2022." Do I have that right?
A. You do.
Q. Okay. Scroll down to the next page, 465. There's an email from Lora Timmons, dated December 12,
10:15:06 2022. Do you see that?
A. Yes.
Q. And she says, "Was there a response to the email he sent . . . Just trying to figure out where we are with this and how to proceed." Is that right?
10:15:19 A. That is right.
Q. There's an email in that chain as well, on Monday, December 12 at 2:49 p.m., from Terese Brown, and she wrote, "All, I confirmed with Syd that there was never a BIT report submitted for [redacted] or Tyrone." Do I
10:15:53 have that right?

A. You do.
Q. What's a BIT report?
A. Behavioral incident, I think, report. Behavioral Intervention Team, I think is what it stands for.
10:16:09 Q. Okay. Were you ever involved in creating BIT reports at all during your time frame at Maricopa Community Colleges?
A. I didn't use them very often, so no, I can't recall a time that we used them.
10:16:30 Q. Do you recall -- or do you know what the process is to create a BIT report?
A. The only one that I can recall, you know, because we had an intoxicated student in the class who was behaving erratically, and a report was written about what 10:16:48 had happened with that student who was intoxicated. It happened one time when I was there.
Most BIT reports were actually written by the instructor. I happened to write that one because, at the time of the incident, I was in the class with the 10:17:09 instructor, so I created that report.
Q. So on December 12, 2022, you knew that there was never a BIT report created --
A. I wouldn't have known that because it doesn't come to me.
10:17:27 Q. Who does it go straight to?

A. Usually goes to academic affairs. So it goes to enrollment services usually, who is responsible for counseling and -- I don't know the other word for it -- the disabilities resource team.

10:17:55

Q. We just read the sentence there, but it says, again, "There was never a BIT report submitted for [redacted] or Tyrone," correct?

A. Correct.

Q. So there were two students that a BIT report was not submitted for, correct?

10:18:16

MS. CAYTON: Form.

THE WITNESS: Yeah, I don't know what's underneath that black thing, so I couldn't tell you.

BY MR. WOODS:

10:18:26

Q. Next, as we scroll down, there's an email from Terese Brown on December 12, 2022 at 2:45 p.m. There's a big black box. And then it says, "Tyrone's complaint, though different, is related." Do I have that right?

A. That is right.

10:18:42

Q. Related to what?

MS. CAYTON: Form.

THE WITNESS: Yeah, I don't know.

BY MR. WOODS:

Q. The language of this -- as we talked about earlier, there was a black box -- "or Tyrone" -- would

10:18:53

suggest that there were two complaints. Would you agree with me?

A. I've never seen these emails, so I don't know what's behind the black boxes. They didn't come to me.

10:19:11 Q. And then in this next email that we just started talking about, it says, "Tyrone's complaint, though different, is related." You would agree with me that that suggests that there is a different complaint as well, correct?

10:19:25 A. That's what it says, yes.

Q. And then it says, "There are concerning themes about the students' experience with the class." And students is plural, correct?

A. It is.

10:19:36 Q. ". . . to include possible sexual harassment, discrimination, and an environment where students are scared to come forward," correct?

A. Correct.

Q. As we scroll down, there is another email on

10:19:54 Monday, December 12, 2022 at 2:24 p.m. from Lora Timmons, correct?

A. There is.

Q. And she says, "This is a related issue to the Tyrone Ross complaint, but the issue was submitted to BIT

10:20:08 and there has been no follow-up on . . . perhaps some of

why the other escalated. Can I find out where this is?" Did I read that right?
A. You did.
Q. So that would suggest that there's a related issue, meaning another complaint other than Tyrone Ross's, correct?
A. That's what it's implying, yes.
Q. Right below that there's a forwarded message from you to Lora Timmons, and it has a subject line of FWD, there's a redaction, and then there's the word "issues," and you wrote "FYI," correct?
A. Yes.
Q. So you forwarded an issue to Lora Timmons that was unrelated to Tyrone Ross, correct?
10:20:54 A. I don't remember what the FYI was for.
Q. Further down below, there's another email from you to Brent Cooper, Terese Brown, Sydney Craig, Mike Hernandez, and Craig Urbanski. Do you see that?
A. I do see that.
10:21:12 Q. That was sent on December 1st, 2022 at 8:45 a.m., correct?
A. Correct.
Q. And again, the subject line says "RE:", it's redacted, and then the word "issues." Is that correct?
10:21:26 A. That is correct.

Q. If you scroll further down, there's a fully redacted page, and then pages of just email signature lines, correct?
A. That is correct.
10:21:42 Q. Okay. So you sent an email on December 1st, 2022, correct?
A. I did send an email, it looks like, on December 1st, 2022.
Q. And then again, that entire email is redacted.
10:22:00 Do I have that right?
A. That is correct.
Q. Okay. Earlier you had testified that you don't recall any other complaints about Brent Cooper. Do you remember that?
10:22:09 A. I do remember that.
Q. Okay. After seeing this, do you recall now there being another issue related to Brent Cooper?
A. I don't recall.
Q. And just to be absolutely sure, though, you sent
10:22:27 this email, correct?
A. I did send the email, but I don't recall what the issue was.
Q. I don't think I said it out loud, but I'm going to mark that as Exhibit 4.
10:22:45 A. Sorry, I didn't hear you.

Q. Sorry, I said I don't think I actually said it, but I'm going to mark that as Exhibit 4.
A. Oh, okay.
MS. CAYTON: Just to confirm, Exhibit 4 is 462 to 470, correct?
MR. WOODS: Yes, that's correct.
MS. CAYTON: Thank you.
MR. WOODS: No problem.
(Deposition Exhibit 5 was marked for identification.)
BY MR. WOODS:
Q. I'll share another screen with you. Let me know when you see it.
A. Yes.
Q. Okay. And we'll mark this as Exhibit 5, just get that out of the way. It's 488 to 492. You see that at the bottom?
A. I do see it.
Q. Okay. On the first page, there's an email from Lora Timmons on December 12, 2022, at 17:38 hours, correct?
A. Yes, 17:38:19.
Q. Lora writes, "Thank you. I have spoken to Mark and conveyed the 'in progress,'" correct?
A. Correct.

Q. Subject line is Re: redaction issues, correct?
A. It is.
Q. Do you remember speaking to Lora Timmons at that time about an issue in Mr. Cooper's class?
10:24:23 A. I do not.
Q. Down below is an email sent December 12, 2022 at 5:25 p.m., by Stephanie Polliard. Do you see that?
A. I do see that.
Q. Starts with a redaction. And then it says,
10:24:41 "Delfi and I are working on the Tyrone part of it. Waiting for clarification on whether or not we need to pull the instructor even though the student is no longer attending. I think the only message you (Lora) can convey to Mark is that we're all working on it. We will keep you
10:25:00 and Mark in the loop as we progress through this." Do I have that right?
A. You do.
Q. Do you recall Stephanie Polliard working with you as they progressed through this?
10:25:15 A. I do not recall her working with me.
Q. As we scroll a little further down, at the bottom of 488, there's an email from Lora Timmons on December 12, 2022 at 5:21 p.m. She writes, "As long as it is moving forward, that is what I was trying to find out for Mark."
10:25:39 Do I have that right?

A. You do.
Q. Do you remember working with Lora Timmons at that time on issues in Brent Cooper's class?
A. I don't remember working with Lora.
10:25:52 Q. Okay. We've already looked at those emails, so we're done with that.
(Deposition Exhibit 6 was marked for identification.)
BY MR. WOODS:
10:27:11 Q. Let me know when you can see the screen.
A. I can.
Q. We'll mark this one as Exhibit 6. This is one page, and it's 466 at the bottom. Do you see that?
A. I do see that.
10:27:23 Q. In the middle of the page, there is an email from Lora Timmons on December 12, 2022 at 2:24 p.m. Is that correct?
A. That is correct.
Q. It says, "This is a related issue to the Tyrone
10:27:37 Ross complaint, but the issue was submitted to BIT and there has been no follow-up on . . . perhaps some of why the other escalated." Do I have that right?
A. You do.
Q. Do you recall an issue escalating at that time
10:27:53 other than Mr. Ross's?

A. I do not.

Q. Right below that email is an email from you to Lora Timmons. We've already seen this email, but I just want to be clear. That email is from you on December 12, 2022 at 8:20 a.m., correct?

10:28:08

A. That is correct.

Q. And it was just sent to Lora Timmons, correct?

A. Yes.

Q. And in that email, you just wrote "FYI," correct?

10:28:24

A. Yes.

Q. And there's subject of FWD: Redacted issues. Do I have that right?

A. That is correct.

Q. And you don't recall sending this email?

10:28:38

A. I don't remember.

Q. And you don't recall there being any other issues other than Mr. Ross?

A. I do not.

Q. But you do recall Mr. Ross's issues, correct?

10:28:47

A. I do remember Mr. Ross coming into my office and talking about needing additional help with his program.

Q. And you remember that clearly?

A. Yes, I remember that clearly. He was in my office, and we were discussing options so that he could complete the program.

10:29:11

Q. Okay. But you don't remember him reporting racial concerns or sexual concerns. Is that correct?
A. Well, once he brought it up, part of my responsibility was to inform leadership, that was the practice, that a student has this complaint, and then share with them our process for dealing with these kinds of complaints. So that's what I did. Basically I think what you're reading here is the outcome of upper leadership working through that process of investigating.
10:29:31
Q. In that December time frame and even prior, how many times did Mr. Ross come to you?
10:30:03
A. I can recall two times only.
Q. Only two times.
Do you recall when those two times were?
A. I do not.
10:30:15
Q. And you only recall him asking you about issues with his -- I'm sorry. Let me just ask that again.
Just repeat again what he told you.
MS. CAYTON: Asked and answered.
But you can respond.
10:30:37
BY MR. WOODS:
Q. Yeah, I just want to get a recollection here for my next question.
A. He wanted to know what we could do to get him the kind of help that he needed to make up some time in his
10:30:45

classroom and finish his project. That's what I recall. That was the main theme of our interaction, was how we could get him additional time to complete the tasks, to finish the competencies, and complete the program.

10:31:08 Q. And again, you remembered him saying that Mr. Cooper used the N-word, correct?

A. I do remember him saying that, yes.

Q. Is that when you told him to go through the formal complaint process?

10:31:31 A. The formal complaint process was always on the table. It's actually -- it actually was part of our conversations every time. I followed that same practice with every student, right? I followed the steps. I think there was like three steps, you know. He introduces the 10:31:51 issue and the concern. We talk about a resolution with the faculty member. We work through that, agreed upon by both of the staff and the student -- I mean the instructor and the student. Then once it escalates, it moves to upper leadership. So when Tyrone escalated it, then it 10:32:13 went to upper leadership, out of my privy.

Q. But as we saw, you actually forwarded certain emails to your upper leadership --

A. Well, I let them know, yeah, things were happening. That's correct. That's part of the practice. 10:32:31 As soon as -- you know, I don't know if the student is

going to file a formal complaint. So on behalf of working with the college, I let my leadership know this is what's going on.

Q. We talked about earlier that Mr. Cooper was removed from the classroom, right?

10:32:46

A. The thing we talked about earlier stated that they were considering removing Mr. Cooper. And then yes, when I realized he was being removed -- when I was informed, it was at the same time he was being removed.

10:33:10

Q. So he was actually removed?

A. He was.

Q. For how long?

A. I don't remember the timeline.

Q. Did he come back to the classroom?

10:33:22

A. He did.

Q. That same semester?

A. We don't work in semesters. It's yearlong. So I don't remember how long he was out and when he returned. I just don't -- I don't remember the timeline.

10:33:39

Q. So this -- sorry -- this Clock Hour program went for a year?

A. It goes for 600 -- I believe 680 hours, so I believe it covers an eight-month -- eight to nine months of contact time with the students.

10:34:07

Q. So during that time -- at some point during that

eight-month period, after Mr. Cooper was removed, he came back to the classroom, correct?

A. You know, I don't -- I don't remember that outcome. So I think maybe my memory is a little foggy on this. I think -- I don't think he did once he was removed. I think he -- he and upper administration met, had a meeting, and then things were discussed. And I think he -- either they let him go or he resigned. I didn't get the details of the outcome, so I don't -- I don't recall. I think -- I think Tyrone left the class and then came back. Brent was still there. But I can't remember the other way. It was a while ago.

Q. Do you recall a formal investigation being performed regarding Mr. Ross's complaints?

A. I do recall that there was a formal investigation being done.

Q. Do you recall when that was done?

A. No.

Q. Do you recall being interviewed during that process?

A. I do not remember being interviewed.

Q. You don't remember being interviewed or you know that you weren't interviewed?

A. I don't know if I was interviewed. I don't remember. I think -- I think they had everything that I

had available already documented and sent to them. So I don't remember them ever coming and having a conversation with me about the investigation at all.

Q. Do you recall ever being sent anything or any requests regarding a formal investigation?

A. No.

Q. So just to be clear, do you recall anything about the formal investigation?

A. No. I do not recall anything about the investigation.

Q. Do you recall -- Okay. So you don't recall anything about it. Do you recall being interviewed by district employees informally about Mr. Ross's complaints?

A. No, not even informally.

Q. Now, Ms. Cayton is here. She's your attorney, correct?

A. Yes. She's the attorney for the district.

Q. And you, correct?

A. Yes.

Q. And Brent Cooper, correct?

A. Yes.

MS. CAYTON: Sean, I just want to jump in here. I'm the attorney for the district, both Mark and Brent have only been named in their official capacities. So to the extent that they're district employees, I

represent them, but I don't represent them in their personal capacity.

MR. WOODS: Thank you.

BY MR. WOODS:

10:39:13 Q. What did you do to prepare for this deposition?

A. Read the complaint.

Q. Any other documents?

A. The documents, yeah. Is that what this is? I read this.

10:39:31 Q. I didn't see it. What does it say?

A. It says Tyrone Ross, plaintiff, amended complaint and jury demand. That's what I read.

Q. Do you have any notes on that document?

A. I do not.

10:39:44 Q. Do you have anything else in front of you?

A. My Monster.

Q. Any other documents?

A. No.

Q. So you read the first amended complaint, that's

10:40:00 it?

A. That's it. I also spoke to Alex.

Q. You spoke to Ms. Cayton?

A. Ms. Cayton, yes.

Q. How many times?

10:40:10 MS. CAYTON: You can tell him that we spoke,

but please don't discuss the substance of our conversation.

MR. WOODS: Yeah, I don't want you to break attorney-client privilege.

10:40:18 THE WITNESS: Yeah, we spoke one time.

BY MR. WOODS:

Q. For about how long?

A. An hour.

Q. Did you go over any documents during that time?

10:40:29 A. That's where I got this document.

MS. CAYTON: Form.

BY MR. WOODS:

Q. Okay. So again, just to be clear, the only document you reviewed is the amended complaint?

10:40:39 A. That's it.

Q. You didn't look at any of your emails?

A. I did not.

Q. Okay. Did you look at any of the discovery responses in this case?

10:40:48 A. I don't know what that is.

Q. Do you recall -- do you recall being sent anything called Interrogatories?

A. I don't know what that is either.

(Deposition Exhibit 7 was marked for identification.)

10:41:07

BY MR. WOODS:
Q. Can you see the document I have on the screen?
A. I can.
Q. All right. We're going to mark that as Exhibit 7. And this is titled "Defendant's Responses to Plaintiff's First Set of Interrogatories." Do I have that right?
A. You are correct.
Q. I'll scroll through this document. We have Responses and Objections Common to All Interrogatories, 1 through 4. Do you see that?
A. I do see that.
Q. Okay. Then there's a section titled "Specific Responses and Objections to Interrogatories." Do you see that?
A. I do see that.
Q. So Interrogatory No. 1 asks for names, addresses, phone numbers of all students. Do you see that?
A. I see that.
Q. And there was an objection under the answer for FERPA. Do you see that?
A. I do see that.
Q. Okay. Interrogatory No. 2 requested -- said, "Provide names, addresses, and phone numbers of all persons You interviewed or obtained information from in

connection with any investigation of Tyrone Ross's complaints of racial bias, prejudice, or discrimination." Do I have that right?
A. You do.
10:42:24 Q. The answer says, "The District objects to this interrogatory to the extent it seeks student information protected by FERPA. Subject to and without waiving its objections, and after a reasonable inquiry, the District states that it interviewed the following employees in
10:42:40 connection with its investigation of Plaintiff's internal complaints." Do I have that right?
A. Yes.
Q. The answer is, Brent Cooper, Mark Woehl, Michael Hernandez. Do I have that right?
10:42:52 A. You do.
Q. Do you recall, after seeing this answer, being interviewed regarding Mr. Ross's complaints?
A. No.
Q. Would that answer be wrong?
10:43:14 A. What do you mean?
Q. The response to my -- our question about all persons being interviewed, the answer was Brent Cooper, Mark Woehl, and Michael Hernandez. You don't recall being interviewed by the district.
10:43:29 A. I don't recall.

Q. The question is, is that incorrect?
A. I don't even recall being interviewed by the district. I don't recall an interview.
Q. You don't recall this document either, correct?
10:43:43 A. I've never seen this document.
Q. Do you recall ever being interviewed by anybody from the United States Department of Education Office of Civil Rights?
A. No.
10:44:13 Q. Do you recall seeing -- I'll just shorten it to OCR. Do you recall seeing any documents from OCR?
A. No.
Q. You didn't see any complaint documents or resolution documents?
10:44:31 A. No. What is OCR?
Q. The Office of Civil Rights.
A. No.
Q. There's objections related to FERPA, but students can consent to disclosure of their information, correct?
10:45:01 MS. CAYTON: Form.
THE WITNESS: Do I answer?
MR. WOODS: Yeah.
MS. CAYTON: Yes.
THE WITNESS: So can you repeat the question, please?
10:45:15

BY MR. WOODS:
Q. Yeah. The question was, the district claims FERPA -- or objected based on FERPA about student information. But students can consent to disclosure of 10:45:29 their information, correct?
A. I think they can. I think you're right. I think general knowledge is allowed, but if they want to share additional information about their grades, it has to be in writing. That's what I remember.
10:45:48 Q. Do you recall talking to any students regarding Mr. Ross's complaint?
A. No.
Q. Do you recall if anybody from the district -- or do you know if anybody from the district talked to any 10:46:02 students related to Mr. Ross's complaint?
A. I do not know if they did or didn't.
(Deposition Exhibit 8 was marked for identification.)
BY MR. WOODS:
10:46:07 Q. Okay. Do you see that on your screen?
A. I do.
Q. Okay. We're going to mark this as Exhibit 8.
Have you seen this document before?
A. I don't recall. There was a document that was 10:47:15 sent to me a couple months ago, but I don't remember what

it was. I haven't looked at it.
Q. You never looked at it?
A. I don't remember. I remember seeing a document, but I just don't remember what it was.
10:47:27 Q. Did it look like this document?
A. They all look pretty much the same, but yes. I was sent something in email, I just don't remember what it was. It wasn't that one. I don't remember seeing any of those highlighted or underlined statements.
10:47:44 Q. Okay. So this is titled "Plaintiff's First Supplemental Disclosure Statement." Do you see that?
A. I do see that.
Q. Okay. I'm going to scroll down here. There's a section I that says "Individuals likely to have 10:47:56 discoverable information/disclosures pursuant to fed rule of civil procedure 26(A)(1)(A)(I)." Do you see that?
A. I do see that.
Q. And you see that Tyrone Ross is listed as Number 1. And Unnamed Representatives, Employees, and 10:48:18 Students of Maricopa County Community College District is Number 2, correct?
A. It is.
Q. As we scroll down a little bit more, we misspelled your name. But on Number 3 is Mark Woehl. Do 10:48:31 you see that?

A. That is correct.
Q. And then Number 4 is Brent Cooper, correct?
A. That is correct.
Q. And then as we scroll down a little more, we have names starting at 6, first name is Erik Lope. Do you know who Eric Lope is?
A. I do not.
Q. Do you know who Jason Marquez is?
A. I do not.
Q. Gonzalo Cortez?
A. I do not.
Q. And I'm probably going to butcher this, but Zain Al Shamma?
A. I do not.
Q. Michael Hernandez?
A. I do know him.
Q. Okay. Julian Meza?
A. I do not know him.
Q. Bryce Brock?
A. Nope.
Q. Brandon Murray?
A. Nope.
Q. Carol Linton?
A. No.
Q. Richard Fernandez?

A. No.
Q. Jossi Gonzalez?
A. No.
Q. David Cadriel?
10:49:37 A. No.
Q. Fabian Alvarez?
A. No.
Q. Okay. Do you remember anybody named Zachary Romo?
10:50:23 A. No.
Q. Were you aware that the internal investigation substantiated that Mr. Cooper asked Mr. Ross why he couldn't say the N-word?
A. No.
10:50:43 Q. Are you aware that that same investigation substantiated that Mr. Cooper referred to a car aesthetic as the N-word-ated?
A. No.
Q. Are you aware that it substantiated that
10:50:59 Mr. Cooper improperly accessed Mr. Ross's car and drove Mr. Ross's car?
A. No.
Q. Are you aware that it substantiated that Mr. Cooper referred to students as a lynch mob?
10:51:11 A. No.

Q. Are you aware that it substantiated inconsistent enforcement of the dress code favoring the female student?
A. No.
Q. Are you aware that it substantiated disproportional paint booth access for a female student?
A. No.
Q. Are you aware that it substantiated disproportionate free materials given to a female student?
A. No.
Q. Okay. Are you aware that investigators concluded that it was more likely than not that Mr. Cooper directly contributed to the creation of a hostile learning environment for Mr. Ross?
A. No.
Q. You were never sent the investigation decision letter?
A. No.
(Deposition Exhibit 9 was marked for identification.)
BY MR. WOODS:
Q. I'm sharing a document which I will mark as Exhibit 9. Do you see the document on your screen?
A. I do see it.
Q. Do you see at the top it says "GateWay Community College, a Maricopa Community College," and then "Office

of the President"?
A. I do see it.
Q. This document is marked ROSS_000003 to 7. Do you see that?
10:53:06 A. I do see that.
Q. Okay. Have you ever seen this document before?
A. No.
Q. The document at the top is titled "Personal and Confidential," correct?
10:53:23 A. It is.
Q. At the bottom, it's signed Dr. Amy S. Diaz. Do you see that?
A. I do see that.
Q. Do you know who Amy S. Diaz is?
10:53:34 A. She was the president -- interim president at the time.
Q. Over GateWay?
A. Of GateWay.
Q. Did you work directly with her at any point?
10:53:44 A. She was the top, so I did work with her.
Q. I'm sorry. You did?
A. I did.
Q. How would you work with her?
A. Similar to working with Delfi. She was the lead,
10:54:00 meetings, requests for information, how programs were

going. Most of it was high level stuff, not much of it was in the weeds.

Q. So when I was asking you about the different things that the investigation found, do you see the section here that says "Based on the investigation, the following facts are undisputed"?

A. I do see that.

Q. Take a moment to read through 1 through 8, and let me know when you're through it.

A. I read it.

Q. Do you remember any of those things?

A. No, I do not.

Q. Under Allegation One on the next page, "Mr. Brent Cooper created a hostile and unwelcome learning environment for the student complainant, Mr. Tyrone Ross, over the course of the program." Did I read that correctly, first of all?

A. Yes, hostile and -- yes.

Q. And there's a number of things that say "substantiated," "unable to substantiate." Do you see that?

A. I do see that.

Q. And then some say "unsubstantiated." Is that correct?

A. That is correct.

Q. Do you remember Mr. Cooper withholding positive verbal evaluation of the paint project that Mr. Ross completed?
A. Holding what?
10:56:36 Q. This is number 1a, "Withholding positive verbal evaluation of a paint project Mr. Ross completed with the support of Employee Witness 1."
A. No.
Q. Do you know who Employee Witness 1 might be?
10:56:52 A. No idea.
Q. Under 1e, "Improper access to and use of Mr. Ross's personal vehicle." Do you see that?
A. I do see that.
Q. That was found to be substantiated, right?
10:57:10 A. Yes.
Q. 1.f.ii says, "A reference to students as a 'lynch mob' when Mr. Ross brought forward a group complaint to Mr. Cooper." Do I have that right?
A. That is correct.
10:57:24 Q. Do you remember Mr. Cooper referencing students as a lynch mob?
A. He didn't do that with me. I do not remember.
Q. Under Allegation Two at the top there, it says, "The second component involved allegations of sexual
10:57:47 harassment and gender discrimination." Do I have that

right?
A. Yes.
Q. The investigation under 2.a.i substantiated "Inconsistent application of student code of conduct and behavioral expectations in dealing with male students versus with Student 1 when she has yelled at faculty and left the classroom in an unsafe manner on multiple occasions." Did I read that right?
A. You read that right.
10:58:15 Q. Do you recall that issue at all?
A. I do not.
Q. You don't recall Mr. Cooper telling you that he had a female student that was yelling and leaving the classroom in an unsafe manner?
10:58:33 A. No.
Q. Under 2.a.ii it says, "Providing Student 1 disproportionate access to the paint booth as part of accommodation/alternative arrangement in response to her behavior, while disregarding a class-generated schedule for accessing the booth." Did I read that right?
A. You did.
Q. Do you recall that issue at all?
A. I do not.
Q. You don't recall Mr. Cooper bringing that to your attention?

A. No.
Q. Under 2.a.iv, it says "Allowing Student 1 disproportionate use of free course materials." Did I read that right?
10:59:21 A. You did.
Q. And it was substantiated?
A. Correct.
Q. Do you recall participating in an investigation regarding that issue?
10:59:25 A. No.
Q. Do you recall Mr. Cooper ever talking to you about that issue?
A. No.
Q. Now we're on page 6. And there's a section titled "Summary." Do you see that?
10:59:44
A. I do see that.
Q. There's an underlined and sometimes bolded sentence, and it reads, "The full pattern and nature of the substantiated allegations lead the investigators to conclude that it is more likely than not that Mr. Cooper directly contributed to the creation of a hostile learning environment for Mr. Ross, and potentially other students." Did I read that right?
10:59:59
A. You did.
11:00:12 Q. Do you recall being told that?

A. No.
Q. Further down it says, "Additionally, the investigation finds it more likely than not that Mr. Cooper managed course conduct and resources in a manner that unfairly favored the only woman in the course over the men." Did I read that right?
A. You did read it right.
Q. Do you recall being told that?
A. No.
11:00:55 Q. After the investigation concluded, were you involved in any meetings about Mr. Ross's return to the program?
MS. CAYTON: Form.
You can answer.
11:01:09 BY MR. WOODS:
Q. By program, I mean the automotive repair program.
A. I was in meetings for Tyrone's return. I cannot align it to your statement of the investigation.
Q. How many meetings were you in?
11:01:25 A. I think maybe one or two, at the most.
Q. What was discussed in that meeting?
A. His return to the class to finish his competencies and his hours that he was behind.
Q. Who was in that meeting?
11:01:37 A. Myself and Delfi, if I recall correctly.

Q. Just you and Delfi?
A. Uh-huh.
Q. Was it agreed that Mr. Ross would return under the supervision of a different instructor?
11:01:49 A. That is correct.
Q. And who was that?
A. Mike Hernandez.
Q. Was there a no-contact directive regarding Mr. Cooper and Mr. Ross?
11:02:01 A. None that I knew of.
Q. So there was no decision made that Mr. Ross and Mr. Cooper should be separated?
MS. CAYTON: Form.
You can answer.
11:02:14 THE WITNESS: So the way the shop was built, that was hard to accommodate because all of it was connected. So you're all in one huge area.
BY MR. WOODS:
Q. But Mr. Hernandez was assigned to be Mr. Ross's
11:02:31 supervisor in the automotive repair class?
A. His instructor, yeah, to complete his competencies needed to finish the program.
Q. Was Mr. Cooper told that he was no longer Mr. Ross's instructor at that time?
11:02:44 A. He was.

Q. And Michael Hernandez was obviously told that he was now Mr. Ross's instructor, correct?
A. We had the conversation with both instructors. They agreed to that.
11:02:57 Q. Did, at any time, you discuss with Mr. Cooper that he should have no contact with Mr. Ross?
A. No, I never discussed that.
Q. Were you aware that Mr. Cooper was placed on administrative leave in March of 2023?
11:03:19 A. I remember he was placed on leave. I don't remember the date.
Q. Do you recall how long he was on leave?
A. I don't recall how long.
MR. WOODS: Okay. We've been going just
11:03:37 under another hour. Let's take another five-minute break.
(A recess ensued.)
BY MR. WOODS:
Q. We established earlier you were the program manager at the time of the issues in this complaint,
11:12:50 correct?
A. I was the program manager, yes.
Q. Were you student-facing?
A. No.
Q. Did you handle student complaints?
11:13:03 A. Excuse me?

Q. Did you handle student complaints?
A. Yes.
Q. Were students told to bring complaints to you?
MS. CAYTON: Form.
11:13:19 You can answer, Mark.
THE WITNESS: Yeah, I don't know what they were told. They were sharing the process for filing the complaint. It was actually stated in their syllabus. I had an open-door policy. If a student wanted to talk to
11:13:35 me, he was more than able to talk to me.
BY MR. WOODS:
Q. Did that process include coming to you, the process they were shared?
A. I don't think so, no.
11:13:49 Q. Tell me when you can see that on your screen.
A. I can see that.
Q. What I'm sharing is titled Discovery Response privilege log MCCCDADD.Tyrone Ross. Do I have that right?
A. Yes.
11:14:44 Q. Have you ever seen this document?
A. No.
Q. Okay. There is a table in the document with columns labeled Bates, type, date, and reason withheld. Do you see that?
11:15:03 A. I do see that.

Q. On December 12, 2022, there is a row that says Bates 462 to 464, type email, date 12-12-22. And it says attorney-client privilege, legal advice from attorney M. Flores, an employee seeking legal advice from Flores. Do I have that right?

A. Yes.

Q. Going down a little further, there are a few redactions, 481, 483, 485, 486, email, 12-13-2022, attorney-client privilege sharing legal advice from district attorneys and legal advice from M. Flores, correct?

A. Yes.

Q. There is another email, 501 to 509, on 12-12-2022, attorney-client privilege, legal advice from M. Flores, an employee seeking legal advice from Flores, correct?

A. That is correct.

Q. So at least from December 12, 2022, attorneys were involved, correct?

MS. CAYTON: Form.

THE WITNESS: That's what -- it's implying that, yes.

BY MR. WOODS:

Q. And we looked at some emails earlier that you were involved in but you couldn't recall sending or

receiving. But you recall the big black boxes on them, right?
A. Yes.
Q. Go ahead.
11:16:40 A. No. I was just asking if you heard me.
Q. Oh, yeah. I heard you. I'm sorry.
On the next page, there are -- there's a block of emails, ranging from 771 to 837, not consecutive, but there are specific Bates stamps in that range,
11:16:59 correct?
A. There are.
Q. And each one is an email, correct?
A. Yes.
Q. And they run from February 27, 2023 to March 7,
11:17:11 2023. Do I have that right?
A. You do.
Q. And going one by one here, attorney-client privilege, employee seeking legal advice from attorney J. Falkenberg. Do you see that?
11:17:23 A. I do.
Q. Do you know who J. Falkenberg is?
A. No.
Q. Have you ever spoken to J. Falkenberg?
A. No.
11:17:30 Q. Okay. The next one says attorney-client

privilege, legal advice from J. Falkenberg, an employee seeking legal advice from Falkenberg and attorney D. Bowman. Do I have that right?

A. You do.

11:17:44 Q. And we talked about David Bowman earlier. Do you recall who that was?

A. No.

Q. You never had any conversations with him?

A. No.

11:17:52 Q. The next one says legal advice from Falkenberg, AD sharing Falkenberg's advice. Do I have that right?

A. You do.

Q. Do you recall being shared Falkenberg's advice?

A. No.

11:18:07 Q. Okay. So as we look through the rest of these, there's more David Bowman and J. Falkenberg, and there's more M. Flores, for instance, March 6, '23, there's an entry, attorney-client privileged legal advice from M. Flores and employee sharing D. Bowman's legal advice.

11:18:24 Did I read that right?

A. Yes.

Q. Do you recall being given any type of advice from M. Flores on this issue?

A. No. I don't even know who he is or if it's even

11:18:40 a he.

Q. And then down here on 3-8-23, there's an entry, attorney-client privilege, M. Davis. Is that Mika?
A. I'm thinking it is, but I'm not sure.
Q. Okay. And then it says -- after M. Davis it says seeking legal advice and attaching document with attorney work product (withheld as the entire document is A/C privilege). Correct?
A. Correct.
Q. On March 10th, 2023, there's another entry, attorney-client privilege, M. Davis sharing D. Bowman's legal advice and employees and student PII. Do I have that right?
A. Yes.
Q. You don't recall being shared anything about M. Davis at that time?
A. No.
Q. Further down there's some entries in April, April 11, '23, attorney-client privilege, AD is requesting legal advice from M. Flores. Do I have that right?
A. You do.
Q. And then on the day prior, April 10th, attorney-client privilege, legal advice from M. Flores. Do I have that right?
A. Yes.
Q. Do you recall receiving any legal advice from M.

Flores at that time?
A. No.
Q. We'll skip the next page. 4-17-23, attorney-client privilege, D. Wilson sharing legal advice and employee PII. Do I have that right?
11:20:12
A. Yes.
Q. Do you recall who D. Wilson is?
A. I'm assuming it's Delfi Wilson.
Q. Do you know a Don Wilson by any chance?
11:20:29
A. I do not.
Q. You don't recall being shared any legal advice on April 17, 2023?
A. I received no legal advice.
Q. You never received any legal advice in your email?
11:20:41
A. Never.
Q. Never in person?
A. Nope.
Q. Phone call?
11:20:47
A. Nope.
Q. Were you ever on any meetings like this, like this Zoom meeting, with anybody in the district regarding Tyrone Ross's complaint?
A. No.
11:21:00
Q. Any conference calls?

A. Nope.
Q. In-person meetings?
A. None that I can recall.
Q. Do you remember having any discussions about preventing retaliation against Mr. Ross for filing a complaint?
A. With who?
Q. With any of your superiors, any instructors, anybody?
A. No. It was already a known fact that there was no -- no one was allowed to retaliate for any reason.
Q. Now I'm going to ask a question about documents in this case, not what you reviewed in preparation, because I've already heard that you only looked at the first amended complaint.
Have you seen any of the disclosures in this case, any documents other than the amended complaint and that one that you said was emailed to you?
A. No.
Q. Have you seen -- I'm sorry. Go ahead.
A. I said I have not.
Q. Have you seen any audio or video recordings shared in this case?
A. No.
Q. Were you aware that Mr. Ross recorded a

conversation with you and Mr. Cooper at any point?
A. I read it in this form, but I was not aware before that.
Q. Do you remember having a conversation with Mr. Cooper in your office regarding how to handle Tyrone Ross?
A. No.
Q. Do you recall telling Mr. Cooper that Tyrone Ross is going to be filing a complaint against you, or a claim?
A. No.
Q. Do you remember telling Mr. Cooper that -- or asking him -- I'm sorry, let me restart that.
Do you remember asking Mr. Cooper if he wants to have two claims filed against him?
A. No.
Q. And again, earlier you testified that you don't remember any other complaint being filed against Mr. Cooper?
A. I do not recall any other complaints.
Q. Do you recall telling Mr. Cooper that you're trying to avoid having a second complaint filed against him?
A. Nope.
Q. Do you ever recall telling Mr. Cooper that Mr. Ross was a thorn?

A. Nope.
Q. Do you ever recall telling Mr. Cooper that he is going to have to deal with this thorn with kid gloves?
A. No.
11:25:17 Q. Do you ever recall talking to Mr. Cooper and saying that you've noticed Tyrone being with other students?
A. Did I notice him being with other students?
Q. No. Do you recall telling Mr. Cooper that you
11:25:40 noticed him being with other students?
A. No.
Q. Do you recall telling Mr. Cooper -- or asking Mr. Cooper, "It seems to be getting heated," right?
A. I do not remember that.
11:25:53 Q. Do you recall saying, "I see the interaction between these two students are heated"?
A. No.
Q. Do you recall telling Mr. Cooper that "It's an advantage to you, think about it. I see these two
11:26:10 students at it, right? You file a formal complaint with leadership that Tyrone is instigating with another student. Stay out of it right now"?
A. No.
Q. Do you recall telling Mr. Cooper, "That pits
11:26:27 student against student through the administration and it

removes you guys from the equation, that would be of benefit to us"?

A. No.

Q. I asked about this, but you don't recall seeing anything from the OCR, correct?

11:27:25

A. I do not, correct.

Q. When Mr. Ross returned to class, do you recall him being required to work on a customer vehicle or a vehicle belonging to a friend of Mr. Cooper's?

11:27:45

A. No.

Q. Do you recall -- my apologies.

Do you recall Mr. Hernandez telling you that Mr. Ross worked on a friend of Mr. Cooper's vehicle?

A. No.

11:28:12

Q. How long did Michael Hernandez supervise Mr. Ross when he returned to class?

A. I believe he had three weeks or four weeks left to complete.

Q. At some point -- I apologize. Go ahead.

11:28:30

A. It was -- I can't remember -- three or four weeks to complete his hours and his competencies.

Q. Okay. Why was Mr. Hernandez removed as Mr. Ross's supervisor/instructor?

A. I didn't know he was removed.

11:29:00

Q. After Mr. Ross came back, did he come to you to

complain about the class?
A. He did not.
Q. I want to talk about some specifics. Were you aware that Mr. Cooper told -- I mean, I asked this earlier, but I'm just going to go through this really quickly.
The first one is the lynching comment, that Mr. Cooper had attended a lynching. You're not aware that he told the class that?
MS. CAYTON: Asked and answered.
BY MR. WOODS:
Q. You can answer.
A. Yeah, I never heard that.
Q. Okay. Okay. So no other students reported that to you, correct?
A. None that I recall.
Q. Okay. And no other students reported that Mr. Cooper had used the term reverse slavery, correct?
A. Correct.
Q. Again, you were told that the N-word had been used though, correct?
A. I was.
Q. Did any other students tell you that?
A. Not that I can remember.
Q. Did you know that Mr. Cooper required Mr. Ross to

leave his car keys when Mr. Ross was no longer on campus?
A. I don't know what the classroom management policy was on keys, but I would assume that all students would leave their keys behind in case he needed to move them or, you know, control the space. All those cars were parked behind the gate inside the lab area. They weren't parked outside in the parking lot.
Q. Did you know that Mr. Ross was the only student required to leave his keys?
A. I did not.
Q. Did you know that Mr. Cooper went to Ross's friend Caleb and told him that Mr. Ross was going to beat him up?
A. No.
Q. Did you know that Mr. Cooper told Mr. Ross that you don't have to be a pussy or a punk?
A. No.
MS. CAYTON: Form.
BY MR. WOODS:
Q. Do you know why Mr. Ross left the program?
A. No.
Q. Was Mr. Ross able to complete his certificate?
A. I believe so.
Q. Did you offer Mr. Ross any supportive measures or classroom assistance during the investigation?

A. None that I can recall.
Q. Did you offer any support -- supportive measures or accommodations to Mr. Ross after the investigation concluded?
11:32:28 MS. CAYTON: Form.
THE WITNESS: I'm not really sure what the question is.
BY MR. WOODS:
Q. So I asked during the investigation if you had
11:32:33 provided any supportive measures or --
A. What's a supportive measure? Give me an example.
Q. I mean, have you -- let me ask you this.
In your career, have you provided accommodations to students?
11:32:47 A. So accommodations come -- go ahead.
MS. CAYTON: I said form.
But go ahead.
THE WITNESS: So accommodations come from disability services, and it goes directly from disability
11:33:02 services to the instructor, who then is required to make those accommodations. It does not come to the program manager.
BY MR. WOODS:
Q. Did you help make the decision to have
11:33:17 Mr. Hernandez be Mr. Ross's instructor?

A. It was a conversation that we had with him, Brent, and Delfi about the fact that Tyrone was in the back half of his program, which aligned closer to Michael Hernandez's strengths, as far as painting and refinishing, so he would work with Mike to complete those competencies at that level.

THE WITNESS: Sean, could I interrupt for one second? I need a restroom break because my system doesn't work on a one-hour schedule.

MR. WOODS: No worries. Five minutes?

THE WITNESS: That would be fantastic. I don't need that much time, but five minutes will work perfect.

(A recess ensued.)

BY MR. WOODS:

Q. All right. Tell me when you see this on your screen?

A. I can see it.

Q. Okay. This is titled "Amended Complaint and Jury Demand," correct?

A. Correct.

Q. Is this the same document you have in front of you?

A. Yes.

Q. I can scroll through whole thing if you would

like.

A. No. This is it. It's the same. It's the front page. The front page is the same so I'm assuming it's the same.

11:43:01 Q. There's 14 pages. Is that what you count on yours?

A. It says 1 of 14, correct.

Q. Okay. At the top here on the caption, it says Tyrone Ross, plaintiff, versus Maricopa County Community 11:43:19 College District, an Arizona public entity; Brent Cooper and Mark Woehl. Is that correct?

A. That is correct.

Q. And we have your name spelled incorrectly, correct?

11:43:29 A. Yes.

Q. Again, apologies for that.

As we scroll through this, there's different sections, jurisdiction and venue, factual background on page 2. There's a section called "Racial Comments" on 11:43:49 page 3, and that continues on to page 4. And page 4 starts at paragraph 23, correct?

A. Yes.

Q. And it says -- sorry.

And it says in paragraph 23: Plaintiff left 11:44:08 and went to Mark Woehl, the administrator overseeing the

shop class, and reported Cooper's inappropriate comments and that plaintiff was uncomfortable with Cooper in the class. Do I have that right?

A. Yes.

11:44:20 Q. Is that accurate?

A. I don't recall the conversation as to what it was about. What I do remember, it had more to deal with the actual fact that he needed help with the program. I don't remember uncomfortable comments or inappropriate comments.

11:44:52 Q. Okay. And paragraph 24 says -- for some reason it says: The Woehl advised plaintiff to speak with Cooper and raise his concerns with Cooper.

Do I have that right?

A. That is the first step of a conflict resolution
11:45:09 policy, that they speak with the instructor about their concerns.

Q. Okay. So is paragraph 24 accurate?

A. It is accurate.

Q. 25 says: Under MCCC policies, Woehl was
11:45:30 obligated to forward this matter for internal review and investigation.

Is that correct?

A. That's what it says, yes.

Q. Is it accurate?

11:45:40 A. I did not fail to follow MCC policy.

Q. If a student reports to you that there's racial discrimination, are you required to report it?
A. A practice of mine is to report immediately so that my supervisors know and they can instruct me on what to do.
Q. There are policies that exist that are in place regarding nondiscrimination?
A. There are. I think it still follows the formal process of a written complaint. But when he verbally expressed those concerns, I passed it on to upper leadership.
Q. How did you pass that on?
A. Usually conversation with my direct -- my direct line chain of command, with Craig Urbanski. I called -- I probably called him and told him this is what's going on, had a conversation with him.
Q. At that time?
A. Yeah, I don't recall that information, so -- if it happened at the same time.
Q. What information did you --
A. Anything that has to do with discrimination.
Q. And you reported that to Craig at that time?
A. I did.
Q. But you don't remember Mr. Ross telling you that he was being discriminated against?

A. I'm assuming, as we're reading this, it was the first time that we met. And the first time we met, I do not recall him talking about discrimination. First time we met, I remember him talking about needing additional support in the classroom. When he came back after the agreement that they made had shattered between him and Cooper, then I remember the discrimination racist, that's when I handed it off. That's the sequence of events that I recall.

11:47:21

11:47:39

Q. So in the first meeting, you remember him asking for additional support?

A. Help in the classroom, yeah. Make-up time, hours, right? Help. Basically needed additional help.

Q. Okay. And so he was asking for additional supportive measures?

11:47:54

A. Not -- I don't know if you want to consider them measures. He just needed additional help from the instructors so that he could meet his competencies.

Q. What would have risen to the level of measures?

11:48:09

A. I don't know what that word means. I really don't. What does "measures" mean?

So a student's skill set is predicated on the student's ability to invest the time, energy, and teaching his muscle memory how to actually tear down a vehicle, put a vehicle back together, sand a vehicle

11:48:27

11:48:48 properly, and then complete the vehicle through the restoration process. So some students are good at that. They just catch on real quickly. Other students need additional help. Whatever help he needed, I don't remember the specifics. If it was more time on task, if it was more hands-on training, if it was more theory, I don't recall.

Q. Paragraph 41 says: Upon information and belief, Woehl discussed plaintiff's complaints to Cooper but otherwise took no action to aid plaintiff or to stop Cooper.

11:49:06 Did you disclose to Cooper what plaintiff's complaints were?

A. Now, is this the first meeting or the second meeting? The first meeting, we discussed additional support and resources that he needed to complete. The second time, when he actually mentioned discrimination, I just -- I gave it to upper leadership.

11:49:19 Q. Did you --

11:49:33 A. I did not talk to Cooper about it.

Q. That was my next question. Thank you.

Paragraph 50 says: The plaintiff, Mr. Ross, went to Woehl to complain about Cooper's dress code harassment.

11:49:54 Did I read that right?

A. You read it right.
Q. Is that accurate?
A. I don't remember that complaint.
Q. Paragraph 62 says: The plaintiff went to Woehl to complain about Cooper's denial of supplies.
Did I read that right?
A. You did.
Q. Do you recall that --
A. I do not. I do not recall that.
Q. Paragraph 70 says: Plaintiff went to Woehl to complain about being denied use of the paint booth and being forced to clean it.
Did I read that right?
A. You read it right.
Q. Do you recall that?
A. No.
Q. Paragraph 84 says: Plaintiff went to Woehl to complain about the car keys and Cooper driving his car without permission.
Did I read that right?
A. You read it right.
Q. Is that accurate?
A. I do not recall that.
Q. I'm not going to mark those as exhibits.
(An off-the-record discussion ensued.)

BY MR. WOODS:
Q. We talked earlier about recording -- whether or not you had seen any video or audio recording in this case. Do you recall that?
11:52:07 A. I do. I don't remember ever agreeing to be recorded.
Q. Do you see what's on your screen right now?
A. I do.
Q. Have you seen this before?
11:52:19 A. It's the floor at the college, yes.
Q. That's the floor where?
A. At the college.
Q. Okay. If I press play, you recognize the hallway there?
11:52:29 A. I do.
Q. Do you recognize that room?
A. My office.
Q. That's your office?
I'm sorry. I was just confirming, that's
11:52:42 your office, yes?
A. That's my office, yes.
Q. I'm sorry. Was your office at the time, correct?
A. Correct, was my office.
Q. I'll fast forward a little bit. It's hard to
11:53:06 hear, but do you hear any voices?

A. No, I do not.

Q. I don't normally ask this, but could you turn your volume all the way up?

A. I believe it is all the way up.

11:53:18 Q. All right. Again, it's tough to hear. But I'm going to press play, and let me know if you hear voices.

Do you hear voices?

A. I did not hear any voices.

Q. Okay. I'm going to share another video, it's the

11:53:55 same one. I just have enhanced the audio on it through VEED, which is an online audio editor. And I want to know if you can hear voices here?

A. I hear a muffled sound. I don't know if that's a voice.

11:54:23 MS. CAYTON: Sean, I can't hear the video either. Is there a way you can increase the sound?

MR. WOODS: It might be -- hold on. I might have forgotten to share the sound, which I do pretty often in these Zoom depositions. All right. Let's try this

11:54:46 again. All right. I'm just going to shrink that down a little bit. Let me reopen the original one.

BY MR. WOODS:

Q. Can you hear sound now?

A. I can hear sound now, yes.

11:55:01 Q. Okay. All right.

MS. CAYTON: I cannot --

MR. WOODS: Let me fast-forward a little bit where it gets slightly louder. And if I need to, I'll go back to the other one.

11:55:11 MS. CAYTON: I'll turn up my volume as well.

MR. WOODS: I'll press play and let it play for about ten seconds.

(Recording played.)

BY MR. WOODS:

11:55:30 Q. Could you hear voices there?

A. I did hear voices, but could not make out what the conversation was or what the words were.

Q. Could you tell who was speaking?

A. I could not tell.

11:55:40 Q. Okay. Let me try the enhanced one. Fast-forward to the same spot.

(Recording played.)

BY MR. WOODS:

Q. Did you hear voices?

11:56:05 A. I did.

Q. Did you recognize the speaker?

A. Sounded like me. But I couldn't make out what I said.

Q. I'll start at 1:18 and try to listen closely.

11:56:32 (Recording played.)

BY MR. WOODS:
Q. Did you hear that?
A. Yeah, but I still had a hard time making out what it was about. I could not follow it. I could hear -- I can hear talking, but I just don't know what it was about.
Q. Okay. I'm going to fast-forward to 2:23, listen.
(Recording played.)
BY MR. WOODS:
Q. Did you hear "file a formal complaint with leadership"?
A. I did hear that.
Q. Okay. Back it up just a little bit. And that was your voice, right?
A. Sounds like me, yes.
Q. Let's play again.
(Recording played.)
BY MR. WOODS:
Q. Did you hear "that pits student against student against the administration"?
A. Yeah, but unfortunately, that voice did not sound like mine, though. I don't know how to explain that.
Q. Play it one more time.
(Recording played.)
BY MR. WOODS:
Q. Do you recognize your voice --

A. I do not recognize that voice. Sorry.
Q. Okay. I'm going to mark that as Exhibit 10.
Actually, hold on. Step back.
I'm going to mark the first video. It's entitled ROSS_000053-IMG_4450.MOV as Exhibit 10. The second video, which is entitled the same thing, except the last three letters are changed to mp4, and it has a watermark of VEED, I'm going to mark as Exhibit 11.
(Deposition Exhibits 10 and 11 were marked for identification.)
BY MR. WOODS:
Q. Looking back on the issues that we talked about, would you do anything differently than you did?
A. Can you repeat that for me, please?
Q. Looking back, you know, having the value of hindsight, looking back on the issues in the complaint, would you have done anything differently?
A. Yeah, if I had the power to see the future, I think I would do things differently.
Q. What would you have done differently?
A. I think maybe probably being a little bit more interactive with the classroom environment. But I was also -- since I was the program manager, budget seemed to be my primary focus for the programs, and responding to leadership demands. I think, from my perspective, having

less than 20 to 25 meetings a week might have benefitted me a little bit more to be more active in the classroom. So maybe changing some of that would have been helpful.

Q. Anything else?

12:01:18 A. Nope.

(Deposition Exhibit 12 was marked for identification.)

BY MR. WOODS:

Q. All right. Share one more screen here. Let me
12:01:31 know when you see it.

A. I see it.

Q. All right. So this is Bates stamped MCCCD-Ross 001058. Do you see that?

A. I do see that.

12:01:47 Q. And it runs to 1101. Do you see that?

A. Yes.

Q. The top page is labeled "5.1 Non-Discrimination." Do I have that correct?

A. Yes.

12:02:00 Q. And then 5.1.1 says "Maricopa County Community College District (Maricopa EEO Policy)." Do I have that right?

A. Yes.

Q. Have you seen this document before?

12:02:18 A. Non-discrimination policy for hiring, yes.

Q. There's -- under the opening paragraph, there's bullet points 1, 2, 3, 4, 5. Do you see that?
A. I do.
Q. The first one is, "Recruit, hire, and promote in all job groups, and to ensure that all Human Resources employment selection and decision practices do not discriminate," and then it continues. Is that correct?
A. That is correct.
Q. Number 2 says, "Administer all HR employment selection and decision practices pertaining to advertising, benefits, compensation, discipline," and so on, correct?
A. Correct.
Q. You have seen this policy before, correct?
A. It's our hiring policy. I have seen it before.
Q. Number 3 says, "Hold each level of management responsible for ensuring that all employment policies, procedures, and activities are in full compliance with all applicable federal, state, and local EEO statutes, rules, and regulations." Is that correct?
A. That's correct.
Q. Okay. Number 4 says, "Maintain an educational environment that does not discriminate or tolerate discrimination on the basis of race, color, religion, sex, sexual orientation, gender identity, national origin,

citizenship status (including document abuse), age, disability, pregnancy, or veteran status in federally funded programs, activities, and MCCCD sponsored events." Is that correct?

12:03:56 A. That is correct.

Q. That's not related to hiring, though, correct?

A. I believe it is hiring policy. That when we're hiring somebody, we don't hire somebody that will discriminate in the educational environment. That was 12:04:13 what my understanding of it is. It's our hiring practices. That's my impression of this form.

Q. I mean, it says, "Maintain an educational environment that does not discriminate" --

A. But we haven't hired anybody yet. But if we do, 12:04:29 then they have to maintain that standard, which is across every business I've ever worked on. Nobody tolerates any kind of discrimination.

Q. What does "maintain an educational environment" mean?

12:04:45 A. Well, that's what we're hiring for. We're hiring for an educational environment. So that's how I read this statement.

Q. And reading that whole paragraph, it means that, like you just said, right, every job you ever worked does 12:05:03 not tolerate discrimination, correct?

A. That's how I read this document.
MS. CAYTON: Form.
Mark, you can answer.
THE WITNESS: I thought I did.
12:05:10 MR. WOODS: We didn't hear your objection. I'm sorry.
MS. CAYTON: Form.
But you can answer.
MR. WOODS: Okay, thank you.
12:05:17 THE WITNESS: I did.
MR. WOODS: I said we actually didn't hear it.
THE WITNESS: Okay. Thank you.
BY MR. WOODS:
12:05:28 Q. As we scroll through, there's other sections in here as well, correct?
A. Yes.
Q. 5.1.3 is the EEO Policy Statement, correct?
A. It is.
12:05:43 Q. 5.1.4 is the EEO Clause, correct?
A. Yes.
Q. 5.1.7 is Notice of Americans with Disabilities Act, Section 504 of the Rehabilitation Act/Title IX Coordinator, correct?
12:06:02 A. Title IX coordinator, yeah.

12:06:12
12:06:30
12:06:46
12:07:22
12:07:44

Q. Okay. And as we scroll through, you know, there are other things, Policy Prohibiting Harassment under 5.1.8, correct?

A. Correct.

Q. And it says, "The policy of the Maricopa County Community College District (MCCCD) is to provide an educational, employment, and business environment free of harassment that is based on race, color, religion, sex, sexual orientation, gender identity," and so on, correct?

A. Yes.

Q. And it actually separates educational from employment and business environment, correct?

A. It does, with a comma.

Q. Okay. So the policy prohibiting harassment applies to the educational environment, correct?

A. Yes. According to this, it provides an educational, comma, employment, and business environment free of harassment. So yeah.

Q. If we scroll through a little more, there is a section under B, Examples of Policy Violations. Under 3, subsection 3 of that says, "Engage in Sexual Harassment, which incudes, but is not limited to," and then it has letter subsections. Under C, it says, "Engage in verbal or physical conduct of a sexual nature with another employee, student, or campus visitor." Do I have that

right?

A. Yes.

Q. That applies also to students, correct?

A. It does.

12:07:52 Q. Employees to students?

A. Employees, student, or campus visitor.

MR. WOODS: All right. Let's take about a five-minute break. I'm just going to review my notes. I don't think I have much of anything left.

12:13:54 (A recess ensued.)

BY MR. WOODS:

Q. Mark, your position during the time, you testified, was program manager, correct?

A. That is correct.

12:14:32 Q. And did you only oversee the automotive program, or were there other ones?

A. There were other ones.

Q. Were you considered a division or department chair?

12:14:43 A. No.

Q. You were considered a manager?

A. Manager, that's correct.

Q. I'll show that back on the screen again. I didn't say it earlier, so I'm going to say it right now.

12:15:14 I'm marking this as Exhibit 12, and it's MCCCD-Ross 001058

through 1101.
All right. So I'm going to go to page 107 -- I'm sorry -- 69. At the bottom there's a 5.1.16, Title IX Sexual Harassment Policy. Do you see that?
12:15:41 A. I see that.
Q. The next page has a table of contents. Do you see that?
A. Yes.
Q. Go down to IV. Section IV on page 1072 states,
12:15:56 "Officials with Authority and Mandatory Reporters." Do I have that right?
A. You do.
Q. Okay. Scroll down a little bit more, there's a section called "Mandatory Reporters." Do I have that
12:16:06 right?
A. You do.
Q. In that list of mandatory reporters, there's the Chancellor, Provost, General Counsel, the Chief Human Resources Officer, Chief Workforce and Economic
12:16:20 Development Officer, Chief Executive Officer, College Presidents, Associate Vice Chancellors, Director of Communications, Associate General Counsels, Supervisors/Managers/Directors (but not including division or department chairs), Deans at all levels, Athletic
12:16:45 Directors/Coaches/Trainers, and Law Enforcement. Did I

read that right?
A. You did.
Q. Okay. And again, you were a manager, correct?
A. I was.
12:17:17 Q. Sorry, I didn't mean to close that.
All right. Now we're down to page 1074, titled number VI, Notice/Complaints of Discrimination, Harassment, and/or Retaliation. Do you see that?
A. Yes.
12:17:32 Q. I have that correct, right?
A. Yes.
Q. It says, "Notice or complaints of discrimination, harassment, and/or retaliation in violation of this policy may be made using any of the following options." And then
12:17:46 there's two options, correct?
A. Yeah.
Q. First one is, "File a complaint with, or give verbal notice to, a college Title IX Coordinator or an Official with Authority." Is that right?
12:17:59 A. That is correct.
Q. So at least under Title IX, this is the how to do a complaint policy, correct?
A. How do you notice -- how do you give notice of complaint of discrimination.
12:18:11 Q. Okay. And is this -- is this what you told

Mr. Ross to do?

A. No. This is what I do when Mr. Ross mentioned discrimination. I gave verbal notice to my leadership that this was going on, and Mr. Ross had this complaint.

12:18:37 What I gave Mr. Ross was the process of filing a noninstructional complaint.

Q. Okay. And you also took notes on your Google form, correct?

A. I did.

12:18:56 Q. Did you -- I don't remember. Did you give those notes to anybody?

A. I shared them with leadership when they asked for it, yes. So Craig would have had a copy of them, and the VP would have had a copy of them. It would have been in a 12:19:14 spreadsheet format. And I believe HR was privy to them also, I'm thinking. I know our IT department can access pretty much everything.

Q. Okay. If we scroll down on page 1075, there's a section Roman numeral VII, titled "Supportive Measures." 12:19:37 Do you see that?

A. I do see that.

Q. It says, "MCCCD will offer and implement appropriate and reasonable supportive measures to the parties upon notice of alleged harassment, discrimination, 12:19:48 and/or retaliation." Did I read that right?

A. You did.
Q. So there's a policy on supportive measures, correct?
A. There is.
12:20:03 Q. And there's a section at the bottom that says, "These actions may include, but are not limited to," and there are 16 different things, correct?
A. Yes.
Q. So there were, in the policy, actual ways and
12:20:20 steps to provide supportive measures, correct?
A. Yes, correct.
Q. Does that refresh your recollection on what supportive measures are?
A. When I look at this, no. This tells me that --
12:20:43 basically what I'm reading here is that MCCCD, the district, who did the investigation, who looked into the actual formal complaint, they come up with a resolution, right? My involvement was more interest-based negotiations between the student and the instructor. Once
12:21:09 the district came with a resolution like this, these measures that you're talking about, they told me what to do. I didn't create them. They were actually -- said, "This is what we are going to do" -- right? -- "in this case."
12:21:29 Q. That wasn't my question, though.

Earlier we talked about the supportive measures and --

A. I don't -- I don't remember this.

Q. Your answer was "I don't know what supportive measures are."

12:21:39

A. Yeah, I don't know what they are. I don't know what they are. I'm reading this because you're sharing it with me.

Q. Okay. But you just told me also that the district told you what to do, correct?

12:21:50

A. That's how I'm reading it. The district -- if you read the last sentence, MCC will implement measures in a way that does not unreasonably burden the other party. So they're telling me. That's how I'm reading it. I'm reading this statement as they're telling me this is what's going to happen.

12:22:05

Q. Right.

A. I don't remember any of this happening, but this is what I'm reading.

Q. But just a second ago you said the district told you what to do?

12:22:15

A. That's what they would do. They would tell me, right? That's what I'm reading. They would --

Q. Did they tell you what to do in this case?

A. I don't recall that.

12:22:26

Q. Okay. But you recall -- you recall this policy, though, 5.1, Non-Discrimination policy, correct?
A. I know that there's a policy about non-discrimination. I don't remember every single detail of the policy.
Q. Right. But you've seen it before, correct?
A. I have seen it before. I've seen all policies from the district.
Q. Yeah, I mean, it's 44 pages. You can't be expected to remember it all from memory, right?
A. Right. I remember in our training that once certain things happened that were outside of my authority, I handed them to upper leadership to get not only guidance but support and some kind of resolution, and that's what I did.
Q. Okay. Do you remember ever talking with Mr. Hernandez and saying that you wanted Tyrone Ross out by Friday and you didn't give an F if he was finished or not?
A. No.
MR. WOODS: Okay. I have nothing further.
MS. CAYTON: I don't have any questions. We're just going to read and sign.
(An off-the-record discussion ensued.)
MR. WOODS: We'll just take a PDF.

MS. CAYTON: Same with us.

(The deposition was concluded at 12:24 p.m.)

______________________________
ROGER MARK WOEHL

STATE OF ARIZONA )
COUNTY OF MARICOPA )

BE IT KNOWN the foregoing deposition was taken by me pursuant to stipulation of counsel; that I was then and there a Certified Reporter of the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; notice was provided that the transcript was available for signature by the deponent; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed into typewriting under my direction; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony had and adduced upon the taking of said deposition, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto nor am I in any way interested in the outcome hereof.

DATED at Phoenix, Arizona, this 31st day of March, 2026.

Gerard T. Coash, RMR
Certified Reporter #50503

### Exhibits

**Woehl Exhibit 1** 2:8 17:16,17 34:1 39:18

**Woehl Exhibit 2** 2:9 34:16,20

**Woehl Exhibit 3** 2:11 35:11

**Woehl Exhibit 4** 2:13 40:12 47:24 48:2,4

**Woehl Exhibit 5** 2:14 48:9,15

**Woehl Exhibit 6** 2:17 50:7,12

**Woehl Exhibit 7** 2:18 58:24 59:5

**Woehl Exhibit 8** 2:20 62:17,22

**Woehl Exhibit 9** 2:22 66:18,22

**Woehl Exhibit 10** 2:24 99:2,5

**Woehl Exhibit 11** 3:1 99:8

**Woehl Exhibit 12** 3:2 100:6 105:25

### -

**-a-t-e-d** 29:14

### 0

**000428** 17:15

**000431** 34:21

**000443** 35:18

**001058** 100:13 105:25

### 1

**1** 17:16,17 34:1 39:18 59:10,17 63:19 68:8 69:7, 9 70:6,16 71:2 89:7 101:2

**1.f.ii** 69:16

**10** 99:2,5,9

**100** 8:2 21:13 39:11

**107** 106:3

**1072** 106:9

**1074** 107:6

**1075** 108:18

**10th** 79:9,21

**11** 79:18 99:8,9

**1101** 100:15 106:1

**11:57** 37:23

**12** 40:22 42:14,22 43:21 44:16 45:20 48:20 49:6,22 50:16 51:4 76:1,18 100:6 105:25

**12-12-2022** 76:14

**12-12-22** 76:2

**12-13-2022** 76:8

**12:09** 36:17

**12:22** 36:9

**12:24** 112:2

**13th** 7:6

**14** 89:5,7

**16** 109:7

**17** 80:12

**17:38** 48:20

**17:38:19** 48:22

**1980** 6:17

**1:03** 35:22

**1:18** 97:24

**1a** 69:5

**1e** 69:11

**1st** 46:20 47:5,8

### 2

**2** 34:16,20 59:23 63:21 89:19 101:2,9

**2.a.i** 70:3

**2.a.ii** 70:16

**2.a.iv** 71:2

**20** 100:1

**2010** 8:19

**2022** 12:2 13:23 14:23 15:21 35:3,22 36:9,16 37:23,24 40:22 41:19 42:10,15 43:21 44:16 45:20 46:20 47:6,8 48:20 49:6,23 50:16 51:5 76:1, 18

**2023** 7:8 74:9 77:14,15 79:9 80:12

**23** 78:17 79:18 89:21,24

**24** 90:10,17

**25** 15:7 90:19 100:1

**26(A)(1)(A)(I)** 63:16

**27** 77:14

**2:00** 15:6

**2:23** 98:6

**2:24** 45:20 50:16

**2:45** 44:16

**2:49** 42:22

### 3

**3** 35:11 63:24 89:20 101:2, 16 104:20,21

**3-8-23** 79:1

### 4

**4** 40:12 47:24 48:2,4 59:11 64:2 89:20 101:2,22

**4-17-23** 80:3

**41** 93:8

**429** 17:15

**44** 111:9

**443** 35:19

**444** 35:18

**462** 40:19 48:5 76:2

**464** 41:24 76:2

**465** 42:13

**466** 50:13

**470** 40:19 48:5

**481** 76:8

**483** 76:8

**485** 76:8

**486** 76:8

**488** 48:16 49:22

**492** 48:16

### 5

**5** 48:9,15 101:2

**5.1** 100:17 111:2

**5.1.1** 100:20

**5.1.16** 106:3

**5.1.3** 103:18

**5.1.4** 103:20

**5.1.7** 103:22

**5.1.8** 104:3

**50** 93:22

**501** 76:13

**504** 103:23

**509** 76:13

**5:21** 49:23

**5:25** 49:7

### 6

**6** 35:3 50:7,12 64:5 71:14 78:17

**600** 54:22

**62** 94:4

**680** 54:22

**69** 106:3

### 7

**7** 58:24 59:5 67:3 77:14

**70** 94:10

**771** 77:8

**7:00** 15:6

**8**

**8** 35:22 36:9,16 37:23,24 38:20 42:10 62:17,22 68:8

**837** 77:8

**84** 94:17

**8:20** 51:5

**8:45** 46:20

**9**

**9** 41:19,24 66:18,22

**9:22** 41:25

**A**

**a.m.** 37:23 41:25 46:20 51:5

**A/c** 79:6

**AA** 6:23

**ability** 11:2 92:23

**absolutely** 47:19

**abuse** 102:1

**academic** 30:15 31:20 44:1

**accelerate** 18:23

**access** 21:7 23:16,18 25:8 26:7 66:5 69:11 70:17 108:16

**accessed** 65:20

**accessing** 70:20

**accommodate** 73:16

**accommodation/ alternative** 70:18

**accommodations** 33:15 87:3,14,15,18,21

**account** 21:4,6 23:9,12

**accountability** 7:6

**accountable** 28:10

**accreditation** 9:24

**accurate** 15:5 90:5,17,18, 24 94:2,22

**acknowledge** 42:9

**Act** 103:23

**Act/title** 103:23

**action** 93:10

**actions** 109:6

**active** 100:2

**activities** 101:18 102:3

**actual** 13:17 14:9 16:15 22:12 40:6 90:8 109:9,17

**AD** 78:11 79:18

**additional** 18:12,24 39:9 40:25 51:21 53:3 62:8 92:4,11,13,14,17 93:4,15

**Additionally** 72:2

**address** 23:12 27:17 35:1 36:22,24,25

**addresses** 59:17,24

**Administer** 101:9

**administration** 55:6 83:25 98:19

**administrative** 42:5 74:9

**administrator** 89:25

**advantage** 83:19

**advertising** 101:11

**advice** 76:3,4,9,10,14,15 77:18 78:1,2,10,11,13,18, 19,22 79:5,11,19,22,25 80:4,11,13,14

**advised** 90:11

**aesthetic** 65:16

**aesthetics** 29:10

**affairs** 30:16 31:20 42:8 44:1

**African-american** 16:13

**afternoon** 36:1

**age** 102:1

**agree** 20:10 45:1,7

**agreed** 53:16 73:3 74:4

**agreeing** 95:5

**agreement** 28:5,10,12, 14,16 92:6

**ahead** 6:9 23:23 77:4 81:20 84:19 87:15,17

**aid** 93:10

**Alex** 57:21

**align** 32:2,20 72:18

**aligned** 88:3

**Allegation** 68:13 69:23

**allegations** 38:14,17,19, 22 39:16 69:24 71:19

**alleged** 38:9 108:24

**allowed** 62:7 81:11

**Allowing** 71:2

**Alvarez** 65:6

**amended** 57:11,19 58:14 81:15,17 88:19

**Americans** 103:22

**amount** 7:25 21:13

**Amy** 67:11,14

**and/or** 107:8,13 108:25

**answering** 27:9

**answers** 6:2

**apologies** 5:18 84:11 89:16

**apologize** 84:19

**applicable** 101:19

**application** 70:4

**applied** 7:16,17 12:23

**applies** 104:15 105:3

**apprenticeship** 29:23 32:20

**apprenticeship-based** 32:24

**approximate** 7:4

**April** 8:19 79:17,21 80:12

**archiving** 21:15

**area** 73:17 86:6

**argue** 19:21

**Arizona** 6:16 89:10

**arrangement** 70:18

**asks** 59:17

**assigned** 73:19

**assistance** 86:25

**assistant** 9:9,12 42:5

**Associate** 106:21,22

**assume** 6:18 41:15 86:3

**assuming** 80:8 89:3 92:1

**Athletic** 106:24

**attached** 36:12

**attaching** 79:5

**attachment** 35:6

**attendance** 8:2 39:10

**attended** 24:16 85:8

**attending** 49:13

**attention** 21:15 70:25

**attorney** 24:2 41:15 56:15,17,23 76:3 77:18 78:2 79:5

**attorney-client** 58:4 76:3,9,14 77:17,25 78:18 79:2,10,18,22 80:4

**attorneys** 76:10,18

**audio** 81:22 95:3 96:10, 11

**August** 7:6,7

**authority** 106:10 107:19 111:12

**auto** 13:19 38:2

**automobile** 13:15

**automotive** 11:19 13:12 14:24 72:16 73:20 105:15

**avoid** 82:21

**aware** 26:23 29:5,9,17 37:4 65:11,15,19,23 66:1, 4,7,10 74:8 81:25 82:2 85:4,8

**B**

**B-O-W-M-A-N** 31:11

**bachelor's** 13:6

**back** 13:16 14:18 15:18 34:1 38:7 54:14 55:2,11 84:25 88:3 92:5,25 97:4 98:12 99:3,12,15,16 105:23

**background** 89:18

**based** 8:24 38:10 40:24 62:3 68:5 104:8

**basically** 7:25 13:14 19:10 22:13 33:11 52:7 92:13 109:15

**basis** 101:24

**Bates** 17:14 34:21 35:17,19 40:18 75:23 76:2 77:9 100:12

**beat** 86:12

**beginning** 13:20

**begins** 7:9

**behalf** 54:1

**behaving** 43:14

**behavior** 70:19

**behavioral** 43:3 70:5

**belief** 93:8

**belonging** 84:9

**benefit** 84:2

**benefits** 101:11

**benefitted** 100:1

**bias** 60:2

**big** 41:12 44:17 77:1

**bit** 32:7 42:24 43:2,5,11,17,22 44:6,9 45:24 50:20 63:23 95:24 96:21 97:2 98:12 99:21 100:2 106:13

**black** 29:10 41:12,23 44:13,17,25 45:4 77:1

**block** 77:8

**body** 13:19 15:16 38:2

**bolded** 71:17

**booth** 25:8 66:5 70:17,20 94:11

**boss** 24:6,8,13

**bottom** 34:20,22 35:19 40:18 48:17 49:21 50:13 67:11 106:3 109:5

**Bowman** 31:9,11 78:3,5,16

**Bowman's** 78:19 79:10

**box** 21:10 41:13,23 44:17,25

**boxes** 45:4 77:1

**Brandon** 64:21

**break** 6:8,10 40:10 58:3 74:15 88:8 105:8

**Brent** 11:11,13 13:24 14:1,3,7,11 27:25 28:11 38:9,13 46:17 47:13,17 50:3 55:11 56:20,24 60:13,22 64:2 68:13 88:2 89:10

**bring** 27:14 75:3

**bringing** 70:24

**broad** 10:9

**Brock** 64:19

**Brosilo** 29:20 32:14,15,17 37:22

**brosilo@gatewaycc.edu** 36:19

**brought** 28:20 52:3 69:17

**Brown** 30:7 42:22 44:16 46:17

**Bryce** 64:19

**budget** 9:21 99:23

**built** 15:15 73:15

**built-in** 15:12

**bullet** 101:2

**bundled** 8:6

**burden** 110:13

**business** 102:16 104:7,12,17

**butcher** 64:12

**C**

**cabinetry** 9:3

**Cadriel** 65:4

**Caleb** 86:12

**call** 12:24 80:19

**called** 28:6 58:22 89:19 91:14,15 106:14

**calls** 80:25

**campus** 86:1 104:25 105:6

**capacities** 56:24

**capacity** 57:2

**caption** 89:8

**car** 29:10 65:16,20,21 86:1 94:18

**care** 30:6

**career** 87:13

**Carol** 64:23

**cars** 86:5

**case** 58:19 81:13,17,23 86:4 95:4 109:24 110:24

**Castellanos** 33:2 40:22

**catch** 93:3

**Caucasian** 27:13

**caught** 18:20

**Cayton** 15:23 16:4 23:22 44:11,21 48:4,7 52:19 56:15,22 57:22,23,25 58:11 61:20,23 72:13 73:13 75:4 76:20 85:10 86:18 87:5,16 96:15 97:1,5 103:2,7 111:22 112:1

**cc'd** 36:20

**cc's** 37:22

**Center** 9:6

**certificate** 86:22

**Certified** 5:3

**chain** 26:20 42:21 91:14

**chair** 12:23 105:19

**chairs** 106:24

**chance** 80:9

**Chancellor** 106:18

**Chancellors** 106:21

**change** 23:17

**changed** 23:9,12,16 99:7

**changing** 100:3

**checklist** 22:14

**Chief** 106:18,19,20

**citizenship** 102:1

**civil** 61:8,16 63:16

**CJ** 13:3,4

**claim** 82:9

**claimed** 38:6

**claims** 62:2 82:14

**clarification** 49:11

**clash** 18:13

**class** 8:5 9:21 15:22 16:6,16 18:12 24:16,20,24 37:2,10,14 38:7 39:6,9 43:13,19 45:12 49:4 50:3 55:10 72:22 73:20 84:7,16 85:1,9 90:1,3

**class-generated** 70:19

**classes** 8:6 14:6 32:21

**classroom** 10:19 11:7 14:10,22,25 22:21 28:14,24 39:5 41:6 53:1 54:5,14 55:2 70:7,14 86:2,25 92:5,12 99:22 100:2

**classrooms** 14:23

**Clause** 103:20

**clean** 94:12

**clear** 6:5 37:20 51:4 56:7 58:13

**clock** 7:21,23,24 8:6,11 15:3 54:20

**close** 107:5

**closely** 97:24

**closer** 88:3

**closure** 39:5

**code** 25:15 66:2 70:4 93:23

**college** 6:20,25 8:18 14:19 19:3 29:24 42:8 54:2 63:20 66:25 89:10 95:10,12 100:21 104:6 106:20 107:18

**Colleges** 16:9 20:1 43:7

**collision** 11:20 13:14 14:11 38:2

**color** 101:24 104:8

**columns** 75:23

**combination** 8:5

**comfortable** 38:7

**comma** 104:13,17

**command** 26:20 91:14

**comment** 85:7

**comments** 12:16 24:24 89:19 90:1,9

**Commission** 9:23

**Common** 59:10

**communicated** 18:14

**communication** 11:2 28:6

**Communications** 106:22

**Community** 6:25 8:18 16:9 20:1 29:24 42:8 43:7 63:20 66:24,25 89:9 100:20 104:6

**company** 23:14

**compensation** 101:11

**competencies** 8:2 28:7 53:4 72:23 73:22 84:21 88:5 92:18

**complain** 85:1 93:23 94:5,11,18

**complainant** 68:15

**complaining** 25:1,7,10, 14

**complaint** 12:2,19 16:19, 22,25 17:5,21 19:14 20:12 23:19 26:17,20 27:3,17 28:3 29:5 38:21,23 39:3, 14,21 40:2,6 41:20 42:10 44:17 45:6,8,24 46:5 50:20 52:5 53:9,10 54:1 57:6,11,19 58:14 61:13 62:11,15 69:17 74:19 75:8 80:23 81:6,15,17 82:9,17, 21 83:20 88:19 91:9 94:3 98:9 99:16 107:17,22,24 108:4,6 109:17

**complaint.docx.** 35:7

**complaints** 10:7,8,10,11, 13 12:8 16:18 17:20 19:3 25:23 27:19 28:21 33:9 40:5 45:1 47:13 52:7 55:14 56:13 60:2,11,17 74:24 75:1,3 82:19 93:9, 13 107:12

**complete** 8:1 15:18 51:25 53:3,4 73:21 84:18, 21 86:22 88:5 93:1,16

**completed** 15:16 69:3,6

**compliance** 101:18

**component** 69:24

**concepts** 33:24,25

**concern** 53:15

**concerns** 14:14 27:4,15 28:20 29:3 52:2 90:12,16 91:10

**conclude** 71:20

**concluded** 41:2 66:10 72:10 87:4 112:2

**conduct** 12:4,8 29:3 70:4 72:4 104:24

**conference** 80:25

**Confidential** 41:20 67:9

**confirm** 48:4

**confirmed** 42:23

**confirming** 95:19

**conflict** 19:11 90:14

**connected** 73:17

**connecting** 32:25

**connection** 60:1,10

**consecutive** 77:8

**consent** 61:19 62:4

**considered** 105:18,21

**consist** 19:19

**construction** 6:25 9:8

**contact** 54:24 74:6

**contents** 106:6

**context** 39:2

**continues** 89:20 101:7

**contributed** 66:12 71:21

**control** 86:5

**conversation** 20:9 22:3 24:20 56:2 58:2 74:3 82:1, 4 88:1 90:6 91:13,16 97:12

**conversations** 53:12 78:8

**convey** 49:13

**conveyed** 48:24

**Cooper** 11:11,13 12:5,13 13:24 14:1 16:19 18:1,9 24:16,20,24 25:11 27:4,8, 11,12,15,17,22 28:1,11, 17,21 29:9,17 38:9,17 41:5 46:17 47:13,17 53:6 54:4,7 55:1 56:20 60:13, 22 64:2 65:12,16,20,24 66:11 68:14 69:1,18,20 70:12,24 71:11,20 72:4 73:9,12,23 74:5,8 82:1,5, 8,11,13,18,20,24 83:2,5,9, 12,13,18,24 85:4,8,18,25 86:11,15 89:10 90:2,11,12 92:7 93:9,11,12,20 94:18

**Cooper's** 12:8 28:24 29:3,6 49:4 50:3 84:9,13 90:1 93:23 94:5

**coordinator** 103:24,25 107:18

**copied** 42:1

**copy** 26:4 42:9 108:13,14

**correct** 5:18 8:21 11:11 12:2,10,11 13:11,22 14:6 16:19 22:1 23:5 24:11 35:4 36:13,14,20,23 37:5, 7,19,23,24 38:3,4,7 40:22 41:2 44:7,8,10 45:9,13,17, 18,21 46:6,11,14,21,22, 24,25 47:3,4,6,11,20 48:5, 6,21,24,25 49:1 50:17,18 51:5,6,7,9,13,19 52:2 53:6,24 55:2 56:16,18,20 59:8 61:4,19 62:5 63:21 64:1,2,3 67:9 68:24,25 69:19 71:7 73:5 74:2,20 76:11,16,17,19 77:10,12 79:7,8 84:5,6 85:15,18,19, 21 88:20,21 89:7,11,12, 14,21 90:22 95:22,23 100:18 101:7,8,12,13,14, 20,21 102:4,5,6,25 103:16,18,20,24 104:3,4, 9,12,15 105:3,13,14,22 107:3,10,15,20,22 108:8 109:3,7,10,11 110:10 111:2,6

**correcting** 37:19

**correctly** 68:17 72:25

**Cortez** 64:10

**Counsel** 106:18

**counseling** 44:3

**Counsels** 106:22

**count** 89:5

**County** 16:9 19:25 21:5 63:20 89:9 100:20 104:5

**couple** 27:6 62:25

**court** 5:23

**covers** 54:23

**Craig** 12:21,25 13:9 24:10 28:23 36:1,3,10,16 37:6,9, 12,16,25 42:1,4 46:17,18 91:14,22 108:13

**create** 22:24 43:11 109:22

**created** 20:24 21:1,4,23 22:13 43:20,22 68:14

**creates** 23:1

**creating** 43:5

**creation** 66:12 71:21

**credit** 8:3,4

**current** 6:24 19:25

**curriculum** 10:23 11:2

**customer** 84:8

## D

**date** 8:17 22:15 38:18 74:11 75:23 76:2

**dated** 35:3 42:14

**dates** 14:21 15:5 21:16

**David** 31:9 65:4 78:5,16

**Davis** 31:5,7 79:2,4,10,15

**day** 7:4,5 10:21 15:7,17 22:22 37:6 79:21

**day-to-day** 9:16

**days** 15:9,10,12,15 21:13

**deadlines** 9:22

**deal** 28:4 83:3 90:7

**dealing** 52:6 70:5

**dean** 12:22,24 13:10 26:21,22 30:5

**Deans** 106:24

**December** 12:2 13:23 14:23 15:20 35:3,22 36:9,16 37:23,24 38:20 40:22 41:19,24 42:10,14,22 43:21 44:16 45:20 46:20 47:5,8 48:20 49:6,22 50:16 51:4 52:10 76:1,18

**decision** 66:15 73:11 87:24 101:6,10

**Defendant's** 59:5

**degrees** 6:22

**deleted** 21:12

**Delfi** 35:22,25 37:3 39:14 41:19,25 42:5,6 49:10 67:24 72:25 73:1 80:8 88:2

**Delfina** 30:12 31:13

**deliver** 11:2

**demand** 57:12 88:20

**demands** 99:25

**demographic** 15:22 16:2,4,9

**demographics** 16:6

**denial** 94:5

**denied** 25:2,8 94:11

**dents** 13:15

**department** 30:6 61:7 105:18 106:24 108:16

**deposition** 5:19 17:17 34:16 35:11 40:12 48:9 50:7 57:5 58:24 62:17 66:18 99:9 100:6 112:2

**depositions** 96:19

**Describe** 13:12

**design** 14:10

**designation** 23:14

**detail** 111:4

**details** 19:8 20:6 55:9

**Development** 106:20

**Diaz** 67:11,14

**difference** 18:13

**differently** 99:13,17,19,20

**direct** 91:13

**directed** 27:14 38:6

**directive** 73:8

**directly** 19:12 27:3,15 66:11 67:19 71:21 87:19

**director** 31:8 106:21

**Directors/coaches/trainers** 106:25

**disabilities** 33:12,15,19,23 44:4 103:22

**disability** 33:20 87:19 102:2

**discipline** 101:11

**disclose** 93:12

**disclosure** 61:19 62:4 63:11

**disclosures** 81:16

**discoverable** 63:15

**discovery** 58:18 75:17

**discriminate** 101:7,23 102:9,13

**discriminated** 39:1 91:25

**discrimination** 45:16 60:2 69:25 91:2,21 92:3,7 93:17 101:24 102:17,25 107:7,12,24 108:3,24

**discuss** 18:10 58:1 74:5

**discussed** 55:7 72:21 74:7 93:9,15

**discussing** 51:24

**discussion** 5:12 94:25 111:24

**discussions** 81:4

**disproportional** 66:5

**disproportionate** 66:8 70:17 71:3

**disregarding** 70:19

**district** 8:18 12:25 13:1 33:7 56:13,17,23,25 60:5,8,24 61:3 62:2,13,14 63:20 76:10 80:22 89:10 100:21 104:6 109:16,20 110:10,11,20 111:8

**district's** 26:1

**division** 12:23 105:18 106:23

**document** 17:9,10,12,14 20:19 22:24 26:10 28:13 34:5,6,11,12,19,20 35:17 39:17,19 40:17 57:13 58:10,14 59:2,9 61:4,5 62:23,24 63:3,5 66:21,22 67:3,6,8 75:20,22 79:5,6 88:22 100:24 102:1 103:1

**documentation** 23:20 24:7

**documented** 22:5,6 56:1

**documents** 57:7,8,17 58:9 61:11,13,14 81:12,17

**Don** 80:9

**donated** 25:2,5

**download** 23:2,6,8

**dress** 25:15 66:2 93:23

**drive** 23:3,17,18

**driving** 25:11 94:18

**drove** 65:20

**duly** 5:2

## E

**earlier** 34:4 39:17 42:3 44:25 47:12 54:4,6 74:18 76:24 78:5 82:16 85:5 95:2 105:24 110:1

**easily** 22:4

**Economic** 106:19

**editor** 96:11

**Education** 61:7

**educational** 101:22 102:9,12,18,21 104:7,11,15,17

**EEO** 100:21 101:19 103:18,20

**eight-month** 54:23 55:1

**email** 17:3 23:11,16 34:24,25 35:9 36:1,2,8,16,22,24,25 37:1,7,21,25 40:21,24 41:18,24,25 42:6,14,17,21 44:15 45:5,19 46:16 47:2,5,7,9,20,21 48:19 49:6,22 50:15 51:2,3,4,9,14 63:7 76:2,8,13 77:12 80:15

**emailed** 81:18

**emails** 21:14 45:3 50:5 53:22 58:16 76:24 77:8

**employed** 8:20

**employee** 41:1 69:7,9 76:4,15 77:18 78:1,19 80:5 104:25

**employees** 56:13,25 60:9 63:19 79:11 105:5,6

**employment** 101:6,9,17 104:7,12,17

**ends** 29:14

**energy** 92:23

**enforcement** 66:2 106:25

**Engage** 104:21,23

**English** 14:19,21

**enhanced** 96:10 97:15

**enrollment** 44:2

**ensued** 5:12 40:11 74:16 88:14 94:25 105:10 111:24

**ensure** 101:5

**ensuring** 101:17

**entail** 9:2 10:18 20:5

**entire** 11:16 47:9 79:6

**entitled** 99:5,6

**entity** 89:10

**entries** 79:17

**entry** 78:18 79:1,9

**environment** 45:16 66:13 68:15 71:22 99:22 101:23 102:9,13,18,21 104:7,12,15,17

**equal** 25:8

**equation** 84:1

**Eric** 64:6

**Erik** 64:5

**erratically** 43:14

**escalated** 19:14 46:1 50:22 53:19

**escalates** 53:18

**escalating** 50:24

**established** 74:18

**evaluating** 10:16 11:6

**evaluation** 69:2,6

**evaluations** 12:5

**events** 92:8 102:3

**exact** 21:16

**EXAMINATION** 5:5

**examined** 5:3

**Examples** 104:20

**Excuse** 5:9 17:23 21:19 74:25

**Executive** 106:20

**Exhibit** 17:16,17 34:1,16,20 35:11 39:18 40:12 47:24 48:2,4,9,15 50:7,12 58:24 59:5 62:17,22 66:18,22 99:2,5,8 100:6 105:25

**exhibits** 94:24 99:9

**exist** 26:9 91:6

**expectations** 70:5

**expected** 111:10

**experience** 45:12

**explain** 9:25 41:14 98:21

**explaining** 33:17

**explicit** 24:24

**expressed** 91:10

**extent** 56:25 60:6

**extra** 15:17 33:18,22

**F**

**Fabian** 65:6

**facilities** 32:22

**facing** 16:10

**fact** 81:10 88:2 90:8

**facts** 68:6

**factual** 89:18

**faculty** 7:1 22:10 53:16 70:6

**fail** 90:25

**failed** 20:14

**faint** 5:11

**Falkenberg** 77:19,21,23 78:1,2,10,16

**Falkenberg's** 78:11,13

**familiar** 8:7 9:23 21:13 33:3,4

**fantastic** 88:11

**fast** 95:24

**fast-forward** 97:2,15 98:6

**faster** 18:23

**favored** 72:5

**favoring** 66:2

**favoritism** 29:6

**February** 77:14

**fed** 63:15

**federal** 101:19

**federally** 102:2

**feel** 38:7

**felt** 18:11 38:25

**female** 29:6 66:2,5,8 70:13

**fenders** 15:16

**Fernandez** 64:25

**FERPA** 15:23 16:1 59:21 60:7 61:18 62:3

**figure** 20:8 42:18

**file** 27:16 54:1 83:20 98:9 107:17

**filed** 12:1 16:19,22 38:21 39:25 40:2,4 82:14,17,21

**files** 21:12 39:21

**filing** 75:7 81:5 82:9 108:6

**fill** 21:24

**filled** 22:23 26:15

**finally** 7:18

**find** 46:1 49:24

**finds** 72:3

**finish** 13:17 39:8 53:1,4 72:22 73:22

**finished** 111:18

**five-minute** 40:10 74:15 105:8

**fixing** 13:15

**floor** 95:10,11

**Flores** 30:10 41:15,16 76:4,10,15 78:17,19,23 79:19,22 80:1

**focus** 99:24

**foggy** 55:4

**follow** 19:4,5 26:5 90:25 98:4

**follow-up** 45:25 50:21

**forced** 94:12

**forgotten** 96:18

**form** 16:1 20:21,22,23 21:8,18,21,23,24 22:13,23 23:22 24:2,12 26:12,15 28:6 40:7 44:11,21 58:11 61:20 72:13 73:13 75:4 76:20 82:2 86:18 87:5,16 102:11 103:2,7 108:8

**formal** 16:19,22 17:5,21 19:14 20:11 23:19 26:17,20 27:2,16 38:21,23 39:3,13,21 53:9,10 54:1 55:13,15 56:5,8 83:20 91:8 98:9 109:17

**format** 108:15

**forms** 25:21,22 26:14

**forward** 45:17 49:24 69:17 90:20 95:24

**forwarded** 46:8,13 53:21

**found** 68:4 69:14

**foundation** 16:1

**fourth** 9:14

**frame** 19:13 43:6 52:10

**free** 66:8 71:3 104:7,18

**Friday** 111:18

**Fridays** 15:13

**friend** 84:9,13 86:12

**front** 38:5 57:15 88:22 89:2,3

**full** 5:8,14,16 26:7 71:18 101:18

**fully** 47:1

**funded** 102:3

**funding** 32:2,3

**future** 99:18

**FWD** 46:9 51:11

**FYI** 46:11,15 51:9

G

**Gagnon** 30:19

**gate** 86:6

**Gateway** 7:13,15,19 8:23 9:14,15 21:9 23:10,15 29:24 42:8 66:24 67:17,18

**gave** 19:2 22:20 26:4 27:16 93:18 108:3,5

**gender** 69:25 101:25 104:9

**general** 62:7 106:18,22

**generic** 21:24

**give** 6:2 16:5 87:11 107:17,23 108:10 111:18

**gloves** 83:3

**Gonzalez** 65:2

**Gonzalo** 64:10

**good** 5:7 6:10,11 17:11 35:25 42:7 93:2

**Google** 20:21,22,23 21:4, 8,11,17,21,23 22:13,23 23:3,9,17,18 24:12 108:7

**grade** 19:20,21,22

**grades** 62:8

**graduate** 8:3

**graduated** 32:25

**grandfather** 24:17

**grievance** 10:14,15 19:7, 15,18 20:1,4 21:25 26:4

**grievances** 22:1 25:19, 25

**ground** 5:22

**group** 69:17

**groups** 101:5

**guess** 14:18 15:25

**guessing** 14:5

**guidance** 111:13

**guys** 20:9 84:1

H

**half** 7:10 88:3

**hallway** 95:13

**handed** 92:8 111:13

**handle** 22:3 74:24 75:1 82:5

**handling** 10:6

**hands-on** 18:22 93:6

**handwritten** 20:18 26:16

**happen** 9:13 110:16

**happened** 43:15,16,18 91:19 111:12

**happening** 53:24 110:18

**happy** 19:20

**harassment** 45:15 69:25 93:24 104:2,8,14,18,21 106:4 107:8,13 108:24

**hard** 73:16 95:24 98:3

**health** 30:6

**hear** 5:9,10 6:4 17:23 24:1,3 25:17 47:25 95:25 96:5,6,7,8,12,13,15,23,24 97:10,11,19 98:2,4,5,9,11, 18 103:5,11

**heard** 29:15 77:5,6 81:14 85:13

**heated** 83:13,16

**held** 22:21

**helpful** 100:3

**helping** 32:2,23

**Hernandez** 13:25 14:1 29:2 38:13 39:8 46:18 60:14,23 64:15 73:7,19 74:1 84:12,15,22 87:25 111:17

**Hernandez's** 88:4

**high** 6:19 9:25 68:1

**Higher** 9:23

**higher-ups** 41:4

**highlighted** 63:9

**hindsight** 99:16

**hire** 101:4 102:8

**hired** 8:15,17 102:14

**hiring** 100:25 101:15 102:6,7,8,10,20

**HLC** 9:23

**hold** 28:9 96:17 99:3 101:16

**Holding** 69:4

**honest** 34:12

**hoods** 15:17

**hostile** 66:12 68:14,18 71:21

**hour** 7:21,23,24 8:6,11 15:3 40:10 54:20 58:8 74:15

**hours** 8:1 15:7,11 48:20 54:22 72:23 84:21 92:13

**HR** 31:8 33:6 101:9 108:15

**huge** 73:17

**Human** 101:5 106:18

**hundreds** 22:11

I

**idea** 69:10

**identification** 17:18 34:17 35:12 40:13 48:10 50:8 58:25 62:18 66:19 99:10 100:7

**identity** 101:25 104:9

**immediately** 91:3

**implement** 108:22 110:12

**implying** 46:7 76:21

**impression** 102:11

**Improper** 69:11

**improperly** 65:20

**In-person** 81:2

**inappropriate** 12:16 90:1,9

**incarcerated** 9:4

**incident** 43:3,19

**include** 45:15 75:12 109:6

**included** 26:8

**including** 102:1 106:23

**inconsistent** 66:1 70:4

**incorrect** 61:1

**incorrectly** 89:13

**increase** 96:16

**incudes** 104:22

**individual** 14:10 16:3,5

**individuals** 16:8 63:14

**inform** 52:4

**informal** 18:17

**informally** 56:13,14

**information** 31:25 40:25 59:25 60:6 61:19 62:4,5,8 67:25 91:18,20 93:8

**information/ disclosures** 63:15

**informed** 54:9

**inquiry** 60:8

**insensitive** 12:13

**inside** 86:6

**instance** 78:17

**instigating** 83:21

**institution** 31:20

**instruct** 91:4

**instructing** 14:17

**instructional** 10:14 19:17,18 25:20 28:4,6

**instructor** 9:5 11:19 13:25 14:3,4 19:12 20:8 22:17 28:9,15 43:18,20 49:12 53:17 73:4,21,24 74:2 87:20,25 90:15 109:19

**instructors** 9:20 10:2,16, 20 11:7 13:23 22:10 74:3 81:8 92:18

**interact** 33:6,8

**interacted** 10:23

**interacting** 22:9 33:4

**interaction** 53:2 83:15

**interactions** 22:18 31:13,16,21 32:4,19 33:10 39:4

**interactive** 99:22

**interest** 19:11

**interest-based** 109:18

**interim** 13:9 31:2 67:15

**intermingled** 14:14

**internal** 60:10 65:11 90:20

**Interrogatories** 58:22 59:6,10,14

**interrogatory** 59:17,23 60:6

**interrupt** 88:7

**intervene** 27:21,23,24

**Intervention** 43:4

**interview** 7:18 61:3

**interviewed** 55:19,21,22, 23,24 56:12 59:25 60:9, 17,22,24 61:2,6

**intoxicated** 43:13,15

**introduces** 53:14

**invest** 92:23

**investigate** 33:11 39:16

**investigated** 26:25

**investigating** 26:25 52:9

**investigation** 41:1 55:13,15 56:3,5,8,10 60:1, 10 65:11,15 66:15 68:4,5 70:3 71:8 72:3,10,18 86:25 87:3,9 90:21 109:16

**investigators** 66:10 71:19

**involved** 11:3 43:5 69:24 72:11 76:19,25

**involvement** 109:18

**issue** 45:23,24 46:5,13 47:17,22 49:4 50:19,20,24 53:15 70:10,22 71:9,12 78:23

**issues** 28:24 29:2 37:1, 10,14 46:10,24 49:1 50:3 51:11,16,19 52:16 74:19 99:12,16

**IV** 106:9

**IX** 103:23,25 106:4 107:18,21

**J**

**Jason** 64:8

**Jennifer** 30:17 32:4,8,10

**Jessica** 29:20 32:13,15 35:25 36:13 37:1,7,11,13, 21

**job** 6:24 7:16 9:19 101:5 102:24

**join** 7:13

**Jossi** 65:2

**Judy** 33:2 40:22,24

**Julian** 64:17

**jump** 56:22

**junior** 6:19

**jurisdiction** 89:18

**jury** 57:12 88:19

**K**

**Kansas** 6:15

**keys** 86:1,3,4,9 94:18

**kid** 24:17 83:3

**kind** 10:11 18:18 19:5,12 20:13 32:22 52:25 102:17 111:14

**kinds** 52:6

**knew** 25:22 43:21 73:10

**knowledge** 29:25 62:7

**L**

**lab** 10:24 14:25 86:6

**label** 9:12

**labeled** 75:23 100:17

**labs** 11:1

**language** 44:24

**Law** 106:25

**lead** 11:19 14:3 67:24 71:19

**leadership** 20:12,15 52:4,9 53:19,20,22 54:2 83:21 91:11 93:18 98:10 99:25 108:3,12 111:13

**learning** 9:23 13:22 18:22 66:12 68:14 71:21

**leave** 7:13,15 74:9,10,12 86:1,4,9

**leaving** 7:19 70:13

**left** 7:20 15:12 21:9 55:10 70:7 84:17 86:20 89:24 105:9

**legal** 76:3,4,9,10,14,15 77:18 78:1,2,10,18,19 79:5,11,18,22,25 80:4,11, 13,14

**letter** 36:2 37:3 41:20 42:10 66:16 104:23

**letters** 99:7

**letting** 31:19

**level** 9:25 13:1 14:2 68:1 88:6 92:19 101:16

**levels** 31:24 106:24

**Lewis** 9:3

**life** 29:18

**limited** 104:22 109:6

**lines** 47:3

**link** 25:24

**Linton** 64:23

**list** 106:17

**listed** 63:18

**listen** 97:24 98:6

**loads** 8:4

**lobby** 38:5

**local** 101:19

**log** 41:14 75:18

**long** 11:13 49:23 54:12,18 58:7 74:12,13 84:15

**longer** 49:12 73:23 86:1

**looked** 10:22 19:9 39:17 50:5 63:1,2 76:24 81:14 109:16

**loop** 49:15

**Lope** 64:5,6

**Lora** 30:2 36:2 37:3 39:14 42:14 45:20 46:9,13 48:20,23 49:3,13,22 50:2, 4,16 51:3,7

**lose** 21:7

**lot** 18:10 22:8,9 31:3 86:7

**loud** 47:23

**louder** 97:3

**lynch** 65:24 69:16,21

**lynching** 24:16 85:7,8

**M**

**made** 10:1 24:24 28:5,12 29:9 38:17,22 73:11 92:6 107:14

**main** 53:2

**maintain** 101:22 102:12, 15,18

**maintained** 25:21

**majority** 22:16

**make** 5:18 6:3 8:2 9:20 11:9 12:13,15 15:19 22:14 26:17 28:8 37:20 39:11

52:25 87:20,24 97:11,22
**Make-up** 92:12
**makeup** 15:10,11,12,22 16:4,6
**makeups** 14:22
**making** 28:8 38:18 98:3
**male** 70:5
**managed** 72:4
**management** 28:14 86:2 101:16
**manager** 7:21 9:10,11,15 32:1 39:15 74:19,21 87:22 99:23 105:13,21,22 107:3
**managing** 22:8
**mandatory** 106:10,14,17
**manner** 70:7,14 72:5
**manual** 26:8,11
**March** 74:9 77:14 78:17 79:9
**maricopa** 8:18 9:5 16:9 19:25 21:5,6 43:6 63:20 66:25 89:9 100:20,21 104:5
**mark** 5:1,16 16:5 17:7,15, 16 34:20,25 36:20 38:1,13 47:24 48:2,15,23 49:14, 15,24 50:12 56:23 59:4 60:13,23 62:22 63:24 66:21 75:5 89:11,25 94:24 99:2,4,8 103:3 105:12 112:4
**marked** 17:17 34:16 35:11 40:12 48:9 50:7 58:24 62:17 66:18 67:3 99:9 100:6
**marking** 105:25
**Marquez** 64:8
**material** 9:20
**materials** 66:8 71:3
**matter** 90:20
**MCC** 90:25 110:12
**MCCC** 90:19
**MCCCD** 102:3 104:6 108:22 109:15
**MCCCD-ROSS** 17:15 34:21 35:18 100:13 105:25
**MCCCDADD.TYRONE** 75:18
**meaning** 46:5
**means** 7:25 23:11 41:13 92:20 102:23
**measure** 87:11
**measured** 11:1
**measures** 86:24 87:2,10 92:15,17,19,21 108:19,23 109:2,10,13,21 110:2,5,12
**mediate** 20:13
**mediation** 18:17
**meet** 9:22 27:25 92:18
**meeting** 10:19 26:3 55:7 72:21,24 80:22 92:10 93:14,15
**meetings** 31:18,25 67:25 72:11,17,19 80:21 81:2 100:1
**Melissa** 30:10 41:15,16
**member** 7:1 22:18 53:16
**members** 22:9
**memory** 55:4 92:24 111:10
**men** 72:6
**mention** 29:2 32:15
**mentioned** 19:15 20:17 25:20 34:4 93:17 108:2
**Mesa** 6:25 7:2,13 23:12, 15
**message** 46:8 49:13
**met** 55:6 92:2,4
**Meza** 64:17
**Michael** 60:13,23 64:15 74:1 84:15 88:3
**Microsoft** 23:7
**middle** 20:13 50:15
**Mika** 31:5,6,7 37:3 39:14 79:2
**Mike** 13:25 14:1,3,7,12 29:2 38:13 39:8 46:17 73:7 88:5
**mine** 91:3 98:21
**minutes** 88:10,12
**missed** 15:10
**missing** 39:10
**misspelled** 5:17 63:24
**misspoke** 11:8
**Missy** 29:7
**mob** 65:24 69:21
**mob'** 69:17
**model** 8:6
**moment** 68:8
**Monday** 15:7,10 40:22 42:22 45:20
**monitor** 22:20
**monitoring** 10:21
**Monster** 57:16
**month** 7:4
**months** 54:23 62:25
**morning** 5:7 17:11 36:2 38:1 42:7
**morphed** 9:17
**move** 6:16 8:5 86:4
**moved** 8:23 23:15
**moves** 53:18
**moving** 15:16 49:23
**mp4** 99:7
**muffled** 96:13
**multiple** 14:17,20,23 28:24 37:1,10,14 40:4 70:7
**Murray** 64:21
**muscle** 92:24

**N**

**N-WORD** 24:20 27:8 29:14 53:6 65:13 85:20
**N-WORD-ATED** 29:14 65:17
**named** 56:24 65:8
**names** 26:12 42:3 59:17, 24 64:5
**national** 101:25
**nature** 71:18 104:24
**needed** 9:21 18:12,20 19:4,5 33:18 39:11 52:25 73:22 86:4 90:8 92:13,17 93:4,16
**needing** 51:21 92:4
**negotiations** 109:19
**no-contact** 73:8
**nod** 6:3
**non-discrimination** 100:17,25 111:2,4
**noncredit** 32:21
**nondiscrimination** 91:7
**noninstructional** 10:14 19:3,7,16,17 20:4 25:20 108:6
**notes** 18:14 20:18 22:4 57:13 105:8 108:7,11
**notice** 21:17,20 83:8 103:22 107:12,18,23 108:3,24
**Notice/complaints** 107:7
**noticed** 83:6,10
**notices** 21:11
**number** 14:9 63:19,21,24 64:2 68:19 69:5 101:9,16, 22 107:7
**numbers** 59:18,24
**numeral** 108:19

**O**

**object** 15:23 16:1
**objected** 24:2 62:3
**objection** 24:4 59:20 103:5
**objections** 24:3 59:10,14 60:8 61:18
**objects** 60:5
**obligated** 90:20
**obtained** 59:25
**occasional** 21:14
**Occasionally** 22:18
**occasions** 22:19 70:8
**OCR** 61:11,15 84:5
**off-the-record** 5:12 94:25 111:24
**offer** 27:21,24 86:24 87:2 108:22
**office** 18:10 51:20,24 61:7,16 66:25 82:5 95:17, 18,20,21,22,23
**Officer** 106:19,20
**official** 25:22 56:24 107:19
**Officials** 106:10
**one-hour** 88:9
**ongoing** 22:15
**online** 96:11
**onset** 28:3
**open** 15:13
**open-door** 75:9
**opening** 101:1
**operate** 9:21
**operating** 10:2
**options** 27:16 51:24 107:14,15
**order** 8:3 22:12
**orientation** 101:25 104:9
**origin** 101:25
**original** 26:2 96:21
**Originally** 6:13
**other's** 14:14
**outcome** 52:8 55:4,9
**outlining** 39:3
**overarching** 26:10
**oversaw** 8:11 9:17
**oversee** 10:4 105:15
**overseeing** 89:25

**P**

**p.m.** 35:22 36:9,17 42:22 44:16 45:20 49:7,23 50:16 112:2
**pages** 17:16 47:2 89:5 111:9
**paint** 13:22 25:8 66:5 69:2,6 70:17 94:11
**painting** 13:16,21 88:4
**painting/refinishing** 14:12
**paragraph** 89:21,24 90:10,17 93:8,22 94:4,10, 17 101:1 102:23
**parked** 86:5,6
**parking** 86:7
**part** 13:17 17:23 19:10,24 49:10 52:3 53:11,24 70:17
**participating** 10:25 71:8
**parties** 108:24
**party** 110:13
**pass** 91:12
**passed** 91:10
**pattern** 71:18
**Patty** 38:6
**pay** 7:25 21:15
**PDF** 111:25
**pending** 6:9
**people** 6:3
**percent** 8:2 39:11
**perfect** 88:13
**performance** 12:4
**performed** 55:14
**period** 55:1
**periodically** 24:3
**permission** 25:12 94:19
**person** 80:17
**personal** 21:4 25:11 29:18 57:2 67:8 69:12
**personality** 18:13
**personnel** 33:7
**persons** 59:25 60:22
**perspective** 99:25
**pertaining** 101:10
**phone** 59:18,24 80:19
**physical** 104:24
**PII** 79:11 80:5
**pits** 83:24 98:18
**place** 11:1 91:6
**plaintiff** 57:11 89:9,24 90:2,11 93:10,22 94:4,10, 17
**plaintiff's** 59:6 60:10 63:10 93:9,12
**play** 95:13 96:6 97:6 98:15,22
**played** 97:8,17,25 98:7, 16,23
**plural** 45:13
**point** 27:21 37:9 54:25 67:19 82:1 84:19
**points** 101:2
**policies** 26:10 90:19 91:6 101:17 111:7
**policy** 18:16 19:2 26:7,11 75:9 86:2 90:15,25 100:21,25 101:14,15 102:7 103:18 104:2,5,14, 20 106:4 107:13,22 109:2, 9 111:1,2,3,5
**Polliard** 30:21 31:22 36:20 49:7,18
**portion** 41:13
**position** 7:17,20 12:25 105:12
**positive** 69:1,5
**possibility** 15:13
**potentially** 71:22
**power** 99:18
**practice** 52:5 53:12,24 91:3
**practices** 101:6,10 102:11
**preamble** 40:19
**predicated** 92:22
**pregnancy** 102:2
**prejudice** 60:2
**preparation** 81:13
**prepare** 57:5
**presence** 28:12
**present** 13:6 28:14
**presented** 10:22
**preserving** 24:4
**president** 31:2 42:8 67:1, 15
**Presidents** 106:21
**press** 95:13 96:6 97:6
**pretty** 18:21 63:6 96:18 108:17
**preventing** 81:5
**primarily** 9:19
**primary** 99:24
**printed** 26:4,5
**prior** 7:19 12:19 17:21 52:10 79:21
**prison** 9:4
**privilege** 41:14 58:4 75:18 76:3,9,14 77:18 78:1 79:2,7,10,18,22 80:4

**privileged** 78:18

**privy** 53:20 108:15

**problem** 48:8

**procedure** 63:16

**procedures** 101:18

**proceed** 42:19

**process** 19:4,6,7 20:5,16 26:2,4,14,15,24 43:10 52:6,9 53:9,10 55:20 75:7, 12,13 91:9 93:2 108:5

**processes** 19:15 20:1 26:9

**product** 79:6

**program** 7:21,23 8:3 9:9, 11,15,17 10:1 11:20 13:13,19,24 14:24 15:3,6, 20 29:23 32:1 38:2 39:15 51:21,25 53:4 54:20 68:16 72:12,16 73:22 74:18,21 86:20 87:21 88:3 90:8 99:23 105:13,15

**programs** 7:22 8:12 9:4 10:2 13:7 18:21 22:8,12 32:2,24 67:25 99:24 102:3

**progress** 22:20 49:15

**progress,'** 48:24

**progressed** 49:19

**prohibiting** 104:2,14

**project** 15:18 39:8 53:1 69:2,6

**projects** 8:8

**promote** 101:4

**properly** 9:21 93:1

**protected** 60:7

**provide** 23:20 59:24 104:6 109:10

**provided** 87:10,13

**Providing** 70:16

**Provost** 106:18

**public** 16:10 89:10

**pull** 49:12

**punk** 86:16

**purge** 21:20

**purging** 21:14

**pursuant** 63:15

**purview** 39:15

**pussy** 86:16

**put** 92:25

**putting** 13:16 34:1

**Q**

**question** 6:9 10:9 15:24 24:5 52:23 60:21 61:1,25 62:2 81:12 87:7 93:21 109:25

**questions** 27:6 111:22

**quickly** 22:5 85:6 93:3

**quiz** 19:21

**R**

**race** 27:11 38:10 101:24 104:8

**racial** 29:11 52:2 60:2 89:19 91:1

**racially** 12:13

**racist** 92:7

**raise** 29:3 90:12

**ran** 13:24 15:6

**range** 77:9

**ranging** 77:8

**rare** 22:19

**reach** 20:8

**read** 34:7 37:13 38:10 44:5 46:2 57:6,9,12,19 68:8,10,16 70:8,9,20 71:4, 23 72:6,7 78:20 82:2 93:25 94:1,6,13,14,20,21 102:21 103:1 107:1 108:25 110:12 111:23

**reading** 52:8 92:1 102:23 109:15 110:7,11,14,15,19, 23

**reads** 71:18

**real** 93:3

**realized** 54:8

**reason** 21:13 75:23 81:11 90:10

**reasonable** 60:8 108:23

**reassignment** 12:25

**recall** 15:21 16:14,17 17:4,12,21,24,25 18:1,6, 19 19:10,24 20:7 21:11 22:7 28:4,22,23 29:8 30:11 31:1 33:17,22,23 34:12,13 35:9 37:9,11 39:6,19,25 40:2,8 41:11, 17 43:9,10,12 47:13,16, 18,21 49:18,20 50:24 51:14,16,19 52:12,14,16 53:1 55:10,13,15,17,19 56:4,7,9,11,12 58:21 60:16,23,25 61:2,3,4,6,10, 11 62:10,13,24 70:10,12, 22,24 71:8,11,25 72:8,25 74:12,13 76:25 77:1 78:6, 13,22 79:14,25 80:7,11 81:3 82:8,19,20,24 83:2,5, 9,12,15,18,24 84:4,7,11, 12 85:16 87:1 90:6 91:18 92:3,9 93:7 94:8,9,15,23 95:4 110:25 111:1

**receive** 12:7

**received** 21:20 25:5 28:20 36:1 41:20 42:9 80:13,14

**receiving** 35:9 77:1 79:25

**recess** 40:11 74:16 88:14 105:10

**recognize** 95:13,16 97:21 98:25 99:1

**recollection** 41:9 52:22 109:12

**recommended** 39:2

**record** 5:8,15 6:6 22:16 24:4 37:20

**recorded** 81:25 95:6

**recording** 95:2,3 97:8,17, 25 98:7,16,23

**recordings** 81:22

**Recruit** 101:4

**redacted** 41:13 42:24 44:7 46:24 47:2,9 51:11

**redaction** 46:10 49:1,9

**redactions** 76:8

**reference** 17:14 69:16

**referencing** 69:20

**referred** 29:9 37:2,15 65:16,24

**refinishing** 88:4

**refresh** 109:12

**refrigeration** 8:7

**regulations** 101:20

**Rehabilitation** 103:23

**related** 19:23 21:20 23:21 44:18,20 45:7,23 46:4 47:17 50:19 61:18 62:15 102:6

**religion** 101:24 104:8

**remarks** 12:13

**remember** 11:5 16:25 17:9,10,12 18:12 19:1,8 20:6 24:15,19,22,23 25:1, 4,7,10,14 27:9 28:5,11 30:5,8,25 31:2 32:8,12,16, 17 33:4,5 34:5,6,8,10,11 35:10 38:16,18 39:22,24 40:1,4,6 41:4,16 46:15 47:14,15 49:3 50:2,4 51:15,20,22,23 52:1 53:7 54:13,18,19 55:3,12,21, 22,25 56:2 62:9,25 63:3,4, 7,8 65:8 68:11 69:1,20,22 74:10,11 81:4 82:4,11,13, 17 83:14 84:20 85:24 90:7,9 91:24 92:4,7,10 93:5 94:3 95:5 108:10 110:3,18 111:4,10,11,16

**remembered** 53:5

**remove** 41:1

**removed** 21:10 41:5,7,9 54:5,8,9,10 55:1,6 84:22, 24

**removes** 84:1

**removing** 13:15 54:7

**reopen** 96:21

**repair** 11:20 13:12,14,17 14:11 38:2 72:16 73:20

**repeat** 52:18 61:24 99:14

**reply** 20:2

**report** 11:21 42:24 43:2, 3,11,14,20,22 44:6,9 91:2, 3

**reported** 11:24 85:14,17 90:1 91:22

**reporter** 5:3,23

**reporters** 106:10,14,17

**reporting** 52:1

**reports** 43:6,17 91:1

**represent** 57:1

**Representatives** 63:19

**requested** 59:23

**requesting** 79:18

**requests** 31:25 32:3 56:5 67:25

**require** 16:5

**required** 9:22 84:8 85:25 86:9 87:20 91:2

**resigned** 55:8

**resolution** 19:13 20:13 53:15 61:14 90:14 109:17, 20 111:14

**resource** 44:4

**resources** 72:4 93:16 101:5 106:19

**respond** 52:20

**responding** 99:24

**response** 42:17 60:21 70:18 75:17

**responses** 58:19 59:5, 10,14

**responsibilities** 9:16,19

**responsibility** 52:4

**responsible** 10:6,11,16 32:1 44:2 101:17

**rest** 78:15

**restart** 82:12

**restoration** 93:2

**restroom** 88:8

**resulted** 24:13

**retaliate** 81:11

**retaliation** 81:5 107:8,13 108:25

**return** 72:11,17,22 73:3

**returned** 54:18 84:7,16

**reverse** 18:3,6 85:18

**review** 10:1 26:22 90:20 105:8

**reviewed** 58:14 81:13

**Richard** 64:25

**Rights** 61:8,16

**rims** 29:11

**Rio** 8:23,25

**risen** 92:19

**Roger** 5:1,16 112:4

**role** 11:15,18 19:25

**roles** 9:19

**Roman** 108:19

**Romo** 65:9

**room** 95:16

**Ross** 12:1 16:12,18,21 17:11,20,24 18:3,8 20:17 23:19 24:15,19,23 25:1,7, 10,14 27:2,3,7,8,10,14,18, 22,25 28:17,20,25 33:12, 14,17 34:25 38:3,16 40:7 41:20 42:7 45:24 46:14 50:20 51:17,20 52:11 57:11 63:18 65:12 66:13 68:15 69:2,6,17 71:22 73:3,9,11 74:6 75:18 81:5, 25 82:6,8,25 84:7,13,15, 25 85:25 86:1,8,12,15,20, 22,24 87:3 89:9 91:24 93:22 108:1,2,4,5 111:17

**Ross's** 12:10,11 16:25 25:11 36:2 46:5 50:25 51:19 55:14 56:13 60:1,17 62:11,15 65:20,21 69:12 72:11 73:19,24 74:2 80:23 84:23 86:11 87:25

**ROSS_000003** 67:3

**ROSS_000053-IMG_ 4450.MOV** 99:5

**row** 76:1

**RSI** 8:7

**rule** 63:15

**rules** 5:22 101:19

**run** 77:14

**running** 15:20

**runs** 29:23 35:18 40:19 100:15

**S**

**safety** 14:14

**Salina** 6:15

**sand** 92:25

**sanding** 13:15

**save** 23:3

**scared** 45:17

**schedule** 15:14 32:21 70:19 88:9

**school** 6:19 8:8

**schools** 8:10

**science** 12:23

**screen** 17:11 34:1 35:14 40:15 48:12 50:10 59:2 62:20 66:22 75:15 88:17 95:7 100:9 105:23

**scroll** 41:12,18 42:13 44:15 45:19 47:1 49:21 59:9 63:13,23 64:4 88:25 89:17 103:15 104:1,19 106:13 108:19

**Sean** 56:22 88:7 96:15

**seat** 7:24

**second-in-command** 31:23,24

**seconds** 97:7

**section** 15:15,16 59:13 63:14 68:5 71:14 89:19 103:23 104:20 106:9,14 108:19 109:5

**sections** 89:18 103:15

**seeking** 76:4,15 77:18 78:2 79:5

**seeks** 60:6

**selected** 7:18

**selection** 101:6,10

**semester** 7:9 54:16

**semesters** 54:17

**send** 47:7,21

**sending** 51:14 76:25

**sends** 21:11

**sentence** 44:5 71:18 110:12

**separate** 14:6 28:17

**separated** 39:6 73:12

**Separately** 28:2

**separates** 104:11

**sequence** 92:8

**services** 44:2 87:19,20

**set** 59:6 92:22

**sex** 29:18 101:24 104:8

**sexual** 45:15 52:2 69:24 101:25 104:9,21,24 106:4

**sexually** 12:15 24:24

**Shamma** 64:13

**share** 24:7,12 34:19 35:14 48:12 52:6 62:7 96:9,18 100:9

**shared** 24:6 36:1 40:25 75:13 78:13 79:14 80:11 81:23 108:12

**sharing** 34:19 66:21 75:7, 17 76:9 78:11,19 79:10 80:4 110:7

**shattered** 92:6
**shop** 25:2,5 73:15 90:1
**shorten** 61:10
**show** 15:4 17:6,7 105:23
**showed** 22:19
**showing** 40:17
**shrink** 96:20
**sic** 13:5 36:9
**side** 14:12,13 31:20
**sidelined** 20:16
**sign** 111:23
**signature** 47:2
**signed** 15:2 28:10,13 67:11
**similar** 8:8 67:24
**single** 111:4
**single-spaced** 39:18
**singled** 25:15
**site** 26:1
**situation** 15:11
**skill** 9:6 18:22 92:22
**skip** 40:18 80:3
**slavery** 18:4,6 85:18
**slightly** 97:3
**slur** 29:11
**smoothly** 10:2
**solution** 18:18 20:9,10
**solved** 22:17
**someplace** 33:1
**sort** 15:11 26:9
**sound** 6:10 96:13,16,18, 23,24 98:20
**Sounded** 97:22
**sounds** 6:11 21:13 98:14
**space** 86:5
**speak** 5:23,24 19:12 27:3 90:11,15
**speaker** 97:21
**speaking** 49:3 97:13
**specific** 21:22 26:12 59:13 77:9
**specifically** 16:12 18:8
**specifics** 34:11 85:3 93:5
**spelled** 26:2 89:13
**spoke** 38:1 57:21,22,25 58:5
**spoken** 38:12 48:23 77:23
**sponsored** 102:3
**spot** 97:16
**spreadsheet** 23:1,2,4 24:12 108:15
**staff** 9:17 22:9,17 27:1 53:17
**staff-to-staff** 33:9
**stamp** 35:19
**stamped** 17:15 34:21 35:17 40:18 100:12
**stamps** 77:9
**standard** 18:21 31:25 102:15
**stands** 43:4
**start** 7:2 97:24
**started** 8:23 45:5
**starting** 64:5
**starts** 17:11 20:16 29:13 49:9 89:21
**state** 5:7,14 101:19
**stated** 54:6 75:8
**statement** 63:11 72:18 102:22 103:18 110:15
**statements** 63:9
**states** 60:9 61:7 106:9
**stating** 28:13
**statistic** 16:10
**status** 102:1,2
**statutes** 101:19
**Stay** 83:22
**step** 20:11 90:14 99:3
**Stephanie** 30:21 31:21 36:20 37:7 38:1 49:7,18
**steps** 13:22 20:14 28:17 53:13,14 109:10
**stop** 93:10
**stopped** 6:23
**straight** 43:25
**strength** 14:11
**strengths** 14:15 88:4
**strongly** 39:3
**struggling** 18:11 33:24
**student** 7:25 10:6,8,10 15:9,15,18,22 16:13 18:2 19:11 22:2,14,17 26:1,7, 16 28:6,7,9,15,21 29:6 38:1 42:8 43:13,15 49:12 52:5 53:13,17,18,25 60:6 62:3 66:2,5,8 68:15 70:4, 6,13,16 71:2 74:24 75:1,9 79:11 83:22,25 86:8 91:1 98:18 104:25 105:6 109:19
**student's** 37:3 92:22,23
**student-facing** 74:22
**students** 10:3,4,24,25 12:8 13:19 14:9,13 15:2,4 16:3,5 18:21,23 22:8,12 25:5,24 26:3 29:18 32:23 33:1 44:9 45:13,16 54:24 59:18 61:18 62:4,10,15 63:20 65:24 69:16,20 70:5 71:22 75:3 83:7,8,10,16, 20 85:14,17,23 86:3 87:14 93:2,3 105:3,5
**students'** 45:12
**stuff** 32:1 68:1
**subject** 10:22 41:19 46:9, 23 49:1 51:11 60:7
**submit** 26:21,23
**submitted** 20:12 22:24 42:24 44:6,10 45:24 50:20
**submitting** 32:3
**subsection** 104:21
**subsections** 104:23
**substance** 58:1
**substantiate** 68:20
**substantiated** 65:12,16, 19,23 66:1,4,7 68:20 69:14 70:3 71:6,19
**suggest** 45:1 46:4
**suggests** 45:8
**Summary** 71:15
**superiors** 81:8
**supervise** 84:15
**supervising** 11:6
**supervision** 73:4
**supervisor** 12:1,18 73:20
**supervisor/instructor** 84:23
**supervisors** 91:4
**Supervisors/managers/ directors** 106:23
**Supplemental** 63:11
**supplies** 25:2,5 94:5
**support** 39:5,9 69:7 87:2 92:5,11 93:16 111:14
**supportive** 86:24 87:2, 10,11 92:15 108:19,23 109:2,10,13 110:1,4
**sworn** 5:2
**Syd** 42:23
**Sydney** 42:1,4 46:17
**syllabus** 25:24,25 26:6 75:8
**system** 88:8

**T**

**table** 53:11 75:22 106:6
**taking** 11:1
**talk** 53:15 75:9,10 85:3 93:20

**talked** 13:12 18:15 26:19 28:7 29:17 44:24 54:4,6 62:14 78:5 95:2 99:12 110:1

**talking** 17:5,6 18:15 31:18,19 32:13 39:20 45:6 51:21 62:10 71:11 83:5 92:3,4 98:5 109:21 111:16

**Tamra** 30:19

**tandem** 14:8

**targeted** 38:10

**task** 18:20 93:5

**tasks** 53:3

**taught** 9:7 10:21 14:7,21

**teach** 6:25 7:16 10:3,20

**teachers** 14:20

**teaching** 7:17 9:3 92:24

**team** 32:25 43:4 44:4

**tear** 92:24

**tearing** 13:14

**technical** 8:10 18:22

**telling** 18:1 24:15,19,22, 23 25:4 41:5 70:12 82:8, 11,20,24 83:2,9,12,18,24 84:12 91:24 110:14,15

**tells** 109:14

**ten** 97:7

**Terese** 30:7 39:14 42:22 44:16 46:17

**term** 18:6 85:18

**test** 19:21

**testified** 5:3 32:8 47:12 82:16 105:13

**text** 39:18

**theme** 53:2

**themes** 45:11

**theory** 15:1 93:6

**thing** 31:24 44:13 54:6 88:25 99:6

**things** 18:10 33:18 53:23 55:7 68:4,11,19 99:19 104:2 109:7 111:12

**thinking** 79:3 108:16

**thorn** 82:25 83:3

**thought** 31:1 103:4

**throw** 15:17

**Thursday** 15:7,10 35:21 36:9,16

**time** 7:24 9:12 11:16,23 12:19,20 13:6,8 14:16,22 15:4,19,22 16:13,15 18:11,20,24 19:13 21:24 22:2,15 24:21 25:21 28:4 30:15 31:4 32:22 33:18,22 35:1 38:16,18 39:9,11 41:5,8,9 43:6,9,16,19 49:4 50:3,24 52:10,25 53:3,12 54:9,24,25 58:5,9 67:16 73:24 74:5,19 79:15 80:1 88:12 91:17,19,22 92:2,3, 12,23 93:5,17 95:22 98:3, 22 105:12

**timeline** 28:8 54:13,19

**times** 7:17 9:18 14:21 16:21 17:21 22:11 52:11, 12,13,14 57:24

**Timmons** 30:2 42:14 45:20 46:9,13 48:20 49:3, 22 50:2,16 51:3,7

**Title** 103:25 106:4 107:18, 21

**titled** 59:5,13 63:10 67:8 71:15 75:17 88:19 107:7 108:19

**told** 17:22,24 18:2,13 19:4,5 24:16 38:12 41:7,8, 10 52:18 53:8 71:25 72:8 73:23 74:1 75:3,7 85:4,9, 20 86:12,15 91:15 107:25 109:21 110:9,10,20

**tolerate** 101:23 102:25

**tolerates** 102:16

**top** 34:24 35:21 40:21 66:24 67:8,20 69:23 89:8 100:17

**topic** 10:21

**tough** 96:5

**track** 22:13

**trainer** 8:25

**training** 8:1,10 10:23 32:23 93:6 111:11

**transitions** 31:3

**Tresse** 37:3

**true** 32:9

**Tuesday** 35:3

**turn** 96:2 97:5

**type** 75:23 76:2 78:22

**types** 10:13

**tyr2142738@maricopa. edu** 41:25

**Tyrone** 17:11 26:3 28:11 34:24 35:6 36:2 38:2,12 41:20 42:6,24 44:7,25 45:24 46:5,14 49:10 50:19 53:19 55:10 57:11 60:1 63:18 68:15 80:23 82:5,8 83:6,21 88:2 89:9 111:17

**Tyrone's** 44:17 45:6 72:17

### U

**uh-huh** 6:3 24:11 73:2

**unable** 68:20

**uncomfortable** 90:2,9

**underlined** 63:9 71:17

**underneath** 44:13

**understand** 33:24

**understanding** 13:9 102:10

**Understood** 6:7

**undisputed** 68:6

**unfairly** 38:9 72:5

**United** 61:7

**Unnamed** 63:19

**unopened** 21:12

**unreasonably** 110:13

**unrelated** 46:14

**unsafe** 70:7,14

**unsubstantiated** 68:23

**unwelcome** 68:14

**updated** 23:13

**upper** 20:12,15 52:8 53:19,20,22 55:6 91:10 93:18 111:13

**Urbanski** 12:21 13:9 36:10,16 37:9 46:18 91:14

**Urrea** 30:17 32:5,9,10

### V

**VEED** 96:11 99:8

**vehicle** 25:11 69:12 84:8, 9,13 92:25 93:1

**venue** 89:18

**verbal** 6:2 69:2,5 104:23 107:18 108:3

**verbally** 91:9

**version** 18:17

**versus** 8:3 70:6 89:9

**veteran** 102:2

**VI** 107:7

**Vice** 42:7 106:21

**video** 81:22 95:3 96:9,15 99:4,6

**VII** 108:19

**violation** 107:13

**Violations** 104:20

**visitor** 104:25 105:6

**vocational** 8:25

**voice** 96:14 98:13,20,25 99:1

**voices** 95:25 96:6,7,8,12 97:10,11,19

**volume** 14:13 96:3 97:5

**VP** 26:23 30:15,24,25 42:7 108:14

W

**W-O-E-H-L** 5:16

**W-U-S-T-E-R** 13:5

**Waiting** 49:11

**waiving** 60:7

**Walking** 10:19

**wall** 39:18

**wanted** 7:16 11:9 18:23 22:2 26:17 52:24 75:9 111:17

**watched** 10:25

**watermark** 99:8

**ways** 109:9

**weaknesses** 14:15

**weeds** 68:2

**week** 7:7 100:1

**weekly** 15:8

**weeks** 84:17,20

**white** 18:2 27:13

**Wilson** 30:12 31:14 35:22 41:19 80:4,7,8,9

**withheld** 75:23 79:6

**withholding** 69:1,5

**Woehl** 5:1,7,16 34:25 36:20 38:13 60:13,23 63:24 89:11,25 90:11,19 93:9,23 94:4,10,17 112:4

**woman** 72:5

**WOODS** 5:6,13 15:25 16:7,11 17:19 23:24 34:18 35:13 40:9,14 44:14,23 48:6,8,11 50:9 52:21 57:3,4 58:3,6,12 59:1 61:22 62:1,19 66:20 72:15 73:18 74:14,17 75:11 76:23 85:11 86:19 87:8,23 88:10,15 95:1 96:17,22 97:2,6,9,18 98:1,8,17,24 99:11 100:8 103:5,9,11,14 105:7,11 111:21,25

**word** 20:19 24:2 29:13 44:3 46:10,24 92:20

**words** 5:24 97:12

**work** 11:13 13:1,19 19:3 20:11 22:25 53:16 54:17 67:19,20,23 79:6 84:8 88:5,9,12

**worked** 11:11 14:8 84:13 102:16,24

**Workforce** 106:19

**working** 7:2 13:6 18:3 39:8 41:15 49:10,14,18,20 50:2,4 52:9 54:1 67:24

**works** 7:24 18:16

**world** 8:4

**worries** 88:10

**write** 39:3 43:18

**writes** 35:25 40:24 48:23 49:23

**writing** 62:9

**written** 20:11,19,20 40:7 43:14,17 91:9

**wrong** 14:6 60:19

**wrote** 20:21 22:14 35:22 36:10 42:23 46:11 51:9

**Wurster** 13:3,5

Y

**year** 9:14 54:21

**yearlong** 54:17

**years** 7:3,8,11 9:7,18 11:14,15,23 12:4,7 19:8,9

**yelled** 70:6

**yelling** 70:13

**young** 6:18

Z

**Zachary** 65:8

**Zain** 64:12

**Zoom** 80:22 96:19

# Exhibit 3

**From:** Tyrone Ross <TYR2142738@maricopa.edu>
**Sent:** Tue, 06 Dec 2022 12:08:17 -0700
**To:** "Woehl,Mark" <woehl@gatewaycc.edu>
**Subject:** complaint
**Attachments:**
· Tyrone Complaint.docx *(21 kb)*

---

Woehl 3-25-26 Gerard T. Coash, RMR Exhibit
**Exhibit 2**
3-25-26 Gerard T. Coash, RMR

# Exhibit 4

Good morning, my name is Tyrone ross, I'm currently a student at gateway community college, I attend the collision car repair class, in which I have not been treated fair. I don't feel welcome in the class and my instructor has made it the worst experience a student can ever encounter. I have to write this letter because I feel like I've been racially singled out, I've been a victim of racial bias, I absolutely feel like I cannot speak my mind freely in class due to my teacher Mr. Cooper. Mr. Cooper has been the most negative teacher I ever ran across, he has not inspired not one person in this class to be here or to do collision repair work. Every time I do a project he always has something negative to say about it vs helping me. For example, when I finished painting my slingshot pieces and showed Mr. Hernandez he replied that "oh Mr. Hernandez did a good job trying to put me down as if I can't do good work myself". When I bought me new spray guns he told me I didn't need them for the level I'm on as if I wasted my time purchasing new paint guns. He has been completely negative towards me since I started this class. He has not given me any donated materials that's for students who can't afford materials, in turn he always asked me if I have money and why can't I afford things which doesn't Make any sense if it supposes to be for us, but yet he won't hesitate to give the materials to [redacted] which is another student that he has been showing favoritism to since the first day of class. I felt completely uncomfortable with my instructor since the day he singled me out in class calling me out just because I couldn't afford materials that comes with this class, and it has gotten more worst from when we first supposedly resolved this issue. He's always talking about how he likes it when he has girl students so when they have their breast out it makes him hornier then when he was a young adult, he always talking about his out of school life which I have been completely uncomfortable with as well because he not only sounds like a prowler but also a pervert. Her told us that's exactly why he shows favoritism and not to us. He has been showing favoritism to one student, [redacted] who has made this class a hazardous working environment, there was an incident last week when the instructor came to help me with a dent in my car, she immediately started cursing them out screaming why is he helping me as if I'm not a student, then Mr. Cooper did nothing about it. He allowed her to scream, curse them out all because her project didn't come out correctly. Now whenever I need help I can't get help because of the situation with her, and the teachers feel more obligated to help her than any other students. There was also an incident where a student used the word (nigger) and Mr. Cooper came up to me and asked me verbatim, "did anybody use this word towards you, I replied no, then he asked me was I ok I replied yes and I wanted to let it go because it was not directed towards me, so if you want to address it based on just the word being used then yes its inappropriate, but then Mr. Cooper proceeded to tell me that using the word isn't the issue because him and his friends use it all the time and he actually said (nigger) then said he just knows when he get to school that word is not allowed to use. So, in turn I felt completely disrespected, I felt completely uncomfortable, because he basically said being a racist or using the word isn't a problem but only when you use it at school. Last week he came up to me and asked me why certain people get to use the word (nigger) and certain people can't, then I asked him what does he mean by that, so he explained that his wife called him a (nigger) which he actually says the word comfortably every single time, that she called him one and then apologized. To be honest I just stayed quite because I was honestly lost why he had come up to me which I am the only black student in class to feel that comfortable with telling me this. Mr. cooper has been very disrespectful on that level and doesn't blink an eye when it comes to telling me racist stuff like this. Every time I speak my mind like today because has allowing [redacted] to do whatever she likes in class, takes the painting booth whenever she wants to and then he set rules forth for us but is allowing her to break each rule, so when I speak my mind about it and tell Mr. Cooper he is not being fair he tells me I'm looking at an illusion, or we don't

Woehl
Exhibit 1
3-25-26 Gerard T. Coash, RMR

know what has going through putting up with her making it ok for him to show favoritism to her and treat me differently. Today he tried kicking me out of class because I'm fed up with the way has treating not only me but the rest of the class. We all pulled him to the side today and told him he's been treating us unfair in this class and all he does is walk around it with excuses. I do not feel that I have gotten what I paid for. I've complained to Mark, the program manager and told him about the two incidents where me Cooper singled me out and took my freshly painted pieces off my bench just to put other students there. I have multiple witnesses who can attest to this as well. Then he started moving my car without permission while I'm there and when I politely asked him to come get me to move my car since I'm here he replied that this is his body shop he can do whatever he wanted then we got into a heated argument there. Just like today when I spoke my mind and called him out on his lies he wanted to try and kick me out the class, so now I want to leave. I don't feel welcome in this class I haven't since day one of this class especially when he referred to my race as "people like you", even when my white friend/student name [redacted] was helping me he would pull him to the side and say, you know your white jokingly, then says it don't look right that you working for a black person. I told mark about it and Mr. Cooper has not changed since. So now I want to find a solution for me to leave the class because I just can't continue with this class knowing I've been a targeted student, racially targeted by all he Has said to me and all he has done to me. he's in my eyes a racist, bias teacher, he doesn't like me because of who I am and how I speak up to defend myself every time. After I write this letter I will try and follow up with taking this the legal route because I have been completely treated unfair, I've been targeted and my freedom of speaking my mind has gotten me targeted. He called us a lynch mob because today we all got fed up and spoke our mind while he still making excuses for his behavior as a teacher, then told me if I don't let it go then I would have to leave for the day so I went to his boss mark because I think it not right him trying to tell me to leave just because I'm bringing up a revolving issue. I'm tired of him saying racist things to me and I'm tired of being a target for him. I don't not want to continue this class, I don't feel safe, I don't feel welcome what so ever. As I sated previously I have more than 10 students who can attest to his racist, pervert, disrespectful, favoritism, negative behavior, ways which I will get for this letter.

To recap I've had multiple conversations to resolve this matter with Mr. Cooper with no success therefore I am writing this account to the best of my knowledge to be accurate and true.

# Exhibit 5

Woehl
Exhibit 3
3-25-26 Gerard T. Coash, RMR

On Thu, Dec 8, 2022 at 1:03 PM Delfi Wilson <delfina.wilson@gatewaycc.edu> wrote:

Jessica,
Good afternoon. Craig shared your email below. I received Tyrone Ross's letter via email this morning from Lora and Craig. I will work with them to get some additional details and to make sure we follow the appropriate steps. In the meantime, can you please share any student contact information you may have? I would like to communicate with the student and acknowledge that I received his letter.
thanks
Delfi

On Thu, Dec 8, 2022 at 12:12 PM Craig Urbanski
<craig.urbanski@gatewaycc.edu> wrote:
>
> Please see the attached from Jessica.
>
> Craig
>
> ---------- Forwarded message ---------
> From: Craig Urbanski <craig.urbanski@gatewaycc.edu>
> Date: Thu, Dec 8, 2022 at 12:09 PM
> Subject: Re: Student complaint - Central City
> To: <brosilo@gatewaycc.edu>
> Cc: Stephanie Polliard <stephanie.polliard@gatewaycc.edu>, Mark Woehl <woehl@gatewaycc.edu>
>
>
> Jessica
>
> There are multiple issues going on in this class. Thus, I have already referred this student's letter letter to Mika, Lora, Tresse and Delfi. They are aware and will be following up.
>
> Thank you,
>
> Craig
> On Thu, Dec 8, 2022 at 11:57 AM Jessica Brosilo <brosilo@gatewaycc.edu> wrote:
>>
>> Hi Craig, Mark, and Stephanie,
>>
>> This morning I spoke with a student in our autobody and collision repair program, Tyrone Ross. He was in the front lobby and Patty directed him to me because he claimed he did not feel comfortable going back to class. He has alleged that Brent Cooper has unfairly targeted him based on race. Tyrone told me that has already spoken to Brent, Mike Hernandez and Mark Woehl about the allegations. He told me that he sent a written complaint via email on Tuesday, Dec. 6, to Mark and Craig Urbanski.
>>
>> I asked Tyrone if he wanted to file an official complaint via the website but he wants to rest on his letter. He also met Dr. Diaz at Runway to Success and has an appointment scheduled with her on Jan. 3 to discuss this issue.
>>
>> He left early today, missing his hours. He told me he would like to finish the program but I don't

think he intends to return until GWCC responds to his complaint. I'd just like to confirm that Mark and Craig received Tyrone's email and that his complaint is being reviewed. I will include his phone number below.
>>
>> Please let me know if anyone would like to discuss this further with me. If not, I'll leave it to Mark, Craig and the official complaints process. Thanks!
>>
>> Tyrone Ross: [redacted]
>>
>> Jessica Brosilo
>> GateWay Community College
>> MARICOPA COMMUNITY COLLEGES
>> Director, Center for Non-Credit Training & Workforce Excellence | Workforce Development
>> 108 N. 40th Street, Phoenix, AZ 85034
>> brosilo@gatewaycc.edu
>> https://www.gatewaycc.edu/
>> O: 602-286-8152
>> LinkedIn | Twitter | Facebook
>
>
>
> --
>
>
>
> Craig Urbanski, PhD
> GateWay Community College
> MARICOPA COMMUNITY COLLEGES
> Industrial Technology/ Division Chair
>
> 108 N. 40th Street, Phoenix, AZ 85034
> craig.urbanski@gatewaycc.edu
> https://www.gatewaycc.edu/
> O: 602-286-8616
> LinkedIn | Twitter | Facebook
>
>
>
> --
>
>
>
> Craig Urbanski, PhD
> GateWay Community College
> MARICOPA COMMUNITY COLLEGES
> Industrial Technology/ Division Chair
>
> 108 N. 40th Street, Phoenix, AZ 85034
> craig.urbanski@gatewaycc.edu
> https://www.gatewaycc.edu/
> O: 602-286-8616
> LinkedIn | Twitter | Facebook
>

# Exhibit 6

**From:** Judy Castellanos <judy.castellanos@domail.maricopa.edu>
**Sent:** Mon, 12 Dec 2022 16:23:13 -0700
**To:** Melissa Flores <MEL2195952@domail.maricopa.edu>
**CC:** delfina.wilson@gatewaycc.edu, Mika Davis <mik2028597@gatewaycc.edu>, Stephanie Polliard <stephanie.polliard@gatewaycc.edu>, David Bowman <david.bowman@domail.maricopa.edu>, Jennifer Urrea <jen2077463@domail.maricopa.edu>, Tamra Gagnon <tamra.facciola@domail.maricopa.edu>
**Subject:** Re: Confidential** Complaint Letter Received Tyrone Ross

---

Based on this additional information that has been shared, we would need to remove this employee while the investigation is concluded. Amy Diaz will need to send that request to Georgetta, and copy Tamra, Jennifer Urrea and me.

Thank you,

Judy

On Mon, Dec 12, 2022 at 10:06 AM Melissa Flores <MEL2195952@domail.maricopa.edu> wrote:

[redacted]

**From:** Delfi Wilson <delfina.wilson@gatewaycc.edu>
**Sent:** Friday, December 9, 2022 4:04 PM
**To:** Melissa Flores <melissa.flores@domail.maricopa.edu>; Judy Castellanos <judy.castellanos@domail.maricopa.edu>; Mika Davis <mik2028597@gatewaycc.edu>; Stephanie Polliard <stephanie.polliard@gatewaycc.edu>
**Subject:** Confidential** Complaint Letter Received Tyrone Ross

Woehl
Exhibit 4
3-25-26 Gerard T. Coash, RMR

[redacted]

[redacted]

---------- Forwarded message ---------
From: **Delfi Wilson** <delfina.wilson@gatewaycc.edu>
Date: Fri, Dec 9, 2022 at 9:22 AM
Subject: Complaint Letter Received
To: <tyr2142738@maricopa.edu>, Sydney Craig <sydney.craig@gatewaycc.edu>

Mr. Tyrone Ross,

Good morning. I am the Vice President of Student Affairs at Gateway Community College. I would like to acknowledge that I received a copy of your complaint letter on December 8, 2022. I attempted to reach you yesterday afternoon but was unsuccessful. I left you a voice message. In your letter, you shared several concerns regarding your experience as a student in the Collision Repair Class at the Central City campus. These issues are of great concern to us and will be addressed accordingly. I appreciate you bringing this to our attention. I will work with you to follow our non-instructional student complaint process. For your reference, below is a link to our Complaint Procedures.

I am happy to meet with you next week. I am including Sydney Craig, Program Coordinator for Student Affairs in this communication. Miss.Craig can help with scheduling our meeting. Please let Miss. Craig know if you prefer a virtual or in-person meeting. I am located at the Washington Campus, but I can meet you at Central City if that works out best with your schedule.

If you have any questions, I can be reached at 602-286-8035 or Delfina.wilson@gatewaycc.edu. Thank you, again, for letting us know about these concerns.

Sincerely,

Dr. Wilson

--

Delfina Acosta Wilson, PhD
GATEWAY COMMUNITY COLLEGE
Vice President, Student Affairs | Office of Student Affairs
108 N. 40th Street, Phoenix, AZ 85034
602.286.8035
delfina.wilson@gatewaycc.edu
https://www.gatewaycc.edu

**From:** Lora Timmons <lora.timmons@gatewaycc.edu>
**Sent:** Mon, 12 Dec 2022 16:03:42 -0700
**To:** terese.brown@gatewaycc.edu
**CC:** Delfi Wilson <delfina.wilson@gatewaycc.edu>, Stephanie Polliard <stephanie.polliard@gatewaycc.edu>
**Subject:** Re: [redacted] issues

---

Was there a response to the email he sent...just trying to figure out where we are with this and how to proceed...

On Mon, Dec 12, 2022 at 2:49 PM Terese Brown <terese.brown@gatewaycc.edu> wrote:

> All, I confirmed with Syd, that there was never a BIT report submitted for [redacted] or Tyrone.
>
> Kind regards,
>
> **TERESE M. BROWN, JD**
> **GATEWAY COMMUNITY COLLEGE**
> Dean, Student Affairs | Office of Student Affairs
> 108 N. 40th Street, Phoenix, AZ 85034
> 602-286.8009 | terese.brown@gatewaycc.edu
> https://www.gatewaycc.edu
>
> On Mon, Dec 12, 2022 at 2:45 PM Terese Brown <terese.brown@gatewaycc.edu> wrote:
>
> [redacted]
>
>> Tyrone's complaint, though different, is related. There are concerning themes about the students' experience with the class, to include possible sexual harassment, discrimination, and an environment where students are scared to come forward. That said, all of the issues need to be addressed. Delfi and I

met with Tyrone on Friday and she can share more, as she deems appropriate, about next steps with the discrimination complaint. I will continue to coordinate with her and Ryan on resolving student grievances, BIT referrals, conduct, and anything else that falls within the purview of Student Affairs.

Kind regards,

**TERESE M. BROWN, JD**
**GATEWAY COMMUNITY COLLEGE**
Dean, Student Affairs | Office of Student Affairs
108 N. 40th Street, Phoenix, AZ 85034
602-286.8009 | terese.brown@gatewaycc.edu
https://www.gatewaycc.edu

On Mon, Dec 12, 2022 at 2:24 PM Lora Timmons <lora.timmons@gatewaycc.edu> wrote:

> This is a related issue to the Tyrone Ross complaint but the issue was submitted to BIT and there has been no follow up on...perhaps some of why the other escalated. Can I find out where this is? Lora
>
> ---------- Forwarded message ---------
> From: **Mark Woehl** <woehl@gatewaycc.edu>
> Date: Mon, Dec 12, 2022 at 8:20 AM
> Subject: Fwd: [redacted] issues
> To: Lora Timmons <lora.timmons@gatewaycc.edu>
>
> FYI,
>
> ---------- Forwarded message ---------
> From: **Mark Woehl** <woehl@gatewaycc.edu>
> Date: Thu, Dec 1, 2022 at 8:45 AM
> Subject: Re: [redacted] ssues
> To: <brent.cooper@gatewaycc.edu>, Terese Brown <terese.brown@gatewaycc.edu>, Sydney Craig <sydney.craig@gatewaycc.edu>
> Cc: Mike Hernandez <hernandezm@gatewaycc.edu>, Craig Urbanski

[redacted]

--

eSig Logo

**BRENT D. COOPER**

**GATEWAY COMMUNITY COLLEGE**

Trades Instructor/Collision Repair

1245 E. Buckeye Rd. Phoenix, AZ. 85034

Office 602-238-4388

Cell 602-475-1946

brent.cooper@gatewaycc.edu

https://www.gatewaycc.edu/

--

Thank you, Mark

*"If you can't explain it simply, you don't understand it well enough ." Albert Einstein*

**Mark Woehl**

**GateWay Community College**

**MARICOPA COMMUNITY COLLEGES**

Trades and Technology Program Manager | Trades

1245 E Buckeye Road Phoenix Az 85034

woehl@gatewaycc.edu

https://www.gatewaycc.edu/

O: 602-238-4379 | M: 623-703-7110

LinkedIn | Twitter | Facebook

--

Thank you, Mark

*"If you can't explain it simply, you don't understand it well enough ." Albert Einstein*

**Mark Woehl**
**GateWay Community College**
**MARICOPA COMMUNITY COLLEGES**
Trades and Technology Program Manager | Trades
1245 E Buckeye Road Phoenix Az 85034
woehl@gatewaycc.edu
https://www.gatewaycc.edu/
O: 602-238-4379 | M: 623-703-7110
LinkedIn | Twitter | Facebook

--

**Lora Timmons, DHPE**
**GateWay Community College**
**MARICOPA COMMUNITY COLLEGES**
Dean of Nursing & Healthcare | Academics
108 N. 40th Street, Phoenix, AZ 85034
lora.timmons@gatewaycc.edu
https://www.gatewaycc.edu/
O: 602-286-8517
LinkedIn | Twitter | Facebook

--

**Lora Timmons, DHPE**

**GateWay Community College**

**MARICOPA COMMUNITY COLLEGES**

Dean of Nursing & Healthcare | Academics

108 N. 40th Street, Phoenix, AZ 85034

lora.timmons@gatewaycc.edu

https://www.gatewaycc.edu/

O: 602-286-8517

LinkedIn | Twitter | Facebook

# Exhibit 7

**From:** Lora Timmons <lora.timmons@gatewaycc.edu>
**Sent:** Mon, 12 Dec 2022 17:38:19 -0700
**To:** stephanie.polliard@gatewaycc.edu
**CC:** terese.brown@gatewaycc.edu, Delfi Wilson <delfina.wilson@gatewaycc.edu>
**Subject:** Re: [redacted] issues

---

Thank you...I have spoken to Mark and conveyed the "in progress". Lora :)

On Mon, Dec 12, 2022 at 5:25 PM Stephanie Polliard <stephanie.polliard@gatewaycc.edu> wrote:

> [redacted] Delfi and I are working on the Tyrone part of it--waiting for clarification on whether or not we need to pull the instructor even though the student is no longer attending.
>
> I think the only message you (Lora) can convey to Mark is that we're all working on it. We will keep you and Mark in the loop as we progress through this.
>
> Stephanie
>
> **Stephanie Polliard, Ed.D**
> **GateWay Community College**
> **MARICOPA COMMUNITY COLLEGES**
> Interim Vice-President of Academic Affairs
> 108 N. 40th Street, Phoenix, AZ 85034
> stephanie.polliard@gatewaycc.edu
> https://www.gatewaycc.edu/
> O: 602-286-8020
> LinkedIn | Twitter | Facebook
>
> *The Maricopa Community Colleges are now operating fully remotely.*
> *We hope you are safe and healthy during this time.*
>
> On Mon, Dec 12, 2022 at 5:21 PM Lora Timmons <lora.timmons@gatewaycc.edu> wrote:

Woehl
Exhibit 5
3-25-26 Gerard T. Coash, RMR

As long as it is moving forward that is what I was trying to find out for Mark. Thank you!

On Mon, Dec 12, 2022 at 4:43 PM Terese Brown <terese.brown@gatewaycc.edu> wrote:

[redacted]

**TERESE M. BROWN, JD**

**GATEWAY COMMUNITY COLLEGE**

Dean, Student Affairs | Office of Student Affairs

108 N. 40th Street, Phoenix, AZ 85034

602-286.8009 | terese.brown@gatewaycc.edu

https://www.gatewaycc.edu

On Mon, Dec 12, 2022 at 4:03 PM Lora Timmons <lora.timmons@gatewaycc.edu> wrote:

Was there a response to the email he sent...just trying to figure out where we are with this and how to proceed...

On Mon, Dec 12, 2022 at 2:49 PM Terese Brown <terese.brown@gatewaycc.edu> wrote:

All, I confirmed with Syd, that there was never a BIT report submitted fo[redacted]r Tyrone.

Kind regards,

**TERESE M. BROWN, JD**

**GATEWAY COMMUNITY COLLEGE**

Dean, Student Affairs | Office of Student Affairs

108 N. 40th Street, Phoenix, AZ 85034

602-286.8009 | terese.brown@gatewaycc.edu

https://www.gatewaycc.edu

On Mon, Dec 12, 2022 at 2:45 PM Terese Brown <terese.brown@gatewaycc.edu> wrote:

[redacted]

Tyrone's complaint, though different, is related. There are concerning themes about the students' experience with the class, to include possible sexual harassment, discrimination, and an environment where students are scared to come forward. That said, all of the issues need to be addressed. Delfi and I met with Tyrone on Friday and she can share more, as she deems appropriate, about next steps with the discrimination complaint. I will continue to coordinate with her and Ryan on resolving student grievances, BIT referrals, conduct, and anything else that falls within the purview of Student Affairs.

Kind regards,

**TERESE M. BROWN, JD**

**GATEWAY COMMUNITY COLLEGE**

Dean, Student Affairs | Office of Student Affairs

108 N. 40th Street, Phoenix, AZ 85034

602-286.8009 | terese.brown@gatewaycc.edu

https://www.gatewaycc.edu

On Mon, Dec 12, 2022 at 2:24 PM Lora Timmons <lora.timmons@gatewaycc.edu> wrote:

This is a related issue to the Tyrone Ross complaint but the issue was submitted to BIT and there has been no follow up on...perhaps some of why the other escalated. Can I find out where this is? Lora

---------- Forwarded message ---------
From: **Mark Woehl** <woehl@gatewaycc.edu>
Date: Mon, Dec 12, 2022 at 8:20 AM
Subject: Fwd: [redacted]ssues
To: Lora Timmons <lora.timmons@gatewaycc.edu>

FYI,

---------- Forwarded message ---------
From: **Mark Woehl** <woehl@gatewaycc.edu>
Date: Thu, Dec 1, 2022 at 8:45 AM
Subject: Re: [redacted]issues
To: <brent.cooper@gatewaycc.edu>, Terese Brown <terese.brown@gatewaycc.edu>, Sydney Craig <sydney.craig@gatewaycc.edu>
Cc: Mike Hernandez <hernandezm@gatewaycc.edu>, Craig Urbanski <craig.urbanski@gatewaycc.edu>

[redacted]

On Thu, Dec 1, 2022 at 8:20 AM Brent Cooper <brent.cooper@gatewaycc.edu> wrote:

[redacted]

# Exhibit 8

Woehl
Exhibit 9
3-25-26 Gerard T. Coash, RMR

GATEWAY COMMUNITY COLLEGE
A MARICOPA COMMUNITY COLLEGE | Office of the President

108 N. 40th Street, Phoenix, AZ 85034 • T: 602.286.8000 • gatewaycc.edu

PERSONAL AND CONFIDENTIAL

March 10, 2023

Tyrone Ross
PO Box 24493
Phoenix, AZ 85074-4493

Dear Mr. Ross,

On February 27, 2023, I received the investigative report findings regarding your complaint from Dr. Delfina Wilson, Vice President of Student Affairs. Per the Maricopa Community Colleges Discrimination Complaint Procedure for Students, the College President may accept, reject, or modify recommendations made by the investigators and provide written notification of the actions taken along with the investigators' findings within fifteen (15) calendar days receiving the findings and recommendation from the Vice President of Student Affairs/Title IX Officer.

Based on the investigation, **the following facts are undisputed:**

1. Mr. Cooper asked Mr. Ross why he (Mr. Cooper) could not say the word "ni**er," and stated that he knows people who do not take issue with him saying the word.
2. Student 1 was permitted to bypass the class-made schedule on days originally marked for other students.
3. On at least one occasion, Mr. Cooper handled Mr. Ross's personal vehicle in a manner that did not align with class protocol and would have resulted in paint damage to the vehicle if not for intervention by Employee Witness 1.
4. On multiple occasions Mr. Cooper had conversations with his students involving matters of his personal life.
5. On at least one occasion Mr. Cooper made offensive unsolicited race related remarks to students, including referring to a car aesthetic as "ni**erated" to Student Witness 1
6. On multiple occasions, Student 1 yelled at fellow students and instructors, disrupted the class, departed from the premises in her vehicle, and was allowed to return to her work.
7. Student 1 was often allowed in class without following the dress code.
8. Various items from the shop have gone missing throughout the time of this cohort.

---

* Names of students, student witnesses and employee witnesses have been redacted and are distinguished by the monikers "Student 1," "Student Witness 1"," "Employee Witness 1," etc.

***Allegation One*****:** Mr. Brent Cooper, created a hostile and unwelcome learning environment for the student complainant, Mr. Tyrone Ross, over the course of the program. In his written complaint, Mr. Ross alleges that incidents of targeted harassment, direct negative comments, uninvited discussions of race, and mishandling of his personal property in the classroom collectively created an environment in which he felt “unwelcome,” “uncomfortable,” and a “victim of racial bias.”

*1.a. Withholding positive verbal evaluation of a paint project Mr. Ross completed with the support of Employee Witness 1*
Based on interviews, the investigation **substantiated** this complaint.

*1. b. Denial of access to and use of donated materials for students to use for free*
The investigation was **unable to substantiate** this complaint due to inconclusive evidence.

*1. c. Verbally singling out Mr. Ross, including a derogatory verbal reference to “people like you” that implied Mr. Ross could not afford class materials due to his race or socioeconomic background during a class meeting about how to access donated supplies.*
The investigation determined this allegation was **unsubstantiated** due to a lack of evidence of misconduct.

*1.d. Inappropriate handling of one of Mr. Ross’s paint projects*
The investigation found this allegation to be **unsubstantiated** due to a lack of evidence of misconduct.

*1.e. Improper access to and use of Mr. Ross’s personal vehicle*
The investigation found this allegation to be **substantiated.**

*1. f. i. A joking comment made to another student, Student 2, about [the] appearance of “reverse slavery” when Student 2 was working with Mr. Ross*
The investigation was **unable to substantiate** this due to inconclusive evidence.

*1.f.ii. A reference to students as a “lynch mob” when Mr. Ross brought forward a group complaint to Mr. Cooper.*
The investigation found this allegation to be **substantiated** by Mr. Cooper’s own response and additional testimony.

*1.f.iii. An uninvited inquiry of Mr. Ross about the use of racial slurs that featured uncensored use of the slur, “ni**er.”*
The investigation found this allegation to be **substantiated** by Mr. Cooper’s own response when interviewed.

***Allegation Two*:** The second component involved allegations of sexual harassment and gender discrimination. The allegations regarding sexual harassment center around uninvited and unwelcome comments and sharing of Mr. Cooper's personal sex life with multiple students in the class. With respect to the allegations of gender discrimination and favoritism, Mr. Ross alleges that Mr. Cooper managed class conduct and access to class resources in favor of the only female Student 1.

*2.a.i. Inconsistent application of student code of conduct and behavioral expectations in dealing with male students versus with Student 1 when she has yelled at faculty and left the classroom in an unsafe manner on multiple occasions.*
Based on the information received this allegation is **substantiated.**

*2.a.ii. Providing Student 1 disproportionate access to the paint booth as part of accommodation/alternative arrangement in response to her behavior, while disregarding a class-generated schedule for accessing the booth.*
Based on the information received this allegation is **substantiated.**

*2.a.iii. Allowing Student 1 to not comply with the course dress code while requiring it for all other students.*
This allegation was found to be **unsubstantiated.**

*2.a.iv. Allowing Student 1 disproportionate use of free course materials.*
The investigation found this allegation to be **substantiated.**

*2.b.i. Saying that he [Mr. Cooper] liked Black women because of their physical proportions*
The investigation found this allegation to be **unsubstantiated** due to inconclusive evidence Mr. Ross and Mr. Cooper were the only participants in the conversation and had differing accounts.

*2.b.ii. Stating that he needed to rush home to "go get some head" (slang for receiving oral sex)*
The investigation found this allegation to be **unsubstantiated** due to inconclusive evidence Mr. Ross and Mr. Cooper were the only participants in the conversation and had differing accounts.

*2.b.iii. Stating that he becomes more aroused by female students than when he was young when they are in the class because they have their breasts out and can be in the booth any time*
The allegation was **unsubstantiated** due to inconclusive evidence as this was denied by Mr. Cooper but one witness stated they heard Mr. Cooper say that when there are girls in the class, he cannot control himself.

*2.b.iv. Commentary about marriage and not "getting head" from his wife*
The investigation found this allegation to be **unsubstantiated** due to inconclusive evidence of misconduct.

Summary:
The investigation yielded mixed findings with respect to the array of allegations. The investigators substantiated some components, were unable to substantiate others due to inconclusive evidence, and found some unsubstantiated due to a lack of misconduct.

The full pattern and nature of the **substantiated allegations** lead the investigators to conclude that it is more likely than not that Mr. Cooper directly contributed to the creation of a hostile learning environment for Mr. Ross, and potentially other students. Evidence collected indicates that Mr. Cooper interacted with Mr. Ross and his personal property in ways that demonstrated a lack of respect; emotional sensitivity; cultural sensitivity; and self-awareness of power dynamics in his interactions with students. As a result, Mr. Ross expressed that he felt harassed and a target of racial bias throughout the program, and that he did not feel capable of being in the class with Mr. Cooper any further.

Additionally, the investigation finds it more likely than not that Mr. Cooper managed course conduct and resources in a manner that unfairly favored the only woman in the course over the men.

Recommendations:
Based on the totality of what students and employees shared in interviews, and what the investigators were able to substantiate from the complaint, the investigators recommend that this case be delivered to Human Resources to determine the proper scope of corrective action within the applicable employee policy concerning harassment.

The investigators also recommend professional development for Mr. Cooper and adjustments to the structure of the program and courses in order to create a more transparent and inclusive learning environment.

Next Steps:
**After examining the complaint, findings, and the investigators' summary, I accept and concur with the findings and recommendations stated above**. Per the Maricopa Community Colleges Discrimination Complaint Procedure for Students (found here), you may request reconsideration of this decision:

> A student or respondent who is not satisfied with the decision of the president or provost has **ten (10) working days** to request, verbally or in writing, administrative review of the decision by his or her college president or provost. The request for administrative review must state reasons why the complainant or respondent believes the finding was improper. The president or provost will review the results of the investigation and written findings and respond to the request within ten (10) working days from receipt of the

request. If the president or provost determines that the decision is not supported by the evidence, the case file will be reopened and assigned for further investigation. If the president or provost determines that the investigation was thorough and complete and that the decision is supported by the evidence, he or she will deny the request for administrative review. At this point, the student has exhausted the Internal Discrimination Complaint Procedure.

If no response to this letter is received by **close of business on Friday, March 31, 2023**, the disposition of this matter is considered final and concluded.

The respondent, Instructor Brent Cooper, has also been informed of this decision.

Thank you for your cooperation during the investigation of this matter.

Sincerely,

Amy S Diaz

Dr. Amy S. Diaz
Interim President

Cc: Dr. Delfina Wilson, VPSA

URL for the Maricopa Community Colleges Discrimination Complaint Procedure for Students:
https://district.maricopa.edu/legal/student-faculty-resources/harassment/discrimination-complaint-procedures-students

# Exhibit 9

GATEWAY COMMUNITY COLLEGE
A MARICOPA COMMUNITY COLLEGE

Office of the President

108 N. 40th Street, Phoenix, AZ 85034 • T: 602.286.8000 • gatewaycc.edu

PERSONAL AND CONFIDENTIAL

April 13, 2023

Tyrone Ross
PO Box 24493
Phoenix, AZ 85074-4493

RE: Request for Reconsideration Determination

Dear Mr. Ross,

This letter serves as a notification of the decision on your request for an Administrative Review of the decision in the complaint you filed against Mr. Brent Cooper.

The following is a chronology of the procedural history in this matter:

- On December 8, 2022, you filed a complaint against Mr. Brent Cooper with Dr. Delfi Wilson.
- On December 9, 2022, an investigation was opened into your complaint.
- On February 27, 2023, the investigators submitted the investigative report and determination to me.
- The fair and impartial investigation resulted in substantiated findings of wrongdoing by Mr. Brent Cooper.
- On March 10, 2023, I accepted the investigator's final report and determination.
- On March 10, 2023, I sent you a communication informing you that I had accepted the report and determination. In this letter, I notified you that you had until March 31, 2023 to file a request for reconsideration of the decision outlined in the March 10, 2023 letter.
- On March 30, 2023, you requested an administrative review of the decision. Your request for reconsideration was based on the following reasons:
    - "I request that this matter be fully investigated so that the appropriate recommendation may be made, more than half of what I first alleged wasn't investigated."

This letter is to inform you of the Request for Reconsideration determination.

After reviewing the report again, along with your request for reconsideration (and supporting argument), I am denying your request for reconsideration on the grounds that a thorough investigation was completed that identified substantiated claims of misconduct by GW employee, Mr. Brent Cooper.

Since this investigation uncovered substantiated findings of a policy violation by an employee, this is now a personnel issue that will be addressed by Human Resources.

In response to your complaint that Mr. Cooper retaliated against you after you filed a complaint against him by continuing to have contact with you while you finished your class project, GateWay has addressed this complaint by removing Mr. Cooper from the program during this appeal process so that you could finish your personal project and earn your Certificate of Competency (CCT), which you have done. By removing Mr. Cooper from the class, GateWay has addressed your concern. The complaint of retaliation is being investigated and you will be informed of the outcome of the investigation.

This matter is now closed. If you have any additional questions or concerns, please do not hesitate to reach out.

Fondly,

Amy S Diaz

Amy S. Diaz, EdD
President

Cc: Mika Davis, HR Director
Delfi Wilson, VPSA

# Exhibit 10

GATEWAY COMMUNITY COLLEGE
A MARICOPA COMMUNITY COLLEGE | Office of the President

108 N. 40th Street, Phoenix, AZ 85034 • T: 602.286.8000 • gatewaycc.edu

PERSONAL AND CONFIDENTIAL

May 17, 2023

Tyrone Ross
PO Box 24493
Phoenix, AZ 85074-4493

RE: Investigation Response of Retaliation

Dear Mr. Ross,

On May 10, 2023, I received the investigative report findings regarding your complaint of retaliation by Mr. Cooper from Dr. Delfi Wilson, Vice President of Student Affairs. Per the Maricopa Community Colleges Discrimination Complaint Procedure for Students, the College President may accept, reject, or modify recommendations made by the investigators and provide written notification of the actions taken along with the investigators' findings within fifteen (15) calendar days receiving the findings and recommendation from the Vice President of Student Affairs/Title IX Officer.

Based on the investigation, **the following facts are undisputed:**

1. Mr. Cooper did raise the idea to separate Mr. Ross from the class in an area outside of the typical lab space, but was ultimately directed to conduct his classes while Mr. Ross worked on the opposite end of the space to maintain a reasonable amount of separation. Ultimately, the two had to work in a space where they would be visible to one another, but would not have to interact directly as part of their respective work.

2. Mr. Cooper and two witnesses all agreed that Mr. Ross needed to continue completing "time on task" and presented him with the option to work on a college customer vehicle. This was presented as an optional learning activity to Mr. Ross. Further, this option allowed Mr. Ross to continue with his time on task with minimal interruption while he awaited access to supplies for his personal vehicle project due to necessary items being on backorder or lack of funds to more immediately obtain the items. Mr. Ross ultimately chose to work on this project and was evaluated positively upon completion.

3. Mr. Cooper did twice give direction that Mr. Ross move his personal vehicle to make space for an instructional vehicle in the lab. The first request was given through another instructor to Mr. Ross. When the vehicle was to be moved again shortly after due to lack of clarity on where to place it, Mr. Cooper provided this direction to another instructor within earshot of Mr. Ross. This secondary instance led to a verbal disagreement between the two.

Findings of investigation for allegations:

1. *Mr. Ross alleged that he was told he needed to continue working on competencies despite completing activities on them prior to his departure, and was made to work on a customer vehicle that belonged to a friend of Mr. Cooper's instead of his own vehicle as normally permitted.*

   Based on the interviews conducted, the investigators found that all parties involved agreed that Mr. Ross needed to continue completing "time on task" and presented him with the optional learning activity of working on a college customer vehicle. Given that Mr. Ross ultimately chose to work on this project; the activity enabled him to continue completing time on task while unable to purchase supplies; and he was evaluated positively upon completion, **the investigators did not interpret this instance to be retaliatory**.

2. *Mr. Ross alleged that on multiple occasions he was approached by students in the newer cohort, and Mr. Cooper directly intervened with the intent to separate those students from Mr. Ross by asking, "What's going on here?" and redirecting them to other areas of the shop.*

   Based on interviews with Mr. Ross and a witness, **the investigators find it more likely than not that Mr. Cooper did approach Mr. Ross when he was with other students on multiple occasions following his return to class.** Both Mr. Ross and another instructor stated that Mr. Cooper did approach his students when they were near Mr. Ross despite prior conversations regarding the supportive measures to be put in place, and being instructed by another authority to not enforce any separation of Mr. Ross from the current cohort of students following Mr. Cooper's original suggestion to do so. While Mr. Cooper did not recall ever addressing Mr. Ross directly, Mr. Ross stated that Mr. Cooper's approaches with questions to all present were unnecessary surveillance and interactions that did not comply with the supportive measures of "no contact" put in place for the remainder of his program. Further, Mr. Ross interpreted Mr. Cooper's intention was to maintain separation from other students despite directives to not do so.

3. *Mr. Ross alleged that on one instance, Mr. Cooper unnecessarily requested that Mr. Ross move his vehicle so Mr. Cooper could place an instructional vehicle in his area, which prompted a disagreement about Mr. Cooper's adherence to the supportive measures put in place.*

   **Based on the interviews conducted, the respondents substantiated this claim.** A witness stated that he did not understand why Mr. Cooper felt it was necessary to move the car where he wanted in Mr. Ross's area given that the students had moved on from the projects to be completed on that vehicle. The witness ultimately would have moved the vehicle elsewhere. An administrator stated in his interview that a contributing factor was that Mr. Cooper and another instructor were not clear in their first directive to Mr. Ross about where to move his vehicle, and the frustration that Mr. Ross experienced upon being asked to move his vehicle again shortly after to an appropriate location. Despite this, the context provided by the other instructor leads us to conclude that, **Mr. Cooper exercised insufficient judgment in arranging his classroom in accordance with the supportive measures and curriculum, which ultimately led to the disagreement with Mr. Ross.**

4. *Mr. Ross alleged that he was being rushed out of the program, and not provided adequate time or support to properly finish his personal vehicle projects following his return and time spent working on a college vehicle.*

   **Upon completing interviews, the investigators did not substantiate this claim**. According to interviews with two witnesses, they offered and afforded Mr. Ross additional time in the program at multiple junctures. Further, an administrator stated that Mr. Ross has been afforded time beyond the required contact hours in the classroom, and noted that he has no recollection of providing a student with more extra time as a supportive measure than what Mr. Ross has received during his time supporting students through completion in his programs.

Next Steps:

**After examining the complaint, findings, and the investigators' summary, I accept and concur with the findings and recommendations stated above.** Per the Maricopa Community Colleges Discrimination Complaint Procedure for Students (found here), you may request reconsideration of this decision:

> A student or respondent who is not satisfied with the decision of the president or provost has **ten (10) working days** to request, verbally or in writing, administrative review of the decision by his or her college president or provost. The request for administrative review must state

reasons why the complainant or respondent believes the finding was improper. The president or provost will review the results of the investigation and written findings and respond to the request within ten (10) working days from receipt of the request. If the president or provost determines that the decision is not supported by the evidence, the case file will be reopened and assigned for further investigation. If the president or provost determines that the investigation was thorough and complete and that the decision is supported by the evidence, he or she will deny the request for administrative review. At this point, the student has exhausted the Internal Discrimination Complaint Procedure.

If no response to this letter is received by **close of business on Tuesday, May 30, 2023**, the disposition of this matter is considered final and concluded.

The respondent, Instructor Brent Cooper, has also been informed of this decision.

Thank you for your cooperation during the investigation of this matter.

Sincerely,

Amy S Diaz

Dr. Amy S. Diaz
President

Cc: Dr. Delfina Wilson, VPSA

URL for the Maricopa Community Colleges Discrimination Complaint Procedure for Students:
https://district.maricopa.edu/legal/student-faculty-resources/harassment/discrimination-complaint-procedures-students

# Exhibit 11

**CONSENT FORM - FOR DISCLOSING NAME AND OTHER PERSONAL INFORMATION CONTAINED IN THE DISCRIMINATION COMPLAINT FORM TO OTHERS**

(Please print or type except for signature line)

**Your Name:** Tyrone Ross

**Name of School or Other Institution That You Have Filed This Complaint Against:** Gateway community college

- The purpose of this consent form is for the Office for Civil Rights (OCR) to request your consent to disclose your name and other personal information contained in the Discrimination Complaint Form for OCR's investigation of, and enforcement activities related to, the Discrimination Complaint Form.
- For example, to decide whether a school discriminated against a person, OCR often needs to reveal that person's name and other personal information from their complaint to employees at that school to verify facts or get additional information. When OCR does that, OCR informs the employees that all forms of retaliation against that person and other individuals associated with the person are prohibited. OCR may also reveal the person's name and personal information during interviews with witnesses and consultations with experts.
- If you do not consent to OCR disclosing your name or other personal information contained in the Discrimination Complaint Form as described above, OCR may decide to close your complaint if OCR determines it is necessary to disclose such information in order to determine whether the school discriminated against you.

  **NOTE**: If you file a complaint with OCR, OCR can release certain information about your complaint to the press or general public, including the name of the school or institution; the date your complaint was filed; the type of discrimination included in your complaint; the date your complaint was resolved, dismissed or closed; the basic reasons for OCR's decision; or other related information. Any information OCR releases to the press or general public will not include your name or the name of the person on whose behalf you filed the complaint.

  **NOTE**: OCR requires you to respond to its requests for information. Failure to cooperate with OCR's investigation and resolution activities could result in the closure of your complaint.

## Please sign section A or section B (but not both) and return to OCR:

- If you filed the complaint on behalf of yourself, you should sign this form.
- If you filed the complaint on behalf of another specific person, that other person should sign this form.

  **EXCEPTION**: If the complaint was filed on behalf of a specific person who is younger than 18 years old or a legally incompetent adult, this form must be signed by the parent or legal guardian of that person.
- If you filed the complaint on behalf of a class of people, rather than any specific person, you should sign the form.

A. **I <u>give</u> OCR my consent to disclose my name (and that of my minor child/ward on whose behalf the complaint is filed) and other personal information contained in the Discrimination Complaint Form to others for OCR's investigation of, and enforcement activities related to, the Discrimination Complaint Form.**

[signature] 5/15/2023

**Signature** **Date**

**<u>OR</u>**

B. **I <u>do not</u> give OCR my consent to disclose my name (and that of my minor child/ward on whose behalf the complaint is filed) nor other personal information contained in the Discrimination Complaint Form to others for OCR's investigation of, and enforcement activities related to, the Discrimination Complaint Form.** I understand that OCR may have to close my complaint.

**Signature** **Date**

I declare under penalty of perjury that it is true and correct that I am the person named above; and, if the complaint is filed by a parent or legal guardian on behalf of a minor child/individual who has been declared to be incompetent due to physical or mental incapacity or age by a court of competent jurisdiction, that I am that person's parent or legal guardian. This declaration only provides consent for the disclosure of identity of the persons (and other individually identifiable information about them contained in the Discrimination Complaint Form) and does not extend to any of the claims filed in the complaint.

*Updated July 18, 2022*

# Exhibit 12

# PLAINTIFF'S MEDIATION MEMORANDUM

**OCR Case Number #08-23-2148**

## I. OVERVIEW:

Claimant Mr. Tyrone Ross ("Mr. Ross") was enrolled as a student in Gateway Community Collège's ("Defendant") Collision Car Repair course during the 2021-2022 academic year. Mr. Ross filed a complaint with United States Department of Education, Office of Civil Rights against Defendant Gateway Community College for racial discrimination, sexual harassment, and retaliation.

**Mr. Ross contends that he was subjected to racial discrimination and harassment by his teacher, Mr. Cooper. This discrimination included evident bias based on race. Mr. Ross further alleges that Mr. Cooper frequently used racially insensitive language, including racial slurs, and made racially offensive comments. Mr. Cooper's inappropriate discussions about his personal experiences related to sexuality throughout the school year also contributed to a hostile environment. Mr. Ross further contends his complaints and requests for investigations into Mr. Cooper's conduct fell on deaf ears, and that Defendant retaliated against Mr. Ross by preventing him from continuing his education in a safe environment, providing Mr. Ross an unfair ultimatum to resume his course under the continued harassment of Mr. Coooper or forfeit his semester. Mr. Ross has endured significant mental, emotional, and financial distress as a result of Mr. Cooper's actions.**

Below is a brief summarization of Mr. Ross's allegations, in his own words, describing the factual basis for this claim.

## II. FACTUAL BACKGROUND AND ALLEGATIONS

### A. BACKGROUND:

During my enrollment in the automotive repair program at Gateway Community College, I faced a range of mistreatment, discrimination, and harassment, primarily at the hands of my instructor, Mr. Cooper. This complaint addresses multiple aspects of this troubling experience, which include racial discrimination, sexual harassment, and retaliatory actions for voicing concerns about unjust treatment. These incidents significantly impacted my educational journey, creating an environment that was hostile, degrading, and emotionally distressing. This account aims to detail these occurrences for further investigation and appropriate resolution.

### B. RACIAL DISCRIMINATION AND HARASSMENT:

One of the central issues of my complaint revolves around racial discrimination and harassment. Mr. Cooper, my instructor, exhibited clear bias based on race. He repeatedly used racial slurs and racially insensitive language in a highly inappropriate manner. This behavior extended to the use of the racial slur "n-word" both in and outside of the classroom context. On one occasion, Mr. Cooper openly discussed the acceptability of using this racial slur, emphasizing that it became problematic only when used within the school setting. He further inquired why certain individuals were not allowed to use the term, recounting that he and his friends frequently used it casually. This conversation left me

uncomfortable, as it implied that racial slurs were acceptable in certain situations, particularly when not directed at me directly.

Furthermore, Mr. Cooper's racially insensitive remarks were not limited to racial slurs. He made a deeply disturbing comment about seeing a lynching during his childhood. This comment, made on the first day of class, created an immediate sense of unease and discomfort, suggesting a severe lack of sensitivity and professionalism on his part.

### C. Sexual Harassment:

In addition to racial discrimination, I also experienced sexual harassment during my time at Gateway Community College. Mr. Cooper, my instructor, made numerous sexually explicit remarks in front of the class. He would frequently express his preference for female students, making objectifying comments about their appearance, particularly focusing on their breasts. On one occasion, he explicitly stated that I needed to stay after class for sexual activities, using explicit language to describe his intentions. He would also regale students with explicit stories about his past encounters, discussing activities such as making out in secluded areas and expressing his sexual desires towards women.

Importantly, these explicit remarks were not isolated incidents; nearly every student in our class can confirm their occurrence. This created an inappropriate and uncomfortable learning environment, which was exacerbated by the fact that Mr. Cooper's actions went unchecked by the College administration.

### D. Retaliation:

My decision to speak out against the mistreatment I experienced led to further retaliation from Mr. Cooper and other College staff. After I filed a formal complaint, Mr. Cooper's behavior towards me became increasingly hostile. He targeted me with antagonistic actions on a daily basis, creating a highly stressful and anxiety-inducing atmosphere. Moreover, Mr. Cooper was informed of my formal complaint by the College, and he subsequently attempted to turn other students against me in a deliberate effort to have me expelled. This retaliatory plan included isolating me from other students, interfering with my academic progress, and making derogatory comments about me. Mr. Hernandez, another teacher, was made aware of this plan and informed me of its details.

Furthermore, Mr. Cooper and Mark, a manager at the College, coerced me into working on a project unrelated to my educational requirements, effectively holding my academic progress hostage. This retaliatory act had a detrimental impact on my educational journey, as it consumed a significant portion of my makeup time, further delaying my completion of the program.

### E. College's Response:

The College's response to my initial internal complaint was unsatisfactory and indicated a lack of commitment to addressing the issues at hand. They conducted a cursory investigation that failed to interview most of the witnesses I provided. This limited scope undermined the credibility of my claims. Furthermore, the College's findings contained inaccurate statements, which I can directly refute with my own evidence.

Additionally, the College failed to provide me with any supportive measures during their evaluation, despite the emotional distress I was experiencing. I was initially told that I did not need to attend class while the complaint was being investigated, but I was later informed that I was still required to complete the class to receive my certificate. This inconsistency created additional stress and disruption to my education.

### F. Witnesses Testimony:

Several individuals are willing to testify in support of my claims it is anticipated that they will as follows:

**Gonzo:** Gonzo can provide crucial testimony regarding several issues, including:

- Mr. Cooper's use of racial slurs and racially insensitive language.
- Mishandling of Mr. Ross's vehicle.
- Inappropriate comments made by Mr. Cooper that constituted sexual harassment.

**Bryce:** Bryce's testimony is pertinent as it includes Mr. Cooper's racially insensitive comments and actions:

- Confirmation of Mr. Cooper telling him to stop working with Mr. Ross, citing it "looks like reverse slavery."
- Bryce heard Mr. Cooper mentioning that he had witnessed a lynching when he was a child.

**Zane:** Zane's testimony corroborates some of the key allegations:

- Confirmation of Mr. Cooper's statement about witnessing a lynching during his childhood.
- Observations of mistreatment towards Mr. Ross within the shop.
- Mr. Cooper's mishandling of Mr. Ross's vehicle.

**Jason:** Jason's testimony relates to Mr. Cooper's targeted behavior towards Mr. Ross:

- Mr. Cooper's continuous antagonization and picking on Mr. Ross throughout the course.
- Instances where Mr. Ross was singled out for differential treatment.

**The Whole Class:** The entire class can provide collective testimony to substantiate Mr. Ross's claims:

- Confirmation of Mr. Cooper's favoritism towards another student, Missy, which included moving Mr. Ross's belongings for her benefit.
- Witnessing Mr. Cooper allowing Missy to verbally attack Mr. Ross without imposing consequences, thereby contributing to a hostile learning environment.
- Knowledge of a class meeting where Mr. Ross was singled out, and there was an attempt to retaliate against him, including evidence in the form of a video recording.

**Mr. Hernandez:** Mr. Hernandez, another teacher, can offer vital insights into Mr. Ross's experience:

- Confirmation of mistreatment towards Mr. Ross, including name-calling and belittlement.
- Awareness of Mr. Cooper's attempts to undermine Mr. Ross's academic progress.
- Knowledge of the retaliatory actions planned by Mr. Cooper and Mark against Mr. Ross, and their interference with Mr. Ross's education.

## III. ARGUMENT

Title VI of the Civil Rights Act of 1964 42 U.S.C.A. § 2000d, et seq., protects students from discrimination based on race, color, or national origin in connection with all academic, educational, extracurricular, athletic, and other activities of a school, including a school's effort to meet its obligations to students with disabilities under Section 50419 or the IDEA.

### A) TITLE IX | RACIAL DISCRIMINATION AND HARASSMENT

School conduct can result in unlawful discrimination based on race in two ways: first, if a student is subjected to different treatment based on the student's race, and second, if a policy is race-neutral on its face and is administered in an evenhanded manner but has an unjustified adverse disparate impact, i.e., a disproportionate and unjustified effect on students of a particular race.

## I. Different Treatment

The Regulations of 34 C.F.R. § 100.3(a) Title VI, prohibits schools from intentionally treating students differently based on race, color, or national origin. Absent direct evidence of racially discriminatory intent (e.g., remarks, testimony, or admissions by school officials revealing racially discriminatory motives), OCR will examine circumstantial evidence that allows OCR to infer, or rebut, discriminatory intent from the facts of the investigation as a whole or from the totality of the circumstances. Under Title VI, OCR will find that a school engaged in unlawful intentional discrimination if, based upon the facts of the specific case: (1) the school treats any student(s) differently from similarly situated student(s) of another race, and (2) the school cannot articulate a legitimate, nondiscriminatory reason for the different treatment, or (3) the nondiscriminatory reason articulated by the school is a pretext for discrimination rather than the actual reason for the different treatment. A school must treat a student with a disability differently than students without disabilities if, after an individualized analysis of that student's needs, that different treatment is determined to be necessary to provide FAPE to that student or provide aids, benefits, or services that are as effective as those provided to others.

A school's compliance with its Section 504 FAPE obligations, however, does not necessarily demonstrate compliance with its Title VI obligation not to treat students differently based on race. A school that provides appropriate special education services to each individual student with a disability who needs such services could, for example, discriminate on the basis of race outside of the provision of FAPE. By way of illustration, if a school provided FAPE for one student, and provided FAPE as well as special access to an

after-school book club to a similarly situated student of a different race, when both students wished to participate in the book club, OCR would find that the school discriminated on the basis of race if the school could not articulate a legitimate, nondiscriminatory reason for treating the students differently that was not a pretext for discrimination.

**In short, the elements for Different Treatment can be broken down as follows:**

- The school treats any student(s) differently from similarly situated student(s) of another race.
- The school cannot articulate a legitimate, nondiscriminatory reason for the different treatment.
- The nondiscriminatory reason articulated by the school is a pretext for discrimination rather than the actual reason for the different treatment.

**Here, it is clear that the fact support that Defendant treated Mr. Ross differently on the basis of his race.**

- Fact: Gonzo attests that the teacher used racial slurs inappropriately. Explanation: This fact suggests that the teacher treated the student (Gonzo) differently based on their race, which is a direct violation of Title VI.
- Fact: Bryce was told to stop working with the student because it looked like "reverse slavery." Explanation: Bryce's testimony implies that the teacher treated the student differently due to their race, using a racially charged term to justify this differential treatment.

- Fact: Zane's testimony mentions Mr. Cooper's racial comments and mistreatment. Explanation: Zane's testimony provides further evidence of the teacher's differential treatment of the student based on race.

## II. DISPARATE IMPACT

A school also violates Title VI by evenhandedly implementing a facially race-neutral criterion, policy, practice, or procedure that was not adopted for a discriminatory purpose, but that nonetheless has an unjustified effect of discriminating against students on the basis of race. OCR uses a three-step analysis to determine whether a facially neutral criterion, policy, practice, or procedure has an unlawful disparate impact on the basis of race. Under Title VI, first OCR would assess whether the criterion, policy, practice, or procedure has an adverse effect on students of a particular race as compared with students of other races. If there is insufficient evidence of such an adverse effect, then OCR would not find a Title VI disparate impact violation.

If there is such evidence of a disparate impact, next OCR will consider whether there is sufficient evidence to show that the school's criterion, policy, practice, or procedure is necessary to advance a legitimate, nondiscriminatory educational goal. If the criterion, policy, practice, or procedure is not necessary to advance a legitimate, nondiscriminatory educational goal, then OCR would find a Title VI violation. If OCR finds that the criterion, policy, practice, or procedure is necessary to advance a legitimate, nondiscriminatory educational goal, OCR will consider whether there is a comparably effective alternative criterion, policy, practice, or procedure that would achieve the school's goal with less adverse

impact. If there is a comparably effective criterion, policy, practice, or procedure with less disparate impact, Title VI prohibits the district from implementing the criterion, policy, practice, or procedure with more adverse impact.

Under the three-part test above, complying with Section 504 and the IDEA are legitimate, nondiscriminatory educational goals. In many instances, however, districts have some discretion in the policies that they use to meet those obligations. If districts or schools select criteria, policies, practices, or procedures that result in an adverse impact on students of a particular race in order to meet their obligations under Section 504 or the IDEA, OCR will determine whether a comparably effective alternative policy or practice would meet the district's Section 504 or IDEA obligations with less of a burden or adverse impact on the disproportionately affected racial group.

**In short, the elements for Disparate Impact can be broken down as follows:**

- The school evenhandedly implements a facially race-neutral policy that has an unjustified effect of discriminating against students on the basis of race.

**Here, it is clear that the fact support that Defendant evenhandedly implemented a facially race-neutral policy that had an unjustified effect of discriminating against students on the basis of race, namely, Mr. Ross.**

- Fact: The whole class can attest to the teacher singling out the student. Explanation: If the entire class can confirm that the student was singled out by the teacher, it could indicate an unjustified adverse impact on the student based on their race.

## B) TITLE IX | SEXUAL HARASSMENT

The Regulations (34 C.F.R. § 106.31(a)) state that: no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity.

The Regulations (34 C.F.R. § 106.31(b)) further state that: in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:

(1) Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;

(2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;

(3) Deny any person any such aid, benefit, or service;

(4) Subject any person to separate or different rules of behavior, sanctions, or other treatment;

(5) Apply any rule concerning the domicile or residence of a student or applicant, including eligibility for instate fees and tuition;

(6) Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees;

(7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

**In short, the elements for Sexual Harassment can be broken down as follows:**

- No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination.
- In providing any aid, benefit, or service, a recipient shall not treat one person differently from another based on sex.

**Here, that facts clearly support that Defendant's conduct constituted sexual harassment under Title IX.**

- Fact: Gonzo attests to sexual harassment comments made by the teacher.

  Explanation: Gonzo's testimony suggests that the teacher subjected the student to sexual harassment, which is prohibited under Title IX.
- Fact: Missy allegedly used vulgar language towards the student without consequences.

  Explanation: If the teacher allowed Missy to use vulgar language towards the student without consequences, it may indicate gender-based discrimination and harassment in the classroom.

**C) TITLE IX | RETALIATION**

The Title IX Regulations include a provision that prohibits retaliation. In particular, 34 C.F.R. § 106.71 incorporates 34 C.F.R. § 100.7(e) of Title VI, which provides:

> **Intimidatory or retaliatory acts prohibited**. No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part.

Title IX and this interpretive regulation prohibit retaliation against any person who complains about what he/she reasonably believes to be a Title IX violation, advocates on behalf of Title IX rights and enforcement, or cooperates in any investigation of a Title IX violation.

**In short, the elements for Sexual Harassment can be broken down as follows:**

- No recipient or person shall intimidate, threaten, coerce, or discriminate against any individual for interfering with Title IX rights or participating in an investigation.

**Here, the Facts clearly support Defendant's conduct constituting retaliation under Title IX.**

- Fact: The whole class can attest to the teacher's attempt to retaliate against the student. Explanation: The class's testimony about the teacher's attempt to retaliate against the student is evidence of possible retaliation for making complaints or raising concerns.
- Fact: Mr. Hernandez is expected to attest to mistreatment by Mr. Cooper. Explanation: Mr. Hernandez's expected testimony suggests that the teacher (Mr. Cooper) may have engaged in retaliatory behavior by mistreating students who complained or spoke out against him.

## IV. <u>CLAIM FOR RELIEF</u>

As a direct and proximate result of Defendants' violation Title IX, Mr. Ross has suffered damages and losses in addition to incurring attorneys' fees and costs, in amount to be proved at trial. The wrongful acts and conduct of Defendants were done with deliberate indifference to the statutory and constitutional rights of Mr. Ross. Mr. Ross is suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory acts and misconduct, unless and until he is fully compensated for his financial losses and the following granting of the following relief:

1) a signed declaration that Defendant interfered with Mr. Ross's enjoyment of his rights under the Civil Rights Act, and discriminated against his in violation of Title IX of the Civil Rights Act;

2) allowing Mr. Ross to participate fully in his course and other related courses without the threat of harassment from Mr. Cooper, and without unnecessary and burdensome restrictions or conditions;

3) compelling Defendant to provide any reasonable accommodations or modifications that may be necessary for Mr. Ross to learn in a safe environment;

4) revision of Defendant's policies to prevent the Defendant from engaging in further acts of discrimination against Mr. Ross on the basis of his race or national origin or family background;

5) expunge all negative materials from Mr. Ross's student record and to facilitate Mr. Ross's transfer or admission to another school or program of similar caliber and reputation;

6) to return any and all tuition monies for the subject semester directly to Mr. Ross;

7) Defendant refrain from further discrimination, harassment, and interference with Mr. Ross's ability to complete courses; and

8) compensate Mr. Ross for his attorney's fees and costs incurred in having to assert his rights in this matter.

**Respectfully submitted on September 12, 2023.**

____________________________________

**Tyrone Ross**

# Exhibit 13

Woehl
Exhibit 12
3-25-26 Gerard T. Coash, RMR

# 5.1 Non-Discrimination

## 5.1.1
## Maricopa County Community College District (Maricopa EEO Policy)

It is the policy of the Maricopa County Community College District (MCCCD), (consisting of Chandler-Gilbert Community College, the District Office, Estrella Mountain Community College, GateWay Community College, GateWay Community College - Central City, Glendale Community College, Mesa Community College, Paradise Valley Community College, Phoenix College, Rio Salado Community College, Scottsdale Community College, South Mountain Community College, and all affiliated locations) to:

1. Recruit, hire, and promote in all job groups, and to ensure that all Human Resources (HR) employment selection and decision practices do not discriminate, nor tolerate discrimination in employment against any applicant or employee, on the basis of race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information.
2. Administer all HR employment selection and decision practices pertaining to advertising, benefits, compensation, discipline (including probation, suspension, and/or involuntary termination for cause or layoff), employee facilities, performance evaluation, recruitment, social/recreational programs, and training will be administered without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information.
3. Hold each level of management responsible for ensuring that all employment policies, procedures, and activities are in full compliance with all applicable federal, state, and local EEO statutes, rules, and regulations.
4. Maintain an educational environment that does not discriminate or tolerate discrimination on the basis of race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, or veteran status in federally funded programs, activities and MCCCD sponsored events.
5. Hold each level of academic and student life management responsible for ensuring that all academic environments and activities are in full compliance with all applicable federal, state, and local non-discrimination laws.

**AMENDED by Direct Approval from the Chancellor, April 8, 2020**
**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

## 5.1.2
## Maricopa EEO Policy

The Maricopa County Community College District (MCCCD) Equal Employment Opportunity (EEO) Policy Statement or EEO Clause appears in all major publications distributed to employees, students, and applicants. Copies of these documents are available at each of the colleges, at the District Office, and at the EEO/Affirmative Action (AA) Office.

In accordance with all applicable federal, state, and local regulations, MCCCD will maintain and update its Affirmative Action Plans (AAPs) on an annual basis. Copies of the AAP will be distributed to the Governing Board and CEC members by December 31st of each year. They include the AAP for Minorities and Females, the AAP for Individuals with Disabilities, and the AAP for Special Disabled Veterans, Vietnam Era Veterans, and Other Eligible Veterans.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED-by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

## 5.1.3
## EEO Policy Statement

It is the policy of the Maricopa County Community College District (MCCCD) to promote equal employment opportunities through a positive continuing program. This means that Maricopa will not discriminate, nor tolerate discrimination in employment or education, against any applicant, employee, or student because of race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information. Additionally, it is the policy of Maricopa to provide an environment for each Maricopa job applicant and employee that is free from sexual harassment, as well as harassment and intimidation on account of an individual's race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information.

In addition, lack of English language skills is not a barrier to admission into Career and Technical Education (CTE) programs or skill centers.

**AMENDED by Direct Approval from the Chancellor, April 8, 2020**
**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by Direct Approval from the Chancellor, May 20, 2014**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

## 5.1.4
## EEO Clause

The Maricopa County Community College District (MCCCD) is an EEO/AA Institution and does not discriminate on the basis of race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information.

**AMENDED by Direct Approval from the Chancellor, April 8, 2020**
**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by Direct Approval from the Chancellor, March 19, 2018**
**AMENDED by Direct Approval from the Chancellor, January 3, 2018**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

## 5.1.5
## Use of the EEO Policy Statement or EEO Clause

As required by federal regulations, the EEO Policy Statement or EEO Clause MUST appear in all major publications distributed to employees, students, and applicants throughout MCCCD. These publications include, but are not limited to, catalogs, handbooks, schedules, policy manuals, recruitment publications, advertisements (internal and external), and application forms (employee and student).

Additionally, the EEO Policy Statement or EEO Clause MUST be included in all purchase orders and contracts.

The approved statements and clauses for use in publications are posted as Appendix ND-3.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by Direct Approval from the Chancellor, January 3, 2018**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

## 5.1.6

# Policy Statements Declaration

The Policy Statements Declaration, which is an exhibit to this regulation, is a one-page document of the Maricopa County Community College District (MCCCD) policies that are to be posted on bulletin boards throughout the District. It defines MCCCD's firm commitment to EEO/AA and to a workplace that is free from harassment.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

# 5.1.7
# Notice of Americans with Disabilities Act (ADA)/ Section 504 of the Rehabilitation Act/Title IX Coordinator

Under the ADA and Section 504, the Maricopa County Community College District (MCCCD) recognizes the obligation to provide overall program accessibility throughout its locations for qualified disabled individuals. Students and employees can raise concerns or make complaints, without retaliation, about matters made unlawful under the ADA.

EMPLOYEES
The District Office and each College must post the address and telephone number for the individual responsible for coordinating services and/or activities relating to the Americans with Disabilities Act (42 U.S.C. Chapter 126), Section 504 of the Rehabilitation Act (29 U.S.C. §794(d)), and all other applicable law. The Notice will specify how employees can request reasonable accommodations.

College ADA Coordinators (Credentials are needed to enter secure site.)

STUDENTS
The District Office and each MCCCD location must post the address and telephone number for the individual responsible for coordinating services and/or activities relating to the Americans with Disabilities Act (42 U.S.C. Chapter 126), Section 504 of the Rehabilitation Act (29 U.S.C. §794(d)), and Title IX of the Education Amendments of 1972 (20 U.S.C. §1681), using the format below:

- ADA/504/Title IX Coordinator
- Address
- Phone #
- Email address

Additionally, each college/center must publish electronically or in print the above information in student handbooks and catalogs.

The designated ADA/504/Title IX Coordinator at each college/center will provide information as to the existence and location of services, activities, and facilities that are accessible to and usable by individuals with disabilities.

Likewise, under Title IX, there is an obligation to provide services and program accessibility in a gender-neutral manner.

Title IX Coordinators

ADA/504 Managers

## MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT
## Policy Statements Declaration

**EEO Clause**

The Maricopa County Community College District (MCCCD) is an EEO/AA institution.

**EEO Policy Statement**

It is the policy of Maricopa County Community College District (MCCCD) (consisting of the District Office, Chandler-Gilbert Community College, Estrella Mountain Community College, Glendale Community College, GateWay Community College, GateWay Community College - Central City, Mesa Community College, Paradise Valley Community College, Phoenix College, Rio Salado Community College, Scottsdale Community College, South Mountain Community College, and all affiliated locations) to promote equal employment opportunities. This means that MCCCD will not discriminate, nor tolerate discrimination in employment or education, against any applicant, employee, or student because of race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, veteran status or genetic information. Additionally, it is the policy of MCCCD to provide an environment for each MCCCD job applicant, employee, and student that is free from sexual harassment, as well as harassment and intimidation on account of an individual's race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, veteran status or genetic information.

**Affirmative Action Policy Statement for Individuals with Disabilities**

In conformance with the provisions of Section 503 of the Rehabilitation Act of 1973, as amended, and the implementing regulations, 41 CFR 60-741.5 (a), as amended, Maricopa County Community College District (MCCCD) will not discriminate, nor tolerate discrimination in employment or education, against any applicant, employee, or student because of physical or mental disability in regard to any position for which the known applicant or employee is qualified. MCCCD agrees to take affirmative action to employ, advance in employment, and otherwise treat known qualified individuals with disabilities without regard to their physical or mental disability in all human resources selection and decision practices, such as the following: advertising, benefits, compensation, discipline (including probation, suspension, and/or termination for cause or layoff), employee facilities, performance evaluation, recruitment, social/recreational programs, and training. MCCCD will also continue to administer these practices without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, veteran status or genetic information. Additionally, all applicants and employees are protected from coercion, intimidation, interference, or discrimination for filing a complaint or assisting in an investigation under the Act.

**Affirmative Action Policy Statement for Other Eligible Veterans, Special Disabled Veterans, and Vietnam Era Veterans**

In conformance with the Vietnam Era Veterans Readjustment Assistance Act of 1974, the Veterans Employment Opportunities Act of 1998, and the implementing regulations, 41 CFR 60-250 (k), Maricopa County Community College District (MCCCD) will not discriminate, nor tolerate discrimination in employment or education, against any applicant, employee, or student because they are a special disabled veteran or Vietnam era veteran in

regard to any position for which the known applicant or employee is qualified. MCCCD agrees to take affirmative action to employ, advance in employment, and otherwise treat known qualified special disabled veterans and Vietnam era veterans without discrimination based upon their disabled or veteran status in all human resources selection and decision practices, such as the following: advertising, benefits, compensation, discipline (including probation, suspension, and/or termination for cause or layoff), employee facilities, performance evaluation, recruitment, social/recreational programs, and training. MCCCD will continue to administer these practices without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, veteran status or genetic information. Additionally, MCCCD agrees to post all suitable job openings at the local office of the State employment service where the job opening occurs. This includes full-time, temporary greater than 3 days' duration, and part-time employment. Finally, all applicants and employees are protected from coercion, intimidation, interference, or discrimination for filing a complaint or assisting in an investigation under the Act.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

# 5.1.8
# Policy Prohibiting Harassment

**A. Policy**

The policy of the Maricopa County Community College District (MCCCD) is to provide an educational, employment, and business environment free of harassment that is based on race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information. Such prohibited harassment includes but is not limited to sexual violence, unwelcome sexual advances, requests for sexual favors, and other verbal and/or physical conduct or communications constituting harassment with regards to race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information as defined and otherwise prohibited by state and federal law.

Employee complaints of harassment must be reported to the District Office of Equal Employment and Opportunity.

Harassment based on race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information violates MCCCD Policy when the conduct is unwelcome, verbal, or physical conduct that is sufficiently severe, or pervasive that it alters working conditions and creates a hostile environment for employees. The unwelcome behavior may be based on power differentials, the creation of a hostile environment, or retaliation for harassment complaints. Harassment by and between any student or employee (paid, unpaid, or contract), is prohibited by this policy.

Due process is afforded any employee accused of harassment. Upon receipt of a complaint, an immediate preliminary review will be conducted to determine if there is reasonable cause to believe the nondiscrimination policy may have been violated. If so, then a prompt, thorough, impartial investigation will be conducted by the

authorized administrator, or designee. If the final decision is that harassment occurred, the college will take immediate action to eliminate the hostile environment, prevent its recurrence, and address its effects. Remedies for the complainant will also be sought. Violations of this policy may result in disciplinary action up to and including termination for employees, sanctions up to and including suspension or expulsion for students, and appropriate sanctions against campus visitors. This policy applies to prohibited conduct that occurs both on and off campus and covers employees, and visitors.

MCCCD affirms its commitment to supporting the academic and personal freedom of all members of the community. In particular, the policy against harassment shall not be applied in a manner that contradicts the principle of academic freedom: Faculty and other members of the community are entitled to freedom in research, and faculty members are entitled to freedom in the classroom to pursue controversial matters related to their disciplines. However, this right to teach controversial material entails the responsibility that it be carried out in a way that would be judged by peers as not violating the District's non-discrimination policy.

Questions about this policy may be directed to the MCCCD EEO/Affirmative Action Office.

**B. Examples of Policy Violations**

It shall be a violation of MCCCD's Harassment Policy for any employee (paid, unpaid, or contract), student or campus visitor to engage in any unwelcome conduct that is based on race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information. Such as to:

1. Engage in offensive conduct that is sufficiently severe or pervasive to create a work or academic environment that a reasonable person would consider intimidating, hostile, or abusive. Such conduct must be based on race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information.
2. Engage in unwelcome verbal or physical conduct, including intimidation, ridicule, insult, or comments, when the behavior can reasonably be considered to adversely affect the work or academic environment, or an employment decision based upon the employee's acceptance or rejection of such conduct. Such verbal or physical conduct must be based on race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information or on their protected activities under applicable non-discrimination laws and policies.
3. Engage in Sexual Harassment, which includes, but is not limited to:
    A. Make unwelcome sexual advances to another employee (paid, unpaid, or contract), student or campus visitor;
    B. Make unwelcome requests for sexual favors, whether or not accompanied by promises or threats with regard to the employment or academic relationship;
    C. Engage in verbal or physical conduct of a sexual nature with another employee, student or campus visitor, that may threaten or insinuate, either explicitly or implicitly, that the individual's submission to, or rejection of, the sexual advances will in any way:
        1. Influence any personnel decision regarding that person's employment, evaluation, wages, advancement, assigned duties, shifts or any other condition of employment or career development; or
        2. Influence his or her grades, participation in or access to academic programs, class standing or other educational opportunities;
    D. Engage in verbal or physical conduct of a sexual nature that:
        1. Has the purpose or effect of substantially interfering with an employee's ability to do his or her job; or with a student's ability to learn or participate in a class; or
        2. Which creates an intimidating, hostile or offensive work or academic environment;
    E. Commit any act of sexual assault or public sexual indecency against any employee or student whether on MCCCD property or in connection with any MCCCD-sponsored activity;
    F. Continue to express sexual interest in another employee, student or campus visitor after being informed or on notice that the interest is unwelcome (reciprocal attraction is not considered sexual harassment).

4. Engage in other harassing conduct in the workplace or academic environment, whether physical or verbal, including, but not limited to, commentary about an individual's body (or body parts), degrading words to describe an individual, offensive comments, suggestive language or jokes, innuendoes, and suggestive objects, print or digital media. Misconduct may include exploitation, stalking, bullying. Such conduct must be based on an individual's race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information.
5. Treat a complainant or witness of harassment in a manner that could dissuade a reasonable person from pursuing or participating in the complaint and investigation. Such treatment must be based on an individual's race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, pregnancy, veteran status or genetic information.
6. Engage in sexual misconduct, including but not limited to:
   A. The use or display in the classroom, including electronic, of pornographic or sexually harassing materials such as posters, photos, cartoons or graffiti without pedagogical justification.
   B. Explicit sexual comments by one or more employees about another employee or student, or circulating drawings or other images depicting an employee or student in a sexual manner.
   C. Unwelcome sexual advances, repeated propositions or requests for a sexual relationship to an individual who has previously indicated that such conduct is unwelcome, or sexual gestures, noises, remarks, jokes, questions, or comments by a student about another person's sexuality or sexual experience.
   D. Harassment based on sex, pregnancy, gender identity, gender expression, or sexual orientation that creates a hostile environment. A hostile environment exists when the conduct is sufficiently severe, or pervasive that it unreasonably interferes with, limits, or deprives an individual from participating in or benefitting from the District's education programs and/or activities, including employment. The existence of a hostile environment is to be judged both objectively (meaning a reasonable person would find the environment hostile) and subjectively (meaning the impacted individual felt the environment was hostile).
   E. Sexual Exploitation, which means taking non-consensual or abusive sexual advantage of another for anyone's advantage or benefit other than the person being exploited. Examples of behavior that could rise to the level of Sexual Exploitation include:
      1. Recruiting, harboring, transporting, providing, or obtaining another person for the purpose of sexual exploitation;
      2. Non-consensual visual (e.g., video, photograph) or audio-recording of sexual activity;
      3. Non-consensual distribution of photos, other images, or information of an individual's sexual activity, intimate body parts, or nakedness, with the intent to or having the effect of embarrassing an individual who is the subject of such images or information;
      4. Going beyond the bounds of consent (such as attempting to kiss an employee or student without their consent)
      5. Engaging in non-consensual voyeurism;
      6. Knowingly transmitting an STI (sexually transmitted infection), such as HIV, to another without disclosing one's STI status;
      7. Exposing one's genitals in non-consensual circumstances, or inducing another to expose their genitals;
      8. Possessing, distributing, viewing or forcing others to view obscenity.
7. All complaints of sexual harassment or sexual misconduct shall be referred promptly to the college Title IX Coordinator (or the District Title IX Coordinator, if the allegations concern a District Office employee), for initial review in determining the appropriate investigation channel.
8. Matters pertaining to sexual harassment/misconduct that do not meet the definition of sexual harassment as outlined in Administrative Regulation 5.1.16 or otherwise do not meet the definition of an educational program or activity and do not occur against a person within the United States will be referred by the Title IX Coordinator to the College or District's respective Human Resources Department for investigation and adjudication under this conduct policy.

**AMENDED by Direct Approval from the Chancellor, August 18, 2020**
**AMENDED by Direct Approval from the Chancellor, April 8, 2020**
**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by Direct Approval from the Chancellor, August 4, 2016**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

# 5.1.9
# Additional Policy Violations

Mandatory Reporters Reporters (as defined in Administrative Regulation 5.1.16) must report allegations of sexual harassment/assault (whether reported by the person who is the subject of the sexual harassment or a witness) to an Official with Authority or the Title IX Coordinator (as defined in Administrative Regulation 5.1.16). Failure to report to an Official with Authority or the Title IX Coordinator is a policy violation subject to discipline up to and including dismissal.

Campus Security Authority (CSAs) are mandatory reporters under the Cleary Act. Failure to report is a policy violation subject to discipline up to and including dismissal.

Mandatory Reporters are expected to report harassment/discrimination (whether reported by the person who is the subject of the sexual harassment or a witness) based on an individual's race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, veteran status or genetic information. Failure to report may be a policy violation subject to discipline up to and including dismissal.

**AMENDED by the Administrative Regulations approval process, November 16, 2020**
**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

# 5.1.10
# Responsibility for Policy Enforcement

Employees and students must avoid offensive or inappropriate harassing behavior based on an individual's race, color, religion, sex, sexual orientation, gender identity,national origin, citizenship status (including document

abuse), age, disability, veteran status or genetic information at work or in the academic environment (in and out of the classroom).

Employees and students are encouraged (but not required) to inform perceived offenders of this policy and that the commentary/conduct is offensive and unwelcome.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

## 5.1.11 Complaints

1. **Employees**
   Employees who experience harassment at work (by a supervisor, co- employee, student or visitor) are urged to report such conduct to the direct attention of their supervisor, their college president or to the Maricopa County Community College District (MCCCD) Equal Employment Opportunity/Affirmative Action Office. If the complaint involves the employee's supervisor or someone in the direct line of supervision, or if the employee for any reason is uncomfortable in dealing with their immediate supervisor, the employee may go directly to the MCCCD EEO/AA Office.
2. **Students**
   Students who experience sexual harassment or sexual assault in a school's education program and activities (by a faculty member, administrator, staff, campus visitor or other student) are urged to report such conduct to the designated Title IX Coordinator, of which there is one for each MCCCD college. A student may also contact the MCCCD EEO/AA Office to obtain the name and phone number of the college official designated to respond to harassment complaints based on an individual's race, color, religion, sex, sexual orientation, gender identity, national origin, citizenship status (including document abuse), age, disability, veteran status or genetic information.
3. **General**
   A. Complaints by employees will be investigated according to procedures established by the MCCCD EEO/AA Office. Copies of these procedures may be obtained on the District website and the MCCCD EEO/AA Office.
   B. Complaints by students will be investigated according to the procedures established in the College Environment section of the Administrative Regulations (AR 2.4). Copies of these procedures are posted on the District website.
   C. All complaints will be investigated in a prompt, through, and impartial manner.
   D. Where investigation confirms the allegations, appropriate, response action will be taken by the college/center/MCCCD.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**

**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

# 5.1.12
# Confidentiality

Records will be maintained in a confidential manner to the extent permitted by law and insofar as they do not interfere with the Maricopa County Community College District's (MCCCD) legal obligation to investigate and resolve issues of discrimination and harassment based on one's protected class status as outlined in law and in MCCCD policy. The MCCCD cannot promise complete confidentiality.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

# 5.1.13
# Violations of Law

An employee or student may be accountable for discrimination, retaliation, and/or harassment under applicable local, state, and/or federal law, as well as under Maricopa County Community College District (MCCCD) policy. Disciplinary action by MCCCD may proceed while criminal proceedings are pending and will not be subject to challenge on the grounds that criminal charges involving the same incident have been dismissed or reduced.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

# 5.1.14
# False Statements Prohibited

Any individual who knowingly provides false information pursuant to filing a discrimination charge or during the investigation of a discrimination charge, will be subject to appropriate disciplinary action, up to and

including, employment termination or academic dismissal.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

## 5.1.15
## Retaliation Prohibited

Retaliation against an employee or student for engaging in protected activity is strictly prohibited. The Maricopa County Community College District (MCCCD) strictly prohibits taking an adverse action that might deter a reasonable person from participating in activity protected by antidiscrimination laws. Protected activity consists of:

(a) opposing conduct reasonably believed to constitute discrimination, including harassment which violates a nondiscrimination statute or which MCCCD policy prohibits;

(b) filing a complaint about such practice; or

(c) testifying, assisting, or participating in any manner in an investigation or other proceeding related to a discrimination complaint.

Retaliatory actions are not limited to formal personnel actions such as termination, demotion, non-promotion, or non-selection. Retaliatory actions are broadly defined as harassing behavior, significant changes to job duties or working conditions, and even threats to take personnel actions based on engaging in protected activity. MCCCD will take appropriate disciplinary action, up to and including employment termination or academic dismissal if retaliation occurs.

**AMENDED by the Administrative Regulations approval process, January 2, 2020**
**AMENDED by the Administrative Regulations approval process, March 13, 2012**
**AMENDED by the Administrative Regulations approval process, September 29, 2011, Motion No. 9863**
**AMENDED by the Administrative Regulations approval process, September 27, 2010**
**AMENDED by the Administrative Regulations approval process, March 23, 2010, Motion No. 9669**
**AMENDED by the Administrative Regulations approval process, February 25, 2009**
**AMENDED by the Administrative Regulations approval process, August 18, 2008**
**AMENDED by the Administrative Regulations approval process, September 26, 2000**

**Founding Source:**
**Governing Board Minutes, November 23, 1993, Motion No. 8167**

## 5.1.16
## Title IX Sexual Harassment Policy

## Table of Contents


I. DEFINITIONS
II. RATIONALE FOR POLICY
III. TITLE IX COORDINATOR
IV. OFFICIALS WITH AUTHORITY AND MANDATORY REPORTERS
V. CONFIDENTIAL RESOURCES AND FEDERAL RESOURCES
VI. NOTICE/COMPLAINTS OF DISCRIMINATION, HARASSMENT, AND/OR RETALIATION
VII. SUPPORTIVE MEASURES
VIII. EMERGENCY REMOVAL
IX. PRIVACY
X. JURISDICTION
XI. TIME LIMITS ON REPORTING
XII. ONLINE HARASSMENT AND MISCONDUCT
XIII. TITLE IX SEXUAL HARASSMENT
XIV. RETALIATION
XV. WHEN A COMPLAINANT DOES NOT WISH TO PROCEED
XVI. FEDERAL TIMELY WARNING OBLIGATIONS
XVII. FALSE ALLEGATIONS AND EVIDENCE
XVIII. AMNESTY FOR COMPLAINANTS AND WITNESSES
XIX. FEDERAL STATISTICAL REPORTING OBLIGATIONS
XX. ALLEGED VIOLATIONS OF THE TITLE IX POLICY


I. **DEFINITIONS** - Back to Top

1. **Actual Knowledge** means that an employee, student, or third-party informs the Title IX Coordinator or other Official with Authority of the alleged occurrence of alleged harassing, discriminatory, and/or retaliatory conduct. Actual knowledge compels the Maricopa County Community College District (MCCCD) to initiate action.
2. **Advisor** means a person chosen by a party or appointed by the institution to accompany the party to meetings related to the resolution process, to advise the party on that process, and to conduct cross-examination for the party at the hearing, if a hearing is held. This individual may be an MCCCD employee, a member of the community, or attorney (hired and paid for by a party).
3. **Complainant** means an individual who is alleged to be the victim of conduct that could constitute sexual harassment or retaliation for engaging in a protected activity.
4. **Formal Complaint** means a document filed with the Title IX Coordinator/signed by a Complainant or signed by the Title IX Coordinator alleging against sexual harassment or retaliation for engaging in a protected activity against a Respondent and requesting that the MCCCD investigate the allegation.
5. **Confidential Resource** means an employee who is not a Mandatory Reporter or an Official with Authority (irrespective of Clery Act Campus Security Authority status). At MCCCD, there is only one confidential resource. This confidential resource is the Ombudsman, who is located in the MCCCD Office of Public Stewardship.
6. **Day(s)** means a business day when the MCCCD is in normal operation.

7. **Education program** or **activity** means locations, events, or circumstances where MCCCD exercises substantial control over both the Respondent and the context in which the sexual harassment or discrimination occurs and also includes any building owned or controlled by a student organization that is officially recognized by the MCCCD.
8. **Final Determination of Responsibility** means a conclusion by preponderance of the evidence that the alleged conduct occurred, or did not occur, and whether it did, or did not violate policy.
9. **Formal Grievance Process** means a method of formal resolution designated by MCCCD to address conduct that falls within the policies included below, and which complies with the requirements of 34 CFR Part 106.45.
10. **Grievance Process Pool** means any investigators, appeal officers, hearing administrators, and Advisors who may perform any or all of these roles (though not at the same time or with respect to the same case).
11. **Hearing Decision-maker** means a person who has decision-making and sanctioning authority within the MCCCD's Formal Title IX Grievance process.
12. **Investigator** means the person or persons charged by MCCCD with gathering facts about an alleged violation of this policy, assessing relevance and credibility, synthesizing the evidence, and compiling this information into an investigation report and file of directly related evidence.
13. **Mandatory Reporter** means an employee of MCCCD who is obligated by policy to share knowledge, notice, and/or reports of harassment, discrimination, and/or retaliation with the Title IX Coordinator. Mandatory reporters do not convey actual knowledge to the MCCCD. Mandatory Reporter under this policy does not diminish the requirement under Arizona state law to report alleged or suspected child abuse, elder abuse, and/or abuse of individuals with disabilities to appropriate officials, though these responsibilities may overlap with those who have mandatory\ reporter responsibility in this policy.
14. **Official with Authority (OWA)** means an employee of the MCCCD explicitly vested with the responsibility to implement corrective measures for harassment and/or retaliation on behalf of the MCCCD. Notice to an OWA of an allegation of sexual harassment as defined in this policy conveys actual knowledge to the MCCCD and triggers a responsibility to act.
15. **Parties** include the Complainant(s) and Respondent(s), collectively.
16. **Promptness** means the time period in which allegations are acted upon once MCCCD has received notice or a formal complaint. Typically, complaints can take 60-90 business days to resolve. There are always exceptions and extenuating circumstances that can cause a resolution to take longer, but MCCCD will avoid all undue delays within its control.
17. **Remedies** means post-finding actions directed to the Complainant and/or the community as mechanisms to address safety, prevent recurrence, and restore access to MCCCD's educational program.
18. **Respondent** means an individual who has been reported to be the perpetrator of conduct that could constitute harassment or discrimination based on a protected class; or retaliation for engaging in a protected activity. When the Respondent is a member of the MCCCD community, a grievance process may be available regardless of the status of the Complainant, who may or may not be a member of the MCCCD community.
19. **Resolution** means the result of an informal or formal grievance process.
20. **Sanction** means a consequence imposed by MCCCD on a Respondent who is found to have violated this policy.
21. **Sexual Harassment** means the umbrella category including the offenses of sexual harassment, sexual assault, stalking, and dating violence and domestic violence.
22. **Title IX Coordinator** is at least one official designated by MCCCD to ensure compliance with Title IX and the MCCCD's Title IX program. References to the coordinator throughout this policy may also encompass a designee of the coordinator for specific tasks.
23. **Student** means any individual who is registered or enrolled for credit or non-credit bearing coursework, camps and other District-sponsored programs or activities, and who maintains an ongoing relationship with the MCCCD, which means the student is on leave (medical, administrative, or other documented leave of absence), but is not registered or taking classes at the time of the complaint being filed.

24. **Title IX Team** refers to the Title IX Coordinator, any deputy coordinators, and any member(s) of the Grievance Process Pool.

## II. RATIONALE FOR POLICY - Back to Top

MCCCD is committed to providing a workplace and educational environment, as well as other benefits, programs, and activities, that are free from sexual harassment, discrimination on the basis of sex, and retaliation. To ensure compliance with federal and state civil rights laws and regulations, and to affirm its commitment to promoting the goals of fairness and equity in all aspects of the educational program or activity, MCCCD has developed internal policies and procedures that provide a prompt, fair, and impartial process for those involved in an allegation of sexual harassment, and for allegations of retaliation. MCCCD values and upholds the equal dignity of all members of its community and strives to balance the rights of the parties in the grievance process during what is often a difficult time for all those involved.

## III. TITLE IX COORDINATOR - Back to Top

Each MCCCD college has a designated Title IX Coordinator who oversees implementation of this policy. The Title IX Coordinator has the primary responsibility for coordinating MCCCD's efforts related to the intake, investigation, resolution, and implementation of supportive measures to stop, remediate, and prevent discrimination, harassment, and retaliation prohibited under this policy.

The names and contact information for each college Title IX Coordinator can be found on the following page: https://district.maricopa.edu/consumer-information/title-ix/title-ix-coordinators. It is the responsibility of each of the MCCCD colleges' Vice Presidents of Student Affairs to ensure this list is up-to-date with correct information. The college Title IX Coordinators must act with independence and authority free from bias and conflicts of interest.

To raise any concern involving bias or conflict of interest by the college Title IX Coordinator, contact the Compliance Office in the Office of General Counsel by emailing compliance@domail.maricopa.edu. Concerns of bias or a potential conflict of interest by any other Title IX team member should be raised with the respective college Title IX Coordinator.

Reports of misconduct or discrimination committed by the college Title IX Coordinator should be reported to the college Human Resources Department. Reports of misconduct or discrimination committed by any other Title IX Team member should be reported to the respective college Title IX Coordinator.

## IV. OFFICIALS WITH AUTHORITY AND MANDATORY REPORTERS - Back to Top

### OFFICIALS WITH AUTHORITY

MCCCD has determined that the following administrators are Officials with Authority to address and correct sexual harassment and/or retaliation. In addition to the Title IX team members listed in Section 1. Definitions, these Officials with Authority listed below may also accept notice or complaints on behalf of the MCCCD. Knowledge on the part of an Official with Authority conveys actual knowledge to the MCCCD.

1. College/District Title IX Coordinator

2. Chancellor
3. Provost
4. General Counsel and Associate General Counsels
5. Chief Human Resources Officer
6. Chief Executive Officer
7. College Vice Presidents (at all levels)
8. Associate Vice Chancellors
9. Law enforcement
10. Athletic Directors
11. Directors (in any administrative area of a college or the District)

**MANDATORY REPORTERS**

The following classification of employees are mandatory reporters and are required to report actual or suspected discrimination or harassment to the respective college Title IX Coordinator or to the District Compliance Office for District employees. A Complainant who expects formal action in response to their allegations, but does not wish to contact the Title IX Coordinator should report their allegations to any mandatory reporter who can connect them with resources to report crimes and/or policy violations. Mandatory reporters will, within twenty-four (24) hours, refer reports to the Title IX Coordinator (and/or police, if desired by the Complainant), who will take action. Mandatory reporters must promptly (within twenty-four (24) hours) share with the Title IX Coordinator all known details of a report made to them in the course of their employment. The persons occupying the following positions are mandatory reporters. Knowledge to a mandatory reporter does not convey actual knowledge to the MCCCD.

1. Chancellor
2. Provost
3. General Counsel
4. Chief Human Resources Officer
5. Chief Workforce and Economic Development Officer
6. Chief Executive Officer
7. College Presidents
8. Associate Vice Chancellors
9. Director of Communications
10. Associate General Counsels
11. Supervisors/Managers/Directors (but not including division or department chairs)
12. College Vice Presidents, at all levels
13. Deans, at all levels
14. Athletic Directors/Coaches/Trainers
15. Law enforcement

**Anonymous Notice to Mandated Reporters**

A Complainant may request that the mandatory reporter provide notice to the Title IX Coordinator anonymously, without identification of the Complainant. A mandatory reporter cannot remain anonymous themselves. The MCCCD will investigate matters in which anonymous notice has been given to the extent

possible, both to assess the underlying allegation(s) and to determine if supportive measures or remedies can be provided. However, anonymous notice typically limits the MCCCD's ability to investigate, respond, and provide remedies, depending on what information is shared. When a Complainant has made a request for anonymity, the Complainant's personally identifiable information may be withheld by a mandatory reporter, but all other details of the alleged incident(s) must be shared with the Title IX Coordinator. Supportive measures may be offered to the Complainant as the result of such disclosures without formal MCCCD action.

Failure of a mandatory reporter to report an incident of harassment or discrimination of which they become aware is a violation of MCCCD policy and the mandatory reporter may be subject to disciplinary action, up to and including termination, for failure to comply.

## V. CONFIDENTIAL RESOURCES AND FEDERAL RESOURCES - Back to Top

- On-campus (Maricopa Community Colleges District Office) Office of Public Stewardship
- Off-campus (non-employees):
  - Licensed professional counselors and other medical providers
  - Local rape crisis counselors
  - Domestic violence resources
  - Local or state assistance agencies
  - Clergy/Chaplains
  - Attorneys

The Office of Public Stewardship will timely submit anonymous statistical information for Clery Act purposes unless they believe it would be harmful to their client.

External Inquiries may also be made to:

Office for Civil Rights,
***Denver Office***
U.S. Department of Education
Cesar E. Chavez Memorial Building
1244 Speer Boulevard, Suite 310
Denver, CO 80204-3582
Telephone: (303) 844-5695
Facsimile: (303) 844-4303
Email: OCR.Denver@ed.gov

## VI. NOTICE/COMPLAINTS OF DISCRIMINATION, HARASSMENT, AND/OR RETALIATION - Back to Top

Notice or complaints of discrimination, harassment, and/or retaliation in violation of this policy may be made using any of the following options:

1. File a complaint with, or give verbal notice to, a college Title IX Coordinator or an Official with Authority. Such a report may be made at any time (including during non-business hours) by using the telephone number or email address, or by mail to the office address, listed for the Title IX Coordinator or any other official listed. Title IX Coordinators can be found on the following page: https://district.maricopa.edu/consumer-information/title-ix/title-ix-coordinators. It is the responsibility of each of the MCCCD college's Vice President of Student Affairs to ensure this list is up to date with correct information.
2. Report online, using the reporting form posted at https://district.maricopa.edu/consumer-information/reporting. Anonymous reports are accepted, but can give rise to a need to investigate. The MCCCD tries to provide supportive measures to all Complainants, which is impossible with an anonymous report when the name of the Complainant is not shared in the report. Since anonymous reporting carries no obligation to initiate a formal response and since the MCCCD respects a Complainant's requests to dismiss complaints, unless there is a compelling threat to health and/or safety, the matter will be dismissed.

A formal complaint is a document filed and signed by the Complainant or signed by the Title IX Coordinator alleging a policy violation by a Respondent and requesting that the MCCCD investigate the allegation(s). A complaint may be filed with the Title IX Coordinator in person, by mail, or by electronic mail, by using the contact information in the section immediately above, or as described in this section. As used in this paragraph, the phrase "document filed by a Complainant" means a document or electronic submission (such as by electronic mail or through an online portal provided for this purpose by the MCCCD) that contains the Complainant's physical or digital signature, which can include the Complainant's name on the email, or otherwise indicates that the Complainant is the person filing the complaint.

The Title IX Coordinator will contact the Complainant regarding any notice that is submitted in a form that does not comply with these requirements to ensure that it is filed correctly.

## VII. SUPPORTIVE MEASURES - Back to Top

MCCCD will offer and implement appropriate and reasonable supportive measures to the parties upon notice of alleged harassment, discrimination, and/or retaliation.

Supportive measures are non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the parties to restore or preserve access to the MCCCD's education program or activity, including measures designed to protect the safety of all parties, the MCCCD's educational environment, and/or deter sexual harassment, discrimination on the basis of sex, and/or retaliation.

The Title IX Coordinator shall make supportive measures available to the parties upon receiving notice of allegations or a formal complaint. There is no statute of limitations for filing a Title IX Complaint. The Title IX Coordinator works with the Complainant to ensure their wishes are considered with respect to the planned and implemented supportive measures.

The MCCCD will maintain the privacy of the supportive measures, provided that maintaining privacy does not impair the MCCCD's ability to provide the supportive measures. MCCCD will act to ensure as minimal an academic impact on the parties as possible. The MCCCD will implement measures in a way that does not unreasonably burden the other party.

These actions may include, but are not limited to:

1. Referral to counseling, medical, and/or other healthcare services

2. Referral to the Employee Assistance Program
3. Referral to community-based service providers
4. In-house visa and immigration assistance
5. Student financial aid counseling
6. Education to the community or community subgroup(s)
7. Altering work arrangements for employees or student-employees
8. Safety planning
9. Providing campus safety escorts
10. Implementing contact limitations (no contact orders) between the parties
11. Academic support, extensions of deadlines, or other course/program-related adjustments
12. Trespass orders, when applicable
13. Timely warnings under the Clery Act
14. Class schedule modifications, withdrawals, or leaves of absence
15. Increased security and monitoring of certain areas of the campus
16. Any other actions deemed appropriate by the Title IX Coordinator

Violations of no contact orders will be referred to appropriate student or employee conduct processes for enforcement and further discipline, as is necessary.

## VIII. EMERGENCY REMOVAL - Back to Top

MCCCD can act to remove a Respondent entirely or partially from its education program/activities or MCCCD employment on an emergency basis when an individualized safety and risk analysis has determined that an immediate threat to the physical health or safety of any student or other individual justifies removal. This risk analysis is performed by the Title IX Coordinator in conjunction with the college or District Behavioral Intervention Team (also known as BIT/BAT/TAT/CARE, etc.) using its standard objective violence risk assessment procedures.

The Title IX Coordinator has sole discretion under this policy to implement or stay an emergency removal and to determine the conditions and duration. Violation of an emergency removal under this policy will be grounds for discipline, which may include expulsion from the MCCCD or termination from employment.

In all cases where an emergency removal is imposed:

1. The Respondent will be given written notice of the action. In the written notice will be the option to request to meet with the Title IX Coordinator as soon as reasonably possible, to show cause as to why the action/removal should not be implemented or should be modified. This meeting is not a hearing on the merits of the underlying Title IX allegations, but rather an administrative process intended to determine solely whether the emergency removal is appropriate.
2. The Respondent has three (3) days after the receipt of the emergency removal to request a meeting with the Title IX Coordinator. If the Respondent does not make such a request within the three (3) day time period, objection to the emergency removal is deemed waived.
3. The Respondent may be accompanied by an Advisor of their choosing in the Show Cause administrative meeting with the Title IX Coordinator.
4. The Respondent will be given access to a written summary of the basis for the emergency removal prior to the meeting to allow for adequate preparation. Such summary will be included in the notification letter regarding the emergency removal.
5. The Title IX Coordinator will issue a Show Cause Meeting Determination letter to the Respondent within two (2) days of the meeting taking place.
6. There is no appeal process for emergency removal decisions.
7. A Complainant and their Advisor may be permitted to participate in this meeting, as it is equitable to do so.
8. MCCCD will implement the least restrictive emergency actions possible in light of the circumstances and safety concerns.

**For additional information regarding emergency removals, please see Emergency Removals.**

## IX. PRIVACY - Back to Top

Every effort is made by the MCCCD to preserve the privacy of a report under this policy.

**For additional information regarding privacy and confidentiality under this policy, please see Privacy and Confidentiality.**

## X. JURISDICTION - Back to Top

This policy applies to all MCCCD educational programs and activities, and to conduct that takes place on the campus or on property owned or controlled by the MCCCD, at MCCCD-sponsored events, or in buildings owned or controlled by MCCCD's recognized student organizations. The Respondent must be a member of MCCCD's community in order for its policies to apply. Nevertheless, even when the Respondent is not a member of the MCCCD's community, supportive measures, remedies, and resources may be accessible to the Complainant by contacting the Title IX Coordinator.

This policy applies to the effects of off-campus misconduct that effectively deprive someone of access to MCCCD's educational programs. The MCCCD may also extend jurisdiction to off-campus and/or to online conduct when the Title IX Coordinator determines that the conduct affects a substantial MCCCD interest.

Regardless of where the conduct occurred, the MCCCD will address notice/complaints to determine whether the conduct occurred in the context of its employment or educational program or activity and/or has continuing effects on campus or in an off-campus sponsored program or activity.

A Title IX Coordinator may be able to provide guidance for a student or employee Complainant who experiences sexual harassment/discrimination in an externship, study abroad program, or other environment external to the MCCCD under the MCCCD's Student Conduct Code or employee conduct or nondiscrimination policies.

**For additional information regarding the MCCCD jurisdiction over Title IX matters, please see Jurisdiction.**

## XI. TIME LIMITS ON REPORTING - Back to Top

There is no time limitation on providing notice/complaints to the Title IX Coordinator. However, if the Respondent is no longer subject to the MCCCD's jurisdiction and/or significant time has passed, the ability to investigate, respond, and provide remedies may be more limited or impossible.

Acting on notice/complaints significantly impacted by the passage of time (including, but not limited to, the rescission or revision of policy) is at the discretion of the Title IX Coordinator (except in cases where mandatory dismissal is required), who may document allegations for future reference, offer supportive measures and/or remedies, and/or engage in informal or formal action, as appropriate.

The MCCCD will apply the policy in place at the time of the alleged misconduct and the procedures in place at the time of the notice of alleged misconduct or complaint of sexual harassment.

## XII. ONLINE HARASSMENT AND MISCONDUCT - Back to Top

This policy is written and should be interpreted broadly to include online and cyber manifestations of any of the behaviors prohibited below, when those behaviors occur in or have an effect on the MCCCD's education programs and activities or use MCCCD networks, technology, or equipment.

When harassing communications made on websites, social media, and other venues not controlled by the MCCCD are reported to the MCCCD pursuant to this policy the MCCCD will attempt to address and mitigate the effects of such communications. Any online postings or other electronic communication by students and employees, including cyber-bullying, cyber-stalking, cyber-harassment, etc., occurring completely outside of the MCCCD's control (e.g., not on MCCCD networks, websites, or between MCCCD email accounts) will only be subject to this policy when such online conduct can be shown to cause a substantial in-program disruption to the student's educational pursuit of MCCCD's educational programs and/or activities.

Off-campus harassing speech by employees, whether online or in person, may be regulated by the MCCCD only when such speech is made in an employee's official or work-related capacity, including where the speaker holds themselves out as employees of an MCCCD college or District office. Otherwise, such communications are considered speech protected by the First Amendment. Supportive measures for Complainants will be provided, but protected speech will not be subjected to discipline.

## XIII. TITLE IX SEXUAL HARASSMENT - Back to Top

MCCCD has adopted the following definition of Title IX Sexual Harassment in order to address the unique environment of an academic community, which consists not only of employer and employees, but of students as well.

Acts of sexual harassment may be committed by any person upon any other person, regardless of the sex, sexual orientation, and/or gender identity of those involved.

Sexual Harassment, as an umbrella category, includes the offenses of sexual harassment/discrimination, sexual assault, domestic violence, dating violence, and stalking, and is defined as:

Conduct on the basis of sex that satisfies one or more of the following:

1. Quid Pro Quo:
   a. an employee of the MCCCD,
   b. conditions the provision of an aid, benefit, or service of the MCCCD,
   c. on an individual's participation in unwelcome sexual conduct; and/or

2. Sexual Harassment:
   a. unwelcome conduct,
   b. determined by a reasonable person,
   c. to be so severe, and
   d. pervasive, and,
   e. objectively offensive,
   f. that it effectively denies a person equal access to the MCCCD's education program or activity. Severity, pervasiveness, and objective offensiveness are evaluated based on the totality of the circumstances from the perspective of a reasonable person in the same or similar

circumstances ("in the shoes of the Complainant"), including the context in which the alleged incident occurred and any similar, previous patterns that may be evidenced.

3. Sexual assault, defined as:
    a. Sex Offenses, Forcible:
        i. Any sexual act directed against another person,
        ii. without the consent of the Complainant,
        iii. including instances in which the Complainant is incapable of giving consent.
    b. Forcible Rape:
        i. Penetration,
        ii. no matter how slight,
        iii. of the vagina or anus with any body part or object, or
        iv. oral penetration by a sex organ of another person,
        v. without the consent of the Complainant.
    c. Forcible Sodomy:
        i. Oral or anal sexual intercourse with another person,
        ii. forcibly,
        iii. and/or against that person's will (non-consensually), or
        iv. not forcibly or against the person's will in instances in which the Complainant is incapable of giving consent because of age (under the age of 18) or because of temporary or permanent mental or physical incapacity.
    d. Sexual Assault with an Object:
        i. The use of an object or instrument to penetrate,
        ii. however slightly,
        iii. the genital or anal opening of the body of another person,
        iv. forcibly,
        v. and/or against that person's will (non-consensually),
        vi. or not forcibly or against the person's will in instances in which the Complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.
    e. Forcible Fondling:
        i. The touching of the private body parts of another person (buttocks, groin, breasts),
        ii. for the purpose of sexual gratification,
        iii. forcibly,
        iv. and/or against that person's will (non-consensually),
        v. or not forcibly or against the person's will in instances in which the Complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.
    f. Sex Offenses, Non-forcible:
        i. Incest:
            1. Non-forcible sexual intercourse,
            2. between persons who are related to each other,
            3. within the degrees wherein marriage is prohibited by Arizona law.
        ii. Statutory Rape:
            1. Non-forcible sexual intercourse,
            2. with a person who is under the Arizona statutory age of consent, which is the age of 18 years old.

4. Dating Violence, defined as:
    a. violence,
    b. on the basis of sex,
    c. committed by a person,
    d. who is in or has been in a social relationship of a romantic or intimate nature with the Complainant.

i. The existence of such a relationship shall be determined based on the Complainant's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship. For the purposes of this definition
ii. Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse
iii. Dating violence does not include acts covered under the definition of domestic violence.

5. Domestic Violence, defined as:
   a. violence,
   b. on the basis of sex,
   c. committed by a current or former spouse or intimate partner of the Complainant
   d. by a person with whom the Complainant shares a child in common, or
   e. by a person who is cohabitating with, or has cohabitated with, the Complainant as a spouse or intimate partner, or
   f. by a person similarly situated to a spouse of the Complainant under the domestic or family violence laws of the state of Arizona or
   g. by any other person against an adult or youth Complainant who is protected from that person's acts under the domestic or family violence laws of the state of Arizona.

To categorize an incident as Domestic Violence, the relationship between the Respondent and the Complainant must be more than just two people living together as roommates. The people cohabitating must be current or former spouses or have an intimate relationship.

6. Stalking, defined as:
   a. engaging in a course of conduct,
   b. on the basis of sex,
   c. directed at a specific person, that

would cause a reasonable person to fear for the person's safety, or the safety of others; or
suffer substantial emotional distress.

For the purposes of this definition—

i. Course of conduct means two or more acts, including, but not limited to, acts in which the Respondent directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.
ii. Reasonable person means a reasonable person under similar circumstances and with similar identities to the Complainant.
iii. Substantial emotional distress means significant mental suffering or anguish that may but does not necessarily require medical or other professional treatment or counseling.

MCCCD reserves the right to impose any level of sanction, ranging from a reprimand up to and including suspension or expulsion/termination, for any offense under this policy.

**Force, Coercion, Consent, and Incapacitation:**
As used in the offenses above, the following definitions apply:

**Force:** Force is the use of physical violence and/or physical imposition to gain sexual access. Force also includes threats, intimidation (implied threats), and coercion that is intended to overcome resistance or produce consent.

Sexual activity that is forced is, by definition, non-consensual, but non-consensual sexual activity is not necessarily forced. Silence or the absence of resistance alone is not consent. Consent is not demonstrated by the absence of resistance. While resistance is not required or necessary, it is a clear demonstration of non-consent.

**Coercion:** Coercion is unreasonable pressure for sexual activity. Coercive conduct differs from seductive conduct based on factors such as the type and/or extent of the pressure used to obtain consent. When someone makes clear that they do not want to engage in certain sexual activity, that they want to stop, or that they do not want to go past a certain point of sexual interaction, continued pressure beyond that point may be coercive.

**Consent is:**

- knowing, and
- voluntary, and
- clear permission
- by word or action
- to engage in sexual activity.

Since individuals may experience the same interaction in different ways, it is the responsibility of each party to determine that the other has consented before engaging in the activity. No one under the age of consent in Arizona, specifically, 18 years old, can consent to sexual activity.

If consent is not clearly provided prior to engaging in the activity, consent may be ratified by word or action at some point during the interaction or thereafter, but clear communication from the outset is strongly encouraged.

For consent to be valid, there must be a clear expression in words or actions that the other individual consented to that specific sexual conduct. Reasonable reciprocation can be implied. For example, if someone kisses you, you can kiss them back (if you want to) without the need to explicitly obtain their consent to being kissed back.

Consent can also be withdrawn once given, as long as the withdrawal is reasonably and clearly communicated. If consent is withdrawn, that sexual activity should cease within a reasonable time.

Consent to some sexual contact (such as kissing or fondling) cannot be presumed to be consent for other sexual activity (such as intercourse). A current or previous intimate relationship is not sufficient to constitute consent.

Proof of consent or non-consent is not a burden placed on either party involved in an incident. Instead, the burden remains on the MCCCD to determine whether its policy has been violated. The existence of consent is based on the totality of the circumstances evaluated from the perspective of a reasonable person in the same or similar circumstances, including the context in which the alleged incident occurred and any similar, previous patterns that may be evidenced.

**Incapacitation:** Incapacitation occurs when someone cannot make rational, reasonable decisions because they lack the capacity to give knowing/informed consent (e.g., to understand the "who, what, when, where, why, or how" of their sexual interaction).

Incapacitation is determined through consideration of all relevant indicators of an individual's state and is not synonymous with intoxication, impairment, blackout, and/or being drunk.

A person cannot consent if they are unable to understand what is happening or are disoriented, helpless, asleep, or unconscious, for any reason, including by alcohol or other drugs. As stated above, a Respondent violates this policy if they engage in sexual activity with someone who is incapable of giving consent.

It is a defense to a sexual assault policy violation that the Respondent neither knew nor should have known the Complainant to be physically or mentally incapacitated. "Should have known" is an objective, reasonable person standard which assumes that a reasonable person is both sober and exercising sound judgment.

This policy also covers a person whose incapacity results from a temporary or permanent physical or mental health condition, involuntary physical restraint, and/or the consumption of incapacitating drugs.

## XIV. RETALIATION - Back to Top

Protected activity under this policy includes reporting an incident that may implicate this policy, participating in the grievance process, supporting a Complainant or Respondent, assisting in providing information relevant to an investigation, and/or acting in good faith to oppose conduct that constitutes a violation of this policy.

Acts of alleged retaliation should be reported immediately to the Title IX Coordinator and will be promptly investigated. The MCCCD is prepared to take appropriate steps to protect individuals who fear that they may be subjected to retaliation.

It is prohibited for the MCCCD or any member of MCCCD's community to take materially adverse action by intimidating, threatening, coercing, harassing, or discriminating against any individual for the purpose of interfering with any right or privilege secured by law or policy, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this policy and procedure.

Charges against an individual for Student Conduct Code violations that do not involve sex discrimination or sexual harassment but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by Title IX, constitutes retaliation.

The following do not constitute retaliation under this policy:

1. The exercise of rights protected under the First Amendment.
2. Charging an individual with a code of conduct violation for making a materially false statement in bad faith in the course of a grievance proceeding under this policy and procedure. A determination regarding responsibility, alone, is not sufficient to conclude that any party has made a materially false statement in bad faith.

**For additional information on prohibited retaliation, please see Retaliation.**

## XV. WHEN A COMPLAINANT DOES NOT WISH TO PROCEED - Back to Top

If a complainant does not wish for their name to be shared, does not wish for an investigation to take place, or does not want a formal complaint to be pursued, they may make such a request to the Title IX Coordinator, who will evaluate that request in light of the duty to ensure the safety of the campus and to comply with state or federal law.

The Title IX Coordinator has ultimate discretion over whether the MCCCD proceeds when the complainant does not wish to do so. The Title IX Coordinator may sign a formal complaint to initiate a grievance process upon completion of an appropriate violence risk assessment. The Title IX Coordinator's decision to sign a formal complaint should be based on results of the violence risk assessment that show a compelling risk to health and/or safety that requires the MCCCD to pursue formal action to protect the community.

When the Title IX Coordinator executes the written complaint, they do not become the Complainant. The Complainant is the individual who is alleged to be the victim of conduct that could constitute a violation of this policy. The Complainant (or their Advisor) may have as much or as little involvement in the process as they wish. The Complainant retains all rights of a Complainant under this Policy irrespective of their level of participation. Typically, when the Complainant chooses not to participate, the Advisor may be appointed as proxy for the Complainant throughout the process, acting to ensure and protect the rights of the Complainant.

In cases in which the Complainant requests confidentiality/no formal action and the circumstances allow the MCCCD to honor that request, the MCCCD will offer supportive measures, and remedies to the Complainant and the community, but will not otherwise pursue formal action.

If the Complainant elects to take no action, they can change that decision if they decide to pursue a formal complaint at a later date. Upon making a formal complaint, a Complainant has the right, and can expect, to have allegations taken seriously by the MCCCD, and to have the incidents investigated and properly resolved through these procedures.

## XVI. FEDERAL TIMELY WARNING OBLIGATIONS - Back to Top

Parties reporting sexual assault, domestic violence, dating violence, and/or stalking should be aware that under the Clery Act, MCCCD must issue timely warnings for incidents reported to them that pose a serious or continuing threat of bodily harm or danger to members of the campus community.

MCCCD will ensure that a Complainant's name and other identifying information is not disclosed, while still providing enough information for community members to make safety decisions in light of the potential danger.

## XVII. FALSE ALLEGATIONS AND EVIDENCE - Back to Top

Deliberately false and/or malicious accusations under this policy, as opposed to allegations which, even if erroneous, are made in good faith, are a serious offense and will be referred to either the Student Conduct Code or employee conduct policies for appropriate disciplinary action.

Additionally, witnesses and parties knowingly providing false evidence, tampering with or destroying evidence after being directed to preserve such evidence, or deliberately misleading an investigator or hearing Decision-maker will be subject to discipline under the appropriate student or employee policy as well as under this policy for providing false testimony.

## XVIII. AMNESTY FOR COMPLAINANTS AND WITNESSES - Back to Top

The MCCCD community encourages the reporting of misconduct and crimes by Complainants and witnesses. Sometimes, Complainants or witnesses are hesitant to report to MCCCD officials or participate in grievance processes because they fear that they themselves may be in violation of certain policies, such

as underage drinking or use of illicit drugs at the time of the incident. Respondents may hesitate to be forthcoming during the process for the same reasons.

It is in the best interests of the MCCCD community that Complainants choose to report misconduct to MCCCD officials, that witnesses come forward to share what they know, and that all parties be forthcoming during the process. To encourage reporting and participation in the process, MCCCD maintains a policy of offering parties and witnesses amnesty from minor policy violations, such as underage consumption of alcohol or the use of illicit drugs related to the incident being reported.

Amnesty does not apply to more serious allegations such as physical abuse of another or illicit drug distribution. A decision not to offer amnesty to a Respondent should not be based on sex nor gender, but should take into account the rationale for amnesty. The incentive to report serious misconduct is rarely applicable to Respondents with respect to a Complainant.

MCCCD maintains a policy of amnesty for students who offer help to others in need via bystander intervention. While policy violations cannot be overlooked, MCCCD may provide purely educational options with no official disciplinary finding, rather than punitive sanctions, to those who offer their assistance to others in need.

## XIX. FEDERAL STATISTICAL REPORTING OBLIGATIONS - Back to Top

Certain campus officials – those deemed Campus Security Authorities – have a duty to report the following for federal statistical reporting purposes (Clery Act):

a. All "primary crimes," which include homicide, sexual assault, robbery, aggravated assault, burglary, motor vehicle theft, and arson;
b. Hate crimes, which include any bias motivated primary crime as well as any bias motivated larceny or theft, simple assault, intimidation, or destruction/damage/vandalism of property;
c. VAWA based crimes, which include sexual assault, domestic violence, dating violence, and stalking (VAWA is the Violence Against Women Act, enacted in 1994 codified in part at 42 U.S.C. sections 13701 through 14040); and
d. Arrests and referrals for disciplinary action for weapons-related law violations, liquor-related law violations, and drug abuse-related law violations.

All personally identifiable information is kept private, but statistical information must be passed along to campus law enforcement regarding the type of incident and its general location (on or off-campus or in the surrounding area, but no addresses are given) for publication in the Annual Security Report and daily campus crime log.

Campus Security Authorities include: presidents, vice-presidents, student affairs/student conduct staff, campus law enforcement/public safety, local police, coaches, athletic directors, student activities staff, human resources staff, Advisors to student organizations, and any other official with significant responsibility for student and campus activities.

## XX. ALLEGED VIOLATIONS OF THE TITLE IX POLICY - Back to Top

1. **Overview**

MCCCD will act on any formal or informal notice/complaint of violation of the Title IX Sexual Harassment policy ("the Policy") that is received by the Title IX Coordinator or any other Official with Authority by applying these procedures.

The procedures below apply **only** to qualifying allegations of sexual harassment (including sexual assault, dating violence, domestic violence, and stalking, as defined in Section XIII) involving MCCCD students, staff, administrator, or faculty members.

Unionized/other categorized employees are subject to the terms of their agreements/employees' rights to the extent those agreements do not conflict with this policy.

2. **Notice/Complaint**

Upon receipt of a complaint or notice to the Title IX Coordinator of an alleged violation of this Policy, MCCCD will initiate a prompt initial assessment to determine the next steps. The Title IX Coordinator will initiate at least one of three responses:

1. Offering supportive measures because the Complainant does not want to proceed formally;
2. Offering supportive measures and initiating an informal resolution; or
3. Offering supportive measures and initiating a Formal Grievance Process including an investigation and a hearing to determine whether or not the Policy has been violated.

3. **Initial Assessment**

Following receipt of notice or a complaint of an alleged violation of this Policy, the Title IX Coordinator (or designee) will engage in an initial assessment, which is typically one (1) to five (5) business days in duration.

**For more information related to the Initial Assessment, please see The Investigative Process.**

4. **Emergency Removal**

In the event an emergency removal is considered, the Title IX Coordinator will follow the procedures outlined in Section VIII of this policy.

5. **Dismissal (Mandatory and Discretionary)**

Mandatory Dismissal: The Title IX Coordinator must dismiss a formal complaint or any allegations therein if, at any time during the investigation or hearing, it is determined that:

1. The conduct alleged in the formal complaint would not constitute sexual harassment as defined in the Policy hereinabove, even if proved; and/or
2. The conduct did not occur in an educational program or activity controlled by MCCCD (including buildings or property controlled by recognized student organizations), and/or MCCCD does not have control of the Respondent; and/or

3. The conduct did not occur against a person in the United States.

Any conduct alleged in the formal complaint that is dismissed under the first (1st) provision above will be referred by the Title IX Coordinator to the Student Code of Conduct administrator (for student Respondents) or the college or district Human Resources administrator (for employee/third party Respondents). Referrals shall take place within three (3) days of the date of the Dismissal Letter being mailed to the parties.

Discretionary Dismissal: The Title IX Coordinator may choose to dismiss a formal complaint or any allegations therein if, at any time during the investigation or hearing:

1. A Complainant notifies the Title IX Coordinator in writing that the Complainant would like to withdraw the formal complaint or any allegations therein. A Complainant who decides to withdraw a complaint may later request to reinstate it or refile it; or

2. The Respondent is no longer enrolled in or employed by the MCCCD; or

3. Specific circumstances prevent MCCCD from gathering evidence sufficient to reach a determination as to the formal complaint or allegations therein.

4.

Upon any dismissal, MCCCD will promptly send written notice of the dismissal and the rationale for doing so simultaneously to the parties.

Both mandatory and discretionary dismissal decisions are appealable by any party under the procedures for appeal below.

6. **Counterclaims**

MCCCD is obligated to ensure that the grievance process is not abused for retaliatory purposes. MCCCD permits the filing of counterclaims but uses an initial assessment, described above, to assess whether the allegations in the counterclaim are made in good faith. Counterclaims made with retaliatory intent will not be permitted and may constitute a violation of this policy.

Counterclaims determined to have been reported in good faith will be processed using the grievance procedures below. Investigation of such claims may take place after resolution of the underlying initial allegation, in which case a delay may occur.

Counterclaims may also be resolved through the same investigation as the underlying allegation, at the discretion of the Title IX Coordinator.

7. **Right to an Advisor**

The parties may each have an Advisor of their choice. The Advisor may be a friend, mentor, family member, attorney, or any other individual a party chooses to advise, support, and/or consult with them throughout the resolution process. The parties may choose Advisors from inside or outside of the MCCCD community. The Advisor may be present with the Complainant or Respondent for all of their meetings and interviews within the resolution process, if they so choose.

The parties may select whoever they wish to serve as their Advisor as long as the Advisor is eligible and available. "Available" means the party agrees to act as Advisor and has no conflict of interest in doing so. Also, the Advisor cannot have institutionally conflicting roles, such as being a Title IX administrator who has an active role in the matter, or a supervisor who must monitor and implement sanctions.

Choosing an Advisor who is also a witness in the process creates potential for bias and conflict-of-interest. A party who chooses an Advisor who is also a witness can anticipate that issues of potential bias will be explored by the hearing Decision-maker.

If the parties choose an Advisor from the pool available from the MCCCD, the Advisor will be trained by the MCCCD and be familiar with the MCCCD's resolution process. If the parties choose an Advisor from outside the pool of those identified by the MCCCD, the Advisor may not have been trained by the MCCCD and may not be familiar with MCCCD policies and procedures.

Parties also have the right to choose not to have an Advisor in the initial stages of the resolution process, prior to a hearing. If either party chooses not to have an Advisor present in the initial stages of the resolution process, this choice will be documented in the record of the case.

**For more information regarding the training received by an Advisor, please see Advisors FAQ.**

a. **Advisors in Hearings/MCCCD-Appointed Advisor**

Under U.S. Department of Education regulations applicable to Title IX, cross-examination is required during the hearing, but must be conducted by the parties' Advisors. The parties are not permitted to directly cross-examine each other or any witnesses. If a party does not have an Advisor for a hearing, MCCCD will appoint a trained Advisor for the limited purpose of conducting cross-examination.

A party may reject this appointment and choose their own Advisor, but they may not proceed with the hearing without an Advisor. If the party's Advisor will not conduct cross-examination, MCCCD will appoint an Advisor who will do so thoroughly, regardless of the participation or non-participation of the advised party in the hearing itself. Extensive questioning of the parties and witnesses may also be conducted by the Decision-maker during the hearing.

b. **Pre-Interview Meetings**

Advisors may request to meet with the administrative officials conducting interviews/meetings in advance of these interviews or meetings. In order for a pre-interview meeting to be held it must be requested by the Advisor. This pre-meeting allows Advisors to clarify and understand their role and MCCCD's policies and procedures. A pre-interview meeting is not mandatory.

c. **Advisor Violations of MCCCD Policy**

All Advisors are subject to the same MCCCD policies and procedures, whether they are attorneys or not. Advisors are expected to advise without disrupting proceedings. Advisors may not address MCCCD officials in a meeting or interview unless invited to do so (e.g., asking procedural questions). The Advisor may not speak on behalf of their advisee during any meeting or proceeding and may not speak on behalf of the advisee to the investigator(s) or other Decision-maker except during a hearing proceeding, during cross-examination.

The parties are expected to respond to questions on their own behalf throughout the investigation phase of the resolution process. Although the Advisor generally may not speak on behalf of their advisee, the Advisor may consult with their advisee, either privately as needed, or by conferring or passing notes during any resolution process meeting or interview. For longer or more involved discussions, the parties and their Advisors should ask for breaks to allow for private consultation.

Any Advisor who oversteps their role as defined by this policy will be warned only once. If an Advisor continues to disrupt or otherwise fails to respect the limits of the Advisor role, the meeting will be ended, or other appropriate measures implemented. Subsequently, the Title IX Coordinator will determine how to address the Advisor's non-compliance and future role.

d. **Sharing Information with the Advisor**

Parties may share documentation and evidentiary information directly with their Advisor or other individuals if they wish. Doing so may help the parties participate more meaningfully in the resolution process.

MCCCD also provides a consent form (FERPA authorization to release) that authorizes the MCCCD to share such information directly with a party's Advisor. The parties must either complete and submit this form to the Title IX Coordinator or provide similar documentation demonstrating consent to a release of information to the Advisor before MCCCD is able to share records with an Advisor.

The MCCCD will not comply with any party's request that all communications be made through their attorney Advisor.

e. **Privacy of Records Shared with Advisor**

Advisors are expected to maintain the privacy of the records shared with them. These records may not be shared with third parties, disclosed publicly, or used for purposes not explicitly authorized by MCCCD. MCCCD may seek to restrict the role of any Advisor who does not respect the sensitive nature of the process or who fails to abide by the MCCCD's privacy expectations.

f. **Expectations of an Advisor**

The MCCCD expects an Advisor to adjust their schedule to allow them to attend MCCCD meetings when planned. At the sole discretion of the Title IX Coordinator, scheduled meetings may be changed to accommodate an Advisor's inability to attend, if doing so does not cause an unreasonable delay. A Title IX Coordinator's decision as to whether to change meeting dates and times is final.

MCCCD may also make reasonable provisions to allow an Advisor who cannot attend in person to attend a meeting by telephone, video conferencing, or other similar technologies as may be convenient and available.

g. **Expectations of the Parties with Respect to Advisors**

A party may elect to change Advisors during the process and is not obligated to use the same Advisor throughout. The parties are expected to inform the Investigator(s) of the identity of their Advisor at least two (2) business days before the date of their first meeting with Investigators (or as soon as possible if a more expeditious meeting is necessary or desired).

The parties are expected to provide timely notice to the Title IX Coordinator if they change Advisors at any time. It is assumed that if a party changes Advisors, consent to share information with the previous Advisor is terminated, and a release for the new Advisor must be secured. Parties are expected to inform the Title IX Coordinator of the identity of their hearing Advisor at least two (2) business days before the hearing.

8. **Resolution Processes**

Resolution proceedings are private. All persons present at any time during the resolution process are expected to maintain the privacy of the proceedings in accordance with MCCCD policy. While there is an expectation of privacy around what Investigators share with parties during interviews, the parties have discretion to share their own knowledge and evidence with others if they so choose. MCCCD encourages parties to discuss this topic with their Advisors before doing so.

9. **Formal Grievance Process**

The Formal Grievance Process relies on a pool of administrators ("the Pool") to carry out the process. Members of the Pool are announced in an annual distribution of this policy to all students, parents/guardians of students, employees, prospective students, and prospective employees. They are also listed in the Annual Title IX Report published by the Title IX Office.

**For more information regarding the Formal Grievance Pool—including selection, training, and responsibilities—please see Formal Grievance Pool.**

10. **Formal Grievance Process: Notice of Investigation and Allegations**

The Title IX Coordinator will provide written notice of allegations (the "NOA") to the Respondent upon commencement of the Formal Grievance Process. This facilitates the Respondent's ability to prepare for the interview and to identify and choose an Advisor to accompany them. The NOA is also copied to the Complainant, who is to be given advance notice of when the NOA will be delivered to the Respondent.

The NOA will include:

- A meaningful summary of all of allegations,
- The identity of the involved parties (if known),
- The precise misconduct being alleged,
- The date and location of the alleged incident(s) (if known),
- The specific policies implicated,
- A statement of the potential sanctions/responsive actions that could result
- A statement that the MCCCD presumes the Respondent is not responsible for the reported misconduct unless and until the evidence supports a different determination,
- A statement that determinations of responsibility are made at the conclusion of the process and that the parties will be given an opportunity to inspect and review all directly related and/or relevant evidence obtained during the review and comment period,
- A statement about the MCCCD's policy on retaliation,
- Information on the need for each party to have an Advisor of their choosing and suggestions for ways to identify an Advisor,
- A statement informing the parties that the MCCCD's policy prohibits knowingly making false statements, including knowingly submitting false information during the resolution process,
- Detail on how the party may request disability accommodations during the interview process,
- A suggested date and time for an initial meeting (proper time will be given to allow for the selection of an Advisor)
- The name(s) of the Investigator(s), along with a process to identify, in advance of the interview process, to the Title IX Coordinator any conflict of interest that the Investigator(s)

may have, and

- An instruction to preserve any evidence that is directly related to the allegations.

Amendments and updates to the NOA may be made as the investigation progresses and more information becomes available regarding the addition or dismissal of various charges.

Notice will be made in writing and will be sent via electronic mail to the MCCCD-issued email account and mailed via regular mail to the local or permanent address as indicated in official MCCCD records. Notice is presumed to have been given upon emailing the NOA to the Respondent's MCCCD-owned email address. The NOA will also be placed in regular mail, postage pre-paid.

11. **Resolution Timeline**

The MCCCD will make a good faith effort to complete the resolution process within a sixty-to-ninety (60-90) business day time period, including appeal, which can be extended as necessary for appropriate cause by the Title IX Coordinator, who will provide notice and rationale for any extensions or delays to the parties as appropriate, as well as an estimate of how much additional time will be needed to complete the process.

12. **Appointment of Investigators**

Once the decision to commence a formal investigation is made, the Title IX Coordinator shall appoint a team of two (2) investigators to investigate the allegations. Appointment of investigators typically occurs within two (2) business days of determining that an investigation should proceed.

13. **Ensuring Impartiality**

Any individual materially involved in the administration of the resolution process may neither have nor demonstrate a conflict of interest or bias for a party generally, or for a specific Complainant or Respondent. The Title IX Coordinator will vet the assigned Investigator(s) to ensure impartiality by ensuring there are no actual or apparent conflicts of interest or disqualifying biases. The parties may, at any time during the resolution process, raise a concern regarding bias or conflict of interest, and the Title IX Coordinator will determine whether the concern is reasonable and supportable. The Title IX Coordinator's decision allegations of bias or conflict of interest is final.

The Formal Grievance Process involves an objective evaluation of all relevant inculpatory and exculpatory evidence obtained. Credibility determinations may not be based solely on an individual's status or participation as a Complainant, Respondent, or witness.

A Respondent is presumed not to be responsible for the reported misconduct unless and until the Respondent is determined to be responsible for a policy violation by the applicable preponderance of the evidence standard.

14. **Delays in the Investigation Process and Interactions with Law Enforcement**

The MCCCD may undertake a short delay in its investigation (several days) if the following circumstances require: a request from law enforcement to temporarily delay the investigation, the need for language assistance, the absence of parties and/or witnesses, and/or accommodations for disabilities or health conditions, or such circumstances as determined by the Title IX Coordinator in their sole discretion.

The MCCCD will communicate in writing the anticipated duration of the delay and reason to the parties and provide the parties with status updates if necessary. The MCCCD will promptly resume

its investigation and resolution process as soon as feasible. During such a delay, MCCCD will implement supportive measures, as deemed appropriate.

The MCCCD's action(s) are not typically altered or precluded on the grounds that civil or criminal charges involving the underlying incident(s) have been filed or that criminal charges have been dismissed or reduced.

15. **The Investigation Process**

All investigations should be thorough, reliable, impartial, prompt, and fair. Investigations involve interviews with all relevant parties and witnesses; obtaining available, relevant evidence; and identifying sources of expert information, as necessary. Either party may submit a written statement to the Title IX Coordinator outlining their position on the allegations.

All parties have a full and fair opportunity, through the investigation process, to suggest witnesses and questions, to provide evidence and expert witnesses (at their own expense), and to fully review and respond to all evidence on the record.

**For additional information regarding steps in the investigative process, please see Investigative Process.**

16. **Role and Participation of Witnesses in the Investigation**

Witnesses (as distinguished from the parties) who are employees or students of the MCCCD are expected to cooperate with and participate in the MCCCD's investigation and resolution process. Failure of such witnesses to cooperate with and/or participate in the investigation or resolution process constitutes a violation of this policy and may warrant discipline.

While in-person interviews for parties and all potential witnesses are ideal, circumstances (e.g., study abroad, summer break) may require individuals to be interviewed remotely. Skype, Zoom, FaceTime, WebEx, or similar technologies may be used for interviews if the Investigator(s) determine that timeliness or efficiency dictate a need for remote interviewing. MCCCD will take appropriate steps to reasonably ensure the security/privacy of remote interviews.

Witnesses may also provide written statements in addition to being interviewed.

17. **Recording of Interviews**

No audio or video recording of any kind is permitted during investigation meetings.

18. **Evidentiary Considerations in the Investigation**

The investigation does not consider:

1. incidents not directly related to the possible violation, unless they evidence a pattern;

2. the character of the parties; or

3. questions and evidence about the Complainant's sexual predisposition or prior sexual behavior, unless such questions and evidence about the Complainant's prior sexual behavior are offered to prove that someone other than the Respondent committed the conduct alleged by the Complainant, or if the questions and evidence concern specific incidents of the Complainant's prior sexual behavior with respect to the Respondent and are offered to prove consent.

19. **Referral for Hearing**

The Title IX Coordinator will refer the matter for a hearing, once the final investigative report is shared with the parties.

The hearing cannot be less than ten (10) business days from the conclusion of the investigation, when the final investigation report is made available to the Parties and the Decision-maker for review and comment, unless all parties, and the Decision-maker agrees to an expedited timeline. This agreement must be in writing.

The Title IX Coordinator will select a Decision-maker that is hired from a list of approved attorneys for any hearing held under the Title IX policy.

20. **Hearing Decision-maker Composition**

The MCCCD will designate a single decision-maker. The single Decision-maker will also be the Chair of the hearing. The Decision-maker will not have had any previous involvement with the investigation. The Decision-maker is an out-sourced position. The Decision-maker will not be an MCCCD employee. The Decision-maker will have had no previous involvement in the matter at hand.

21. **Evidentiary Considerations in the Hearing**

Any evidence that the Decision-maker determines is relevant and credible may be considered. The hearing does not consider:

1. incidents not directly related to the possible violation, unless they evidence a pattern;
2. the character of the parties; or
3. questions and evidence about the Complainant's sexual predisposition or prior sexual behavior, unless such questions and evidence about the Complainant's prior sexual behavior are offered to prove that someone other than the Respondent committed the conduct alleged by the Complainant, or if the questions and evidence concern specific incidents of the Complainant's prior sexual behavior with respect to the Respondent and are offered to prove consent.

Previous disciplinary action of any kind involving the Respondent may be considered in determining an appropriate sanction upon a determination of responsibility. This information is only considered at the sanction stage of the process.

The parties, if they so choose, may submit a written impact statement prior to the hearing for the consideration of the Decision-maker at the sanction stage of the process when a determination of responsibility is reached.

After post-hearing deliberation, the Decision-maker renders a determination based on the preponderance of the evidence--whether it is more likely than not that the Respondent violated the policy as alleged.

22. **Notice of Hearing**

No less than ten (10) business days prior to the hearing, the Title IX Coordinator will send notice of the hearing to the parties via email to the individual MCCCD-issued email address. Once emailed, notice will be presumptively delivered.

The notice will contain:

1. A description of the alleged violation(s), a list of all policies allegedly violated, a description of the applicable procedures, and a statement of the potential sanctions/responsive actions that could result.
2. The time, date, and location of the hearing and a reminder that attendance is mandatory, superseding all other campus activities. Thoroughness and fairness are the primary FOCI of any Title IX hearing process. Hearings are generally scheduled for two (2) hours, but can be extended, as needed at the discretion of the Decision-maker, to ensure that both parties are able to present the information relevant to their position. (e.g., complicated fact pattern, numerous witnesses, etc.).
3. Any technology that will be used to facilitate the hearing.
4. A list of all those who will attend the hearing, along with an invitation to object to the Decision-maker on the basis of demonstrated bias. This must be raised with the Title IX Coordinator at least two (2) business days prior to the hearing.
5. Information on how the hearing will be recorded and on access to the recording for the parties after the hearing.
6. A statement that if any party or witness does not appear at the scheduled hearing, the hearing may be held in their absence. For compelling reasons, the Decision-maker may reschedule the hearing.
7. Notification that the parties may have the assistance of an Advisor of their choosing at the hearing and will be required to have one present for any questions they may desire to ask. The party must notify the Title IX Coordinator if they do not have an Advisor, and the MCCCD will appoint one. Each party must have an Advisor present. There are no exceptions.
8. An invitation to each party to submit to the Decision-maker an impact statement. Pre-hearing that the Decision-maker will review during any sanction determination.
9. An invitation to contact the Title IX Coordinator to arrange any disability accommodations, language assistance, and/or interpretation services that may be needed at the hearing, at least seven (7) business days prior to the hearing.
10. Direction that the parties may not bring mobile phones/devices into the hearing.

Hearings for possible violations that occur near or after the end of an academic term (assuming the Respondent is still subject to this policy) and are unable to be resolved prior to the end of term will typically be held immediately after the end of the term or during the summer, as needed, to meet the resolution timeline followed by the MCCCD and remain within the 60-90 business day goal for resolution.

In these cases, if the Respondent is a graduating student, a hold may be placed on graduation and/or official transcripts until the matter is fully resolved (including any appeal). A student facing charges under this policy is not in good standing to graduate.

23. **Virtual Hearings**

All hearings will occur virtually by use of technology, specifically WebEx or Zoom technology. Each party will be located in a separate room from the Decision-maker, but will be able to see and hear each other. Witnesses will testify in the same room as the Decision-maker, but not the room where the parties and their Advisors sit. The Title IX Coordinator will arrange to use technology to allow remote testimony without compromising the fairness of the hearing.

24. **Pre-Hearing Preparation**

The Decision-maker, or designee, after any necessary consultation with the parties, Investigator(s) and/or Title IX Coordinator, will provide the names of persons who will be participating in the hearing, all pertinent documentary evidence, and the final investigation report to the parties at least ten (10) business days prior to the hearing. During the ten (10) business day period prior to the

hearing, the parties have the opportunity to review and comment on the final investigation report and available evidence.

The Decision-maker, or designee will also provide the parties a copy of the pre-hearing preparation checklist/document. A copy of the pre-hearing preparation checklist/document may be found on the MCCCD's Title IX webpage: https://district.maricopa.edu/consumer-information/title-ix/ .

25. **Hearing Procedures**

At the hearing, the Decision-maker has the authority to hear and make determinations on all allegations of sexual harassment and/or retaliation and may also hear and make determinations on any additional alleged policy violations that have occurred in concert with the discrimination, harassment, and/or retaliation, even though those collateral allegations may not specifically fall within the Title IX policy.

Participants at the hearing will include the Decision-maker, the hearing facilitator, the Investigator(s) who conducted the investigation, the parties, Advisors to the parties, any called witnesses, the Title IX Coordinator and anyone providing authorized accommodations or assistive services.

The Decision-maker will answer all questions of procedure. Anyone appearing at the hearing to provide information will respond to questions on their own behalf.

The Decision-maker will allow witnesses who have relevant information to appear at a portion of the hearing in order to respond to specific questions from the Decision-maker and the parties and will then be excused from attendance.

26. **Joint Hearings**

In hearings involving more than one Respondent or in which two (2) or more Complainants have accused the same individual of substantially similar conduct, the parties may agree to hear the allegations jointly. All parties must agree to a joint hearing. If one party does not agree, the default will be to hold the hearings separately.

In joint hearings, separate determinations of responsibility will be made for each Respondent with respect to each alleged policy violation.

27. **Refusal to Submit to Cross-Examination and Inferences**

The Decision-maker may not draw any inference solely from a party's or witness's absence from the hearing or refusal to answer cross-examination or other questions.

If charges of policy violations other than sexual harassment are considered at the same hearing, the Decision-maker may consider all evidence it deems relevant.

If a party's Advisor of choice refuses to comply with MCCCD's established rules of decorum for the hearing, MCCCD may require the party to use a different Advisor. If a MCCCD-provided Advisor refuses to comply with the rules of decorum, the Title IX Coordinator may provide that party with a different Advisor to conduct cross-examination on behalf of that party.

28. **Recording Hearings**

Hearings (but not deliberations) are recorded by MCCCD for purposes of review in the event of an appeal. The parties may not record the proceedings and no other unauthorized recordings are permitted.

The Decision-maker, the parties, their Advisors, and appropriate administrators of the MCCCD will be permitted to listen to the recording in a controlled environment determined by the Title IX Coordinator. No person will be given a copy or be allowed to make a copy of the recording.

29. **Deliberation, Decision-making, and Standard of Proof**

The Decision-maker will deliberate alone to determine, by a preponderance of the evidence, whether the Respondent is responsible or not responsible for the policy violation(s) in question. The deliberation period is not to exceed five (5) days. The Decision-maker may consider the previously submitted party impact statements in determining appropriate sanction(s), when there is a finding of responsibility as to one or more of the allegations.

The Decision-maker will ensure that each of the parties has an opportunity to review any impact statement submitted by the other party(ies). The Decision-maker may--at their discretion--consider the statements, but they are not binding.

The Decision-maker will then prepare a written deliberation statement and deliver it to the Title IX Coordinator, detailing the determination, rationale, the evidence used in support of its determination, the evidence disregarded, credibility assessments, and any sanctions. This report typically should not exceed three (3) to five (5) pages in length and must be submitted electronically to the Title IX Coordinator within two (2) business days of the end of deliberations, unless the Title IX Coordinator grants an extension. If an extension is granted, the Title IX Coordinator will notify the parties in writing of the extension.

30. **Notice of Outcome**

Using the deliberation statement, the Title IX Coordinator will prepare a Notice of Outcome, which shall include the final determination, rationale, and any applicable sanction(s). The Title IX Coordinator will then provide the Notice of Outcome to the parties and their Advisors within five (5) business days of receiving the Decision-maker's deliberation statement. The Notice of Outcome must be shared with the parties simultaneously.

Notification will be made in writing and will be mailed to the local or permanent address of the parties as indicated in official MCCCD records, or emailed to the parties' MCCCD-issued email or otherwise approved account. Once mailed, emailed, and/or received in-person, notice will be presumptively delivered.

**For more information about the Notice of Outcome Letter, please see Notice of Outcome.**

31. **Sanctions**

Factors considered when determining a sanction/responsive action may include, but are not limited to:

1. The nature, severity of, and circumstances surrounding the violation(s)
2. The Respondent's disciplinary history
3. Previous allegations or allegations involving similar conduct
4. The need for sanctions/responsive actions to bring an end to the discrimination, harassment, and/or retaliation
5. The need for sanctions/responsive actions to prevent the future recurrence of discrimination, harassment, and/or retaliation
6. The need to remedy the effects of the discrimination, harassment, and/or retaliation on the Complainant and the community
7. Any other information deemed relevant by the Decision-maker

The sanctions will be implemented as soon as is feasible, either upon the outcome of any appeal or the expiration of the window to appeal without an appeal being requested.

The sanctions described in this policy are not exclusive of, and may be in addition to, other actions taken or sanctions imposed by external authorities.

a. **Student Sanctions**

The following are the usual sanctions that may be imposed upon students or organizations singly or in combination:

1. *Warning:* A formal statement that the conduct was unacceptable and a warning that further violation of any MCCCD policy, procedure, or directive will result in more severe sanctions/responsive actions.
2. *Required Counseling:* A mandate to meet with and engage in external counseling to better comprehend the misconduct and its effects.
3. *Probation:* A written reprimand for violation of institutional policy, providing for more severe disciplinary sanctions in the event that the student is found in violation of any institutional policy, procedure, or directive within a specified period of time. Terms of the probation will be articulated and may include denial of specified social privileges, exclusion from co-curricular activities, exclusion from designated areas of campus, no-contact orders, and/or other measures deemed appropriate.
4. *Suspension:* Termination of student status for a definite period of time not to exceed two years and/or until specific criteria are met. Students who return from suspension are automatically placed on probation through the remainder of their tenure as a student at MCCCD.
5. *Expulsion:* Permanent termination of student status and revocation of rights to be on any MCCCD campus for any reason or to attend MCCCD-sponsored events.
6. *Withholding Diploma:* MCCCD may withhold a student's diploma for a specified period of time and/or deny a student participation in commencement activities if the student has an allegation pending or as a sanction if the student is found responsible for an alleged violation.
7. *Revocation of Degree:* MCCCD reserves the right to revoke a degree previously awarded from MCCCD for fraud, misrepresentation, and/or other violation of MCCCD policies, procedures, or directives in obtaining the degree, or for other serious violations committed by a student prior to graduation.
8. *Organizational Sanctions:* Deactivation, loss of recognition, loss of some or all privileges (including MCCCD registration) for a specified period of time.
9. *Other Actions:* In addition to or in place of the above sanctions, MCCCD may assign any other sanctions as deemed appropriate.

b. **Employee Sanctions**

Responsive actions for an employee who has engaged in harassment, discrimination, and/or retaliation include:

1. Warning – Verbal or Written
2. Performance Improvement/Management Process
3. Required Counseling
4. Required Training or Education
5. Probation
6. Loss of Annual Pay Increase

7. Loss of Oversight or Supervisory Responsibility
8. Demotion
9. Suspension with pay
10. Suspension without pay
11. Termination
12. Other Actions: In addition to or in place of the above sanctions, the MCCCD may assign any other sanctions as deemed appropriate.

32. **Withdrawal or Resignation While Charges Pending**

Students: If a student is a Respondent in a pending matter alleging a violation of the Title IX policy, the MCCCD may place a hold on a student's ability to graduate and/or to receive an official transcript/diploma.

Should a student decide to not participate in the resolution process, the process proceeds absent their participation to a reasonable resolution. Should a student Respondent permanently withdraw from the MCCCD, the resolution process ends, as the MCCCD no longer has disciplinary jurisdiction over the withdrawn student. A student who withdraws or leaves while the process is pending may not return to any MCCCD college. Such exclusion applies to all campuses of MCCCD. A hold will be placed on their ability to be readmitted. They may also be barred from MCCCD property and/or events.

However, MCCCD will continue to address and remedy any systemic issues, variables that may have contributed to the alleged violation(s), and any ongoing effects of the alleged harassment, discrimination, and/or retaliation.

During the resolution process, MCCCD may put a hold on a responding student's educational record that a disciplinary matter is pending.

Employees: Should an employee Respondent resign with unresolved allegations pending, the resolution process ends, as MCCCD no longer has disciplinary jurisdiction over the resigned employee. The employee who resigns with unresolved allegations pending is not eligible for rehire with any MCCCD or any campus of the MCCCD, and the records retained by the Title IX Coordinator will reflect that status. Human Resources should also be notified and make the appropriate notation on its list of people who are not permitted to be rehired.

However, MCCCD will continue to address and remedy any systemic issues, variables that contributed to the alleged violation(s), and any ongoing effects of the alleged harassment or discrimination.

All MCCCD responses to future inquiries regarding employment references for that individual will include that the former employee resigned during a pending disciplinary matter.

33. **Appeals**

Any party may file a Request for Appeal by submitting such a request in writing to the Title IX Coordinator within five (5) days of the delivery of the Notice of Outcome Letter. Once the five (5) days have passed, the matter will be deemed closed.

The request for appeal will be forwarded to the Provost or Chief Academic Officer for the MCCCD, acting as the Appeal Chair, for consideration to determine if the request meets the grounds for appeal.

a. **Grounds for Appeal**

Appeals are limited to the following grounds:

A. Procedural irregularity that affected the outcome of the matter;
B. New evidence that was not reasonably available at the time the determination regarding responsibility or dismissal was made, that could affect the outcome of the matter; and
C. An allegation that the Title IX Coordinator, Investigators, or Decision-maker had a conflict of interest or bias for or against Complainants or Respondents generally or the specific Complainant or Respondent that affected the outcome of the matter.

The Appeal Chair will deny any request for appeal that does not meet the grounds in this policy and will notify the parties and their Advisors in writing of the denial and the rationale. Denials based on lack of grounds shall be communicated to the requesting party within five (5) days of the request for appeal being received by the Appeal Chair.

If any of the grounds in the Request for Appeal meet the grounds in this policy, then the appeal chair will:

1. Notify the other party(ies) and their Advisors, the Title IX Coordinator, and, when appropriate, the investigators and/or the original Decision-maker.
2. Provide the other party(ies) and their Advisors, the Title IX Coordinator, and, when appropriate, the Investigators and/or the original Decision-maker a copy of the appeal request with the approved grounds outlined.
3. Provide the other party(ies) and their Advisors, the Title IX Coordinator, and when appropriate, the investigators and/or the original Decision-maker five (5) days to submit a response to the portion of the appeal that was approved and involves them.
4. Collect any additional information needed and all documentation regarding the approved grounds and the subsequent responses and render a decision in no more than fifteen (15) days from the date the Request for Appeal was filed, barring exigent circumstances. All decisions apply the preponderance of the evidence.
5. Prepare a Notice of Appeal Outcome letter and send it to all parties simultaneously, which includes the decision on each approved ground and rationale for each decision. The Notice of Appeal Outcome letter will also outline specific instructions for remand or reconsideration of any sanction imposed by the Decision-maker, which MCCCD is permitted to share according to state or federal law.

The Notice of Appeal Outcome letter will be mailed to the local or permanent address of the parties as indicated in official institutional records and emailed to the parties' MCCCD-issued email or otherwise approved account. Notice is presumed to have been made once the letter is emailed.

b. **Sanctions Status During the Appeal**

Any sanctions imposed as a result of the hearing are stayed during the appeal process. Supportive measures may be continued or reinstated, subject to the supportive measures procedure in Section VII of this policy.

MCCCD may still place holds on official transcripts, diplomas, graduations, and course registration pending the outcome of an appeal when the original sanctions included separation.

34. **Long-Term Remedies/Other Actions**

Following the conclusion of the resolution process, and in addition to any sanctions implemented, the Title IX Coordinator may implement additional long-term remedies or actions with respect to the parties and/or the campus community that are intended to stop the harassment, and/or retaliation, remedy the effects, and prevent reoccurrence.

These remedies/actions may include, but are not limited to:

1. Referral to community services including counseling and health services
2. Referral to the Employee Assistance Program
3. Education to the individual and/or the community
4. Permanent alteration of work arrangements for employees
5. Provision of campus safety escorts
6. Climate surveys
7. Policy modification and/or training
8. Implementation of long-term contact limitations between the parties
9. Implementation of adjustments to academic deadlines, course schedules, etc.

At the discretion of the Title IX Coordinator, certain long-term support or measures may also be provided to the parties even if no policy violation is found.

When no policy violation is found, the Title IX Coordinator will address any remedies owed by the MCCCD to the Respondent to ensure that the Respondent did not experience effective denial of educational access.

The MCCCD will maintain the privacy of any Party subject to any long-term remedies/actions/measures, provided doing so does not impair the MCCCD's ability to provide these services.

35. **Failure to Comply with Sanctions and/or Interim and Long-term Remedies and/or Responsive Actions**

All parties are expected to comply with the assigned sanctions, responsive actions, and/or corrective actions within the timeframe specified by the final Decision-maker (including the Appeal Chair).

Failure to abide by the sanction(s)/action(s) imposed by the date specified, whether by refusal, neglect, or any other reason, may result in additional sanction(s)/action(s), including suspension, expulsion, and/or termination from the MCCCD.

A suspension will only be lifted when compliance is achieved to the satisfaction of the Title IX Coordinator.

36. **Recordkeeping**

MCCCD will maintain for a period of seven (7) years records of:

1. Each sexual harassment investigation including any determination regarding responsibility and any audio or audiovisual recording or transcript required under federal regulation;
2. Any disciplinary sanctions imposed on the Respondent;

3. Any remedies provided to the Complainant designed to restore or preserve equal access to the MCCCD's education program or activity;
4. Any appeal and the result therefrom;
5. Any Informal Resolution and the result therefrom;
6. All materials used to train Title IX Coordinators, investigators, Decision-makers, and any person who facilitates an Informal Resolution process. MCCCD will make these training materials publicly available on MCCCD's website. (Note: If the MCCCD does not maintain a website, MCCCD must make these materials available upon request for inspection by members of the public.); and
7. Any actions, including any supportive measures, taken in response to a report or formal complaint of sexual harassment, including:
   a. The basis for all conclusions that the response was not deliberately indifferent;
   b. Any measures designed to restore or preserve equal access to the MCCCD's education program or activity; and
   c. If no supportive measures were provided to the Complainant, document the reasons why such a response was not clearly unreasonable in light of the known circumstances.

The MCCCD will also maintain any and all records in accordance with state and federal laws. The MCCCD will follow the destruction of records policy as outlined by the state of Arizona.

37. **Disabilities Accommodations in the Resolution Process**

MCCCD is committed to providing reasonable accommodations and support to qualified students, employees, or others with disabilities to ensure equal access to the MCCCD's resolution process. Anyone needing such accommodation should contact the Title IX Coordinator and request the accommodation. The Title IX Coordinator shall seek consultation from the college Disability Resource Services Manager (for students) or Human Resources (for employees).

38. **Mandatory Training**

This policy requires that annual training for the Title IX Coordinators, investigators, decision-makers, and any person who facilitates an informal resolution process will include:

1. the definition of sexual harassment under this policy,

2. the scope of the MCCCDs education program or activity,

3. how to conduct an investigation and grievance process including hearings, appeals, and informal resolution processes, as applicable, and

4. how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias.

Decision-makers will receive annual training on any technology to be used at a live hearing and on issues of relevance of questions and evidence, including when questions and evidence about the complainant's sexual predisposition or prior sexual behavior are not relevant.

Investigators will receive annual training on issues of relevance to create an investigative report that fairly summarizes relevant evidence.

Any materials used to train Title IX Coordinators, investigators, decision-makers, and any person who facilitates an informal resolution process, must not rely on sex stereotypes and must promote impartial investigations and adjudications of formal complaints of sexual harassment.

39. **Revision of this Policy and Procedures**

This policy and procedures supersede any previous policy(ies) addressing Title IX sexual harassment and discrimination. The policy (administrative regulation) will be reviewed and updated as needed by the Title IX Coordinator, in consultation with any other stakeholders deemed necessary by the Title IX Coordinator and upon approval by the Chancellor. MCCCD reserves the right to make changes to this document as necessary, and once those changes are posted online, they are in effect.

During the resolution process, the Title IX Coordinator may make minor modifications to procedures that do not materially jeopardize the fairness owed to any party, such as to accommodate summer schedules. District legal may also vary procedures materially with notice (on the institutional website, with the appropriate effective date identified) upon determining that changes to law or regulation require policy or procedural alterations not reflected in this policy and procedures.

If government laws or regulations change – or court decisions alter – the requirements in a way that impacts this document, this document will be construed to comply with the most recent government regulations or holdings.

This document does not create legally enforceable protections beyond the protection of the background state and federal laws which frame such policies and codes, generally.

This policy and procedures are effective August 14, 2020.

ATIXA 2020 ONE POLICY, TWO PROCEDURES MODEL.

USE AND ADAPTATION OF THIS MODEL WITH CITATION TO ATIXA IS PERMITTED THROUGH A LIMITED LICENSE

TO MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT ALL OTHER RIGHTS.

Back to Top of Policy

**AMENDED by Direct Approval from the Chancellor, September 20, 2021**
**AMENDED by Direct Approval from the Chancellor, September 16, 2020**
**ADOPTED by Direct Approval from the Chancellor, August 3, 2020**

# Exhibit 14

Robert T. Mills (Arizona Bar No. 018853)
Sean A. Woods (Arizona Bar No. 028930)
MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com
swoods@millsandwoods.com
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Tyrone Ross,<br><br>Plaintiff,<br><br>v.<br><br>Maricopa County Community College District, an Arizona public entity; Brent Cooper; Mark Woehl,<br><br>Defendants. | No. CV-25-01671-PHX-SMB<br><br>**DECLARATION OF TYRONE ROSS**<br><br>(Assigned to the Hon. Susan M. Brnovich) |

I, Tyrone Ross, declare as follows:

1. I am the Plaintiff in this action. I am over eighteen years old and have personal knowledge of the matters stated here.

2. In 2023, I filed a complaint against GateWay Community College with the U.S. Department of Education, Office for Civil Rights ("OCR"). My complaint was about how the College responded to my complaints about Brent Cooper, and about how I was treated as a Black student in the collision repair program.

3. I signed OCR's consent form on May 15, 2023. A true and correct copy is Exhibit 11 attached to Plaintiff's Controverting Statement of Facts and Statement of Additional Facts (the "PSOF"), filed concurrently with this declaration.

4. I answered OCR's written questions about my complaint. On September 12, 2023, I submitted a mediation memorandum to OCR. A true and correct copy is Exhibit 12 attached to the PSOF.

5. The District took part in mediation through OCR. At the mediation, which I believe took place around December 2023, District representatives gave me my

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014-2555
480.999.4556

Certificate of Competency. That was the first time I received it. At the mediation, the District also told me for the first time that Mr. Cooper no longer worked there.

6. I received the District's letters dated April 13, 2023 and May 17, 2023. True and correct copies are Exhibits 9 and 10 attached to the PSOF.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 13, 2026.

Tyrone Ross (Oct 13, 2026 19:27:27 PDT)

Tyrone Ross

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

# Exhibit 14 - Ross Decl

Final Audit Report 2026-10-14

| | |
|---|---|
| Created: | 2026-10-14 |
| By: | Sean Woods (swoods@millsandwoods.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAIK7Xr4nHiVdn4mE031IyI5Nt3KnLc4AR |

## "Exhibit 14 - Ross Decl" History

Document created by Sean Woods (swoods@millsandwoods.com)
2026-10-14 - 2:26:30 AM GMT

Document emailed to Tyrone Ross (rosstyrone24@gmail.com) for signature
2026-10-14 - 2:26:33 AM GMT

Email viewed by Tyrone Ross (rosstyrone24@gmail.com)
2026-10-14 - 2:26:54 AM GMT

Document e-signed by Tyrone Ross (rosstyrone24@gmail.com)
Signature Date: 2026-10-14 - 2:27:27 AM GMT - Time Source: server - Signature Appearance Selected: MOBILE_DRAW

Agreement completed.
2026-10-14 - 2:27:27 AM GMT